# Exhibit 1

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MICHAEL S. DORSI, State Bar No. 281865
KATHERINE GAUMOND, State Bar No. 349453
CAITLAN MCLOON, State Bar No. 302798
EMMANUELLE S. SOICHET, State Bar No. 290754
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorney General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-0299
 Fax:  (510) 622-2270
 E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON** | Case No. 25-cv-_____ |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **v.** | Administrative Procedure Act Case |
| **UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States, | |
| Defendants. | |

**INTRODUCTION**

1. When Congress directed the United States Environmental Protection Agency (EPA) to regulate harmful emissions from new motor vehicles, 42 U.S.C. § 7521(a), it also preempted States from setting such standards, *id.* § 7543(a). But, recognizing that California had already developed deep expertise in vehicle emissions control and that the State suffers from severe air pollution challenges, Congress directed EPA to "waive" this preemption for California, unless record evidence supports one of three limited bases for declining to do so. *Id.* § 7543(b)(1).

2. Congress's choice to allow California "to continue and expand its pioneering efforts" (pursuant to preemption waivers granted by EPA) has meant that the State "act[s] as a kind of laboratory for innovation" for vehicular emission controls, thereby advancing a core value of federalism while encouraging technological innovation for the protection of public health and welfare. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* ("*MEMA I*"), 627 F.2d 1095, 1111 (D.C. Cir. 1979); *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 386-87 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

3. This Clean Air Act waiver provision was enacted in 1967, and EPA has granted California more than seventy-five preemption waivers for updates to the State's new motor vehicle emissions control program. As Congress intended, these waivers have allowed California to "improve on 'its already excellent program,'" to foster technological advancements, and to protect Californians from harmful pollution. *See MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).

4. Between April 2023 and January 2025, EPA granted California's requests for three Clean Air Act preemption waivers, authorizing enforcement of the State's latest additions to its regulatory program, including the Advanced Clean Trucks, Advanced Clean Cars II, and Omnibus Low NOx ("Omnibus") regulations. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). Pursuant to Section 177 of the Clean

1

1    Air Act, 42 U.S.C. § 7507, other States—including Plaintiffs here—have adopted these California

2    standards as their own.

3         5.    On May 22, 2025, the Senate joined the House in adopting three Resolutions,

4    purporting to "disapprove[]" these waivers.  H.J. Res. 87, 88, 89 (119th Congress).

5    ("Resolutions").  The President signed the Resolutions on June 12, 2025.  In so doing, the Federal

6    Government "singled out" these waivers—and the underlying California regulations—for an

7    unprecedented attack, *South Carolina v. Baker*, 485 U.S. 505, 513 (1988), employing a statute—

8    the Congressional Review Act (CRA)—deemed inapplicable by every nonpartisan arbiter and

9    expert who analyzed the question.  The Plaintiff States—California, Colorado, Delaware,

10   Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and

11   Washington—challenge these unlawful Resolutions, which purport to prevent these States from

12   enforcing laws they have chosen to adopt within their jurisdictions.

13        6.    The CRA was enacted to facilitate congressional review of certain *federal agency*

14   *rules*.  5 U.S.C. § 801(a)(1)(A); *id.* § 804(3) (defining "rule").  Where it applies, it creates a

15   narrow exception to the filibuster that enables the Senate to adopt a resolution disapproving of a

16   federal agency's rule with a simple majority vote.  *Id.* § 802(d)(1).  The CRA also limits Senate

17   debate over a given resolution to a maximum of five hours per side.  *Id.* § 802(d)(2).  If a CRA

18   resolution disapproving of a federal agency's rule is enacted, the targeted rule ceases to have legal

19   effect.  *Id.* § 801(b)(1).  And "a new rule that is substantially the same … may not be issued,"

20   absent further, specific congressional authorization.  *Id.* § 801(b)(2).

21        7.    While all fifty States consented—through their Senators—to these expedited

22   procedures for congressional disapproval of *federal rules*, no State consented to the CRA as a

23   means for Congress to negate *state rules*.  Nor would any State have done so.  States do not so

24   easily surrender "the dignity … of sovereignty" they retain in our system of government.  *Alden*

25   *v. Maine*, 527 U.S. 706, 715 (1999).

26        8.    Cabining the CRA to *federal rules* is also consistent with the principle that the

27   Federal Government does not "impose its will on the States … lightly"—*e.g.*, through a process

28   with severely constrained debate.  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  To the

2

contrary, the Framers intentionally designed the Federal Government to "partake sufficiently of the spirit [of the States]" such that it would "be disinclined to invade the rights of the individual States, or the prerogatives of their governments." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 551 (1985) (quoting The Federalist No. 46, p. 332).

9.      The Federal Government ran roughshod over federalism and separation of powers principles in applying the CRA to these three preemption waiver decisions. It did so despite EPA's decades-old, consistent position—reiterated in each of the three actions at issue—that preemption waiver decisions are not "rules" and, accordingly, "the Congressional Review Act … does not apply." *E.g.*, 88 Fed. Reg. 20,688, 20,726 (Apr. 6, 2023). The Federal Government also blithely disregarded the legal conclusions of every nonpartisan arbiter upon whom Congress otherwise relies for determining the CRA's applicability—all of whom concluded that use of the CRA here would be unlawful.

10.      In fact, the CRA has never before been used in any context that resembles this one. It has certainly never been used, as it was here, to negate particular state laws.

11.      The President, his EPA Administrator, and Congressional leadership took these unprecedented steps because they saw the CRA as a quick and easy way to "take … down" California's regulations. Times of San Diego, *Republicans in Congress Are Preparing to Break Decades of Precedent to Block Climate Policy* (Feb. 27, 2025) (quoting Senator Capito).[1] They appear to have agreed with the argument that the CRA should be used—despite its obvious inapplicability—because "[w]aivers take years to roll back through the administrative process" and "ordinary legislation … would have to overcome the 60-vote filibuster in the Senate." Boyden Gray PLLC, *Buschbacher, Conde Discuss How to Overturn CA's EV Mandate in the Wall Street Journal* (Jan. 9, 2025).[2]

12.      With every step, the "workings of the National Government" failed to follow the law and likewise failed to honor the "special restraints on federal power over the States." *Garcia*, 469 U.S. at 552. The "extraordinary defects" in the "national political process" that produced these

---

[1] Available at https://perma.cc/8GQV-LQEN, last visited May 15, 2025.
[2] Available at https://perma.cc/D59T-Q7JB, last visited May 17, 2025.

1    Resolutions renders them unlawful and "invalid under the Tenth Amendment" and principles of

2    structural federalism. *South Carolina*, 485 U.S. at 512. That Congress violated separation of

3    powers principles along the way only underscores the unconstitutionality of the Resolutions.

4        13. This Court should declare that the Resolutions have no effect on the status or

5    enforceability of state emissions control programs. This Court should also require EPA to

6    implement the Clean Air Act, including Section 209(b)(3), 42 U.S.C. § 7543(b)(3), in a manner

7    consistent with the three waivers as granted.

8    **PARTIES**

9        14. Plaintiff State of California is a sovereign state in the United States of America.

10   California is represented by and through Attorney General Rob Bonta, the chief law enforcement

11   officer of California; Governor Gavin Newsom, the chief executive officer of the State; and the

12   California Air Resources Board (CARB), the state agency that developed and promulgated the

13   state regulations at issue, including the Advanced Clean Cars II, Advanced Clean Trucks, and

14   Omnibus regulations. *See, e.g.*, Cal. Code Regs., tit. 13, §§ 1961.4, 1962.4; *id.* § 1963 et seq.; *id.*

15   §§ 1956.8, 1961.2.

16       15. Plaintiff State of Colorado is a sovereign state in the United States of America.

17   Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney

18   General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat.

19   § 24-31-101 to pursue this action. Colorado has adopted the Advanced Clean Cars II (for model

20   years 2027-2032), Advanced Clean Trucks, and Omnibus regulations. *See* 5 Colo. Code Regs.

21   § 1001-24.

22       16. Plaintiff State of Delaware, represented by and through its Attorney General,

23   Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is

24   Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29

25   Del. C. § 2504. Delaware has adopted the Advanced Clean Cars II regulation. *See* 7 Del. Admin.

26   C. § 1140.

27       17. Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States

28   of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the

4

chief law enforcement officer of Massachusetts.  The Commonwealth of Massachusetts has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* 310 C.M.R. §§ 7.40(1)(c) Tbls. 1 & 2, 7.40(1)(d)(3)-(5).

18.    Plaintiff State of New Jersey is a sovereign state in the United States of America.  New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.  New Jersey has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* N.J.A.C. 7:27-29A.7; N.J.A.C. 7:27-31.4; N.J.A.C. 7:27-28A.11.

19.    Plaintiff State of New Mexico is a sovereign state in the United States of America.  New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.  New Mexico has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* 20.2.91.102 (C) New Mexico Administrative Code.

20.    Plaintiff State of New York is a sovereign state of the United States of America.  As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York.  Attorney General Letitia James is the chief law enforcement officer for New York.  New York has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* N.Y. Comp. Codes R. & Regs., tit. 6, Part 218 and Section 200.9.

21.    Plaintiff State of Oregon is a sovereign state of the United States of America.  Oregon is represented by Attorney General Dan Rayfield, who is Oregon's chief legal officer and is authorized to represent the State in this Court.  Oregon has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* Or. Admin. R. 340-257-0020 to -0095; 340-257-0200 to -0230; 340-261-0010 to -0090.

22.    Plaintiff State of Rhode Island is a sovereign state in the United States of America.  Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.  Rhode Island has adopted the Advanced Clean Cars II,

5

Advanced Clean Trucks, and Omnibus regulations.  *See* 250-RICR-120-05-37; 250-RICR-120-05-37.4(B)(1) Tbls. 1 & 2.

23.    Plaintiff State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State.  Vt. Stat. Ann. tit. 3, § 159. Vermont has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* Vt. Code R. § 12.030-040.

24.    Plaintiff State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown.  The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.  *See* Chapter 43.10 RCW.  Washington has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* Wash. Admin. Code § 173-423-030.

25.    Defendant United States is the Federal Government of the United States of America.

26.    Defendant EPA is a federal agency.

27.    Defendant Lee Zeldin is the EPA Administrator.  He is sued in his official capacity.

28.    Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

29.    This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the Constitution or laws of the United States).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and the Court may grant declaratory relief, injunctive relief, and other relief against Defendants pursuant to 28 U.S.C. §§ 2201, 2202 and the Court's equitable powers.

30.    5 U.S.C. § 805 does not strip this Court of its jurisdiction because (a) Plaintiffs challenge actions and/or determinations that fall outside the scope of that provision; (b) Plaintiffs raise constitutional issues to which that provision does not apply; and/or (c) it would be unconstitutional to apply that provision to Plaintiffs' claims.  Indeed, this case presents precisely

6

the kinds of "questions of intricacy and nicety" about federalism that the courts alone can resolve. *New York v. United States*, 505 U.S. 144, 155 (1992) (quoting The Federalist No. 82, p. 491 (C. Rossiter ed. 1961)).

31.    Venue is proper in this District under 28 U.S.C. § 1391(e) because this is a judicial district in which the State of California resides for purposes of that provision.

32.    Under Civil Local Rules 3-2(c) and 3-5(b), Plaintiffs allege that there is no basis for assignment of this action to any particular location or division of this Court.

## FACTUAL BACKGROUND

### I.    Congress Enacted the Clean Air Act Waiver Provision to Allow California's Regulatory Program to Continue with Minimal Federal Oversight

33.    From the inception of efforts to limit vehicular air pollution, California led the way. The State's "interest in pollution control from motor vehicles dates to 1946," *MEMA I*, 627 F.2d at 1109 n.26, and California's legislature mandated statewide motor vehicle emission standards beginning in the 1950s, *see* 1959 Cal. Stat. 2091.  By contrast, "[n]o federal statute purported to regulate emissions from motor vehicles until 1965." *MEMA I*, 627 F.2d at 1108; *see also* Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965).

34.    When Congress took up the mantle of federal vehicle emission regulation, it recognized both California's extraordinary air pollution challenges and the value of state-level experimentation.  Congress therefore opted to allow the State to continue and "improve on 'its already excellent program.'" *MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).  Accordingly, while it preempted other States from regulating emissions from new motor vehicles, Congress required EPA to waive that preemption for California except in narrow circumstances.  Pub. L. No. 90-148, § 208(b), 81 Stat. 485, 501 (1967).[3]  Under this waiver provision, California promulgates its own standards through a state rulemaking proceeding, determines that its state program is at least as protective as EPA's, and requests a

---

[3] The 1967 Act gave this authority to the Secretary of Health, Education, and Welfare.  In 1970, Congress transferred this authority to the Administrator of the newly created EPA.  Pub. L. No. 91-604, § 15(c)(2), 84 Stat. 1676, 1713 (1970).

7

waiver of preemption from EPA.  42 U.S.C. § 7543(b)(1); *see also* 42 U.S.C. § 7543(b)(1)(A)-(C) (identifying exclusive findings that can support EPA's denial of California's request for waiver).

35.    Consistent with the principle that Congress does not "impose its will on the States … lightly," *Gregory*, 501 U.S. at 460, the questions about whether and how to preempt state regulation of new motor vehicle emissions were heavily debated.  The precise text of the waiver provision was the subject of particularly rigorous discussion, with competing versions offered by the House and Senate.  The Senate version provided that the waiver "shall" be granted (absent certain limited findings), while the House version made waivers discretionary through the use of the word "may."  *See* 113 Cong. Rec. 30,956-57 (1967); *see also id.* at 30,950, 30,952.

36.    The Senate's use of "shall" was described as a "guarantee[]" that California could regulate, *id.* at 30,952, with the "burden … on the [agency] to show why California … should not be allowed to [do so]," H.R. Rep. No. 90-728, at 96 (1967).  By contrast, the House's use of "may" was characterized as placing California "at the mercy of" the Federal government, forcing the State "to come with hat in hand to Washington."  113 Cong. Rec. at 30,941, 30,955; *see also* H.R. Rep. No. 90-728, at 96 ("Are we now to tell California that we don't quite trust her to run her own program, that big government should do it instead?").

37.    Congress opted for "shall," 42 U.S.C. § 7543(b)(1), "consciously choos[ing] to permit California to blaze its own trail with a minimum of federal oversight," *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).[4]

38.    The decision to allow California to continue and expand its state-level program reflected a careful congressional compromise, balancing the benefits—for the State and "the entire country"—of preserving "a kind of laboratory for innovation," *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996), against automakers' fears of "having to meet fifty-one separate sets of emissions control requirements," *MEMA I*, 627 F.2d at 1109-10.  This compromise ensured that California's "government will represent and remain accountable to its own citizens," *Printz v. United States*, 521 U.S. 898, 920 (1997), while also ensuring

---

[4] In the 1970 CAA amendments, the waiver provision (originally Section 208(b)) was recodified as Section 209(b), 42 U.S.C. § 7543(b).  Pub. L. No. 91-604, § 8(a), 84 Stat. at 1694.

8

1    manufacturers must meet no more than two different sets of emission standards—California's

2    state standards and EPA's federal ones.  And, as intended, this compromise has allowed

3    California to continue addressing the "harsh reality" of the State's pollution problems using its

4    expertise in regulating vehicular emissions.  *See* H.R. Rep. No. 90-728, at 96-97 (1967); *see also*

5    S. Rep. No. 90-403, at 33 (1967).

6        39.    As part of the 1977 Clean Air Act Amendments, Congress noted with approval that

7    EPA had been readily granting waivers to California, consistent with Congress's intent.  H.R.

8    Rep. No. 94-1175 at 247 (1976); *see also MEMA I*, 627 F.2d at 1110 n.32.  Congress nonetheless

9    sought to "ratify and strengthen" the waiver provision in order "to afford California the broadest

10   possible discretion in selecting the best means to protect the health of its citizens and the public

11   welfare."  H.R. Rep. No. 95-294, at 301-02 (1977).  Specifically, Congress amended the waiver

12   provision's text, removing the original requirement that each California standard be more

13   stringent than its federal counterpart and allowing the protectiveness of the state's program to be

14   measured by viewing all the "state standards, in the aggregate."  42 U.S.C. § 7543(b)(1).

15       40.    Congress also opted to permit other States to choose to adopt "standards … identical

16   to the California standards for which a waiver has been granted" under certain conditions, 42

17   U.S.C. § 7507, thereby respecting state authority to protect residents and natural resources while

18   maintaining the commitment that manufacturers would be subject to no more than two sets of

19   standards.

20       41.    EPA has granted California more than seventy-five Clean Air Act preemption

21   waivers as the State has expanded and strengthened its requirements that manufacturers reduce

22   emissions from the vehicles they sell in the State.  *See* EPA, *Vehicle Emissions California*

23   *Waivers and Authorizations*.[5]  EPA has granted such waivers under Democratic and Republican

24   Presidents alike.  *See id.*  And these waivers are—and have been—subject to judicial review in

25   the appropriate Court of Appeals.  42 U.S.C. § 7607(b)(1).

26       42.    Among these previously granted waivers are those for California's zero-emission-

27   vehicle (ZEV) requirements for passenger cars and light trucks.  58 Fed. Reg. 4166 (Jan. 13,

28

---

[5] Available at https://perma.cc/9F5K-QC79, last visited May 14, 2025.

9

1993); 71 Fed. Reg. 78,190 (Dec. 28, 2006); 78 Fed. Reg. 2112 (Jan. 9, 2013).[6]  The State first
adopted such requirements in 1990, Cal. Code Regs. tit. 13, § 1960.1(g)(2) (1991), and has made
them increasingly more stringent over time.

43.    One of the three waivers at issue here authorized the Advanced Clean Cars II
regulation which extended and gradually strengthened California's ZEV requirements for
passenger cars and light trucks such that, by model year 2035, at least 80% of such vehicles sold
in California would be zero-emission, while the other 20% could be plug-in hybrids.  Cal. Code
Regs., tit. 13, § 1962.4(c), (e)(1)(C).  That regulation also strengthened several emission
standards for vehicles with internal combustion engines, requiring reduced emissions of fine
particulate matter and smog-forming oxides of nitrogen.  *Id.* § 1961.4.

44.    Another of the waivers at issue here authorized, *inter alia*, the Advanced Clean
Trucks regulation—designed to build on the success of the California ZEV requirements
described above by requiring gradual increases in sales of medium- and heavy-duty ZEVs
beginning with model year 2024.  Cal. Code Regs., tit. 13, § 1963.1(b).  This regulation was
adopted in 2021, and manufacturers began earning early credits for ZEV sales that year.  CARB,
*Advanced Clean Trucks Credits Summary as of March 31, 2022*.[7]  Indeed, manufacturers
"generated enough credits to meet the estimated 2024 model year compliance obligations" before
that model year even commenced.  CARB, *Advanced Clean Trucks Credit Summary through the
2023 Model Year* (May 22, 2024).[8]

45.    The third of the waivers at issue here authorized California's "Omnibus" regulation
which requires manufacturers of heavy-duty (mostly diesel-fueled) trucks to reduce smog-
forming emissions beginning with model year 2024 and then further reduce those emissions in
model year 2027 and beyond.  Cal. Code Regs., tit. 13, § 1956.8.

46.    Despite decades of progress, tens of millions of Californians live, study, work, or play
in regions that continue to experience some of the worst air quality in the Nation.  American Lung

---

[6] A zero-emission vehicle is one that—like an electric or hydrogen vehicle—has zero
tailpipe emissions of any pollutant.
[7] Available at https://perma.cc/2DHP-FUR9, last visited May 24, 2025.
[8] Available at https://perma.cc/7B5E-2RBG, last visited May 24, 2025.

10

Association, *State of the Air 2025 Report* 15-16, 18-19.[9]  The State faces particularly severe challenges to meet public health standards for ozone (or smog) and fine particulate matter.  *Id.*  The regulations covered by the waivers at issue are crucial parts of comprehensive plans to meet those public health standards and improve the air Californians breathe.  California Air Resources Board, *2022 State Strategy for the State Implementation Plan* 55, 65 (Sept. 22, 2022).[10]

47.    All of these regulations apply only in California and other States that have chosen to adopt one or more of the regulations, pursuant to the option provided by Congress in the Clean Air Act.  *See* 42. U.S.C. § 7507.

## II.    Congress Enacted the Congressional Review Act to Enhance Its Oversight of Generally Applicable *Federal Rules* and, Prior to these Resolutions, Has Only Used It for that Purpose

48.    When Republicans took control of both chambers of Congress after the 1994 midterm elections, they credited their election victory to the "Contract with America," which contained a promise to push for federal regulatory reform, including shrinking the size of the federal government.  *See* S. Rep. 104-15, at 3 (Mar. 16, 1995) (describing 1994 elections as sending "a clear message to Washington that [Americans] want a smaller, more efficient, and more effective government").

49.    Once in office, the Republican majority in the House attempted to impose a moratorium on all new federal regulations "to ensure economy and efficiency of Federal Government Operations."  H.R. Rep. No. 104-39, at 1 (Feb. 16, 1995).  That effort failed.

50.    The push for federal regulatory reform then evolved into what became known as the Small Business Regulatory Enforcement Fairness Act and the CRA, both of which were incorporated into a broader, bipartisan bill:  the Contract with America Advancement Act of 1996.  Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996).  That Act also contained an increase to the Nation's debt limit and an increase to the limit on income Social Security recipients may earn without losing benefits.  110 Stat. at 847, 875.  That broader bill passed the House by a bipartisan

---

[9] Available at https://perma.cc/G2RK-V9BM, last visited May 24, 2025.
[10] Available at https://perma.cc/X2Y9-LQ4N, last visited May 24, 2025.

11

1    vote of 328 to 91.  The House bill then passed, without amendment, by unanimous consent in the

2    Senate.  142 Cong. Rec. S3114 (Mar. 28, 1996).

3           51.    The CRA requires a "Federal agency" that has promulgated a "rule" to submit the

4    rule, along with its "proposed effective date" and other information, to Congress and the

5    Government Accountability Office (GAO) "[b]efore a rule can take effect."  5 U.S.C.

6    § 801(a)(1)(A) (emphasis added).

7           52.    Underscoring that it applies only to federal rules, the CRA defines the federal agency

8    actions to which it applies by way of the federal Administrative Procedure Act's (APA) definition

9    of "rule."  5 U.S.C. § 804(3) (cross-referencing 5 U.S.C. § 551).  The CRA then narrows the APA

10    definition by, among other things, excluding "any rule of particular applicability."  *Id.*

11           53.    Congress has 60 session days from the agency's submission to adopt a resolution to

12    disapprove a particular rule.  5 U.S.C. § 802(a).  The text of such resolutions is prescribed by the

13    statute as follows:  "That Congress disapproves the rule submitted by the __ relating to __, and

14    such rule shall have no force or effect."  *Id.*  The first blank is filled in with the agency's name

15    and the second is typically filled in with the title of the Federal Register notice announcing the

16    final rule.  *E.g.,* H.J. Res. 35 (approved Mar. 14, 2025).  After a joint resolution of disapproval, "a

17    new rule that is substantially the same … may not be issued, unless [it] is specifically authorized

18    by a law enacted after the date of the joint resolution disapproving the original rule."  5 U.S.C.

19    § 801(b)(2).

20           54.    If an agency fails to submit an action that one or more members of Congress believe

21    is a "rule" subject to the CRA, those members may ask the GAO for a determination.

22    Congressional Research Service, *The Congressional Review Act: Determining Which "Rules"*

23    *Must Be Submitted to Congress* 23 (updated Oct. 22, 2024).[11]  In that case, if the GAO concludes

24    the agency action is or is not subject to the CRA, Congress treats that conclusion as dispositive.

25    *Id.*  ("Thus, the question of whether Congress may use the CRA's fast-track parliamentary

26

27    _____

28        [11] Available at The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress | Congress.gov | Library of Congress, last visited May 21, 2025.

1  disapproval mechanism generally hinges upon the determination reached in GAO's opinion in

2  such cases.").

3    55. In the Senate, the consideration of CRA resolutions is highly expedited.  The CRA

4  creates an exception to the filibuster, so that resolutions of disapproval require only a simple

5  majority to pass.  5 U.S.C. § 802(d)(1).  And motions, amendments, and even debate are all

6  severely limited.  *Id.* §§ 802(d)(1), 802(d)(2).  Specifically, debate about the resolution and any

7  "debatable motions and appeals in connection therewith, shall be limited to not more than 10

8  hours, which shall be divided equally between those favoring and those opposing the joint

9  resolution."  *Id.* § 802(d)(2).  Although other motions are not "in order" and thus not permitted,

10  "[a] motion further to limit debate"—to less than 10 hours—"is in order and not debatable."  *Id.*

11    56. The CRA also provides that "no determination, finding, action, or omission under [it]

12  shall be subject to judicial review."  5 U.S.C. § 805.

13    57. Nothing in the CRA—or the broader Contract with America Advancement Act of

14  1996—indicates Congress was contemplating the use of the CRA to negate *state rules* or to

15  otherwise alter federal limits on state authority.  To the contrary, the text of the CRA is

16  exclusively concerned with federal rules promulgated by federal agencies.  *E.g.*, 5 U.S.C.

17  § 801(a)(1)(B) (referring to "the Federal agency promulgating the rule").  So, too, were other

18  parts of the broader bill that contained the CRA.  *E.g.*, Pub. L. 104-121, 110 Stat. at 857

19  ("fundamental changes … are needed in the regulatory and enforcement culture of Federal

20  agencies").

21    58. The absence of any mention of state rules or state authority is particularly telling

22  because Congress does not lightly exercise its power to "impose its will on the States."  *Gregory*,

23  501 U.S. at 460.  Many features of the CRA—including its constraints on debate and its barriers

24  to judicial review—are entirely inconsistent with that principle.

25    59. Moreover, the Framers intended "[t]he difficulty of legislating at the federal level …

26  to preserve room for lawmaking by governments" like States, which are "more local and more

27  accountable than a distant federal authority."  *West Virginia v. EPA*, 597 U.S. 697, 739 (2022)

28  (Gorsuch, J., concurring).  As the 1967 debate over the Clean Air Act's preemption and waiver

1   provisions indicate, had Congress contemplated that the CRA could be used to hamstring state

2   authority, that would have been the topic of fierce debate.

3       60.    Until these Resolutions, Congress had never applied the CRA to an agency action

4   outside the statute's intended and explicit scope.

5       61.    Specifically, no previous use of the CRA disapproved of a federal agency action that

6   waived preemption or otherwise authorized States to proceed with their own regulatory programs.

7   Congress has never, for example, even considered using the CRA to disapprove EPA's actions to

8   authorize States to implement permitting programs under the Clean Water Act—even when EPA

9   has "rush[ed] to transfer this permitting authority to [a State] in the final days" of a presidential

10   administration. *See Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 11 (D.D.C.),

11   *judgment entered*, 729 F. Supp. 3d 37 (D.D.C. 2024) (appeal pending). Congress has likewise

12   never even considered using the CRA to disapprove of waivers that allow individual States "to

13   test new or existing ways to deliver and pay for health care services in Medicaid and the

14   Children's Health Insurance Program (CHIP)." *See* Centers for Medicare & Medicaid Services,

15   State Waivers List.[12]

16       62.    Likewise, Congress has never considered using the CRA to disapprove federal agency

17   orders that, like these preemption waivers, permit conduct that would otherwise be prohibited.

18   For example, Congress has never considered using the CRA to disapprove of a radio spectrum

19   license, mining permit, or oil lease.

20   **III.    For Half a Century, and Regardless of Which Party Occupied the White House,**

21   **Clean Air Act Preemption Waivers Have Been Understood to Be Adjudicatory *Orders*, Not *Rules***

22       63.    The text of the Clean Air Act demonstrates that Congress has always understood the

23   difference between federal vehicle emission standards (which are federal rules) and decisions to

24   waive preemption for state vehicle emission standards (which are not). Where Congress

25   delegated rulemaking power over vehicle emissions to EPA, it directed the agency to

26   "prescribe … standards," 42 U.S.C. § 7521(a)(1), consistent with the APA's definition of rules as

27   ───────────────

28       [12] Available at https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list, last visited May 8, 2025.

1    "prescrib[ing] law," 5 U.S.C. § 551(4).  By contrast, Congress "sharply restricted [EPA's] role in

2    a waiver proceeding."  *MEMA I*, 627 F.2d at 1121.  Far from delegating rulemaking authority to

3    EPA, the waiver provision anticipates that *California* will prescribe "State standards" and

4    determine whether its standards "will be, in the aggregate, at least as protective" as EPA's.  42

5    U.S.C. § 7543(b)(1).  Thus, the waiver provision only empowers EPA to "waive application" of

6    the preemption provision to California, not to make rules.  *Id.*

7        64.    Congress confirmed as much when it omitted waiver decisions from the list of EPA

8    Clean Air Act actions to which the Act's "[r]ulemaking" requirements apply.  42 U.S.C.

9    § 7607(d)(1).

10       65.    Until its post-hoc actions challenged here, EPA had likewise consistently maintained

11   that its waiver decisions are not rules and therefore are not subject to a host of requirements that

12   apply only to rules—including Executive Order 12866, the Regulatory Flexibility Act (5 U.S.C.

13   § 601(2)), and the CRA.  This had been EPA's position through Administrations of both parties,

14   regardless of whether EPA granted a waiver request or denied it.  Thus, EPA's waiver decisions

15   have consistently specified "this action is not a rule."  75 Fed. Reg. 70,237, 70,241 (Nov. 17,

16   2010); *see also, e.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("The CRA does not apply …

17   because this action is not a rule."); 73 Fed. Reg. 12,156, 12,169 (Mar. 6, 2008) ("As with past

18   waiver decisions, this action is not a rule…").  EPA maintained this position when the first

19   Trump Administration purported to withdraw parts of a waiver EPA had granted six years earlier.

20   84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is not a rule ..., consistent

21   with its previous actions on waiver requests….").[13]

22       66.    The GAO—the entity on which Congress relies for CRA applicability

23   determinations—has agreed.  When asked by members of Congress whether a 2022 waiver action

24   was a "rule" subject to the CRA, the GAO concluded that the action "meets the statutory

25   definition of an order," rather than a rule.  GAO Decision B-334309, *Environmental Protection*

26   _____
     [13] This Federal Register notice was submitted to the Office of Management and Budget
27   under Executive Order 12866, and to Congress and the GAO for CRA consideration, because it
     contained a separate action by the National Highway Traffic Safety Administration that was a
28   "rule."  84 Fed. Reg. at 51,352, 51,353.  By contrast, EPA repeatedly reaffirmed its position that
     the waiver portion of the notice was not a rule.  *Id.* at 51,352, 51,353, 51,360.

                                        15

*Agency—Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act Waiver of Preemption* 5 (Nov. 30, 2023) (Exh. A).  Specifically, the GAO determined that a waiver decision "mak[es] a 'final disposition' granting California a 'form of permission' which meets the definition of order under APA."  *Id.* (quoting 5 U.S.C. § 551(6), (8), (9)).

67.     Members of both the Senate and the House also indicated—as recently as last year—that they understood that EPA's preemption waiver decisions are not rules.  When he introduced a bill to repeal the Clean Air Act's waiver provision, in September 2024, Senator Mike Lee expressly acknowledged that Clean Air Act preemption waivers "cannot be reviewed under the Congressional Review Act (CRA)" because they are not "rule[s] as that term is defined in the CRA."  Mike Lee, *Stop CARB Act One Pager* (118th Congress) (emphasis omitted).[14]  That bill—S.5038, 118th Cong. (2024)—had five co-sponsors in the Senate.[15]  Representative Troy Nehls likewise acknowledged that "none of [California's waivers] are subject to congressional review" when he introduced the companion bill in the House.  Rep. Troy Nehls Introduces the Stop CARB Act (Sept. 12, 2024).[16]  That bill—H.R. 9574, 118th Cong. (2024)—had nine co-sponsors in the House.[17]

68.     Consistent with those understandings (including its own longstanding view), EPA did not follow rulemaking procedures when considering these California waiver requests.  It did not, for example, issue a proposed rule, or even a proposed disposition of California's request, when it solicited public comment.  Instead, EPA followed its traditional practice, providing notice to the public that it had received a waiver request from California and would provide "opportunity for public hearing and comment" on the three findings the waiver provision empowers EPA to make.  *E.g.*, 88 Fed. Reg. 88,908, 88,909 (Dec. 26, 2023).

69.     When it finalized the waiver decisions at issue here, EPA reiterated its longstanding position that "the Congressional Review Act, 5 U.S.C. 801 et seq., … does not apply because this

---

[14] Available at https://perma.cc/LNG5-45AW, last visited May 4, 2025.
[15] *See* https://www.congress.gov/bill/118th-congress/senate-bill/5038/cosponsors.
[16] Available at https://perma.cc/55TB-737M, last visited May 4, 2025.
[17] *See* https://www.congress.gov/bill/118th-congress/house-bill/9574/cosponsors.

1   action is not a rule, for purposes of 5 U.S.C. 804(3)." *E.g.*, 88 Fed. Reg. 20,688, 20,726 (Apr. 6,

2   2023).

3       70.    EPA did not submit these waivers to Congress when they were published in the

4   Federal Register—one in April 2023 and two in January 2025.  Any member of Congress could

5   have asked the GAO to determine whether these unsubmitted actions were rules subject to the

6   CRA.  No member of Congress did so.

7   **IV.    The Trump Administration Implements a CRA Playbook, Without Providing**
    **       Any Legal Rationale and Without Any Administrative Process**

8

9       71.    President Trump took aim at parts of California's vehicle emission program, from the

10  very beginning of his second term.  He signed a day-one Executive Order that declared "state

11  emissions waivers that function to limit sales of gasoline-powered automobiles" should be

    "terminat[ed]."[18]

12      72.    That Executive Order directed federal agencies (including EPA) to "identify …

13  agency actions … inconsistent with" the Order and to "develop and begin implementing action

14  plans to suspend, revise, or rescind all [such] agency actions."  *Id.*  Thus, at the outset, it appeared

15  that the Trump Administration intended to take administrative action to rescind certain waivers

16  (or parts thereof), as the first Trump Administration had done.  *See* 84 Fed. Reg. 51,310 (Sept. 27,

17  2019) ("EPA announces its decision to withdraw the waiver" for certain California emission

18  standards).

19      73.    The Administration changed course on February 14, 2025, when President Trump and

20  EPA Administrator Zeldin "announced in the Oval Office … that the EPA [would] transmit[] to

21  Congress," for CRA consideration, the three waiver decisions at issue.[19]  In so doing, the

22  President and EPA Administrator appeared to be following a playbook as to "how the incoming

23  Trump administration" could use the CRA to "stop" the State's efforts to reduce vehicular

24  pollution, without following "the administrative process" which could "take years" and without

25

26  _____
        [18] *Unleashing American Energy* Executive Order (Jan. 20, 2025), available at
    https://perma.cc/33NL-LQKE, last visited May 5, 2025.

27      [19] EPA, *Trump EPA to Transmit California Waivers to Congress in Accordance with
    Statutory Reporting Requirement* (Feb. 14, 2025), available at https://perma.cc/GDF5-HVM2, last

28  visited May 5, 2025.

1    employing "ordinary legislation [which] would have to overcome the 60-vote filibuster in the

2    Senate." *See supra* n.2.

3        74.    The Administration's announcement provided no explanation for EPA's about-face

4    from its longstanding prior position that waiver decisions are not rules, much less rules of general

5    applicability subject to the CRA. *See supra* n.19.  Indeed, the announcement did not even

6    acknowledge that EPA had always treated waiver decisions as adjudicatory orders, including in

7    the very actions at issue. *See id.*  Nor did EPA provide any public process leading up to the

8    announcement of the purported reclassification of these waivers from orders to rules.

9        75.    The Administration's announcement likewise did not explain how the submission of

10   these waiver decisions was consistent with the CRA, given that all of the waivers had already

11   "take[n] effect" and one of the waivers had been published in the Federal Register almost two

12   years earlier. *See* 5 U.S.C. § 801(a)(1)(A).

13       76.    Nonetheless, some members of Congress indicated they, too, were prepared to follow

14   the CRA playbook (again without establishing the statute's applicability), responding to the

15   Administration's announcement by asserting that "the Trump EPA's" submission of "these

16   waivers, [would give] Congress the opportunity to reject California's effort to impose its EV

17   mandate on all Americans."[20]  The only "rules" referenced were California's *state rules*, not

18   federal ones, and these statements failed to acknowledge that California's regulations only apply

19   in California (and other States that so choose), much less to accurately describe California's

20   regulations, including the many provisions that require reduced emissions from gasoline- or

21   diesel-fueled vehicles.

22       77.    EPA then submitted the three waivers at issue to the GAO and Congress on February

23   19, 2025.  *See* GAO Letter B-337179, *Observations Regarding the Environmental Protection

24   *Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules

25   *Under the Congressional Review Act* 1 & n.1 (March 6, 2025) (Exh. B).  Neither EPA nor the

26

27   _____

        [20] @EPWGOP, X, https://perma.cc/5WMM-DQVJ (Feb. 14, 2025), last visited May 11,
28   2025.

President made that submission public, although Administrator Zeldin claimed EPA was taking this action to "transparently correct[]" prior errors.  *See supra* n.19.

## V.  The GAO Determines (Again) that Waiver Decisions Are Not Subject to the CRA

78.  Upon receipt of EPA's submission, the GAO observed that the waiver "notices themselves stated that CRA did not apply" and that EPA had not explained "why the agency was submitting the notices under the CRA."  Exh. B at 2, 6.  In fact, EPA's February 19 submission described the waiver decisions as "actions" and "Notice[s] of Decisions," rather than rules.  The GAO thus "reached out to EPA on February 20, 2025, for clarification."  *Id.* at 2.

79.  On February 21, 2025, three Senators—including both Senators from California—requested that the GAO provide its legal opinion about whether these three waivers were rules subject to the CRA.  *See id.* at 1.

80.  On February, 25, 2025, the GAO followed up on its initial outreach to EPA, sending "a formal letter … seeking factual information and the agency's legal views on this matter."  *Id.* at 2.  EPA "resubmitted the Notices of Decision to GAO on February 27, 2025" but "still did not address the statements in the notices regarding the inapplicability of the CRA."  *Id.*

81.  Some members of Congress welcomed EPA's submission but, like EPA, failed to articulate a legal basis for treating waiver decisions as rules.  Rather, they asserted that the agency's submission—by itself—could transform into *rules* these actions that had been considered and finalized by EPA as *orders*:  "Once they submitted it to us, it's a rule. … [And] we can take it down."  Times of San Diego, *Republicans in Congress Are Preparing to Break Decades of Precedent to Block Climate Policy* (Feb. 27, 2025) (quoting Senator Capito).[21]

82.  On March 5, 2025, EPA submitted a revised version of its report to Congress.  In this version, EPA altered the labels it applied to the waiver decisions, referring to them as "final rules," instead of "actions" or "Notice[s] of Decision" as in the initial February 19 report.  EPA still provided no explanation for the change.

---

[21] Available at https://perma.cc/9VHE-RTB4, last visited May 11, 2025.

83.     On March 6, 2025, the GAO issued its legal analysis, concluding (as before) that waiver actions are not subject to the CRA.  Exh. B at 9.  Again, the GAO concluded that these three waiver decisions meet "the APA definition of an order," not of a rule, because they make preemption determinations—i.e., "'final disposition[s]' granting California a 'form of permission' as described in the APA definition" of "order."  *Id.* at 6 (quoting 5 U.S.C. § 551(6)).

84.     The GAO also reiterated its prior conclusion that, even if waiver decisions were rules, they would still not be subject to the CRA because they are not rules of general applicability. Instead, the GAO concluded, waiver decisions "concern[] a specific entity—California—and address[] a statutory waiver specific to California's [program]."  *Id.*

**VI.    Congressional Leadership Considers Moving Forward with the Resolutions, Despite GAO's Determination that the CRA Was Inapplicable**

85.     About a month later, and despite the GAO's reaffirmation that the CRA does not apply to Clean Air Act preemption waivers, members of the House introduced the Resolutions—each targeting one of the three preemption waivers at issue.  H.J. Res. 87, 88, 89 (introduced April 2, 2025).

86.     Some Senate leaders also signaled an interest in disregarding the GAO's determination.  For example, Senator Capito—Chairman of the Senate Committee on Environment and Public Works—responded to the GAO's determination by stating "that these waivers are rules, and subject to a resolution of disapproval under the Congressional Review Act."  Alex Nieves, *There's hope for the waivers still* (Mar. 20, 2025).[22]

87.     No legal justification for using the CRA was provided, however.  No public statements identified any errors in the GAO's reasoning or otherwise articulated a legal rationale for concluding that these waivers fit the statutory definition of a rule (or were generally applicable).

88.     Meanwhile, industry advocates—including those who first publicized the CRA playbook—maintained that the GAO's determination and, indeed, the statutory definition of "rule," were all irrelevant.  Buschbacher & Conde, *Congress Has the Authority to Review EPA*

---

[22] Available at https://www.politico.com/newsletters/california-climate/2025/03/20/theres-hope-for-the-waivers-still-00242123, last visited May 11, 2025.

*"Waivers" of Clean Air Act Preemption*, Yale J. Reg. (Mar. 5, 2025) (arguing "that the CRA's text … do[es] not bind").[23]  Under that view, the only thing that mattered was EPA's submission of the waiver decisions to Congress because "the CRA gives Congress unchallengeable power to invalidate any action that an agency submits for review."  *Id.*

## VII.  The Senate Parliamentarian Also Concludes that these Waiver Decisions Are Not Properly Subject to the CRA

89.    The question of the CRA's applicability was then presented to the Senate Parliamentarian, "the sole definitive arbiter[] of the CRA parliamentary mechanism" in that chamber.  Congressional Research Service, *The Congressional Review Act (CRA):  Frequently Asked Questions*, 18 (Updated Nov. 12, 2021);[24] *see also* Jonathan S. Gould, *Law Within Congress*, 129 Yale L. J. 1946, 1959 (2020) ("The parliamentarians are the primary interpreters of the rules governing Congress.").

90.    After hearing arguments on both sides, the Senate Parliamentarian agreed with the GAO that waiver decisions are not subject to the CRA.  Although her decision was not made public, it was widely reported as occurring on April 4, 2025.  Lisa Friedman, *Republican Plan to Kill California's E.V. Policies Hits Senate Snag* (April 4, 2025).[25]

91.    That should have been the end of it because "in the ordinary course of business, Congress's procedural rules—and the parliamentarians' interpretations of those rules—are as good as binding."  *Law Within Congress* at 1958.  Senate Majority Leader John Thune had agreed as recently as January 2025, responding to questions about possibly overriding the Senate Parliamentarian with "[w]e can't go there."  Russell Payne, *The Senate parliamentarian could block some of Trump's agenda — and be a scapegoat for Republicans* (January 9, 2025).[26]

92.    But some members of Congress remained intent on using the CRA to invalidate these three waivers.  Indeed, some immediately started "weighing whether to defy the parliamentarian [in order to] to reject California's plans…."  Kelsey Brugger, *Senators weigh next moves on*

---

[23] Available at https://perma.cc/C8V5-9KFY, last visited May 11, 2025.
[24] Available at https://www.congress.gov/crs-product/R43992, last visited May 21, 2025.
[25] Available at https://www.nytimes.com/2025/04/04/climate/california-ev-waiver-senate.html, last visited May 22, 2025; *see also* https://perma.cc/A47L-KQEJ, last visited May 21, 2025.
[26] Available at https://perma.cc/B8K5-CLCZ, last visited May 10, 2025.

21

*California clean car rules* (April 10, 2025).[27]  The attack continued to focus on the parts of California's program that allegedly "ban gas-powered cars and trucks," again failing to acknowledge that other parts of the state program were authorized by these waivers.  *See supra* n.26.

## VIII. Congress Adopts the Resolutions, Flouting the GAO and Parliamentarian's Rulings

93.    Despite the GAO and Senate Parliamentarian determinations, House members proceeded to introduce the Resolutions targeting the three California waivers at issue.  Kelsey Brugger, *House plows ahead with assault on California EPA waivers* (Apr. 4, 2025).[28]  The public statements around this action again failed to address the fact that state emission regulations only apply in States that have chosen to adopt them.  *Id.* ("The American people should choose what vehicle is right for them, not California bureaucrats.").  These statements likewise failed to reconcile claims about the impacts of these waivers with EPA's position—in the very reports it submitted to Congress—that these were not "major rules," meaning EPA did not expect these waiver decisions to cause "major increase[s] in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions" or "significant adverse effects on competition, employment, investment, productivity, [or] innovation."  *See* 5 U.S.C. § 804(2).

94.    The only explanation provided by House members for departing from the practice that "the GAO … has historically decided what can be considered a rule under the CRA" was the fact that EPA submitted the waivers to Congress.  *Id.* ("'By submitting the three California waivers to Congress, Administrator Zeldin is ensuring that Congress has oversight of these major rules that impact every American,' [Energy and Commerce Chair] Guthrie said."); *see also Chairman Guthrie, Vice Chairman Joyce, and Energy and Commerce Republicans Introduce Legislation to Stop California EV Mandates.*[29]

---

[27] Available at https://perma.cc/SX9T-AAQK, last visited May 11, 2025.
[28] Available at https://perma.cc/AD9Z-P7W7, last visited May 11, 2025.
[29] Available at https://perma.cc/3UAM-QWWL, last visited May 21, 2025.

22

95.    The House later voted to adopt all three Resolutions, targeting the Advanced Clean Trucks and Omnibus waivers on April 30, 2025, and the Advanced Clean Cars II waiver on May 1, 2025.  Camila Domonoske, *The House Strikes a Blow Against California in the Fight over EVs* (May 1, 2025).[30]

96.    No member or committee of the House provided any legal rationale for concluding that waiver decisions are federal agency rules of general applicability that could be subject to the CRA.  Nor did any members of the House who had previously expressed the opposite view explain their change of position.  Instead, after the House votes, the sponsors of the Resolutions continued to attribute Congress's ability to use the CRA here solely to the actions of the Executive Branch.  *E.g.*, Congressmen Brett Guthrie, John Joyce, John James, and Jay Obernolte, *How Congress Is Fighting Biden's Disastrous EV Mandate* (May 2, 2025).[31]

97.    At least one press outlet described the House's decision to "hold[] the votes anyway"—despite the GAO and Senate Parliamentarian determinations—as "demonstrating that they are willing to carry out their agenda regardless of whether the nonpartisan arbiter deems them legal."  Rachel Frazin, *House votes to overturn California gas car ban — again defying internal watchdog.*[32]

98.    Leaders in the Senate also ultimately decided to proceed with votes on the Resolutions, disregarding GAO's legal conclusion and overriding the Senate Parliamentarian's determination that the CRA was inapplicable.  E&E News, *Senate GOP Plots Demise of California Clean Car Rules* (May 20, 2025).[33]  Yet again, the announcements provided no basis for any disagreement with the GAO and Parliamentarian's legal conclusions.

99.    In justifying the decision to "defy the chamber's parliamentarian," Senate Majority Leader Thune asserted that "'widespread effects'" make preemption waivers rules, without reference to the definition of a rule, without acknowledging that any "widespread effects" result from choices by *state governments*, and without explaining how waiver decisions do anything

---

[30] Available at https://perma.cc/63NY-2KR9, last visited May 21, 2025.
[31] Available at https://perma.cc/DUL5-3VQS, last visited May 21, 2025.
[32] Available at https://perma.cc/W7UY-CLGA, last visited May 11, 2025.
[33] Available at https://perma.cc/PKF2-4386, last visited May 22, 2025.

23

1    other than dispose of a request from California.  *Id.*  Senate Majority Whip John Barrasso

2    likewise focused on alleged nationwide effects (and ignored the conventional vehicle provisions

3    of these state regulations), claiming California's laws would somehow "force-feed electric

4    vehicles to every man and woman who drives in this country."  *Id.*

5        100.   When Senate Majority Leader Thune announced that he would override the

6    Parliamentarian's decision and proceed with the Resolutions, he did not explain how the Senate

7    would do so, underscoring the unprecedented nature of this step.  *See id.* ("It's a little early to

8    sketch and lay that out.  But we have a process.  We're moving forward.").

9        101.   The process to end-run the Parliamentarian became clear two days later when—on an

10   unrelated CRA resolution concerning a Department of Transportation (DOT) safety rule—Senate

11   Majority Leader Thune introduced a point of order for the Senate to determine "that points of

12   order are in order under the Congressional Review Act given sections 802(d)(1), 802(d)(2), and

13   802(d)(4) are in conflict with one another."[34]  That point of order was agreed to by a vote of 51 to

14   46.

15       102.   Notably, section 802(d)(1) provides that "all points of order against the joint

16   resolution (and against consideration of the joint resolution) are waived," meaning no such points

17   of order are permitted as to CRA resolutions.  5 U.S.C. § 802(d)(1).  The passage of Senator

18   Thune's point of order purported to change that and make any point of order permissible.

19       103.   That change was necessary only to allow Senate Majority Leader Thune to introduce

20   a second point of order—one that would presumably have been impermissible without approval

21   of the first.  This second point of order sought to establish that "Joint Resolutions that meet all the

22   requirements of Section 802 of the Congressional Review Act [are] entitled to expedited

23   procedures under the Congressional Review Act."  *See supra* n.34 ("Recent Floor Activity").

24   _____

25        [34] *See* Recent Floor Activity, May 21, 2025, *available at* https://perma.cc/4RK3-L4ZU,
     last visited May 23, 2025.  "Points of order" are the mechanism by which "Senators may enforce
26   the Senate's legislative rules and precedents."  Congressional Research Service, *Points of Order,
     Rulings, and Appeals in the Senate* 1 (updated Nov. 15, 2018), available at Points of Order,
27   Rulings, and Appeals in the Senate | Congress.gov | Library of Congress, last visited June 8,
     2025.  When a member "believe[s] that one of those rules or precedents is, or is about to be,
28   violated," they introduce a point of order to obtain a decision whether or not the action of another
     member would violate or have violated the Senate's internal rules.  *Id.*

Under this second point of order, the Senate could proceed to consider and vote on joint resolutions so long as a federal agency had submitted a report to Congress declaring that its action was a "rule," regardless of whether the GAO and Senate Parliamentarian had concluded otherwise. In other words, the purpose of Majority Leader Thune's second point of order was to change the trigger for the Senate's CRA procedures so that agency submission alone sufficed, effectively rendering the statutory definition of "rule"—and any Senate Parliamentarian determinations concerning applicability of that definition—irrelevant.

104. As Senator Whitehouse, the Ranking Member of the Senate Environment and Public Works Committee, noted "[t]he purpose" of these points of order was to "allow[] a bypass of the Parliamentarian's decision" that it was unlawful to apply the CRA to Clean Air Act preemption waivers because they are not rules subject to the CRA. 117 Cong. Rec. S3025 (May 21, 2025) (Exh. C).

105. Indeed, these points of order had no other purpose—and seemingly no other effect—other than to evade the CRA's express limitations that make it applicable only to certain federal rules. Neither point of order was necessary for the proceeding into which the points of order were introduced—the proceeding concerning the DOT CRA resolution. In other words, the Senate Majority Leader introduced impermissible and entirely unnecessary points of order into the Senate's consideration of the DOT CRA resolution solely to enable the Senate to later vote on the EPA waiver Resolutions without having to directly address the Parliamentarian's contrary determination.

106. The Presiding Officer—Senator Capito—confirmed the point when the Senate proceeded to consider the Resolutions concerning the preemption waivers. She explicitly stated that the Senate could only do so "[p]ursuant to the precedent just established by the Senate"—i.e., the second point of order just approved during proceedings concerning the DOT resolution. 117 Cong. Rec. S3052 (May 21, 2025) (Exh. C).

107. Those in favor of the Resolutions continued to mischaracterize California's regulations and the waivers that authorized them. For example, Senate Majority Whip Barrasso asserted that "the Biden administration gave California—the liberal State of California—

25

1  permission to export its far-left electric vehicle mandate to the entire country."  117 Cong. Rec.

2  S3017 (May 21, 2025) (Exh.C); *see also, e.g.*, *id.* at S3086-87 (Senator Capito inaccurately

3  describing Advanced Clean Cars II as an "EV mandate").  All of these statements made clear that

4  the regulatory requirements disfavored by the speakers were those designed and promulgated *by*

5  *California*.  No regulatory requirement designed or promulgated by any federal agency was ever

6  identified.

7      108.  Those in favor of the Resolutions also made clear they were relying on the

8  "submission by the Trump EPA" as the sole basis for application of the CRA's expedited

9  procedures.  117 Cong. Rec. S3087 (May 21, 2025) (Senator Capito describing agency

10  submission as sufficient to "trigger[] my right as a Senator to introduce this resolution to block

11  California's EV mandate") (Exh. C); *see also id.* at S3088 (repeatedly using the phrase "Agency-

12  submitted rules" rather than simply "rules").  Indeed, Senate leadership exclusively credited

13  "President Trump and EPA Administrator Lee Zeldin … submitting the approved California

14  waiver[s]" for the opportunity to use the CRA and to enact the Resolutions.  *Id.* at S3807.

15      109.  As noted, that was the full purpose and effect of Senate Majority Leader Thune's

16  second point of order:  to allow the Senate to proceed on the Resolutions simply because EPA

17  submitted CRA reports concerning the waiver decisions, without regard to EPA's express, prior

18  conclusions in the Federal Register notices or the independent determinations of the GAO and

19  Senate Parliamentarian that these waiver decisions are not rules, and without any congressional

20  finding that these EPA actions are rules actually subject to the CRA.  *See also* 117 Cong. Rec.

21  S3106 (May 22, 2025) (Exh. D) ("Before dinner yesterday, these bills to gut California's Clean

22  Air Act authority were recognized as regular bills, subject to the filibuster rule requiring 60 votes

23  to move forward, open to full debate and amendments, but somehow, after dinnertime yesterday,

24  once Senate Republicans were done with overruling the Parliamentarian, these bills were now not

25  subject to the filibuster.").

26      110.  Nonetheless, throughout the Senate proceedings, advocates for the Resolutions

27  continued to acknowledge that, by its plain terms, the CRA "applies only to allow for disapproval

28  of Federal Agency rules and only during a prescribed time defined by the statute."  117 Cong.

26

Rec. S3088 (May 21, 2025) (Exh. C). They also described the expedited Senate procedures as established "by law," *id.* at S3087, although they had purported to alter the trigger for those procedures by a mere point of order.

111. The next day, May 22, 2025, the Senate voted on each of the Resolutions and passed all three with votes of 51-45 (H.J. Res. 87, Advanced Clean Trucks), 51-44 (H.J. Res. 88, Advanced Clean Cars II), and 49-46 (H.J. Res. 89, Omnibus).

112. EPA "hail[ed]" the Resolutions with a press release indicating that President Trump would sign them and again mischaracterizing the California regulations as an "EV Mandate." EPA, *EPA Hails Congressional Disapproval of Biden EPA's California EV Mandate Rule* (May 22, 2025).[35] EPA described the Resolutions as "maintaining a consistent national approach to vehicle standards"—an approach the Clean Air Act explicitly rejects—and as preventing a "single state" from imposing "its radical agenda." *Id.*

113. The President signed the Resolutions on June 12, 2025.

## CLAIMS FOR RELIEF

### COUNT I
*Ultra Vires* – Conduct in Excess of Statutory Authority
(Against All Defendants)

114. Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

115. No statute empowers any of the Defendants to intentionally utilize a statute that is inapplicable to these waiver decisions—as declared on the face of the actions—simply because it provides a faster or easier, but unlawful, means to a desired end.

116. Certainly, no statute empowers Defendants to reclassify agency actions from adjudicatory orders into rules after the actions are final and the agency proceedings are complete. Nor does any statute empower any of the Defendants to take such actions without any public process and without providing any explanation or justification for the reclassification.

---

[35] Available at https://perma.cc/WW4C-Z4P7, last visited May 23, 2025.

117.   Yet, that is precisely what President Trump and Administrator Zeldin purported to do by fiat in their February 14, 2025 Oval Office announcement and press release.  Their post-hoc reclassification of these three waiver decisions from adjudicatory orders to rules was ultra vires.

118.   That reclassification was the sole basis for the submission of these waivers to Congress as "rules" subject to the CRA.  The submission was also ultra vires because it had no lawful premise and because no statute empowers Defendants to recharacterize, much less mischaracterize, agency actions to Congress.  Nor does any statute empower Defendants to do so after the agency action has gone into effect.

119.   Defendants took these ultra vires actions to provide a pretextual basis for the use of the CRA to disapprove adjudicatory orders granting the three waivers at issue, and the Resolutions would not have been enacted without that pretextual basis.  The Resolutions thus "stand[] or fall[] on the validity of the" actions taken by the President, EPA, and its Administrator.  *See INS v. Chadha*, 462 U.S. 919, 938 (1983).

120.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants reclassification and submission actions were *ultra vires* and the resulting Resolutions are unlawful, void, and of no effect.

121.   Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect and from taking similar actions as to other Clean Air Act adjudicatory orders.

### COUNT II
### Violation of the Administrative Procedure Act
### (Against the United States, EPA and Its Administrator)

122.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

123.   Congress "enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (internal quotation marks and citation omitted).

28

124.   EPA is an "agency" as defined in 5 U.S.C. § 551(1).  Both the agency and its Administrator must follow the APA when it applies.

125.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

126.   In carrying out the purported reclassification of these adjudicatory orders into rules (and the follow-on submission to Congress), EPA and its Administrator ("EPA Defendants") failed to observe the procedures required by law and took arbitrary and capricious actions that contravened core principles of reasoned decision-making.

127.   Indeed, they followed no procedure at all.  Administrator Zeldin simply referred to the waiver decisions as "rules" in a press release.  That does not suffice to reclassify an action after it was finalized pursuant to the opposite view.  *See supra* n.19.  Agencies cannot supplant earlier conclusions with "impermissible post hoc rationalization," *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908 (2020) (internal quotation marks and citation omitted), much less can they do so by way of unsupported references in a press release, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  That the challenged agency actions—the reclassification and submission—were taken without *any* process and without acknowledgment, let alone explanation, for the change in position renders them unlawful—particularly given States' reliance on these waivers to protect public health and welfare.  *Id.*

128.   All of the EPA Defendants' actions were predicated on a new (albeit implicit) interpretation of the APA term "rule," but that interpretation is contrary to the statute's text.  EPA's waiver decisions do not "implement, interpret, or prescribe law or policy" as rules do.  5 U.S.C. § 551(4).

129.   That is clear from the nature of waiver proceedings which, pursuant to the Clean Air Act's text, do not begin with notices of proposed rulemaking.  Rather, by congressional design, a waiver proceeding commences with a request from California that includes a finding that the

29

State's new motor vehicle emission standards "will be, in the aggregate, at least as protective of public health and welfare" as EPA's federal standards. 42 U.S.C. § 7543(b)(1). EPA must then grant California's waiver request, unless evidence supports one of three factual determinations that could support a denial. *Id.* § 7543(b)(1)(A)-(C).

130. In contrast with its power to "prescribe" federal vehicle emission standards under a separate provision of the Clean Air Act (42 U.S.C. § 7521(a)(1)), EPA's role "in a waiver proceeding" is thus "sharply restricted." *MEMA I*, 627 F.2d at 1121. EPA does not determine the pollutants to be regulated, the stringency of the standards, or the speed with which standards increase in stringency. California makes all those choices in a state rulemaking proceeding, before it submits a waiver request to EPA. For its part, EPA determines only whether any "parties favoring denial of the waiver" have met their evidentiary burden to obtain that result. *Id.*

131. Put another way, it is California's actions here (not EPA's) that are "designed to prescribe law"—namely, the emission standards and other requirements vehicle manufacturers must meet in the State. 5 U.S.C. § 551(4) (defining "rule"). EPA issues an "order" as "a final disposition" of California's request; and that order—like a licensing decision—either grants or denies California permission to engage in a course of conduct (i.e., enforcement of its regulatory program). *Id.* §§ 551(6) (defining "order" and including "licensing"), 551(8) (defining "license").

132. The EPA Defendants' APA violations provided a pretextual basis for the use of the CRA by the United States to disapprove these waivers, and the Resolutions would not have been enacted without that pretextual basis. The Resolutions thus "stand[] or fall[] on the validity of the" actions taken by the EPA Defendants. *See Chadha*, 462 U.S. at 938.

133. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the reclassification and submission actions, and the resulting Resolutions, are unlawful, void, and of no effect.

134. Pursuant to 5 U.S.C. § 706, Plaintiffs are entitled to vacatur of EPA Defendants' reclassification and submission actions.

135. Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect.

30

**COUNT III**
**Violation of the Congressional Review Act**
**(Against All Defendants)**

136. Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

137. By its own plain terms, the CRA does not apply to these waiver decisions because EPA's waiver actions are orders, not rules, as defined by the APA (and incorporated in the CRA). And, even if waiver decisions were rules, they would still not be rules of general applicability that would be subject to the CRA. Until its post-hoc change of position here, EPA consistently maintained that waiver decisions are adjudicatory orders that dispose of California's requests. It reiterated that position in each of the three final orders here.

138. Based on EPA's longstanding position (affirmed by the GAO) that these waiver decisions are adjudicatory orders, not rules, EPA did not submit these waiver decisions to Congress when it issued the orders. Notably, no member of Congress sought a determination from the GAO that these decisions were rules, rather than adjudicatory orders. In other words, no member of Congress sought to apply the CRA to these waiver decisions when the decisions issued, although these decisions took effect upon issuance and the CRA is expressly intended to apply before a rule takes effect.

139. When Defendants later changed positions and declared these decisions were rules subject to the CRA, they never explained why. Most notably, Defendants identified no errors in the legal analysis provided in the GAO's 2023 determination that an earlier waiver decision was not a rule subject to the CRA, although Congress had relied on that determination at the time by declining to take up resolutions of disapproval.

140. The GAO and the Senate Parliamentarian—the nonpartisan arbiters that advise Congress on the CRA's applicability—concurred with the position EPA announced in these waiver decisions: they are not rules and are, therefore, outside the scope of the CRA.

141. The CRA's plain terms—the terms to which all fifty States consented—cabin its use; and that purported use was unlawful here. Indeed, there was no "reasonable relation between the

31

mode or method of proceeding"—i.e., the CRA—"and the result which [the Federal Government]

sought" here—i.e., rendering particular *state* rules unenforceable. *United States v. Ballin*, 144

U.S. 1, 5 (1892).

142.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the

Resolutions are unlawful, void, and of no effect.

143.  Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief,

enjoining EPA and its Administrator from giving the Resolutions any legal effect.

**COUNT IV**
**Violation of the Take Care Clause**
**(Against President Trump, EPA, and Its Administrator)**

144.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged

herein.

145.  Article II, Section 3 of the Constitution provides that the President—and pursuant to

his direction, the Executive Branch—"shall take care that the laws be faithfully executed."  U.S.

Const. art. II, § 3.

146.  All Executive Branch Defendants were aware that the three waiver decisions at issue

are not rules, much less rules of general applicability, subject to the CRA.  That had been EPA's

consistent position since the enactment of the CRA, under Presidents of both parties.  And EPA

reiterated that position in these very decisions.  These Defendants were also aware that the

GAO—the non-partisan body that aids Congress in implementing the CRA—had concluded, in

2023, that Clean Air Act preemption waiver decisions are not rules and not subject to that statute.

147.  The Executive Branch Defendants nonetheless declared, by press release, that these

actions were suddenly rules of general applicability subject to the CRA.  They then submitted

these waiver decisions to Congress and the GAO for CRA action, claiming (without support) this

was "in accordance with statutory requirements."  *See supra* n.19.  Notably, EPA had to submit

these waiver decisions to Congress *twice* because in the first submission, EPA correctly described

the decisions not as "rules," but as "actions" and "Notice[s] of Decision."

148.   The Executive Branch Defendants purported to replace the statutory definition of "rule" with their own, unidentified one.  These Defendants did so purely for purposes of using a statute they knew to be inapplicable—and one they hoped would preclude judicial review.

149.   The Executive Branch Defendants neither exercised care nor even attempted to faithfully execute the Nation's laws, including the Clean Air Act, the APA, the CRA, and the Constitution.

150.   The Executive Branch Defendants' failure to honor their constitutional duties were deliberate efforts to use—and enable Congress's use—of the CRA to disapprove of these waivers. These actions were unconstitutional, and so, too, are the Resolutions that depend on them.

151.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

152.   Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect.

**COUNT V**
**Violation of Separation of Powers**
**(Against All Defendants)**

153.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

154.   The "checks and balances" established in the Constitution "were the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). "The Framers provided a vigorous Legislative Branch and a separate and wholly independent Executive Branch, with each branch responsible ultimately to the people." *Id.* "The Framers also provided for a Judicial Branch equally independent with "'[t]he judicial Power ... extend[ing] to all Cases, in Law and Equity, arising under this Constitution, and the Laws of the United States,'" *id.* (quoting U.S. Const. Art. III, § 2), and expressly to those cases in which the United States or one of the several States is a party, U.S. Const. Art. III, §§ 1, 2.

155.   The Federal Government was "deliberately so structured to assure full, vigorous, and open debate on the great issues affecting the people and to provide avenues for the operation of checks on the exercise of governmental power." *Bowsher*, 478 U.S. at 722.

156.   Using its lawmaking powers, Congress expressly cabined the CRA so it applies only to certain rules promulgated by federal agencies. *E.g.*, 5 U.S.C. § 801(a)(1)(A); id. § 804(3) (defining "rule[s]" to which CRA applies). Congress could, of course, use those same lawmaking powers to amend the CRA—for example, by changing the trigger for its application or by changing the definition of "rule." It did not do so here, however.

157.   Instead, Congress opted to proceed as though the term "rule" had a different definition than the one in 5 U.S.C. § 804(3) or was entirely irrelevant to the statutory scheme. Specifically, Congress relied exclusively on the submission of a report from EPA characterizing the waiver decisions as rules as a sufficient trigger for application of the CRA. The Senate did so explicitly in its second point of order. *See supra* ¶¶ 103-106. The House did so as well by proceeding to vote on the Resolutions, although CRA resolutions are only proper as to certain federal rules (as defined in the statute), and although no one offered any credible basis for disagreeing with EPA's stated position in these Federal Register notices (affirmed by the GAO and Senate Parliamentarian) that these waiver decisions do not fit that definition.

158.   Each chamber improperly delegated its constitutional authority "to determine the Rules of its Proceedings," U.S. Const., art. I, § 5, cl. 2, to the Executive Branch. Both chambers purported to employ their rules for CRA resolutions based exclusively on mere statements by the Executive Branch—no matter how spurious—that these orders were rules of the sort subject to the CRA.

159.   Maintaining separation of powers for congressional procedural rules is no less important than maintaining that separation for more substantive powers. "The Constitution … is concerned with means as well as ends." *Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015). "To leave this aspect of the constitutional structure alone undefended would serve only to accelerate the flight of power from the legislative to the executive branch, turning the latter into a vortex of

34

1    authority that was constitutionally reserved for the people's representatives in order to protect

2    their liberties." *Gundy v. United States*, 588 U.S. 128, 169 (2019) (Gorsuch, J., dissenting).

3        160.   And, as James Madison reiterated, quoting "the famous warning of Montesquieu,"

4    "'there can be no liberty where the legislative and executive powers are united in the same

5    person, or body of magistrates.'" *Bowsher*, 478 U.S. at 721–22 (quoting The Federalist No. 47, p.

6    325 (J. Cooke ed. 1961)).

7        161.   The rules Congress adopts for its own proceedings cannot "ignore constitutional

8    restraints," and *Congress* is responsible, in the first instance, for ensuring there is "a reasonable

9    relation between the mode or method of [its] proceeding … and the result which is sought to be

10   attained." *NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) (quoting *United States v. Ballin,* 144

11   U.S. 1, 5 (1892)).

12       162.   It matters not that Congress's abdication of its internal rulemaking powers reflected

13   the preferences (in favor of the use of the CRA) of majorities in Congress.  Separation of powers

14   problems are not erased simply because "the encroached-upon branch approves the

15   encroachment." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010)

16   (quoting *New York v. United States,* 505 U.S. 144, 182 (1992)).

17       163.   Congress's decision to allow the Executive Branch to be the sole arbiter of what the

18   definition of "rule" means under the APA and CRA also unconstitutionally intruded on the

19   judiciary's Article III power "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177

20   (1803); U.S. Const. art. III, § 2.

21       164.   So, too, did Congress's direction that preexisting federal law preempts particular state

22   laws, where Congress failed to legislatively change the legal standard for that preemption.  Put

23   another way, Congress may not enact "a statute [that] would create no new substantive law" but

24   "instead direct the court how pre-existing law applies to particular circumstances." *Bank Markazi

25   v. Peterson*, 578 U.S. 212, 226 n.17 (2016).

26       165.   In these waiver decisions, EPA exercised "the type of nonpolicymaking adjudicatory

27   power[] typically exercised by a court in the agency-review context," *Martin v. Occupational

28   Safety & Health Review Comm'n*, 499 U.S. 144, 154 (1991), by pronouncing that particular laws

35

1    are not preempted by the Clean Air Act.  EPA's adjudicatory orders were the subject of pending

2    litigation at the time the Resolutions were introduced and voted on.

3        166.  The Resolutions "fail[] to supply any new legal standard effectuating the lawmakers'

4    [new] policy judgment," *Bank Markazi*, 578 U.S. at 231, that the relevant state laws should be

5    preempted by federal law.  Indeed, by applying the CRA—a statute designed to allow for

6    rescission of new *federal law* made by the Executive Branch—beyond its bounds, Congress did

7    not make law.  Rather, it disapproved the Executive Branch's application of existing law to a

8    particular factual record, ignoring both that the Executive Branch had acted within its powers in

9    carrying out existing law and that the Judiciary might well agree with EPA's decisions and is

10   entitled to say so.

11       167.  "The hydraulic pressure inherent within each of the separate Branches to exceed the

12   outer limits of its power, even to accomplish desirable objectives, must be resisted."  *Chadha*, 462

13   U.S. at 951.  The Federal Government may not violate separation of powers principles, as it did

14   here, even when doing so makes achieving desired objectives easier.

15       168.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the

16   Resolutions are unlawful, void, and of no effect.

17       169.  Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief,

18   enjoining EPA and its Administrator from giving the Resolutions any legal effect.

19                                    **COUNT VI**
                 **Violation of the Tenth Amendment and Structural Principles of Federalism**
20                              **(Against All Defendants)**

21       170.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged

22   herein.

23       171.  A "fundamental limitation that the constitutional scheme imposes on the Commerce

24   Clause to protect the 'States as States' is one of process."  *Garcia*, 469 U.S. at 554.  Thus, courts

25   may—and indeed must—intervene "to compensate for possible failings in the national political

26   process" that infringe on the States as States.  *Id.*  And that is not the only "affirmative limit[] *the*

27   *constitutional structure* might impose on federal action affecting the States under the Commerce

28

                                           36

1    Clause." *South Carolina*, 485 U.S. 505, 528 (1988) (Scalia, J, concurring in part) (quoting

2    *Garcia*, 469 U.S. at 556).

3        172.   These Resolutions were enacted only because both the Executive and Legislative

4    Branches opted to flout settled procedures and the plain text of the CRA (to which all States

5    consented).  The Executive Branch began this unprecedented maneuver when, without any

6    process or explanation, it issued a blatantly unlawful post-hoc declaration that the three

7    adjudicatory orders at issue were suddenly rules.  With the President's imprimatur, Congress then

8    compounded the errors, opting to disregard and overrule the reasoned decisions of both the GAO

9    and the Senate Parliamentarian, although those decisions are ordinarily treated as dispositive.

10       173.   By purporting to use the CRA (despite its clear inapplicability), the Federal

11   Government blasted gaping holes in longstanding state regulatory programs without any of the

12   procedural mechanisms—such as rigorous debate and state official testimony—that serve to

13   inform members of Congress about the consequences of their actions.  In the push to end the

14   alleged "electric vehicle fantasy," for example, state regulations that require crucial emission

15   reductions from gasoline- and diesel-fueled vehicles got swept in for termination too.

16       174.   In so doing, the Federal Government also effectively changed the substantive criteria

17   applicable to a California waiver request retroactively—years after California submitted its

18   requests (and in one instance years after EPA acted on that request).  The Federal Government

19   also created uncertainty about how it will apply the waiver provision's statutory criteria to future

20   waiver requests.

21       175.   Put simply, the Federal Government carried out an illegal playbook designed to evade

22   lawful procedures that might prevent the "take down" of disfavored California laws.  The Federal

23   Government cast aside expert legal opinions and the plain text of the CRA in order to extend that

24   statute's expedited procedures beyond the bounds to which all States agreed.  Defendants

25   provided no opportunity for California, or the public, to participate in crucial parts in this scheme.

26   And Defendants and congressional leadership chose to use the CRA here precisely because, when

27   that statute applies, it severely limits debate, avoids the filibuster, and contains a barrier to

28   judicial review.  Those features further prevented Plaintiff States from defending their own state

37

1  laws in the political process; and the Federal Government seeks to prevent Plaintiff States from

2  obtaining relief in the courts.

3      176.  The Framers designed a Federal Government that would "be disinclined to invade the

4  rights of the individual States, or the prerogatives of their governments."  *Garcia*, 469 U.S. at 551

5  (quoting The Federalist No. 46, at 332 (B. Wright ed. 1961)).  These Resolutions required an end-

6  run around that design.  The numerous "extraordinary defects in the national political process"

7  reflected in that end-run render the Resolutions "invalid under the Tenth Amendment" and the

8  principles of federalism embedded in the Constitution's structure.  *South Carolina*, 485 U.S. at

9  512.

10      177.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the

11  Resolutions are unlawful, void, and of no effect.

12      178.  Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief,

13  enjoining EPA and its Administrator from giving the Resolutions any legal effect.

14

15  **COUNT VII**

16  **Nonstatutory Review: Violations of Federal Law by Federal Officials**
**(Against All Defendants)**

17      179.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged

18  herein.

19      180.  Federal courts possess inherent equitable power to grant injunctive and declaratory

20  relief "with respect to violations of federal law by federal officials," *Armstrong v. Exceptional*

21  *Child Ctr.*, 575 U.S. 320, 326–27 (2015), among them violations that themselves contravene the

22  structural principles of the Constitution, *see Free Enter. Fund*, 561 U.S. at 491–92 n.2, or actions

23  premised on legislation that does.

24      181.  The President, EPA, and its Administrator have stated definitely that the state

25  regulations at issue here, including the Advanced Clean Cars II, Advanced Clean Trucks, and

26  Omnibus regulations, became preempted and unenforceable upon enactment of the respective

27  Resolutions and are now preempted and unenforceable.

28      182.  Each of the Resolutions is unlawful and unconstitutional.

38

183.  Because the Resolutions are unlawful, unconstitutional and void, the preemption waivers granted for California's addition of the state regulations at issue, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations, to the State's regulatory program are valid and in effect.

184.  Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit the rejection of certifications of vehicle or engine manufacturer compliance with the state regulations at issue—including the Advanced Clean Cars II, Advanced Clean Trucks, and/or Omnibus regulations—as compliant with federal Clean Air Act standards under 42 U.S.C. § 7543(b)(3).

185.  Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit their taking other actions to implement or give legal effect to the Resolutions.

186.  Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit interference with Plaintiffs' enforcement of any state law on the ground that one or more of the Resolutions resulted in preemption of that state law.

187.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

188.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that any action by Defendants premised on validity of the unconstitutional Resolutions is itself unlawful, void, and of no effect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs State of California, et al. respectfully request that this Court

1.      Declare the Resolutions unconstitutional, unlawful, void, and of no effect;

2.      Declare that the three preemption waivers at issue are valid and in effect;

3.      Declare that any action by Defendants premised on validity of the Resolutions is unlawful, void, and of no effect;

39

4. Enjoin EPA and its Administrator from taking any action to implement or give legal effect to the Resolutions;

5. Enjoin EPA and its Administrator from rejecting certifications of vehicle or engine manufacturer compliance with the state regulations for which EPA waived Clean Air Act preemption in the decisions at issue, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations, as compliant with federal Clean Air Act standards under 42 U.S.C. § 7543(b)(3);

6. Enjoin EPA and its Administrator from interfering with Plaintiffs' enforcement of any state law on the ground that one or more of the Resolutions resulted in preemption of that state law;

7. Declare the reclassification and submission of the three preemption waiver decisions as federal agency rules *ultra vires*, unconstitutional, and unlawful;

8. Vacate EPA's reclassification of the three preemption waiver decisions as federal rules and the submission of those decisions as rules to Congress;

9. Declare that the CRA does not apply to EPA waiver decisions under 42 U.S.C. § 7543(b)(1);

10. Enjoin EPA and its Administrator from transmitting these or other Clean Air Act waiver decisions under 42 U.S.C. § 7543(b)(1) to Congress for consideration under the CRA;

11. Grant such other relief as the Court deems just and proper.

Dated: June 12, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
*Attorneys for Plaintiff State of California*

40

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
Carrie.noteboom@coag.gov

**MATTHEW J. PLATKIN**
*Attorney General for the State of New Jersey*

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

 */s/ William Grantham*
WILLIAM GRANTHAM*
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
 (505) 717-3520
wgrantham@nmdoj.gov

**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

*/s/ Seth Schofield*
SETH SCHOFIELD *
Senior Appellate Counsel
JON WHITNEY*
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov

**LETITIA JAMES**
*Attorney General for the State of New York*

*/s/ Ashley M. Gregor*
ASHLEY M. GREGOR*
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov

41

**DAN RAYFIELD**
*Attorney General for the State of Oregon*

*/s/ Paul Garrahan*
PAUL GARRAHAN*
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

*/s/ Hannah Yindra*
HANNAH YINDRA*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

**PETER F. NERONHA**
*Attorney General for the State of Rhode Island*

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ*
Special Assistant Attorney General
Office of the Attorney General
Chief, Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

**NICHOLAS W. BROWN**
*Attorney General for the State of Washington*

*/s/ Alexandria Doolittle*
ALEXANDRIA K. DOOLITTLE*
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

*Application for admission pro hac vice forthcoming*

Pursuant to Local Rule 5-1(i), I attest that all signatories to this document concurred in its filing.

*/s/ M. Elaine Meckenstock*
M. Elaine Meckenstock
Counsel for Plaintiff State of California

Complaint  (25-cv-_____)

# EXHIBIT A

 **U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

# Decision

**Matter of:**   Environmental Protection Agency—Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act Waiver of Preemption

**File:**   B-334309

**Date:**   November 30, 2023

---

## DIGEST

The Environmental Protection Agency (EPA) issued a notice of decision entitled *California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision* (*Notice*).  The *Notice* rescinds a withdrawal of a waiver of preemption for California's Advanced Clean Car Program.

The Congressional Review Act (CRA) requires that agencies submit rules to Congress for review before they may take effect.  CRA incorporates the Administrative Procedure Act's (APA) definition of a rule, which does not include adjudicatory orders.  CRA also excludes certain categories of rules from coverage, including rules of particular applicability.  EPA did not submit the *Notice* to Congress pursuant to CRA.  We conclude that the *Notice* is an adjudicatory order not subject to CRA.  Even if the *Notice* were to satisfy the APA definition of a rule, it would be considered a rule of particular applicability, and, therefore, would still not be subject to the CRA's submission requirement.

---

## DECISION

On March 14, 2022, the Environmental Protection Agency (EPA) issued a notice of decision entitled *California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*.  87 Fed. Reg. 14332 (*Notice*).  We received a request for a decision as to whether the *Notice* is a rule for purposes of the Congressional Review Act (CRA).  Letter from Senator Capito to the Comptroller General (May 11, 2022).  For the reasons discussed below, we conclude that the *Notice* is not a rule under CRA.

Our practice when rendering decisions is to contact the relevant agencies to obtain their legal views on the subject of the request. GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* https://www.gao.gov/products/gao-06-1064sp. Accordingly, we reached out to EPA to obtain the agency's legal views. Letter from Assistant General Counsel, GAO, to General Counsel, EPA (June 7, 2022). We received EPA's response on July 1, 2022. Letter from General Counsel, EPA, to Assistant General Counsel, GAO (June 30, 2022) (Response Letter).

BACKGROUND

Clean Air Act

The Clean Air Act generally preempts states from adopting or enforcing emission control standards for new motor vehicles or new motor vehicle engines. *See* 42 U.S.C. § 7543(a); Response Letter, at 2; *Notice*. However, the Clean Air Act requires the Administrator of EPA to grant a waiver of preemption for a state that adopted a standard prior to March 30, 1966, if the state determined its standard will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards.[1] 42 U.S.C. § 7543(b); Response Letter, at 2–3. The Administrator must approve the waiver unless the Administrator makes any one of three findings set forth in the statute: (1) the determination of the state is arbitrary and capricious; (2) the state does not need state standards to meet compelling and extraordinary conditions; or (3) the state standards and accompanying enforcement procedures are not consistent with 42 U.S.C. § 7521(a) (EPA standards for emissions from new vehicles or new vehicle engines). 42 U.S.C. § 7543(b)(1)(A)-(C); Response Letter, at 3.

When the Administrator receives a waiver request, they must give notice of a public hearing and comment period. 42 U.S.C. § 7543(b); Response Letter, at 3; EPA, *Vehicle Emissions California Waivers and Authorizations*, *available at* https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations (last visited Oct. 5, 2023) (California Waivers).[2] The Administrator makes a decision on the waiver and publishes a notice of their decision and reasons in the *Federal Register*. Response Letter, at 4.

While only California can qualify for a waiver of preemption, section 177 of the Clean Air Act authorizes other states to adopt and enforce emission control standards for new motor vehicles or new motor vehicle engines if the standards are identical to the

---

[1] Only California can qualify for a waiver of preemption because it is the only state that adopted a standard prior to March 30, 1966. *Notice* at 14332 n. 1.

[2] During the hearing, the state presents its regulations and findings, and parties opposing the waiver have a chance to provide oral testimony. *See* Response Letter, at 3.

California standards for which a waiver has been granted.  42 U.S.C. § 7507 (Section 177).[3]

The Clean Air Act does not explicitly provide for EPA to reconsider and withdraw a previously granted waiver.[4]  When EPA reconsiders a previous waiver, it considers whether there was a clerical or factual error in the waiver, or a significant change in a factual circumstance or condition related to the three findings set forth in the statute that would call the waiver into doubt.[5]

EPA's Notice

On June 27, 2012, California requested a waiver of preemption under the Clean Air Act for its Advanced Clean Car Program.[6]  The Advanced Clean Car Program regulates smog forming pollutants and greenhouse gas emissions, and includes a zero emission vehicle sales mandate.[7]  EPA provided notice of a public hearing and comment period.[8]  On January 9, 2013, the Administrator granted the waiver.[9]

Subsequently, in 2018, EPA provided notice of a public hearing and comment period proposing to withdraw the 2013 waiver of preemption for California's Advanced Clean Car Program, and proposing the view that Section 177 does not authorize states to adopt California's greenhouse gas emissions standards.[10]  In 2019, the Administrator withdrew the 2013 waiver, and finalized the view that Section 177 does not apply to greenhouse gas standards.[11]

Consistent with Executive Order 13990, issued January 25, 2021, and a number of petitions for reconsideration,[12] EPA issued a notice of a public hearing and comment period to reconsider the withdrawal of the 2013 waiver and interpretive view of Section 177.[13]  On March 14, 2022, the Administrator issued the *Notice*, which is the subject of this decision.  The *Notice* rescinds the withdrawal of the waiver, bringing

---

[3] States are not required to seek EPA approval to adopt California's standards under Section 177.  California Waivers.

[4] *Notice* at 14344.

[5] *Id.*

[6] 77 Fed. Reg. 53199–53200.

[7] 77 Fed. Reg. 53199; *see also Notice* at 14332.

[8] 77 Fed. Reg. 53199.

[9] 78 Fed. Reg. 2112.

[10] 83 Fed. Reg. 42986, 42999, 43253 (Aug. 24, 2018).

[11] 84 Fed. Reg. 51310, 51350 (Sept. 27, 2019).

[12] 86 Fed. Reg. 7037; *Notice* at 14333, 14340.

[13]  86 Fed. Reg. 22421 (Apr. 28, 2021).

back into force the 2013 waiver of preemption for California's Advanced Clean Car Program, and rescinds the interpretive view of Section 177, meaning that Section 177 applies to greenhouse gas standards.[14]

<u>The Congressional Review Act</u>

CRA, enacted in 1996 to strengthen congressional oversight of agency rulemaking, requires federal agencies to submit a report on each new rule to both houses of Congress and to the Comptroller General for review before a rule can take effect. 5 U.S.C. § 801(a)(1)(A).  The report must contain a copy of the rule, "a concise general statement relating to the rule," and the rule's proposed effective date.  *Id*. CRA allows Congress to review and disapprove rules issued by federal agencies for a period of 60 days using special procedures.  *See* 5 U.S.C. § 802.  If a resolution of disapproval is enacted, then the new rule has no force or effect.  5 U.S.C. § 801(b)(1).

CRA adopts the definition of rule under the Administrative Procedure Act (APA), 5 U.S.C. § 551(4), which states that a rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 804(3).  CRA excludes three categories of rules from coverage:  (1) rules of particular applicability; (2) rules relating to agency management or personnel; and (3) rules of agency organization, procedure, or practice that do not substantially affect the rights or obligations of non-agency parties.  *Id.*

EPA did not submit a CRA report to Congress or the Comptroller General on the *Notice*.  In its response to us, EPA stated the *Notice* is an adjudicatory order, not a rule, and therefore is not subject to CRA.  Response Letter, at 1.

DISCUSSION

At issue here is whether EPA's *Notice* is a rule under CRA.  For the reasons discussed below, we conclude the *Notice* is not a rule because it is, instead, an order.

CRA adopts the APA's definition of rule and, therefore, CRA does not apply to "those types of agency action that the APA defines separately."  B-334400, Feb. 9, 2023, at 4.  Separate from a rule, which is the result of the rulemaking process, APA provides for agencies to issue an order, which is the result of the adjudication process.  5 U.S.C. § 551(5), (7); B-334995, July 6, 2023.  APA defines an order as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing."  5 U.S.C. § 551(6).  APA further defines "licensing" to include an agency

---

[14] *Notice* at 14332–14333.

granting or revoking a license, and "license" to include an agency approval, statutory exemption, or other form of permission.  5 U.S.C. § 551(8), (9).  An agency action that constitutes an order under APA does not meet the definition of rule under APA and, therefore, is not a rule under CRA.  B-334995, July 6, 2023; B-334400, Feb. 9, 2023; B-332233, Aug. 13, 2020 (rules and orders are "mutually exclusive").

Courts have identified that an adjudicatory order is a case-specific, individual determination of a particular set of facts that has immediate effect on the individual(s) involved.  *See United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 245–246 (1973); *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir., May 26, 2017); *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir., Sept. 12, 1994).  Statutory interpretation can be made through an adjudicatory order.  *Neustar*, 857 F.3d at 894.  By contrast, courts have provided that a rule is a broad application of general principles that is prospective in nature. *See Florida East Coast Railway Co.,* 410 U.S. at 246; *Neustar,* 857 F.3d at 895; *Yesler Terrace Community Council,* 37 F.3d at 448.

For example, in B-334400, EPA denied petitions from refineries for an exemption under a federal statute. There, the agency considered facts presented by the refineries and comments it received concerning the petitions and applied the relevant standard for exemption.  B-334400, Feb. 9, 2023, at 6.  Because the agency action was a final disposition of particular petitions under a statutory exemption, we concluded it was an order, not a rule, under APA.  *Id*. at 6, 7, 8; *see also* B-332233, Aug. 13, 2020, at 4–5 (after conducting a fact-intensive review, an agency modified the terms of a license to permit the licensee to conduct a new activity, and we concluded the action was an order).

In another case, B-334995, the Food and Drug Administration (FDA) issued a modification to a risk mitigation strategy for a particular drug.  Following a process set forth in statute, the agency considered pertinent information and issued the modification after determining it was necessary under the statutory criteria.  B-334995, July 6, 2023, at 2, 4.  We concluded that FDA's action had immediate effect on the companies sponsoring the drug and was an order under APA.  *Id*. at 5–6.

Here, the *Notice* meets the statutory definition of an order, reflects the hallmarks of an order that courts identified, and is similar to the actions in our prior decisions that were orders.  With regard to the statutory definition of an order, the *Notice* determines that California is not preempted from enforcing its Advanced Clean Car Program.  In doing so, the *Notice* is making a "final disposition" granting California a "form of permission" which meets the definition of order under APA.  5 U.S.C. § 551(6), (8), (9).

Further, the *Notice* is particular to California's Advanced Clean Car Program, as opposed to a broad unspecified group.  The Administrator's process involved consideration of particular facts, as opposed to general policy, such as whether there were any factual or clerical errors in the 2013 waiver that could justify the 2019

waiver withdrawal, and whether any "factual circumstances or conditions" related to the statutory waiver criteria had changed so significantly as to call the 2013 waiver into doubt. *Notice* at 14344, 14352; *see* Response Letter at 3–4. The *Notice* has immediate effect in that California is not preempted from enforcing its Advanced Clean Car Program.

The characteristics of the Notice and EPA's processes are similar to our prior decisions involving particular petitions from refineries and a modification to a risk mitigation strategy for a particular drug sponsored by particular companies. In those decisions, the applicable agency considered specific facts under the relevant statute and issued an action having immediate effect on the refineries and drug sponsors.

The fact that the *Notice* also rescinds EPA's previous interpretive view of Section 177 does not make the *Notice* a rule, even though rescinding the interpretive view could have broad, prospective application. An agency action having some characteristics more typical of a rulemaking "does not automatically convert an adjudication into a rulemaking." B-334400, Feb. 9, 2023, at 5; *see also Neustar*, 857 F.3d at 894 ("Statutory interpretation can be rendered in the form of an adjudication, not only in a rulemaking. The fact that an order rendered in an adjudication may affect agency policy and have general prospective application [] does not make it rulemaking subject to APA") (citation omitted). For example, in B-334400, the agency's action affected multiple petitioners and the agency used public notice-and-comment procedures. We concluded, however, that the action was an order, not a rule, because it met the statutory definition of an order and agencies may seek public comment in adjudicatory proceedings. B-334400, Feb. 9, 2023, at 6–7. Here, the *Notice* meets the statutory definition of an order, reflects key hallmarks of an order, and is similar in character and process to the actions in our prior decisions that were orders. We conclude, therefore, that the *Notice* is an order under APA.

Finally, even if the *Notice* fell within the definition of rule, it would still not be subject to CRA because of CRA's exclusion of rules of particular applicability. A rule of particular applicability is "addressed to an identified entity and also address[es] actions that entity may or may not take, taking into account facts and circumstances specific to that [] entity." B-334995, July 6, 2023, at 5. For example, in B-334400, an agency's denial of petitions for a statutory exemption addressed 69 petitions "based on the facts those petitions presented" and, therefore, would be a rule of particular applicability, had the action been considered a rule. B-334400, Feb. 9, 2023, at 7. Here, the *Notice* concerns a specific entity—California—and addresses a statutory waiver specific to California's Advanced Clean Car Program. *See* Response Letter, at 5 (waivers of preemption under the Clean Air Act "are a specific grant of approval to California's request for a waiver of generally applicable [statutory] requirements, which have the effect of recognizing the State's exemption if its request meets the statutory findings"). Therefore, the *Notice* would be a rule of particular applicability and excluded from coverage by CRA on that basis.

B-334309

CONCLUSION

The *Notice* does not meet the APA definition of a rule. Rather, the *Notice* is an adjudicatory order because it is a final disposition rescinding a waiver withdrawal for California's Advanced Clean Car Program, bringing back into force a waiver of preemption to enforce the program. Even if the action were considered to be a rule, it would be a rule of particular applicability. For these reasons, the *Notice* is not a rule for purposes of CRA and, thus, not subject to the requirement that it be submitted to Congress and the Comptroller General before it may take effect.

*Edda Emmanuelli Perez*

Edda Emmanuelli Perez
General Counsel

B-334309

# EXHIBIT B

 **U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

B-337179

March 6, 2025

Congressional Requesters

Subject:  *Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act*

This letter responds to your request for a legal decision as to whether the Environmental Protection Agency's (EPA) Clean Air Act preemption waivers and Notices of Decision that EPA submitted as rules to Congress and GAO in late February 2025[1] are rules subject to the Congressional Review Act (CRA).[2]  Our regular practice is to issue decisions on actions that agencies have not submitted to Congress as rules under CRA in order to further the purposes of CRA by protecting Congress's CRA review and oversight authorities.[3]  In this case, we are presented with a different situation because the actions were submitted as rules under the CRA, and it is not one in which we normally issue a legal decision.  However, we do have prior caselaw that addressed the applicability of CRA to Clean Air Act preemption waivers, B-334309, Nov. 30, 2023, and EPA's recent submission is inconsistent with this caselaw.  Therefore, we are providing you with our views and analysis of preemption waivers under the Clean Air Act that may be helpful as Congress considers how to treat these Notices of Decision and the application of CRA procedures.

---

[1] Email from Director, Regulatory Management Division, EPA, to GAO CRA Rules Mailbox, *Subject: Electronic Delivery of USEPA Final Actions to GAO under the Congressional Review Act (CRA) – [0 major and 3 non-major actions (02-19-2025)]* (Feb. 19, 2025) (EPA Initial Submission).

[2] Letter from Senators Sheldon Whitehouse, Alex Padilla, and Adam B. Schiff to the Comptroller General (Feb. 21, 2025) (Request Letter).

[3] GAO does not issue formal decisions on actions that agencies have submitted to Congress as rules under CRA because that submission generally obviates the need for a GAO decision on the matter.  *See* B-330376, Nov. 30, 2018 (explaining that when a rule is submitted to Congress, Congress has an opportunity to review the rule and pass a joint resolution of disapproval to void the rule (*see* 5 U.S.C. § 802) and there is no impediment that a GAO decision might cure).

As background to these issues, we issued a legal decision concluding that a Clean Air Act preemption waiver was not a rule subject to CRA but was instead an adjudicatory order.  *See* B-334309, Nov. 30, 2023.  Furthermore, we explained that even if the waiver were to satisfy the APA definition of a rule, it would be considered a rule of particular applicability and, therefore, would still not be subject to CRA's submission requirement because of CRA's exclusions.  *Id.*

For the three Notices of Decision announcing the waivers at issue here, EPA stated that the Notices of Decision were not rules under CRA, and, in the underlying decision documents for two of those notices, cited to our 2023 decision in support of that statement.  However, EPA submitted them as rules to GAO and Congress without any explanation of this discrepancy.

We reached out to EPA on February 20, 2025, for clarification on the submission of the Notices of Decision at issue here because the notices themselves stated that CRA did not apply.[4]  After receiving your request, we followed our regular procedure[5] and sent a formal letter to EPA on February 25, 2025, seeking factual information and the agency's legal views on this matter.[6]  Although EPA resubmitted the Notices of Decision to GAO on February 27, 2025, with additional information in the corresponding CRA reports, the agency still did not address the statements in the notices regarding the inapplicability of the CRA,[7] and, to date, EPA has not further responded to our letter.

As explained more fully below, our view is that the analysis and conclusions in our 2023 Clean Air Act preemption waiver decision would also apply to the Notices of Decision recently submitted as rules to Congress by EPA.

---

[4] Email from Senior Attorney, GAO, to Director, Regulatory Management Division, EPA, *Subject: RE: Electronic Delivery of USEPA Final Actions to GAO under the Congressional Review Act (CRA) – [0 major and 3 non-major actions (02-19-2025)]* (Feb. 20, 2025).

[5] GAO, *GAO's Protocols for Legal Decisions and Opinions*, GAO-24-107329 (Washington, D.C.: Feb. 2024), *available at* https://www.gao.gov/products/gao-24-107329.

[6] Letter from Assistant General Counsel for Appropriations Law, GAO, to Principal Deputy General Counsel, EPA (Feb. 25, 2025).

[7] Email from Director, Regulatory Management Division, EPA, to GAO CRA Rules Mailbox, *Subject: Electronic Delivery of USEPA Final Rules to GAO under the Congressional Review Act (CRA) – [0 major and 3 non-major rules (02-27-2025)]* (Feb. 27, 2025) (EPA Resubmission).

BACKGROUND

Clean Air Act

The Clean Air Act generally preempts states from adopting or enforcing emission control standards for new motor vehicles or new motor vehicle engines.  *See* 42 U.S.C. § 7543(a); B-334309, Nov. 30, 2023.  However, the Clean Air Act requires the EPA Administrator to grant a waiver of preemption for a state that adopted a standard prior to March 30, 1966, if the state determined its standard will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards.  42 U.S.C. § 7543(b); B-334309, Nov. 30, 2023.  Only California can qualify for preemption waivers under this section because it is the only state that adopted a standard prior to March 30, 1966.  B-334309, Nov. 30, 2023.

The EPA Administrator must approve the waiver unless the Administrator makes any one of three findings set forth in the statute:  (1) the determination of the state is arbitrary and capricious; (2) the state does not need state standards to meet compelling and extraordinary conditions; or (3) the state standards and accompanying enforcement procedures are not consistent with 42 U.S.C. § 7521(a) (EPA standards for emissions from new motor vehicles or new motor vehicle engines).  42 U.S.C. § 7543(b)(1)(A)–(C); B-334309, Nov. 30, 2023.

When the EPA Administrator receives a waiver request, they must provide notice of a public hearing and comment period.  42 U.S.C. § 7543(b); B-334309, Nov. 30, 2023; EPA, *Vehicle Emissions California Waivers and Authorizations*, *available at* https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations (last visited Mar. 5, 2025) (California Waivers and Authorizations Website).  The Administrator makes a decision on the waiver and publishes a notice of their decision and reasons in the *Federal Register*.  B-334309, Nov. 30, 2023.

The Clean Air Act provides similar procedures for the EPA Administrator to authorize California to adopt and enforce emission control standards for certain nonroad engines or vehicles.  42 U.S.C. § 7543(e)(2)(A).  The Administrator must authorize California to adopt and enforce such standards if California determined that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards, unless the Administrator makes any one of three findings set forth in the statute:  (1) California's determination is arbitrary and capricious; (2) California does not need its own standards to meet compelling and extraordinary conditions; or (3) the California standards and accompanying enforcement procedures are not consistent with section 7543.  *Id.* Like the waiver process under section 7543(b), the authorization process under section 7543(e)(2)(A) involves providing notice of a public hearing and comment period and publishing notice of the decision.  *See id.*; California Waivers and Authorizations Website.

EPA Notices of Decision

At issue here are the following EPA Clean Air Act preemption waiver Notices of Decision:

- *California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision*, 88 Fed. Reg. 20688 (Apr. 6, 2023) (Advanced Clean Trucks Waiver Notice);

- *California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The "Omnibus" Low $NO_X$ Regulation; Waiver of Preemption; Notice of Decision*, 90 Fed. Reg. 643 (Jan. 6, 2025) (Low $NO_X$ Waiver Notice); and

- *California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision*, 90 Fed. Reg. 642 (Jan. 6, 2025) (Advanced Clean Cars II Waiver Notice).

In the Advanced Clean Trucks Waiver Notice, the EPA Administrator granted two requests for preemption waivers regarding four California regulations for heavy-duty on-road vehicles and engines.  88 Fed. Reg. at 20688.  The Low $NO_X$ Waiver Notice announced the EPA Administrator's December 17, 2024, decision granting California a preemption waiver for regulations applicable to new 2024 and subsequent model year California on-road heavy-duty vehicles and engines and authorizing regulations regarding off-road diesel engines.  90 Fed. Reg. at 643–44.  The Advanced Clean Cars II Waiver Notice announced the EPA Administrator's December 17, 2024, decision granting California a preemption waiver for regulations applicable to new 2026 and subsequent model year California on-road light- and medium-duty vehicles.  90 Fed. Reg. at 642.

Congressional Review Act (CRA)

CRA, enacted in 1996 to strengthen congressional oversight of agency rulemaking, requires federal agencies to submit a report on each new rule to both houses of Congress and the Comptroller General for review before the rule can take effect.  5 U.S.C. § 801(a)(1)(A).  The report must contain a copy of the rule, "a concise general statement relating to the rule," and the rule's proposed effective date.  *Id.*  CRA allows Congress to review and disapprove rules issued by federal agencies for a period of 60 days using special procedures.  *See* 5 U.S.C. § 802.  If a resolution of disapproval is enacted, then the new rule has no force or effect.  5 U.S.C. § 801(b)(1).

CRA adopts the definition of "rule" under the Administrative Procedure Act (APA), which states that a rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. §§ 551(4); 804(3). However, CRA excludes three categories of APA rules from coverage: (1) rules of particular applicability; (2) rules relating to agency management or personnel; and (3) rules of agency organization, procedure, or practice that do not substantially affect the rights or obligations of nonagency parties. 5 U.S.C. § 804(3).

EPA did not submit CRA reports to Congress or GAO for any of the Notices of Decision when they were initially issued on April 6, 2023, and January 6, 2025, and each notice states that CRA does not apply because the relevant action is not a rule for purposes of the Act. Advanced Clean Trucks Waiver Notice, 88 Fed. Reg. at 20726; Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 645; Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 643. In addition, the underlying decision documents referenced in the Low NO$_X$ Waiver Notice and Advanced Clean Cars II Waiver Notice include similar statements about the inapplicability of CRA and cite our 2023 decision determining that a Clean Air Act preemption waiver notice of decision was not a rule under CRA. *See* EPA, *California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The "Omnibus" Low NO$_X$ Regulation; Waiver of Preemption; Decision Document* (Dec. 17, 2024) (Low NO$_X$ Waiver Decision), at 95 & n.281[8]; EPA, *California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Decision Document* (Dec. 17, 2024) (Advanced Clean Cars II Waiver Decision), at 189 & n.504[9] (both citing B-334309, Nov. 30, 2023).

EPA subsequently submitted a CRA report for the three Notices of Decision to Congress and GAO on February 19, 2025.[10] The House of Representatives and GAO received the report on February 19, 2025,[11] and the Senate received the report on February 20, 2025.[12] EPA resubmitted the CRA report to GAO on February 27, 2025.[13] The resubmitted report included additional information for each notice,

---

[8] This decision document is available at https://www.regulations.gov/document/EPA-HQ-OAR-2022-0332-0109 (last visited Mar. 5, 2025).

[9] This decision document is available at https://www.regulations.gov/document/EPA-HQ-OAR-2023-0292-0562 (last visited Mar. 5, 2025).

[10] *See* EPA Initial Submission.

[11] 171 Cong. Rec. H875 (daily ed. Feb. 26, 2025); EPA Initial Submission.

[12] 171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025).

[13] EPA Resubmission.

including the date of the document, the nature of the action submitted, and proposed effective date.[14]  EPA did not explain in either submission why the agency was submitting the notices under CRA given its statement in each notice that CRA did not apply.[15]

DISCUSSION

GAO's 2023 Decision on a Clean Air Act Preemption Waiver Notice of Decision

In B-334309, we examined an EPA Notice of Decision titled *California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision* (Advanced Clean Car Program Waiver Notice).  87 Fed. Reg. 14332 (Mar. 14, 2022).  This Notice of Decision rescinded EPA's 2019 withdrawal of a 2013 preemption waiver for California's greenhouse gas emissions standards and zero emission vehicle sale mandate, thereby reinstating the waiver.  *Id.* at 14332; B-334309, Nov. 30, 2023.

We determined that the Advanced Clean Car Program Waiver Notice was not a rule under CRA because it did not meet the APA definition of a rule.  We concluded that the notice was, instead, an "order" under APA.  APA defines an order as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing."  5 U.S.C. § 551(6).  APA further defines "licensing" to include an agency

---

[14] *See id.*, Attachments.

[15] EPA also states in each notice that the action is not a rule under the Regulatory Flexibility Act and therefore EPA did not prepare a regulatory flexibility analysis addressing the impact of the action on small businesses.  Advanced Clean Trucks Waiver Notice, 88 Fed. Reg. at 20725–26; Low $NO_X$ Waiver Notice, 90 Fed. Reg. at 645; Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 643.  Similarly, EPA further states in each notice that the relevant action is not a rule under Executive Order 12866 and is therefore exempt from review by the White House Office of Management and Budget (OMB).  Advanced Clean Trucks Waiver Notice, 88 Fed. Reg. at 20725; Low $NO_X$ Waiver Notice, 90 Fed. Reg. at 645; Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 643.  Lastly, although EPA indicated in their submission to GAO that the notices were "non-major" under CRA, the statements in the notices make it unclear whether the Office of Information and Regulatory Affairs within OMB had an opportunity to review the actions to determine if they were major rules under CRA, *see* 5 U.S.C. § 804(2), given that those determinations are usually made as part of the Executive Order 12866 review process.  *See* OMB Memorandum M-24-09, *Guidance on Compliance with the Congressional Review Act* (2024), at 3.

granting or revoking a license, and "license" to include an agency approval, statutory exemption, or other form of permission. 5 U.S.C. § 551(8), (9). An agency action that constitutes an order under APA is not a rule under the statute and, therefore, is not a rule under CRA. B-334309, Nov. 30, 2023 (citing B-334995, July 6, 2023; B-334400, Feb. 9, 2023; B-332233, Aug. 13, 2020 (rules and orders are "mutually exclusive")).

We explained that an adjudicatory order is a case-specific, individual determination of a particular set of facts that has immediate effect on the individual(s) involved. B-334309, Nov. 30, 2023 (citing *United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 245–46 (1973); *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017); *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994)). In contrast, a rule is a broad application of general principles that is prospective in nature. B-334309, Nov. 30, 2023 (citing *Florida East Coast Railway Co.,* 410 U.S. at 246; *Neustar,* 857 F.3d at 895; *Yesler Terrace Community Council,* 37 F.3d at 448).

We concluded that the Advanced Clean Car Program Waiver Notice met the APA definition of an order because the notice determined that California was not preempted from enforcing its Advanced Clean Car Program and therefore made a "final disposition" granting California a "form of permission" as described in the APA definition. B-334309, Nov. 30, 2023 (citing 5 U.S.C. § 551(6), (8), (9)). We noted that the notice was particular to California's Advanced Clean Car Program, involved consideration of particular facts, as opposed to general policy, and had immediate effect on California. *Id.*

We also concluded that even if the Advanced Clean Car Program Waiver Notice met the APA definition of a rule, it would still not be subject to CRA because of CRA's exclusion of rules of particular applicability. B-334309, Nov. 30, 2023. A rule of particular applicability is addressed to an identified entity and also addresses actions that entity may or may not take, taking into account facts and circumstances specific to that entity. B-334309, Nov. 30, 2023 (citing B-334995, July 6, 2023). We noted that the notice concerned a specific entity—California—and addressed a statutory waiver specific to California's Advanced Clean Car Program; therefore, the notice would be a rule of particular applicability. B-334309, Nov. 30, 2023.

EPA's Recently Submitted Notices of Decision

    (1) Applicability of GAO's 2023 Decision

The analysis and conclusion in B-334309 that the Advanced Clean Car Program Waiver Notice was not a rule for purposes of CRA because it was an order under APA would apply to the three notices of decision at issue here. For example, all three notices of decision involve waivers granted to California under the same authority and process (42 U.S.C. § 7543(b)) at issue in the Advanced Clean Car Program Waiver Notice. In each case, California requested preemption waivers

from EPA with respect to specific California regulations, and EPA, after holding a public hearing, receiving comments, and considering information presented by California and opponents of the waivers, determined to grant the requested waivers. *See* Advanced Clean Trucks Waiver Notice, 88 Fed. Reg. at 20688–90; Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 643–45; Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 642–43.

The Low NO$_X$ Waiver Notice also involves an authorization under a separate authority (42 U.S.C. § 7543(e)(2)(A)). As described above, the nature of the determination and process used is very similar to section 7543(b), and our analysis and conclusions in B-334309 would apply to this portion of the notice as well. *See* Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 644–45 (describing the relevant procedures and grouping the corresponding findings in sections 7543(b)(2) and 7543(e)(2)(A) together in summarizing the decision). Specifically, California requested EPA's authorization to adopt and enforce specific California regulations, and EPA, after holding a public hearing, receiving comments, and considering information presented by California and opponents of the authorization, determined to grant the requested authorization. *See* Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 643–45.

### (2) Effect of Resolutions of Disapproval

If Congress were to treat the EPA Notices of Decisions as rules under CRA and subsequently enact resolutions of disapproval, there is a question as to the precise effect those resolutions would have. As described above, if a resolution of disapproval is enacted, then the rule has no force or effect. 5 U.S.C. § 801(b)(1). However, two of the three Notices of Decision submitted by EPA to Congress, the Low NO$_X$ Waiver Notice and the Advanced Clean Cars II Waiver Notice, appear to merely notify the public of previously issued decision documents granting California the requested preemption waivers and, in the Low NO$_X$ Waiver Notice, the requested authorization for its regulations. *See* Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 643–44 (stating that EPA "is providing notice of its decision" and referencing the Low NO$_X$ Waiver Decision); Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 642–43 (stating that EPA "is providing notice of its decision" and referencing the Advanced Clean Cars II Waiver Decision). EPA did not include the underlying decision documents in its submission to Congress and GAO.[16] In contrast, the Advanced Clean Trucks Waiver Notice, like the Advanced Clean Car Program Waiver Notice we examined in B-334309, appears to be the decision document. *See* 88 Fed. Reg. at 20688 (stating that EPA "is granting . . . California['s] . . . requests for waivers"). Accordingly, if Congress were to enact resolutions disapproving the Low NO$_X$ Waiver Notice or the Advanced Clean Cars II Waiver Notice under CRA, it is unclear whether or how those resolutions would affect the underlying waivers and authorizations.

---

[16] *See* EPA Initial Submission; EPA Resubmission.

CONCLUSION

In these circumstances, our view is that our prior analysis and conclusion in B-334309 that the Advanced Clean Car Program Waiver Notice was not a rule for purposes of CRA because it was an order under APA would apply to the three notices at issue here. We provide this information to assist Congress as it considers how to treat these Notices of Decision and the application of CRA procedures.

If you have any questions, please contact Shirley A. Jones, Managing Associate General Counsel, at JonesSA@gao.gov, or Charlie McKiver, Assistant General Counsel for Appropriations Law, at McKiverC@gao.gov.

Sincerely,

*Edda Emmanuelli Perez*

Edda Emmanuelli Perez
General Counsel

B-337179

Page 9

*Congressional Requesters*

The Honorable Sheldon Whitehouse
Ranking Member
Committee on Environment and Public Works
United States Senate

The Honorable Alex Padilla
United States Senate

The Honorable Adam B. Schiff
United States Senate

B-337179

# EXHIBIT C



# Congressional Record

### PROCEEDINGS AND DEBATES OF THE *119th* CONGRESS, FIRST SESSION

United States
of America

*Vol. 171*     WASHINGTON, WEDNESDAY, MAY 21, 2025     *No. 86*

## Senate

The Senate met at 10 a.m. and was called to order by the President pro tempore (Mr. GRASSLEY).

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Heavenly Father, You are our fortress and shield. Your laws guide us, and Your teachings protect us. Your way is perfect, and Your word is truth. Bless all who follow Your guidance, giving them the power to serve others with wisdom, patience, and kindness.

As our lawmakers seek to serve, empower them to minister in Your Name to the suffering, the friendless, and the needy. Lord, give our legislators wisdom and strength for this day, that they may dispose of their responsibilities in ways that honor You. Help them in all their relationships to be constructive and edifying, speaking words that will bring life and peace.

We pray in Your matchless Name. Amen.

### PLEDGE OF ALLEGIANCE

The President pro tempore led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

### RESERVATION OF LEADER TIME

The PRESIDING OFFICER (Mr. MULLIN). Under the previous order, the leadership time is reserved.

### CONCLUSION OF MORNING BUSINESS

The PRESIDING OFFICER. Morning business is closed.

### LEGISLATIVE SESSION

### GUIDING AND ESTABLISHING NATIONAL INNOVATION FOR U.S. STABLECOINS ACT—Motion to Proceed—Resumed

The PRESIDING OFFICER. Under the previous order, the Senate will resume consideration of the motion to proceed to S. 1582, which the clerk will report.

The senior assistant legislative clerk read as follows:

Motion to proceed to Calendar No. 66, S. 1582, a bill to provide for the regulation of payment stablecoins, and for other purposes.

The PRESIDING OFFICER. The Senator from Iowa.

#### MAKE AMERICA HEALTHY AGAIN COMMISSION

Mr. GRASSLEY. Mr. President, I come to the floor today to express concerns that I have heard from many stakeholders regarding the Make America Healthy Again Commission. For short, this is called the MAHA Commission. Their report will be coming out tomorrow.

The concerns that I have heard from food and agriculture stakeholders center around the difficulty that they have had getting meetings with the Department of Health and Human Services. HHS Secretary Kennedy is the Chair of the MAHA Commission.

Many people fear that the contents of this report will not be based on sound science, that it will be based on opinions and fears instead of scientific consensus.

When I met with Secretary Kennedy before his confirmation—and that is a traditional thing to do—we discussed things like pesticides, genetically modified crops and other important components that come together to ensure the United States has the largest and safest food supply on the globe, and how all those things center on making the life of the farmer producing food as easy as possible. Now, Secretary Kennedy agreed that these

tools farmers use are necessary for that food supply.

The MAHA report should be based upon sound science. I want that Department of Agriculture Secretary Rollins and EPA Administrator Zeldin have had robust input on this report and that they would advocate for the 2 percent of Americans that feed the other 98 percent and the tools that are used to produce the food supply that feeds America.

We want to remember that we have the reputation of producing food so that the expendable income of—the average family in the United States spends roughly 10 or 11 percent of their discretionary money on food—the cheapest of any consumers in the world.

So I want everybody to know that I am watching this report closely that is coming out tomorrow, and I hope it reflects what Secretary Kennedy told me when I met with him in my office and he stands by his word.

I hope there is nothing in the MAHA report that jeopardizes our food supply or the livelihood of farmers or jeopardizes the food supply—to emphasize—for the 98 percent of Americans that buy and depend on the food that the 2 percent of Americans that are farmers produce.

I yield the floor.

The PRESIDING OFFICER. The Republican whip.

#### S.J. RES. 55

Mr. BARRASSO. Mr. President, as you know, in its final days in office, the Biden administration gave California—the liberal State of California—permission to export its far-left electric vehicle mandate to the entire country. This week, this Senate will end California's mandate madness.

Now, I listened to some of the Democrats' arguments on the floor yesterday. There was a lot of huffing and puffing going on about the sanctity of the Government Accountability Office and about the filibuster, which, let me

---



● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

Printed on recycled paper.

remind you, every single Democrat has promised to eliminate. There were wild accusations that the sky was falling on the U.S. Senate.

What nobody who tuned in heard is what these California rules would actually do to our country. Why not, Mr. President? Isn't that why Democrats are really so panicked? Isn't that why Democrats and Joe Biden waited until after the election—after they lost the election in the House, the Senate, and the White House—to spring this whole thing on the American people? They were losers going out the door, and they said: We are coming after you, the American people, with our leftist dreams.

Isn't that why they spent months coordinating this release with their allies at the GAO—so they could avoid or at least try to avoid Senate scrutiny under the Congressional Review Act? Isn't that what they were really up to? Well, it is what they were up to.

So why are the Democrats so darn desperate to talk about anything and everything except what these punishing rules will actually do to America, American workers, and the American economy? Let me tell you why.

California EV mandates ban—ban, ban—the sale of gas-powered cars and trucks. No more in America—gas-powered trucks. Can you imagine that in Oklahoma or in my home State of Wyoming? They threaten—the Democrats want to threaten the freedom of every American to choose what they drive. That is what this is about.

EVs currently make up 7 percent—7 percent—of the U.S. market. Even in California, they account for only 20 percent of vehicle sales. And do you know what else? The sales are stalling. They are stalling out. People don't want these. Even with the big government subsidies, people don't want to buy these things. Yet California's radical mandates require that by next year—it is coming; we are already into May of this year. By next year, by January, all vehicle sales in the State of California—35 percent of them have to be electric. That is 6 months from now, 7 months from now. By 2035, it would be 100 percent of vehicle sales in California have to be electric, with big penalties if it doesn't meet that.

For the people that are making the cars that people don't want to buy, this is a whole new meaning in California of fantasyland. That is what we are dealing with here.

America can't meet these impossible standards—not next year, not in 10 years—and the American people don't want to meet those standards.

For carmakers, the consequences are severe. If you don't sell enough electric vehicles—California is saying to them and to the other States that sign on to this—even when Americans don't want to buy them, too bad. In California, these people will pay a fine of $20,000 per vehicle—$20,000 per vehicle because people don't want to buy what the government says they have to buy.

There are ways to avoid this fine, and one way is limiting the sales of gas-powered vehicles. Well, that is rationing. That is what we are seeing. The Democrats want to ration the sales of gas-powered vehicles to live in their fantasyland of everybody driving an electric vehicle.

The harms of this mandate extend way beyond just carmakers. The Democrat mandates would cost the economy about $100 billion a year—$100 billion. The impact would be about 330,000 jobs lost.

The Democrat mandate would punish hard-working families. Prices would be higher. They are trying to buy these regular, gas-powered vehicles, but there would be fewer for sale. They would bury small businesses under crushing compliance costs.

In my home State of Wyoming and in rural States like ours, farmers and ranchers would suffer, both from EV's limited reliability and, clearly, from the limited range. People drive long distances in Wyoming to school, to the grocery store, to work.

Every American citizen would lose options, whether you live in California or not.

So you have the California EV mandates. The Democrats don't want to talk about that part of it. They are expensive, they are expansive, and they are economically destructive. They would hurt our economy, hurt our workers, and hurt the pocketbooks and purses of Mr. and Mrs. America.

This isn't just a California problem. It is a nationwide assault on gas-powered cars in America. The California mandates cover over 40 percent of all new cars in the country. They span 11 States, including big-population States—New York, New Jersey, here in the District of Columbia. All of them signed onto California's radical attempt to set a new national standard. So it is not just a California standard. Everyone is impacted.

The California Senators—the Members of this body—they actually brag about this overreach of this mandate on EVs. The junior Senator from California says he is "very proud" that his State's liberal agenda can control the country.

How many Members of this Senate—certainly on this side of the aisle—want to share the pride of California's liberal agenda controlling the country? The American public on election day rejected the liberal agenda of California—whether it comes to electric vehicles, whether it comes to open borders, whether it comes to sanctuary cities and sanctuary States, or their efforts to defund police. People have rejected, all across the country, the liberal agenda controlling our country.

So Democrats have this delusional dream. They want to eliminate gas-powered vehicles. The rest of us, we live in the real world. And that is what we are doing here today, because in the real world, gas-powered vehicles keep our farms running, keep our ranches

growing, keep our businesses thriving, and keep our economy moving.

The Congressional Review Act provides the Senate a swift and permanent solution. With a simple majority here in the Senate, Congress can kill these rules and ban similar ones forever—not just the Senate, the House as well.

And the fight goes beyond party lines because it is not just about Republicans and Democrats. It is about common sense. It is about control. The House of Representatives voted on this. They wanted to end these punishing mandates.

How did the vote go? Well, every Republican voted to kill the mandate. Thirty-five House Democrats voted to kill this mandate, including Democrats from the State of California who realized just how impractical and expensive and impossible it would be to comply with what the Biden administration tried to force-feed the American people after they lost the election, lost the Presidency, lost the House, and lost the Senate.

A New York Democrat who voted with the Republicans and with these 35 other Democrats said: "Out of touch with reality" is what these California mandates are—"out of touch with reality."

Even the junior Senator from Michigan, a Democrat, campaigned and won an election in 2024 against EV mandates. Well, we will see how she votes today on the floor of the Senate, after she campaigned last year in Michigan against the EV mandate.

Will she be against them today when we vote on this? Time will tell. She actually told voters: "Drive what you want." We will see today if she really believes that, or if she says: Drive what you want, but you can only buy what I am demanding that you buy—an electric vehicle.

We will see it in the vote today.

Senate Democrats now want to force-feed electric vehicles to everyone in America. So Democrats are claiming the Congressional Review Act doesn't apply. They don't want to talk about the policy. They want to say: Well, the Congressional Review Act shouldn't apply.

These last-minute objections by Democrats are very flawed. What they are citing is a nonbinding observation—an observation—by the Government Accountability Office—an observation that said, for the first time in history, an Agency-submitted rule wasn't a rule. That is what they are saying. The argument collapses under scrutiny.

The Environmental Protection Agency submitted these rules as rules to Congress this year, after being released by the Biden administration in his final days in office. That is a fact. No one disputes it. The Democrats don't dispute it. They know what happened. They know they are trying to sneak one through. They know it.

Under the Congressional Review Act, that makes these rules subject to review—period, end of story. They are subject to review.

May 21, 2025                         CONGRESSIONAL RECORD — SENATE                                         S3019

The GAO has no veto power over this body, the U.S. Senate—not a veto from the Congressional Review Act, not a veto under the Senate rules, not a veto under Senate precedent. They have no standing.

More troubling, the GAO's actions suggest bias because leftwing bureaucrats in the GAO rushed a response in only 13 days to prop up the mandates. How do we know that? Because we know they colluded with Senate Democrats to do so.

When Republicans challenged the GAO's observations, Senate Democrats turned to scare tactics now about the filibuster. It is ironic since every single Senate Democrat has either voted for or campaigned for eliminating the filibuster.

This Senate vote on the California EV mandates is not about Senate rules. It is about the Democrats' delusional dream to eliminate gas-powered vehicles forever. That is what they want. What their complaints are is a smokescreen to save a pillar of their Green New Deal.

You know, years ago, Congress created a fast-track procedure. It was actually in 1996. That is when the Congress passed the Congressional Review Act.

This week, the Senate must decide: Do we uphold our rights under the Congressional Review Act, or do we give the GAO a veto over Congressional Review Act now and forever?

Our decision is going to shape the future of the Congressional Review Act. Americans have spoken. They have rejected EV mandates in November at the ballot box. The House has acted in a bipartisan way, with 35 Democrats joining all the Republicans. And it is now up to the Senate to stop these EV mandates from taking hold on our Nation.

I want to thank my colleagues who led the effort: Chairman SHELLEY MOORE CAPITO of West Virginia, Senator DEB FISCHER of Nebraska, and Senator MARKWAYNE MULLIN of Oklahoma.

Together, we are going to reject this far-left cheerleading for more regulations, and we are going the protect consumers, and we are going to protect affordability, and we are going to protect the authority of this institution.

It is time to end this California mandate madness.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. THUNE. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The majority leader is recognized.

BUDGET RECONCILIATION

Mr. THUNE. Mr. President, Republicans are continuing our work on a reconciliation bill that delivers for the American people. And if I had to summarize this bill in one phrase, I would say it is about building a stronger America.

A stronger America is a safer America.

Last week, I discussed the importance of strengthening our border security, something we are addressing in our reconciliation bill. Today, I would like to discuss another aspect of that bill: strengthening our military to meet today's and tomorrow's threats.

The world has grown increasingly unstable in recent years. America's interests, our allies, and, worst of all, American servicemembers have come under attack. Russia, China, North Korea, and Iran and its terrorist proxies have all grown more brazen.

Meanwhile, the previous administration regularly telegraphed weakness on the world stage and put investing in our military on the back burner.

There is never a time when we can afford to let our military readiness slide. But above all, at this time of increased instability, it is vital that we ensure that our military has the resources it needs to deter our enemies and defend our country.

ADM Samuel Paparo, the commander of the U.S. Indo-Pacific Command, last year called deterrence "our highest duty."

He said:

Deterrence is effective when it is credible: The adversary believes the defending side will act on its threats when it is capable. A robust military with the ability to project power globally and inflict significant damage on the aggressor is essential.

Let me just repeat that:

A robust military with the ability to project power globally and inflict significant damage on the aggressor is essential.

That is the kind of military we need to secure with this bill.

Our aim is to reverse the trend of underinvestment in our military, to rebuild our military capabilities, and to ensure that our adversaries will think long and hard before attacking us—in other words, peace through strength.

One area where that is especially critical is in our strategic competition with China. Leaders of the intelligence community testified this year that China represents the most comprehensive, robust military threat to U.S. national security. Its designs on Taiwan are obvious, and its brazen actions, from cybertheft and espionage to its aggressive territorial claims and its harassment of American pilots are alarming.

But we have allowed China to outpace us in building new military capabilities. China produces two submarines per year for every 1.4 submarines built in the United States. China can build naval surface warships three times faster than we can. And in the defining technologies of tomorrow's wars—space, AI, hypersonics, and cyber—China is gaining quickly or already has an edge.

Republicans' reconciliation bill is about reestablishing the U.S. advantage in all those areas. We are going to invest in shipbuilding to expand and enhance our fleet. We will restock our munitions stockpiles and expand weapons production. We will modernize our nuclear deterrence and build a Golden Dome for missile defense here at home.

Our bill will expedite the delivery of innovative weapons to servicemembers on the frontlines. It will enhance the readiness of our military units and modernize infrastructure at depots and shipyards. And it will make improvements to servicemembers' quality of life.

To be clear, the investment we are making here in this bill, while critically important, is no substitute for robust annual defense funding levels. But it will help us catch up after years of the Biden administration's deprioritizing defense investments.

We can't afford to let our military readiness slide any further. We need to reverse the current trend and put our national security on a better trajectory for the future, and that is what our reconciliation bill will do.

A stronger America is a safer America, and that, Mr. President, is what Republicans intend to deliver.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Democratic leader is recognized.

S.J. RES. 55

Mr. SCHUMER. Mr. President, so 100 days into Donald Trump's Presidency, America is plagued with deep problems. Donald Trump's trade war is sending prices up and up. Republicans are on the brink of taking away people's Medicaid. Trust in American leadership is in decline on the world stage. But what are Senate Republicans focusing on today? Today, Republicans are going nuclear to appease the fossil fuel industry and, at the same time, erode away the institution they profess to care about.

First, the facts: This week, Senate Republicans want to use a measure known as the Congressional Review Act—CRA for short—to repeal three vehicle emission waivers from California. These waivers have been used for decades and are vital for helping keep our air cleaner, our kids healthier, and to lessen our reliance on Big Oil.

Republicans have tried to get rid of California's emission waivers for a very long time. The fossil fuel industry—which knows it is in decline, which knows that clean energy is not only the cleaner wave of the future but the less costly wave of the future—but the fossil fuel industry hates them, hates

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

that industry. So Donald Trump's EPA tried to rescind the last iteration of one of these waivers during his first administration, but that effort fell short in the courts. The courts rejected it. Now Republicans want to try again. This time by using the CRA to repeal these emissions waiver at a simple majority threshold.

But what was made crystal clear today on the Senate floor through parliamentary inquiries I made to the Parliamentarian that the Senate Parliamentarian has advised both sides, Democrats and Republicans, that legislation to overturn these waivers does not—does not—qualify for expedited consideration under the Congressional Review Act. That means any legislation to repeal these waivers should be subject to a 60-vote threshold in the Senate.

The Senate Parliamentarian, as we know, plays a vital role in keeping this institution whole. It is thankless work. Parliamentarians' advice and judgment on rules and procedures of this institution is indispensable to both parties. So Republicans face a choice: Do they adhere to Senate precedent, as they have long claimed to do, and find another way to pass their repeal or are they going to plow ahead, overrule the Parliamentarian, do the bidding of Big Oil, and further eat away at the Senate in the process?

Well, today we have our answer: Senate Republicans are going nuclear. Let's be very clear, to override the Parliamentarian and to use the CRA in the ways the Republicans propose is going nuclear—no ifs, ands, or buts.

And don't take my word for it. Let me read a quote from Leader THUNE from just a few months ago when he was asked if he would advise his party against moving to override the Parliamentarian, Leader THUNE said this:

Yeah, and that's totally akin to killing the filibuster. We can't go there. People need to understand that.

Again, Leader THUNE himself said: Overruling the Parliamentarian is akin to killing the filibuster, and that is just what the Republicans are proposing to do today.

Just yesterday, Leader THUNE admitted that this step could "create precedent for the future" and what an awful precedent.

And in his first address as Republican leader, Leader THUNE stood right here in the Chamber—I sat and listened—and promised that "one of my priorities as leader will be to ensure that the Senate stays the Senate."

Well, what happened to all of that? What happened to all the preaching we hear from the other side about norms and rules and precedent? Apparently, when the rules suit them, Republicans will preach about protecting precedent. But now that the rules are inconvenient, when they stand in the way of their ideological goals, Republicans say: Away with them.

Shameful. Shameful.

Republicans don't need to take the Senate down this road. They have other alternatives at their disposal. If they want to repeal these waivers, bring legislation to the floor. Have a debate. There is nothing that prohibits that. That is what should be done in the kind of regular order our Senate Republicans professed they were going to restore when they got here, when they got the majority here in January.

Make no mistake, this is not a narrow assertion of congressional authority, as Leader THUNE claimed it was. Today, Republicans set a new precedent that cannot likely be reversed. Moving forward, Congressional Review Acts will be weaponized like never before. Today it is all about California emission waivers; tomorrow, the CRA could now be used to erase any policy from an Agency that the Trump administration doesn't like at a simple majority threshold. They could go after permits for oil and gas drilling; some on the other side wouldn't like that. They could eliminate healthcare innovation waivers that States use to get care to people through Medicaid and the ACA.

They could even use the CRAs to make it even harder to form a union. They could go after Agency actions that protect access to reproductive care, like making it harder to access the medication mifepristone. They could go after rules that protect access to reproductive care.

All of this and more could now be done at a simple majority threshold with an expanded CRA. And all that would need to happen is for Donald Trump to choose an Agency action or policy he doesn't like, stamp it with a label "CRA," send it over to the Congress, and Republicans will bow in obeisance and repeal it at a simple majority threshold.

This, in other words, is a backdoor strategy from Republicans to make Project 2025 a reality. And mark my words, many of our Republican colleagues are going to not like having to vote on CRAs that Trump wants, and we will be able to get votes on them because of what the Republicans are attempting to do today.

It is the legislative branch ceding authority over to the executive if we go forward with this, and Republicans should tread carefully. What goes around comes around.

If Republicans are willing to overrule the Parliamentarian and highjack the CRA in a way that it has never been used before, they will not like it the next time they are in the minority. That is for sure.

So this is a sad, shameful, disappointing day for the U.S. Senate. Republicans will come to regret the ill-considered step they take today, mark my words. And our country, the health of our children, the health of our communities—the whole country—will be worse off because of what Republicans have done.

### BUDGET RECONCILIATION

Mr. President, now, on reconciliation, it is no secret how awful the Republican tax bill is. For weeks, we have said their bill shows that billionaires win; American families lose. Last night, the nonpartisan CBO proved that to be quite accurate.

The CBO's nonpartisan analysis shows that this bill would decrease household resources by 4 percent for the bottom 10 percent of Americans while increasing household resources by 2 percent for the top 10 percent of the country. To be clear, this bill would hurt the most vulnerable Americans, and the most benefits would only reach the top wealthiest—trickle-down economics, if there ever was one.

This bill hurts American families. They are the losers of this bill. American families will lose healthcare. They will lose food benefits. They will lose jobs. They will lose money. Bottom line: American families lose; billionaires win.

### SALT

Mr. President, and finally on the SALT deal, yesterday Donald Trump came to the Capitol to deliver a message to New York House Republicans:

Back down on SALT or else.

That is what he reportedly said, his words.

Less than 24 hours later, we are learning that New York Republicans have all bowed to the king and caved in obeisance to Trump. New York Republicans are showing, once again, that their loyalty does not lie with the volunteer firefighter in Bay Shore or with the teacher in Riverhead or even with the small business owner in Suffern. No. Their blind loyalty lies with Donald Trump.

The so-called SALT deal is a humiliating failure for New York Republicans. New York Republicans settled for barely half of what they wanted on SALT and barely a fraction of what Trump ripped away from them in the first term, and they are doing it because they are scared of the President and no relief for the marriage penalty. So if there is a firefighter and a teacher married to one another, nope. Being married hurts them in the SALT deal the Republicans made.

New York Republicans settled for SALT caps forever and a double tax on middle-class New Yorkers: our cops and firefighters, our teachers, our small businesses, our construction workers in the Hudson Valley, on Long Island, and across the State. I mean, even if New York Republicans did nothing, New York would be better off at the end of this year when the SALT cap would have expired.

This SALT deal leaves in place a penalty for married couples. A couple who are paying both taxes face the same limit as a single individual, even if they are paying double the taxes. This is one of the biggest issues facing middle-class families, and New York Republicans are leaving it in place. It is barely 20 percent of the New York Republicans' own SALT bill that they wrote.

One Republican Congressman— MIKE LAWLER—said last year:

Eliminating the marriage penalty within SALT isn't just important—it's absolutely essential.

Well, clearly it must not have been that essential.

New York Republicans have said for months that they had one job they were sent to Washington for: to get rid of the SALT cap. With this SALT deal, so-called SALT deal, they have failed everyone back home.

New York Republicans' capitulation to Trump on SALT is a slap in the face to Long Island, the Hudson Valley, New York City, and the hard-working, middle-class families across New York and across the United States.

I yield the floor.

The PRESIDING OFFICER. The Senator from South Carolina.

UKRAINE

Mr. GRAHAM. Mr. President, I will be making a quick presentation here and then Senator ERNST will follow, and I just want to compliment her for all the effort she has made to stand by Ukraine and make sure that this war ends in a way that is honorable and just. And we can stop the killing but do it in a way that we don't have future wars because we made a mistake here.

So there are so many things going on in the world right now that are very dangerous. You have Iran close to a nuclear breakout. You have the war in Russia and Ukraine. It is killing 5,000 people a day. Only God knows how many people are actually being killed or wounded, hard to track, but it is just massive. It is a major land war in Europe, and we thought those days were behind us.

We have threats from China. We have got all kinds of things going on in the world. So my advice is, when you have a hard decision to make, make sure you look at it through a moral clarity lens. Make it simple. Russia is the problem, not Ukraine. Ukraine didn't invade Russia; Russia invaded Ukraine.

We need moral clarity on all these issues. Iran is not trying to have civilian nuclear power; they are trying to build a bomb. We need to take them at their word as to what they intended to do over time. They intended to destroy the State of Israel, purify Islam, and come after us. That is what they say. They write on their missiles "Death to Israel," and they call us the "Great Satan." They have 600 pounds of highly enriched uranium—60 percent. That is enough for six or seven or maybe more bombs. They went from 60-percent to 90-percent enrichment in less than a month.

They have one civilian nuclear reactor. How much uranium has been used to run that reactor enriched by Iran itself? Not one gram. Think of all the fuel needed to run the civilian reactor from Russia. So they are trying to stockpile weapons-grade uranium to make a bomb; and they lie, cheat, and steal, and we catch them all the time.

So some moral clarity here. Iran with a nuclear weapon is not only un-

acceptable, it is the biggest threat to the planet, as I see it. The Arab nations want a nuclear weapon of their own.

And Israel—one Holocaust is sufficient. This is the 80th anniversary of the end of World War II. It happened a few days ago. During that war, there was an effort to annihilate the Jews. Founding the State of Israel in 1948 was a significant world event. And there is a saying in Israel, "Never again." They actually mean it.

(Mr. SHEEHY assumed the Chair.)

How about moral clarity from the United States here? We are with Israel. If Israel has to use military force to destroy or degrade the nuclear capability of Iran, we should be with them. I am glad we are trying to find a peaceful solution to the uranium problem. If you can get Iran to dismantle their nuclear program, then that gets us to where I want to go. But they have to dismantle.

Right now, there are discussions between Russia, Ukraine, and the United States and Europe about how to end this war. Putin, in my view, is playing us all. President Trump called for a 30-day cease-fire. Ukraine said yes; Russia said no. President Trump urged Zelenskyy and Putin to go to Istanbul—I was over there—and meet to have direct talks. Zelenskyy went; Putin didn't.

So there was a call a couple of days ago between President Trump and Putin. The Russians now are supposed to submit a terms sheet about what it takes to get a cease-fire. That is supposed to happen in a few days. They are talking about going to the Vatican and having direct negotiations. I am for all of that, but I don't know about how. I think most people feel like I do. We have given Russia plenty of opportunity to find an honorable and just end to this war. They are not interested, and they are not going to change until we up the ante.

So we need moral clarity here. Putin is dragging this out. He believes he is winning on the battlefield. I don't believe he is. He is defying every effort that has been earnest by President Trump to find a solution to this war. President Trump says he wants to stop the slaughtering and the killing. He is right to do so. But this is a time of decision-making. This has gone on too long with too many games being played.

I will tell you in just a minute what the Senate can do. But what we need when it comes to Russia-Ukraine is moral clarity. When President Trump focuses on an issue and takes a firm stand, it always works. He is standing up to China and the world who has been ripping us off on trade. He has a policy now that whatever you charge us on tariffs, we are going to charge you. It is called reciprocal trade. He has imposed tariffs on China.

Everybody in this body goes home and talks about how China rips us off. Trump is actually doing something

about it. China steals our intellectual property, they manipulate the currency to get them a trade advantage, and that needs to come to an end.

When President Trump focuses on fixing a problem—righting a wrong—he gets good results because the world now is calling Washington wanting deals. I think you are going to see a lot of good trade deals to right the wrong of trade abuse because President Trump stood up and insisted we get a better outcome.

The border. When he got in office, one of his top priorities was to fix a broken border. Look at what has happened. The lowest daily number of border encounters fell to less than 200, the lowest in history. He turned it all off because he was firm and resolved with Mexico and others. His border policies have worked. He has shut down a broken border, literally, in months because he had the desire and the will to do it, and people responded. And we are getting a great result at the border because of his determination and his will to do so. We went from 7,200 in March down to 200—that drop is amazing—because of his policies.

China, I just talked about. He is taking China on, and I am hoping we can reach a deal with China that will level out the trade playing field. China is talking to us; we are talking to China. The world is responding to President Trump's tariffs. We are going to get a bunch of good trade deals. And I very much appreciate that.

What did he say about Iran?

You know, it's not complicated formula. Iran cannot have a nuclear weapon. That's all there is.

That is moral clarity. You can understand that, no matter where you are at on the planet:

You know, it's not complicated formula. Iran cannot have a nuclear weapon. That's all there is.

We are in talks with Iran. Whether or not they achieve a result, I don't know. I don't mind trying. I do know this: Time is not on our side. President Trump said we are going to end the nuclear program one way or the other. When he said it, I think the Iranians believed it; and when he says it, I believe it. And the best chance to stop the Iran nuclear program is with President Trump's leadership.

Moral clarity, again, regarding Russia and Ukraine. Russia is the aggressor. Russia must end this bloodbath now. He has talked about ending the bloodbath. I am saying, from my point of view, Russia is the aggressor. Ukraine, like every other Nation, is not perfect. But they have fought like tigers.

In 1994, 1998—I can't remember—they gave up 1,700 nuclear weapons, the Budapest Memorandum. In return, Russia, the United States, Great Britain promised territorial integrity. They gave up 1,700 nuclear weapons with a promise from these countries they would be safe territorially.

Russia has violated that promise numerous times. They are constantly

(70 of 196), Page 70 of 196  Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 70 of 196
Case 4:25-cv-04966  Document 1-3  Filed 06/12/25  Page 7 of 82
S3022

harassing their neighbors. This is the second invasion of Ukraine by Russia. They have a view Ukraine belongs to them. No, it doesn't. It belongs to the people of Ukraine, a sovereign nation. If you have a dispute with a country, there are ways to arbitrate land disputes.

Putin is trying to rewrite the map of Europe by force of arms. If he gets away with it, if he is seen to having been rewarded for, you will get more of this. There goes Taiwan. Russia is the aggressor. Russia must end this bloodbath. That is my view of this situation.

Let's look at history and see what happens when you have moral clarity and see what happens when you lose it. September 27, 1938. Here is what Chamberlain said:

How horrible, fantastic, incredible it is that we should be digging trenches and trying on gas-masks here because of a quarrel in a faraway country between people of whom we know nothing.

That was his view of what Hitler was doing. Why do we care? We don't know these people. We don't speak their language. That is not exactly moral clarity in the face of Nazi oppression:

However much we may sympathize with a small nation confronted by a big and powerful neighbour, we cannot, in all circumstances, undertake to involve the whole British Empire in war simply on her account.

We know what that small country was. It led to the slaughter of 50 million people. It enticed Hitler to keep going, and Hitler told you what he was going to do. He wrote a book. Chamberlain, obviously, didn't read the book, and he didn't have the moral clarity to confront the Nazi regime. And a lot of people died.

September 30, 1938:

I believe it is peace for our time.

A paper signed by Adolf Hitler that he waved to the world. Less than a year later, the world is on fire. This is what happens when you don't realize what is going on. You misread evil. You think Hitler is something he is not. This is an example of not having moral clarity. It leads to a worldwide war.

Russia, the Soviet Union—this is an example of moral literacy, President John F. Kennedy:

Let every nation know, whether it wishes us well or ill, that we shall pay any price, bear any burden, meet any hardship, support any friend, oppose any foe to assure the survival and the success of liberty . . . When all are free, then we can look forward to that day when this city will be joined as one and this country and this great continent of Europe in a peaceful and hopeful globe.

He was talking about Berlin—moral clarity to the Soviet Union. He stood up for freedom, stood against the Soviet Empire.

And along comes my favorite, Ronald Reagan:

Mr. Gorbachev, tear down this wall!

How clear could you be? On the other side of this wall is an evil empire that moral clarity, over time, brought the Soviet Union down to its knees.

Russia today, Putin's Russia, is an evil country oppressing his own people, harassing his neighbor, wanting to take things that are not theirs, wanting to recreate the Soviet Union, the Russian Empire. And they are using every terrible tactic in the military book—bombing civilians, killing people by tens of thousands.

So when it comes to Putin, we need to have moral clarity, as Reagan and Kennedy had with the Soviet Union. It is not enough to give speeches. These were great speeches. But what we did against the Soviet Union is we built up our military. Ronald Reagan went to ''Star Wars'' and they couldn't keep up. We not only opposed the Soviet Union rhetoric, we opposed it in capability.

What do we do now with Putin? How do we end this war? I am not out to humiliate Russia or Putin, but I am out to end this war soon—not later but soon—in a way not to start another war.

When we left Afghanistan dishonorably and disgracefully, it set in motion a belief that the United States will not stand by its allies and we are apparently weak. I believe that. And the Presiding Officer of the Senate understands what happens when politicians get it wrong. People like him, in his old job, pay a heavy price. They go all over the world fighting these guys because when we pulled out of Afghanistan, every jihadist was on steroids. Putin licked his chops and went into Ukraine and Iran, kept enriching, and sort of the rest is history. That was a horrible decision, and we are paying the price for it today.

To my colleagues, Republican and Democrat, if we don't get Ukraine-Russia right, it will be worse than Afghanistan. If it is seen, when this is all over, that Putin was rewarded for his aggression—I am not trying to humiliate Russia, but I am trying to make sure they are not rewarded in a way that China will be enticed to take Taiwan or Iran will believe we are all talk in the West when it comes to their nuclear capability, isolating Israel even further.

Speeches are important. Moral clarity is the right lens from which to look through regarding aggression and evil. But we have to do more than talk.

I appreciate President Trump's earnest effort to bring the parties together, to find a solution we can all live with, to keep an independent, sovereign Ukraine and end this war sooner rather than later. It is clear to me after all these months, the earnest efforts by President Trump are not being equally met. I think Zelenskyy is ready to make concessions to end this war. Putin seems to be more talking and less acting.

What can we do to up the ante? What can we do in the U.S. Senate to change the equation? What can we do to persuade Russia to get to the peace table?

We can impose bone-crushing sanctions on Putin's Russia. And he has

earned that. I hate it for the Russian people, but it is now time to increase the cost of this war on Putin.

The sanctions packet that we have put together has 80 cosponsors. Do you know how hard it is to get 80 Senators to agree on anything? Eighty of us—and the number is climbing—are ready to impose sanctions on Russia if he does not come to the table and earnestly seek peace—Putin.

And these sanctions are geared toward China. There are tariffs in these sanctions on any nation that buys Russian oil and gas from the shadow fleet. Putin's war machine is propped up by China and India buying Russian oil at a massive discount to keep the war machine and Putin running.

So what have we decided to do here? Focus on those causing the problem, not just Putin; focus on his customers.

Most of Europe has weaned themselves off of Russian oil and gas. That is a major advancement. But it is now time to let the Chinese know: If you want to be a normal country, act normal. If you want to have a better relationship with the United States and Europe, help us. Don't fuel the flames of a bloodbath. Don't buy cheap oil from a despot because you can with impunity. Those days of buying cheap oil from Putin with impunity are coming to a close.

We are going to act. And how we act and when we act will be a political exercise among the body, talking to the White House, and talking to our allies.

To China: I would like a better relationship. We have a lot of opportunity to grow our economies together. But if you keep supporting Putin and fueling his war machine, you will never have a normal relationship with the U.S. Senate.

To our friends in India: Watch what you are doing.

To my colleagues: Seldom do we have a chance to speak with one voice at such an important time. The entire world is watching the U.S. Senate.

I just got back from T rkiye with Secretary Rubio, who invited me to go. He allowed me to speak to every Foreign Minister of our NATO allies, talking about the Senate bill, telling them that the Senate is an independent body and that we are moving down the road to holding Putin accountable.

The world is watching the Senate in a way I haven't seen since I have been here. We have a chance, my colleagues, to help end this war. We have a chance to push Putin to the table. And if we fail as a world, not only does this war continue, but we are going to start new wars.

I have never been more proud of this body than I am right now. We have come together in a bipartisan fashion. There are a group of House Members who will take the Senate bill and sign a discharge petition. What does that mean? It is coming to the floor of the House no matter what.

So we stand ready. I am going to talk to the majority leader, talk to all of

*May 21, 2025*                    CONGRESSIONAL RECORD — SENATE                    S3023

my colleagues who have a say in how this bill moves forward, and I am going to urge them to get ready to act.

We have sat on the sidelines too long. We have watched too many people get slaughtered by Putin. We have put sanctions on, but they haven't worked the way they should.

What we are doing in the Senate is a game-changer. It will affect China, which provides the most fuel to Putin's war machine in a dramatic fashion.

To China: I don't want to do that. I will, if I have to. I want you to help us in this war. I am not looking to punish or destroy your economy or hurt our economy. I am looking to get a result here.

But I will end where I started: If we have to, we will.

President Kennedy said: "We shall pay any price and bear any burden." He was right.

President Reagan said: "Tear down this wall"; end this evil empire.

Sometimes, freedom comes at a heavy price. The Ukrainians are paying that price, and I am so proud of them. They are fighting like tigers, and they are dying by the thousands. And they are not going to quit no matter what we do—nor should they.

This is a moment of reckoning. This is a moment that matters. All of us got to the Senate, and it is not an easy path to take to get elected to this body. But now you are here, and you have a chance, my colleagues, to make a real difference, to make this world safer and more peaceful.

Let's not shirk the responsibility history has put upon us. This is a historical moment. Let's rise to the occasion like those before us. Let's have moral clarity when it comes to Putin. Let's do more than talk. Let's act.

I will yield to Senator ERNST, who has been a champion for getting a good outcome for Ukraine and the world.

I very much appreciate all you have done in this cause.

The PRESIDING OFFICER. The Senator from Iowa.

Ms. ERNST. Mr. President, I want to thank my colleague and great friend, as we work on this together.

I really appreciate your leadership. Thank you for allowing me to join you on the floor today as we show our support for your bill, Sanctioning Russia Act of 2025. Thank you, Senator GRAHAM.

Folks, last week, President Trump showed the world that American leadership is back. He brought home the last living American hostage, delivering Edan Alexander from Iran-backed Hamas and reuniting him to his family after nearly 600 days. He stood with our partners in the Middle East to strength the historic Abraham Accords. And he delivered a strong message to Vladimir Putin: End the war.

Today, I stand in support of a sovereign Ukraine and echo the President's call to Putin to stop this bloodbath that never should have happened.

This is an issue that not only affects a close partner under siege but also the strength of the United States of America and the security of the free world.

Let's be clear here, folks: China is watching; so are Iran and North Korea. And, of course, Vladimir Putin is watching too. They call it the "new axis of evil" for a reason.

I personally witnessed and experienced the growth of the U.S.-Ukrainian relationship when I visited Ukraine, in its waning days of Soviet control, as part of an agricultural student exchange program. This was in 1989.

I had the privilege of living with a Ukrainian family on a very small collective farm. As we got together, there were a number of us Iowa students on that exchange. Again, it was an agricultural exchange. We came together, each of us with our families, in a group setting, one of the very first nights that we were on that collective. Again, with the premise of an agricultural exchange—we were farming tomatoes, working with the cattle and the hogs—a very small, small collective. We came together, and the Ukrainians wanted to ask us questions. So all of us American students, all of us from Iowa, we sat down with our Ukrainian families. We expected to talk about agriculture—Iowan agriculture versus Ukrainian agriculture. Much to my surprise, the first question that came from our Ukrainian counterparts was not about how we raise corn or soybeans in Iowa. It was not about the types of machinery that we use on our farm. But the first question the Ukrainians asked us was, What is it like to be free? What is it like to be an American? Because in 1989, those Ukrainians were living under Soviet socialist rule. They could not travel without having the permission of their government.

My family did not have a telephone, and if they wanted to use the collective manager's telephone, they would have somebody listening in on the conversation. They would have to know the purpose of the telephone call, whom they were calling, why they needed to make a telephone call.

This was 1989, and I learned a lot from that exchange. I saw a Ukrainian people who were desperate to break free of socialist economic structures and authoritarian restrictions on freedom of movement, the ability to have your own employment, and on freedom of speech.

Two years later, Ukraine declared its independence from the Soviet Union and broke free.

Later—many years later—in 2003, the United States is involved in the war in Iraq. I was a soldier in 2003 during Iraqi Freedom. I was a transportation company commander, permanently stationed in Kuwait.

My transporters ran convoys from the ports in Kuwait up to Iraq, delivering goods for our warfighters. So I got a little subcamp in Kuwait, outside of Camp Arifjan. Half of that subcamp, called Camden Yards, was occupied by American forces. My soldiers and I lived on that subcamp. The other half of the camp was occupied by other forces. Those other forces were Ukrainian soldiers.

Ukraine is not part of NATO. They were not required to support the United States of America in Iraq. But Ukraine, of its own volition, sent their soldiers—and not just as support elements. They were there as combat forces.

Again, I was a transporter. We ran convoys in Iraq. The other half of that camp that I lived on, they were Ukrainian engineer forces. They did road clearing.

I think back: How many American lives did those engineers save from their road-clearing efforts, clearing bombs so they wouldn't be detonated by my drivers—Ukrainian forces, combat forces?

Today, Ukraine is fighting its own war. And I will remind everyone, the United States does not have forces involved in the Russia-Ukraine war—none, zero, none.

Today, Ukraine fights not only for its own survival but for the very principles the United States was founded on. When America leads, the world is safer. When we disengage and when we retreat, like we saw for the last 4 years under the Biden administration, chaos fills the void.

Russia's aggression has already cost too many innocent lives, about 5,000 lives every single week. Those are too many innocent lives, folks, which is why I support President Trump's efforts to get a peace deal done now. Vladimir Putin cannot keep tapping the United States of America along.

I vow to keep working with my colleagues to equip the President with all the tools necessary to hold Russia accountable, including sanctioning Russia and its supporters if they continue to drag out these peace talks and carry on with the needless bloodshed so this war that never should have started can come to an end.

I yield the floor.

The PRESIDING OFFICER. The Senator from Washington.

Ms. CANTWELL. Mr. President, I ask unanimous consent to complete my remarks before the vote starts.

The PRESIDING OFFICER. Without objection, it is so ordered.

### BUDGET RECONCILIATION

Ms. CANTWELL. Mr. President, I come to the floor to talk about the action that we are seeing in the House of Representatives today that will lead to action here in the Senate and asking our colleagues to reverse course on this reconciliation bill that I think is going to have unbelievable economic consequences to our economy.

Trillions in red ink that are alarming credit agencies and bond markets, spiking billions in energy project costs, and driving up prices and burdening States with billions of dollars of new healthcare that they can't afford.

Instead, they should be focusing on protecting healthcare coverage, lowering costs for American families, and

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

giving working families the breathing room they need to prosper.

Even now, 5 years later out of COVID, we can still see the effects of the pandemic. That time changed the way we live and took a toll on our economy. The U.S. economy lost 23 million jobs at the start of the pandemic, leading to a recession in early 2020, and thanks in no small part to well-designed, bipartisan fiscal policies by both Congress and the Biden administration, the recession that started was the shortest in history, lasting only 2 months.

Coming out of it though, the combined effects and impacts on our supply chains and durable goods caused inflation to spike to 9 percent by June of 2022. Again, well-designed fiscal policies by the Fed helped get that inflation back down in just 1 year to 3 percent by June of '23 and continue to lower and hover just above 2 percent.

We need, though, to continue to make progress on inflation and costs—costs that impact everything from clothes, cars, food, computers, you name it, and costs may be getting even more expensive because of the impacts of the tariffs, and they are making their way onto our shelves.

The last thing American families need is to be saddled with even more financial restraint, particularly as it relates to Medicaid and the policies in the reconciliation bill. More than 72 million Americans are enrolled in Medicaid, making it the single largest insurer in the United States.

It is critical that it remain a critical part of our healthcare system. Depending on the State, the Federal Government covers somewhere between 50 and 70 percent of the cost of insuring people with Medicaid. While Medicaid is administered jointly by the Federal Government and, in most States, about two-thirds of the funding for the State Medicaid program is Federal support. So make no mistake about it, cutting Medicaid at the Federal level is going to have a dramatic economic impact on States. It is the largest source of Federal funding for States.

It is the largest component expenditure across all States—more than K–12, more than higher education, more than transportation—and somehow, in an economy with great inflation, you think the idea is to make it more expensive for Americans to get health insurance and cover their costs and impact the economy?

The bill that is now being cobbled together is a serious attack on Medicaid. As an assault, they will continue to have ripple impacts on the economy. It undermines the Medicaid program, shifting the burdens to the State, and it makes the entire healthcare system more expensive for everyone.

Medicaid provides financial support to the healthcare sector, stimulates local economies—spending that does have a multiplier effect. Every dollar spent generates more than $1 worth of economic activity. Medicaid drives employment in the healthcare sector, it generates State and local revenue, and it saves money for the enrollees to spend on more items—not healthcare.

But reductions in the Medicaid funding, especially as large as $715 billion, will take a toll on States, on jobs, on revenue, and it will increase the financial burden on individuals and families.

So it is important to remember that direct recipients of Medicaid are not just individuals with coverage. They are a payment system. They are the benefits of a healthcare system, hospitals, doctors' offices, pharmacies, nursing homes. And so when you cut that funding, you are cutting those businesses and those opportunities. The impact on the State economy would be greater than the loss of Federal Medicaid funding because of the ripple effects of the costs across the State.

The Commonwealth Fund estimated that, collectively, States' gross domestic product could be cut $95 billion smaller than the total economic output lost, and that could be even deeper.

So imagine every State now having $2 billion more costs because of Medicaid. The additional loss in individual income would mean that State and local revenues would decline by $7 billion. This would make it harder for States and localities to balance the burden of Medicaid.

And our constituents would also see more far reaching impacts as they struggle to provide healthcare. Today, 49 States, plus the District of Columbia, are all part of the system and counting on these providers and the funds. But this bill even eliminates the ability for States to adjust the revenue in any way that would be helpful for them to deal with this crisis. So this is an extreme approach to cutting American citizens off of the healthcare.

But think a bit about it for a second on the work requirement—also almost like a surveillance of U.S. citizens, trying to make them prove that they are eligible. Let's be honest; the provisions are not designed to cut down on waste. Rather, their primary objective is to prevent people from signing up for Medicaid coverage. In Arkansas, the casework requirement led to disenrollment of 18,000 people in just 4 months. And in New Hampshire, the complexity and administrative burden of the work requirement caused 17,000 beneficiaries to receive coverage termination in just 1 month.

Today, Georgia is the only State that has a work requirement for Medicaid. And instead of expanding Medicaid through the Affordable Care Act, it allows individuals and households that have income up to 100 percent of the Federal work poverty to get coverage if they work for 80 hours a month. The results are not good. A report found that Georgia's model cost taxpayers—taxpayers, not these individuals—cost the taxpayers $87 million and enrolled only 6,000 people, about 75 percent fewer than had been projected. So I ask again, what policy is this that saves money?

It makes healthcare more expensive for the rest of us. Nobody defers their healthcare costs. They are just going to show up at the emergency room. Just because we are cutting spending, it doesn't mean that the need magically disappears. States will have to find their way to make up for these shortfalls. A Kaiser analysis found that the House reconciliation bill—if it is enacted, the State of Washington would need to spend 30 percent more per Medicaid enrollee to make up the difference.

We don't have those resources. The same will be true of every State. For example, Louisiana would have to spend 50 percent more per Medicaid enrollee to make up the difference, translating into an 11 percent increase in the State taxes if they had to do that. Now is not the time to force our States to jump off of a cliff just because we won't live up to our Medicaid obligation.

I know the President used the f word, but what is real here on the Senate floor—I am not going to say it—but you are making a mess out of Medicaid, and we should stop them.

I yield the floor.

VOTE ON MOTION

The PRESIDING OFFICER. Under the previous order, all time is expired.

The question is on agreeing to the motion to proceed.

Mr. BOOZMAN. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

The result was announced—yeas 69, nays 31, as follows:

[Rollcall Vote No. 263 Leg.]

YEAS—69

| | | |
|---|---|---|
| Alsobrooks | Gallego | Moreno |
| Banks | Gillibrand | Mullin |
| Barrasso | Graham | Murkowski |
| Blackburn | Grassley | Ossoff |
| Blunt Rochester | Hagerty | Padilla |
| Booker | Hassan | Ricketts |
| Boozman | Heinrich | Risch |
| Britt | Hoeven | Rosen |
| Budd | Husted | Rounds |
| Capito | Hyde-Smith | Schiff |
| Cassidy | Johnson | Schmitt |
| Collins | Justice | Scott (FL) |
| Cornyn | Kelly | Scott (SC) |
| Cortez Masto | Kennedy | Sheehy |
| Cotton | Lankford | Slotkin |
| Cramer | Lee | Sullivan |
| Crapo | Luján | Thune |
| Cruz | Lummis | Tillis |
| Curtis | Marshall | Tuberville |
| Daines | McConnell | Warner |
| Ernst | McCormick | Warnock |
| Fetterman | Moody | Wicker |
| Fischer | Moran | Young |

NAYS—31

| | | |
|---|---|---|
| Baldwin | Hirono | Paul |
| Bennet | Kaine | Peters |
| Blumenthal | Kim | Reed |
| Cantwell | King | Sanders |
| Coons | Klobuchar | Schatz |
| Duckworth | Markey | Schumer |
| Durbin | Merkley | Shaheen |
| Hawley | Murphy | |
| Hickenlooper | Murray | |

*May 21, 2025* **CONGRESSIONAL RECORD — SENATE** **S3025**

| Smith | Warren | Whitehouse |
| Van Hollen | Welch | Wyden |

The motion was agreed to.

## GUIDING AND ESTABLISHING NATIONAL AND INNOVATION FOR U.S. STABLECOINS ACT

The PRESIDING OFFICER (Mr. RICKETTS). The clerk will report.

The senior assistant legislative clerk read as follows:

A bill (S. 1582) to provide for the regulation of payment stablecoins, and for other purposes.

The PRESIDING OFFICER. The majority leader.

### AMENDMENT NO. 2228

Mr. THUNE. Mr. President, I call up my amendment No. 2228 and ask that it be reported by number.

The PRESIDING OFFICER. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from North Dakota [Mr. THUNE], for Mr. RICKETTS, proposes an amendment numbered 2228.

The amendment is as follows:

(Purpose: To provide for expedited certification of existing regulatory regimes)

In section 4(c), add at the end the following:

(8) EXPEDITED CERTIFICATIONS OF EXISTING REGULATORY REGIMES.—The Stablecoin Certification Review Committee shall take all necessary steps to endeavor that, with respect to a State that, within 180 days of the date of enactment of this Act, has in effect a prudential regulatory regime (including regulations and guidance) for the supervision of digital assets or payment stablecoins, the certification process under this paragraph with respect to that regime occurs on an expedited timeline after the effective date of this Act.

---

## PROVIDING FOR CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION RELATING TO "FEDERAL MOTOR VEHICLE SAFETY STANDARDS; FUEL SYSTEM INTEGRITY OF HYDROGEN VEHICLES; COMPRESSED HYDROGEN STORAGE SYSTEM INTEGRITY; INCORPORATION BY REFERENCE"—Motion to Proceed

Mr. THUNE. Mr. President, I move to proceed to Calendar No. 85, S.J. Res. 55.

### VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion to proceed.

Mrs. GILLIBRAND. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Virginia (Mr. WARNER) is necessarily absent.

The result was announced—yeas 53, nays 46, as follows:

[Rollcall Vote No. 264 Leg.]

YEAS—53

| Banks | Graham | Moreno |
| Barrasso | Grassley | Mullin |
| Blackburn | Hagerty | Murkowski |
| Boozman | Hawley | Paul |
| Britt | Hoeven | Ricketts |
| Budd | Husted | Risch |
| Capito | Hyde-Smith | Rounds |
| Cassidy | Johnson | Schmitt |
| Collins | Justice | Scott (FL) |
| Cornyn | Kennedy | Scott (SC) |
| Cotton | Lankford | Sheehy |
| Cramer | Lee | Sullivan |
| Crapo | Lummis | Thune |
| Cruz | Marshall | Tillis |
| Curtis | McConnell | Tuberville |
| Daines | McCormick | Wicker |
| Ernst | Moody | Young |
| Fischer | Moran | |

NAYS—46

| Alsobrooks | Hickenlooper | Rosen |
| Baldwin | Hirono | Sanders |
| Bennet | Kaine | Schatz |
| Blumenthal | Kelly | Schiff |
| Blunt Rochester | Kim | Schumer |
| Booker | King | Shaheen |
| Cantwell | Klobuchar | Slotkin |
| Coons | Luján | Smith |
| Cortez Masto | Markey | Van Hollen |
| Duckworth | Merkley | Warnock |
| Durbin | Murphy | Warren |
| Fetterman | Murray | Welch |
| Gallego | Ossoff | Whitehouse |
| Gillibrand | Padilla | Wyden |
| Hassan | Peters | |
| Heinrich | Reed | |

NOT VOTING—1

Warner

The motion was agreed to.

---

## PROVIDING FOR CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION RELATING TO "FEDERAL MOTOR VEHICLE SAFETY STANDARDS; FUEL SYSTEM INTEGRITY OF HYDROGEN VEHICLES; COMPRESSED HYDROGEN STORAGE SYSTEM INTEGRITY; INCORPORATION BY REFERENCE"

The PRESIDING OFFICER. The clerk will report the joint resolution by title.

The senior assistant legislative clerk read as follows:

A joint resolution (S.J. Res. 55) providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the National Highway Traffic Safety Administration relating to "Federal Motor Vehicle Safety Standards; Fuel System Integrity of Hydrogen Vehicles; Compressed Hydrogen Storage System Integrity; Incorporation by Reference".

The PRESIDING OFFICER. The Senator from Rhode Island.

### CLIMATE CHANGE

Mr. WHITEHOUSE. Mr. President, let me describe what I think is going on here on the Senate floor. Today is an unusual and interesting day.

What we understood the plan was, was that the majority was going to move to the Congressional Review Act regarding the California clean air rule in an effort to overrule the Clean Air Act rule for the fossil fuel industry, which the majority so diligently serves.

The problem with that is that the Parliamentarian has ruled that the Congressional Review Act does not apply to the waiver that California gets, allowing it to do its own clean air standard. So they had a problem. The problem was that Democrats were going to make a point of order saying: Hey, you can't do that. We have argued this matter. We both went before the Parliamentarian. We made our case. We filed our pleadings. We got a decision. In our view, it was not even a close call of a decision. But that is in our view. And what you are really doing here is, for the fossil fuel industry, going nuclear, overruling the Senate Parliamentarian to accomplish a legislative task—to amend, basically, the Congressional Review Act—and then open the door for that to undo a 30-year tradition of California and other States like Rhode Island being able to operate under better clean air standards and the vehicle emissions standards than the Federal Government may be willing to accomplish.

So that is where we thought we were. Now, what is happening is that we have gone to a different CRA, this one having to do with hydrogen vehicles. The minority has 5 hours. There is a total of 10 hours, evenly divided. I suspect the majority is not going to use much of that time. But the minority has 5 hours to talk about what is going on.

We are now in the 5-hour debate period on the hydrogen vehicle CRA, as the majority moves toward making its play on the California clean air standard.

This is a slight bump in the road for them, but our understanding is that there is a new plan. The new plan is, at the conclusion of our 5 hours, to make a new point of order that allows them to do the California CRA effort and create a new way to get around the terms of the Congressional Review Act.

The predicament for them is that the Congressional Review Act, as a law—passed by the Senate, passed by the House, signed into law by the President—says: In the Senate, which is where we are, when a committee is discharged from further consideration of a joint resolution, which is where we are, all points of order against the joint resolution are waived.

They intend to create a Senate exception to that. We expect the Parliamentarian will say, when they offer this point of order, based on the statute, based on the law, well, that is not in order. Then they will go nuclear on this. They will bring everybody back to, by a simple majority vote of 51, overrule the Parliamentarian as to that new point of order.

The purpose is to create a point of order that allows a bypass of the Parliamentarian's decision—a very sound one, a clear one, in my view, based on precedent, law, history, tradition, all of it—that the CRA effort to undermine California's clean air standard does not work under Senate rules.

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

In a sense, this is like a double nuclear option. They are going to overrule the Parliamentarian to create a new point of order under the CRA that will amend, in effect, the CRA. It will make the law regarding this no longer effective because they will come in and overrule the Parliamentarian.

And, then, even though the Parliamentarian's ruling is that you can't use the CRA to go after the California waiver, they don't have to overrule that directly because they will have, by overruling the Parliamentarian, created this little end-around.

So I guess this is a demonstration of how many hoops the Senate majority is willing to jump through for their fossil fuel supports.

And it ends at the same point, which is the purpose of the exercise. It ends with the Parliamentarian being overruled, and it ends with an attack on California and other sovereign States' ability to require cleaner air and lower vehicle emissions in their States.

Now, why does that matter? Well, obviously, if you are the fossil fuel industry, one of the things you sell is gasoline, and one of the things that the California clean air and emissions standards do is to require the auto industry to make automobiles more efficient—maybe even make them hybrid, maybe even make them electric. And whether they are more efficient or hybrid or electric, it all ends in the same place for the fossil fuel industry, which is: We can't sell as much polluting gasoline, and we want to sell more gasoline, and we don't like clean air standards that get in the way of us selling as much gasoline as we want to.

So we are here through this complex parliamentary rigmarole to overrule the Parliamentarian to get around her ruling that the Congressional Review Act only covers rulemakings, not the California waiver and other things. One of the problems with that is that—you know, if you give a mouse a cookie—it doesn't stop here; it opens the Congressional Review Act, which was very specifically designed to address rulemakings within a period of time after the conclusion of the rulemaking. And this would allow essentially anything you could put into the Federal Register to be submitted to Congress for Congressional Review Act review, no matter when it was done. All you have to do is re-up it with a submission and send it in to Congress, the California waiver being an example of that in the sense that it has been around for about 30 years now.

So one of the Congressional Review Act's limitations was it had a brief time window in which you were allowed to come to Congress to disapprove a rule, and that time period is now blown to smithereens if they go through with this parliamentary scheme.

The second thing is, it had to be a rulemaking; that it added a process at the end of the Administrative Procedure Act rulemaking, when the rule was finally enacted into law as an Agency rule. You always had the ability to go to court and sue and say that the Administrative Procedure Act was violated, it is arbitrary and capricious, was a violation of the law or whatever. This gave it political extra opportunity, which was to jump straight to Congress and just ask us to disapprove it. You don't have to prove, then, that there is anything wrong with the rule; just, politically, we don't like it so we are going to jam it.

And so, when you expand beyond just APA rulemaking to essentially any Executive decision that can be dumped into the Federal Register to create a submission that can then be brought here, you have opened a massive, massive array of Executive actions to Congressional Review Act disapproval.

As my colleagues have said, it could be as simple as a lease, as simple as a permit, as simple as a license. Essentially, any Executive decision since the passage of the Congressional Review Act can now be brought here on a purely political basis and—boom—blown up.

If my colleagues on the other side don't think that we will use this if they do this, they have taken leave of their senses. Of course we will. They are about to create a new Senate in which the CRA can be used for an immense array of purposes, well beyond what the actual law says.

(Mr. SHEEHY assumed the Chair.)

They don't have to be doing this. Let's be clear. They do not have to be doing this. There are other ways to serve their fossil fuel industry friends in the industry's desire to attack the vehicle emissions standards, the clean air standards. There are a whole bunch of them. One, they could do it administratively.

In fact, in 2019, the Trump administration withdrew a previously granted Clean Air Act waiver. And to do that, it made findings per a Clean Air Act process—administrative findings per a Clean Air Act process—as to the three criteria established under the Clean Air Act that determine whether a waiver application gets granted or denied.

So they already tried that once. They know that that is an avenue. Why did they not want to do that? Well, for starters, it is amenable to challenge if it is done unlawfully, if it is done arbitrarily and capriciously—the magic words of administrative mischief. And you end up in a forum like a court where you have to defend your facts, unlike here where all you have to do is have a majority and ram it through. So they didn't want to do it administratively, but they could have, and they already tried in the last Trump administration.

What else could they have done? Well, this is California's Clean Air Act standard. They could have gone and negotiated with the sovereign State of California and the other sovereign States that have attached themselves to the cleaner standard of California, which includes Rhode Island. This could be done through a regular process of negotiation.

We just had the Administrator of the EPA in the committee this morning for a lively exchange, and he repeatedly talked about how interested EPA was in cooperative federalism; that the Federal Government has to be a real partner with sovereign States; that we shouldn't be lording it over the sovereign States; they have expertise and interests of their own and cooperative federalism means that the Federal Government and the State governments should work as partners to accomplish goals.

Well, that was pretty rich, while EPA is trying to roll a sovereign State that is the fourth biggest economy on the planet without any hint of negotiation or cooperative federalism or effort—because when you are negotiating, the other side gets a vote, too, and you have to come to an agreement. And it is much easier to come here and have your friends in the Senate do your bidding in the Senate without any standard other than: Do we have the votes?

But they could have done it that way. There is a totally clear path to negotiate with California—say: Hey, circumstances have changed in this way or that. We have new policy issues that we want to argue to you, and let's try to figure out if we can work this out.

Nope. Didn't even try.

The other way to do this would be to go back and actually change the Congressional Review Act, right? It is a statute so we can amend it. And we could go through the process of amendment and say: OK, we don't want the Congressional Review Act to be limited to rulemakings any longer. We want to open it up to more stuff. And we could have a conversation about what should and should not be included in an expanded gateway to the Congressional Review Act. The House would have its say. You would end up doing what we call around here regular order. And in the Senate the minority—because you would have to get through cloture, the minority would have a chance to make our points. And you could do an amendment using regular order. Again, they would have to listen to us, and they would have to pay attention to facts.

Now, all they have to pay attention to are interests—and the fossil fuel interest is their dominant interest—and votes, do they have the votes. And those make it easy to choose this way, to go nuclear in the Senate rather than do the work either of amending the Congressional Review Act by law or negotiating with a sovereign State in ordinary Federal-State cooperative federalism or pursue that Clean Air Act administrative process that they had begun back in Trump 1.

Again, the reason not to do all those three is you can't just roll everybody and do what the fossil fuel industry wants. So here we are. This is because

*May 21, 2025* CONGRESSIONAL RECORD — SENATE S3027

this is the shortcut. This is the thing that does what the fossil fuel industry wants.

And the price is going to be very, very high because, in my recollection, there has never been a legislative outcome in this body determined by overruling the Parliamentarian. We have gone back and forth on nominations, but on a legislative outcome which changes the Congressional Review Act and which allows an attack on a statutory waiver in the Clean Air Act for the State of California—those are legislative in their effect. And so, to me, that is not the right way that we should be going about this.

So there are a bunch of problems with what is going on here, but to understand the floor machinations we are about to go through—the overruling of the Parliamentarian to create an end-around so we don't have to overrule but can only violate the order of the Parliamentarian on the CRA—you really have to understand the baseline story here. And the baseline story here is that this is the fossil fuel industry in action. It may look like it is a majority and a minority in the Senate having an argument. No. It is the fossil fuel industry in action, trying to create a shortcut for itself so it can sell more gasoline and pollute more and ignore all the States that have joined with California to demand cleaner air for their constituents.

The fossil fuel industry essentially runs the Republican Party right now. The fossil fuel industry hates this clean air standard because it sells less gasoline in the States where the clean air standard is there. And it sells less gasoline in other States because it is hard to market both a clean vehicle and a dirty vehicle side by side. So to get to the enormous number of States that are with California on this and to sell into their markets, they have to make more efficient vehicles everywhere so that everybody enjoys the benefit of spending less on gasoline, getting better vehicle mileage, and having cleaner air.

So it actually works out pretty well for everybody except—except—the fossil fuel industry, which, of course, wants to sell more gasoline, period and end of story. And what they have is a willing Senate majority that will basically do whatever it is that they want, and they have an executive branch that has been infiltrated by fossil fuel interests and is now essentially run by fossil fuel interests.

In my previous "Time to Wake Up" speeches, I have described—I am probably not going to get this perfectly right because I am going from memory here, but there is a kind of wasp that injects its larvae into another bug; and as the larval wasp begins to grow, it takes over the neural system, it takes over the command and control system of the other bug. So the other bug is still alive. It still looks like the other bug's shape and size and all of that. It doesn't look any different than a reg-

ular other bug, but it is being driven from inside by the larval wasp, which tells it to go do things that then create a place where the larval wasp can grow, can nest, can feed, whatever it needs to do.

It takes over the bug from the inside and takes over command and control, and steers it around. That, to me, is a pretty good analogy for what the fossil fuel industry is doing with the U.S. Government right now.

All of their front groups, all the machinery they created over the years to propagate the fraud of climate denial and to exert wild political influence all over the country, all of that just slots right into positions in government that are taken over by people who say, you know, that the concern about climate change is crud, climate change is a religion and not science.

They speak utter nonsense. It is like the worship of Baal back in Biblical times, bowing down to fossil fuel and doing whatever it is the great god Baal wants.

Well, things didn't work out too well for the priests of Baal, if you followed that analogy, but that is where we are. And what all of this overlooks is the coming storm.

When the President pretends that climate change is a hoax, he disables government's ability to prepare for a coming storm. When the executive branch sensors the use of the terms "climate change," demands that they be struck from government documents, that prevents the executive branch from preparing for the coming storm.

When the executive branch—as we heard just today in the Environment and Public Works Committee—goes around and terminates grants based on a heresy hunt, where they are looking through the grants for language they don't like—like "equity," there is a bad word; "inclusion," can't have that; "climate," definitely worth terminating a grant over that—they are destroying the programs that would help communities prepare for the coming storm because they have the word "climate" in them.

They even went so far in the executive branch as to have an Executive order on energy that refused to include either solar energy or wind energy in the definition of "energy." Like, you can say what you want about whether you like solar or whether you like wind, but all you have to do is go to a solar facility or go to a wind facility, and you can see the electrons coming off of it.

The idea that that is not energy, that is not just a violation of law and common sense, that violates the dictionary. But that is how far the fossil fuel industry wasp will drive the Trump administration bug to ignore the coming storm.

What does the coming storm look like? Well, let me start.

Mr. President, I ask unanimous consent to use a larger than usual graphic in order to show an old page from the New York Times.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. WHITEHOUSE. Mr. President, now this is always good to remember because it wasn't always this way with President Trump. Here in 2009, there was a full-page ad in the New York Times. President Obama was getting ready to send a crew to Copenhagen for the COP, the climate change conference, and business leaders spoke up about that, saying, as business leaders, here is what we have to say:

[One,] if we fail to act now, it is scientifically irrefutable that there will be catastrophic and irreversible consequences for humanity and our planet.

Well, that is kind of the point here, and I will get into, in a moment, what some of those catastrophic and irreversible consequences look like.

And it goes on to demand that the Obama administration show leadership on climate change:

Please allow us, the United States of America, to serve in modeling the change necessary to protect humanity and our planet.

Signed by Donald J. Trump, chairman and President; Donald J. Trump, Jr., EVP; Eric F. Trump, EVP; Ivanka M. Trump, EVP; and the Trump organization.

So there have been times when the Trump family understood what climate change was all about, understood the catastrophic and irreversible consequences that were looming, and were willing to say so.

But in between came exposure to politics, exposure to the power of fossil fuel on the Republican side and the understanding that if you really want to make it in Republican politics, you have got to do whatever the fossil fuel industry wants, whenever the fossil fuel industry wants it. That means we are ignoring some pretty serious warnings.

One of the earliest warnings came from Freddie Mac. Freddie Mac is not a green organization. Freddie Mac is a huge mortgage company, a federally chartered giant mortgage company. And as a giant mortgage company, it has a very distinct interest in the mortgage market.

And what did the chief economist for Freddie Mac warn? He warned that climate change was making coastal properties uninsurable. Climate change was making coastal properties uninsurable, either because sea levels were rising and they would flood or because storms were worse and there would be more damage by hurricanes and massive rains or because, who knows, they would lose access to the fresh water in their wells because of the infiltration of salt water underground. There are all sorts of ways in which climate risk hits coastal properties.

So the chief economist said: Here is how that works. The climate risk disrupts the insurance industry as to certain properties—meaning, those properties also can't get a mortgage any longer.

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

Freddie Mac is a mortgage giant. It knows what is needed for a mortgage. What is needed for a mortgage is an insurance policy. No insurance policy, no mortgage.

So now you have got properties along the coast that are at risk, that can't get insurance and can't get a mortgage. What happens to the value of those properties? Well, it goes down, he predicted. He predicted a coastal property values crash as a result of that cascade from climate risk to uninsurability to no mortgages.

And the coastal properties values crash he predicted was going to be so severe that it would look like 2008—that mortgage meltdown—all over again, and he stands by that testimony. In fact, he came when I was chairman of the Budget Committee to reiterate it.

Something else has changed in the meantime, though. It is not just coastal property risk. Ask any of our Western colleagues about wildfire risk and about what is going on in areas that have wildfire risk that the insurance company can't figure out, can't predict; and, therefore, it backs away from.

We are seeing that all across the country. The coastal property values crash warning now has an evil sibling: the wildfire adjacent property values crash warning. And either one of them, or both, could create that cascade from uninsurability to unmortgageability to crash in property values to nationwide recession.

He is not alone. A little over a month ago, the Chairman of the Federal Reserve Chairman Powell came and testified in the Banking Committee. What did Chairman Powell have to say? He said that in 10 to 15 years, it will be impossible to get insurance or a mortgage in entire regions of the United States; exactly that cascade—climate risk, uninsurability, can't get a mortgage, property values crash.

Here is the Chairman of the Federal Reserve, also not green, just a guy who is interested in dealing with risk to the financial system, and he is saying: Here it comes, buckle up. We are going to see that in 10 to 15 years.

Well, if we are going to see that in 10 to 15 years, who is looking at that now? Investors are; insurance companies are. You can't wait 10 to 15 years for the effects of entire regions of the country that can't get mortgages to start to be felt. That is going to start to happen now, and, in fact, it is. Look at the high-risk areas in the country.

Here, we see things like—from our Budget Committee work—these are nonrenewal rates around the country. And you can see in high-risk areas—Florida or coastal, California for both coastal and wildfire, that nonrenewals are spiking up in areas of climate risk.

What is nonrenewal? A nonrenewal is when your insurance company says to you: You know, thanks for all the premium you paid all these years, but your piece of property has now become

uninsurable. We can't manage that risk any longer. Therefore, you are fired. Go find another insurance company.

Well, that is a big mess.

Then we go onto First Street, which took some of this data and others and started predicting forward. This is where home values are headed because of climate change.

You can see in these darker red areas, you are looking at actual reductions in home value, right? Not your home is your castle and it is always going to be valuable but, actually, the value of it goes down.

Some of the marks go as much as 100-percent loss of value. Eighty percent is this color. Sixty percent is this color. And you can see it speckled throughout the country. Places where, in the time of a 30-year mortgage—in the time of a 30-year mortgage, you are going to see property values actually go down—the property values crash that was predicted by Freddie Mac and the loss of mortgage availability that was predicted by Chairman Powell.

Here is another one: Where do insurance premiums go in the next 30 years? Well, in a lot of places, like down in Florida, we have already seen double, triple, and quadruple. An average home insurance payment in Miami Dade County is $17,000 a year. You look down here at Miami, and it is in the dark zone where it is supposed to go up 300 percent. That is a quadrupling, just so you know.

So if you are at $17,000 now and you are going to quadruple in 30 years, that means you are going to end up—do the math. I am not doing it right now in my head, but let's say it is $70,000 a year, right? Quadrupling $17,000—$68,000 a year.

If you have a property that has a carrying cost for the buyer of $68,000 a year, how valuable is that property? What is the present value of that liability that comes with the property? It is a huge liability, and it knocks down the value of the property.

So that is why the home value evidence that First Street collected here relates to the insurance premium expense. You don't just lose the value of your house when your property isn't mortgageable any longer and you can't find anybody to buy it other than a cash buyer; you also lose the value of your house when the carrying cost of your home insurance becomes so great that nobody wants to buy into that annual $68,000 liability.

How much would you pay to have to write a $68,000 check every year? Not much. It would have to be a pretty darn nice house to cover that. And for a lot of people, that just erases the value of the home, which is why we get there.

So, First Street, their estimate was that climate change could erase $1.4 trillion in U.S. residential real estate value by 2055 due to these concerns that they put on the chart. And they are not alone. It is not just Freddie Mac; it is not just First Street Foundation; it is not just Fed Chair Powell.

Here is the Mortgage Bankers Association. You think that is a green group? Fat chance. But they do care about mortgages, and what they say in their report is:

Chronic physical risk associated with climate change—i.e. the insurance risk—may exceed the capacity of insurance and government assistance to sustain some areas.

That kind of tracks with Jay Powell saying there are going to be whole regions of the country where you can't get a mortgage any longer—even with government help, even with insurance, it just doesn't work any longer.

So when an advocacy group like that for the mortgage bankers is giving this warning, it might be worth paying attention to. It might be worth not just dismissing it: Oh, climate change is a hoax. None of us need to worry about that.

The Economist Magazine, also about as ungreen as it can be. And the Economist Magazine—this is a cover story. If you can't read it, it says: "The next housing disaster," and it is a house on a piece of land that is being eroded by seas.

If the size of the risk suddenly sinks in and borrowers and lenders alike realize the collateral underpinning so many transactions—

Like those mortgages—

is not worth as much as they thought—

Because those prices have fallen as insurance rates climbed—

a wave of repricing will reverberate through financial markets.

Here is the punch line:

Climate change, in short, could prompt the next global property crash.

Another way they say it in the article is this:

At present, the risks of climate change are not properly reflected in house prices. A study in Nature, a journal, finds that if the expected losses from increased flooding alone—

That is that coastal value crash risk; not the wildfire one, just flooding—

were taken into account, the value of American homes would fall by from $121 billion to $237 billion.

Again aligning with what First Street predicted—changes in Americans' home values because of climate risk uninsurability and unmortgageability.

Mr. President, $121 billion to $237 billion is a pretty big hit on those homeowners whose properties have lost that value.

Globally, what they say is that we are looking at a $25 trillion hit to global real estate markets. The largest asset class on the planet is real estate, and it is looking at a $25 trillion hit. Yeah, let's ignore that and believe the fossil fuel-funded White House that says it is a hoax. That makes a lot of sense.

Obviously, if there is going to be a property values crash and if mortgages are going to be in the center of it, that is not great for the banking industry. Why? First of all, the banking industry makes a lot of money off of mortgages.

*May 21, 2025* CONGRESSIONAL RECORD — SENATE S3029

If a whole bunch of properties won't sustain a mortgage any longer, that shrinks the market, so there is less revenue to be had for the banking industry.

Also, if you have a mortgage on your books as a bank, the liability—what the owner owes you on the mortgage—gets offset in your solvency determination by the value of the collateral that you hold against that liability. The collateral is the value of the home.

What happens to a bank in a region where the value of the home has fallen by half? What happens when the homeowner owes more money than the property is now worth? That hits the bank's loan-to-value ratio. That is a determinant of bank solvency.

So, guess what, this is not just me saying this; the International Financial Stability Board just did this report in January giving a warning to the global banking system: Look out. Buckle up. Climate risk is coming. Uninsurability is coming. Unmortgageability is coming. You need to plan to stay solvent through and survive that crisis.

So I will tell you, this is a very technical report done by very technical people. The Financial Stability Board is, again, not a green organization, but they do have an obligation to look forward and predict risk, and they are predicting this risk to the global banking system.

The Commodity Futures Trading Commission, during Trump 1, by the way, issued this report—"Managing Climate Risk in the U.S. Financial System"—saying that climate change poses systemic risk to the U.S. economy across multiple sectors "simultaneously and within a short time-frame"—this is coming at us—undermining the U.S. financial system's ability to sustain the economy.

Let me read the opening sentence from the report, from the executive summary:

Climate change poses a major risk to the stability of the U.S. financial system and to its ability to sustain the American economy.

Precisely as the other experts argued.

Risk to insurance, to mortgage, to property values crash, to economic collapse.

On the next page, they say among findings of the report:

A central finding of this report is that climate change could pose systemic risks to the U.S. financial system.

Let me say a word on systemic risks because it sounds like a pretty dull term. It is not like apocalyptic risk, catastrophic risk; it just says systemic risk. What does that mean? That means that the whole system takes a hit. That means that the damage is not contained to the sector where the damage is happening.

That is like 2008 all over again. We had that set of bad mortgages, but when that set of bad mortgages—when it became apparent that that was fake and phony and that there was not real

value there, it didn't just harm the mortgage holders, it took down entire investment firms, and that crash cascaded out through the entire economy.

Those of us who were here in 2008—I can remember the financial agony of Rhode Islanders when that recession hit so hard and so suddenly. I can remember the people who were at the Treasury and at the Fed who were supposed to prop up our economy in a state of absolute, sweating panic about how this crash was going to wipe out the U.S. financial system. That is what systemic risk is. It means the whole thing goes down, the whole system.

So it sounds like a pretty mild term, but if you are familiar with economics, you know that is one of the scariest words in the economic lexicon.

What else have we here? We have Deloitte—not very green, either—a big consulting powerhouse. Here is what they say about continuing to fiddle around on climate change, pretend it is a hoax, censor the term, and act like idiots about a true coming risk with abundant warnings about the risk. They say that we have a range of outcomes. By 2070—that was their target period—they said that if we can start getting climate right, if we can start addressing this problem before these systemic harms happen, then what is going to happen is the global GDP will increase by around $40 trillion; i.e., the world will be better off financially by $40 trillion by our making the right decisions to get climate change right. That is one outcome.

The other option is that we continue goofing off. We continue fiddling around and lying about climate change or believing the lies about climate change. We continue ignoring the evidence. We continue ignoring what we are seeing with our own eyes in the insurance industry in regions of the United States right now, already.

Go around Florida and talk about property insurance and tell me what you hear, because I am pretty sure I know because I have been there and heard it.

The other is a $180 trillion hit to global GDP, which means there is a $220 trillion swing that will come to pass in the lives of children now. The world can be $220 trillion poorer or $220 trillion richer depending on whether we continue to screw up responding to climate change, ignore it, and listen to the worst people in the world to listen to—the fossil fuel industry, which is wreathed in conflicts of interest on the subject, crawling with conflicts of interest, infested with conflicts of interest, and eager to shove those conflicts of interest into our politics with lies and dark money, secret influence. It is one of the fouler things that have been done, what has been done in our Congress by the fossil fuel industry.

If Deloitte is right, that $220 trillion swing is a hell of an outcome for people who will be alive then—all because we won't make good decisions now.

Potsdam Institute says that climate change losses by 2049 could hit $38 trillion and then get bigger after that.

So, again, we are dealing with a sooner window than 2070, but we are dealing with very, very, very big numbers—$25 trillion hit to the global real estate sector; $38 trillion hit from lost agricultural yields, labor productivity, and infrastructure; $220 trillion globally, depending on whether we get this right or continue to be fooled by those with the worst conflicts of interest.

Recently, Allianz, which, by the way, is the biggest insurance company in the world, a trillion-dollar company—two things about the insurance industry and Allianz in particular. The insurance industry needs to predict accurately in order to price its insurance correctly. So, first of all, they are making like trillion-dollar bets on what the future is going to look like. They are not just lying to make up stuff so that they can sell more gasoline next year in California and Rhode Island and other States; they have to look out.

When they do look out, not only do they have that huge bet that they are placing on what the world is going to look like, what risk they are insuring, they are actually under a fiduciary obligation. They can be sued by their shareholders and by their members if they are not doing proper due diligence and getting it right.

So when the insurance industry is doing signals like this, it is worth paying attention. The insurance industry is under a fiduciary obligation to get it right, the fossil fuel industry has a massive conflict of interest to tell us stuff that is wrong, and we are believing the fossil fuel industry? It is madness or it is politics or worse.

Well, here is what the Allianz board member wrote:

We are fast approaching temperature levels—1.5 degrees [centigrade], 2 degrees [centigrade], 3 degrees [centigrade]—where insurers will no longer be able to offer coverage. . . . Entire regions are becoming uninsurable.

Sound familiar? Fed Chair Powell used almost the exact same language. They are seeing the same thing.

This is a systemic risk. Remember what I said about systemic risk? Here is a board member of the largest insurance company on the planet, with a trillion dollars at stake, saying that this is a systemic risk that threatens "the very foundation of the financial sector"—just like the Commodity Futures Trading Commission report threatened, just like the International Financial Stability Board warned.

This is a systemic risk that threatens "the very foundation of the financial sector." How? He continues. If insurance is no longer available, "other financial services become unavailable" too. A house that cannot be insured cannot be mortgaged.

This is the same deal that the chief economist of Freddie Mac was predicting. No bank will issue loans for uninsurable property.

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

Credit markets freeze. This is a climate-induced credit crunch.

He also points out in his article something that I hadn't paid attention to. I was looking at the "insurance to mortgage to property values" crash. But what he points out is that, if you go to the financial sector, big wheeler-dealers in the financial world do big deals and transactions, and very often those transactions depend on an insurance component to make the deal work. And in areas where the risk involved in that transaction is uninsurable, then the transaction can't happen any longer.

So it is not just mortgages and the mortgage market that are imperiled by this insurance risk. It is the whole swath of other financial transactions, which is why the title was "An End to Capitalism." That is what we are dealing with.

There is a lot more that I could go through. Here is my current binder on the economic risks of climate change, which includes these articles and more. I have circulated it to Finance Committee members. I have circulated it to Budget Committee members. I have circulated it to Environment and Public Works Committee members. I don't think anybody really wants to read it because, in this place, the fossil fuel industry gets what it wants, whatever it wants, whenever it wants. And the fossil fuel industry does not want the Senate or the House paying any attention to these looming risks, to these storm warnings that are coming.

I have been through small insurance collapses in Rhode Island—two of them. One was a banking insurance—State-backed banking insurer—that failed just as I was coming in as a new Governor's legal counsel. And as we saw this beginning to fail, he asked me to handle the issue. So it was a handful of an issue, I will tell you, because we knew that the insurer was going to fail, and we knew that all of the insured banks would no longer be able to honor their accounts. And we knew that about a third of Rhode Islanders had money in those various banking institutions and that they would lose access to their funds until we sorted this out. And it happened the day that the new Governor was sworn in.

I can remember preparing the needed papers to take over the closed institution in an all-nighter in a law firm and, in the morning, running the papers up to the Governor's office through the cold weather of a Rhode Island January as the guns were firing, signaling the start of the new administration—the ceremonial guns of probably the Newport Artillery Company.

And on day one, we had to close all of these banking institutions, and I spent the next many months of my life trying to figure out how to get them back, get depositors repaid, and clean up the insurance system.

So I know that when Ernest Hemingway was asked, "How did you go broke?" he said, "Gradually, and then all at once." That is how these insurance crises happen.

The Rhode Island Share and Deposit Indemnity Corporation went broke gradually and then all at once. It was just a matter of days from steady state status to complete calamity, and we had to dig our way back out of it.

The next one was workers' compensation insurance—that too, gradually and then all at once.

Like the California FAIR Plan, we had a backstop insurance entity that, if you couldn't get insurance in the regular market, you would go to the State entity, and then your risk would be farmed out to all of the other companies—which is fine if it is 2 or 3 or 4 percent of the market. But when that company starts to have a huge share of the market and huge losses, the insurance companies look around and say: Wow, we are going to own our share of those losses. I don't want to do business here any longer.

They came in, and in a matter of a day or two, every single workers' comp insurer in Rhode Island had said: We are out of here. We are done. We are closing.

And we had until the end of their policy to stand up a whole new workers' compensation system that paid for itself and was fair to workers.

Between those two things, I don't think I have ever worked so hard in my life. But we solved both of those problems.

Now, you may say: Well, that is just a little problem in a little State. Yes. Many years ago, my father set up Special Operations and Low Intensity Conflict in the Defense Department. He was the first SOLOC, as they called it. And one of the things that people in Special Operations really didn't like was being told that what they were doing was low intensity.

Mr. Whitehouse, when it is you that is being shot at, it is not low intensity. We have got to get rid of that name.

So small fights can be brutally intense fights, and these were small but brutally intense situations in Rhode Island. And the lesson to me is really clear: These things happen gradually and then all at once. And we are well into the gradual part of what climate change is doing to insurance markets, and the cascade from that into mortgage markets and into property values and into economic recession is now entirely predictable—indeed, predicted by essentially anyone who is, A, paying attention to this, and, B, not on the payroll of the fossil fuel industry.

So when we are messing around with Senate parliamentary procedures, when we are actually threatening—maybe cooler heads will prevail—threatening to go nuclear, threatening to overrule a ruling of the Parliamentarian just to run a political errand for the fossil fuel industry to help it sell more gasoline, we are doing two really evil things at once: We are doing real damage to this institution that will be very hard to walk back from; and, two,

we are indulging an industry with a massive special interest and a massive conflict of interest that is simply out to sell more gasoline and that wants us to ignore the risk that its emissions are creating in the world.

And we are now, in this building, so overwhelmed by that fossil fuel political influence infrastructure—all its dark money running through super PACs, all its lies being spouted out by phony front groups, all of the fake scientists making up stuff that isn't science but sounds good because it was cooked up on Madison Avenue to sound good. And now they have actually infiltrated the office of government, and they are running the U.S. Government from the inside with a view to making sure that nobody pays attention to the climate harm.

And I will close with a different point, which is that I have spent my time so far on the floor talking about how a corrupting industry has used its influence in Congress to steer us away from paying attention to a massive economic risk that numerous expert voices have warned us is in peril—and not just expert voices but many who are under a fiduciary obligation to their shareholders.

We had in the Budget Committee the CEO of Aon, which is one of the biggest insurance companies in the world. He is their U.S. CEO. He came in to testify and give that same warning. Over and over and over again, we are getting that warning about the economic peril that is looming, where we are now in it gradually, and we are waiting for "all at once" to happen.

And I talk about that as an economic matter because this is the "House of Mammon," where the worship of the fossil fuel god Baal and money is the No. 1 thing that we do. So I am speaking in the terms that the Senate and the House most pay attention to, which is money—money.

But know that behind the economic peril is real natural disaster, is real tumult in the natural systems of the Earth that have allowed our species to develop for 20,000 years in a relatively safe harbor of limited atmospheric carbon, a healthy climate range, moderate storm activity, and a robust ecosystem around us where that security and that safety have allowed the ecosystem to flourish.

And it happens in a million small ways. One of my favorites was the red knot. There is a bird; it is called the red knot. It lands in Delaware every year, and lots of them land in Delaware every year, and they come to Delaware every year because the horseshoe crabs in Delaware Bay come ashore to lay their eggs. So it is like social hour for horseshoe crabs, but it is also feeding frenzy for birds that like to eat the horseshoe crab eggs.

But here is the deal about the red knot. I bet you don't know where they come from to get to Delaware Bay for that moment when the horseshoe crabs are laying their eggs. They come from

*May 21, 2025*                    CONGRESSIONAL RECORD — SENATE                    S3031

Brazil. They have come from all the way down in Patagonia. They have flown up to Brazil, and then they go from Brazil over the water to Delaware Bay.

Imagine how long it takes to fly from Brazil to the east coast, to Delaware, in a jet plane. These little birds, they do it on their own. They are not big. They are about that big. And they fly all that way on their own.

It is such an arduous journey that their bodies actually metamorphose a bit during the journey to make it possible. It is one of the miracles of creation that this little bird can make that astonishing journey and have the physical changes to its body that take place during that trip make it possible for that little bird to make that journey.

And the reason that species makes it and survives is because, in God's great ecosystem, they have figured out that if they land at this time in this bay, the food will be there for them. And if we screw that up with fossil fuel emissions so that the schedule of the horseshoe crabs' egg laying goes off and those red knots come all the way from Brazil and there are no eggs there for them—they are too late; they are too early—that is how populations crash.

That is just one tiny example. That is one thread of this beautiful interlocking natural planet that we have, and there are a million more such threads that put the world together that we take for granted.

Behind the looming economic risk is a disruption of the Earth's natural systems that goes well beyond just economic harm.

It means that the creek where your grandfather taught you to fish and where you want to teach your granddaughter to fish isn't going to have the fish in it any longer. Can you put a price on that? No. It means that the water flowing out of the Himalayas—fought over between Pakistan and India forever—becomes less because there is dramatically less glacier in the Himalayas to provide the glacial flow down into those rivers.

And now you have a conflict between those countries over that most elemental need of humans—water. Can you put a price on that risk? Coastal homes all over the world are being lost to sea level rise.

After Superstorm Sandy, I walked the beaches near Matunuck, RI, and there was a man standing on the shore near his house. His house was tipped over because the storm had eroded the foundations of it, and he was looking at his house. They spent time going into it. It was tipping over. It was dangerous to go in, but they were getting out as much stuff as they could.

I asked him: Tell me the story of this house. It was a nice old house, been there a long time. He said: Well, I remember being here as a baby. It was my grandparents' house. They came here in the summers. It was beautiful. We had all this beach in front of us. We even had a lawn in front of us. The thing I want most in my life is to be able to pass this home on to my grandchildren; to have that family tradition, generation after generation after generation, to be able to come to this beautiful place and enjoy this beautiful shore and continue this glorious family tradition.

How do you put a price on that when that is taken away because we are too damned lazy and indolent to clean up the fossil fuel industry's mess when they won't do it?

My point is that as I focus on the economics of this—because that is what people care about in this place—there is a whole other set of costs to mankind and to our Earth that we will be forcing future generations to bear that have nothing to do with the almighty dollar but actually may be worse in terms of humankind and the human spirit.

I yield the floor.

The PRESIDING OFFICER (Mr. BANKS). The Democratic whip.

Mr. DURBIN. Mr. President, let me first thank my colleague from Rhode Island. I don't know how many years he has been delivering this message on the floor, but he has become the spokesperson for a cause that we all should share and try to make certain we address the deterioration of this planet that we live on; that our kids, our grandkids, and their children have a fighting chance against elements that they can't personally control. It is up to our generation. And Senator WHITEHOUSE comes to the floor and reminds us on a regular basis about our moral and economic and environmental responsibility.

I thank him for his statement today. I want to join him in that respect.

S.J. RES. 55

Mr. President, last month, the Senate Parliamentarian analyzed the GAO's opinion ruling that Senate Republicans cannot use the Congressional Review Act to overturn a waiver granted to California by the U.S. EPA to regulate its own vehicle emissions.

I remember a time in the House and, again, in the Senate when we had a hardy debate here over miles per gallon and what was reasonable. I remember the automobile industry saying that we shouldn't impose a standard that they could never live up to, never produce cars that meet that standard of the higher miles per gallon.

I remember that California stepped out ahead of the rest of the Nation and said: Let us prove we can do it. Our economy is so big, you can't miss it if we succeed or if we fail. And they succeeded. They proved that if you create the right incentives, technology will move in that direction, and it has, successfully, when it comes to miles per gallon.

Now Republicans have decided, with the new President, to attempt to block a California law requiring all new cars sold in the State by 2035 to be zero-emission vehicles. It is an ambitious goal. It is as ambitious as some of the MPG goals they set in earlier times.

That is right. Despite the claims of being the party of States' rights, Republicans want to end the State-level regulation in the State of California. And get this, Elon Musk—the unelected adviser to the President—previously wrote to the EPA in favor of California's waiver. Now he has joined the Republican majority to try to gut the rule.

The Parliamentarian's decision was not one of party loyalty. It followed decades of precedent showing California's Clean Air Act waivers are not subject to the Congressional Review Act.

Despite the Parliamentarian's decision, my Senate Republican colleagues want to override the GAO and Senate Parliamentarian to advance the fossil fuel agenda. It is "burn, baby, burn; drill, baby, drill."

Now, I understand using the CRA might be faster than Agency rulemaking or even considering legislation. Think about this. There was a time when we actually legislated on the floor of the U.S. Senate. I can vaguely remember, it was so long ago. Rather than deal with legislation, hearings, and public review, we are all about these shortcut methods, which in some cases are disastrous. In fact, President Trump, in his first term, took administrative action to rescind California's Clean Air Act waivers and can take that path again.

But what Republicans are pursuing today is a procedural nuclear option, a dramatic break from Senate precedent with profound consequences. Let me repeat. Should my Senate Republican colleagues overrule the Senate Parliamentarian, it will have a major long-term impact for the Senate and the legislative filibuster.

This move is unprecedented. The Senate has never overruled the Parliamentarian regarding the CRA or allowing a bill to pass by majority vote. Before, when the tables were turned and the Senate Democrats were in the majority, my Republican colleagues were singing a very different tune about never breaking from the Parliamentarian. Leader THUNE, himself, acknowledged in January of this year that overruling the Parliamentarian is "totally akin to killing the filibuster. We can't go there," Leader THUNE said, "People need to understand that."

If Senate Republicans disregard the Parliamentarian's decision, they would set a new precedent in the Senate, eliminating longstanding guardrails and paving the way for future Senate majorities to overrule the Parliamentarian to achieve its partisan goals. I caution my Senate Republican colleagues from toeing this line and setting the wrong precedent.

As I said, time and time again, there cannot be one set of rules for the Republicans in the Senate and another set of rules for the Democrats. I hope my Republican colleagues will heed my

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

warning and make the right choice— the only choice: accept the GAO and Senate Parliamentarian's decision.

I yield the floor.

The PRESIDING OFFICER. The Senator from California.

Mr. PADILLA. Mr. President, colleagues, today, on the Senate floor, we are expecting to see some outrageous attacks on my home State of California and important provisions of the historic Clean Air Act.

While it is not too late to turn back at this moment, I think it is important for all of my colleagues to know that I will be back here again and again and again throughout this process to make sure that everyone knows what these votes mean, not just for the precedent and procedures of the U.S. Senate but for the health of my constituents in California and about the real threat to human life that comes when California is denied the ability to control toxic air and greenhouse gas emissions.

But before I do, I want Senators and the American people to fully understand what we are about to witness on the Senate floor. Put aside all the procedural back-and-forth—I will get back to that in a few minutes—but overall it is actually pretty simple. Senate Republicans are preparing to vote to overrule the Parliamentarian—the nonpartisan umpire, referee for the Senate—who lets us know what is in order, what is not in order. Senate Republicans are preparing to vote to overrule the Parliamentarian. They will argue that they are not, but that is indeed what is happening here. They want to do that in order to bypass the filibuster in order to gut the Clean Air Act.

As I stand here right now, those joint resolutions that are going to be before us are subject to rule XXII of the Senate and, therefore, subject to the 60-vote filibuster threshold. They are subject to debate. They are subject to amendments. That has already been determined.

In this moment, they are in regular legislation and are subject, as a result, to the legislative filibuster. But if we see what we expect to see happen today, the status of these same bills— maybe later this evening—will be very, very different. If Senate Republicans behave the way that we expect them to, all of a sudden these same measures that are subject to the legislative filibuster and debate and amendments will all of a sudden be expedited procedurally—no amendments allowed, very limited debate.

Colleagues, as I said here yesterday, it is not just the "why" Republicans are willing to endanger the health of Californians, it is also the "how" they are doing it that is threatening.

A bit of history. In 1967, the Clean Air Act passed this body under regular order by a vote of 88 to 12. In 1990, the landmark Clean Air Act amendment passed the Senate 89 to 11—overwhelming bipartisan support. But today, Republicans are trying to pass these bills to gut California's Clean Air Act authority under a simple 50-vote threshold. They are plotting to overturn the Senate Parliamentarian's determination, plain and simple.

Why is that significant? Well, the majority leader said it himself at the very start of this Congress that when it comes to overriding the Parliamentarian, "that is totally akin to killing the filibuster. We can't go there. People need to understand that." But fast forward to this week, and we have heard all sorts of excuses and explanations and mental gymnastics as to why all of a sudden overturning the Parliamentarian is not akin to killing the filibuster. It is a complete 180-degree shift.

But in one way, I guess, they might be right. No, this isn't the same as killing the legislative filibuster. This actually goes way, way beyond that because, first, they are doing more than going nuclear on the Parliamentarian; they are going nuclear on the Congressional Review Act itself. It is true that the Parliamentarian does not make law. Under the Constitution, the House and the Senate set their own procedures, limited by the requirements set in the Constitution.

For the good of the order and actual functioning democracy, we have all come to rely on the Parliamentarian to call balls and strikes and set the rules of the road. But the Congressional Review Act is a law, and it says that all points of order are waived during a CRA resolution. And that is what we are debating right now, an actual CRA resolution relating to hydrogen fuel.

I oppose this particular resolution, but at least it is following the law and Senate procedure. But what is about to happen is going to be against the law and against Senate procedure.

As I understand it, Senate Republicans are preparing to have this Senate go nuclear not just once but twice. First, we will go nuclear and overturn the rule on points of order during a CRA, which is in the law. Then Republicans plan to go nuclear a second time: to throw out the rulebook and use the CRA against any Agency action that any Agency submits, no questions asked. Like I said, this goes way beyond just the legislative filibuster. So let's play it out a little bit so we are clear as to what this would lead to.

Under this logic, the Trump administration can send an endless stream of nonrule actions to Congress going back to 1996, including vaccine approvals. After all, we have an HHS Secretary with a spotty history as it pertains to the health and safety of vaccines. The administration could send broadcast licenses because you know this is an administration that is not shy about attacking anybody in the community who disagrees with their agenda. We can see the administration send merger approvals—again, not just those that are pending but go back to 1996—and any number of government decisions that apply to President Trump's long list of enemies.

All it would take is a minimum of 30 Senators to introduce related bills, and the Senate would be bogged down voting on Agency actions, large and small, all day long. Is that how we want to spend our days here in the Senate, voting on every vaccine approval because Secretary Kennedy decides to send them to Congress?

And what about the next Democratic administration? All bets would be off. Consider mining permits. Consider fossil fuel project approvals; consider LNG export licenses or offshore leases, IRS tax policies, foreign policies, and every Project 2025 or DOGE disruption or overreach. Every Agency action the Democrats don't like—whether it is a rule or not and no matter how much time has passed—would be fair game if Republicans go through with this and establish this precedent.

So let's take a step back. Republicans are admitting that they don't have the votes to pass these California resolutions under the Senate rules that the Parliamentarian says apply in this case, so they will overrule the Parliamentarian—why not throw out the rulebook altogether?

By voting to go nuclear on the CRA, they are ignoring the law, not just Senate rules but the text of the law itself. By voting to overrule the Parliamentarian, they are saying that the rules are whatever the Republicans say they are, not what the Parliamentarian has determined. The majority here can tell themselves whatever they want, and they can twist themselves into pretzels and knots to try and justify these reckless actions, but despite their smoke-and-mirrors approach to confuse the general public, we are all going to see it today with our own eyes if they go forward.

The majority wants to go nuclear to bypass the filibuster and pass a bill for the first time in Senate history. It has happened for nominations before. It has happened on a few procedural questions before, but never on a bill or three bills—never. And if this happens under a Republican majority, it would actually be pretty ironic that the party who claims to be the staunch defender of the filibuster threw the rules aside as soon as it was convenient.

I have been honest on my views of the filibuster. I do think it needs to be changed overall going forward, but it was my colleagues on the other side of the aisle who fought hard to keep it.

Well, there is about to be a new precedent on the record, unless we step back at the last minute. And it will stand as a guidepost going forward. Democrats are in the minority today. Democrats will be in the majority again some day—maybe later, maybe sooner—but we will certainly not forget what happened here today. History will not forget. California will not forget what is at stake today either.

I yield for now, but I will be back.

The PRESIDING OFFICER. The Senator from California.

May 21, 2025      CONGRESSIONAL RECORD — SENATE      S3033

Mr. SCHIFF. Mr. President, I thank my colleague Senator PADILLA for his eloquent speech on this subject.

Today, I want to talk about what is taking place in this Chamber, and I want to talk about it in two respects. I want to talk about what it will mean for the American people in terms of the air that we breathe and the water that we drink—that is the most important thing—but then I want to also talk about what it will mean for this institution, for the Senate; what it will mean for the filibuster; what it will mean for whether things can get passed on a simple majority vote at the behest of the oil industry or any other special interest or whether things in the future will continue to require 60 votes to get through this body.

Let's start with the first and most important thing: What does the repeal of California's clean air waiver—that is, its right to set its own standards for the air that we breathe—what does this mean for the people of California? What does this mean for the people of the United States?

This is downtown Los Angeles in 1955. Now, I don't remember 1955—I didn't come around until 1960—but I do remember air that looked a lot like this when I moved to Los Angeles. I remember days when there were smog alerts. We still have some of those. I remember when it was unhealthy air to breathe, and people were advised not to go outside if they didn't need to, and kids couldn't go out on recess because the air quality was so bad.

But this is what places in California, like Los Angeles and many places in the San Joaquin Valley, looked like just a few years ago—the San Joaquin Valley, where so much of the food in the Nation is grown. These areas have experienced the rapid rise of personal automobiles and expansion of our population—America's West, its suburbs and its cities.

On days like this, you just couldn't walk outside sometimes without hacking. If you had asthma or breathing problems, it was even more severe. And California families, through no fault of their own, were on the frontlines of a health risk unseen since the worst days of the Industrial Revolution pollution. The smog was so bad that in one instance, mass panic broke out in California because there was a belief that there was some kind of chemical weapons attack.

This was, in part, due to these amazing increases of population, but it was also our unique topography. The San Gabriel Mountains in Los Angeles, the Sierra Nevadas for the Central Valley, they trap fossil fuel emissions and keep smog clouds hanging over our cities where they may not hang over other parts of the Nation. So the San Gabriel Mountains, for those of us in L.A., but the Verdugos and other mountain ranges and the Sierra Nevadas have an impact on the Central Valley.

All that means is that 10 million Californians are living in areas that are under distinct and elevated threats from air pollution. And what that has meant historically is higher rates of respiratory issues like asthma and chronic lung disease. It has meant increased risk of heart disease, chronic headaches, immune system issues, and, most significantly, increased cancer risks.

That is multiplied by us living now on the frontlines of the climate crisis. We have devastating and year-round fire dangers that put millions of other pollutants into our air. So we need, deserve, and reserve the right, as Californians, to do something about our air.

In fact, this is why California became the first State in the Nation to regulate the emissions of automobiles back in 1966 because we understood then, as we do now, the risks that Californians face if we don't take action. Over the past 60 years, since our skies looked like this, California has led on this issue, and now, we are being targeted for it.

What will the cost of that be? By revoking California's right to protect its citizens from dirty air, we face not just dirtier air, but we also face a sicker society. The American Lung Association projected that our Nation moving to zero-emission vehicles in the next decade would generate more than $1 trillion in public health benefits and save more than 100,000 people from premature death.

So this is really the heart of the question for this body, and that is, What is more valuable to us? Is it the unfettered right to pollute the skies and make them look like this? Or do we want to save about $1 trillion in money we would have to spend otherwise on treating asthma and treating lung cancer and treating heart disease that is caused by air like this?

That electric vehicle requirement can save more than 100,000 people from premature death. So I guess we have to ask ourselves, How much is life worth? What would it be worth to us to be able to live a few years longer?

I suppose the answer to that question depends on, well, what kind of life is that? What kind of health are we in? But I would say a few more years is worth a lot. It is worth a lot. It is certainly worth more than contributions from the oil industry to be able to live a little longer, to be able to live a little healthier.

By targeting California—as this effort is doing—which comprises 11 percent of the Nation, and our goal of decarbonizing our transportation sector, we are selling poison seeds for the future—seeds that will grow to be more asthma and more sickness and more hospitalizations and more death. That is the bleak but blatant reality of what we are debating here today.

If the Republicans go nuclear to repeal California's clean air rules, that is what this will mean. It will mean shorter lives, poorer quality of life because of what we are breathing in the air, and ultimately, when they strike down clean water rules, what we are drinking in our water is going to be dirtier, and the American people are going to be more plagued by a whole variety of cancers.

Now, I mentioned the term "going nuclear." What does that mean? This gets to the second point I want to make today, which is how the Republican majority intends to go about repealing California's ability to set the standards for its own air; that is, how does the Republican majority intend to foist its will on millions of people in other States? How are they determined to overturn States' rights? How are they determined that the Federal Government should tell a State: No, you can't protect your people from air pollution, not to that degree you can't, because we answer to a higher authority and that higher authority is called the oil industry? So how are they going to do it because in this body, for better or worse, it generally takes 60 votes to get things done. That is the filibuster. It requires 60 votes.

To repeal California's law, if you were to take that step, it would require 60 votes. Don't just take my word for it. We asked the Parliamentarian, who is the expert: Does this require 60 votes? Is this subject to the filibuster?

The answer is, yes, it does.

Well, you would think that would be the end of the story, but you can overrule the Parliamentarian, say the Parliamentarian is wrong, and then reduce the threshold to 50 votes.

Now, you might ask: How is that possible? Is the filibuster really that fragile that whenever it is ruled that you need 60 votes, you can simply overrule the Parliamentarian?

The answer is, yes, the rule is that fragile, which means that if Republicans move to go nuclear, to overturn the Parliamentarian, to do away with the filibuster, to do away with California's clean air, they will be setting a precedent that at any time and for any reason, for any State, for any rule, for any nonrule, for any waiver, for any license, for any grant—for any anything—a new majority can simply say: Well, we would like to vote on this with 50 votes. And if the Parliamentarian says it takes 60, you just vote to overturn the Parliamentarian.

So that is the import of what we are doing today, which is we are setting a precedent that the filibuster is essentially now meaningless, because if you can do away with the filibuster to do away with one State's clean air, well, you can pretty much do away with the filibuster for anything and everything.

So that is the momentous nature of what is happening today. The majority here may force Californians to breathe air like that again, and the majority here may decide they are getting rid of the filibuster.

Now, getting back to the underlying merits here, the American Lung Association found that our transition to cleaner air and zero-emission vehicles would result in 13 million fewer lost

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

workdays in the next 10 years. So what does that mean, 13 million? It means 13 million fewer times that you are so sick, you can't go to work. You get 13 million more days of health with these clean air rules. Think about that—13 million more healthy days for you, the American people, if we achieve our emissions goals.

Now, since my swearing-in 6 months ago to the Senate, I have had the privilege of visiting communities all over California, talking to Californians who are on the frontlines of this. Yes, some are environmental activists, and, yes, some work on science and climate issues, but there are others, too. They are the people who put food in your grocery stores. They are the people who spend so much of their days outside, breathing the only air available to them. They are the people who will be sicker—some of the people who will be sicker, work less, maybe die earlier, if we let the fossil fuel industry win this week; the people who spend hundreds of hours each month on their hands and knees, making sure that all the rest of us can have fresh berries and greens and other crops that California puts on your plate. I am, of course, talking about farmworkers. I invite any of my colleagues to consider what millions more pounds of smog in our air over the next decade will do to them.

Of course, it is not just farmworkers; it is all of us—all of us who spend time outdoors, all of us who can't help but be outdoors. All of us are going to be breathing in dirtier air, all of us are going to be suffering more sick days, and all of us are going to be plagued by more cancers if we repeal the rules that each State gets to set that has a waiver or wants to join California's healthier air rules. That will be the repercussion.

It used to be there was a bipartisan consensus in favor of cleaner air. It wasn't just Democrats. Richard Nixon, who founded the EPA, Pete Wilson, Ronald Reagan—they all understood the importance of the environment and clean air and clean water. They helped California take the environmental movement and make it mainstream. We got pollutants out of our air and out of our water and out of our communities.

Where is that party now? Where is the party that helped write the Clean Air Act? Where is the party that says Congress should not meddle in what one State is doing to govern itself?

What will happen when you lose the majority and Democrats have the opportunity to follow this precedent? What will happen to your State? We decide we don't like your State's rule on mifepristone or we don't like the fact that your State got a license to export liquid natural gas or we don't like a grant that your State got in transportation or we don't like some rule that benefits your State. Will you argue to us that "oh, no, you can't overturn the Parliamentarian"? Will that be your

argument? Because that fight will be over.

So I will remember where I am today. I will remember what we are doing today. I think we all would and will. I hope it is not the day that we made it easier to pollute California's skies. I hope it is not the date we made it easier to make water filled with more forever chemicals like PFAS. I hope it is not the day we decided that we could eliminate a State's right to control the quality of the air that their citizens breathe or the water they drink. And I hope it is not the day we decided that it was worth getting rid of the filibuster to satisfy the fossil fuel industry.

With that, I yield the floor.

The PRESIDING OFFICER. The Senator from California.

Mr. SCHIFF. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. SANDERS. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Vermont.

UNANIMOUS CONSENT REQUEST—S. 1818

Mr. SANDERS. Mr. President, I know that my Republican colleagues like to do what the President asks them to do. They agree with him on virtually everything, so today I am going to make life easy for my Republican colleagues. I am going to ask them to support legislation—extremely important legislation—that, in fact, does what President Trump claims that he wants to do.

On May 20, just a few days ago, President Trump said the following:

Not only that, remember, I am cutting drug prices by 85 percent.

This is what President Trump said a few days ago: I am cutting drug prices by 85 percent. Right now, I am saving—I am saving the whole thing because I did something nobody was willing to do. Other countries pay a tiny fraction of what we do, and I instituted favored nations. We are now going to pay the lowest in the world. We will be the equivalent of the lowest country in the world. People go to London, they go to Canada, they go to other countries, many other countries, because they want to pay their pharmaceutical products—their drugs—at a fraction of the cost. We are going to have the lowest cost of anywhere in the world. No one else could do that but me.

That is President Trump a few days ago.

Well, I don't usually agree with President Trump on anything, but, in fact, on this issue, he makes a very strong point.

In the United States today, we have a healthcare system that is broken; it is dysfunctional; and it is cruel. It is a system which spends twice as much per capita on healthcare as any other major country while 85 million Americans are uninsured or underinsured. And one out of four Americans today cannot afford the cost of the drugs their doctors prescribe, and it is a system where over 60,000 people a year die because they don't get to a doctor on time.

While the current system makes huge profits for the large drug companies, huge profits for the insurance companies, it is obviously failing the needs of ordinary Americans.

So what is the U.S. Congress doing to address this crisis? Well, right now, sadly and tragically, the Republicans are trying to ram through a so-called reconciliation bill, which would deny coverage—take away coverage—for up to 13.7 million Americans, according to the Congressional Budget Office.

In other words, in the midst of a terrible healthcare crisis, this legislation makes a very bad situation much worse. We cannot allow that to happen.

So what should we do? Well, in my view, healthcare is a human right. We should do what every other major country on Earth does and guarantee healthcare for all people.

But, today, I want to get back to what President Trump said a few days ago, and what he said is that the American people are sick and tired of paying by far the highest prices in the world for prescription drugs. And he is right.

Whether you are a Democrat or a Republican or an Independent, or progressive or conservative, you understand that there is something wrong when Americans can't afford the high cost of prescription drugs, and the drug companies make over $100 billion a year in profits.

Let me give you just a few examples of the current situation regarding prescription drug costs in America. While it costs just $5 to manufacture Ozempic—that is a widely used drug right now—Novo Nordisk, the manufacturer of Ozempic, makes obscene profits by selling this drug for more than a $1,000 in the United States. That drug costs $76 in France, $85 in Germany, and $170 in Canada.

But it is not just Ozempic. Prescription drug after prescription drug costs far more in this country to purchase than in other countries—in some cases, 10 times more.

So what are we going to do about it? Well, I think it might be a good idea for my Republican friends to listen to what the President of the United States said. And, today, we are going to offer my Republican friends the opportunity to achieve the goals that President Trump has talked about.

The problem with President Trump's initiative is that he is mostly just talking. The Executive order that he has introduced and signed does not do what he says he wants to do.

Just don't take my word for it. An expert at Harvard University was recently quoted as saying:

The executive order reads more like an aspirational statement than a serious attempt to initiate a policy change.

*May 21, 2025*  CONGRESSIONAL RECORD — SENATE  S3035

The Wall Street Journal—no great friend of mine—their analysts said the order was "more bark than bite."

Since issuing the Executive order, President Trump has gone on FOX News, and while talking about differences in American prices and international prices, he said "he ended it."

Good news. It is all over. He ended it. We no longer pay the highest prices in the world for prescription drugs, according to President Trump.

During that same interview, he said that "drug companies were great." The drug companies, apparently, even told him: "Look, it's time."

Just yesterday, at a press conference with Speaker Johnson, he claimed he "is cutting [drug prices] by 80 to 85 percent" because "he stopped the scam."

Well, there you go. Good news, America. The President said it. It must be true because he would not lie. Drug prices are down by 80 to 85 percent.

Does anyone really believe that? Nobody does.

If we want to, on the other hand, do more than just talk, we have got to do something, and the way we do it is with some serious legislation. And that is the legislation that I have introduced today.

If we want to actually lower the outrageously high cost of prescription drugs in America, we need to take on the pharmaceutical industry in a way that President Trump has never even thought about doing. In other words, we need less talk; we need more action.

And that is why I introduced legislation to make sure that Americans pay no more than people in other countries for the exact same prescription drug. Unlike President Trump's Executive order, my bill doesn't just ask drug companies nicely, please, to lower prices. My legislation makes it clear that drug companies must lower prices for Americans to those they charge people in other countries. In other words, what we are finally saying is, if you are charging the people in the UK $100 for this prescription drug, that is what you are going to charge the people in the United States—not 10 times more.

And the difference between my legislation and Trump's so-called Executive order is that, if the pharmaceutical industry refuses to do the right thing and substantially lower drugs, my bill will allow other companies to sell the same prescription drugs at a far lower cost. In other words, generics can come on to the market and sell the drug for a fraction of the price.

So President Trump says he supports making sure Americans pay no more than people in other countries for prescription drugs. President Trump says:

Campaign contributions can do wonders, but not with me, and not with the Republican Party. We are going to do the right thing, something that the Democrats have fought for many years.

Well, I am just ever so delighted that campaign contributions have no impact on the Republican Party. It could

have shocked me, but there we go. President Trump said it. It must be right.

So the bottom line here is President Trump says he wants to lower the cost of prescription drugs in America by 80 to 85 percent. I agree.

President Trump has issued an Executive order which he says will do that. It will not do that.

The legislation that I have introduced has real teeth, and it will do that. So, today, I call upon all of my colleagues, especially my Republican colleagues, to support this legislation, because I know President Trump has said that the huge amount of money that the pharmaceutical industry gives in campaign contributions to Democrats and Republicans doesn't have any impact on the Republicans. They are prepared to stand up to the drug companies. So that is great news. I am delighted to hear that.

So, Mr. President, as if in legislative session, I ask unanimous consent that the Committee on Health, Education, Labor, and Pensions be discharged from further consideration of S. 1818, and the Senate proceed to its immediate consideration; further, that the bill be considered read a third time and passed, and the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Is there an objection?

Mr. CASSIDY. Reserving the right to object.

The PRESIDING OFFICER. The Senator from Louisiana.

Mr. CASSIDY. I appreciate the ranking member's interest in addressing drug prices, and you absolutely have to lower the cost of prescription drugs. And we absolutely have to acknowledge that there is a tension. If we do not incentivize the development of new types of drugs, we condemn ourselves to continue to die from diseases for which there are currently no cures.

And I say this as a guy who has practiced medicine—or graduated from med school in 1983. Let me put it that way.

When I graduated from medical school, one of the most common surgeries was taking out a portion of somebody's stomach. I don't mean your belly. I mean your stomach, where the food goes down after you swallow it. This is how I talk to medical students—because of peptic ulcer disease.

And there came along a medicine called cimetidine. It just changed the landscape. And we went from a surgery being most common to one which was rarely performed in 6 months. Cimetidine, which is now called Tagamet, which is now sold over the counter—just a measure of innovation, which if we had not had that innovation then, a most common surgery would still be removing a portion of somebody's stomach because of bleeding ulcers.

More tragically—it is pretty tragic when you lose part of your stomach—when I was a resident in Los Angeles is

when the HIV epidemic came out. And all of these men—they were all men—20 to 30, came in with something that we didn't even know what the disease was. We didn't have a way to diagnose it. So we called it the Acquired Immunodeficiency Syndrome. And they all died. They all died.

And I remember saying to one of the older physicians: Why do we even bother treating them, because they all die?

But because there was an incentive for companies to come up with cures, they did it. And they stopped dying, and they began living.

That doesn't happen accidentally. It happens because there is incentive to bring a drug through expensive studies to the market. By the way, I recently had a doc tell me, who treats HIV positives, that if a patient takes their medicine, they die when they are 88 of Alzheimer's or a stroke or something else, but they should not die from an AIDS-related cancer. That is the power of innovation, and that is the power of incentivizing innovation.

I could go down a list of other drugs. Melanoma. When I was in med school, if you got diagnosed with melanoma, they said go fill out the will. Now I have friends who have been living for 8 years, 10 years longer taking immunotherapy for melanoma. That doesn't just happen. That happens because you incentivize innovation.

So what are our diseases now for which we have no cure? Alzheimer's. I lost two parents to it. Wouldn't it be great if we had a cure for Alzheimer's?

Pancreatic cancer, esophageal cancer—I could just go down the list of things for which there is no cure. But, I can tell you, with the appropriate incentive, with the research taking place, in 10 years, we will speak of those diseases as diseases of the past, as we now speak of bleeding peptic ulcer disease causing a portion of your stomach to be resected as something in the distant past.

Now, by the way, I applaud my colleague. I applaud President Trump for saying that other countries are not carrying their fair share of the load for paying for this innovation. They should do it too. This is not the way to get there. But it is absolutely essential that they do. And my staff is bringing something, which I will invite my colleague from Vermont to join us on that, because it is absolutely essential that we have the innovation, that we be able to afford it. And the only way we balance those two is if other countries pay their fair share.

But let's return to the measure at hand. The measure at hand sounds simple. It is simple. It won't succeed. Well, it will succeed in lowering prices temporarily, but, in the long term, it will defeat the ability to incentivize innovation. And then all drugs will be cheap because all drugs will be old. But we need new drugs, and we need the incentive, and this kills that incentive.

So for that, I object.

The PRESIDING OFFICER. The objection is heard.

S3036 CONGRESSIONAL RECORD — SENATE *May 21, 2025*

The Senator from Vermont.

Mr. SANDERS. I want to thank my colleague from Louisiana, the chairman of the Committee on Health, Education, Labor, and Pensions, on which I serve, for his remarks. And I think nobody will disagree with him that we have seen in recent years incredible innovation, and there are drugs now on the market that are saving lives that 20, 30 years ago, 10 years ago, were not the case. And we want to continue that innovation—no debate about that.

But all that I am asking my colleague from Louisiana to focus on is what President Trump said, not last year, not 5 years ago. It is what he said yesterday. And what he said yesterday, and I quote, Senator CASSIDY—this is President Trump:

I'm cutting drug prices by 85 percent. Right now, I'm saving—I'm saving the whole thing because I did something that nobody was willing to do. Other countries pay a tiny fraction of what we do. And I instituted favored nations. We're now going to pay the lowest in the world. We will be the equivalent of the lowest country in the world. People go to London. They go to Canada. They go to other countries—many other countries.

But we are going to do it here in the United States. That is what he said.

So all that I am doing, Chairman CASSIDY, is putting into legislative, effective language what the President of the United States said.

And by the way, he said, again, that the pharmaceutical industry and all of their campaign contributions have no impact on Republicans, only on Democrats. Well, maybe that is the case, but I doubt that very much.

So all that I am asking my colleague and friend the chairman of the committee to do is to put in place what President Trump said he was doing.

And what my legislation would do is exactly what Trump talked about. It would lower the cost of prescription drugs to what other countries are paying. That is what it does; it does what Trump says he wants to do. I would urge my friend from Louisiana to reconsider.

I yield the floor.

The PRESIDING OFFICER. The Senator from Hawaii.

BUDGET RECONCILIATION

Mr. SCHATZ. Mr. President, there is a sort of general rule in politics, which is that if you start your meeting at 1 a.m., you are probably not proud of what you are doing. Now, there are some instances in which you start the meeting at 7 p.m. and it goes long and then you have to vote at whatever hour you finish. But to convene at 1 a.m. is an intentional thing. It is to say: I would very much like if nobody saw what we were up to. And that is exactly what happened at 1 a.m. today, Wednesday morning.

Republicans in the House know that the bill that they are considering is super unpopular, but they have been ordered to pass it anyway. That is what is happening on the other side of the Capitol right now. House Republicans

have convened the Rules Committee at 1 a.m. to advance their tax bill, and it is because they know this bill stinks.

For starters, it is the largest wealth transfer in American history. Think about that. There have been a lot of wealth transfers in American history, but this is the biggest one in terms of the Tax Code. It is not like they were redistributing wealth among the wealthy. They are literally taking from the poor—people who don't have enough money—and shoveling it straight into the pockets of people who already have more than enough.

This bill is about making the richest people ever to walk the Earth even richer. How do they plan to do that? By kicking 14 million Americans off of health insurance and denying food assistance to millions more. People will be turned away at hospitals and go to bed hungry, all so that billionaires have a bit more.

You do not need fancy polling to tell you that this is super unpopular. And so Republicans have decided to fix that problem by convening the hearing in the middle of the night, hoping that people will not notice.

The plain facts of the bill are so egregious. And as I started to write these remarks, I had a problem, which is, How do you describe this thing accurately and not sound like you are frothing at the mouth like a partisan and sort of overstating the case? Because this really is kicking 14 million people off of Medicaid, kicking millions more off of food assistance, and then that is the savings that is generated in order to fund these tax cuts for billionaire corporations and the wealthiest people in the United States.

And what happens if something is both true and sounds like a partisan accusation? But that is where we are at. This is actually what they are trying to do.

Here is the thing, even the biggest cuts to Medicaid in history are still not enough to cover the cost of these enormous giveaways. So the Republicans have turned to one of their favorite punching bags: solving the climate crisis.

Never mind that hundreds of billions of dollars are being invested in clean energy across the country, mostly in Republican States and districts; never mind that those investments are creating hundreds of thousands of good-paying jobs; never mind that even if you don't care about any of that, there is a basic principle in running a smart economy and running an investable economy—and that is that when the private sector makes an investment on the basis of the Tax Code and they are in the middle of that investment, you can't pull the rug out from under them.

The reason is very simple. Besides fairness and besides the fact that we are undermining progress towards actually addressing an existential crisis for the planet, it also makes the United States very hard to invest in because if you were a business and you are look-

ing at the Federal Tax Code and you are saying: I am going to make a 5-, maybe 10-year investment—capital investment—in chips, manufacturing, climate, agriculture, hospitality, real estate, transportation, infrastructure, whatever it may be—you are doing it on the basis of what the Federal Tax Code says.

And then your investment committee, board of directors, whomever it may be, will say: How do we know these things are going to stay on the books?

The normal answer is: Come on, the Federal Government is not going to pull out a tax incentive structure in the middle of your investment and construction cycle.

And the truth is, yes, they are.

So this doesn't have just climate implications or economic implications in terms of the specific projects. It actually has to do with how stable of an investment climate we establish in the United States of America. We are no longer doing "all of the above." The argument that we used to have between the political parties was Democrats would say we have to transition to clean energy; Republicans would say, no, let's do clean energy, but let's also do these other things.

But now the Republican position is picking winners and losers and, basically, riding the losers into the ground.

Here is the very tough truth: Coal is on the way out, whether you like it or not. But Trump and Republicans would rather revive it for a few more years just to squeeze a couple more years of profitability out of it because, after all, their capital investments are fully amortized. So a couple more years of profitability means no more investment, but a couple more years of revenue.

So that is what they are doing. This is going to raise costs for Americans. Let's be clear. This is going to raise costs for Americans.

There was a time—and I was part of these debates in the State of Hawaii— there was a time when there was a tradeoff between how much consumers had to pay and our climate objectives. But those trends have changed. Now wind is the cheapest form of energy. Nuclear is among the cheapest forms of energy. Solar is among the cheapest forms of energy. For me, in the State of Hawaii, to bring in low sulfur fuel oil on a fuel tanker and then light it on fire for electron is the dumbest thing to do, even if you don't care about climate.

It is simply cheaper. It is simply cheaper for consumers and businesses and for the climate crisis and, therefore, our ability to fiscally manage the climate crisis as we see increasing disasters, both in their severity and how often they happen. And then every—what?—year, year and a half we do $150 million emergency supplemental because there are now wildfires where there have never been wildfires, floods where there have never been floods, tornadoes where there have never been

May 21, 2025 | CONGRESSIONAL RECORD — SENATE | S3037

tornadoes? This is not made up. Nobody gets to deny this anymore.

So there is a reason they convened at 1 a.m., and it is not because that is prime time in Hawaii. They didn't convene at 1 a.m. because they like to see each other past midnight. They convened at 1 a.m. because they are about to pass one of the most unpopular pieces of legislation that has ever been passed out of the U.S. House of Representatives.

I just wonder why—if I am a House Member and I am being told "We are going to make all these changes. All these things that you are voting for are going to be excised from the Senate version. Don't worry," well, my view would be "If you are going to fix all that stuff, why are you making me vote on it now? Why are you making me vote on it now?"

The answer is very simple: Donald Trump showed up in the caucus and used a couple of expletives. They implied that voting no is a betrayal, that standing up for your constituents is a betrayal, and I think they are all going to fall in line.

So it is up to the U.S. Senate to fix this bill or kill this bill. That is the task in front of us.

I am hoping that cooler heads prevail. I know there are a number of Republicans who hate these Medicaid cuts. I know there are a number of Republicans who have a ton of clean energy investment in their States.

There is plenty of political room to criticize the Biden administration or say "I am against the Green New Deal" and still be for wind and solar and nuclear and geothermal and agriculture that is done in a more climate-friendly way. All of that is available to us. We don't have to do things in the maximally unpopular way, but the Speaker apparently wants to do it that way.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Democratic leader.

UNANIMOUS CONSENT REQUEST—S. 1593

Mr. SCHUMER. Mr. President, I am a sponsor, along with Senator MARKEY, our lead sponsor, and Senator HIRONO, for the Small Business Liberation Act. In a few minutes, Senator MARKEY will come to the floor and ask unanimous consent to pass it, but I wanted to say a few words in advance of its coming.

Senate Democrats today will try to pass the Small Business Liberation Act to exempt small businesses from Trump's destructive trade war. I am very proud to cosponsor and support this legislation that Senator MARKEY has sponsored.

Two months since Donald Trump's so-called "Liberation Day," his tariffs have been economic arson on Main Street, and small businesses are getting scorched.

I have visited small businesses from one end of New York to the other, and these tariffs are sowing chaos. They are raising costs, smashing supply chains, forcing businesses to hike prices, lay off people, and even close their doors for good. Already, employment of the smallest of small businesses has declined by 3 percent, and last month alone, 65,000 small business jobs were wiped out.

Trump's 90-day pause does nothing to bring relief or certainty to small business but only continues the uncertainty and chaos. How can a small business possibly plan for the future when the future only shows chaos? One day Donald Trump says this, the next day he says that, and nobody knows what tomorrow brings.

These small businesses can't do anything about their pain. They don't have the ear of the President like the mega corporation CEOs do. The administration is utterly clueless about the pain they are creating for small business.

Our legislation will help small businesses get back on track by exempting them from Trump's destructive tariffs. There are almost 35 million small businesses in the United States that employ roughly half of the private sector jobs in the country. Providing these businesses with tariff relief shouldn't be partisan. It is a national priority.

If Republicans clearly care and truly care about protecting small business, they should not stand in the way of our legislation passing today.

Will they side with the American people and small business and help pass our legislation or will Republicans block this bill and side with Donald Trump as his trade war decimates small businesses from one end of the country to the other?

I yield the floor.

The PRESIDING OFFICER. The Senator from Hawaii.

Ms. HIRONO. Mr. President, we are witnessing one of the most anti-small business administrations in our Nation's history.

Since day one, Donald Trump and his administration have sown chaos in our country and our economy, disregarding the impacts of their mayhem on the American people, including the nearly 35 million small business owners in our country.

From freezing Federal funds to enacting tariffs that harm small businesses and consumers, Donald Trump is taking a wrecking ball to the American economy and the small businesses that fuel it. Now the Trump administration has taken to gaslighting business owners and the American people about the impacts of their recklessness.

Just today, Small Business Administrator Kelly Loeffler—a billionaire herself—testified before the Small Business Committee on which I sit. To call her remarks Orwellian would be an understatement. In her testimony before

the committee, Administrator Loeffler claimed that thanks to the President's economic agenda, "demand for American goods is rising and small manufacturers are stepping up to meet it."

On the contrary, President Trump's tariffs are harming U.S. businesses—especially small businesses—and increasing their costs. As a result, business confidence is plummeting.

According to the National Small Business Association, only 59 percent of small business owners are confident in the financial future of their businesses. This is a new low in this organization's survey. It is a new low in the 16-year history of this survey.

According to another organization, Small Business for America's Future, 80 percent of business owners feel concerned or pessimistic about their economic outlook, 79 percent of businesses are concerned about a recession in the next 12 months, and 86 percent are concerned about navigating current economic conditions.

Normally, the SBA would be there for small businesses in moments of pain and uncertainty like this, but this anti-business administration has wasted no time in basically gutting the SBA. To date, nearly 800 SBA employees have been fired or resigned, and the Administrator has a goal to shed another 1,900 employees in the months ahead. The SBA is the smallest entity in our Federal bureaucracy, and they are shedding all these employees. When I asked the Administrator about these employees, the majority of whom are gone, she had a hard time giving me a straight answer.

Already, we have heard from small businesses that have noticed a significant decline in customer service since January when the SBA began shedding all these employees. If the SBA goes ahead with this disastrous plan to shed more employees, nearly half—nearly half—of the Agency's workforce will have been eliminated, leaving small businesses across the country basically to fend for themselves, not to mention all of the programs that the SBA supports on behalf of small businesses.

Gutting the SBA is hardly what I would call, to quote Ms. Loeffler in her testimony today, "meeting the moment." Despite the Administrator's bluster, the numbers are clear: Our small businesses are suffering; they are not prospering. They are suffering under the weight of Trump's actions, especially his tariffs.

That is why I was proud to join Senator MARKEY in introducing legislation which he will talk about soon to exempt small businesses from Trump's tariffs, tariffs that may well force many of these businesses to shut down altogether. While the massive corporations controlled by President Trump's billionaire buddies may be able to weather this economic storm, our small businesses don't have the same luxury.

Republicans think our Tax Code makes our economy great; that if they

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

keep giving massive tax breaks to their billionaire buddies, some of these tax breaks, this money that is concentrated at the top, will eventually trickle down to working people. We already know that is not so. Democrats know that small businesses, entrepreneurs, and their hard-working employees are the powerhouses of the American economy. We should be making it easier for hard-working people to start and run businesses—not harder—so that they can unleash a wave of innovation and prosperity rather than waiting and hoping for a trickle that may never come. And in fact, it hasn't. It doesn't. But the Republicans keep hoping that we are going to continue to buy this argument.

So, for these reasons, if Republicans are serious about supporting small businesses, they will join us in passing our commonsense bill. On behalf of the nearly 35 million small businesses across our country, I urge my colleagues to join us in passing the Markey bill.

I yield the floor.

The PRESIDING OFFICER (Mr. SCHMITT). The Senator from Massachusetts.

S.J. RES. 55

Mr. MARKEY. Mr. President, while we are waiting for the next opportunity to move on the legislation to liberate small businesses from the tariffs of the Trump administration, I would just like to speak for a few minutes about the attempts by the Republican leadership to truncate the process by which California is able to have a waiver to increase the efficiency of the vehicles which are driven in California, but the same thing would be true across the rest of the Nation.

All I want to say is that, right now, China is investing $1 trillion this year in clean energy, low-carbon technologies—$1 trillion in 1 year. Japan has just announced they are investing $1 trillion in clean energy, low-carbon technologies.

So what we are debating here is going to absolutely allow for these other countries to catch up to us, and we will ultimately fall further and further behind, especially in the efficiency of the vehicles which we drive in this country. We might as well put a bow on an entire industry over the long term and just hand it over to countries around the world that are focusing on these technologies.

That is why this is a big mistake. We should not be allowing for a procedural trick to be played here that is unprecedented in the history of the Senate, to then have the underlying issue be really not debated the way it should in terms of the consequences for our Nation and for the planet in terms of the greenhouse gases, additionally, that are going to go up that will endanger our planet.

So I just wanted to make that comment. I will come back later in order to speak on it.

At this point, Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Minnesota.

TARIFFS

Ms. KLOBUCHAR. Mr. President, I am here in support of Senator MARKEY's very important bill that looks at these tariff taxes which, as we all know, apply to consumers—$3,000 for every family in America will be the tariff tax from President Trump's tariffs.

But the focus of Senator MARKEY's bill—which is so smart—it is on what is happening with small businesses. They are literally roadkill here. They do not have the margins of the big businesses who can go in and have the number of the White House and get a special meeting and get an exemption, which is exactly what has happened.

Or they are not invited to the special secret meeting at JPMorgan with the Treasury Secretary with major investors to find out what is going to happen next with tariffs. They are completely in the dark. Yet they are the backbone of our economy.

I use the example of Beth Benike who is from Minnesota, an Army veteran from southern Minnesota, CEO and founder of a little company called Busy Baby, Minnesota Small Business Person of the Year, just honored at the Small Business Administration about a week ago or 2. And she was celebrating getting her products into major, major retailers. And then these tariffs struck.

Beth's story is the American dream. She came up with an idea based on her own experiences with little kids to help with highchairs. And now she is worried about losing her business and even her house because of these across-the-board tariffs.

We are seeing this over and over again. That is why I am honored to join Senator MARKEY in his bill to say: If we are not going to help the rest of the world, at least we must exempt small businesses in America from these tariff taxes.

I would prefer for everyone to look at only doing targeted tariffs like we have successfully done in the past under both Democratic and Republican Presidents, instead of this across-the-board business that is basically driving China into the arms of Russia, that is dissing our own allies, like South Korea and Japan and Europe, Canada and Mexico. And the time is here to do something.

Mr. President, at the very least, let us exempt those small businesses who are going to be the first to fold under the weight of these tariff taxes. I thank Mr. MARKEY for his leadership.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oregon.

TRIBUTE TO JESSICA STEVENS

Mr. MERKLEY. Mr. President, the motto of the State of Oregon is "She flies with her own wings."

I can't think of a better description for my State director Jessica Stevens. After more than 12 years with Team Merkley, I have come to the Senate floor today to bid her a grateful farewell.

Jessica has spent her career serving the people of our State of Oregon. She fought for working families as the executive director of the Oregon State Council of the Service Employees International Union, SEIU, before joining Team Merkley as director of our field team.

I hold a townhall in each of Oregon's 36 counties every year, so leading the field team is a very demanding challenge.

For 3 years, she traveled with me across the length and breadth of our State, from big cities to rural communities, from the Oregon coast to the Owyhee Canyonlands, from the Columbia River to Crater Lake.

So in 2015, when it was time to hire a new State director, there was no question that Jessica was the right person to lead our State team.

For the last decade, she has coordinated between two teams on two coasts, managing six field offices with nearly 20 staff working across Oregon's more than 98,000 square miles.

She has overseen more than 400 townhalls with the people of Oregon. She has built close working relationships with 3 Governors, 11 Members of the House of Representatives, countless State legislators, county commissioners, community leaders, stakeholders, advocates, and constituents, not to mention Senator WYDEN's team.

And she leads by example.

As one of our team members said:

Jessica works harder than anyone else. And what we see is only the tip of the iceberg.

Others describe her "constantly working behind the scenes," that she "squashes trouble," "puts out fires," and "fixes problems nobody [has even yet seen]."

A former Team Merkley member said she "was so impressed with how Jessica handled [difficult situations, bringing] immense calmness and clarity [with] considerable empathy and support."

Another former team member said:

Regardless of roadblocks or the crisis du jour, Jessica has always remained dogged and determined to make sure that the people and causes who needed help [get] it.

Jessica has also taken countless members of Team Merkley under her wing. She has encouraging words for our interns, podcast recommendations on tricky local issues.

She sets a "calm but strong" example for the entire team, including her "skill for listening and really seeing all the diverse groups and constituencies" my office serves.

One longtime member of our team said:

When I first met Jessica, I was pretty intimidated by her as an intern and just recognized immediately [that] she was a badass woman.

Another shared the story of the first time she had to do an airport pickup, saying:

Jessica could tell I was really nervous and offered to come with me . . . so I would feel

*May 21, 2025*  CONGRESSIONAL RECORD — SENATE  S3039

more comfortable and [that] everything would go smoothly.

Another member of Jessica's team said:

> She takes care of family, she takes care of friends, she takes care of her neighbors. She is just honestly incredibly selfless and giving.

Someone said:

> [She's] always sending a personal note to celebrate people's good news and glad tidings. [And] it [really] means a lot and builds the kind of camaraderie that makes Team Merkley special.

And one member of my team summed it up by simply saying:

> When you have Jessica in your corner, you feel [very] supported and safe.

In addition, she led one of the most consequential and sensitive processes: the nominations of Federal judgeships in Oregon. She supported judicial selection committees of legal and community leaders and worked with the White House to advance these nominations.

Thanks to her tireless efforts, Oregon has made history with its recent appointments, including Judge Adrienne Nelson, who is the first African-American woman to serve on the Federal bench from the District of Oregon, and Judge Mustafa Kasubhai, who is the first Muslim to serve as a Federal judge in the United States.

Her quiet efforts behind the scenes have helped to make our courts and our country more equitable and more just.

The motto of the State of Oregon is ''She flies with her own wings.''

Through workers' strikes and wildfires, through pandemics and post office closings, through the first Trump administration and now the second, she has kept Team Merkley flying for 12½ years.

It is with deep gratitude that Team Merkley and I thank Jessica Stevens for her service to the people of Oregon. We wish her all the best in her new chapter.

The PRESIDING OFFICER. The Senator from Massachusetts.

UNANIMOUS CONSENT REQUEST—S. 1593

Mr. MARKEY. Mr. President, today, I rise to advocate to my colleagues in the Senate for my Small Business Liberation Act, and I do so with Leader SCHUMER and Senator HIRONO, who have each already spoken on this very important issue.

Here is what the bill would do: The bill would give relief from President Trump's disastrous, destructive, small business-killing tariffs that have been turning Main Street into ''Pain Street'' all over our country for the last 7 weeks.

I would also provide with my bill certainty to the constant whiplash and chaos that is President Trump's tariff policies by exempting small businesses from the baseline 10-percent tariffs and the tariffs that have been on a 90-day pause since April 9.

So let me just explain what I am talking about. On April 2, President Trump imposed a 10-percent tariff on

pretty much the whole world. In other words, a 10-percent tax on anything coming into the country—10 percent.

He also imposed an additional—called reciprocal tariff—on April 2 as well. And those tariffs, for example, were an additional 20 percent on the EU or an additional—we will just say—32 percent on Fiji, for whatever reason.

So that was an incredible additional tax on top of the 10-percent tax, which he imposed on the same day.

So on April 9, the President said: Well, we will wait—we will wait 90 days on those additional tariffs; on the EU for 20 percent; the 32 percent for Fiji; the 24 percent additional for Japan—we will put that aside, but we are going to keep the 10 percent on.

Now, for a big company, maybe they can figure that out. They can ride that out, the 10 percent. However, if you are a small business in our country, and all of a sudden, there is a new 10-percent tax you have to pay on all of those goods which you are bringing into our country, and then there is a sword of Damocles sitting out there, as well, that there could be, in July—which is only 6 weeks away—an additional 20 percent if those products come in from Europe. You are going to have a chilling effect that is placed on your business decisions, without question.

They don't have the leeway to be able to make the kind of riskier decisions that, perhaps, a bigger business could to just ride through all of these tariffs. So all across every Main Street in our country, these small businesses are getting paralyzed by the Trump actions.

Again, we are going to start with this: There is a 10-percent tariff—tax—already in place right now, since April 2, on every good coming into our country. So this is a very dangerous place to put the small businesses of our country.

Even as the vast majority of small businesses are seeing massive tariff-induced cost hikes, this administration is offering exemptions—exemptions—for billion-dollar corporations.

If you can get a dinner invitation to Mar-a-Lago, like the heads of Apple and Google, you can secure an exemption for your industry.

Now, in almost every instance, that is preceded by a big, big multimillion-dollar contribution to some entity that the Trump administration would like you to give that money to.

And then Apple is out; Google is out. They are not any longer affected by the tariffs. But no one on Main Street can afford to go to Mar-a-Lago to give the President $1 million. That probably exceeds the total worth of their business.

So that is the problem with where we are. And, by the way, it is also why the national chamber of commerce says that small businesses should get an exemption. It is not me. It is the national chamber of commerce that says that they should get an exemption.

And 97 percent of all companies that do business on an international basis

are small businesses, and they constitute 30 percent of all trade. The national chamber of commerce is saying they should all be exempted. That is what my bill does. It says: Exempt those 97 percent of all businesses that constitute 30 percent of the trade from these tariffs—from the 10-percent tariff; from the upcoming, 6 weeks from now, upward of 20 percent, 30 percent, 40 percent more tariffs that are being imposed on countries around the world, while we are waiting for the President to negotiate bilateral agreements with each one of these entities.

Well, so far, after a month and a half, he is up to one agreement with the United Kingdom. That is it. He has got dozens and dozens to go and no time on the clock, and that is what small businesses are looking at. They are looking up at the clock. They are saying: How long can I last? I survive week to week. I survive month to month. I can't afford to be paying these tariffs or wondering if there is a new tariff which is coming in.

And all across our country, these numbers are unbelievable. In Massachusetts, we have 7 million people. We have 700,000 small businesses. Well, the same thing is true for the country. There are about 330 million Americans, and there are 33 million small businesses. There is a small business in America for every 10 people, and that person right now is looking up with fear that their future has a cloud over it.

And those small businesses, they account for two out of every three jobs added to our economy in the last 25 years. They are our engine of growth.

So I have heard from small businesses all across Massachusetts, all across our country, about how they are forcing those businesses to lay off employees, scale back benefits, or even shut their doors in some cases.

I spoke with Brandale Randolph, founder of the 1854 Cycling Company, an electric bike manufacturer based in Massachusetts, and here is what Brandale told me. He shared the story that his company finally—finally—after years of work, recovered from the $45 million which they lost during COVID, only to now be forced to decide whether or not they can weather this new tariff disaster hanging over their head.

So they moved from COVID to tariffs—none of this having been in any way instigated by the small businesses of our country. They don't have anything to do with it. It just keeps coming into their lives. And the messages from 1854 and other small businesses across the country are clear: These tariffs are going to threaten to put them out of business.

Small businesses are not Democrat. They are not Republican. This should not be a partisan issue, and I am disappointed that President Trump continues to ignore the outrage and the opposition to his irrational and ill-advised tariff policy.

(88 of 196), Page 88 of 196 Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 88 of 196
Case 4:25-cv-04966    Document 1-3    Filed 06/12/25    Page 25 of 82
S3040    CONGRESSIONAL RECORD — SENATE    May 21, 2025

It is time for the Senate to stand up and exempt small businesses in our country. There is a trade war going on. We should allow small businesses not to be drafted into this war because they are the ones that will be the casualty.

So, Mr. President, I ask unanimous consent that the Committee on Finance be discharged from further consideration of S. 1593, and the Senate proceed to its immediate consideration; that the bill be considered read a third time and passed; and that the motion to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Is there an objection?

The Senator from Ohio.

Mr. MORENO. Reserving the right to object, and if my Democratic colleague could just yield for a very brief question for clarification, I think, for those listening: How do you define a small business?

Mr. MARKEY. Well, a small business is defined in the Small Business Administration definitions, and those would be the ones which we would exempt. And it can be different, depending upon the industry or its status, but, in general, what we are using is the definition used by the Small Business Administration.

Mr. MORENO. And just for clarification of my colleague, that is actually 500 employees or less. So I think when we are talking about small businesses, I just want to clarify that we are talking about 500-employee businesses.

So, first of all, I also want to actually thank my colleague for caring about small businesses. Certainly, as a small business owner up until 4 months ago, I think we should have much more passion here in this Chamber around small businesses. So I truly commend you for that.

I also commend you in a very big and meaningful way for the vote you took 25 years ago when you voted against giving China normalization status with the United States. I think that was a courageous vote. You were on the right side of history.

That disastrous situation has led China to grow its GDP from $1.2 trillion back then, when you voted, to $25 trillion today. So the fact that you went against some of your colleagues and took that vote shows that you are somebody who is independently minded and understands what businesses go through.

I truly, truly commend you for that because there is no worse bill in American history than that act. That act destroyed companies, not just all over America but, specifically, in the Presiding Officer's State and in my State. We see it every day, don't we, when we go on the campaign trail, when we are driving around Missouri or driving around Ohio. We see the remnants of companies that once existed.

Well, let's talk about how we can liberate small businesses, and maybe we can agree on these plans. No. 1, in the 2017 tax reform, the 2017 Tax Cuts and Jobs Act, what is interesting to me, as a small business owner, is that very large companies had their taxes made permanent, but it was for small businesses that those tax rates expire. In fact, they expire this year.

And the bill that we are looking to advance here in the Senate is a bill that would make those tax rates permanent. Let me just repeat that. We are not looking to cut taxes, because that is what you hear from my colleagues quite a bit. We are looking to make the 2017 tax reform permanent—not for big companies, not for the massive companies that are headquartered in Massachusetts but for the small businesses in Ohio and Missouri and in other places around the country that are going to see a massive increase in their taxes if we don't take action.

To put it in numbers, it is a $4 trillion tax increase for businesses. So if we are going to liberate small businesses, join me in calling for the 2017 tax reform to be made permanent.

Let's reform onerous regulations, especially in the banking sector. If you were a small business over the last 4 years, it was really hard to get access to banking because banks were basically shutting out small businesses from lending. The big banks kept getting bigger. Community banks, which is what small businesses rely on, were getting absolutely tortured.

We need better energy policies. What that means is certainly not banning coal, which is important in my State; natural gas, of which we have a thousand years of reserves. And I have offered to my colleague that we will build a big, beautiful pipeline right to Massachusetts. You will never need energy again from Canada or any other place. You can get it right from Ohio.

Better workforce policies, ending the incredible amount of onerous overlitigation—those types of policies will liberate small businesses. How do I know it? Because I have been a small business owner my entire life.

So let's talk about the subject at hand, tariffs. Tariffs are exactly intended to help these kinds of companies. When a Mexican company came in and bought Republic Steel in Canton, OH, the first thing they did was take all the equipment that was valuable, shipped it to Mexico, massively laid off the employees, sucked all of the cash out of the business, and left a 258-acre environmental disaster in the heart of Canton, OH. Now, that same steel is made in Mexico, and they want to ship that steel into the United States completely tariff free.

What was the impact on small businesses around that steel mill—restaurants, the hairdressers, the grocery stores, the doctors, the dentists—that relied on those employees? Devastation. Devastation rate.

In Lordstown, OH, we once had a General Motors facility that employed 10,000 people, 6 million square feet. They made the highest quality products of any facility in America. The production was shipped to Mexico. Now the facility remains basically idle. What was the effect on the small businesses of Lordstown, OH? Total and complete devastation.

So while I appreciate my colleague's desire—I really, really do. I have had a chance to meet you in your office. I think you are a good man. I say that with total earnestness on my part.

Let's actually liberate small businesses. Let's give them certainty on taxes. Let's keep their tax rates permanent, just like the big guys got.

Why did the big guys get permanency? And the little guys, who don't have access to the Halls of Congress, why do they get the tax rates that go up?

Let's give them better energy policies that allow them to have energy costs go down. Let's give them better workforce policy. Let's end the reign of terror of litigation that hits small businesses and drives up insurance costs. And let's give them good workforce policies. And let's support—let's unite as a country, as President Trump tries to undo, Senator, what you tried to do 25 years ago. And 25 years ago, you wanted this country to stand up to China and say: No, we will not give you normalization because if we do, you will destroy our economy.

And they have.

Let's rally around President Trump. It has been just over 100 and some-odd days. He is trying to reverse 25 years of bad behavior. We should be in this Chamber saying: Look, go out and do that. Negotiate. We have your back. Fight for America. Fight for American workers. Fight for American small businesses.

That is the message other countries need to hear. They shouldn't be hearing from this Chamber that we are not united as Americans in making the best deal for American workers.

And with that and therefore, I object.

The PRESIDING OFFICER. The objection is heard.

The Senator from Massachusetts.

Mr. MARKEY. First of all, I want to say that I appreciate the comments of the Senator from Ohio.

But here is the bottom line: This isn't just about China. The President hasn't targeted just China. He hasn't explained his "just China" strategy. He has imposed these tariffs all across the world—all across the world, every country.

And yes, the legislation that we have, it doesn't touch the steel tariffs that are imposed. We don't touch those. They can stay in place. We don't touch them.

But here is the bottom line: You can't make silk for U.S. ties in the United States. You can't grow coffee in the United States. I could go on and on and on and on, about product after product that is sold in Main Street in America. Putting a 20-percent tariff on and, on top of that, an additional 20

CONGRESSIONAL RECORD — SENATE

percent, 30 percent, 40 percent, it is not going to do anything for the person on Main Street with the small business. It is just going to make it almost impossible for them to import those goods that they need to sell in their stores on every Main Street in America. That is what they are saying to us. And this 10-percent tariff is still going to stay on.

We are only 6 weeks from having the sword of Damocles of 20 percent more for the EU and countries from all around the world—Japan, Israel, you name it, India—it is just dozens and dozens of countries that aren't China. But there is no plan. The President is making it up as he goes along, and the people who are going to suffer are going to be the small business people.

If you import toys, and there are maybe 20 different countries from which you import your toys to put on the shelves of your stores on Main Street everywhere, and parents can go in to buy the presents for their child—I just think it is unrealistic. The President is saying: Well, maybe the kids can get by with 3 dolls instead of 30.

Well, that is not how it is going to work. The store is going out of business. The store has a certain predictable business model in terms of how much revenue they are going to have per year, based upon what they can import.

If the President had a plan, I would like to hear it. But I don't. I don't want to hear him talk about how he is ultimately going to get a deal with dozens of countries in 6 weeks. There is no likelihood of that happening. But a small business person can't take that risk.

So that is why, again, this short-term pain that the President keeps talking about for long-term gains, well, honestly, in the short run, these businesses are going—they are going under, the small businesses. And there may be some posthumous indication of the President's theory about these tariffs, 2 years, 3 years, 5 years from now. That won't really do these small businesses any good.

So let the big businesses fight it out, and don't allow the Googles and the Apples to buy their way out of it.

You know, in the Civil War, there was an old saying: It was "a rich man's war but a poor man's fight"—meaning the rich man could buy his way out of the draft. Rich man's war; poor man's fight.

So big business war, but it is going to be fought by small businesses on Main Street, who are going to be the victims. Those are always the casualties. And they have been drafted into this battle of big businesses.

So, again, I appreciate the comments of the gentleman from Ohio. I think he is wrong. I think we should exempt small businesses and let them know that they are not going to be driven out of business by this still-unplanned guided missile heading right toward every Main Street in our country that is going to be destructive of the hard-

earned success those small businesses have had.

I yield the floor.

The PRESIDING OFFICER. The Senator from Ohio.

Mr. MORENO. Just real quickly. Again, I truly respect my colleague and his point of view. I want to remind him that there is a great Massachusetts family, the Hassenfelds. Do you know what they used to do—what they still do? The brothers created a company called Hasbro. Those toys used to be made in the United States of America. They were employing lots of American citizens. They shipped all that production to China and elsewhere, and communities suffered as a result.

As I said—if you notice, my colleague did not address any of the points that I made. If you talk to any small business owner, they will tell you the No. 1 priority right now is for us to make their tax rates permanent. It is not tax cuts. No matter how many times my colleagues will say it is tax cuts for billionaires, it is objectively not true. This is permanency of the current rates.

Only in Washington, DC, by the way, would keeping things the same be considered a tax cut. It is ludicrous, and it makes no sense.

Since you asked for the plan, here is the plan: We are going to make America the best place to do business. We are going to give American companies and American citizens the best tax rates so they can grow and thrive here. We are going to give them a regulatory environment that is not overbearing, that doesn't kneecap companies. We are going to make certain we protect critical industries like steel, which I appreciate that.

I think we should put, by the way, a full tariff on all major steel products—like, for example, appliances. This country was once the epicenter of appliance manufacturing, and now there is only one company—Whirlpool. I am proud they make their appliances primarily in Ohio. Yet they have to compete with cheap appliances coming in from China.

We have a plan. The plan is very simple. We are going to have fair and reciprocal trade. And you are right; it is not just China. It is Japan, which charges us tariffs and nontariff barriers, and we allow them to bring their products here.

South Korea—not only is that the case, but we also pay to defend them.

Australia. Great ally. Great people. They tariff our meat. Their meat can come in tariff-free.

Canada and Mexico are great allies and large trading partners, but they have allowed their borders to be open. They have allowed hundreds of thousands of Americans to die of fentanyl. I am ecstatic that we have a President of the United States that says: No, we will not allow that to continue. And if you want to have a relationship with the United States of America, you are going to secure your borders, and you

are going to make it darn well necessary to secure your borders to protect Americans.

So that is the plan. The plan is to usher in a golden age for this country where working-class Americans have the ability to live a good life, have a good job where a mom or a dad can provide for their kids, afford a home, afford a car, go on vacation every once in a while, and retire with dignity. That was once the dream of the Democratic Party. This is what we should unite around and rally around and make certain that all of our policies are pointed straight in that direction.

So, again, I appreciate the comments from my colleague. Hopefully, I think we can work together on some initiatives, as I laid out—good tax policy, good regulatory policy, good workforce policies that allow small businesses to thrive—because as somebody who did that 5 months ago for my whole entire life, I am happy to hear that conversation happening here in the U.S. Senate.

I yield the floor.

The PRESIDING OFFICER. The minority leader.

UNANIMOUS CONSENT REQUEST—S. 1804

Mr. SCHUMER. Mr. President, earlier today, the Defense Department announced that the United States has formally accepted a luxury 747 jetliner as a gift from Qatar to be used as Air Force One. It is the largest foreign gift to an American President in modern history—one Donald Trump says will go to his Presidential library after his term.

This gift is outrageous. Donald Trump will berate companies to "eat his tariffs" and tell parents to pay yet more for groceries but is accepting a luxury plane he can use as Air Force One.

This gift screams "national security risk." It is bribery in broad daylight. Donald Trump is thumbing his nose at Republicans and practically daring them to stop him.

Well, today, the Senate can. In a few moments, I will move for swift passage of the Presidential Airlift Security Act, prohibiting the use of any foreign plane to be utilized as Air Force One.

Specifically, my legislation would prohibit even a single taxpayer dollar from being used by the Department of Defense to procure, modify, retrofit, or maintain any foreign aircraft for the purposes of transporting a U.S. President. This is about ensuring our national security and about not wasting taxpayer dollars on an utterly senseless deal.

It should not take an act of Congress to stop the President of the United States from accepting the largest foreign bribe in modern history, but apparently Donald Trump is perfectly willing to sell out the American people and the Presidency to fill his own pockets.

Senate Republicans who say they are troubled by the idea of using a foreign plane as Air Force One should join me in supporting this very commonsense

(90 of 196), Page 90 of 196  Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 90 of 196
Case 4:25-cv-04966   Document 1-3   Filed 06/12/25   Page 27 of 82
S3042 CONGRESSIONAL RECORD — SENATE May 21, 2025

bill. Donald Trump accepting this gift reeks of corruption and naked self-enrichment, and Republicans should stand up and support my bill, defend national security, and protect Americans.

So I ask unanimous consent that the Committee on Armed Services be discharged from further consideration of S. 1804 and the Senate proceed to its immediate consideration; that the bill be considered read a third time and passed and the motion to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Is there an objection?

The Senator from Kansas.

Mr. MARSHALL. I object.

The PRESIDING OFFICER. The objection is heard.

Mr. SCHUMER. I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. BLUMENTHAL. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. BANKS). Without objection, it is so ordered.

UNANIMOUS CONSENT REQUESTS—S. RES. 242, S. RES. 243, S. RES. 244, AND S. RES. 245

Mr. BLUMENTHAL. Mr. President, I ask unanimous consent that at a time to be determined by the majority leader in consultation with the Democratic leader, the Senate proceed to the consideration of the following Senate resolutions in the order listed: S. Res. 242, S. Res. 243, S. Res. 244, and S. Res. 245; that there be up to 2 hours for debate on each resolution, individually; and that upon the use or yielding back of that time, the Senate vote on adoption of the resolutions, individually; and that if any of the resolutions are adopted, the preambles be agreed to and the motions to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Is there objection?

The Senator from Wyoming.

Mr. BARRASSO. I object.

The PRESIDING OFFICER. Objection is heard.

The Senator from Connecticut.

Mr. BLUMENTHAL. Mr. President, the purpose and effect of these resolutions, very simply, is to provide votes. That is what we do in the U.S. Senate—we vote. And on these votes, the Constitution is involved. The provision of the Constitution commonly known as the emoluments clause enables officials of the Federal Government—from a sergeant in the Air Force or some other military branch to the President of the United States—to accept payments or benefits from a foreign power or other foreign entity or individual but only if there is approval by the U.S. Senate and Congress.

We need to take those votes if the President of the United States is to ac-

cept any benefits or payments. And that is what is happening in plain sight, openly, for all to see.

Literally, tomorrow night, in the White House, individuals who have invested to the President's benefit in his meme coin and World Liberty Financial will have dinner with him in the White House. He has literally put a "For Sale" sign on the White House. But money in his pocket will come from some anonymous donors, some foreign investors, and others in violation of the emoluments clause, unless there is approval from the U.S. Congress. That is tomorrow night in the White House.

And today, the Trump administration formally accepted a $200 million Boeing 747–8 jumbo jet as a gift from the Government of Qatar. Now, that plane may be used as Air Force One while he is in office before it is transferred to the Trump Presidential Library Foundation before the end of his term.

The Department of Defense has confirmed that the Secretary of Defense, Pete Hegseth, has ordered the Air Force to plan rapid modifications to upgrade the plane for use as Air Force One. They are no small modifications. The plane has to be stripped down virtually to its shell to ensure the installation of multiple top-secret systems. The work will take, potentially, years to complete. And the estimate to taxpayers—all of us American taxpayers—is about $1 billion.

That plane probably won't even be ready before the end of President Trump's term when the foundation—his foundation—takes ownership of it. It is a gift, in effect, to him from Qatar.

The Air Force is a passthrough entity. That is the arrogance of this step—corruption—but also a violation of the emoluments clause, unless there is approval from the U.S. Congress.

Majority leader Thune has said:

If and when the plane is no longer a hypothetical, I can assure you there will be plenty of scrutiny of whatever that arrangement might look like.

Well, it is no longer a hypothetical. Selling out American interests began the first days and hours of this administration in President Trump's second term. How did he celebrate his inauguration? Well, he launched a cryptocurrency scheme, a meme coin. The only purpose of it was to enrich the President. Unsurprisingly, by design, foreign governments, unscrupulous foreign individuals, and anonymous foreign nationals are competing with themselves—literally, there is a leaderboard—to line his pockets and make known how they are lining his pockets.

There is no reason for them to write him a letter or file with some government Agency. Face-to-face, he will be with them in the White House tomorrow evening. They are competing—and I mean literally competing—with each other for access, and he has put his of-

fice and the White House on the auction block.

Tomorrow evening, he will be hosting that dinner—personally hosting it for 220 holders of that meme coin. Wherever the dinner occurs, whether it is in the White House or someplace else, the effect is the same: to be selling access.

And after the dinner competition was announced—alongside a "Special VIP White House Tour" for the top 25 holders—President Trump cashed in. The price of that meme coin rose more than 50 percent after the announcement of that dinner. In total, President Trump and his sons and his business partners have now earned $350 million in sales and related fees from that scheme.

Come tomorrow evening, he will have pumped up the price. And sometimes the price goes down. He may have dumped part of his holding—pump-and-dump—raise the price and then dump the stock. It is a classic Wall Street corrupt move that would normally go to the SEC. But, of course, there is no regulation.

Bidders aren't hiding the pay-for-play scheme either. The winner of Trump's contest—the grand winner—is Justin Sun, who faces a civil fraud case from the SEC over allegations of market manipulation and unregistered asset sales.

Since the election, Justin Sun has poured nearly $100 million into Trump's crypto ventures. And guess what. Trump's SEC—poof—it is not a legal term, by the way—poof—the SEC paused the litigation and now is in negotiations to settle that case. It is out in the open.

One shipping firm with operations in Mexico announced it has raised $20 million to purchase the Trump coins for the express purpose of influencing tariff policy in the United States of America.

When Donald Trump negotiates tariffs, is he protecting American consumers and small businesses? No, not so much. More likely, he is cutting deals for his crypto friends. That is the essence of selling public office, and it is corruption.

But put aside the criminal violations of law that may be involved because the U.S. Supreme Court has given him immunity for what he is doing in the White House, the emoluments clause forbids him from taking those payments—benefits—without coming to the U.S. Congress and seeking our consent and approval.

Foreign governments are paying President Trump through another one of his cryptocurrency ventures, in addition to the FIGHT, FIGHT, FIGHT meme coin. World Liberty Financial, on May 1—literally, this month—World Liberty Financial announced an investment fund backed by the United Arab Emirates. The government of that country, using Trump's digital coins, is completing a $2 billion transaction that, once again, puts money in his pocket. From this deal, Donald Trump and his family stand to gain hundreds

May 21, 2025     CONGRESSIONAL RECORD — SENATE     **S3043**

of millions of dollars—apart from the $350 million I mentioned earlier—hundreds of millions more from this foreign government.

His sons are traveling around the world getting VIP treatment in Pakistan and elsewhere, using the President and the White House to strike deals for World Liberty Financial. We simply cannot accept this kind of practice as normal or legal. We can't abdicate our responsibility. We cannot seem to endorse or encourage this kind of corruption. That is the reason we have the emoluments clause. That is the reason the Founders wanted Congress to be involved whenever there is any benefit or payment to a member of the executive branch. Again, it applies not only to the President of the United States but all of the Federal officials, down to the rank and file.

Right now, the Senate is considering legislation to promote the growth of cryptocurrencies. This legislation has no ethical rules or conflict of interest provisions that would stop the President or his family from using the White House to enrich himself—none applying to the President. It fails to provide many basic consumer protections and national security rules. It invites Big Tech into our financial system.

We are considering this legislation at the very same time as Trump's crypto dinner will be happening literally within about 24 hours. Is there any wonder that the public's esteem for the U.S. Congress has sunk to the kinds of lows we are seeing right now? We are adding to the perception that Congress somehow is legitimizing or overlooking his behavior—in fact, looking the other way. That is not the message we ought to be sending at this moment in our history, and it is not legally right under the Constitution.

We ought to be voting on his emoluments, every one of these benefits. That is the reason I have separate resolutions—simply to preserve our own authority and power and our integrity and send a signal about the independence of this branch, the legislative branch.

Foreign governments have figured out a lot of ways to line Donald Trump's pockets. The Trump Organization—he is still the owner. It may be in trust. He maybe figured out some technical legal way to seem to insulate or isolate himself from it. But that organization is doing business deals with Saudi Arabia, with Qatar, and with Oman and Serbia.

LIV Golf, backed by the Saudi Arabian Government, hosted a tournament at Trump National Doral in April—April—of this year. The Trump Organization has signed $5.5 billion in real estate deals with a Qatari Government-owned firm, and it is going to build a new development on government-owned land in Serbia and Oman. The Trump Organization has already received $5 million from Oman. These are violations of the emoluments clause plainly, simply, in plain sight.

We have no excuse for failing to vote. We have no excuse for remaining silent. We have no excuse for ducking or dodging.

The foreign emoluments clause states:

[N]o Person holding any Office of Profit or Trust under them, shall, without the Consent of Congress, accept of any present, Emolument, Office, or Title of any kind whatever, from any King, Prince, or foreign State.

Foreign states are clearly involved in these transactions.

The purpose of this clause is basic and unassailable, indisputable. It is to prevent undue foreign influence and foreign corruption.

The Founders knew about the dangers of a foreign government trying to influence our President or anyone under him. They knew about those powerful Kings in France and England. We had just liberated ourselves from England. We were a small, struggling country, and they were afraid that our executives would be influenced by those more powerful countries.

It was to ensure our government officials work for the American people and the Nation rather than their own financial self-interests or on behalf of any foreign government that the emoluments clause was adopted. But President Trump seemingly doesn't care about working for the American people; he cares about his own pocketbook. Not once has he come to Congress for consent on any of these deals. He hasn't even hinted at it. And he will continue pursuing these corrupt foreign deals until we, as Congress, have the gumption to act.

Today, I am introducing resolutions that condemn President Trump's violation of the foreign emoluments clause and demand the transfer to the U.S. Government of any gifts, benefits, or payments recovered or received from foreign governments or others through his illegal dealings.

I have asked for unanimous consent to schedule floor votes—I want floor votes—on each of these resolutions. I think the American people deserve to know where we stand, who is going to allow him to go forward with these deals, who is going to sacrifice the integrity and independence of this branch of government, and where every Senator stands on Donald Trump's self-enrichment schemes. We need to know whether the Senate is willing to stand up and show up against this corrupt self-dealing.

I yield the floor.

The PRESIDING OFFICER. The Democratic whip.

Mr. DURBIN. Mr. President, it was my good fortune as a young man to work for a Senator from Illinois named Paul Douglas. He was known as Mr. Ethics in the U.S. Senate. He believed—and he shared that belief with me and all who worked with and for him—that the first obligation of a public official is to not betray the trust of the voters when it comes to self-deal-

ing or making money out of public office.

He started me down the path in my early years in politics of making a complete disclosure—both my income tax return and net worth in detail, specific amounts—every year. I have done that for over 40 years. I believe he was right.

I remember Paul Simon, my predecessor in the U.S. Senate, used to say: People may not agree with my vote, but they know I didn't cast it to make a buck.

It is just that simple.

So what has happened at the highest level of the Government, the Office of President? Throughout our history, there have been examples of corruption which have been well documented. The Teapot Dome scandal comes to mind, and certainly the departures of previous Vice Presidents for wrongdoing have been well documented.

What we have going on in the White House now with the Trump administration is unprecedented not just in the amount of money involved going to the President and his family but also in the very real fact that the bottom line is that he is bold and states clearly: I have done it, and I defy you to do anything about it.

It is one of the reasons I am opposing the pending legislation on the floor on cryptocurrency. The President, as has been documented by my colleague from Connecticut, is making millions of dollars exploiting cryptocurrency, and he is inviting those who buy into his scheme—his profit-making scheme—to official gatherings and occasions at the White House. It is the most bald-faced demonstration of corruption we have ever seen in the Office of the Presidency. And this plane now—this $400 million airplane—says it all.

Mr. President, so that you understand, Pam Bondi is the Attorney General of the United States, duly appointed, and she has supposedly released a memo justifying the transfer of this airplane to the U.S. Government and then to Donald Trump personally as being acceptable—no objection. I am still looking for a copy of that public opinion. It should be public, if it hasn't been yet.

There has been reference made to the Constitution on this issue. In the Constitution, article I, section 9 is explicit:

[N]o Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title of any kind whatever, from any King, Prince, or foreign State.

How clear can you be? This President has no authority to accept this gift. And the notion that he would accept it, use it for the remainder of his Presidency, and then take personal title to the airplane is outrageous.

The fact of the matter is—those of us who have taken the time to check—it will cost the American taxpayers a fortune to take this gift from Qatar and to make it safe for any President to travel in it.

CONGRESSIONAL RECORD — SENATE   *May 21, 2025*

As one of my colleagues has said, if the Qataris said "As a favor to the people of the United States, we are going to redesign and pay for the redesign of the Oval Office, the Situation Room, and the President's residence. We will do it on our dime," the American people would never fall for it. Why would we ever let them get that close to the decision making at the highest level in America? That is exactly what we are doing here if we accept this airplane. We have taken all those three functions of the President, added wings to the equation, and said the Constitution doesn't count.

Republicans have claimed for years that Joe Biden, during his administration and his time as Vice President, engaged in wrongdoing due to his family's business dealings. I am sure we remember congressional Republicans' endless investigations into President Biden's son and his past business dealings as a private citizen. But despite multiple investigations and a failed impeachment inquiry against President Biden, Republicans are largely silent and willing to disregard the overwhelming corruption of President Trump and his family as they pocket millions of dollars personally at the expense of the American people.

In the latest of a long line of shady dealings, President Trump is receiving a private jet as a gift from the royal family of Qatar and is claiming that it is simply a gift to the Defense Department.

This aircraft that we are talking about is sitting in San Antonio, TX. It would be retrofitted to act as Air Force One for the remainder of Trump's term in office before ownership is transferred to the Trump Presidential Library Foundation.

The President claimed it would be "stupid [to] say 'No, we don't want a free, very expensive airplane.'" However, what he doesn't say is that it will cost American taxpayers millions more to retrofit the plane to meet the President's security, communication, and intelligence needs.

Mr. President, what is stupid is retrofitting a very expensive plane from a foreign government, which constitutes a major counterintelligence risk, on the American taxpayers' dime when an American company is already manufacturing the next Air Force One.

The Constitution, as I have read, explicitly gives Congress the power to control whether any officer of the United States, including the President, may accept a gift from "any King, Prince, or foreign State." This unprecedented gift clearly violates the Constitution and laws enacted by Congress to govern such gifts. Yet Attorney General Bondi reportedly concluded it would be "legally permissible" for President Trump to accept this gift. I am calling on the Attorney General today to release this opinion and report in its entirety to the U.S. Congress.

I am not surprised by it. This administration continues to abuse its power at the cost of the American people time and again, while Republicans in Congress stand by and allow it.

Mr. President, do you hear it? The silence? The silence of the President's party? The silence of the lambs?

Make no mistake, this is more than just a gift that benefits the President and not the American people. The President, we understand, it has been reported, has actively solicited this gift from Qatar. The question remains: In exchange for what?

President Trump's acceptance of such a substantial gift from a foreign government could disproportionately influence the foreign policies of this country—exactly why the Founding Fathers gave Congress the power to control these gifts under the Constitution. It is clear to our foreign partners and enemies that, under President Trump, America's policymaking is open to the highest bidder.

We also see President Trump and his family profiting off the promise of influenced domestic policy. Right before his second inauguration, President Trump launched a valueless cryptocurrency token marked not as an investment but as monetary support for Trump. First Lady Melania Trump also promoted her own meme coin shortly thereafter. This scheme allowed the President to pocket millions of dollars in direct payments with little or no public disclosure or oversight. He has never denied it. He has since fired the heads of the Agencies that investigate these crypto schemes.

Donald Trump, Jr., has founded a new private membership club in DC called Executive Branch with a $500,000 membership fee. The launch party, featuring several Cabinet and other administration officials, underscored Trump Junior's efforts to sell access.

That is what this administration does. It sees a barrier to cutting corners or any check on its corruption and gets rid of it. These actions were entirely predictable because Trump and his family also blatantly used the Presidency to enrich themselves by selling access and the chance to influence policy under his first administration.

I am saddened that our colleagues on the Republican side of the aisle apparently believe that silence is the best response to these outrages. It is the "Silence of the Lambs."

When will they stand up for the American people and say "enough is enough," or do they believe American policy should be sold to whatever country is willing to place the highest bid?

If we are talking about a swamp in DC, sadly, this is a major part of it.

I yield the floor.

The PRESIDING OFFICER (Mr. MORENO). The Senator from Vermont.

Mr. WELCH. Mr. President, I want to align myself with the comments made by the Senator from Connecticut and the Senator from Illinois.

The Constitution is pretty straightforward on this. It is pretty basic:

[N]o Person holding any Office of Profit or Trust under them, shall, without the Consent of Congress, accept of any present, Emolument, Office or Title, of any kind whatever, from any King, Prince, or foreign State.

This $200 million plane that is going to—$400 million plane—the estimates go up and down, but it is an expensive plane—is a gift, and it is going to the personal use of the President of the United States. The Constitution says it is the job of Congress to say yes or no to a gift. It is our job. And if this Congress wants to vote to accept this $400 million plane, that is our job to do it. If this Congress is silent and doesn't demand that we enforce article I responsibility about this extraordinary gift from the Government of Qatar, that is on us. That is on us.

And what we are seeing time and again is the relinquishment of authority and power under article I, and it can't be shipped out of here fast enough to the Executive down at 1600 Pennsylvania Avenue to satisfy anyone.

That is so profoundly threatening to the well-being of our democracy. The whole point of having three branches of government is the recognition that you cannot allow one person, or even one branch of government, to consolidate all power. There has to be checks and balances. It was based upon what was true then and is true now: Absolute power can corrupt absolutely. And the foundational principle that has served us well is that with the checks and balances, the ambition of one branch can compete with the ambition of the other branch. We have given away the authority that Congress has and the responsibility it has to have those checks and balances and defend democracy.

And by the way, why in the world would we want some other government to be providing transportation for our Chief Executive? It is embarrassing. We don't need no stinking Qatar plane. We need our own planes. We need our own planes. This is about us having respect for the men and women who work here. It is about us having respect for our own responsibility to take care of our own national security needs. We can't outsource this to another government. We shouldn't do it, just as a matter of pride.

But we also shouldn't do it because it does stink—it does stink—of corruption. And all the evidence here is that, for whatever reason, Donald Trump thought this would be a pretty cool plane to fly in. He started putting the pressure on, directly and indirectly, to get this offer of a gift, and now it is a $200 million, $400 million gift. That is what we have. And that is, by the way, without any of us having any opportunity to ask the hard questions: What is it going to cost to so-call retrofit? Can it be retrofitted? How much will taxpayers be asked to pay? Is this gift going to be something that actually costs us a lot more money?

So the Appropriations Committee has no capacity to look into this, to kick the tires, to assess what this

CONGRESSIONAL RECORD — SENATE

means for the taxpayers of this country. So I find it astonishing that we would even be considering and that the President of the United States would be considering having the national security transportation, Air Force One, be a gift of a foreign government. I find it astonishing that we in Congress wouldn't, on a unanimous basis, demand that the emoluments clause be enforced by the Congress voting yes or no on acceptance of this gift.

The implications are pretty clear: Corruption is alive and well in the administration. The implications are pretty clear: Passivity is alive and well in the Congress of the United States, that we turn our back on exercising the profound responsibility that we have, an obligation we have to the people we represent.

Mr. President, I urge the passage of this resolution, and I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. BLUMENTHAL. Mr. President, I want to thank my colleagues Senator DURBIN and Senator WELCH for being here today. I know my resolutions reflect unanimity on our side, and I believe sincerely the reservations and doubts on the other side as well. And I regret the objection to these resolutions because I think that my colleagues deserve a vote. We deserve a vote on both sides of the aisle.

This violation of the Constitution benefits nobody. Many of the votes we take here, there are differing interests, there are contrasting and sometimes conflicting points of view on the merits, on who benefits and who may be hurt. Here, there is only one beneficiary: Donald Trump and his family—maybe some of the foreign investors, maybe some of the others who have donated or contributed to his campaign and have invested in the meme coins or in World Liberty Financial stablecoin.

This plane should be built by an American company. It should be built so that President Trump can use it—or any other President—on time, on schedule. It is now already delayed. Boeing should be held accountable. And if it can't deliver it when the President needs it, somebody else ought to be required to build it.

So I am deeply disappointed we are not going to have these votes, at least right now. I am going to be coming back to the floor and asking for these votes on the emoluments clause because it is part of our job, it is part of our constitutional responsibility, and Donald Trump is violating the Constitution by accepting gifts in the plane, investments, and money in his pocket from his cryptocurrency ventures and other schemes that he is enabling in plain sight. This corruption should not be allowed to continue.

I yield the floor.

The PRESIDING OFFICER. The Senator from Massachusetts.

CLEAN AIR ACT

Mr. MARKEY. Mr. President, today, I am here to defend clean air regulations

that tackle the climate crisis, protect public health, and save drivers money at the pump.

For more than 50 years, California has had the legal authority under the Clean Air Act to adopt stricter emissions standards than the Federal baseline. For 50 years, both Democrat and Republican administrations have granted these Clean Air Act waivers that are essential for reducing toxic air pollution, protecting public health, and cutting greenhouse gas emissions that dangerously warm our planet. No Congress has ever dared to revoke these waivers—until now.

My Republican colleagues say this is about protecting consumer choice. Well, let me ask: Who is really choosing this? Not the parents. Not the residents near busy highways. Not the doctors and nurses. Not even the drivers.

It is the polluters. This dependence on fossil fuels allows Big Oil CEOs to turn drivers upside down at the pump and shake money out of their pockets.

The Republicans say "all of the above." No. No. It is "oil above all." We put 70 percent of the oil we consume into gasoline tanks. And with cleaner, smarter, more efficient technologies, we can reduce and reduce and reduce the amount of oil that we put into the vehicles which we drive. This terrifies the oil industry.

America is a technological giant. We have a capacity to invent new technologies. By the way, the Chinese are just on the HOV lane of new technologies for the vehicles which they are driving. They have invented a technology that allows for the charging of a battery in 5 minutes in a vehicle that people are driving.

That should be us. We should be the ones leading.

That is not what the Republicans are doing. Donald Trump is saying he wants to repeal the tax breaks for electric vehicles in our Nation, just take those tax breaks off the books. He wants to repeal the laws which incentivize the development of even better batteries in our country—batteries that, with one charge, will go further and further and further. Maybe we could compete with the Chinese. But Trump wants to take them off the books, and the Republicans are going along with that.

Maybe we could put more charging stations across the country to make it easier for people to drive all-electric vehicles. No. Trump is saying we want to take away all those tax breaks too. Let's just make it easy for the Chinese to take over the electric vehicle industry of the 21st century. Let's just hand it over to them on a silver platter.

We are only 5 percent of the world's population. The other 95 percent is going electric.

The other 95 percent is moving to the future. That is not going to be the United States. The Republicans are working here tonight in order to absolutely short-circuit this future that was ours.

You know, honestly, gas-guzzling cars aren't just bad for drivers, they are bad for every one of us. According to the American Lung Association, more than 131 million people live in counties with unhealthy levels of ozone and particulate pollution.

And what is the largest source of that pollution? It is vehicles. It is the cars and the trucks which we drive in our country. That is what sends up the pollution. That is what gets into the lungs of Americans.

And now my Republican colleagues are trying to rip away the safeguards that help to protect public health and to save our country money. By triggering the Congressional Review Act to repeal California's waivers, it would allow for 1.6 billion metric tons of carbon emissions; more than 1.5 million metric tons of nitrogen oxide, all going up into the air; 17,000 metric tons of fine particulate matter, the type of pollution that penetrates deep into your lungs, the lungs of your children, the lungs of your loved ones, and enters the bloodstream to wreak havoc on the body in the form of asthma, respiratory problems, cardiovascular diseases, and more—much, much, more—all spewed into the air.

And that is what they want. That is what they want.

After the Surgeon General in 1964 issued a warning about smoking, America went from 50 percent of the country smoking down to 18 percent. People started to wise up. They said: We don't want that stuff in our lungs, and we are going to tell our kids not to smoke because it is dangerous.

Your lungs—your lungs—are vulnerable if there is an inhalation of dangerous substances.

So what does it look like in real life? Well, it means more kids are going to suffer from asthma. It means grandma and grandpa dying earlier. It means more death and destruction from extreme weather events, such as the Los Angeles wildfires and Hurricanes Helene and Milton. By the way, those three events caused $500 billion worth of damage—those three events, all related to climate change, all related to the warming of the atmosphere.

Just assume that the ceiling here on the Senate floor is capturing all of the heat all day long, and there is no air-conditioning down below. That is the greenhouse effect. It just gets warmer and warmer and warmer, which is why, by the way, the Senate used to adjourn in the beginning of May because it just got too hot in rooms like this before air-conditioning.

Well, there is no air-conditioning for the planet. You have to engage in a preventive strategy, lower the temperature right from the beginning, lower the thermostat right from the beginning.

Ultimately, it is just going to raise costs on everyday families. By blocking the California waivers, consumers would spend more than $89 billion in additional fuel costs through the year

(94 of 196), Page 94 of 196  Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 94 of 196
Case 4:25-cv-04966    Document 1-3    Filed 06/12/25    Page 31 of 82
S3046       CONGRESSIONAL RECORD — SENATE       *May 21, 2025*

2040. It is much less expensive to be charging a battery than to be putting that pump into the side of your car and watching that dollar sign just skyrocket as you are watching your hard-earned money go to Big Oil all across our Nation.

That is more money at Big Oil's gas pump and less money at your kitchen table. This comes at a time when Trump is waging war on clean cars, repeals to clean vehicle tax credits, attempts to flip a U-turn on fuel economy and EPA vehicle emissions standards.

In 2007, I worked on a bipartisan basis as the chairman of the committee over in the House to enact a provision in the energy law that increased our Nation's fuel economy standards for the first time in 32 years. We were actually going backward by 2007, and the rest of the world was zooming right past us.

It is one of the laws I passed which I am most proud of, and that is what led to the rulemaking that promulgated the higher fuel economy standards for our Nation. I am very proud of that law and the work I played over in the House authoring it.

And the industry, they were able to do it. They were still stuck at 27 miles a gallon. That was the law from 1975. It was 2007, 32 years later. They still couldn't figure out how to improve the efficiency of the vehicles which we drive.

Meanwhile, the Chinese and others, they were getting on the speedway. They were getting ready to catch up to us. And starting in 2009, the Obama administration's Environmental Protection Agency and Department of Transportation built upon that law to negotiate a historic agreement with the State regulators, with the automakers, with labor unions, and the environmental community.

But now—now—Trump, Republicans, at the behest of the oil industry, are trying to do a U-turn on these standards and the benefits that they give to our consumers, to our families, to our planet.

It is not enough for Republicans to promote chaos and conflict in our economy for the sake of billionaires. They now want to create chaos and conflict as well.

By intentionally modifying the Senate rules that protect this institution at a moment when Donald Trump is actively undermining the checks and balances enshrined in our Constitution, that is a serious threat, not just to the Senate but to our country. It is a threat to the rule of law. It is a threat to our health, to our communities, and access to clean air. It is a threat to our planet.

With this action, my Republican colleagues are opening the door for future votes on the countless unlawful and unethical actions waiting to be carried out by the Trump administration. There will be no putting the genie back into the bottle.

It is going to unleash the President who says he is a stable genius to continue to perpetrate more of his unconscionable actions on the people of our country.

So let's not trigger this nuclear option. Let's not unleash a mushroom cloud of pollution on our communities. Let's not allow polluters to rewrite Senate precedent. Let's not steal the right of States to set high standards that result in children breathing cleaner air, not having their vulnerable lungs be sucking in these particulates, sucking in this unhealthy air that vehicles emit.

We have another direction in which we can head. We have a better vision for us. By the way, this is not rocket science. We are not asking anyone to go to Mars. We are just asking people to improve automotive technology. This is car mechanics. It is not a mission to the Moon.

So while I hear Trump bragging about his buddy Elon and a mission to Mars and all these satellites out in outer space and how he wants to have a Golden Dome over our Nation that is going to protect us from incoming Soviet missiles at 2 a.m. in the morning, and here is vision of a Golden Dome that is going to protect us.

Then, when you turn to him and say: Hey, can we improve the efficiency of the cars which we drive, Trump and his oil buddies said: What are you crazy? That is auto mechanics. That is too difficult for us to figure out.

Well, it is not too difficult for the Chinese. They are coming. They are coming. And country by country, it is going to say: "Made in China." "Made in China."

Unfortunately, for too many of our domestic auto companies, they are using this as the excuse to just walk away. And maybe for the short run, it will be OK, but in the long run, that is not a business plan.

Maybe it makes it to their retirement as executives of the companies, maybe they make it a few more years, but the country—the country—is going to suffer.

You know, when you look at Fortune magazine or Forbes magazine and there is a picture of one or another businessperson on the cover, that is great. That is great for that individual. But when you look at the international magazines, you know what is on the cover, just a picture of China.

It is a country with a plan. It is a country with a vision. It is a country that is just speeding past us in terms of their capacity to deploy new technologies. That is what we are confronted with right now—a plan from our arch rival economically that we are going to ignore on behalf of the oil industry in our Nation.

They will reap the short-term profits for sure, but our country and the children in our country will reap whirlwinds economically as each year goes by because we are going to be left in China's technological dust.

So that is what we are voting on, and they are going to use a perversion of Senate rules to attempt to accomplish it at the behest of the oil industry, but the price—the price—not only for this institution and its rules but also the well-being of our economy, the health of our planet is going to be way too high to pay.

You can't preach temperance from a barstool. You can't tell the rest of the world they have to reduce greenhouse gases if the Senate continues to pass laws which allow for all of this dangerous pollution to go up in historically high quantities.

That is absolutely the wrong path for the next several generations of American children. You are endangering their lungs right now, and you are going to endanger their ability to have a job in the future.

We are going to wind up with China dominating the auto industry and the planet. That is what we are voting on tonight: Who is going to win in the long term?

By the way, the Republicans have a comprehensive plan to hand this entire industry over to the Chinese. They are going to do away with all the tax breaks for electric vehicles, do away with all the tax breaks for chargers. They are going to do away with all the tax breaks for battery storage technologies to be developed.

This is systematic. This is a plan that our country has to pull us out of the competition with the largest industry in the world, this automotive industry, tied to the oil industry—just an absolutely reckless, historic mistake.

And by the way, they are doing the same thing over in biotech. They want to cut NIH funding by 40 percent. That is finding the cure for Alzheimer's and cancer and diabetes and Parkinson's and every other disease.

You are saying to all the young, brilliant people in the country who are going to dedicate their lives to finding the cures for those diseases: Don't go there. There is no guarantee you are going to have a job next year or the year after or the year after that. Again, another industry we are going to put a bow on it and hand it over to Beijing: Hope you enjoy this great present we are handing you—the technological leadership of the United States in biotech, in automotive technology, in battery technology, just handing it over.

So this is a pretty sad day in the history of the Senate, that there will be a compromise of our procedures—our rules—that have been sacred on behalf of the oil industry in our Nation. It is not the first. There is an ongoing systematic plot that Donald Trump came up to the Hill to say: Get my "big, beautiful bill" passed.

Well, he might see it as a "big, beautiful bill," but this thing is one big economic disaster for our Nation.

And I will say it again. It is all to get the tax breaks for the billionaires, all of the tax breaks for the wealthiest people in our society.

So, please, Senate, please say no. Please allow us to retain our procedural prerogatives. And please, on this

CONGRESSIONAL RECORD — SENATE

larger issue of the planet and the leadership which the United States should be playing, please say no to these industries.

They are going to look back at this moment—children alive today—and they are going to just wonder, What were they thinking that every car is coming in from China into every country in the world, and eventually our barriers will come down, too, because we won't be able to compete.

It is just a sad commentary on the Senate today that they will acquiesce to such a pathetic concession made to the oil industry in our Nation. But it is the perfect example of the outsized influence that is now playing in our society.

When Trump promised them last April if they gave him a billion dollars, he would do away with all the clean energy technologies in our country, he is paying them off right now. There is no transition plan. There is no promise that maybe we will help the oil industry so they catch up to the Chinese Government.

Mr. President, no. They are going to cede the field, and ultimately it will be the next generations that pay the price.

I yield the floor.

Mr. SCHATZ. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Democratic leader.

S.J. RES. 55

Mr. SCHUMER. Mr. President, I want to be very clear about what is about to happen tonight, here on the floor of the Senate.

Tonight, in order to do the bidding of the fossil fuel industry, Republicans will erode away at the Senate and undermine this institution they claim to care about.

By weaponizing the CRA, Republicans tonight cross a point of no return for the Senate, expanding what this Chamber can do at a majority threshold—this from the very party that professes to care about the rules and norms and precedents of this institution.

To override the Parliamentarian and to use the CRA in the way that Republicans propose is going nuclear—no ifs, no ands, no buts. It is going nuclear.

Don't take my word for it. This comes from Leader THUNE himself. He was asked a few months ago about this very scenario of overriding the Parliamentarian, and he said this:

Yeah, and that's totally akin to killing the filibuster. We can't go there. People need to understand that.

But, unfortunately, we are going there, it seems. And, just yesterday, he admitted that this step could "create precedent for the future."

So, apparently, when the rules suit the Republicans, they will preach about protecting them. But now that the rules are inconvenient, when they stand in the way of their ideological goals, Republicans will say: Away with them.

Make no mistake, this is not a narrow assertion of congressional authority, as the other side claims. This is an aggressive, new precedent. Moving forward, Congressional Review Acts will likely be weaponized to bold new levels.

Today, it is all about California emission waivers, but tomorrow the CRA could now be used to erase any policy from an Agency that the Trump administration doesn't like, at a simple majority threshold. They could eliminate healthcare innovation waivers that assist patients on Medicaid and the ACA, at a simple majority threshold. They could use CRAs to make it harder to form a union, at a simple majority threshold. They could go after Agency actions that protect access to reproductive care, like making it harder to access the medication mifepristone. All of this and more can now be done, at a simple majority threshold, with an expanded CRA.

This, in other words, is a backdoor strategy for Republicans to make Project 2025 a reality. It is the legislative branch ceding its authority over to the Executive, which will now slap the "CRA" label on a whole host of policies and get Congress to rubberstamp their appeals.

Republicans should tread very carefully today. What goes around comes around.

If Republicans are willing to overrule the Parliamentarian and hijack the CRA in a way it has never been used before, they will not like it during this session of Congress and, certainly, next time, when they are in the minority.

So this is a sad, shameful, disappointing day for the U.S. Senate. Republicans, I am certain, will come to regret the ill-considered step they take tonight.

PARLIAMENTARY INQUIRY

Now, I have a parliamentary inquiry.

The PRESIDING OFFICER (Mrs. CAPITO). The Senator will state his inquiry.

Mr. SCHUMER. Is the Chair familiar with section 802(d)(1) of the Congressional Review Act, which states that "all points of order against the joint resolution (and against consideration of the joint resolution) are waived"?

The PRESIDING OFFICER. Yes.

Mr. SCHUMER. Thank you, Madame Chair, you made the case that this is nuclear.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. THUNE. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

S.J. RES. 55

Mr. THUNE. Madam President, we are facing a novel situation here in the Senate. For the sake of my Democrat colleagues, who seem more than a little confused as to what is going on here, let me just review the situation.

We have received from the House joint resolutions of disapproval that meet all the statutory requirements under chapter 8, title 5, of the U.S. Code, the Congressional Review Act.

In the past, the Senate has treated any such joint resolution as being eligible for expedited floor consideration procedures prescribed under the Congressional Review Act. But here is the twist: Senate Democrats claim that we can't consider these resolutions under these Congressional Review Act procedures because the rules addressed in the resolutions in question are not, in fact, rules.

Now, the rules in question, the California waiver rules, were submitted to Congress's rules, which has always been all the Senate needed to consider something as eligible for consideration under the Congressional Review Act, and they are clearly rules in substance given their nationwide impact and scope. But, in an unprecedented move, the Government Accountability Office has inserted itself into this situation and declared that these rules submitted to Congress by the EPA as rules are not, in fact, rules.

Now, for years, the Senate has turned to the Government Accountability Office, the GAO, to determine if something not submitted by an Agency is actually a rule that should have been submitted to Congress as such. That is not part of the Congressional Review Act statute, but the Senate has relied on GAO for this to prevent Agencies from flouting the law and ignoring Congress's statutory right to review Agency rulemaking. In other words, GAO has acted as a failsafe to ensure Congress's rights are protected from encroachment by the executive branch.

That is not the situation we find ourselves in today. In fact, it is the inverse. The situation we are facing today is an Agency submitting to the Senate actions that the Agency says are rules and GAO, for the first time in history, inserting itself into the situation and offering its own opinion that the rules in question are not, in fact, rules.

Well, so what do we do about this? I believe that when the Senate is facing a novel situation like this one with disagreement among its Members, it is appropriate for the Senate to speak as a body to the question—something the Senate does when questions over application of the rules arise.

For example, just last year, a Republican Member of the Senate brought a resolution to the floor under a fast-track procedure, the War Powers Act, and a Democrat Member of the Senate argued that it was not entitled to those

**S3048**

**CONGRESSIONAL RECORD — SENATE**

*May 21, 2025*

procedures. He then made a point of order to that effect, and the Chair submitted the question to the Senate, and the Senate voted on what qualifies for that fast-track procedure. That is what we are doing today.

Nobody at the time cried nuclear. Nobody said the Democrat Member was blowing up the Senate. In fact, most Members probably don't even remember the situation because it was just the Senate doing what the Senate is supposed to do, and that is voting on how to apply the rules when faced with a new situation.

I think at this point it should be abundantly clear that what we are doing has nothing to do with the legislative filibuster. But while I would love to think that reality will prevail, I fully expect Democrats to continue to misrepresent the situation, and I think there are probably multiple reasons for that.

One is that I think a lot of Democrats support an electric vehicle mandate and are perfectly happy to allow California to set an EV mandate for the whole country. In fact, I think they are somewhat frantic at the prospect of losing this "Green New Deal" policy.

Two, I suspect Democrats are trying to use the situation as cover to justify abolishing the filibuster next time they are in charge. I think they think that they can make dismantling the Senate filibuster a lot more palatable by claiming—however mendaciously—that Republicans attacked it first.

I would love to believe—I would love to believe—the Democrats have suddenly come to the realization of the importance of the legislative filibuster no matter how misplaced their concerns would be in this particular instance. I think there is perhaps no Senate rule today that does more to preserve the character of the Senate as developed by our Founders, and there is nothing I would like more than to see Democrats recognize this.

But despite the rank hypocrisy the Democrats have displayed by embracing the use of the filibuster this Congress repeatedly after campaigning to overturn it mere months ago, I suspect that their newfound enthusiasm for the filibuster is situational only—something to be used when it helps them and to be destroyed when it doesn't.

As I said, I strongly suspect they are attempting to use the situation as cover for destroying the filibuster the next time they are in power; hence the misrepresentations and hysteria.

I can't control what Democrats do the next time they take the majority here in the Senate, although if they attempt to abolish the legislative filibuster and destroy the institution of the Senate, I can safely promise to fight them on it tooth and nail. But I can say this: While Republicans are in charge, the legislative filibuster will remain in place, and you can take that to the bank.

The PRESIDING OFFICER. The Democrat leader.

PARLIAMENTARY INQUIRY

Mr. SCHUMER. Madam President, is it true—parliamentary inquiry, Madam President.

The PRESIDING OFFICER. The Senator will state his inquiry.

Mr. SCHUMER. Yes. I just want to—I hope our leader will listen because it is exactly clear, and I want to repeat what we had said yesterday.

Is it true what you said yesterday: that the Parliamentarian advised leadership offices that the joint resolution of disapproval regarding the California waivers at issue do not qualify—do not qualify—for expedited consideration under the Congressional Review Act?

The PRESIDING OFFICER. The Parliamentarian has advised me that such advice was given.

Mr. SCHUMER. Thank you. It shows we are going nuclear, no matter what the leader says.

I yield the floor.

The PRESIDING OFFICER. The Senator from Rhode Island.

S.J. RES. 55

Mr. WHITEHOUSE. Madam President, notwithstanding the distinguished majority leader's accusations of mendacity and hypocrisy and misrepresentation, the facts at heart here are quite simple: The waiver at issue is not a rule and was never a rule. Thirty years of precedent and practice at EPA and in this body prove that. So what the GAO did here was not unprecedented.

What was unprecedented was for the House to send over a document claiming falsely, according to the Parliamentarian, that the waiver is, in fact, a rule under the CRA. And to blame the GAO or the Parliamentarian for that is to mistake the referee for the player who committed the foul. The foul here is pretending that a waiver is a rule, and both the GAO and the Parliamentarian independently blew the whistle on that foul. Those are the facts.

The PRESIDING OFFICER. The majority leader.

Mr. THUNE. I yield back all time.

The PRESIDING OFFICER. All time is yielded back.

POINT OF ORDER

Mr. THUNE. Madam President, I make a point of order. The points of order are in order under the Congressional Review Act, given sections 802(d)(1), 802(d)(2), and 802(d)(4) are in conflict with each other.

The PRESIDING OFFICER. In the opinion of the Chair, the Senate has not previously considered this question; therefore, the Chair, under the provisions of rule XX, submits the question to the Senate for its decision: Shall points of order be in order under the Congressional Review Act?

The Democrat leader.

VOTE ON MOTION TO TABLE

Mr. SCHUMER. Madam President, I move to table the question submitted by the Chair, and I ask for the yeas and nays.

The PRESIDING OFFICER. The question is on agreeing to the motion. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senator is necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN).

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 52, as follows:

[Rollcall Vote No. 265 Leg.]

YEAS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Durbin | Murphy | Warnock |
| Duckworth | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NAYS—52

| | | |
|---|---|---|
| Banks | Grassley | Mullin |
| Barrasso | Hagerty | Murkowski |
| Boozman | Hawley | Paul |
| Britt | Hoeven | Ricketts |
| Budd | Husted | Risch |
| Capito | Hyde-Smith | Rounds |
| Cassidy | Johnson | Schmitt |
| Collins | Justice | Scott (FL) |
| Cornyn | Kennedy | Scott (SC) |
| Cotton | Lankford | Sheehy |
| Cramer | Lee | Sullivan |
| Crapo | Lummis | Thune |
| Cruz | Marshall | Tillis |
| Curtis | McConnell | Tuberville |
| Daines | McCormick | Wicker |
| Ernst | Moody | Young |
| Fischer | Moran | |
| Graham | Moreno | |

NOT VOTING—2

| | |
|---|---|
| Blackburn | Heinrich |

The motion was rejected.

The PRESIDING OFFICER. For the benefit of the Senate, I would like to remind you that the question is, Shall points of order be in order under the Congressional Review Act?

The Democratic leader.

POINT OF ORDER

Mr. SCHUMER. Madam President, I raise a point of order that points of order are not in order under section 802(d)(1) of the Congressional Review Act.

The PRESIDING OFFICER. A point of order is currently pending before the Senate. It is not in order to have multiple points of order pending at the same time; therefore, the point of order is out of order.

Mr. SCHUMER. I appeal the ruling of the Chair.

The PRESIDING OFFICER. The Republican leader.

MOTION TO TABLE

Mr. THUNE. Madam President, I move to table the appeal, and I ask for the yeas and nays.

VOTE ON MOTION TO TABLE APPEAL

The PRESIDING OFFICER. The question is on agreeing to the motion.

*May 21, 2025* — CONGRESSIONAL RECORD — SENATE — **S3049**

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from Kentucky (Mr. PAUL).

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 266 Leg.]

**YEAS—51**

| | | |
|---|---|---|
| Banks | Graham | Moran |
| Barrasso | Grassley | Moreno |
| Boozman | Hagerty | Mullin |
| Britt | Hawley | Murkowski |
| Budd | Hoeven | Ricketts |
| Capito | Husted | Risch |
| Cassidy | Hyde-Smith | Rounds |
| Collins | Johnson | Schmitt |
| Cornyn | Justice | Scott (FL) |
| Cotton | Kennedy | Scott (SC) |
| Cramer | Lankford | Sheehy |
| Crapo | Lee | Sullivan |
| Cruz | Lummis | Thune |
| Curtis | Marshall | Tillis |
| Daines | McConnell | Tuberville |
| Ernst | McCormick | Wicker |
| Fischer | Moody | Young |

**NAYS—46**

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

**NOT VOTING—3**

| | | |
|---|---|---|
| Blackburn | Heinrich | Paul |

The motion was agreed to.

(Mr. JUSTICE assumed the Chair.)

The PRESIDING OFFICER (Mr. HUSTED). The Senate sustains the decision of the Chair. The point of order by the Democratic leader is not in order.

The Chair recognizes the Democratic leader.

MOTION TO RECESS

Mr. SCHUMER. Mr. President, I move to recess for 90 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "nay."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 51, as follows:

[Rollcall Vote No. 267 Leg.]

**YEAS—46**

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

**NAYS—51**

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

**NOT VOTING—3**

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

The PRESIDING OFFICER. The majority leader.

Mr. THUNE. Mr. President, for the information of Senators, for the balance of the evening, we are going to confine votes to 15 minutes in duration.

The PRESIDING OFFICER. The Democratic leader.

MOTION TO RECESS

Mr. SCHUMER. Mr. President, I move to recess for 60 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "nay."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) and the Senator from Colorado (Mr. HICKENLOOPER) are necessarily absent.

The result was announced—yeas 45, nays 51, as follows:

[Rollcall Vote No. 268 Leg.]

**YEAS—45**

| | | |
|---|---|---|
| Alsobrooks | Bennet | Blunt Rochester |
| Baldwin | Blumenthal | Booker |

| | | |
|---|---|---|
| Cantwell | King | Schatz |
| Coons | Klobuchar | Schiff |
| Cortez Masto | Luján | Schumer |
| Duckworth | Markey | Shaheen |
| Durbin | Merkley | Slotkin |
| Fetterman | Murphy | Smith |
| Gallego | Murray | Van Hollen |
| Gillibrand | Ossoff | Warner |
| Hassan | Padilla | Warnock |
| Hirono | Peters | Warren |
| Kaine | Reed | Welch |
| Kelly | Rosen | Whitehouse |
| Kim | Sanders | Wyden |

**NAYS—51**

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

**NOT VOTING—4**

| | |
|---|---|
| Blackburn | Heinrich |
| Budd | Hickenlooper |

The motion was rejected.

The PRESIDING OFFICER (Mr. RICKETTS). The Democrat leader.

MOTION TO RECESS

Mr. SCHUMER. I move to recess for 30 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "nay."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 51, as follows:

[Rollcall Vote No. 269 Leg.]

**YEAS—46**

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

**NAYS—51**

| | | |
|---|---|---|
| Banks | Cassidy | Crapo |
| Barrasso | Collins | Cruz |
| Boozman | Cornyn | Curtis |
| Britt | Cotton | Daines |
| Capito | Cramer | Ernst |

**S3050**

CONGRESSIONAL RECORD — SENATE

*May 21, 2025*

| | | |
|---|---|---|
| Fischer | Lee | Risch |
| Graham | Lummis | Rounds |
| Grassley | Marshall | Schmitt |
| Hagerty | McConnell | Scott (FL) |
| Hawley | McCormick | Scott (SC) |
| Hoeven | Moody | Sheehy |
| Husted | Moran | Sullivan |
| Hyde-Smith | Moreno | Thune |
| Johnson | Mullin | Tillis |
| Justice | Murkowski | Tuberville |
| Kennedy | Paul | Wicker |
| Lankford | Ricketts | Young |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

The PRESIDING OFFICER. The Democratic leader.

MOTION TO RECESS

Mr. SCHUMER. Mr. President, I move to recess for 15 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "nay."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 51, as follows:

[Rollcall Vote No. 270 Leg.]

YEAS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NAYS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

The PRESIDING OFFICER. The Democratic leader.

MOTION TO RECESS

Mr. SCHUMER. Mr. President, I move to recess for 10 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "nay."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 45, nays 52, as follows:

[Rollcall Vote No. 271 Leg.]

YEAS—45

| | | |
|---|---|---|
| Alsobrooks | Hirono | Rosen |
| Baldwin | Kaine | Sanders |
| Bennet | Kelly | Schatz |
| Blumenthal | Kim | Schiff |
| Blunt Rochester | King | Schumer |
| Booker | Klobuchar | Shaheen |
| Cantwell | Luján | Slotkin |
| Coons | Markey | Smith |
| Cortez Masto | Merkley | Van Hollen |
| Duckworth | Murphy | Warner |
| Durbin | Murray | Warnock |
| Gallego | Ossoff | Warren |
| Gillibrand | Padilla | Welch |
| Hassan | Peters | Whitehouse |
| Hickenlooper | Reed | Wyden |

NAYS—52

| | | |
|---|---|---|
| Banks | Grassley | Mullin |
| Barrasso | Hagerty | Murkowski |
| Boozman | Hawley | Paul |
| Britt | Hoeven | Ricketts |
| Capito | Husted | Risch |
| Cassidy | Hyde-Smith | Rounds |
| Collins | Johnson | Schmitt |
| Cornyn | Justice | Scott (FL) |
| Cotton | Kennedy | Scott (SC) |
| Cramer | Lankford | Sheehy |
| Crapo | Lee | Sullivan |
| Cruz | Lummis | Thune |
| Curtis | Marshall | Tillis |
| Daines | McConnell | Tuberville |
| Ernst | McCormick | Wicker |
| Fischer | Moody | Young |
| Graham | Moreno | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

The PRESIDING OFFICER (Mr. HUSTED). The Democratic leader.

MOTION TO ADJOURN

Mr. SCHUMER. Mr. President, I move that the Senate adjourn, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

VOTE ON MOTION

The question is on agreeing to the motion to adjourn.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "nay."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 51, as follows:

[Rollcall Vote No. 272 Leg.]

YEAS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NAYS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

VOTE ON POINT OF ORDER

The PRESIDING OFFICER (Mrs. CAPITO). For the body to remember, the question is, shall points of order be in order under the Congressional Review Act?

Mr. THUNE. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 273 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Cornyn | Ernst |
| Barrasso | Cotton | Fischer |
| Boozman | Cramer | Graham |
| Britt | Crapo | Grassley |
| Capito | Cruz | Hagerty |
| Cassidy | Curtis | Hawley |
| Collins | Daines | Hoeven |

*May 21, 2025* CONGRESSIONAL RECORD — SENATE S3051

| | | |
|---|---|---|
| Husted | McCormick | Schmitt |
| Hyde-Smith | Moody | Scott (FL) |
| Johnson | Moran | Scott (SC) |
| Justice | Mullin | Sheehy |
| Kennedy | Murkowski | Sullivan |
| Lankford | Paul | Thune |
| Lee | Ricketts | Tillis |
| Lummis | Risch | Tuberville |
| Marshall | Rounds | Wicker |
| McConnell | | Young |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The PRESIDING OFFICER. On this vote, the yeas are 51, the nays are 46.

The point of order is sustained.

The PRESIDING OFFICER. The majority leader.

POINT OF ORDER

Mr. THUNE. Madam President, I make a point of order that joint resolutions that meet all the requirements of section 802 of the Congressional Review Act or are disapproving of Agency actions which have been determined to be rules subject to the CRA by a legal decision from GAO are entitled to expedited procedures under the Congressional Review Act.

The PRESIDING OFFICER. In the opinion of the Chair, the Senate has not previously considered this question. Therefore, the Chair, under the provisions of rule XX, submits the question to the Senate for its decision.

Shall joint resolutions that meet all of the requirements of section 802 of the Congressional Review Act or are disapproving of Agency actions which have been determined to be rules subject to the Congressional Review Act by a legal decision from the Government Accountability Office be entitled to expedited procedures under the Congressional Review Act?

The Democrat leader.

Mr. SCHUMER. Madam President, on this vote, the Republicans will be breaking their commitment and will be going nuclear. And however they try to disguise their actions, this is nuclear—no ands, ifs, or buts.

Tonight, Senate Republicans expose themselves as fair weather institutionalists by overriding the Parliamentarian, which the Chair explicitly noted that the Parliamentarian has been overridden. And in order to do the bidding of the fossil fuel industry, Republicans have eroded away at the Senate foundation and undermined this institution they claim to care about.

Make no mistake, Republicans have set a new precedent that will come back to haunt them and haunt this Chamber. What goes around comes around.

If Republicans are willing to overrule the Parliamentarian and highjack the CRA in a way that has never been used before, they will not like it next time they are in the minority.

I yield the floor.

Mr. THUNE. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 274 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The PRESIDING OFFICER. On this vote, the yeas are 51, the nays are 46.

The point of order is sustained.

The clerk will read the title of the joint resolution for the third time.

The joint resolution was ordered to be engrossed for a third reading and was read the third time.

VOTE ON S.J. RES. 55

The PRESIDING OFFICER. The joint resolution having been read the third time, the question is, Shall the joint resolution pass?

Mr. BARRASSO. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 275 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The joint resolution (S.J. Res. 55) was passed, as follows:

S.J. RES. 55

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That Congress disapproves the rule submitted by the National Highway Traffic Safety Administration relating to "Federal Motor Vehicle Safety Standards; Fuel System Integrity of Hydrogen Vehicles; Compressed Hydrogen Storage System Integrity; Incorporation by Reference" (90 Fed. Reg. 6218 (January 17, 2025)), and such rule shall have no force or effect.

The PRESIDING OFFICER. The majority leader.

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

PROVIDING CONGRESSIONAL DIS-APPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; ADVANCED CLEAN CARS II; WAIVER OF PREEMPTION; NOTICE OF DECISION"—Motion to Proceed

Mr. THUNE. Madam President, I understand the Senate has received H.J. Res. 88 from the House.

The PRESIDING OFFICER. The leader is correct.

Mr. THUNE. I move to proceed to H.J. Res. 88.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

Motion to proceed to H.J. Res. 88, a joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision".

VOTE ON MOTION

The PRESIDING OFFICER. Pursuant to the precedent just established by the Senate, the question occurs on the motion to proceed.

Mr. THUNE. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 276 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Blunt Rochester | Cortez Masto |
| Baldwin | Booker | Duckworth |
| Bennet | Cantwell | Durbin |
| Blumenthal | Coons | Fetterman |

| | | |
|---|---|---|
| Gallego | Merkley | Shaheen |
| Gillibrand | Murphy | Slotkin |
| Hassan | Murray | Smith |
| Hickenlooper | Ossoff | Van Hollen |
| Hirono | Padilla | Warner |
| Kaine | Peters | Warnock |
| Kelly | Reed | Warren |
| Kim | Rosen | Welch |
| King | Sanders | Whitehouse |
| Klobuchar | Schatz | Wyden |
| Luján | Schiff | |
| Markey | Schumer | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was agreed to.

(Mr. CASSIDY assumed the Chair.)

PROVIDING CONGRESSIONAL DIS-APPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; ADVANCED CLEAN CARS II; WAIVER OF PREEMPTION; NOTICE OF DECISION"

The PRESIDING OFFICER (Mr. ROUNDS). The clerk will report the joint resolution by title.

The legislative clerk read as follows:

A joint resolution (H.J. Res. 88) providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision".

APPOINTMENT

The PRESIDING OFFICER. The Chair, on behalf of the Vice President, pursuant to 22 U.S.C. 276d–276g, as amended, appoints the following Senator as Chairman of the Senate Delegation to the Canada-U.S. Interparliamentary Group conference during the 119th Congress: The Honorable KEVIN CRAMER of North Dakota.

MORNING BUSINESS

THE GRAVITY OF MEMORIAL DAY MUST NOT BE FORGOTTEN

Mr. GRASSLEY. Mr. President, after the bloodiest war in U.S. history, an enlisted soldier in the Union Army was assigned to recover war dead from Southern battlefields. Brevet Lt.-Col. Edmund B. Whitman mapped out an intricate system of "cemeterial districts" that formed the framework for our system of National Cemeteries. They provide a final resting place for fallen heroes and sacred space for mourners and citizenry to honor those who gave their last full measure of devotion to preserve freedom and liberty for generations to come.

"That Nation which respects and honors its dead, shall ever be respected and honored itself."—Brevet Lt.-Col. Edmund B. Whitman, 1868

After the Civil War, it became popular to place flowers near gravesites to honor the fallen. So-called "decoration days" in springtime came to be called Memorial Day. A Union General issued General Orders No. 11 urging the Nation not to forget the human toll of war.

"Let no vandalism of avarice or neglect, no ravages of time, testify to the present or to the coming generations that we have forgotten as a people the cost of a free and undivided republic."—General John A. Logan, May 5, 1868

A century later, President Lyndon B. Johnson signed into law the Uniform Monday Holiday Act, designating Memorial Day a Federal holiday on the last Monday in May.

In 1973, President Richard M. Nixon signed the National Cemeteries Act to update and modernize the administration of gravesites, particularly for aging World War II and Korean war veterans, as well as future servicemembers. It transferred 82 National Cemeteries from the Department of the Army to the Veterans Administration, expanding its network to 103 National Cemeteries. Today, the National Cemetery Administration oversees 156 National Cemeteries, 35 soldiers' lots, and has 122 grant-funded State veterans cemeteries, including the Iowa Veterans Cemetery at Van Meter. One of the oldest in the country is located in southeast Iowa. Keokuk National Cemetery was established during the Civil War for veterans who died in local military hospitals. Cast-iron tablets inscribed with a verse from an elegiac poem "Bivouac of the Dead" written by Theodore O'Hara are found throughout our National Cemeteries, including in Keokuk. The original tablets were fabricated at Rock Island Arsenal in the late 19th century to replace painted signs first placed on battlefields turned into burial grounds. The most frequently quoted passage follows:

On Fame's eternal camping-ground
Their silent tents are spread,
And Glory guards, with solemn round,
The bivouac of the dead.

On Memorial Day, the annual wreath-laying at Arlington National Cemetery is a somber moment to honor the sons and daughters lost on the battlefields of history. Since 1948, the 3rd Infantry Regiment, known as the Old Guard, places U.S. flags at more than 260,000 headstones and more than 7,000 columbarium niches containing the remains of the deceased. Iowa-born President Herbert Hoover led the first national Memorial Day ceremony at the Tomb of the Unknown Soldier on May 30, 1929, calling on Americans to honor the "unselfish souls who gave life in service to their ideals" and that their sacrifice must evoke "the most solemn mood of consecration" to "manifest our gratitude" in memoriam of their valor for perpetuity.

Since the Civil War, when Iowa sent the most soldiers per capita to the Union Army, Iowans have continued a legacy of strong military service, including the ultimate sacrifice. One of

(101 of 196), Page 101 of 196    Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 101 of 196
Case 4:25-cv-04966    Document 1-3    Filed 06/12/25    Page 38 of 82

May 21, 2025        CONGRESSIONAL RECORD — SENATE        S3053

the first three American soldiers killed in World War I was an Iowa farm boy from Glidden. Pvt. Merle David Hay was killed while serving sentry duty in the trenches in France. On May 25, 1930, thousands of people gathered at West Lawn Cemetery to dedicate an 8-foot granite monument in his honor. Travelers can see the monument while driving through Glidden on the historic Lincoln Highway.

Put the Sullivan Brothers Iowa Veterans Museum on your family calendar. You will learn about Iowans who answered the call to serve in the Armed Forces, including all five Sullivan brothers who were tragically killed aboard the USS *Juneau* on November 13, 1942.

Fifty years ago, one of the last servicemembers killed in Vietnam was a 19-year-old from Marshalltown. Lance Cpl. Darwin Lee Judge died 1 day before the fall of Saigon in 1975. As Saigon fell, Judge rescued a 3-year-old girl, putting her on his back "piggyback style" and ran her out to the plane. His bravery saved her life and cost him his own in a mortar attack on Tan Son Nhut Air Base.

Every Memorial Day, communities across Iowa reverently celebrate hometown heroes who made the ultimate sacrifice. From grave decorations to patriotic observances, neighbors, loved ones, and family members gather to pay tribute to these fallen heroes from one generation to the next, honoring their memories, bravery, and service. The sacrifice of these servicemembers is a profound reminder to every American articulated by President Ronald Reagan, "Ours is the land of the free because it is the home of the brave."

As Americans, it is our solemn duty to honor fallen servicemembers who have given their lives to defend our cherished blessings of freedom. In his acceptance speech for the Vice Presidential nomination in 1920, Calvin Coolidge imparted wisdom from history that rings truer than ever in the 21st century, "The nation which forgets its defenders will be itself forgotten."

I encourage Iowa families to remember the defenders from our home State and hometowns who are deeply missed around supper tables and family celebrations. Be intentional on Memorial Day to attend community celebrations. Plan a road trip to visit nearby Freedom Rocks honoring veterans in each of Iowa's 99 counties. Find out the history of road names, parks, and post offices named for local heroes who died in service to our country. They put their precious lives on the line to preserve our way of life for generations yet to come. For that, Americans owe them an eternal debt of gratitude.

---

## FISCAL YEAR 2025 ENFORCEMENT FILING

Mr. GRAHAM. Mr. President, H. Con. Res. 14, the fiscal year 2025 congressional budget resolution, included an instruction to the chairman of the Senate Committee on the Budget to file enforceable levels in the Senate in the event the budget was agreed to without the need to appoint a committee of conference on the measure. On April 5, 2025, the Senate amended and adopted H. Con. Res. 14, and on April 10, the House agreed to the amended resolution without changes. As such, I am submitting the required filing.

Specifically, section 4002 of the fiscal year 2025 congressional budget resolution requires the chairman to file an allocation for fiscal year 2025 for the Committee on Appropriations and an allocation for fiscal years 2025, 2025–2029, and 2025–2034 for committees other than the Committee on Appropriations.

The figures in the filing are consistent with the spending limits set forth in the Fiscal Responsibility Act of 2023 and the levels included in H. Con. Res. 14, as adjusted for the budgetary effects of recent legislation, pursuant to section 4006 of the resolution.

Adjustments were included for the budgetary effects of the following enacted legislation: Full-Year Continuing Appropriations and Extensions Act of 2025, H.R. 1968, and Providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Internal Revenue Service relating to "Gross Proceeds Reporting by Brokers That Regularly Provide Services Effectuating Digital Asset Sales," H.J. Res. 25.

Section 2002 of the fiscal year 2025 budget resolution included reconciliation instructions to six Senate committees to increase the deficit by not more than a given amount. Pursuant to section 3001 of the resolution, I am holding the corresponding amounts in reserve until the consideration of reconciliation legislation.

For purposes of enforcing the Senate's pay-as-you-go rule found in section 4106 of the fiscal year 2018 congressional budget resolution, I am resetting the Senate's scorecard to zero for all fiscal years.

The 2025 congressional budget resolution's budgetary levels and the budget baseline used to enforce it reflect current tax policy and assume provisions of the 2017 Tax Cuts and Jobs Act are permanently extended. I am also including in this filing the Joint Committee on Taxation's estimate of the budgetary effects of these current tax policy adjustments relative to the Congressional Budget Office's unmodified baseline.

The Congressional Budget Office and Joint Committee on Taxation will provide cost estimates of legislation using both the budget resolution baseline and CBO's unmodified baseline.

I ask unanimous consent that the accompanying tables be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

## ALLOCATION OF SPENDING AUTHORITY TO SENATE COMMITTEE ON APPROPRIATIONS FOR FISCAL YEAR 2025
[$ Billions]

| | Budget Authority | Outlays |
|---|---|---|
| Appropriations: | | |
| Revised Security Category Discretionary Budget Authority [1] | 906.987 | N.A. |
| Revised Nonsecurity Category Discretionary Budget Authority [1] | 856.623 | N.A. |
| General Purpose Outlays [1] | N.A. | 1,872.320 |
| Memo: | | |
| Subtotal | 1,763.610 | 1,872.320 |
| on-budget | 1,757.332 | 1,866.013 |
| off-budget | 6.278 | 6.307 |
| Mandatory | 1,688.081 | 1,667.103 |

[1] The allocation includes adjustments to the discretionary spending limits outlined in section 251(b) of the Balanced Budget and Emergency Deficit Control Act of 1985(BBEDCA), as estimated by the Congressional Budget Office during the consideration of the legislation containing the eligible adjustments.

**Note:** This allocation is consistent with the statutory limits imposed by the Fiscal Responsibility Act of 2023. Regular appropriations assumed in this allocation total $895.212billion in revised security category discretionary budget authority and $710.688 billion in revised nonsecurity category discretionary budget authority. This allocation alsoincludes the cap adjustments pursuant to section 251 of BBEDCA and sections 302 and 314 of the Congressional Budget Act of 1974.

## ALLOCATION OF SPENDING AUTHORITY TO SENATE COMMITTEES OTHER THAN APPROPRIATIONS
[$ Billions]

| | 2025 | 2025–2029 | 2025–2034 |
|---|---|---|---|
| Agriculture, Nutrition, and Forestry | | | |
| Budget Authority | 185.761 | 967.912 | 1,987.937 |
| Outlays | 177.349 | 926.669 | 1,876.969 |
| Armed Services | | | |
| Budget Authority | 289.771 | 1,117.079 | 2,102.064 |
| Outlays | 287.699 | 1,113.882 | 2,104.071 |
| Banking, Housing and Urban Affairs | | | |
| Budget Authority | 26.245 | 87.321 | 277.233 |
| Outlays | −12.404 | −128.025 | −165.530 |
| Commerce, Science, and Transportation | | | |
| Budget Authority | 28.674 | 112.433 | 208.612 |
| Outlays | 19.151 | 103.520 | 188.736 |
| Energy and Natural Resources | | | |
| Budget Authority | 11.317 | 46.797 | 94.470 |
| Outlays | 14.111 | 73.125 | 129.454 |
| Environment and Public Works | | | |
| Budget Authority | 65.948 | 333.253 | 657.947 |
| Outlays | 26.197 | 70.513 | 92.512 |
| Finance | | | |
| Budget Authority | 4,098.211 | 22,927.227 | 53,373.809 |
| Outlays | 4,086.136 | 22,904.608 | 53,305.155 |
| Foreign Relations | | | |
| Budget Authority | 60.169 | 256.871 | 501.910 |
| Outlays | 51.381 | 249.031 | 494.062 |
| Homeland Security and Government Affairs | | | |
| Budget Authority | 183.814 | 962.501 | 2,038.641 |
| Outlays | 186.248 | 954.058 | 2,009.642 |
| Judiciary | | | |
| Budget Authority | 25.392 | 121.706 | 241.572 |
| Outlays | 23.858 | 120.549 | 237.629 |
| Health, Education, Labor, and Pensions | | | |
| Budget Authority | 58.247 | 281.354 | 537.451 |
| Outlays | 73.149 | 274.662 | 513.809 |
| Rules and Administration | | | |
| Budget Authority | 0.054 | 0.282 | 0.596 |
| Outlays | 0.029 | 0.217 | 0.471 |
| Intelligence | | | |
| Budget Authority | 0.514 | 2.570 | 3.598 |
| Outlays | 0.514 | 2.570 | 3.598 |
| Veterans' Affairs | | | |
| Budget Authority | 231.668 | 1,334.594 | 3,081.121 |
| Outlays | 230.783 | 1,325.218 | 3,085.866 |
| Indian Affairs | | | |
| Budget Authority | 2.222 | 11.283 | 22.896 |
| Outlays | 2.480 | 11.963 | 23.259 |
| Small Business | | | |
| Budget Authority | 0.000 | 0.000 | 0.000 |
| Outlays | 0.013 | 0.014 | 0.014 |
| Unassigned to Committee | | | |
| Budget Authority | −2,484.527 | −12,554.107 | −27,799.842 |
| Outlays | −2,483.659 | −12,501.545 | −27,679.319 |
| TOTAL | | | |
| Budget Authority | 2,783.480 | 16,009.076 | 37,330.015 |
| Outlays | 2,683.035 | 15,901.026 | 36,220.398 |

Includes entitlements funded in annual appropriations acts. Certain budgetary changes related to reconciliation legislation pursuant to section 3001 of H.Can. Res. 14 will be held in reserve until consideration of such legislation.

## BUDGET AGGREGATES
($ billions)

| | 2025 | 2025–2029 | 2025–2034 |
|---|---|---|---|
| Figures Found in H. Con. Res. 14 | | | |
| Spending: | | | |
| Budget Authority .... | 4,663.769 | N.A. | N.A. |
| Outlays ................. | 4,636.008 | N.A. | N.A. |
| Revenue | 3,699.743 | 19,737.037 | 43,789.852 |
| Social Security Levels: | | | |
| Outlays ................. | 1,413.704 | 7,968.716 | 18,518.095 |
| Revenue ................. | 1,303.924 | 7,088.122 | 15,681.437 |
| Adjustments Pursuant to Sections 3001 and 4006 of H. Con. Res. 14 | | | |
| Spending: | | | |
| Budget Authority .... | −51.709 | N.A. | N.A. |
| Outlays ................. | −51.806 | N.A. | N.A. |
| Revenue | 149.921 | 748.663 | 1,496.094 |
| Social Security Levels: | | | |
| Outlays ................. | 0.000 | 0.000 | 0.000 |

## BUDGET AGGREGATES—Continued
($ billions)

| | 2025 | 2025–2029 | 2025–2034 |
|---|---|---|---|
| Revenue ................. | 0.000 | 0.000 | 0.000 |
| Adjusted H. Con. Res. 14 Figures | | | |
| Spending: | | | |
| Budget Authority .... | 4,612.060 | N.A. | N.A. |
| Outlays ................. | 4,584.202 | N.A. | N.A. |
| Revenue | 3,849.664 | 20,485.700 | 45,285.946 |
| Social Security Levels: | | | |
| Outlays ................. | 1,413.704 | 7,968.716 | 18,518.095 |
| Revenue ................. | 1,303.924 | 7,088.122 | 15,681.437 |

Note: Aggregate figures displayed at levels assumed in H. Con. Res. 14, with adjustments for enacted legislation and certain budgetary changes for reconciliation legislation held in reserve. Total figures here reflect levels different from those that will be enforced immediately due to the inclusion of spending exempt from enforcement.

## PAY-AS-YOU-GO SCORECARD FOR THE SENATE
($ billions)

| | Balances |
|---|---|
| Fiscal Year 2025 | 0 |
| Fiscal Years 2025–2029 | 0 |
| Fiscal Years 2025–2034 | 0 |

## BASELINE ADJUSTMENTS FOR CURRENT TAX POLICIES
($ billions)

| | 2025 | 2025–2029 | 2025–2034 |
|---|---|---|---|
| Individual rates and standard deduction changes | 0.000 | −535.717 | −1,440.061 |
| Child tax credit provisions | 0.000 | −282.939 | −692.806 |
| Pass-through business income changes | −6.970 | −283.369 | −712.800 |
| Deductions, exclusions and other individual tax provisions | 0.000 | 397.038 | 1,087.217 |
| Estate tax changes | −0.050 | −66.520 | −201.316 |
| Alternative minimum tax modifications | 0.000 | −506.121 | −1,374.573 |
| Business tax provisions | −0.098 | −227.343 | −425.018 |
| Net Total | −7.118 | −1,504.971 | −3,759.757 |

Source: Joint Committee on Taxation.
Note: Includes effects on both revenues and outlays, including off-budget effects.

### REMEMBERING RICHARD ARMITAGE

Mr. REED. Mr. President, I rise today to pay tribute to Richard Armitage, one of the finest statesmen of his, or any, generation of American national security leaders.

Few American leaders have served their Nation more thoroughly—from combat overseas as a young officer, to the heights of diplomacy on the world stage. Richard Armitage will hold an important place in our country's history.

Richard dedicated his life to service. He attended the Naval Academy and, following graduation, volunteered to serve three combat tours in Vietnam. He was known to his comrades to be fearless and unwavering, even risking his life embedding with Vietnamese riverine warfighters and, over the objections of others, personally led a flotilla of 30,000 Vietnamese refugees to safe harbor during the fall of Saigon.

Richard would go on to serve in a number of critical roles in the Senate, Pentagon, and State Department across a number of administrations, including as Assistant Secretary of Defense for International Security Affairs and as Deputy Secretary of State. He served as one of America's lead diplomats during the Gulf War, in Eastern Europe after the fall of the Soviet Union, and in the early years of the Global War on Terror.

Throughout his distinguished career, Richard was an inspirational force to the men and women he commanded and the leaders he advised. Indeed, like his reputation as a linebacker at the Naval Academy, his tenacity was legendary among the national security and foreign policy leaders he worked with.

I was privileged to work often with Richard, both in and out of his time in government. His leadership in so many demanding jobs leaves me with great admiration and gratitude.

Richard's love for his country was surpassed only by his love of family—his wonderful wife Laura, their eight children, and their beautiful grandchildren. I offer the Armitage family my deepest condolences and thank them for sharing Richard with us for so many years.

Richard Armitage was a powerful, inspiring person. He dedicated his life's work to serving others, and his was a life well-lived. He will be missed by all who had the privilege to know him and serve with him.

I am proud to honor the legacy of Richard Armitage, and I know the Members of the Senate will join me in recognizing the incredible contributions he made for our Nation.

### TRIBUTE TO RETIRING LEADERSHIP OFFICIALS AT THE IDAHO CLEANUP PROJECT

Mr. CRAPO. Mr. President, with my colleagues Senator JIM RISCH and Representative SIMPSON, I recognize the careers and service of Mark Brown, Maria Mitchell-Williams, Michael Goriup, Jennifer Cate, Doug Pruitt, and Mark Jones, instrumental leaders for the Idaho Cleanup Project, ICP. With more than 140 combined years of experience, these individuals have been integral contributors to the U.S. Department of Energy, DOE, and the ICP.

With more than 40 years of experience in nuclear operations and environmental restoration, Mark C. Brown has made a lasting impact on the Nation's environmental cleanup mission. Since joining DOE in 1995, he has held several senior leadership positions, most recently serving as manager of the ICP, where he led critical efforts to safely treat, store, and dispose of radioactive and hazardous waste, remove legacy buried waste and oversee the removal of spent nuclear fuel and high-level waste from Idaho. His career reflects a deep commitment to safety, operational excellence, and environmental stewardship, demonstrated through his roles at both the Idaho Site and Office of River Protection. Prior to his civilian service, Mr. Brown served with distinction as a nuclear submarine officer in the U.S. Navy.

Maria Mitchell-Williams provided outstanding leadership throughout her career, most recently as deputy manager for the ICP, where she oversaw the complex cleanup work at the Idaho National Laboratory, INL, Site. Previously, she served as assistant manager for business and acquisition management, applying more than 20 years of experience in contract oversight, budget management, and workforce planning, including administration of the $6.4 billion ICP End State contract. Her work encompassed leading high-impact efforts in contract management, project controls, budget, and workforce oversight, while also driving strategic coordination between the Office of Environmental Management and the Office of Nuclear Energy to ensure mission alignment and operational success. With a strong foundation in business, human resources, and level III certifications in acquisition and financial assistance, Ms. Mitchell-Williams' service has significantly advanced DOE's cleanup mission.

With more than 34 years of dedicated service to the DOE and nearly 40-plus years of experience in the nuclear field, Michael Goriup has been a vital leader in advancing the mission of the ICP. Since joining DOE Idaho in 1990, he has held key roles including program manager for the Idaho Nuclear Technology

and Engineering Center, INTEC, construction project manager, facility engineer at the Advanced Test Reactor Complex, and as a facility representative qualified across all INL facilities. In 2012, he was promoted to supervisor of the facility representatives team, where he led a group of facility representatives providing critical oversight of ICP operations, safety, and support activities. Under his leadership members of his staff were awarded four DOE Complex Facility Representative of the Year Awards. His Federal service was preceded by 9 years in the U.S. Navy, where he served in a nuclear submarine fleet as an electronics technician. Mr. Goriup's commitment to safety, technical excellence, and mission success has left a meaningful legacy at DOE Idaho.

Doug Pruitt, assistant manager for environment and waste programs at the ICP, has provided 20 years of environmental restoration and waste management, starting as a college intern, Mr. Pruitt completed his career as a senior manager with ICP. Mr. Pruitt has overseen critical cleanup efforts at the INL site, including the exhumation and disposal of transuranic waste, soil and groundwater remediation, and facility demolition. He has also played a key role in waste disposal systems, such as the Comprehensive Environmental Response, Compensation, and Liability Act, CERCLA, waste disposal cell and the evapotranspiration cap over waste disposal areas. Mr. Pruitt has been instrumental in leading procurement efforts for the past two ICP contracts and served as transition manager for the ICP end state contract.

Jennifer K. Cate, who concluded her notable Federal service as the acting assistant manager for business and acquisition management at the ICP, played a key role in overseeing the project cost and analysis and contract management teams, which provided essential services including budget formulation, financial management, and contracting for the $6.4 billion ICP end state indefinite delivery indefinite quantity, IDIQ, contract. With more than 30 years of contract management experience, she developed innovative business strategies and cost-effective solutions to support the successful execution of the ICP mission. Holding level III certifications in acquisition and financial assistance, her leadership and expertise were critical to the success of the project and the broader DOE mission.

Mark Jones served with dedication as the chief of staff for the ICP, bringing a strong background in project controls to the DOE. With 17 years of Federal civilian service and more than 20 years in the U.S. Air Force, retiring as a major in the Air Force Reserve, he has provided consistent leadership, coordination, and support across a wide range of mission-critical functions. Mr. Jones played a key role in integrating project baseline planning and perform-

ance metrics that supported the safe and timely execution of environmental cleanup activities under the ICP end state contract. Mr. Jones' professionalism and commitment to the ICP mission have made him a valued leader and colleague throughout his career.

The careers of Mark Brown, Maria Mitchell-Williams, Mike Goriup, Doug Pruitt, Jennifer Cate, and Mark Jones reflect an unwavering dedication to public service, technical excellence, and mission success to the American people. Throughout their distinguished service, these individuals provided oversight and leadership on some of the most significant accomplishments at the ICP, including the completion of exhumation and retrieval of buried waste at the radioactive waste management complex, the startup of the integrated waste treatment unit, the successful transfer of spent nuclear fuel from wet to dry storage, and the awarding of multiple major contracts for managing the cleanup mission. Collectively, they were responsible for the management and disposition of high-level waste, transuranic waste, and spent nuclear fuel at the INL Site. They provided executive oversight of a $470 million annual budget, 52 Federal employees, and more than 1,900 contractor personnel. As they enter retirement, we honor their lasting contributions and thank them for their tireless efforts to advance the DOE's environmental cleanup mission and serve the people of Idaho and the Nation.

It is our great honor to congratulate these individuals on their accomplishments and thank them for the many years of service. We wish them the best of luck following their retirement from DOE and the Idaho Cleanup Project.

TRIBUTE TO LIEUTENANT COLONEL LAUREN A. HARRISON

Mr. KELLY. Mr. President, I rise today to honor a great American and an exceptional member of the U.S. Air Force, Lt. Col. Lauren Harrison.

As an Air Force Senate legislative liaison officer from April 2023 to May 2024, Lauren performed her duties well and without reservation supporting the 118th U.S. Congress. Hailing from Puyallup, WA, and a graduate of the U.S. Air Force Academy, Lauren has served in the Air Force for over 15 years. Throughout her career, she has demonstrated exceptional and unrivaled officership. She is a senior pilot with over 2,700 hours of flight time—1,200 of which are in combat. Lieutenant Colonel Harrison was formerly an E-3 formal training unit instructor pilot, where she developed highly-skilled and mission-ready aviators prepared to meet global challenges.

Lieutenant Colonel Harrison distinguished herself through her professional character and dedication by serving this Nation in uniform as a Department of the Air Force legislative liaison to the Senate. In this role she advised the Department's senior lead-

ers and helped develop strategic engagement opportunities to advance U.S. Air Force and U.S. Space Force priorities. Her leadership facilitated seamless collaboration on behalf of the Department of the Air Force across 62 congressional offices, serving as the principal Air Force liaison to 20 Senators and their respective staffs. She supported numerous engagements and delegations for 150 Senators, Congressmen, and staffers, including my own staff, to showcase Department equities in the United States and abroad. Most notably, Lauren spearheaded efforts across eight organizations, leading a 28-person team to successfully plan and execute critical briefings for key lawmakers. These briefings, including the Secretary of the Air Force Imperatives Briefings for Members of Congress and the China Threat briefing for new Senate Armed Services Committee Members, effectively communicated the Department's modernization and resource requirements to address pacing challenges abroad. Her efforts helped ensured the Department of the Air Force's support of the National Defense Strategy in our return to Great Power Competition.

A skilled relationship builder, Lauren expertly conveyed Department of the Air Force positions on the Air Force Future Design. Responding to Senate staff feedback regarding the clarity of Air Force program messaging, Lauren drove a proactive collaborative effort to enhance communication with Congress. Working across six divisions, she organized a series of five targeted briefings for Armed Services Committee staff, fostering greater transparency and bolstering congressional support for the Department of the Air Force's modernization strategy and priorities.

Finally, Lauren cultivated strong relationships with Members of Congress through insightful and consistent engagement. She organized 9 trips showcasing 26 defense installations to 3 Senators and 46 staffers, demonstrating transparency and building understanding of Department of the Air Force operations. Lauren's significant efforts led to 79 successful engagements between this governing body and senior Department of Defense officials, including the Secretary of the Air Force. All of these engagements helped U.S. Senators and their staffs understand defense equities and their impact on national security. Due to her direct involvement and stewardship, Members of Congress were able to make informed decisions and ensured the Department of the Air Force was properly resourced and funded.

After serving in this crucial role and becoming a fixture on Capitol Hill, Lt. Col. Lauren Harrison will move on to attend the School of Advanced Air and Space Studies this summer, where she will learn to develop strategy and policy for the Air Force and the Nation. Lauren and her husband William, who is also a command pilot in the U.S. Air

(104 of 196), Page 104 of 196 Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 104 of 196
Case 4:25-cv-04965 Document 1-3 Filed 06/12/25 Page 41 of 82
S3056
# CONGRESSIONAL RECORD — SENATE

Force, have together flown over 2,500 combat hours as Air Force aviators and have instilled a legacy of service for their children Lillian, Corrie, and Claire. They have sacrificed much as a family in service to our Nation. I am thankful for Lauren's service and her work with my office and the Senate over the past year on issues of vital importance to the defense of the United States. I salute this American patriot whose selfless service has kept our country safe and strong.

---

## ADDITIONAL STATEMENTS

### TRIBUTE TO COLONEL RON BARNES

● Mr. WHITEHOUSE. Mr. President, I rise today to congratulate Colonel Ron Barnes on his retirement after serving 20 years as commanding officer of the Pawtuxet Rangers. The Pawtuxet Rangers are among the oldest existing chartered commands in the United States and the most active of Rhode Island's historic militia groups.

The Rangers were chartered in 1774 by the Colony of Rhode Island to protect what was then the thriving seaport of Pawtuxet in the wake of the Gaspee Affair. The Colonists' first strike against England took place in 1772 on Narragansett Bay with the burning of the Royal Navy's loathed revenue cutter, the HMS *Gaspee*. Each year, the spirited Gaspee Days Parade takes place in Pawtuxet Village to commemorate this important historic event and Rhode Island's great contribution to the American Revolution. And Colonel Barnes has become a beloved feature of the celebration.

Colonel Barnes marched in his first Gaspee Days Parade as a student at Cranston East High School. In 1987, he formally enlisted with the Pawtucket Rangers. He started as a drummer and went on to hold positions of artillery officer and executive officer before serving as commander. Colonel Barnes was bestowed the high honor of serving as the grand marshal of the 250th Gaspee Days Parade, the first event of the Nation's semiquincentennial celebrations.

Some years ago, Colonel Barnes gave me a challenge coin which I have always made sure to carry with me on any occasion on which I might see him. I thank him for keeping this very special part of Rhode Island's history alive and thriving for future generations. He has done a wonderful job leading the Rangers and I wish him, his wife Sandra—known affectionately as "The General"—and his sons Joshua, Zachary, and Alexander all the best. Godspeed, my friend.●

### MESSAGES FROM THE HOUSE

At 10:10 a.m., a message from the House of Representatives, delivered by Mrs. Alli, one of its reading clerks, announced that the House has passed the

following joint resolution, without amendment:

S.J. Res. 13. Joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Office of the Comptroller of the Currency of the Department of the Treasury relating to the review of applications under the Bank Merger Act.

The message also announced that the House has passed the following bill, in which it requests the concurrence of the Senate:

H.R. 1223. An act to require a plan to improve the cybersecurity and telecommunications of the U.S. Academic Research Fleet, and for other purposes.

At 7:47 p.m., a message from the House of Representatives, delivered by Mrs. Cole, one of its reading clerks, announced that the House has passed the following joint resolution, in which it requests the concurrence of the Senate:

H.J. Res. 88. Joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision".

At 10:54 p.m., a message from the House of Representatives, delivered by Mrs. Cole, of its reading clerks, announced that the House has passed the following joint resolutions, in which it requests the concurrence of the Senate:

H.J. Res. 87. Joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision".

H.J. Res. 89. Joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The 'Omnibus' Low NOX Regulation; Waiver of Preemption; Notice of Decision".

---

## MEASURES REFERRED

The following bill was read the first and the second times by unanimous consent, and referred as indicated:

H.R. 1223. An act to require a plan to improve the cybersecurity and telecommunications of the U.S. Academic Research Fleet, and for other purposes; to the Committee on Commerce, Science, and Transportation.

---

## MEASURES DISCHARGED PETITION

We, the undersigned Senators, in accordance with chapter 8 of title 5, United States Code, hereby direct that the Senate Committee on Commerce, Science, and Transportation be discharged from further consideration of S.J. Res. 55, a joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of

the rule submitted by the National Highway Traffic Safety Administration relating to "Federal Motor Vehicle Safety Standards; Fuel System Integrity of Hydrogen Vehicles; Compressed Hydrogen Storage System Integrity; Incorporation by Reference" and, further, that the joint resolution be immediately placed upon the Legislative Calendar under General Orders.

Shelly Moore Capito, John Thune, Lindsey Graham, Cynthia M. Lummis, Tommy Tuberville, Ashley Moody, Cindy Hyde-Smith, Tim Scott, Lisa Murkowski, Katie Boyd Britt, James Lankford, Todd Young, James E. Risch, Steve Daines, Dan Sullivan, John Hoeven, Kevin Cramer, Roger F. Wicker, Tom Cotton, John Boozman, Deb Fischer, John Cornyn, Ted Budd, Thom Tillis, John Kennedy, Mike Rounds, Tim Sheehy, Marsha Blackburn, Roger Marshall, Bernie Moreno.

---

## MEASURES DISCHARGED

The following joint resolution was discharged from the Committee Commerce, Science, and Transportation by petition, pursuant to 5 U.S.C. 802(c), and placed on the calendar:

S.J. Res. 55. Joint resolution for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the National Highway Traffic Safety Administration relating to "Federal Motor Vehicle Safety Standards; Fuel System Integrity of Hydrogen Vehicles; Compressed Hydrogen Storage System Integrity; Incorporation by Reference".

---

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. CRUZ, from the Committee on Commerce, Science, and Transportation, without amendment:

S. 283. A bill to require the Under Secretary of Commerce for Standards and Technology and the Administrator of National Oceanic and Atmospheric Administration to develop a standard methodology for identifying the country of origin of seafood to support enforcement against illegal, unreported, and unregulated fishing, and for other purposes (Rept. No. 119–24).

---

## EXECUTIVE REPORTS OF COMMITTEES

The following executive reports of nominations were submitted:

By Mr. BOOZMAN for the Committee on Agriculture, Nutrition, and Forestry.

*Luke Lindberg, of South Dakota, to be Under Secretary of Agriculture for Trade and Foreign Agricultural Affairs.

*Devon Westhill, of Florida, to be an Assistant Secretary of Agriculture.

By Mr. CRUZ for the Committee on Commerce, Science, and Transportation.

*David Fink, of New Hampshire, to be Administrator of the Federal Railroad Administration.

*Pierre Gentin, of New York, to be General Counsel of the Department of Commerce.

*David Fogel, of Connecticut, to be Assistant Secretary of Commerce and Director General of the United States and Foreign Commercial Service.

*Robert Gleason, of Pennsylvania, to be Director of the Amtrak Board of Directors for a term of five years.

Mr. CRUZ. Mr. President, for the Committee on Commerce, Science, and

Transportation I report favorably the following nomination lists which were printed in the RECORDS on the dates indicated, and ask unanimous consent, to save the expense of reprinting on the Executive Calendar that these nominations lie at the Secretary's desk for the information of Senators.

The PRESIDING OFFICER. Without objection, it is so ordered.

*Coast Guard nominations beginning with Joshua S. Alleman and ending with Matthew G. Zavalij, which nominations were received by the Senate and appeared in the Congressional Record on April 28, 2025. (minus 3 nominees: Bradford D. Long; Trent D. Moon; Tevin A. White)

*Coast Guard nominations beginning with Jason B. Veara and ending with Tara E. Larkin, which nominations were received by the Senate and appeared in the Congressional Record on April 28, 2025.

By Mr. LEE for the Committee on Energy and Natural Resources.

*Conner Prochaska, of Texas, to be Director of the Advanced Research Projects Agency-Energy, Department of Energy.

*Ned Mamula, of Pennsylvania, to be Director of the United States Geological Survey.

*Tina Pierce, of Idaho, to be Chief Financial Officer, Department of Energy.

*Jonathan Brightbill, of Virginia, to be General Counsel of the Department of Energy.

*Nomination was reported with recommendation that it be confirmed subject to the nominee's commitment to respond to requests to appear and testify before any duly constituted committee of the Senate.

---

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second times by unanimous consent, and referred as indicated:

By Mr. SCOTT of Florida:
S. 1824. A bill to improve defense cooperation between the United States and Taiwan, and for other purposes; to the Committee on Foreign Relations.

By Ms. HIRONO (for herself and Mr. MORAN):
S. 1825. A bill to amend the Research Facilities Act to address deferred maintenance at agricultural research facilities, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Ms. ERNST (for herself and Ms. KLOBUCHAR):
S. 1826. A bill to amend the Food, Conservation, and Energy Act of 2008 to clarify propane storage as an eligible use for funds provided under the storage facility loan program, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Mrs. MOODY (for herself and Mr. SCHMITT):
S. 1827. A bill to authorize the expedited removal of aliens who are criminal gang members, members of foreign terrorist organizations, or have been convicted of certain specified crimes; to the Committee on the Judiciary.

By Mr. CRAMER (for himself and Mr. MARKEY):
S. 1828. A bill to amend title 23, United States Code, to require States to designate a coordinator of the safe routes to school program in the State, and for other purposes; to

the Committee on Environment and Public Works.

By Mr. HAWLEY (for himself, Mr. DURBIN, Ms. KLOBUCHAR, Mr. GRASSLEY, and Mr. KELLY):
S. 1829. A bill to combat the sexual exploitation of children by supporting victims and promoting accountability and transparency by the tech industry; to the Committee on the Judiciary.

By Mr. JOHNSON:
S. 1830. A bill to clarify that agencies of the Department of Health and Human Services do not have the authority to regulate the practice of medicine; to the Committee on Health, Education, Labor, and Pensions.

By Mr. KAINE (for himself and Mr. CASSIDY):
S. 1831. A bill to amend the Internal Revenue Code of 1986 and the Employee Retirement Income Security Act of 1974 to allow for periodic automatic reenrollment under qualified automatic contribution arrangements, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. SANDERS (for himself, Mr. BLUMENTHAL, Mr. PADILLA, Mr. MURPHY, Mr. WELCH, Ms. WARREN, Mr. MARKEY, Mr. VAN HOLLEN, Mr. MERKLEY, and Mr. BOOKER):
S. 1832. A bill to amend the Higher Education Act of 1965 to ensure College for All; to the Committee on Finance.

By Mrs. BLACKBURN (for herself and Mr. WELCH):
S. 1833. A bill to require the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office to establish and carry out a pilot program to expedite the examination of applications for certain patents, and for other purposes; to the Committee on the Judiciary.

By Mrs. HYDE-SMITH (for herself, Mr. KAINE, Mr. HAWLEY, and Mrs. GILLIBRAND):
S. 1834. A bill to prevent cost-sharing requirements for prenatal, childbirth, neonatal, perinatal, or postpartum health care; to the Committee on Health, Education, Labor, and Pensions.

By Mrs. FISCHER (for herself and Mr. RICKETTS):
S. 1835. A bill to amend title 38, United States Code, to make permanent the pilot program authorized by the Communities Helping Invest through Property and Improvements Needed for Veterans Act of 2016, and for other purposes; to the Committee on Veterans' Affairs.

By Ms. KLOBUCHAR (for herself, Mr. WELCH, Ms. SMITH, Mr. KING, Ms. CANTWELL, Mr. REED, Mr. WHITEHOUSE, Ms. DUCKWORTH, Ms. WARREN, Mrs. GILLIBRAND, Mr. MERKLEY, Mrs. MURRAY, Mr. BLUMENTHAL, Mrs. SHAHEEN, Ms. CORTEZ MASTO, Ms. BALDWIN, Mr. BOOKER, Mr. VAN HOLLEN, Mr. DURBIN, Mr. MURPHY, Mr. FETTERMAN, Mr. MARKEY, Mr. LUJAN, Ms. HASSAN, Mr. HEINRICH, Ms. SLOTKIN, and Mr. BENNET):
S. 1836. A bill to amend title XVIII of the Social Security Act to strengthen the drug pricing reforms in the Inflation Reduction Act; to the Committee on Finance.

By Mr. DURBIN (for himself, Mr. GRAHAM, Ms. KLOBUCHAR, Mr. KING, Mr. LEE, Mr. HEINRICH, Mr. WELCH, Mr. SCHUMER, and Mr. HAWLEY):
S. 1837. A bill to improve rights to relief for individuals affected by non-consensual activities involving intimate digital forgeries, and for other purposes; to the Committee on the Judiciary.

By Mr. HICKENLOOPER (for himself, Mr. MORAN, Mr. BOOKER, and Mr. MULLIN):

S. 1838. A bill to amend the Public Health Service Act to authorize the Secretary of Health and Human Services to carry out a program of research, training, and investigation related to Down syndrome, and for other purposes; to the Committee on Health, Education, Labor, and Pensions .

By Mr. CORNYN:
S. 1839. A bill to amend the Internal Revenue Code of 1986 to allow individuals to defer recognition of reinvested capital gains distributions from regulated investment companies; to the Committee on Finance.

By Ms. HASSAN (for herself and Mr. BUDD):
S. 1840. A bill to amend the Internal Revenue Code of 1986 to provide for a micro-employer pension plan startup credit; to the Committee on Finance.

By Mr. PAUL:
S. 1841. A bill to provide regulatory relief to alternative fuel producers and consumers, and for other purposes; to the Committee on Environment and Public Works.

By Mr. WHITEHOUSE (for himself and Mr. SCHIFF):
S. 1842. A bill to amend the Internal Revenue Code of 1986 to create a credit for carbon removal and storage for forest residues from wildfire management; to the Committee on Finance.

By Mrs. CAPITO (for herself, Mr. BOOKER, Mr. CORNYN, Mr. DURBIN, Mr. TILLIS, Mr. WHITEHOUSE, Mr. CRAMER, Mr. WELCH, Mrs. BRITT, Ms. KLOBUCHAR, Mr. JUSTICE, Mr. COONS, and Ms. ALSOBROOKS):
S. 1843. A bill to reauthorize the Second Chance Act of 2007; to the Committee on the Judiciary.

By Ms. HIRONO (for herself, Mr. PADILLA, Ms. KLOBUCHAR, Mr. BOOKER, Mr. GALLEGO, and Ms. ROSEN):
S. 1844. A bill to authorize the Secretary of Education to award grants to eligible entities to carry out educational programs that include the history of peoples of Asian, Native Hawaiian, and Pacific Islander descent in the settling and founding of America, the social, economic, and political environments that led to the development of discriminatory laws targeting Asians, Native Hawaiians, and Pacific Islanders and their relation to current events, and the impact and contributions of Asian Americans, Native Hawaiians, and Pacific Islanders to the development and enhancement of American life, United States history, literature, the economy, politics, body of laws, and culture, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. BANKS (for himself and Mr. TUBERVILLE):
S. 1845. A bill to amend the public service loan forgiveness program under the Higher Education Act of 1965 to ensure qualifying public service excludes employment with organizations that engage in activities that have a substantial illegal purpose; to the Committee on Health, Education, Labor, and Pensions.

By Mr. BANKS (for himself and Mr. HICKENLOOPER):
S. 1846. A bill to amend title 38, United States Code, to provide for certain requirements relating to the use of the design-build construction method for Department of Veterans Affairs construction projects, and for other purposes; to the Committee on Veterans' Affairs.

By Mr. PAUL (for himself and Mr. WICKER):
S. 1847. A bill to amend the Employee Retirement Income Security Act of 1974 to clarify the treatment of certain association health plans as employers, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

**S3058**

CONGRESSIONAL RECORD — SENATE

*May 21, 2025*

By Mr. LEE (for himself, Mr. BOOKER, Ms. WARREN, and Mr. PAUL):

S. 1848. A bill to prohibit certain practices relating to certain commodity promotion programs, to require greater transparency by those programs, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. BENNET:

S. 1849. A bill to amend the Federal Election Campaign Act of 1971 to require each authorized committee or leadership PAC of a former candidate for election for Federal office to disburse all of the remaining funds of the committee or PAC after the election, and for other purposes; to the Committee on Rules and Administration.

By Mr. BENNET:

S. 1850. A bill to provide greater controls and restrictions on revolving door lobbying; to the Committee on Homeland Security and Governmental Affairs.

By Ms. ROSEN (for herself and Mr. YOUNG):

S. 1851. A bill to enhance the cybersecurity of the Healthcare and Public Health Sector; to the Committee on Homeland Security and Governmental Affairs.

By Mr. CRUZ (for himself and Mr. LUJAN):

S. 1852. A bill to amend the International Bridge Act of 1972 to streamline the Presidential permitting process for international bridges and land ports of entry, and for other purposes; to the Committee on Environment and Public Works.

By Ms. HIRONO (for herself and Mr. SCHATZ):

S. 1853. A bill to amend title 38, United States Code, to improve the provision of direct housing loans and medical care from the Department of Veterans Affairs for Native Hawaiians; to the Committee on Veterans' Affairs.

By Mrs. SHAHEEN (for herself, Mr. SCOTT of Florida, Mr. KAINE, Mr. CURTIS, and Mr. COONS):

S. 1854. A bill to require the imposition of sanctions with respect to political and economic elites in Haiti, and for other purposes; to the Committee on Foreign Relations.

SUBMISSION OF CONCURRENT AND SENATE RESOLUTIONS

The following concurrent resolutions and Senate resolutions were read, and referred (or acted upon), as indicated:

By Mr. CRAMER (for himself, Mr. KING, Mr. CRAPO, Mrs. BLACKBURN, Ms. KLOBUCHAR, Ms. MURKOWSKI, Ms. HASSAN, Ms. COLLINS, Mr. ROUNDS, and Mr. WELCH):

S. Res. 239. A resolution reaffirming the deep and steadfast partnership between the United States and Canada and the ties that bind the 2 countries in support of economic and national security; to the Committee on Foreign Relations.

By Ms. HIRONO (for herself, Mr. BOOKER, Mr. COONS, Ms. DUCKWORTH, Mr. PADILLA, Mr. SCHIFF, Mr. WHITEHOUSE, Ms. KLOBUCHAR, Mr. WELCH, Mr. BLUMENTHAL, and Ms. SMITH):

S. Res. 240. A resolution affirming that diversity, equity, inclusion , and accessibility are fundamental values of the United States and emphasizing the ongoing need to address discrimination and inequality in the workplace, pre-K through 12th grade and higher education systems, government programs, the military, and our society; to the Committee on the Judiciary.

By Mr. RICKETTS (for himself, Mr. MARSHALL, Mrs. FISCHER, and Mr. CORNYN):

S. Res. 241. A resolution expressing support for the designation of May 2025 as ''National Beef Month'' to recognize the important role cattle play in the United States, and to consumers; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. BLUMENTHAL:

S. Res. 242. A resolution condemning the private business agreements of President Donald J. Trump with foreign governments for posing unacceptable conflicts of interest, affirming such agreements violate the Foreign Emoluments Clause of the Constitution of the United States, and demanding the transfer of any proceeds from such agreements to the United States Government; to the Committee on Homeland Security and Governmental Affairs.

By Mr. BLUMENTHAL:

S. Res. 243. A resolution condemning the financial entanglements of World Liberty Financial, Inc. with President Donald J. Trump, the Trump family, and the Trump Administration; to the Committee on Homeland Security and Governmental Affairs.

By Mr. BLUMENTHAL:

S. Res. 244. A resolution affirming that the underlying purpose of the Foreign Emoluments Clause renders the acceptance and transfer of a plane from the government of Qatar, without the explicit consent of Congress, an illegal emolument, withholding the consent of the Senate to the acceptance and transfer of plane from the government of Qatar, and demanding the transfer of any plane received by President Donald J. Trump or entities under his control from the government of Qatar to the permanent control of the United States Government; to the Committee on Homeland Security and Governmental Affairs.

By Mr. BLUMENTHAL:

S. Res. 245. A resolution condemning the financial entanglements of Presidnet Donald J. Trump with the $TRUMP meme coin; to the Committee on Homeland Security and Governmental Affairs.

ADDITIONAL COSPONSORS

S. 224

At the request of Mr. LANKFORD, the names of the Senator from North Dakota (Mr. HOEVEN) and the Senator from Ohio (Mr. HUSTED) were added as cosponsors of S. 224, a bill to amend the Internal Revenue Code of 1986 to allow intangible drilling and development costs to be taken into account when computing adjusted financial statement income.

S. 463

At the request of Mrs. GILLIBRAND, the names of the Senator from Maryland (Ms. ALSOBROOKS) and the Senator from New York (Mr. SCHUMER) were added as cosponsors of S. 463, a bill to facilitate the implementation of security measures undertaken by the United States Postal Service, and for other purposes.

S. 719

At the request of Ms. MURKOWSKI, the name of the Senator from Alaska (Mr. SULLIVAN) was added as a cosponsor of S. 719, a bill to amend the Tribal Forest Protection Act of 2004 to improve that Act, and for other purposes.

S. 756

At the request of Ms. KLOBUCHAR, the name of the Senator from Kansas (Mr. MORAN) was added as a cosponsor of S. 756, a bill to amend the Internal Revenue Code of 1986 to treat certain post-secondary credentialing expenses as qualified higher education expenses for purposes of 529 accounts.

S. 817

At the request of Mr. CRUZ, the name of the Senator from South Dakota (Mr. ROUNDS) was added as a cosponsor of S. 817, a bill to provide for the imposition of sanctions with respect to forced organ harvesting within the People's Republic of China, and for other purposes.

S. 844

At the request of Mr. HAWLEY, the name of the Senator from Arizona (Mr. GALLEGO) was added as a cosponsor of S. 844, a bill to accelerate workplace time-to-contract under the National Labor Relations Act.

S. 995

At the request of Mr. CRAPO, the name of the Senator from South Carolina (Mr. SCOTT) was added as a cosponsor of S. 995, a bill to repeal a rule of the Environmental Protection Agency with respect to multi-pollutant emissions standards, to amend the Clean Air Act to ensure that tailpipe regulations do not limit the availability of new motor vehicles, and for other purposes.

S. 1072

At the request of Mr. LEE, the name of the Senator from South Carolina (Mr. SCOTT) was added as a cosponsor of S. 1072, a bill to amend the Clean Air Act to eliminate a waiver under that Act, to eliminate an authorization for States to use new motor vehicle emission and new motor vehicle engine emissions standards identical to standards adopted in California, and for other purposes.

S. 1241

At the request of Mr. GRAHAM, the name of the Senator from Delaware (Ms. BLUNT ROCHESTER) was added as a cosponsor of S. 1241, a bill to impose sanctions and other measures with respect to the Russian Federation if the Government of the Russian Federation refuses to negotiate a peace agreement with Ukraine, violates any such agreement, or initiates another military invasion of Ukraine, and for other purposes.

S. 1298

At the request of Mr. KAINE, the name of the Senator from Delaware (Mr. COONS) was added as a cosponsor of S. 1298, a bill to authorize the continuation of lawful nonimmigrant status for certain religious workers affected by the backlog for religious worker immigrant visas.

S. 1318

At the request of Mr. MORAN, the name of the Senator from Maine (Ms. COLLINS) was added as a cosponsor of S. 1318, a bill to direct the American Battle Monuments Commission to establish a program to identify American-Jewish servicemembers buried in United States military cemeteries

overseas under markers that incorrectly represent their religion and heritage, and for other purposes.

S. 1467

At the request of Mr. REED, the name of the Senator from Alaska (Mr. SULLIVAN) was added as a cosponsor of S. 1467, a bill to amend the Fair Credit Reporting Act to prevent consumer reporting agencies from furnishing consumer reports under certain circumstances, and for other purposes.

S. 1563

At the request of Ms. KLOBUCHAR, the name of the Senator from Delaware (Mr. COONS) was added as a cosponsor of S. 1563, a bill to amend the Omnibus Crime Control and Safe Streets Act of 1968 to establish a grant program to help law enforcement agencies with civilian law enforcement tasks, and for other purposes.

S. 1668

At the request of Mr. MERKLEY, the name of the Senator from Arizona (Mr. GALLEGO) was added as a cosponsor of S. 1668, a bill to amend chapter 131 of title 5, United States Code, to prohibit the President, Vice President, Members of Congress, and individuals appointed to Senate-confirmed positions from issuing, sponsoring, or endorsing certain financial instruments, and for other purposes.

S. 1804

At the request of Mr. SCHUMER, the names of the Senator from Rhode Island (Mr. REED) and the Senator from Maryland (Ms. ALSOBROOKS) were added as cosponsors of S. 1804, a bill to prohibit the use of funds to procure or modify foreign aircraft for presidential airlift.

S. RES. 212

At the request of Mr. GRAHAM, the name of the Senator from North Carolina (Mr. TILLIS) was added as a cosponsor of S. Res. 212, a resolution affirming the acceptable outcome of any nuclear deal between the United States and the Islamic Republic of Iran, and for other purposes.

---

STATEMENTS ON INTRODUCED
BILLS AND JOINT RESOLUTIONS

By Mr. DURBIN (for himself, Mr. GRAHAM, Ms. KLOBUCHAR, Mr. KING, Mr. LEE, Mr. HEINRICH, Mr. WELCH, Mr. SCHUMER, and Mr. HAWLEY):

S. 1837. A bill to improve rights to relief for individuals affected by non-consensual activities involving intimate digital forgeries, and for other purposes; to the Committee on the Judiciary.

Mr. DURBIN. Mr. President, I ask unanimous consent that the text of the bill be printed in the RECORD.

There being no objection, the text of the bill was ordered to be printed in the RECORD, as follows:

S. 1837

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the ''Disrupt Explicit Forged Images and Non-Consensual Edits Act of 2025'' or the ''DEFIANCE Act of 2025''.

SEC. 2. FINDINGS.

Congress finds the following:

(1) Digital forgeries, often called deepfakes, are synthetic images and videos that look realistic. The technology to create digital forgeries is now ubiquitous and easy to use. Hundreds of apps are available that can quickly generate digital forgeries without the need for any technical expertise.

(2) Digital forgeries can be wholly fictitious but can also manipulate images of real people to depict sexually intimate conduct that did not occur. For example, some digital forgeries will paste the face of an individual onto the body of a real or fictitious individual who is nude or who is engaging in sexual activity. Another example is a photograph of an individual that is manipulated to digitally remove the clothing of the individual so that the person appears to be nude.

(3) The individuals depicted in such digital forgeries are profoundly harmed when the content is produced with intent to disclose, disclosed, or obtained without the consent of those individuals. These harms are not mitigated through labels or other information that indicates that the depiction is fake.

(4) It can be destabilizing to victims whenever those victims are depicted in intimate digital forgeries against their will, as the privacy of those victims is violated and the victims lose control over their likeness and identity.

(5) Victims can feel helpless because the victims—

(A) may not be able to determine who has created the content; and

(B) do not know how to prevent further disclosure of the intimate digital forgery or how to prevent more forgeries from being made.

(6) Victims may be fearful of being in public out of concern that individuals the victims encounter have seen the digital forgeries. This leads to social rupture through the loss of the ability to trust, stigmatization, and isolation.

(7) Victims of non-consensual, sexually intimate digital forgeries may experience depression, anxiety, and suicidal ideation. These victims may also experience the ''silencing effect'' in which the victims withdraw from online spaces and public discourse to avoid further abuse.

(8) Digital forgeries are often used to—

(A) harass victims, interfering with their employment, education, reputation, or sense of safety; or

(B) commit extortion, sexual assault, domestic violence, and other crimes.

(9) Because of the harms caused by non-consensual, sexually intimate digital forgeries, such digital forgeries are considered to be a form of image-based sexual abuse.

SEC. 3. CIVIL ACTION RELATING TO DISCLOSURE OF INTIMATE IMAGES.

(a) DEFINITIONS.—Section 1309 of the Consolidated Appropriations Act, 2022 (15 U.S.C. 6851) is amended—

(1) in the section heading, by inserting ''OR NONCONSENSUAL ACTIVITY INVOLVING DIGITAL FORGERIES'' after ''INTIMATE IMAGES''; and

(2) in subsection (a)—

(A) in paragraph (2), by inserting ''competent,'' after ''conscious,'';

(B) by striking paragraph (3);

(C) by redesignating paragraph (4) as paragraph (3);

(D) by redesignating paragraphs (5) and (6) as paragraphs (6) and (7), respectively;

(E) by inserting after paragraph (3) the following:

''(4) IDENTIFIABLE INDIVIDUAL.—The term 'identifiable individual' means an individual whose body appears in whole or in part in an intimate visual depiction or intimate digital forgery and who is identifiable by virtue of the individual's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature, or from information displayed in connection with the intimate visual depiction or intimate digital forgery.

''(5) INTIMATE DIGITAL FORGERY.—

''(A) IN GENERAL.—The term 'intimate digital forgery' means any intimate visual depiction of an identifiable individual that—

''(i) falsely represents, in whole or in part—

''(I) the identifiable individual; or

''(II) the conduct or content that makes the visual depiction intimate;

''(ii) is created through the use of software, machine learning, artificial intelligence, or any other computer-generated or technological means, including by adapting, modifying, manipulating, or altering an authentic visual depiction; and

''(iii) is indistinguishable from an authentic visual depiction of the identifiable individual when viewed as a whole by a reasonable person.

''(B) LABELS, DISCLOSURE, AND CONTEXT.— Any visual depiction described in subparagraph (A) constitutes an intimate digital forgery for purposes of this paragraph regardless of whether a label, information disclosed with the visual depiction, or the context or setting in which the visual depiction is disclosed states or implies that the visual depiction is not authentic.''; and

(F) in paragraph (6)(A), as so redesignated—

(i) in clause (i), by striking ''or'' at the end;

(ii) in clause (ii)—

(I) in subclause (I), by striking ''individual;'' and inserting ''individual; or''; and

(II) by striking subclause (III); and

(iii) by adding at the end the following:

''(iii) an identifiable individual engaging in sexually explicit conduct; and''.

(b) CIVIL ACTION.—Section 1309(b) of the Consolidated Appropriations Act, 2022 (15 U.S.C. 6851(b)) is amended—

(1) in paragraph (1)—

(A) by striking subparagraph (A) and inserting the following:

''(A) IN GENERAL.—Except as provided in paragraph (5)—

''(i) an identifiable individual whose intimate visual depiction is disclosed, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, without the consent of the identifiable individual, where such disclosure was made by a person who knows or recklessly disregards that the identifiable individual has not consented to such disclosure, may bring a civil action against that person in an appropriate district court of the United States for relief as set forth in paragraph (3);

''(ii) an identifiable individual who is the subject of an intimate digital forgery may bring a civil action in an appropriate district court of the United States for relief as set forth in paragraph (3) against any person that knowingly produced or possessed the intimate digital forgery with intent to disclose it, knowingly disclosed the intimate digital forgery, or knowingly solicited and received the intimate digital forgery, if—

''(I) the identifiable individual did not consent to such production or possession with intent to disclose, disclosure, or solicitation and receipt;

''(II) the person knew or recklessly disregarded that the identifiable individual did not consent to such production or possession

CONGRESSIONAL RECORD — SENATE                *May 21, 2025*

with intent to disclose, disclosure, or solicitation and receipt; and

"(III) such production or possession with intent to disclose, disclosure, or solicitation and receipt, is in or affects interstate or foreign commerce or uses any means or facility of interstate or foreign commerce; and

"(iii) an identifiable individual who is the subject of an intimate digital forgery may bring a civil action in an appropriate district court of the United States for relief as set forth in paragraph (3) against any person that knowingly produced the intimate digital forgery if—

"(I) the identifiable individual did not consent to such production;

"(II) the person knew or recklessly disregarded that the identifiable individual—

"(aa) did not consent to such production; and

"(bb) was harmed, or was reasonably likely to be harmed, by the production; and

"(III) such production is in or affects interstate or foreign commerce or uses any means or facility of interstate or foreign commerce."; and

(B) in subparagraph (B)—

(i) in the subparagraph heading, by inserting "IDENTIFIABLE" before "INDIVIDUALS"; and

(ii) by striking "an individual who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the individual" and inserting "an identifiable individual who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the identifiable individual";

(2) in paragraph (2)—

(A) in subparagraph (A)—

(i) by inserting "identifiable" before "individual";

(ii) by striking "depiction" and inserting "intimate visual depiction or intimate digital forgery"; and

(iii) by striking "distribution" and inserting "disclosure, solicitation, or possession"; and

(B) in subparagraph (B)—

(i) by inserting "identifiable" before "individual";

(ii) by inserting "or intimate digital forgery" after "depiction" each place it appears; and

(iii) by inserting ", solicitation, or possession" after "disclosure";

(3) by redesignating paragraph (4) as paragraph (5);

(4) by striking paragraph (3) and inserting the following:

"(3) RELIEF.—

"(A) IN GENERAL.—In a civil action filed under this section, an identifiable individual may recover—

"(i) damages as provided under subparagraph (C); and

"(ii) the cost of the action, including reasonable attorney fees and other litigation costs reasonably incurred.

"(B) PUNITIVE DAMAGES AND OTHER RELIEF.—The court may, in addition to any other relief available at law, award punitive damages or order equitable relief, including a temporary restraining order, a preliminary injunction, or a permanent injunction ordering the defendant to delete, destroy, or cease to display or disclose the intimate visual depiction or intimate digital forgery.

"(C) DAMAGES.—For purposes of subparagraph (A)(i), the identifiable individual may recover—

"(i) liquidated damages in the amount of—

"(I) $150,000; or

"(II) $250,000 if the conduct at issue in the claim was—

"(aa) committed in relation to actual or attempted sexual assault, stalking, or harassment of the identifiable individual by the defendant; or

"(bb) the direct and proximate cause of actual or attempted sexual assault, stalking, or harassment of the identifiable individual by any person; or

"(ii) actual damages sustained by the individual, which shall include any profits of the defendant that are attributable to the conduct at issue in the claim that are not otherwise taken into account in computing the actual damages.

"(D) CALCULATION OF DEFENDANT'S PROFIT.—For purposes of subparagraph (C)(ii), to establish the defendant's profits, the identifiable individual shall be required to present proof only of the gross revenue of the defendant, and the defendant shall be required to prove the deductible expenses of the defendant and the elements of profit attributable to factors other than the conduct at issue in the claim.

"(4) PRESERVATION OF PRIVACY.—In a civil action filed under this section, the court may issue an order to protect the privacy of a plaintiff, including by—

"(A) permitting the plaintiff to use a pseudonym;

"(B) requiring the parties to redact the personal identifying information of the plaintiff from any public filing, or to file such documents under seal; and

"(C) issuing a protective order for purposes of discovery, which may include an order indicating that any intimate visual depiction or intimate digital forgery shall remain in the care, custody, and control of the court.";

(5) in paragraph (5)(A), as so redesignated—

(A) by striking "image" and inserting "visual depiction or intimate digital forgery"; and

(B) by striking "depicted" and inserting "identifiable"; and

(6) by adding at the end the following:

"(6) STATUTE OF LIMITATIONS.—Any action commenced under this section shall be barred unless the complaint is filed not later than 10 years from the later of—

"(A) the date on which the identifiable individual reasonably discovers the violation that forms the basis for the claim; or

"(B) the date on which the identifiable individual reaches 18 years of age.

"(7) DUPLICATIVE RECOVERY BARRED.—No relief may be ordered under paragraph (3) against a person who is subject to a judgment under section 2255 of title 18, United States Code, for the same conduct involving the same identifiable individual and the same intimate visual depiction or intimate digital forgery.".

(c) CONTINUED APPLICABILITY OF FEDERAL, STATE, AND TRIBAL LAW.—

(1) IN GENERAL.—This Act shall not be construed to impair, supersede, or limit a provision of Federal, State, or Tribal law.

(2) NO PREEMPTION.—Nothing in this Act shall prohibit a State or Tribal government from adopting and enforcing a provision of law governing disclosure of intimate images or nonconsensual activity involving an intimate digital forgery, as defined in section 1309(a) of the Consolidated Appropriations Act, 2022 (15 U.S.C. 6851(a)), as amended by this Act, that is at least as protective of the rights of a victim as this Act.

SEC. 4. SEVERABILITY; RULE OF CONSTRUCTION.

(a) SEVERABILITY.—If any provision of this Act, an amendment made by this Act, or the application of such a provision or amendment to any person or circumstance, is held to be unconstitutional, the remaining provisions of and amendments made by this Act, and the application of the provision or amendment held to be unconstitutional to any other person or circumstance, shall not be affected thereby.

(b) RULE OF CONSTRUCTION.—Nothing in this Act, or an amendment made by this Act,

shall be construed to limit or expand any law pertaining to intellectual property.

---

## SUBMITTED RESOLUTIONS

---

SENATE RESOLUTION 239—REAFFIRMING THE DEEP AND STEADFAST PARTNERSHIP BETWEEN THE UNITED STATES AND CANADA AND THE TIES THAT BIND THE 2 COUNTRIES IN SUPPORT OF ECONOMIC AND NATIONAL SECURITY

Mr. CRAMER (for himself, Mr. KING, Mr. CRAPO, Mrs. BLACKBURN, Ms. KLOBUCHAR, Ms. MURKOWSKI, Ms. HASSAN, Ms. COLLINS, Mr. ROUNDS, and Mr. WELCH) submitted the following resolution; which was referred to the Committee on Foreign Relations:

S. RES. 239

Whereas strengthening and deepening United States alliances is critically important, and the Senate is called upon not only to protect, but to advance, United States partnerships;

Whereas the United States enjoys the great fortune of having one of its closest allies next door at a time when countries around the world are facing existential threats from their neighbors;

Whereas, in June 2023, the bipartisan and bicameral American-Canadian Economy and Security Caucus was established in the Senate and the House of Representatives, which presents an opportunity to fortify and advance the indispensable economic and security partnership between the United States and Canada;

Whereas the United States and Canada can together reinforce their shared interest in 4 critical areas, which are—

(1) economic security;

(2) energy and critical minerals security;

(3) national security; and

(4) global security;

Whereas the prosperity of the citizens of the United States and Canada are supported by their mutually beneficial economic relationship and resilient and integrated supply chains;

Whereas the Agreement between the United States of America, the United Mexican States, and Canada, done at Mexico City on December 10, 2019 (commonly known as the "USMCA"), forms the foundation of the economic competitiveness of the 3 countries;

Whereas the United States and Canada—

(1) share one of the largest trading relationships in the world, with nearly $1,000,000,000,000 in bilateral trade in goods and services in 2023, supporting nearly 8,000,000 jobs in the United States and more than 2,400,000 jobs in Canada; and

(2) understand the importance of secure and resilient supply chains, and have established formal mechanisms to further strengthen economic integration and minimize the dependency of the United States on foreign adversaries;

Whereas Canada is the largest single export market for the United States, and Canada was the number one customer for 36 of the 50 States in 2023;

Whereas, in 2023, more than 330 congressional districts each exported more than $250,000,000 in goods to Canada, and more than congressional 100 districts each exported more than $1,000,000,000 in goods to Canada;

Whereas bilateral trade in agriculture between Canada and the United States reached

$72,564,000,000 in 2023 and Canada is the number one agricultural export market for 27 States;

Whereas trade between Canada and the United States is built on long-standing binational supply chains, whereby roughly 70 percent of Canadian goods exported to the United States are used by manufacturers in the United States to produce higher value goods;

Whereas Canada purchases more than $22,000,000,000 worth of automotive parts and approximately $33,600,000,000 worth of vehicles from the United States each year;

Whereas, in 2024, the United States imported $53,000,000,000 worth of motor vehicles and parts from Canada, while United States exports of motor vehicles and parts to Canada totaled $55,000,000,000, including $18,000,000,000 worth of automotive parts;

Whereas the United States lumber industry produces approximately 70 percent of the lumber needed every year in the United States and Canadian lumber makes up most of the shortfall, helping to meet the needs of United States consumers;

Whereas the United States and Canada—

(1) are global leaders in science, technology, and innovation, and can secure the future of North America as the most competitive region in the world; and

(2) are working together to deepen cooperation in developing and protecting emerging technologies, including artificial intelligence and quantum technologies;

Whereas Canada—

(1) is the world's fourth-largest petroleum producer and is the largest foreign supplier of energy, including oil, uranium, natural gas, and electricity, to the United States;

(2) supports United States energy dominance by providing safe and reliable natural gas, electricity, crude oil, and uranium for nuclear power;

(3) bolsters the position of the United States as the world's number one exporter of liquified natural gas by supplying border States with Canadian natural gas;

(4) enables the growth of United States artificial intelligence technology by supplying the critical fuels required by the United States power industry; and

(5) is a reliable source of energy and resources for the United States, producing more than 60 minerals and metals, and is a leading global producer of critical minerals on the critical minerals list the United States Geological Survey;

Whereas Canada is—

(1) committed to ensuring North American competitiveness and the success of workers and communities in Canada and the United States; and

(2) taking steps to address nonmarket practices of the People's Republic of China, notably by screening inbound investment into Canada and applying a surtax on products imported from the People's Republic of China, such as electric vehicles, steel, and aluminum;

Whereas the United States and Canada—

(1) have a deeply interconnected electricity sector, with more than 35 active electricity transmission connections between the 2 countries, many of which enable bidirectional flows of electricity, helping to ensure the security and reliability of the North American grid;

(2) have committed to work together to protect biodiverse areas that span their shared border, including in collaboration with Indigenous and Tribal partners, benefiting shared species like migratory birds; and

(3) have jointly collaborated for more than 100 years under the Treaty relating to the Boundary Waters and Questions arising along the Boundary between the United States and Canada, signed at Washington January 11, 1909 (36 Stat. 2448; 12 Bevans 319) (commonly known as the "Boundary Waters Treaty") to manage and conserve their shared waters for the benefit of both countries, including almost 50 years under the Agreement on Great Lakes Water Quality, 1978, with Annexes and Terms of Reference, signed at Ottawa November 22, 1978 (commonly known as the "Great Lakes Water Quality Agreement");

Whereas the United States and Canada—

(1) share 3 oceans and the world's longest border, and safely oversee the movement of about 400,000 people and more than $2,500,000,000 worth of goods and services across that border each day;

(2) cooperate to keep the border open to legitimate trade and travel but closed to illegal migration, terrorists, criminals, and threats to the health and safety of citizens;

(3) are committed to jointly protecting the security of their citizens, including though Canada's recent actions and significant investments to strengthen border security by—

(A) fighting sources of illegal migration at the border, and keeping deadly drugs like fentanyl and its precursors from entering;

(B) securing border crossings by maintaining 24/7 eyes on the border using new surveillance technology and increased personnel;

(C) combating fentanyl trafficking through the appointment of a fentanyl czar, listing cartels as terrorist entities, and launching a Canada-United States Joint Strike Force detecting and disrupting the fentanyl trade with more technology, tools, and intelligence;

(D) reinforcing a "one border, one team" approach through more cross-border information and intelligence sharing; and

(E) keeping people safe through joint emergency readiness and creating a joint emergency management partnership similar to the North American Aerospace Defense Command (commonly referred to as "NORAD");

(4) are united in fighting a fentanyl crisis that is indiscriminately affecting citizens on both sides of the border and is fueled by the actions of malign actors abroad;

(5) work together to secure the border between the United States and Canada through the Cross Border Crime Forum, the Integrated Border Enforcement Teams, the Beyond the Border Initiative, the United States-Canada NEXUS Trusted Traveler Program, the Border Enforcement Security Task Forces, the Integrated Cross-Border Maritime Law Enforcement Operations (commonly known as the "Shiprider"), and the United States preclearance operations conducted at airports in Canada, all of which enhance joint security efforts;

(6) have an Integrated Border Enforcement Charter that allows border enforcement agencies to jointly identify national security threats, disrupt organized criminal activities, seize drugs and weapons, and intercept criminal networks trying to smuggle people across the border; and

(7) both understand that a threat to the security of one country is a threat to the security of both countries;

Whereas the United States and Canada—

(1) are Pacific, Atlantic, and Arctic countries;

(2) are unequivocally committed to playing a leadership role in protecting global security and promoting democracy around the world;

(3) recognize that collective security is a shared responsibility, and are committed to expanding cooperation on continental defense and in the Arctic, including by increasing investments in continental defense and modernizing NORAD, the world's only binational military command;

(4) share the desire for a peaceful, stable, and predictable Arctic region, including for the benefit of Arctic and Northern peoples and communities;

(5) work together to advance democratic principles, human rights, and free trade policies through the Group of 7, the Group of 20, the United Nations, the Organization for Security and Co-operation in Europe, the Organisation for Economic Co-operation and Development, the World Trade Organization, and at the Organization of American States;

(6) cooperate extensively through a "Tri-Command Framework" comprised of the United States Northern Command, the Canadian Joint Operations Command, and NORAD;

(7) work together as the only North American members of the North Atlantic Treaty Organization (commonly referred to as "NATO") to ensure peace and security in the transatlantic region;

(8) support NATO's deterrence and defense efforts, and allies in Europe, through their roles as the Framework Nations for the NATO brigades in Latvia and Poland; and

(9) share a long and storied history of civil space partnership between the National Aeronautics and Space Administration (commonly referred to as "NASA") and the Canadian Space Agency, and a Canadian will fly on the historic Artemis II mission around the Moon with NASA;

Whereas Canada has been a committed ally in upholding the rules-based international order by promoting peace, resilience, and security in the Indo-Pacific region through an augmented and diversified military presence;

Whereas Canada has been a reliable and engaged partner of the United States in the Indo-Pacific region by collaborating extensively with the United States Indo-Pacific Command, including through bilateral and multilateral exercises, regional security cooperation and defense engagements, involvement in regional defense forums, and ultimately, through unwavering support of free, open, and inclusive Indo-Pacific region;

Whereas Canada is in consultation with the United States, Australia, and the United Kingdom to identify collaborative projects on advanced capabilities under Pillar II of the enhanced trilateral security partnership between Australia, the United Kingdom, and the United States; and

Whereas history, geography, commerce, security, and shared democratic values underpin a close relationship between the United States and Canada: Now, therefore, be it

*Resolved,* That the Senate—

(1) recognizes that the relationship between the United States and Canada is—

(A) an essential strategic asset to the United States and the people of the United States; and

(B) critical to promoting peace, expanding global economic opportunity, and being prepared to respond to unforeseen events;

(2) reaffirms its full commitment to maintain and grow the critical partnership between the United States and Canada;

(3) recognizes that the security of either the United States or Canada is dependent on the security of the other, and welcomes greater collaboration in the areas of defense, cyber and technology security, and Arctic security;

(4) reaffirms its commitment to the bilateral and international alliance between the 2 countries, which allows both countries to face common threats together and uphold common values, including democracy, human rights, and the rule of law;

(5) recognizes the strategic importance of one of the most secure borders in the world, the co-management of which facilitates trade and serves as a trusted corridor for the supply chains of both countries;

CONGRESSIONAL RECORD — SENATE
*May 21, 2025*

(6) recognizes that bolstering the supply chains of both countries will make both countries more competitive and more resilient in the face of economic aggression from hostile countries;

(7) supports an increased focus on energy security through greater cross-border energy infrastructure, including infrastructure for oil, natural gas, nuclear, renewable energy, and resilient electricity transmission, and through diversifying electricity supply chains for critical minerals; and

(8) is fully committed to the creation of more well-paying United States jobs through continued trade and investment with Canada.

SENATE RESOLUTION 240—AFFIRMING THAT DIVERSITY, EQUITY, INCLUSION , AND ACCESSIBILITY ARE FUNDAMENTAL VALUES OF THE UNITED STATES AND EMPHASIZING THE ONGOING NEED TO ADDRESS DISCRIMINATION AND INEQUALITY IN THE WORKPLACE, PRE-K THROUGH 12TH GRADE AND HIGHER EDUCATION SYSTEMS, GOVERNMENT PROGRAMS, THE MILITARY, AND OUR SOCIETY

Ms. HIRONO (for herself, Mr. BOOKER, Mr. COONS, Ms. DUCKWORTH, Mr. PADILLA, Mr. SCHIFF, Mr. WHITEHOUSE, Ms. KLOBUCHAR, Mr. WELCH, Mr. BLUMENTHAL, and Ms. SMITH) submitted the following resolution; which was referred to the Committee on the Judiciary:

S. RES. 240

Whereas everyone should have the opportunity to achieve the American Dream, and it is too often out of reach for hardworking and talented individuals due to discriminatory barriers to opportunity;

Whereas diversity, equity, inclusion, and accessibility initiatives address discriminatory barriers to opportunity and ongoing discrimination;

Whereas diversity, equity, inclusion, and accessibility initiatives allow everyone to access equal opportunity and are not unlawful quotas;

Whereas, for 6 decades, Presidents of both major political parties have supported diversity, equity, inclusion, and accessibility initiatives to strengthen the workforce, expand opportunity, and ensure everyone has a fair shot at achieving the American Dream;

Whereas diversity, equity, and inclusion initiatives are broadly popular;

Whereas polling shows that over 70 percent of people in the United States, including majorities of White, Black, Latino, and Asian American populations, support diversity, equity, inclusion, and accessibility initiatives;

Whereas data from the Department of Labor, the Bureau of the Census, the Board of Governors of the Federal Reserve System, the Survey of Consumer Finances, the Bureau of Labor Statistics, the Equal Employment Opportunity Commission, the Department of Housing and Urban Development, the Bipartisan Policy Center, the Urban Institute, the Brookings Institution, the Pew Research Center, Citi Group, the KFF Survey on Racism, Discrimination, and Health, the GLSEN National School Climate Survey, McKinsey & Company, and numerous other sources show that Black, Latino, Asian American, and Indigenous people, women, LGBTQ+ people, and people with disabilities experience persistent segregation, exclusion, and discrimination in education, employ-

ment, healthcare, access to capital and financial services, housing, and other sectors, which demonstrates the necessity for diversity, equity, inclusion, and accessibility practices, policies, and programs;

Whereas disability-based discrimination constitutes more than half (53.26 percent) of all housing discrimination complaints filed with fair housing organizations and government agencies;

Whereas, for the past several years, disability has continued to be the top basis of discrimination reported under the Fair Housing Act (42 U.S.C. 3601 et seq.), representing 5,128 complaints filed with the Department of Housing and Urban Development and its Fair Housing Assistance Program partners in fiscal year 2023;

Whereas less than 5 percent of housing nationwide is accessible to individuals with moderate mobility difficulties, and less than 1 percent of housing is accessible for those who use wheelchairs;

Whereas approximately 32 percent of adults with disabilities have reported unfair treatment in healthcare settings due to their disabilities or other personal characteristics;

Whereas, in 2023, only 22.5 percent of people with disabilities were employed, compared to 65.8 percent of those without disabilities;

Whereas students with disabilities frequently receive insufficient support, resulting in lower graduation rates and limited career opportunities;

Whereas Black and Latino homebuyers—

(1) have been steered toward or away from certain neighborhoods, which impacts their ability to buy homes in their preferred areas;

(2) face appraisal discrimination, which diminishes their wealth by undervaluing their property; and

(3) are more likely than White homebuyers to receive costly subprime mortgages, even when their financial situations are comparably qualified;

Whereas these disparities highlight systemic issues in the housing market that disproportionately disadvantage Black and Latino communities, emphasizing the need for ongoing efforts to address and rectify discriminatory lending and appraisal practices;

Whereas the racial wealth gap has widened in recent decades, with Black and Latino households experiencing significantly lower average net wealth than White households;

Whereas, while White households hold 86.8 percent of the overall wealth of the United States, they only account for 68.1 percent of the total households in the United States, and in comparison, Black and Hispanic households hold 2.9 percent and 2.8 percent of the overall wealth of the United States, respectively, while accounting for 15.6 percent and 10.9 percent of the United States population, respectively;

Whereas nearly 30 percent of LGBTQ+ people have encountered discrimination, including being denied or discouraged from buying or renting a home, being denied loans, being physically and verbally harassed, and having landlords refuse to provide maintenance;

Whereas people of color have faced significant discrimination in healthcare, impacting access to care, treatment quality, health outcomes, and trust in medical institutions;

Whereas this discrimination has led to disparities in treatment, access, health outcomes, and social determinants of health;

Whereas racial biases result in inadequate pain management, misdiagnoses, and higher maternal and infant mortality rates, particularly among Black and Indigenous women;

Whereas historical injustices contribute to deep mistrust in the medical system, affecting participation in clinical trials and preventive care;

Whereas environmental racism, lack of culturally competent mental health services, and unequal access to quality healthcare further worsen health disparities;

Whereas healthcare discrimination negatively impacts the lives of LGBTQ+ people;

Whereas 1 out of 5 transgender people have been turned away from healthcare, and more than 60 percent of LGBTQ+ adults have had a negative interaction with a healthcare provider, such as being blamed for their health challenges, being ignored, and being denied pain medications;

Whereas, for LGBTQ+ people, these experiences cut across racial lines;

Whereas Black, Indigenous, and Latino students continue to experience discrimination in the pre-k through 12th grade and higher education systems that create barriers to accessing and completing a quality education;

Whereas Black students and Indigenous students are disproportionately disciplined in schools and excluded from classrooms, feeding a pipeline to prison and disengagement from school, particularly for Black girls, who are 4 times more likely to be suspended, 4 times more likely to be expelled, and 3 times more likely to have the police called on them in school, compared to White girls;

Whereas 1 in 5 Black students and 1 in 4 Latino students experience discrimination on college and university campuses;

Whereas most students who are parents while attending higher education identify as Black, Indigenous, and Latino, and they face a variety of barriers to graduation while learning in schools that do not consider their parenting responsibilities;

Whereas LGBTQ+ students face hostility and discrimination in educational settings, which negatively impacts their success in schools;

Whereas more than ⅔ of LGBTQ+ students feel unsafe at school due to their sexual orientation or gender identity, and more than ⅓ of LGBTQ+ students have missed school as a result;

Whereas occupational segregation of Black workers into lower-paid jobs and less lucrative industries persists despite an increase in the number of Black people with college degrees over the previous 20 years;

Whereas Black, Latino, Asian American, and Indigenous workers are over represented in dangerous jobs with worse pay and fewer benefits due to ongoing occupational segregation;

Whereas, in 2023, the wage gap widened for the first time in 20 years, with women working full-time, year-round jobs receiving 83 cents for every dollar paid to men while that number was 84 cents in 2022, and Black women experienced a more severe backslide;

Whereas, in 2023, Black women working full-time, year-round jobs were paid 66 cents for every dollar paid to White, non-Hispanic men, compared to 69 cents in 2022;

Whereas Asian American and Native Hawaiian and Pacific Islander women were paid 97 cents, Latinas were paid 58 cents, and Native women were paid 58 cents for every dollar paid to White, non-Hispanic men;

Whereas women at all education levels experience a wage gap compared to their male counterparts;

Whereas a Latina with a professional degree stands to lose over $2,900,000 over her lifetime due to the wage gap;

Whereas Native women working a full-time, year-round job must get a bachelor's degree (typical pay of $58,113) to be paid more than White, non-Hispanic men working a full-time, year-round job with a high school diploma (typical pay of $50,976);

Whereas disabled women also face a pay gap;

Whereas a disabled woman working a full-time, year-round job is paid 68 cents for every dollar paid to a non-disabled man;

Whereas studies reveal wage disparities for LGBTQ+ individuals, particularly for transgender and bisexual people;

Whereas data shows LGBTQ+ workers earn about 90 cents, transgender men earn 70 cents, and transgender women earn 60 cents for every dollar that all full-time workers are paid;

Whereas approximately 40 percent of Black workers, 25 percent of Asian workers, and 20 percent of Latino workers report experiencing discrimination or being treated unfairly by an employer in hiring, pay, or promotions because of their race or ethnicity;

Whereas women continue to face discrimination in the workplace, and many women of color experience the dual burden of race and sex discrimination at work;

Whereas 1 recent study found that 40 percent of working women experience sexual harassment on the job;

Whereas some studies indicate that as many as 60 percent of women have experienced workplace sexual harassment, and in some industries, that number is as high as 90 percent;

Whereas women also continue to face occupational segregation, limiting their access to higher paying careers across the spectrum;

Whereas, in the skilled trades, women make up just 3.9 percent of the workforce;

Whereas, in private law firms, just 18 percent of associates are women of color, only 28 percent of partners are women, and just over 5 percent of partners are women of color;

Whereas, in corporate management generally, women still make up just 29 percent of C-suite positions;

Whereas, despite legal protections guaranteed by Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.) and the Supreme Court's ruling in Bostock v. Clayton County, 590 U.S. 644 (2020), many LGBTQ+ individuals still encounter workplace discrimination, including being fired, denied promotions, or harassed due to their sexual orientation or gender identity;

Whereas ½ of LGBTQ+ adults and 70 percent of transgender workers reported experiencing some form of workplace discrimination or harassment;

Whereas LGBTQ+ workers of color and LGBTQ+ workers with disabilities report experiencing workplace discrimination at higher rates than LGBTQ+ workers who do not identify as people of color or people with disabilities;

Whereas discriminatory lending practices, barriers to funding, and limited access to capital make it difficult for Black, Latino, and Asian American entrepreneurs to start or expand businesses;

Whereas venture capital firms reject Black-owned businesses at 3 times the rate of their white counterparts;

Whereas Black women receive less than 0.35 percent of all venture capital funding despite Black people making up 14.2 percent of the United States population;

Whereas Latino small business owners experience similar barriers to access to funding;

Whereas racial disparities exist in government contract awards;

Whereas firms owned by people of color receive a smaller share of contracting dollars than their representation among available firms;

Whereas, in fiscal year 2023, Black-owned businesses secured approximately $9,990,000,000 in Federal contracts, representing less than 1.3 percent of the total amount awarded by the Federal Government;

Whereas, in fiscal year 2023, Latino-owned small companies received roughly $10,900,000,000 in Federal contracts, and Asian American-owned businesses were awarded $9,000,000,000 in Federal contracts out of $774,000,000,000 in Federal contracts;

Whereas the persistence of discrimination in the United States limits our innovation and productivity, weakens our economy, and undermines our democracy;

Whereas the failure to effectively address growing inequality has decreased economic mobility rates in the United States and made the American Dream more elusive regardless of talent or hard work;

Whereas the Federal Government is responsible for addressing discriminatory barriers to opportunity in the United States by increasing and enhancing initiatives that support diversity, equity, inclusion, and accessibility, and enforcing anti-discrimination laws;

Whereas, according to an analysis by Citi Group, disparities for Black people across the economic system of the United States from 2004 to 2024 have cost the United States economy $16,000,000,000,000;

Whereas studies show that companies with workforces that are diverse on multiple levels, including by race, are more innovative, productive, and profitable;

Whereas diversity, equity, inclusion, and accessibility initiatives can address disparities and reduce labor shortages in high-demand industries like technology, healthcare, and finance, ensuring that the United States can compete in the global marketplace;

Whereas the United States is best served when the Federal workforce reflects the talent and contributions of people from all backgrounds;

Whereas career pathway programs, investment in Historically Black Colleges and Universities, Tribal Colleges and Universities, and other minority-serving institutions, access to financial aid, expanding access to apprenticeship and job skills training programs, offering mentorship opportunities, and other solutions help talented individuals overcome barriers to opportunity;

Whereas diversity, equity, inclusion, and accessibility initiatives are crucial in ensuring fair and comprehensive access to core services for all communities, whether in education, healthcare, employment, or government programs;

Whereas diversity, equity, inclusion, and accessibility initiatives ensure that core services are designed to meet the diverse needs of all populations, especially historically underserved or marginalized communities;

Whereas, without an equity lens, systemic barriers, such as cost, transportation, and a lack of culturally competent services, may prevent some groups from accessing essential resources;

Whereas government agencies and organizations that integrate diversity, equity, inclusion, and accessibility principles develop policies that intentionally reduce disparities in service accessibility;

Whereas diversity, equity, inclusion, and accessibility-focused transportation policies could ensure rural communities and individuals with disabilities have equal access to public transit;

Whereas a diverse workforce in service-oriented fields, such as education, healthcare, and social services, leads to better understanding and responsiveness to community needs;

Whereas inclusion training can reduce biases that might otherwise result in service denial or discrimination;

Whereas qualified students and workers who benefit from scholarships, internships, training programs, and mentorships supported by diversity, equity, inclusion, and accessibility initiatives could lose these opportunities, potentially widening existing disparities;

Whereas diversity, equity, inclusion, and accessibility initiatives in schools, colleges, and universities help foster inclusive environments and support underrepresented students;

Whereas eliminating these initiatives may reduce retention and graduation rates among underrepresented groups;

Whereas companies and organizations may struggle to recruit and retain skilled, diverse workforces, which could potentially affect innovation, productivity, and competitiveness;

Whereas diversity, equity, inclusion, and accessibility initiatives bring down costs in several ways through reduced turnover and hiring costs and better decision making;

Whereas diversity, equity, inclusion, and accessibility initiatives help mitigate the risk of discrimination lawsuits by helping to ensure equal opportunity and workplace cultures of respect;

Whereas diversity, equity, inclusion, and accessibility initiatives often support small minority- and women-owned businesses through procurement goals and funding, and their elimination could hinder such businesses' growth and success;

Whereas diversity, equity, inclusion, and accessibility efforts and policies in healthcare ensure culturally competent and bias-free care and address social determinants of health, such as housing and food security;

Whereas diversity, equity, inclusion, and accessibility efforts and policies in healthcare promote culturally competent providers who understand and respond to diverse patient needs;

Whereas language access services, including qualified medical interpreters and translated materials, ensure that patients can receive quality care in their primary language;

Whereas expanding Medicaid, subsidies under the Patient Protection and Affordable Care Act (Public Law 111–148; 124 Stat. 119), and community-based healthcare programs assists uninsured and underinsured populations in obtaining necessary medical services;

Whereas implicit bias in healthcare results in racial and socioeconomic disparities in treatment, as evidenced by Black women facing higher maternal mortality rates than the general population;

Whereas diversity, equity, inclusion, and accessibility-informed training equips medical professionals to recognize and mitigate biases, ensuring equal treatment and fostering patient trust;

Whereas diversity, equity, inclusion, and accessibility initiatives in healthcare often address disparities in access and outcomes for marginalized communities and assist individuals benefitting from community programs focused on equity in housing, nutrition, and mental health;

Whereas these and other initiatives that advance diversity, equity, inclusion, and accessibility promote equal access to opportunities and resources, foster an environment of respect and belonging, ensure that every individual, regardless of background, can fully participate in all aspects of society, and are essential to creating a culture where all individuals are valued and included;

Whereas President Donald Trump's Executive orders on diversity, equity, inclusion, and accessibility represent a regressive step, undermining decades of progress toward equal opportunity in the United States, and misconstrue the fundamental purpose of diversity, equity, inclusion, and accessibility efforts;

Whereas the idea that diversity, equity, inclusion, and accessibility initiatives do not consider merit is a false and harmful narrative that misunderstands both concepts;

Whereas, rather than lowering standards, diversity, equity, inclusion, and accessibility initiatives ensure that merit is measured in ways that are more accurate, inclusive, and aligned with real-world potential, benefitting schools, workplaces, and society at large;

Whereas, contrary to the Trump administration's claims, diversity, equity, inclusion, and accessibility initiatives are not about preferential treatment or quotas but leveling the playing field;

Whereas dismantling these programs disregards the persistent inequalities that necessitate their existence and signals a troubling departure from the commitment of the United States to civil rights and equal opportunity for all; and

Whereas attacks on initiatives that advance diversity, equity, inclusion, and accessibility make the United States less prosperous, fair, and safe: Now, therefore, be it

*Resolved,* That the Senate—

(1) affirms its commitment to—

(A) diversity, equity, inclusion, and accessibility as essential foundations for achieving the American Dream; and

(B) fostering environments where all individuals have the freedom to be healthy, prosperous, and safe, the opportunity to realize their full potential, and the right to be equal members of our multiracial democracy; and

(2) encourages local, State, and Federal policymakers, educational institutions, workplaces, and other organizations to adopt, uphold, and promote inclusivity, expand diversity and accessibility, remove barriers, and provide equitable opportunities for all individuals to pursue their dreams, which, in turn, benefits all people.

---

SENATE RESOLUTION 241—EXPRESSING SUPPORT FOR THE DESIGNATION OF MAY 2025 AS "NATIONAL BEEF MONTH" TO RECOGNIZE THE IMPORTANT ROLE CATTLE PLAY IN THE UNITED STATES, AND TO CONSUMERS

Mr. RICKETTS (for himself, Mr. MARSHALL, Mrs. FISCHER, and Mr. CORNYN) submitted the following resolution; which was referred to the Committee on Agriculture, Nutrition, and Forestry:

S. RES. 241

Whereas cattle production accounts for largest share of cash receipts for agricultural commodities in the United States at $88,400,000,000;

Whereas the United States produces the most beef in the world, accounting for 19 percent of global production;

Whereas the United States raises more than 92,000,000 head of cattle accounting for 6 percent of global stock;

Whereas the United States has the largest inventory of fed cattle in the world;

Whereas beef provides 25 grams of high-quality protein per 3-ounce serving; and

Whereas beef contains essential nutrients which help the body convert food into energy and support immune health and brain function, including—

(1) iron, which helps with oxygen absorption;

(2) choline, which supports nervous system development;

(3) vitamins B6 and B12, which maintains brain function;

(4) phosphorous, which builds bones and teeth;

(5) zinc, which maintains immune system function;

(6) niacin, which supports energy production and metabolism;

(7) riboflavin, which converts food into energy; and

(8) selenium, which promotes cell health: Now, therefore, be it

*Resolved,* That the Senate—

(1) supports the designation of May 2025 as "National Beef Month"; and

(2) recognizes that—

(A) historically, cattle production has contributed about 17 percent of the $520,000,000,000 in total cash receipts for agricultural commodities;

(B) the United States is also the largest consumer of beef in the world, primarily high-value, grain-fed beef; and

(C) beef is an excellent source of nutritious protein.

---

SENATE RESOLUTION 242—CONDEMNING THE PRIVATE BUSINESS AGREEMENTS OF PRESIDENT DONALD J. TRUMP WITH FOREIGN GOVERNMENTS FOR POSING UNACCEPTABLE CONFLICTS OF INTEREST, AFFIRMING SUCH AGREEMENTS VIOLATE THE FOREIGN EMOLUMENTS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES, AND DEMANDING THE TRANSFER OF ANY PROCEEDS FROM SUCH AGREEMENTS TO THE UNITED STATES GOVERNMENT

Mr. BLUMENTHAL submitted the following resolution; which was referred to the Committee on Homeland Security and Governmental Affairs:

S. RES. 242

Whereas President Donald J. Trump has pursued numerous new business deals with foreign states that will generate millions of dollars of revenue for President Trump and the Trump family;

Whereas LIV Golf, which is backed by the government of Saudi Arabia, hosted a tournament at Trump National Doral Resort in April 2025;

Whereas the Trump Organization is designing a Trump-branded hotel, golf course, and golf club on government-owned land in Oman and with a Saudi Arabian real estate firm that has close ties to the government of Saudi Arabia;

Whereas the Trump Organization has already received not less than $5,000,000 from the Trump-branded hotel deal in Oman;

Whereas the Trump Organization plans to build a $500,000,000 luxury residential and commercial complex and Trump International Hotel on government-owned land in Serbia;

Whereas the Trump Organization has signed a $5,500,000,000 deal with a Qatari government-owned firm and a Saudi Arabian company with close ties to the government of Saudi Arabia to build a luxury golf resort in Qatar, including Trump-branded beachside villas and an 18-hole golf course;

Whereas President Trump recently completed a 4-day tour of Saudi Arabia, Qatar, and the United Arab Emirates;

Whereas, prior to the 4-day tour, the sons of President Trump had traveled through the Middle East to pursue and announce a flurry of new deals for the Trump Organization, including a residential tower in Saudi Arabia and a hotel in Dubai;

Whereas President Trump has refused to divest from his financial interests and remains an owner of the Trump Organization;

Whereas engaging in private business transactions with a foreign government, and the acceptance of substantial payments and benefits from a foreign government, could unduly influence the foreign policies of the United States;

Whereas the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States provides that no present, emolument, office, or title, of any kind, may be accepted by the President of the United States from a king, prince, or foreign state without the consent of Congress;

Whereas the Founders included the Foreign Emoluments Clause in the Constitution of the United States, by unanimous agreement of the State delegations, to ensure the President would remain loyal to the Nation and the public interest;

Whereas the Foreign Emoluments Clause has long been understood to be "'directed against every kind of influence by foreign governments upon officers of the United States,' in the absence of consent by Congress'";

Whereas the President of the United States has a constitutional and statutory obligation to uphold the public trust; and

Whereas the violation of the Foreign Emoluments Clause of the Constitution of the United States undermines public trust and the integrity of public office in the United States: Now, therefore, be it

*Resolved,* That the Senate—

(1) condemns the private business agreements of President Donald J. Trump with foreign governments for posing unacceptable conflicts of interest;

(2) affirms that any such agreements are violations of the Foreign Emoluments Clause of the Constitution of the United States because President Donald J. Trump did not seek the consent of Congress for any such agreements; and

(3) demands the transfer of any proceeds from any such agreements nevertheless received by President Donald J. Trump in violation of the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States to the United States Government.

---

SENATE RESOLUTION 243—CONDEMNING THE FINANCIAL ENTANGLEMENTS OF WORLD LIBERTY FINANCIAL, INC. WITH PRESIDENT DONALD J. TRUMP, THE TRUMP FAMILY, AND THE TRUMP ADMINISTRATION

Mr. BLUMENTHAL submitted the following resolution; which was referred to the Committee on Homeland Security and Governmental Affairs:

S. RES. 243

Whereas World Liberty Financial, Inc. (referred to in this preamble as "WLFI"), which is owned in part by President Donald J. Trump and members of the Trump family, launched in September 2024 with the promise of "driving the mass adoption of stablecoins and decentralized finance";

Whereas the Trump family took greater control over WLFI during the period immediately preceding the inauguration of the President, asserting a claim of more than 75 percent of net revenues from token sales and 60 percent from the operations of the firm;

Whereas WLFI started attracting new attention from investors after the 2024 election, raising $550,000,000 from the governance

CONGRESSIONAL RECORD — SENATE

token issued by WLFI, with half of those investors spending more than $1,000,000 each;

Whereas the financial ties of President Trump to WLFI allow and invite anyone in the world, including foreign governments and unscrupulous individuals, to directly enrich the President and the Trump family, while hiding potential payoffs in the pseudonymity of the blockchain;

Whereas Justin Sun, who was facing a civil fraud case beginning in 2023 from the Securities and Exchange Commission over allegations of market manipulation and unregistered asset sales, has invested $75,000,000 in WLFI and announced that his blockchain project, TRON, would be a partner on the WLFI stablecoin named USD1;

Whereas the Securities and Exchange Commission under President Trump has paused the litigation against Justin Sun, and Justin Sun is now seeking to favorably settle;

Whereas reporting indicates that the blockchain project TRON of Justin Sun has become a preferred payment platform for Hamas and Hezbollah to evade United States sanctions;

Whereas WLFI has reportedly used the Trump name to solicit substantial investments from cryptocurrency startups, asking for between $10,000,000 and $30,000,000 in investment in the governance token issued by WLFI, while WLFI would buy a smaller amount of the digital coins of the startup in return and pocket the difference for WLFI;

Whereas DWF Labs, a Dubai-based cryptocurrency firm suspected of engaging in market manipulation, has invested $25,000,000 in the governance token issued by WLFI, making it one of the largest holders of the governance token;

Whereas, on May 1, 2025, MGX Fund Management Limited, an investment firm established and backed by the government of the United Arab Emirates, announced an agreement to use the WLFI stablecoin to complete a $2,000,000,000 deal with Binance Holdings, Ltd.;

Whereas, as a result of the deal between MGX Fund Management Limited and Binance Holdings, Ltd., President Trump and the Trump family could stand to receive hundreds of millions of dollars from a foreign state;

Whereas representatives of the Trump family have reportedly held talks with Binance Holdings, Ltd. about investing in the United States arm of Binance Holdings, Ltd.;

Whereas Binance Holdings, Ltd. pleaded guilty to violating anti-money-laundering laws in 2023, and the founder of Binance Holdings, Ltd., Changpeng Zhao, has served 4 months in prison after pleading guilty to related charges;

Whereas the Securities and Exchange Commission under President Trump has paused a civil lawsuit against Binance Holdings, Ltd.;

Whereas Binance Holdings, Ltd. executives have reportedly met with officials of the Department of the Treasury to discuss loosening United States Government oversight on the company;

Whereas Binance Holdings, Ltd. founder Changpeng Zhao is reportedly seeking a formal pardon from the Trump Administration;

Whereas President Trump has used the Federal Government to enrich cryptocurrency firms through the creation of a Strategic Bitcoin Reserve and United States Digital Asset Stockpile and used the White House to promote cryptocurrencies;

Whereas WLFI business partners and other cryptocurrency interests donated millions of dollars to the inauguration fund of President Trump;

Whereas the financial entanglements of WLFI with the President, the Trump family, and the Trump Administration present un-

precedented conflicts of interest, national security risks, and constitutional violations;

Whereas the acceptance of a substantial payment from a foreign government could unduly influence the foreign policies of the United States;

Whereas the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States provides that no present, emolument, office, or title, of any kind, may be accepted by the President of the United States from a king, prince, or foreign state without the consent of Congress;

Whereas the Founders included the Foreign Emoluments Clause in the Constitution of the United States, by unanimous agreement of the State delegations, to ensure the President would remain loyal to the Nation and the public interest;

Whereas the Foreign Emoluments Clause of the Constitution of the United States has long been understood to be "directed against every kind of influence by foreign governments upon officers of the United States, in the absence of consent by Congress";

Whereas the President of the United States has a constitutional and statutory obligation to uphold the public trust; and

Whereas the violation of the Foreign Emoluments Clause of the Constitution of the United States undermines public trust and the integrity of public office in the United States: Now, therefore, be it

*Resolved*, That the Senate—

(1) condemns the financial entanglements of World Liberty Financial, Inc. with President Donald J. Trump, the Trump family, and the Trump Administration for—

(A) potentially enabling the violation of Government ethics requirements;

(B) facilitating investments from foreign governments and financial transactions with foreign nationals under Federal prosecution; and

(C) posing unacceptable conflicts of interest;

(2) affirms that the agreement between MGX Fund Management Limited and World Liberty Financial, Inc. is a violation of the Foreign Emoluments Clause of the Constitution of the United States because President Donald J. Trump did not seek the consent of Congress for such agreement; and

(3) demands the transfer of any proceeds from any such agreement nevertheless received by President Donald J. Trump in violation of the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States to the United States Government.

SENATE RESOLUTION 244—AFFIRMING THAT THE UNDERLYING PURPOSE OF THE FOREIGN EMOLUMENTS CLAUSE RENDERS THE ACCEPTANCE AND TRANSFER OF A PLANE FROM THE GOVERNMENT OF QATAR, WITHOUT THE EXPLICIT CONSENT OF CONGRESS, AN ILLEGAL EMOLUMENT, WITHHOLDING THE CONSENT OF THE SENATE TO THE ACCEPTANCE AND TRANSFER OF PLANE FROM THE GOVERNMENT OF QATAR, AND DEMANDING THE TRANSFER OF ANY PLANE RECEIVED BY PRESIDENT DONALD J. TRUMP OR ENTITIES UNDER HIS CONTROL FROM THE GOVERNMENT OF QATAR TO THE PERMANENT CONTROL OF THE UNITED STATES GOVERNMENT

Mr. BLUMENTHAL submitted the following resolution; which was referred to the Committee on Homeland Security and Governmental Affairs:

S. RES. 244

Whereas President Donald J. Trump reportedly plans to—

(1) accept a Boeing 747-8 jumbo jet from the government of Qatar for United States Government use as Air Force One during the Trump Administration; and

(2) transfer that plane nominally to the Donald J. Trump Presidential Library shortly before the expiration of the term of office of President Trump but continue personal use of the plane after the Presidency of President Trump;

Whereas the estimated value of the plane is $400,000,000, making the plane one of the biggest gifts to the United States from a foreign government, if accepted;

Whereas Air Force One is equipped with advanced, specialized communications technologies, so that Air Force One may transmit highly classified national security information and serve as a mobile command center in the event of an attack on the United States;

Whereas accepting a plane from a foreign government poses counterintelligence and other national security concerns, such as the insertion of listening devices on the plane;

Whereas ensuring the plane is free from all security risks, including listening devices, could require stripping the plane down to its parts;

Whereas retrofitting the Qatari plane to serve as Air Force One also requires the installation of multiple top-secret systems that enable secure Government communications, midair refueling, and missile defense and that protect against electronic jamming and electromagnetic pulse attacks;

Whereas such a process could cost taxpayers more than $1,000,000,000 and take years to complete;

Whereas the only means of speeding up such work requires relaxing current Air Force One security rules;

Whereas, even if such work is sped up, the Qatari plane may only be ready near the end of the term of office of President Trump, at which time the plane will be turned over to the Donald J. Trump Presidential Library;

Whereas all fees related to the transfer of the plane to the Donald J. Trump Presidential Library reportedly will be paid by the United States Air Force, rather than by President Trump himself;

Whereas the acceptance of a substantial gift from a foreign government could unduly influence the foreign policies of the United States;

Whereas the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States provides that no present, emolument, office, or title, of any kind, may be accepted by the President of the United States from a king, prince, or foreign state without the consent of Congress;

Whereas the Founders included the Foreign Emoluments Clause in the Constitution of the United States, by unanimous agreement of the State delegations, to ensure the President would remain loyal to the Nation and the public interest;

Whereas the Foreign Emoluments Clause has long been understood to be "'directed against every kind of influence by foreign governments upon officers of the United States,' in the absence of consent by Congress";

Whereas the President of the United States has a constitutional and statutory obligation to uphold the public trust; and

Whereas the violation of the Foreign Emoluments Clause of the Constitution of the United States undermines public trust and the integrity of public office in the United States: Now, therefore, be it

Resolved, That the Senate—

(1) affirms that the underlying purpose of the Foreign Emoluments Clause of the Constitution of the United States renders the acceptance and transfer of a plane from the government of Qatar, without the explicit consent of Congress, an illegal emolument, regardless of the legal technicalities of ownership;

(2) withholds the consent of the Senate to the acceptance and transfer of any plane from the government of Qatar, as such acceptance and transfer poses unacceptable potential costs to taxpayers in the United States as well as grave risks to national security and of foreign corruption; and

(3) demands the transfer of any plane received by President Donald J. Trump or entities under the control of President Trump from the government of Qatar, in violation of the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States, to the permanent control of the United States Government.

SENATE RESOLUTION 245—CONDEMNING THE FINANCIAL ENTANGLEMENTS OF PRESIDNET DONALD J. TRUMP WITH THE $TRUMP MEME COIN

Mr. BLUMENTHAL submitted the following resolution; which was referred to the Committee on Homeland Security and Governmental Affairs:

S. RES. 245

Whereas, on January 17, 2025, Fight Fight Fight LLC launched the "OFFICIAL TRUMP" cryptocurrency (referred to in this preamble as "$TRUMP"), which is a meme coin;

Whereas a meme coin is a type of asset purchased "for entertainment, social interaction, and cultural purposes", with the value of the asset "driven primarily by market demand and speculation";

Whereas the $TRUMP website states in the disclaimers of the website that the product is "not intended to be . . . an investment opportunity", but rather to function as "an expression of support for, and engagement with, the ideals and beliefs embodied by the symbol '$TRUMP'";

Whereas President Trump himself promoted the venture at the time of launch, and on multiple occasions since the launch has

encouraged investors to "join [his] very special Trump Community'";

Whereas, within 2 days of launch, the price for $TRUMP skyrocketed over 10 times to $74.27 before steeply declining to settle at $7.50 by April 2025;

Whereas, in the face of dwindling value and steep losses for hundreds of thousands of investors, on April 23, 2025, Fight Fight Fight LLC announced a "Dinner with Trump" competition that promised an evening with the President to discuss cryptocurrency policy at Trump National Club in Washington, D.C., for the top 220 holders of $TRUMP;

Whereas, in addition to the dinner, the promotion offered a "Special VIP White House Tour" for the top 25 holders before removing the reference to the White House;

Whereas the price of $TRUMP rose more than 50 percent with a significant surge in trading volume following the announcement of the promotional dinner;

Whereas $TRUMP allows and invites anyone in the world, potentially even foreign governments and unscrupulous individuals, to directly enrich the President, while hiding potential payoffs in the pseudonymity of the blockchain;

Whereas the top holders of $TRUMP are reported to be foreign nationals and entities, which may include individuals or entities tied to foreign governments;

Whereas a Chinese-linked firm, GD Culture Group, which nominally produces content for TikTok, has raised up to $300,000,000 from an unidentified investor to purchase $TRUMP and Bitcoin, despite having no revenue;

Whereas a shipping firm with operations in Mexico raised $20,000,000 to purchase $TRUMP for the express purpose of influencing the tariff policy of the United States;

Whereas Justin Sun, who was facing a civil fraud case from the Securities and Exchange Commission over allegations of market manipulation and unregistered asset sales, is believed to be the top holder of $TRUMP;

Whereas the Securities and Exchange Commission under President Trump paused the litigation against Justin Sun, and Sun is now seeking to favorably settle;

Whereas President Trump financially benefits from the market value and activity of the $TRUMP, as Fight Fight Fight LLC and CIC Digital LLC, an affiliate of the Trump Organization, collectively own 80 percent of the 1,000,000,000 issued $TRUMP coins, which are currently worth $10,500,000,000 in market value;

Whereas both Fight Fight Fight LLC and CIC Digital LLC, as well as the affiliated "Celebration Cards LLC", receive transaction fees derived from trading activities, making surges in trading from the promotion of the $TRUMP coin by President Trump and competition particularly lucrative;

Whereas the $TRUMP coin has generated $350,000,000 in fees for Fight Fight Fight LLC and partners of Fight Fight Fight LLC, including over $1,000,000 since the "Dinner with Trump" announcement;

Whereas the financial entanglements of President Trump with the $TRUMP coin, as well as the attempted use of the White House to host competitions to prop up the value of $TRUMP, represent an unprecedented, pay-to-play scheme to provide access to the Presidency to the highest bidder;

Whereas the purchase by a foreign government of $TRUMP would violate the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States, which provides that no present, emolument, office, or title, of any kind, may be accepted by the President of the United States from a king, prince, or foreign state without the consent of Congress;

Whereas the Founders included the Foreign Emoluments Clause in the Constitution of the United States, by unanimous agreement of the State delegations, to ensure the President would remain loyal to the Nation and the public interest;

Whereas the Foreign Emoluments Clause of the Constitution of the United States has long been understood to be "directed against every kind of influence by foreign governments upon officers of the United States, in the absence of consent by Congress";

Whereas the President of the United States has a constitutional and statutory obligation to uphold the public trust; and

Whereas the violation of the Foreign Emoluments Clause of the Constitution of the United States undermines public trust and the integrity of public office in the United States: Now, therefore, be it

Resolved, That the Senate—

(1) condemns the financial entanglements of President Donald J. Trump with the $TRUMP meme coin for—

(A) permitting and facilitating covert payments to the President and the Trump family, including potential investments from foreign governments and foreign nationals under Federal prosecution; and

(B) auctioning access to the Presidency in return for the purchase of the cryptocurrency of President Trump;

(2) affirms that any purchase of $TRUMP by a foreign government is a violation of the Foreign Emoluments Clause of the Constitution of the United States because President Donald J. Trump did not seek the consent of Congress before accepting such payments; and

(3) demands the transfer of any proceeds from any foreign government purchase of $TRUMP nevertheless received by President Donald J. Trump in violation of the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States to the United States Government.

AMENDMENTS SUBMITTED AND PROPOSED

SA 2236. Mr. TUBERVILLE submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table.

SA 2237. Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2238. Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2239. Mr. HAWLEY (for himself and Mr. SANDERS) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2240. Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2241. Mr. HAGERTY (for himself, Mrs. GILLIBRAND, Mr. SCOTT of South Carolina, and Ms. LUMMIS) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2242. Mr. WHITEHOUSE submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2243. Mr. DURBIN submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2244. Mr. DURBIN (for himself and Mr. WARNOCK) submitted an amendment intended to be proposed to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2245. Mr. DURBIN submitted an amendment intended to be proposed to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2246. Mr. DURBIN (for himself, Mr. BLUMENTHAL, Mr. REED, and Ms. WARREN) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2247. Mr. LEE submitted an amendment intended to be proposed to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2248. Mr. TUBERVILLE submitted an amendment intended to be proposed to amendment SA 2228 proposed by Mr. THUNE (for Mr. RICKETTS (for himself and Ms. LUMMIS)) to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2249. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2250. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2251. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2252. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2253. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2254. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2255. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2256. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2257. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2258. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2259. Mr. MURPHY submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2260. Mr. SCHIFF submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2261. Mr. SCHIFF submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2262. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2263. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2264. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2265. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

## TEXT OF AMENDMENTS

**SA 2236.** Mr. TUBERVILLE submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 18(a), add at the end the following:

(5) The foreign payment stablecoin issuer is not owned, in whole or in part, by—

(A) the People's Republic of China, including the Hong Kong Special Administrative Region and the Macao Special Administrative Region;

(B) the Republic of Cuba;

(C) the Islamic Republic of Iran;

(D) the Democratic People's Republic of Korea;

(E) the Russian Federation; or

(F) the Bolivarian Republic of Venezuela under the regime of Nicolás Maduro Moros.

**SA 2237.** Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the end, add the following:

## TITLE II—STOP CSAM ACT

### SEC. 201. SHORT TITLE.

This title may be cited as the "Strengthening Transparency and Obligations to Protect Children Suffering from Abuse and Mistreatment Act of 2025" or the "STOP CSAM Act of 2025".

### SEC. 202. PROTECTING CHILD VICTIMS AND WITNESSES IN FEDERAL COURT.

(a) IN GENERAL.—Section 3509 of title 18, United States Code, is amended—

(1) in subsection (a)—

(A) in paragraph (2)(A), by striking "or exploitation" and inserting "exploitation, or kidnapping, including international parental kidnapping";

(B) in paragraph (3), by striking "physical or mental injury" and inserting "physical injury, psychological abuse";

(C) by striking paragraphs (5), (6), and (7) and inserting the following:

"(5) the term 'psychological abuse' includes—

"(A) a pattern of acts, threats of acts, or coercive tactics intended to degrade, humiliate, intimidate, or terrorize a child; and

"(B) the infliction of trauma on a child through—

"(i) isolation;

"(ii) the withholding of food or other necessities in order to control behavior;

"(iii) physical restraint; or

"(iv) the confinement of the child without the child's consent and in degrading conditions;

"(6) the term 'exploitation' means—

"(A) child pornography;

"(B) child sex trafficking; or

"(C) an obscene visual depiction of a child;

"(7) the term 'multidisciplinary child abuse team' means a professional unit of individuals working together to investigate child abuse and provide assistance and support to a victim of child abuse, composed of representatives from—

"(A) health, social service, and legal service agencies that represent the child;

"(B) law enforcement agencies and prosecutorial offices; and

"(C) children's advocacy centers;";

(D) in paragraph (9)(D)—

(i) by striking "genitals" and inserting "anus, genitals,"; and

(ii) by striking "or animal";

(E) in paragraph (11), by striking "and" at the end;

(F) in paragraph (12)—

(i) by striking "the term 'child abuse' does not" and inserting "the terms 'physical injury' and 'psychological abuse' do not"; and

(ii) by striking the period and inserting a semicolon; and

(G) by adding at the end the following:

"(13) the term 'covered person' means a person of any age who—

"(A) is or is alleged to be—

"(i) a victim of a crime of physical abuse, sexual abuse, exploitation, or kidnapping, including international parental kidnapping; or

"(ii) a witness to a crime committed against another person; and

"(B) was under the age of 18 when the crime described in subparagraph (A) was committed;

"(14) the term 'protected information', with respect to a covered person, includes—

"(A) personally identifiable information of the covered person, including—

"(i) the name of the covered person;

"(ii) an address;

"(iii) a phone number;

"(iv) a user name or identifying information for an online, social media, or email account; and

"(v) any information that can be used to distinguish or trace the identity of the covered person, either alone or when combined with other information that is linked or linkable to the covered person;

"(B) medical, dental, behavioral, psychiatric, or psychological information of the covered person;

"(C) educational or juvenile justice records of the covered person; and

"(D) any other information concerning the covered person that is deemed 'protected information' by order of the court under subsection (d)(5);

"(15) the term 'child pornography' has the meaning given the term in section 2256(8); and

"(16) the term 'obscene visual depiction of a child' means any visual depiction prohibited by section 1466A involving an identifiable minor, as that term is defined in section 2256(9).";

(2) in subsection (b)—

(A) in paragraph (1)(C), by striking "minor" and inserting "child"; and

(B) in paragraph (2)—

(i) in the heading, by striking "VIDEOTAPED" and inserting "RECORDED";

(ii) in subparagraph (A), by striking "that the deposition be recorded and preserved on videotape" and inserting "that a video recording of the deposition be made and preserved";

(iii) in subparagraph (B)—

(I) in clause (ii), by striking "that the child's deposition be taken and preserved by videotape" and inserting "that a video recording of the child's deposition be made and preserved";

(II) in clause (iii)—

(aa) in the matter preceding subclause (I), by striking "videotape" and inserting "recorded"; and

(bb) in subclause (IV), by striking "videotape" and inserting "recording"; and

(III) in clause (v)—

(aa) in the heading, by striking "VIDEOTAPE" and inserting "VIDEO RECORDING";

CONGRESSIONAL RECORD — SENATE

(bb) in the first sentence, by striking "made and preserved on video tape" and inserting "recorded and preserved"; and

(cc) in the second sentence, by striking "videotape" and inserting "video recording";

(iv) in subparagraph (C), by striking "child's videotaped" and inserting "video recording of the child's";

(v) in subparagraph (D)—

(I) by striking "videotaping" and inserting "deposition"; and

(II) by striking "videotaped" and inserting "recorded";

(vi) in subparagraph (E), by striking "videotaped" and inserting "recorded"; and

(vii) in subparagraph (F), by striking "videotape" each place the term appears and inserting "video recording";

(3) in subsection (d)—

(A) in paragraph (1)(A)—

(i) in clause (i), by striking "the name of or any other information concerning a child" and inserting "a covered person's protected information"; and

(ii) in clause (ii)—

(I) by striking "documents described in clause (i) or the information in them that concerns a child" and inserting "a covered person's protected information"; and

(II) by striking ", have reason to know such information" and inserting "(including witnesses or potential witnesses), have reason to know each item of protected information to be disclosed";

(B) in paragraph (2)—

(i) by striking "the name of or any other information concerning a child" each place the term appears and inserting "a covered person's protected information";

(ii) by redesignating subparagraphs (A) and (B) as clauses (i) and (ii), respectively, and adjusting the margins accordingly;

(iii) by striking "All papers" and inserting the following:

"(A) IN GENERAL.—All papers"; and

(iv) by adding at the end the following:

"(B) ENFORCEMENT OF VIOLATIONS.—The court may address a violation of subparagraph (A) in the same manner as disobedience or resistance to a lawful court order under section 401(3)."; 

(C) in paragraph (3)—

(i) in subparagraph (A)—

(I) by striking "a child from public disclosure of the name of or any other information concerning the child" and inserting "a covered person's protected information from public disclosure"; and

(II) by striking ", if the court determines that there is a significant possibility that such disclosure would be detrimental to the child";

(ii) in subparagraph (B)—

(I) in clause (i)—

(aa) by striking "a child witness, and the testimony of any other witness" and inserting "any witness"; and

(bb) by striking "the name of or any other information concerning a child" and inserting "a covered person's protected information"; and

(II) in clause (ii), by striking "child" and inserting "covered person"; and

(iii) by adding at the end the following:

"(C)(i) For purposes of this paragraph, there shall be a presumption that public disclosure of a covered person's protected information would be detrimental to the covered person.

"(ii) The court shall deny a motion for a protective order under subparagraph (A) only if the court finds that the party opposing the motion has rebutted the presumption under clause (i) of this subparagraph.";

(D) in paragraph (4)—

(i) by striking "This subsection" and inserting the following:

"(A) DISCLOSURE TO CERTAIN PARTIES.—This subsection";

(ii) in subparagraph (A), as so designated—

(I) by striking "the name of or other information concerning a child" and inserting "a covered person's protected information"; and

(II) by striking "or an adult attendant, or to" and inserting "an adult attendant, a law enforcement agency for any intelligence or investigative purpose, or"; and

(iii) by adding at the end the following:

"(B) REQUEST FOR PUBLIC DISCLOSURE.—If any party requests public disclosure of a covered person's protected information to further a public interest, the court shall deny the request unless the court finds that—

"(i) the party seeking disclosure has established that there is a compelling public interest in publicly disclosing the covered person's protected information;

"(ii) there is a substantial probability that the public interest would be harmed if the covered person's protected information is not disclosed;

"(iii) the substantial probability of harm to the public interest outweighs the harm to the covered person from public disclosure of the covered person's protected information; and

"(iv) there is no alternative to public disclosure of the covered person's protected information that would adequately protect the public interest."; and

(E) by adding at the end the following:

"(5) OTHER PROTECTED INFORMATION.—The court may order that information shall be considered to be 'protected information' for purposes of this subsection if the court finds that the information is sufficiently personal, sensitive, or identifying that it should be subject to the protections and presumptions under this subsection.";

(4) by striking subsection (f) and inserting the following:

"(f) VICTIM IMPACT STATEMENT.—

"(1) PROBATION OFFICER.—In preparing the presentence report pursuant to rule 32(c) of the Federal Rules of Criminal Procedure, the probation officer shall request information from the multidisciplinary child abuse team, if applicable, or other appropriate sources to determine the impact of the offense on a child victim and any other children who may have been affected by the offense.

"(2) GUARDIAN AD LITEM.—A guardian ad litem appointed under subsection (h) shall—

"(A) make every effort to obtain and report information that accurately expresses the views of a child victim, and the views of family members as appropriate, concerning the impact of the offense; and

"(B) use forms that permit a child victim to express the child's views concerning the personal consequences of the offense, at a level and in a form of communication commensurate with the child's age and ability.";

(5) in subsection (h), by adding at the end the following:

"(4) AUTHORIZATION OF APPROPRIATIONS.—

"(A) IN GENERAL.—There is authorized to be appropriated to the United States courts to carry out this subsection $25,000,000 for each fiscal year.

"(B) SUPERVISION OF PAYMENTS.—Payments from appropriations authorized under subparagraph (A) shall be made under the supervision of the Director of the Administrative Office of the United States Courts.";

(6) in subsection (i)—

(A) by striking "A child testifying at or attending a judicial proceeding" and inserting the following:

"(1) IN GENERAL.—A child testifying at a judicial proceeding, including in a manner described in subsection (b),";

(B) in paragraph (1), as so designated—

(i) in the third sentence, by striking "proceeding" and inserting "testimony"; and

(ii) by striking the fifth sentence; and

(C) by adding at the end the following:

"(2) RECORDING.—If the adult attendant is in close physical proximity to or in contact with the child while the child testifies—

"(A) at a judicial proceeding, a video recording of the adult attendant shall be made and shall become part of the court record; or

"(B) in a manner described in subsection (b), the adult attendant shall be visible on the closed-circuit television or in the recorded deposition.

"(3) COVERED PERSONS ATTENDING PROCEEDING.—A covered person shall have the right to be accompanied by an adult attendant when attending any judicial proceeding.";

(7) in subsection (j)—

(A) by striking "child" each place the term appears and inserting "covered person"; and

(B) in the fourth sentence—

(i) by striking "and the potential" and inserting ", the potential";

(ii) by striking "child's" and inserting "covered person's"; and

(iii) by inserting before the period at the end the following: ", and the necessity of the continuance to protect the defendant's rights";

(8) in subsection (k), by striking "child" each place the term appears and inserting "covered person";

(9) in subsection (l), by striking "child" each place the term appears and inserting "covered person"; and

(10) in subsection (m)—

(A) by striking "(as defined by section 2256 of this title)" each place it appears;

(B) by inserting "or an obscene visual depiction of a child" after "child pornography" each place it appears except the second instance in paragraph (3);

(C) in paragraph (1), by inserting "and any civil action brought under section 2255 or 2255A" after "any criminal proceeding";

(D) in paragraph (2), by adding at the end the following:

"(C)(i) Notwithstanding rule 26 of the Federal Rules of Civil Procedure, a court shall deny, in any civil action brought under section 2255 or 2255A, any request by any party to copy, photograph, duplicate, or otherwise reproduce any property or material that constitutes child pornography or an obscene visual depiction of a child.

"(ii) In a civil action brought under section 2255 or 2255A, for purposes of paragraph (1), the court may—

"(I) order the plaintiff or defendant to provide to the court or the Government, as applicable, any equipment necessary to maintain care, custody, and control of such property or material; and

"(II) take reasonable measures, and may order the Government (if such property or material is in the care, custody, and control of the Government) to take reasonable measures, to provide each party to the action, the attorney of each party, and any individual a party may seek to qualify as an expert, with ample opportunity to inspect, view, and examine such property or material at the court or a Government facility, as applicable."; and

(E) in paragraph (3)—

(i) by inserting "and during the 1-year period following the date on which the criminal proceeding becomes final or is terminated" after "any criminal proceeding";

(ii) by striking ", as defined under section 2256(8),"; and

(iii) by inserting "or obscene visual depiction of a child" after "such child pornography".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to conduct that occurs before, on, or after the date of enactment of this Act.

eason

''(B) provide a reliable means for the victim to access or benefit from the restitution payments.

''(4) PAYMENT OF FEES.—

''(A) IN GENERAL.—The court may, with respect to the fees of the trustee or other fiduciary—

''(i) pay the fees in whole or in part; or

''(ii) order the defendant to pay the fees in whole or in part.

''(B) APPLICABILITY OF OTHER PROVISIONS.—With respect to a court order under subparagraph (A)(ii) requiring a defendant to pay fees—

''(i) subsection (f)(3) shall apply to the court order in the same manner as that subsection applies to a restitution order;

''(ii) subchapter C of chapter 227 (other than section 3571) shall apply to the court order in the same manner as that subchapter applies to a sentence of a fine; and

''(iii) subchapter B of chapter 229 shall apply to the court order in the same manner as that subchapter applies to the implementation of a sentence of a fine.

''(C) EFFECT ON OTHER PENALTIES.—Imposition of payment under subparagraph (A)(ii) shall not relieve a defendant of, or entitle a defendant to a reduction in the amount of, any special assessment, restitution, other fines, penalties, or costs, or other payments required under the defendant's sentence.

''(D) SCHEDULE.—Notwithstanding any other provision of law, if the court orders the defendant to make any payment under subparagraph (A)(ii), the court may provide a payment schedule that is concurrent with the payment of any other financial obligation described in subparagraph (C).

''(5) AUTHORIZATION OF APPROPRIATIONS.—

''(A) IN GENERAL.—There is authorized to be appropriated to the United States courts to carry out this subsection $15,000,000 for each fiscal year.

''(B) SUPERVISION OF PAYMENTS.—Payments from appropriations authorized under subparagraph (A) shall be made under the supervision of the Director of the Administrative Office of the United States Courts.''.

SEC. 204. CYBERTIPLINE IMPROVEMENTS, AND ACCOUNTABILITY AND TRANSPARENCY BY THE TECH INDUSTRY.

(a) IN GENERAL.—Chapter 110 of title 18, United States Code, is amended—

(1) in section 2258A—

(A) by striking subsections (a), (b), and (c) and inserting the following:

''(a) DUTY TO REPORT.—

''(1) DUTY.—In order to reduce the proliferation of online child sexual exploitation and to prevent the online sexual exploitation of children, as soon as reasonably possible after obtaining actual knowledge of any facts or circumstances described in paragraph (2) or any apparent child pornography on the provider's service, and in any event not later than 60 days after obtaining such knowledge, a provider shall submit to the CyberTipline of NCMEC, or any successor to the CyberTipline operated by NCMEC, a report that—

''(A) shall contain—

''(i) the mailing address, telephone number, facsimile number, electronic mailing address of, and individual point of contact for, such provider; and

''(ii) information or material described in subsection (b)(1)(A) concerning such facts or circumstances or apparent child pornography; and

''(B) may contain information described in subsection (b)(2), including any available information to identify or locate any involved minor.

''(2) FACTS OR CIRCUMSTANCES.—The facts or circumstances described in this paragraph are any facts or circumstances indicating an apparent, planned, or imminent violation of

section 1591 (if the violation involves a minor), 2251, 2251A, 2252, 2252A, 2252B, 2260, or 2422(b).

''(3) COMPLAINANT INFORMATION.—For a report premised on a complaint or notification submitted to a provider by a user of the provider's product or service, or a parent, guardian, or representative of such user, the provider shall take reasonable measures to determine what information or material in the user's account shall be included in the report as provided in subsection (b)(1)(A)(vi).

''(b) CONTENTS OF REPORT.—

''(1) IN GENERAL.—In an effort to prevent the future sexual victimization of children, and to the extent the information is within the custody or control of a provider, each report provided under subsection (a)(1)—

''(A) shall include, to the extent that it is applicable and reasonably available—

''(i) the name, address, electronic mail address, user or account identification, Internet Protocol address, port number, and uniform resource locator of any individual who is a subject of the report;

''(ii) the terms of service in effect at the time of—

''(I) the apparent violation; or

''(II) the detection of apparent child pornography or a planned or imminent violation;

''(iii) a copy of any apparent child pornography that is the subject of the report, or all accessible chats, messages, or text exchanges that are related to the report, that were identified in a publicly available location;

''(iv) for each item of apparent child pornography included in the report under clause (iii) or paragraph (2)(E), information indicating whether—

''(I) the apparent child pornography was publicly available; or

''(II) the provider, in its sole discretion, viewed the apparent child pornography, or any copy thereof, at any point concurrent with or prior to the submission of the report;

''(v) for each item of apparent child pornography that is the subject of the report, an indication as to whether the apparent child pornography—

''(I) is created in whole or in part through the use of software, machine learning, artificial intelligence, or any other computer-generated or technological means, including by adapting, modifying, manipulating, or altering an authentic visual depiction;

''(II) has previously been the subject of a report under subsection (a)(1); or

''(III) is the subject of multiple contemporaneous reports due to rapid and widespread distribution; and

''(vi) any and all information or material (including apparent child pornography, chats, messages, or text exchanges) relating to the subject of the report in the account of a user of the provider's product or service, if the user, or the parent, guardian, or representative of such user—

''(I) provided the information or material in a notification or complaint to the provider;

''(II) indicates that such information or material should be included in the report; or

''(III) consents to the inclusion of such information or material in the report; and

''(B) may, at the sole discretion of the provider, include the information described in paragraph (2) of this subsection.

''(2) OTHER INFORMATION.—The information referred to in paragraph (1)(B) is the following:

''(A) INFORMATION ABOUT ANY INVOLVED INDIVIDUAL.—Any information relating to the identity or location of any individual who is a subject of the report, including payment or financial information (excluding personally identifiable information) and self-reported identifying or locating information.

''(B) INFORMATION ABOUT ANY INVOLVED MINOR.—Information relating to the identity or location of any involved minor, which may include an address, electronic mail address, Internet Protocol address, port number, uniform resource locator, payment or financial information (excluding personally identifiable information), or any other information that may identify or locate any involved minor, including self-reported identifying or locating information.

''(C) HISTORICAL REFERENCE.—Information relating to when and how a customer or subscriber of a provider uploaded, transmitted, or received content relating to the report or when and how content relating to the report was reported to, or discovered by the provider, including a date and time stamp and time zone.

''(D) GEOGRAPHIC LOCATION INFORMATION.—Information relating to the geographic location of the involved individual or website, which may include the Internet Protocol address, port number, or verified address, or, if not reasonably available, at least one form of geographic identifying information, including area code or zip code, provided by the customer or subscriber, or stored or obtained by the provider.

''(E) APPARENT CHILD PORNOGRAPHY.—Any apparent child pornography not described in paragraph (1)(A)(iii), or other content related to the subject of the report.

''(F) COMPLETE COMMUNICATION.—The complete communication containing any apparent child pornography or other content, including—

''(i) any data or information regarding the transmission of the communication; and

''(ii) any visual depictions, data, or other digital files contained in, or attached to, the communication.

''(G) TECHNICAL IDENTIFIER.—An industry-standard hash value or other similar industry-standard technical identifier for any reported visual depiction as it existed on the provider's service.

''(H) DESCRIPTION.—For any item of apparent child pornography that is the subject of the report, an indication of whether—

''(i) the depicted sexually explicit conduct involves—

''(I) genital, oral, or anal sexual intercourse;

''(II) bestiality;

''(III) masturbation;

''(IV) sadistic or masochistic abuse; or

''(V) lascivious exhibition of the anus, genitals, or pubic area of any person; and

''(ii) the depicted minor is—

''(I) an infant or toddler;

''(II) prepubescent;

''(III) pubescent;

''(IV) post-pubescent; or

''(V) of an indeterminate age or developmental stage.

''(I) CHATS, MESSAGES, OR TEXT EXCHANGES.—Chats, messages, or text exchanges that fully provide the context for the report.

''(3) FORMATTING OF REPORTS.—When a provider includes any information described in paragraph (1) or, at its sole discretion, any information described in paragraph (2) in a report to the CyberTipline of NCMEC, or any successor to the CyberTipline operated by NCMEC, the provider shall use best efforts to ensure that the report conforms with the structure of the CyberTipline or the successor, as applicable.

''(c) FORWARDING OF REPORT AND OTHER INFORMATION TO LAW ENFORCEMENT.—

''(1) IN GENERAL.—Pursuant to its clearinghouse role as a private, nonprofit organization, and at the conclusion of its review in furtherance of its nonprofit mission, NCMEC shall make available each report submitted

(119 of 196), Page 119 of 196    Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 119 of 196
Case 4:25-cv-04966    Document 1-3    Filed 06/12/25    Page 56 of 82

May 21, 2025                          CONGRESSIONAL RECORD — SENATE                                S3071

under subsection (a)(1) to one or more of the following law enforcement agencies:

"(A) Any Federal law enforcement agency that is involved in the investigation of child sexual exploitation, kidnapping, or enticement crimes.

"(B) Any State or local law enforcement agency that is involved in the investigation of child sexual exploitation.

"(C) A foreign law enforcement agency designated by the Attorney General under subsection (d)(3) or a foreign law enforcement agency that has an established relationship with the Federal Bureau of Investigation, Immigration and Customs Enforcement, or INTERPOL, and is involved in the investigation of child sexual exploitation, kidnapping, or enticement crimes.

"(2) TECHNICAL IDENTIFIERS.—If a report submitted under subsection (a)(1) contains an industry-standard hash value or other similar industry-standard technical identifier—

"(A) NCMEC may compare that hash value or identifier with any database or repository of visual depictions owned or operated by NCMEC; and

"(B) if the comparison under subparagraph (A) results in a match, NCMEC may include the matching visual depiction from its database or repository when forwarding the report to an agency described in subparagraph (A) or (B) of paragraph (1).";

(B) in subsection (d)—

(i) in paragraph (2), by striking "subsection (c)(1)" and inserting "subsection (c)(1)(A)";

(ii) in paragraph (3)—

(I) in subparagraph (A), by striking "subsection (c)(3)" and inserting "subsection (c)(1)(C)"; and

(II) in subparagraph (C), by striking "subsection (c)(3)" and inserting "subsection (c)(1)(C)"; and

(iii) in paragraph (5)(B)—

(I) in clause (i), by striking "forwarded" and inserting "made available"; and

(II) in clause (ii), by striking "forwarded" and inserting "made available";

(C) by striking subsection (e) and inserting the following:

"(e) FAILURE TO COMPLY WITH REQUIREMENTS.—

"(1) CRIMINAL PENALTY.—

"(A) OFFENSE.—It shall be unlawful for a provider to knowingly—

"(i) fail to submit a report under subsection (a)(1) within the time period required by that subsection; or

"(ii) fail to preserve material as required under subsection (h).

"(B) PENALTY.—

"(i) IN GENERAL.—A provider that violates subparagraph (A) shall be fined—

"(I) in the case of an initial violation, not more than—

"(aa) $850,000 if the provider has not fewer than 100,000,000 monthly active users; or

"(bb) $600,000 if the provider has fewer than 100,000,000 monthly active users; and

"(II) in the case of any second or subsequent violation, not more than—

"(aa) $1,000,000 if the provider has not fewer than 100,000,000 monthly active users; or

"(bb) $850,000 if the provider has fewer than 100,000,000 monthly active users.

"(ii) HARM TO INDIVIDUALS.—The maximum fine under clause (i) shall be doubled if an individual is harmed as a direct and proximate result of the applicable violation.

"(2) CIVIL PENALTY.—

"(A) VIOLATIONS RELATING TO CYBERTIPLINE REPORTS AND MATERIAL PRESERVATION.—A provider shall be liable to the United States Government for a civil penalty in an amount of not less than $50,000 and not more than $250,000 if the provider knowingly—

"(i) fails to submit a report under subsection (a)(1) within the time period required by that subsection;

"(ii) fails to preserve material as required under subsection (h); or

"(iii) submits a report under subsection (a)(1) that—

"(I) contains materially false or fraudulent information; or

"(II) omits information described in subsection (b)(1)(A) that is reasonably available.

"(B) ANNUAL REPORT VIOLATIONS.—A provider shall be liable to the United States Government for a civil penalty in an amount of not less than $100,000 and not more than $1,000,000 if the provider knowingly—

"(i) fails to submit an annual report as required under subsection (i); or

"(ii) submits an annual report under subsection (i) that—

"(I) contains a materially false, fraudulent, or misleading statement; or

"(II) omits information described in subsection (i)(1) that is reasonably available.

"(C) HARM TO INDIVIDUALS.—The amount of a civil penalty under subparagraph (A) or (B) shall be tripled if an individual is harmed as a direct and proximate result of the applicable violation.

"(D) COSTS OF CIVIL ACTIONS.—A provider that commits a violation described in subparagraph (A) or (B) shall be liable to the United States Government for the costs of a civil action brought to recover a civil penalty under that subparagraph.

"(E) ENFORCEMENT.—This paragraph shall be enforced in accordance with sections 3731, 3732, and 3733 of title 31, except that a civil action to recover a civil penalty under subparagraph (A) or (B) of this paragraph may only be brought by the United States Government.

"(3) DEPOSIT OF FINES AND PENALTIES.— Notwithstanding any other provision of law, any criminal fine or civil penalty collected under this subsection shall be deposited into the Child Pornography Victims Reserve as provided in section 2259B.";

(D) in subsection (f), by striking paragraph (3) and inserting the following:

"(3) affirmatively search, screen, or scan for—

"(A) facts or circumstances described in subsection (a)(2);

"(B) information described in subsection (b)(2); or

"(C) any apparent child pornography.";

(E) in subsection (g)—

(i) in paragraph (2)(A)—

(I) in clause (iii), by inserting "or personnel at a children's advocacy center" after "State)"; and

(II) in clause (iv), by striking "State or subdivision of a State" and inserting "State, subdivision of a State, or children's advocacy center"; and

(ii) in paragraph (3), in the matter preceding subparagraph (A), by striking "subsection (a)" and inserting "subsection (a)(1)";

(F) in subsection (h), by striking paragraph (5) and inserting the following:

"(5) RELATION TO REPORTING REQUIREMENT.—Submission of a report as described in subsection (a)(1) does not satisfy the obligations under this subsection."; and

(G) by adding at the end the following:

"(i) ANNUAL REPORT.—

"(1) IN GENERAL.—Not later than March 31 of the second year beginning after the date of enactment of the STOP CSAM Act of 2025, and of each year thereafter, a provider that had more than 1,000,000 unique monthly visitors or users during each month of the preceding year and accrued revenue of more than $50,000,000 during the preceding year shall submit to the Attorney General and the Chair of the Federal Trade Commission a re-

port, disaggregated by subsidiary, that provides the following information for the preceding year to the extent such information is applicable and reasonably available:

"(A) CYBERTIPLINE DATA.—

"(i) The total number of reports that the provider submitted under subsection (a)(1).

"(ii) Which items of information described in subsection (b)(2) are routinely included in the reports submitted by the provider under subsection (a)(1).

"(B) OTHER REPORTING TO THE PROVIDER.—

"(i) The measures the provider has in place to receive other reports concerning child sexual exploitation and abuse using the provider's product or on the provider's service.

"(ii) The average time for responding to reports described in clause (i).

"(iii) The number of reports described in clause (i) that the provider received.

"(iv) A summary description of the actions taken upon receipt of the reports described in clause (i).

"(C) POLICIES.—

"(i) A description of the policies of the provider with respect to the commission of child sexual exploitation and abuse using the provider's product or on the provider's service, including how child sexual exploitation and abuse is defined.

"(ii) A description of possible user consequences for violations of the policies described in clause (i).

"(iii) The methods of informing users of the policies described in clause (i).

"(iv) The process for adjudicating potential violations of the policies described in clause (i).

"(D) CULTURE OF SAFETY.—

"(i) The measures, tools, and technologies that the provider deploys to—

"(I) protect children from sexual exploitation and abuse using the provider's product or service;

"(II) prevent or interdict activity by children related to sexual exploitation and abuse, including the posting or sharing of intimate visual depictions; and

"(III) accurately identify adult and minor users.

"(ii) The measures, tools, and technologies that the provider deploys to empower parents and guardians to protect their children from sexual exploitation and abuse using the provider's product or service.

"(iii) The measures, tools, and technologies that the provider deploys to prevent the use of the provider's product or service by individuals seeking to commit child sexual exploitation and abuse.

"(iv) With respect to the measures, tools, and technologies described in clauses (i), (ii), and (iii)—

"(I) an assessment of their efficacy, including any relevant quantitative information indicating when and how often they are used; and

"(II) information on any factors that limit their efficacy or create gaps in their protection and efforts by the provider to address those loopholes or gaps.

"(v) A description of factors that interfere with the provider's ability to detect or evaluate instances of child sexual exploitation and abuse and an analysis of the impact of those factors.

"(vi) Information shared by the provider with users about the risks to children on the provider's product or service concerning sexual exploitation and abuse and an assessment of the impact of the information on users, including any relevant quantitative information indicating how often the information is reviewed.

"(E) SAFETY BY DESIGN.—The measures that the provider takes before launching a new product or service—

"(i) to assess—

(120 of 196), Page 120 of 196 Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 120 of 196
Case 4.25-cv-04966 Document 1-3 Filed 06/12/25 Page 57 of 82
S3072 CONGRESSIONAL RECORD—SENATE May 21, 2025

''(I) the safety risks for children with respect to sexual exploitation and abuse; and

''(II) whether and how individuals could use the new product or service to commit child sexual exploitation and abuse; and

''(ii) to determine—

''(I) the appropriate age for users of the new product or service; and

''(II) whether the new product or service will be adopted to commit child sexual exploitation and abuse.

''(F) PREVALENCE, TRENDS, AND PATTERNS.—Any information concerning—

''(i) the prevalence of child sexual exploitation and abuse on the provider's product or service, including the volume of child pornography that is available and that is being accessed, distributed, or received; and

''(ii) emerging trends, risks, and changing patterns with respect to the commission of online child sexual exploitation and abuse.

''(G) OTHER INFORMATION.—Any other information relevant to child sexual exploitation and abuse on the provider's product or service.

''(2) AVOIDING DUPLICATION.—Notwithstanding the requirement under the matter preceding paragraph (1) that information be submitted annually, in the case of any report submitted under that paragraph after the initial report, a provider shall submit information described in subparagraphs (C) through (F) of that paragraph not less frequently than once every 3 years or when new information is available, whichever is more frequent.

''(3) LIMITATION.—Nothing in paragraph (1) shall require the disclosure of trade secrets or other proprietary information.

''(4) PUBLICATION.—

''(A) IN GENERAL.—Subject to subparagraph (B), the Attorney General and the Chair of the Federal Trade Commission shall publish the reports received under this subsection.

''(B) REDACTION.—

''(i) IN GENERAL.—Whether or not such redaction is requested by the provider, the Attorney General and Chair of the Federal Trade Commission shall redact from a report published under subparagraph (A) any information as necessary to avoid—

''(I) undermining the efficacy of a safety measure described in the report; or

''(II) revealing how a product or service of a provider may be used to commit online child sexual exploitation and abuse.

''(ii) ADDITIONAL REDACTION.—

''(I) REQUEST.—In addition to information redacted under clause (i), a provider may request the redaction, from a report published under subparagraph (A), of any information that is law enforcement sensitive or otherwise not suitable for public distribution.

''(II) AGENCY DISCRETION.—The Attorney General and Chair of the Federal Trade Commission—

''(aa) shall consider a request made under subclause (I); and

''(bb) may, in their discretion, redact from a report published under subparagraph (A) any information pursuant to the request.'';

(2) in section 2258B—

(A) by striking subsection (a) and inserting the following:

''(a) IN GENERAL.—

''(1) LIMITED LIABILITY.—Except as provided in subsection (b), a civil claim or criminal charge described in paragraph (2) may not be brought in any Federal or State court.

''(2) COVERED CLAIMS AND CHARGES.—A civil claim or criminal charge referred to in paragraph (1) is a civil claim or criminal charge against a provider or domain name registrar, including any director, officer, employee, or agent of such provider or domain name registrar, that is directly attributable to—

''(A) the performance of the reporting or preservation responsibilities of such provider or domain name registrar under this section, section 2258A, or section 2258C;

''(B) transmitting, distributing, or mailing child pornography to any Federal, State, or local law enforcement agency, or giving such agency access to child pornography, in response to a search warrant, court order, or other legal process issued or obtained by such agency; or

''(C) the use by the provider or domain name registrar of any material being preserved under section 2258A(h) by such provider or registrar for research and the development and training of tools, undertaken voluntarily and in good faith for the sole and exclusive purpose of—

''(i) improving or facilitating reporting under this section, section 2258A, or section 2258C; or

''(ii) stopping the online sexual exploitation of children.''; and

(B) in subsection (b)—

(i) in paragraph (1), by striking ''; or'' and inserting ''or knowingly failed to comply with a requirement under section 2258A;'';

(ii) in paragraph (2)(C)—

(I) by striking ''sections'' and inserting ''this section or section''; and

(II) by striking the period and inserting ''; or''; and

(iii) by adding at the end the following:

''(3) for purposes of subsection (a)(2)(C), knowingly distributed or transmitted the material, or made the material available, except as required by law, to—

''(A) any other entity;

''(B) any person not employed by the provider or domain name registrar; or

''(C) any person employed by the provider or domain name registrar who is not conducting any research described in that subsection.'';

(3) in section 2258C—

(A) in the section heading, by striking ''the CyberTipline'' and inserting ''NCMEC'';

(B) in subsection (a)—

(i) in the subsection heading, by striking ''ELEMENTS'' and inserting ''INFORMATION SHARING WITH PROVIDERS AND ENTITIES FOR THE PURPOSES OF PREVENTING AND CURTAILING THE ONLINE SEXUAL EXPLOITATION OF CHILDREN'';

(ii) in paragraph (1)—

(I) by striking ''to a provider'' and inserting the following: ''or submission to the Child Victim Identification Program to—

''(A) a provider'';

(II) in subparagraph (A), as so designated—

(aa) by inserting ''use of the provider's products or services to commit'' after ''stop the''; and

(bb) by striking the period at the end and inserting ''; or''; and

(III) by adding at the end the following:

''(B) an entity for the sole and exclusive purpose of preventing and curtailing the online sexual exploitation of children.''; and

(iii) in paragraph (2)—

(I) in the heading, by striking ''INCLUSIONS'' and inserting ''ELEMENTS'';

(II) by striking ''unique identifiers'' and inserting ''similar technical identifiers'';

(III) by inserting ''or content, elements, or reported materials,'' after ''visual depiction,'';

(IV) by inserting a comma after ''location'';

(V) by striking ''and any other elements''; and

(VI) by inserting ''or submission to the Child Victim Identification Program'' after ''CyberTipline report''

(C) in subsection (b)—

(i) in the heading, by inserting ''OR ENTITIES'' after ''PROVIDERS'';

(ii) by striking ''Any provider'' and inserting the following:

''(1) IN GENERAL.—Any provider or entity'';

(iii) in paragraph (1), as so designated—

(I) by striking ''receives'' and inserting ''obtains''; and

(II) by inserting ''or submission to the Child Victim Identification Program'' after ''CyberTipline report''; and

(iv) by adding at the end the following:

''(2) LIMITATION ON SHARING WITH OTHER ENTITIES.—A provider or entity that obtains elements under subsection (a)(1) may not distribute those elements, or make those elements available, to any other entity, except for the sole and exclusive purpose of curtailing, preventing, or stopping the online sexual exploitation of children.'';

(D) in subsection (c)—

(i) by striking ''subsections'' and inserting ''subsection'';

(ii) by striking ''providers receiving'' and inserting ''a provider or entity to obtain'';

(iii) by inserting ''or submission to the Child Victim Identification Program'' after ''CyberTipline report''; and

(iv) by striking ''to use the elements to stop the online sexual exploitation of children''; and

(E) in subsection (d), by inserting ''or to the Child Victim Identification Program'' after ''CyberTipline'';

(4) in section 2258E—

(A) in paragraph (6), by striking ''electronic communication service provider'' and inserting ''electronic communication service'';

(B) in paragraph (7), by striking ''and'' at the end;

(C) in paragraph (8), by striking the period at the end and inserting a semicolon; and

(D) by adding at the end the following:

''(9) the term 'publicly available', with respect to a visual depiction on a provider's service, means the visual depiction can be viewed by or is accessible to all users of the service, regardless of the steps, if any, a user must take to create an account or to gain access to the service in order to access or view the visual depiction; and

''(10) the term 'Child Victim Identification Program' means the program described in section 404(b)(1)(K)(ii) of the Juvenile Justice and Delinquency Prevention Act of 1974 (34 U.S.C. 11293(b)(1)(K)(ii)).'';

(5) in section 2259B(a), by inserting '', any fine or penalty collected under section 2258A(e),'' after ''2259A''; and

(6) by adding at the end the following:

''§ 2260B. Liability for certain child sexual exploitation offenses

''(a) OFFENSE.—It shall be unlawful for a provider of an interactive computer service, as that term is defined in section 230 of the Communications Act of 1934 (47 U.S.C. 230), that operates through the use of any facility or means of interstate or foreign commerce or in or affecting interstate or foreign commerce, through such service to—

''(1) intentionally host or store child pornography or make child pornography available to any person; or

''(2) knowingly promote or facilitate a violation of section 2251, 2251A, 2252, 2252A, or 2422(b).

''(b) PENALTY.—A provider of an interactive computer service that violates subsection (a)—

''(1) subject to paragraph (2), shall be fined not more than $1,000,000; and

''(2) if the offense involves a conscious or reckless risk of serious personal injury or an individual is harmed as a direct and proximate result of the violation, shall be fined not more than $5,000,000.

''(c) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to apply to

(121 of 196), Page 121 of 196  Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 121 of 196
Case 4:25-cv-04966   Document 1-3   Filed 06/12/25   Page 58 of 82
May 21, 2025                          CONGRESSIONAL RECORD — SENATE                                        S3073

any good faith action by a provider of an interactive computer service that is necessary to comply with a valid court order, subpoena, search warrant, statutory obligation, or preservation request from law enforcement.''.

(b) CLERICAL AMENDMENT.—The table of sections for chapter 110 of title 18, United States Code, is amended by adding at the end the following:

''2260B. Liability for certain child sexual exploitation offenses.''.

(c) EFFECTIVE DATE FOR AMENDMENTS TO REPORTING REQUIREMENTS OF PROVIDERS.—The amendments made by subsection (a)(1) of this section shall take effect on the date that is 120 days after the date of enactment of this Act.

SEC. 205. EXPANDING CIVIL REMEDIES FOR VICTIMS OF ONLINE CHILD SEXUAL EXPLOITATION.

(a) STATEMENT OF INTENT.—Nothing in this section shall be construed to abrogate or narrow any case law concerning section 2255 of title 18, United States Code.

(b) CIVIL REMEDY FOR PERSONAL INJURIES.—Section 2255(a) of title 18, United States Code, is amended—

(1) by striking ''IN GENERAL.—Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue'' and inserting the following: ''PRIVATE RIGHT OF ACTION.—

''(1) IN GENERAL.—Any person described in subparagraph (A), (B), or (C) of paragraph (2) who suffers personal injury as a result of a violation described in that subparagraph, regardless of whether the injury occurred while such person was a minor, may bring a civil action''; and

(2) by adding at the end the following:

''(2) ELIGIBLE PERSONS.—Paragraph (1) shall apply to any person—

''(A) who, while a minor, was a victim of—

''(i) a violation of section 1589, 1590, 1591, 2241, 2242, 2243, 2251, 2251A, 2260(a), 2421, 2422, or 2423;

''(ii) an attempt to violate section 1589, 1590, or 1591 under section 1594(a);

''(iii) a conspiracy to violate section 1589 or 1590 under section 1594(b); or

''(iv) a conspiracy to violate section 1591 under section 1594(c);

''(B) who—

''(i) is depicted as a minor in child pornography; and

''(ii) is a victim of a violation of 2252, 2252A, or 2260(b) (regardless of when the violation occurs); or

''(C) who—

''(i) is depicted as an identifiable minor in a visual depiction described in section 1466A; and

''(ii) is a victim of a violation of that section (regardless of when the violation occurs).''.

(c) CIVIL REMEDY AGAINST ONLINE PLATFORMS AND APP STORES.—

(1) IN GENERAL.—Chapter 110 of title 18, United States Code, is amended by inserting after section 2255 the following:

''§ 2255A. Additional remedy for certain victims of child pornography or child sexual exploitation

''(a) IN GENERAL.—

''(1) PROMOTION OR AIDING AND ABETTING OF CERTAIN VIOLATIONS.—Any person who is a victim of the intentional, knowing, or reckless promotion, or aiding and abetting, of a violation of section 1591 or 1594(c) (involving a minor), or section 2251, 2251A, 2252, 2252A, or 2422(b), where such promotion, or aiding

and abetting, is by a provider of an interactive computer service or an app store, and who suffers personal injury as a result of such promotion or aiding and abetting, regardless of when the injury occurred, may bring a civil action in any appropriate United States District Court for relief set forth in subsection (b).

''(2) ACTIVITIES INVOLVING CHILD PORNOGRAPHY.—Any person who is a victim of the intentional, knowing, or reckless hosting or storing of child pornography or making child pornography available to any person by a provider of an interactive computer service, and who suffers personal injury as a result of such hosting, storing, or making available, regardless of when the injury occurred, may bring a civil action in any appropriate United States District Court for relief set forth in subsection (b).

''(b) RELIEF.—In a civil action brought by a person under subsection (a)—

''(1) the person shall recover the actual damages the person sustains or liquidated damages in the amount of $300,000, and the cost of the action, including reasonable attorney fees and other litigation costs reasonably incurred; and

''(2) the court may, in addition to any other relief available at law, award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate, including a temporary restraining order, a preliminary injunction, or a permanent injunction ordering the defendant to cease the offending conduct.

''(c) STATUTE OF LIMITATIONS.—There shall be no time limit for the filing of a complaint commencing an action under subsection (a).

''(d) VENUE; SERVICE OF PROCESS.—

''(1) VENUE.—Any action brought under subsection (a) may be brought in the district court of the United States that meets applicable requirements relating to venue under section 1391 of title 28.

''(2) SERVICE OF PROCESS.—In an action brought under subsection (a), process may be served in any district in which the defendant—

''(A) is an inhabitant; or

''(B) may be found.

''(e) RELATION TO SECTION 230 OF THE COMMUNICATIONS ACT OF 1934.—Nothing in section 230 of the Communications Act of 1934 (47 U.S.C. 230) shall be construed to impair or limit any claim brought under subsection (a).

''(f) RULES OF CONSTRUCTION.—

''(1) APPLICABILITY TO LEGAL PROCESS OR OBLIGATION.—Nothing in this section shall be construed to apply to any good faith action that is necessary to comply with a valid court order, subpoena, search warrant, statutory obligation, or preservation request from law enforcement.

''(2) APPLICATION OF SECTION 2258B.—A civil action brought under subsection (a) shall be subject to section 2258B.

''(g) ENCRYPTION TECHNOLOGIES.—

''(1) IN GENERAL.—None of the following actions or circumstances shall serve as an independent basis for liability under subsection (a):

''(A) Utilizing full end-to-end encrypted messaging services, device encryption, or other encryption services.

''(B) Not possessing the information necessary to decrypt a communication.

''(C) Failing to take an action that would otherwise undermine the ability to offer full end-to-end encrypted messaging services, device encryption, or other encryption services.

''(2) CONSIDERATION OF EVIDENCE.—Evidence of actions or circumstances described in paragraph (1) shall be admissible in a civil action brought under subsection (a) if—

''(A) the actions or circumstances are relevant under rules 401 and 402 of the Federal Rules of Evidence to—

''(i) prove motive, intent, preparation, plan, absence of mistake, or lack of accident; or

''(ii) rebut any evidence or factual or legal claim; and

''(B) the actions or circumstances—

''(i) are otherwise admissible under the Federal Rules of Evidence; and

''(ii) are not subject to exclusion under rule 403 or any other rule of the Federal Rules of Evidence.

''(3) NO EFFECT ON DISCOVERY.—Nothing in paragraph (1) or (2) shall be construed to create a defense to a discovery request or otherwise limit or affect discovery in any civil action brought under subsection (a).

''(h) DEFENSE.—In a civil action under subsection (a)(2) involving knowing or reckless conduct, it shall be a defense at trial, which the provider of an interactive computer service must establish by a preponderance of the evidence as determined by the finder of fact, that—

''(1) the provider disabled access to or removed the child pornography within a reasonable timeframe, and in any event not later than 48 hours after obtaining knowledge that the child pornography was being hosted, stored, or made available by the provider (or, in the case of a provider that, for the most recent calendar year, averaged fewer than 10,000,000 active users on a monthly basis in the United States, within a reasonable timeframe, and in any event not later than 2 business days after obtaining such knowledge);

''(2) the provider exercised a reasonable, good faith effort to disable access to or remove the child pornography but was unable to do so for reasons outside the provider's control; or

''(3) it is technologically impossible for the provider to disable access to or remove the child pornography without compromising encryption technologies.

''(i) SANCTIONS FOR REPEATED BAD FAITH CIVIL ACTIONS OR DEFENSES.—

''(1) DEFINITIONS.—In this subsection:

''(A) BAD FAITH CIVIL ACTION.—The term 'bad faith civil action' means a civil action brought under subsection (a) in bad faith where the finder of fact determines that at the time the civil action was filed, the party, attorney, or law firm described in paragraph (2) had actual knowledge that—

''(i) the alleged conduct did not involve any minor; or

''(ii) the alleged child pornography did not depict—

''(I) any minor; or

''(II) sexually explicit conduct, sexual suggestiveness, full or partial nudity, or implied sexual activity.

''(B) BAD FAITH DEFENSE.—The term 'bad faith defense' means a defense in a civil action brought under subsection (a) raised in bad faith where the finder of fact determines that at the time the defense was raised, the party, attorney, or law firm described in paragraph (3) had actual knowledge that the defense—

''(i) was made solely for purpose of delaying the civil action or increasing the costs of the civil action; or

''(ii) was objectively baseless in light of the applicable law or facts at issue.

''(2) BAD FAITH CIVIL ACTION.—In the case of a civil action brought under subsection (a), the court may impose sanctions on—

''(A) the party bringing the civil action if the court finds that the party has brought 2 or more bad faith civil actions (which may include the instant civil action); or

''(B) an attorney or law firm representing the party bringing the civil action if the

(122 of 196), Page 122 of 196

Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 122 of 196

Case 4:25-cv-04966    Document 1-3    Filed 06/12/25    Page 59 of 82

S3074

CONGRESSIONAL RECORD — SENATE

May 21, 2025

court finds that the attorney or law firm has represented—

"(i) a party who has brought 2 or more bad faith civil actions (which may include the instant civil action); or

"(ii) 2 or more parties who have each brought a bad faith civil action (which may include the instant civil action).

"(3) BAD FAITH DEFENSE.—In the case of a civil action brought under subsection (a), the court may impose sanctions on—

"(A) the party defending the civil action if the court finds that the party has raised 2 or more bad faith defenses (which may include 1 or more defenses raised in the instant civil action); or

"(B) an attorney or law firm representing the party defending the civil action if the court finds that the attorney or law firm has represented—

"(i) a party who has raised 2 or more bad faith defenses (which may include 1 or more defenses raised in the instant civil action); or

"(ii) 2 or more parties who have each raised a bad faith defense (which may include a defense raised in the instant civil action).

"(4) IMPLEMENTATION.—Rule 11(c) of the Federal Rules of Civil Procedure shall apply to sanctions imposed under this subsection in the same manner as that rule applies to sanctions imposed for a violation of rule 11(b) of those Rules.

"(5) RULES OF CONSTRUCTION.—

"(A) RULE 11.—This subsection shall not be construed to limit or expand the application of rule 11 of the Federal Rules of Civil Procedure.

"(B) DEFINITION CHANGE.—Paragraph (1)(A)(ii) shall not be construed to apply to a civil action affected by a contemporaneous change in the law with respect to the definition of 'child pornography'.

"(j) DEFINITIONS.—In this section:

"(1) APP.—The term 'app' means a software application or electronic service that may be run or directed by a user on a computer, a mobile device, or any other general purpose computing device.

"(2) APP STORE.—The term 'app store' means a publicly available website, software application, or other electronic service that—

"(A) distributes apps from third-party developers to users of a computer, a mobile device, or any other general purpose computing device; and

"(B) operates—

"(i) through the use of any means or facility of interstate or foreign commerce; or

"(ii) in or affecting interstate or foreign commerce.

"(3) INTERACTIVE COMPUTER SERVICE.—The term 'interactive computer service' means an interactive computer service, as defined in section 230(f) of the Communications Act of 1934 (47 U.S.C. 230(f)), that operates—

"(A) through the use of any means or facility of interstate or foreign commerce; or

"(B) in or affecting interstate or foreign commerce.

"(k) SAVINGS CLAUSE.—Nothing in this section, including the defenses under this section, shall be construed to apply to any civil action brought under any other Federal law, rule, or regulation, including any civil action brought against a provider of an interactive computer service or an app store under section 1595 or 2255.".

(2) CLERICAL AMENDMENT.—The table of sections for chapter 110 of title 18, United States Code, is amended by inserting after the item relating to section 2255 the following:

"2255A. Additional remedy for certain victims of child pornography or child sexual exploitation.".

### SEC. 206. SEVERABILITY.

If any provision of this title, an amendment made by this title, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this title and the amendments made by this title, and the application of the provision or amendment to any other person or circumstance, shall not be affected.

### SEC. 207. CONTINUED APPLICABILITY OF FEDERAL, STATE, AND TRIBAL LAW.

(a) FEDERAL LAW.—Nothing in this title or the amendments made by this title, nor any rule or regulation issued pursuant to this title or the amendments made by this title, shall affect or diminish any right or remedy for a victim of child pornography or child sexual exploitation under any other Federal law, rule, or regulation, including any claim under section 2255 of title 18, United States Code, with respect to any individual or entity.

(b) STATE OR TRIBAL LAW.—Nothing in this title or the amendments made by this title, nor any rule or regulation issued pursuant to this title or the amendments made by this title, shall—

(1) preempt, diminish, or supplant any right or remedy for a victim of child pornography or child sexual exploitation under any State or Tribal common or statutory law; or

(2) prohibit the enforcement of a law governing child pornography or child sexual exploitation that is at least as protective of the rights of a victim as this title and the amendments made by this title.

**SA 2238.** Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 2, redesignate paragraphs (27) through (32) as paragraphs (32) through (37), paragraphs (22) through (26) as paragraphs (26) through (30), and paragraphs (10) through (21) as paragraphs (11) through (22).

In section 2, after paragraph (9), insert the following:

(10) EXCLUDED LARGE ONLINE PLATFORM.— The term "excluded large online platform"—

(A) means a social media platform, an online search engine, an online marketplace, or an online communication platform that—

(i) averages more than 1,000,000 unique users on a monthly basis; or

(ii) has more than 1,000,000 user accounts;

(B) includes all parents, subsidiaries, and affiliates of the excluded large online platform; and

(C) does not include a platform that only permits users to interact via a predetermined set of phrases, emoticons, or nonlinguistic symbols.

In section 2, after paragraph (22), as so redesignated, insert the following:

(23) ONLINE COMMUNICATION PLATFORM.— The term "online communication platform" means a service that allows users to communicate, connect, or collaborate via the internet and includes instant messaging, online video conferencing, online discussion forum, and online collaboration services.

(24) ONLINE MARKETPLACE.—The term "online marketplace" has the meaning given that term in section 2(f) of the Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act (15 U.S.C. 45f(f)).

(25) ONLINE SEARCH ENGINE.—The term "online search engine" means an internet intermediary service that allows users to input queries to perform searches of the World Wide Web and, in response, returns information related to the requested content.

In section 2(27)(A)(iii), as so redesignated, strike "and".

In section 2(27)(B), as so redesignated, strike the period at the end and insert "; and".

In section 2(27), as so redesignated, add at the end the following:

(C) is not an excluded large online platform.

In section 2, after paragraph (30), as so redesignated, insert the following:

(31) SOCIAL MEDIA PLATFORM.—The term "social media platform" has the meaning given that term in section 124(a) of the Trafficking Victims Prevention and Protection Reauthorization Act of 2022 (42 U.S.C. 1862w(a)).

**SA 2239.** Mr. HAWLEY (for himself and Mr. SANDERS) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

### SEC. ___. CAP ON CREDIT CARD INTEREST RATES.

(a) IN GENERAL.—Section 107 of the Truth in Lending Act (15 U.S.C. 1606) is amended by adding at the end the following:

"(f)(1) The annual percentage rate applicable to an extension of credit obtained by use of a credit card may not exceed 10 percentage points, inclusive of all finance charges.

"(2) Any fees that are not considered finance charges under section 106(a) may not be used to evade the limitations of paragraph (1), and the total sum of such fees may not exceed the total amount of finance charges assessed.

"(3) The taking, receiving, reserving, or charging of a credit card annual percentage rate or fee greater than that permitted under this subsection, when knowingly done, shall be deemed a violation of this title, and a forfeiture of the entire interest which the note, bill, or other evidence of the obligation carries with it, or which has been agreed to be paid thereon.

"(4) If a credit card annual percentage rate or fee greater than that permitted under this subsection has been paid, the person by whom it has been paid, or the legal representative thereof, may, by bringing an action not later than 2 years after the date on which the usurious collection was last made, recover back from the lender in an action in the nature of an action of debt, the entire amount of interest, finance charges, or fees paid.

"(5) Any creditor who violates this subsection shall be subject to the provisions of section 130.

"(g) Nothing in this section may be construed to preempt any provision of State law that provides greater protection to consumers than is provided under this section.".

(b) TECHNICAL AND CONFORMING AMENDMENT.—Section 130(a) of the Truth in Lending Act (15 U.S.C. 1640(a)) is amended, in the matter preceding paragraph (1), by inserting "section 107(f)," before "this chapter".

(c) SUNSET.—

(1) IN GENERAL.—The Truth in Lending Act (15 U.S.C. 1601 et seq.) is amended—

(A) in section 107 (15 U.S.C. 1606), by striking subsections (f) and (g); and

(B) in section 130(a) (15 U.S.C. 1640(a)), in the matter preceding paragraph (1), by striking "section 107(f),".

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall take effect on January 1, 2031.

**SA 2240.** Mr. HAWLEY submitted an amendment intended to be proposed by

(123 of 196), Page 123 of 196    Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 123 of 196
Case 4:25-cv-04966    Document 1-3    Filed 06/12/25    Page 60 of 82

*May 21, 2025*                    CONGRESSIONAL RECORD — SENATE                    S3075

him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. __. COMMUNICATIONS ACT AMENDMENT.**

Section 230(c) of the Communications Act of 1934 (47 U.S.C. 230(c)) is amended by adding at the end the following:

"(3) EXCEPTION FOR ISSUERS OF PAYMENT STABLECOIN.—The protections under this subsection shall not apply to any person that issues a payment stablecoin, as defined in section 2 of the GENIUS Act.''.

**SA 2241.** Mr. HAGERTY (for himself, Mrs. GILLIBRAND, Mr. SCOTT of South Carolina, and Ms. LUMMIS) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

On page 3, line 25, strike "node''.

On page 9, line 23, insert "is'' after "that''.

On page 9, strike line 24 and all that follows through page 10, line 9, and insert the following:

(A) a subsidiary of an insured depository institution that has been approved to issue payment stablecoins under section 5;

(B) a Federal qualified payment stablecoin issuer; or

(C) a State qualified payment stablecoin issuer.

On page 13, line 18, strike "any'' and insert "a''.

On page 13, line 24, strike "person'' and insert "digital asset service provider''.

On page 14, line 5, strike "or'' and insert "and any''.

On page 14, line 18, strike "If the Secretary'' and all that follows through line 21, and insert the following:

(A) IN GENERAL.—If the Secretary of the Treasury determines that unusual and exigent circumstances exist, the Secretary may provide limited safe harbors from subsection (a).

(B) JUSTIFICATION.—Prior to issuing a limited safe harbor under this paragraph, the Secretary or the Treasury shall submit to the chairs and ranking members of the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a justification for the determination of the unusual and exigent circumstances, which may be contained in a classified annex, as applicable.

On page 14, line 22, strike "The'' and insert "Consistent with section 13, the''.

On page 14, line 23, strike "may'' and insert "shall''/

On page 14, line 25, strike "statutory''.

On page 15, line 19, insert "as'' before "a cash equivalent''.

On page 15, line 21, insert "as'' before "a cash equivalent''.

On page 16, line 5, strike "RULE'' and insert "RULES''.

On page 16, strike lines 7 through 18 and insert the following:

(1) EXEMPT TRANSACTIONS.—This section shall not apply to—

(A) the direct transfer of digital assets between 2 individuals acting on their own behalf and for their own lawful purposes, without the involvement of an intermediary;

(B) to any transaction involving the receipt of digital assets by an individual between an account owned by the individual in the United States and an account owned by the individual abroad that are offered by the same parent company; or

(C) to any transaction by means of a software or hardware wallet that facilitates an individual's own custody of digital assets.

(2) TREASURY AUTHORITY.—Nothing in this Act shall alter the existing authority of the Secretary of the Treasury to block, restrict, or limit transactions involving payment stablecoins that reference or are denominated in United States dollars that are subject to the jurisdiction of the United States.

On page 28, lines 17 and 18, strike ", as applicable''.

On page 28, lines 20 and 21, strike "and economic sanctions compliance''.

On page 28, lines 22 and 23, strike ", verification of sanctions lists,''.

On page 28, line 24, strike "programs'' and insert "program''.

On page 29, line 4, strike "policies'' and insert "technical capabilities, policies,''.

On page 29, line 7, strike "and''.

On page 29, line 13, strike the period and insert ''; and''.

On page 29, between lines 13 and 14, insert the following:

(vi) maintenance of an effective economic sanctions compliance program, including verification of sanctions lists, consistent with Federal law.

On page 29, lines 14 and 15, strike "Financial Crimes Enforcement Network'' and insert "Secretary of the Treasury''.

On page 32, lines 21 and 22, strike "and the amendments made by that section''.

On page 32, strike lines 10 through 16 and insert the following:

(B) RULE OF CONSTRUCTION.—Nothing in subparagraph (A) shall limit a permitted payment stablecoin issuer from engaging in payment stablecoin activities or digital asset service provider activities specified by this Act, and activities incidental thereto, that are authorized by the primary Federal payment stablecoin regulator or the State payment stablecoin regulator, as applicable, consistent with all other

On page 33, line 15, strike "A permitted'' and all that follows through page 34, line 3, and insert the following:

(A) IN GENERAL.—A permitted payment stablecoin issuer may not—

(i) use any combination of terms relating to the United States Government, including "United States'', "United States Government'', and "USG'', in the name of a payment stablecoin; or

(ii) market a payment stablecoin in such a way that a reasonable person would perceive the payment stablecoin to be—

(I) legal tender, as described in section 5103 of title 31, United States Code;

(II) issued by the United States; or

(III) guaranteed or approved by the Government of the United States.

(B) PEGGED STABLECOINS.—Abbreviations directly relating to the currency to which a payment stablecoin is pegged, such as "USD'', are not subject to the prohibitions in subparagraph (A).

On page 36, strike lines 7 through 12 and insert the following:

(11) PROHIBITION ON INTEREST.—No permitted payment stablecoin issuer or foreign payment stablecoin issuer shall pay the holder of any payment stablecoin any form of interest or yield (whether in cash, tokens, or other consideration) solely in connection with the holding, use, or retention of such payment stablecoin.

On page 36, between lines 12 and 13, insert the following:

(12) NON-FINANCIAL SERVICES PUBLIC COMPANIES.—

(A) DEFINITIONS.—In this paragraph:

(i) FINANCIAL ACTIVITIES.—The term "financial activities''—

(I) has the meaning given that term in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(k)); and

(II) for the avoidance of doubt, includes those activities described in subparagraphs (A) and (B) of section 2(7) and section 4(a)(7)(A) of this Act.

(ii) PUBLIC COMPANY.—The term "public company'' means an issuer that is required to file reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)).

(B) PROHIBITION.—

(i) IN GENERAL.—A public company that is not predominantly engaged in 1 or more financial activities, and its wholly or majority owned subsidiaries or affiliates, may not issue a payment stablecoin unless the public company obtains a unanimous vote of the Stablecoin Certification Review Committee finding that—

(I) it will not pose a material risk to the safety and soundness of the United States banking system, the financial stability of the United States, or the Deposit Insurance Fund;

(II) the public company will comply with data use limitations providing that, unless the public company receives consent from the consumer, nonpublic personal information obtained from stablecoin transaction data may not be—

(aa) used to target, personalize, or rank advertising or other content;

(bb) sold to any third party; or

(cc) shared with non-affiliates; and

(III) the public company and the affiliates of the public company will comply with the tying prohibitions under paragraph (8).

(ii) EXCEPTION.—The prohibition under clause (i) against the sharing of consumer information shall not apply to sharing of such information—

(I) to comply with Federal, State, or local laws, rules, and other applicable legal requirements;

(II) to comply with a properly authorized civil, criminal, or regulatory investigation, subpoena, or summons by a Federal, State, or local authority; or

(III) to respond to judicial process or a government regulatory authority having jurisdiction over the public company.

(C) EXTENSION OF PROHIBITION.—

(i) IN GENERAL.—Any company not domiciled in the United States or its Territories that is not predominantly engaged in 1 or more financial activities, may not issue a payment stablecoin unless the public company obtains a unanimous vote of the Stablecoin Certification Review Committee finding that—

(I) it will not pose a material risk to the safety and soundness of the United States banking system, the financial stability of the United States, or the Deposit Insurance Fund;

(II) the public company will comply with data use limitations providing that, unless the public company receives consent from the consumer, nonpublic personal information obtained from stablecoin transaction data may not be—

(aa) used to target, personalize, or rank advertising or other content;

(bb) sold to any third party; or

(cc) shared with non-affiliates; except

(III) the public company and the affiliates of the public company will comply with the tying prohibitions under paragraph (8).

(ii) EXCEPTION.—The prohibition under clause (i) against the sharing of consumer information shall not apply to sharing of such information—

(I) to comply with Federal, State, or local laws, rules, and other applicable legal requirements;

(II) to comply with a properly authorized civil, criminal, or regulatory investigation, subpoena, or summons by a Federal, State, or local authority; or

CONGRESSIONAL RECORD — SENATE    *May 21, 2025*

(III) to respond to judicial process or a government regulatory authority having jurisdiction over the public company.

(D) RULEMAKING.—Not later than 1 year after the date of enactment of this Act, the Stablecoin Certification Review Committee shall issue an interpretive rule clarifying the application of this paragraph.

(13) ELIGIBILITY.—Nothing in this Act shall be construed as expanding or contracting legal eligibility to receive services available from a Federal Reserve bank or to make deposits with a Federal Reserve bank, in each case pursuant to the Federal Reserve Act.

On page 36, line 13, strike "(12)" and insert "(14)".

On page 38, lines 2 and 3, strike "that subsection" and insert "this Act".

On page 40, line 13, insert "any" after "to".

On page 43, line 1, insert "(or the Vice Chair for Supervision, as delegated by the Chair of the Board)" after "Board".

On page 46, line 16, strike "a".

On page 46, line 17, strike "stablecoin" and insert "stablecoins".

On page 47, line 18, strike ", provided that" and all that follows through line 25.

On page 49, line 6, strike "may" and insert "shall".

On page 51, lines 14 and 15, strike "House of Representatives and the Senate" and insert "Senate and the House of Representatives".

On page 51, lines 19 and 20, strike "House of Representatives and the Senate" and insert "Senate and the House of Representatives".

On page 51, line 22, strike "product".

On page 51, line 23, insert "For the purposes of this paragraph, an employee described in section 202 of title 18, United States Code, shall be deemed an executive branch employee for purposes of complying with section 208 of that title." after "public service.".

On page 60, line 21, insert "Nothing in this subsection shall preempt or supersede the authority of a State to charter, license, supervise, or regulate an insured depository institution or credit union chartered in such State or to supervise a subsidiary of such an insured depository institution or credit union that is approved under this section to be a permitted payment stablecoin issuer." after "stablecoin issuer.".

On page 61, line 9, strike "including,".

On page 63, lines 22 and 23, strike "to be" and insert "and".

On page 64, line 9, strike "with" and insert "within".

On page 66, line 5, insert "or recklessly" after "willfully" each place it appears.

On page 73, strike lines 3 through 8 and insert the following:

(c) RULE OF CONSTRUCTION.—Nothing in this Act may be construed to modify or otherwise affect any right or remedy under any Federal consumer financial law, including 12 U.S.C. 5515 and 15 U.S.C. 41 et seq.

On page 81, lines 5 and 6, strike "Unless otherwise provided in this Act" and insert "Notwithstanding any other provision of law".

On page 82, lines 8 and 9, strike "as specified in this subsection" and insert "for State laws relating to the chartering, licensure, or other authorization to do business as a permitted payment stablecoin issuer".

On page 82, line 13, strike "STABLECOIN" and insert "STABLECOINS".

On page 82, line 15, strike "Payment" and insert "A payment".

On page 82, line 18, insert "by a digital asset service provider" after "United States".

On page 83, lines 6 and 7, strike "that is".

On page 83, line 25, insert "except as provided in subsection (c)" after "(a),".

On page 83, line 25, strike "may" and insert "shall".

On page 85, between lines 4 and 5, insert the following:

(C) PUBLICATION.—Upon a determination under subparagraph (A), the Secretary of the Treasury shall publish the determination in the Federal Register, including a statement detailing how the foreign payment stablecoin issuer has met the criteria described in subparagraph (B).

On page 86, line 9, insert "Notwithstanding the foregoing, the Secretary of Treasury may determine that multiple acts of non-compliance constitute separate violations if such acts were the result of gross negligence, a reckless disregard for, or a pattern of indifference to, money laundering, financing of terrorism, or sanctions evasion requirements." after "cause.".

On page 88, line 15, insert "(2), or (3)," after "(1),".

On page 88, lines 15 and 16, strike "a report".

On page 88, line 19, insert "a report, which may include a classified annex, if applicable," after "House of Representatives,".

On page 88, between lines 22 and 23, insert the following:

(d) RULE OF CONSTRUCTION.—Nothing in this Act shall be construed as altering the existing authority of the Secretary of the Treasury to block, restrict, or limit transactions involving payment stablecoins that reference or are denominated in United States dollars that are subject to the jurisdiction of the United States.

On page 91, line 22, strike "Best practices" and insert "Standards".

On page 92, line 2, strike "and" and insert "or".

On page 92, line 3, strike "Best practices" and insert "Standards".

On page 92, between lines 9 and 10, insert the following:

(4) Tailored risk management standards for financial institutions interacting with decentralized finance protocols.

On page 92, line 11, strike "Not later than" and all that follows through page 93, line 7, and insert the following:

(1) IN GENERAL.—Not later than 180 days after the date of enactment of this Act, the Secretary of the Treasury shall submit to the chairs and ranking members of the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report on—

(A) legislative and regulatory proposals to allow regulated financial institutions to develop and implement novel and innovative methods, techniques, or strategies to detect illicit activity, such as money laundering and sanctions evasion, involving digital assets;

(B) the results of the research and risk assessments conducted pursuant to this section;

(C) efforts to support the ability of financial institutions to implement novel and innovative methods, techniques, or strategies to detect illicit activity, such as money laundering and sanctions evasion, involving digital assets;

(D) the extent to which transactions on distributed ledgers, digital asset mixing services, tumblers, or other similar services that mix payment stablecoins in such a way as to make such transaction or the identity of the transaction parties less identifiable may facilitate illicit activity; and

(E) legislative recommendations relating to the scope of the term "digital asset service provider" and the application of that term to decentralized finance.

(2) CLASSIFIED ANNEX.—A report under this section may include a classified annex, if applicable.

On page 95, strike line 1 through 25 and insert the following:

(b) CUSTOMER PROPERTY REQUIREMENT.—A person described in subsection (a) shall, with respect to other property described in that subsection—

(1) treat and deal with the payment stablecoins, private keys, cash, and other property of a person for whom or on whose behalf the person described in that subsection receives, acquires, or holds payment stablecoins, private keys, cash, and other property (hereinafter referred to in this section as the "customer") as belonging to such customer and not as the property of such person; and

(2) take such steps as are appropriate to protect the payment stablecoins, private keys, cash, and other property of a customer from the claims of creditors of the person.

On page 98, line 8, insert "provided such treatment is consistent with Federal law" after "deposit".

On page 99, strike lines 6 through 18 and insert the following:

(a) IN GENERAL.—Subject to section 507(e) of title 11, United States Code, as added by subsection (d), in any insolvency proceeding of a permitted payment stablecoin issuer under Federal or State law, including any proceeding under that title and any insolvency proceeding administered by a State payment stablecoin regulator with respect to a permitted payment stablecoin issuer—

(1) the claim of a person holding payment stablecoins issued by the permitted payment stablecoin issuer shall have priority over the claims of the permitted payment stablecoin issuer and any other creditor of the permitted payment stablecoin issuer, with respect to required payment stablecoin reserves;

(2) notwithstanding any other provision of law, including the definition of "claim" under section 101(5) of title 11, United States Code, any person holding a payment stablecoin issued by the permitted payment stablecoin issuer shall be deemed to hold a claim; and

(3) the priority under paragraph (1) shall not apply to claims other than those arising directly from the holding of payment stablecoins or required payment stablecoin reserves maintained by the permitted payment stablecoin issuer.

On page 101, lines 16 and 17, strike "of a person holding payment stablecoin" and insert "arising from a person's holding of a payment stablecoin".

On page 103, between lines 7 and 8, insert the following:

(h) STUDY BY PRIMARY FEDERAL PAYMENT STABLECOIN REGULATORS.—

(1) STUDY REQUIRED.—The primary Federal payment stablecoin regulators shall perform a study of the potential insolvency proceedings of permitted payment stablecoin issuers, including an examination of—

(A) existing gaps in the bankruptcy laws and rules for permitted payment stablecoin issuers;

(B) the ability of payment stablecoin holders to be paid out in full in the event a permitted payment stablecoin issuer is insolvent; and

(C) the utility of orderly insolvency administration regimes and whether any additional authorities are needed to implement such regimes.

(2) REPORT.—Not later than 3 years after the date of enactment of this Act, the primary Federal payment stablecoin regulators shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report that contains all findings of the study under paragraph (1), including any legislative recommendations.

On page 110, line 13, strike "8" and insert "10".

On page 113, line 8, insert a period at the end.

On page 114, between lines 11 and 12, insert the following:

(4) The foreign country in which the foreign payment stablecoin issuer is domiciled and regulated is not subject to comprehensive economic sanctions by the United States or in a jurisdiction that the Secretary of the Treasury has determined to be a jurisdiction of primary money laundering concern.

On page 114, line 19, insert "Prior to such determination taking effect, the Secretary of the Federal Register a justification for such determination, including how the foreign country's regulatory and supervisory regime is comparable to the requirements established under this Act, including the requirements under section 4(a). The Stablecoin Certification Review Committee shall have not less than 7 days' notice of a determination under this paragraph to reject such determination prior to publication in the Federal Register. Such rejection shall be included in the Federal Register." after "section 4(a).".

On page 115, line 13, insert "Prior to such rescission taking effect, the Secretary of the Treasury shall publish in the Federal Register a justification for the rescission." after "under this Act.".

On page 118, line 22, insert "Prior to such rescission taking effect, the Comptroller shall publish in the Federal Register a justification for the rescission." after "financial stability risk.".

On page 119, strike lines 9 through 19 and insert the following:

(1) IN GENERAL.—The Secretary of the Treasury may create and implement reciprocal arrangements or other bilateral agreements between the United States and jurisdictions with payment stablecoin regulatory regimes that are comparable to the requirements established under this Act. The Secretary of the Treasury shall consider whether the jurisdiction's requirements for payment stablecoin issuers include—

(A) similar requirements to those under section 4(a);

(B) adequate anti-money laundering and counter-financing of terrorism program and sanction compliance standards; and

(C) adequate supervisory and enforcement capacity to facilitate international transactions and interoperability with United States dollar-denominated payment stablecoins issued overseas.

On page 119, between lines 19 and 20, insert the following:

(2) PUBLICATION.—Not later than 90 days prior to the entry into force of any arrangement or agreement under paragraph (1), the Secretary of the Treasury shall publish the arrangement or agreement in the Federal Register.

On page 119, in line 20, strike "(2)" and insert "(3)".

---

**SA 2242.** Mr. WHITEHOUSE submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Add at the end the following:

**SEC. 20. EMISSIONS FROM POWER CONSUMPTION OF DATA CENTERS AND CRYPTOMINING FACILITIES.**

(a) AMENDMENT.—Part A of title I of the Clean Air Act (42 U.S.C. 7401 et seq.) is amended by adding at the end the following:

**"SEC. 139. EMISSIONS FROM POWER CONSUMPTION OF DATA CENTERS AND CRYPTOMINING FACILITIES.**

"(a) DEFINITIONS.—In this section:

"(1) COVERED FACILITY.—The term 'covered facility' means a data center or cryptomining facility that has more than 100 kilowatts of installed information technology nameplate power.

"(2) CRYPTOMINING FACILITY.—The term 'cryptomining facility' means a facility used to mine or create cryptocurrencies or other blockchain based digital assets, which may be—

"(A) a freestanding structure; or

"(B) a facility within a larger structure that uses environmental control equipment to maintain the proper conditions for the operation of electronic equipment.

"(3) DATA CENTER.—The term 'data center' has the meaning given the term in section 453(a) of the Energy Independence and Security Act of 2007 (42 U.S.C. 17112(a)).

"(4) ELECTRIC UTILITY.—The term 'electric utility' has the meaning given the term in section 3 of the Federal Power Act (16 U.S.C. 796).

"(5) REGION.—The term 'region' means a geographic region described in the National Transmission Needs Study of the Department of Energy, dated October 30, 2023.

"(b) ANNUAL DATA COLLECTION OF ENERGY CONSUMPTION OF DATA CENTERS AND CRYPTOMINING FACILITIES.—

"(1) IN GENERAL.—The Administrator, in conjunction with the Administrator of the Energy Information Administration, shall annually collect—

"(A) the information described in paragraph (2) from the owners of covered facilities, including federally owned data centers located within the United States and territories of the United States; and

"(B) the information described in paragraph (3) from the electric utilities that serve covered facilities.

"(2) INFORMATION DESCRIBED FOR COVERED FACILITIES.—The information referred to in paragraph (1)(A), with respect to a covered facility, is—

"(A) the location of the covered facility, including in which balancing authority area the covered facility is located;

"(B) whether the covered facility is a data center or a cryptomining facility;

"(C) the owner of the covered facility;

"(D) the electric utility, if any, that provides power to the covered facility;

"(E) the total annual electricity consumption of the covered facility;

"(F) the total annual electricity consumed by the covered facility from electricity generation assets located behind the power meter of the covered facility;

"(G) subject to paragraph (5), the percentage of electricity consumed annually by the covered facility from electricity generation assets located behind the power meter of the covered facility that is generated from wind, solar, hydropower, nuclear, coal, gas, and any other power source;

"(H) the terms of any power purchase agreements or other contractual mechanisms for procuring power from an electricity generator that the covered facility is party to; and

"(I) any other relevant information, as reasonably determined by the Administrator and the Administrator of the Energy Information Administration.

"(3) INFORMATION DESCRIBED FOR ELECTRIC UTILITIES.—The information referred to in paragraph (1)(B), with respect to each covered facility served by an electric utility, is—

"(A) the total annual electricity consumed by the covered facility from the electric grid;

"(B) subject to paragraph (4), the percentage of electricity consumed annually by the covered facility from the electric grid that is generated from wind, solar, hydropower, nuclear, coal, gas, and any other power source;

"(C) the rates charged by the electric utility for each class of electric consumer for the current year and each of the 3 prior years; and

"(D) any other relevant information, as reasonably determined by the Administrator and the Administrator of the Energy Information Administration.

"(4) ELECTRICITY CONSUMED FROM THE ELECTRIC GRID.—For purposes of collecting the information described in paragraph (3)(B) with respect to a covered facility—

"(A) the Administrator, in conjunction with the Administrator of the Energy Information Administration, shall consider the average resource mix of the electric utilities that serve the covered facility to be the resource mix for the portion of electricity consumed annually from the electric grid by a covered facility that is not described in subparagraph (B); and

"(B) if the covered facility or the owner of the covered facility is party to a power purchase agreement or other contractual mechanism for procuring power from an electricity generation asset (such as the voluntary higher rate described in subsection (c)(4)(C)(iii)(I)(aa)), or purchases and retires energy attribute certificates, the Administrator, in conjunction with the Administrator of the Energy Information Administration, shall consider the electricity generation represented by those instruments as part of the electricity consumed annually by the covered facility from the electric grid only if the owner of the covered facility can demonstrate that—

"(i)(I) the electricity generation asset began commercial operations not more than 36 months before the date on which operations began at the covered facility;

"(II) the electricity generation asset would otherwise be retired and the retirement could not be prevented by the use of existing public funding programs;

"(III) the electricity provided by the electricity generation asset would otherwise be curtailed;

"(IV) the power that the electricity generation asset provides to the covered facility resulted from an uprate that occurred not more than 36 months before the date on which operations began at the covered facility;

"(V) the power purchase agreement or other contractual mechanism was finalized before the date of enactment of this section; or

"(VI)(aa) the electricity generation asset has undergone or will undergo a retrofit that reduces the greenhouse emissions intensity of the electricity generation asset, expressed in terms of metric tons of carbon dioxide equivalent of greenhouse gases per kilowatt-hour, by not less than 75 percent, as compared to before the retrofit; and

"(bb) the retrofit otherwise would not have occurred, even after the use of existing public funding programs, without the power purchase agreement or other contractual mechanism;

"(ii) the electricity is generated—

"(I) in the same calendar year as the electricity is consumed by the covered facility, in the case of electricity that is generated before January 1, 2028; and

"(II) in the same hour as the electricity is consumed by the covered facility or an energy storage asset that serves the covered facility, in the case of electricity that is generated after December 31, 2027;

"(iii)(I) the electricity generation asset that produced the electricity is electrically interconnected to a balancing authority located in the same region as the covered facility; or

CONGRESSIONAL RECORD — SENATE

''(II) the owner of the electricity generation asset can demonstrate that the power produced by the electricity generation asset is physically delivered to the covered facility, as determined by the Administrator, in coordination with the Secretary of Energy; and

''(iv) the electricity generation represented by the power purchase agreement or other contractual mechanism for procuring power from an electricity generation asset are claimed exclusively by the covered facility through the retirement of an equivalent quantity of energy attribute certificates.

''(5) ELECTRICITY CONSUMED FROM ASSETS BEHIND THE METER.—For purposes of collecting the information described in paragraph (2)(G) with respect to a covered facility—

''(A) the Administrator, in conjunction with the Administrator of the Energy Information Administration, shall consider the average resource mix of the electric utilities that serve the covered facility to be the resource mix for the portion of electricity consumed annually by the covered facility from electricity generation assets located behind the power meter of a covered facility that is not described in subparagraph (B); and

''(B) the Administrator, in conjunction with the Administrator of the Energy Information Administration, shall consider the electricity generated by electricity generation assets located behind the power meter of the covered facility as part of the electricity consumed annually by the covered facility from electricity generation assets located behind the power meter of the covered facility only if—

''(i) the owner of the covered facility can demonstrate that—

''(I) the electricity generation asset began operations not more than 36 months before the date on which operations began at the covered facility; or

''(II) the electricity generation asset would otherwise be retired and the retirement could not be prevented by the use of existing public funding programs; or

''(ii) the Administrator determines that the greenhouse gas emissions intensity, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour, of the electricity generation asset is higher than the greenhouse gas emissions intensity of the electric utilities that serve the covered facility, based on the average resource mix of those electric utilities.

''(6) GREENHOUSE GAS EMISSIONS INTENSITY.—Based on the information collected under paragraph (1), for each covered facility, the Administrator shall determine the greenhouse gas emission intensity, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour, of—

''(A) the total annual electricity consumed by the covered facility from the electric grid; and

''(B) the total annual electricity consumed by the covered facility from electricity generation assets located behind the power meter of the covered facility.

''(7) PUBLICLY AVAILABLE.—The Administrator shall make publicly available on an annual basis—

''(A) for each covered facility—

''(i) the information described in each of subparagraphs (A), (B), (C), and (D) of paragraph (2);

''(ii) the percent of electricity consumed annually by the covered facility that is generated from wind, solar, hydropower, nuclear, coal, gas, and any other power source; and

''(iii) the greenhouse gas emissions intensity of the total annual electricity consumed by the covered facility, as determined under paragraph (6); and

''(B) for each owner of a covered facility, the aggregate annual electricity consumption of all covered facilities owned by that owner.

''(8) CONFIDENTIAL BUSINESS INFORMATION.—

''(A) IN GENERAL.—Except as provided in subparagraph (B), of the information collected under paragraph (1), the Administrator and the Administrator of the Energy Information Administration shall treat the information described in each of subparagraphs (E) and (F) of paragraph (2) and subparagraph (A) of paragraph (3) as confidential business information.

''(B) EXCEPTION.—Subparagraph (A) does not apply to information that is required to be made publicly available pursuant to paragraph (7)(C).

''(c) EMISSIONS PERFORMANCE STANDARD.—

''(1) DEFINITIONS.—In this subsection:

''(A) BASELINE.—The term 'baseline', with respect to a covered facility in a calendar year, means the baseline of the region the covered facility is located in for that calendar year as determined under paragraph (2).

''(B) GREENHOUSE GAS.—

''(i) IN GENERAL.—The term 'greenhouse gas' means the air pollutants carbon dioxide, any hydrofluorocarbon, methane, nitrous oxide, any perfluorocarbon, and sulfur hexafluoride.

''(ii) GLOBAL WARMING POTENTIAL.—For purposes of the term 'methane' in clause (i), the Administrator shall use the 20-year global warming potential of methane, as determined in accordance with the Sixth Assessment Report of the Intergovernmental Panel on Climate Change.

''(2) DETERMINATION OF BASELINE.—

''(A) PUBLICATION OF BASELINE.—Not later than December 31, 2025, the Administrator shall determine and publish in the Federal Register the greenhouse gas emissions intensities of the electric grid of each region, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour.

''(B) INITIAL BASELINE.—For purposes of calendar year 2026, the baseline of each region shall be the baseline of that region published under subparagraph (A).

''(C) BASELINES THROUGH 2034.—For each of calendar years 2027 through 2034, the baseline of each region for that calendar year shall be determined by reducing the baseline from the previous calendar year by 11 percent of the baseline of that region for calendar year 2026.

''(D) BASELINE IN 2035 AND THEREAFTER.—For calendar year 2035 and each calendar year thereafter, the baseline for each region shall be 0 metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour.

''(3) ASSESSMENT OF FEES.—

''(A) FEE ON UTILITIES.—

''(i) IMPOSITION OF FEE ON UTILITIES.—Beginning on January 1, 2026, the Administrator shall, in accordance with this subparagraph and using the information collected under subsection (b) but subject to subparagraphs (C) and (D), assess on the owner of any electric utility providing power to a covered facility a fee with respect to the greenhouse gas emissions of the electricity consumed by the covered facility from the electric grid above the baseline of the region the covered facility is located in for that calendar year.

''(ii) AMOUNT OF FEE.—The amount of a fee assessed under clause (i) with respect to an electric utility for a calendar year shall be the sum obtained by adding, for each covered facility served by the electric utility, the product (rounded to the nearest dollar) obtained by multiplying—

''(I) the total electricity consumed by the covered facility from the electric grid during the calendar year, as expressed in kilowatt-hours;

''(II) subject to clause (iii), $20; and

''(III) the amount, if any, that the greenhouse gas emissions intensity of the electricity consumed by the covered facility from the electric grid, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour, exceeds the baseline of the region the covered facility is located in for the calendar year.

''(iii) FEE ADJUSTMENT.—Beginning in calendar year 2027, the Administrator shall annually increase the amount described in clause (ii)(II) by the sum obtained by adding—

''(I) the product obtained by multiplying—

''(aa) the applicable amount under clause (ii)(II) during the previous calendar year; and

''(bb) the rate of inflation, as determined by the Administrator using the changes for the 12-month period ending the preceding November 30 in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the Department of Labor; and

''(II) $10.

''(iv) NOTIFICATION OF FEE AMOUNT.—Not later than January 31, 2027, and not later than January 31 of each calendar year thereafter, the Administrator shall notify—

''(I) the owner of each electric utility subject to a fee under clause (i) of the amount of the fee that is assessed with respect to the electric utility for the previous calendar year under clause (i); and

''(II) the owner of each covered facility of the total amount of any fee assessed for the previous calendar year under clause (i) that is attributable, pursuant to clause (ii), to the electricity consumed by the covered facility.

''(v) REMITTANCE OF FEE AMOUNT.—A fee assessed under clause (i) for a calendar year shall be due and payable to the Administrator not later than March 31 of the calendar year after the calendar year for which the fee is assessed.

''(vi) PASS-THROUGH LIMITATION.—

''(I) IN GENERAL.—Any electric utility assessed a fee under clause (i) may not recoup the cost of the fee by raising rates or assessing fees on any customer that is not a covered facility.

''(II) MONITORING COMPLIANCE.—The Administrator, in conjunction with the Administrator of the Energy Information Administration, shall use the best available data, including the information collected pursuant to subsection (b)(1)(B) and described in subsection (b)(3)(C), to monitor the compliance of electric utilities with subclause (I).

''(III) PENALTY.—If the Administrator, in conjunction with the Administrator of the Energy Information Administration, determines that an electric utility has violated subclause (I), the Administrator shall assess a fine on the electric utility in an amount equal to 2 times the amount recouped by the electric utility, as described in subclause (I), from customers that are not covered facilities.

''(B) FEE ON COVERED FACILITIES.—

''(i) IMPOSITION OF FEE ON COVERED FACILITIES.—Beginning on January 1, 2026, the Administrator shall, in accordance with this subparagraph and using the information collected under subsection (b) but subject to subparagraphs (C) and (D), assess on the owner of any covered facility a fee with respect to the greenhouse gas emissions of the electricity consumed by the covered facility from electricity generation assets located

behind the power meter of the covered facility above the baseline of the region the covered facility is located in for that calendar year.

''(ii) AMOUNT OF FEE.—The amount of a fee assessed under clause (i) with respect to a covered facility for a calendar year shall be the product (rounded to the nearest dollar) obtained by multiplying—

''(I) the total electricity consumed by the covered facility from electricity generation assets located behind the power meter of the covered facility during the calendar year, as expressed in kilowatt-hours;

''(II) subject to clause (iii), $20; and

''(III) the amount, if any, that the greenhouse gas emissions intensity of the electricity consumed by the covered facility from electricity generation assets located behind the power meter of the covered facility, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour, exceeds the baseline of the region the covered facility is located in for the calendar year.

''(iii) FEE ADJUSTMENT.—Beginning in calendar year 2027, the Administrator shall annually increase the amount described in clause (ii)(II) by the sum obtained by adding—

''(I) the product obtained by multiplying—

''(aa) the applicable amount under clause (ii)(II) during the previous calendar year; and

''(bb) the rate of inflation, as determined by the Administrator using the changes for the 12-month period ending the preceding November 30 in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the Department of Labor; and

''(II) $10.

''(iv) NOTIFICATION OF FEE AMOUNT.—Not later than January 31, 2027, and not later than January 31 of each calendar year thereafter, the Administrator shall notify the owner of each covered facility the amount of the fee that is assessed with respect to the covered facility for the previous calendar year under clause (i).

''(v) REMITTANCE OF FEE AMOUNT.—A fee assessed under clause (i) for a calendar year shall be due and payable to the Administrator not later than March 31 of the calendar year after the calendar year for which the fee is assessed.

''(C) APPLICABILITY TO ZERO-CARBON ELECTRICITY GENERATION ASSETS.—This paragraph shall not apply to a covered facility if the Administrator, in conjunction with the Administrator of the Energy Information Administration, determines, pursuant to the information collected under subsection (b), that the covered facility is powered entirely by zero-carbon electricity generation assets during all hours of the operation of the covered facility.

''(D) ALTERNATIVE BASELINE.—If the Administrator determines at any point that the greenhouse gas emissions intensity of the electric grid of any region falls below the baseline of that region, during the period beginning on the date of that determination and ending on the date on which the Administrator determines that the determination is no longer applicable, subparagraphs (A) and (B) shall be applied to covered facilities located in that region by substituting 'greenhouse gas emissions intensity of the electric grid' for 'baseline'.

''(4) USE OF FUNDS.—

''(A) ADMINISTRATION.—For fiscal year 2028 and each fiscal year thereafter, there are appropriated, out of any funds in the Treasury not otherwise appropriated, to the Administrator an amount equal to 3 percent of the amounts collected pursuant to fees and penalties assessed under paragraph (3) during

the previous calendar year to support the administration of the reporting program under subsection (b) and the assessment of the fees and penalties under this subsection.

''(B) CONSUMER ENERGY COSTS.—For fiscal year 2028 and each fiscal year thereafter, there are appropriated, out of any funds in the Treasury not otherwise appropriated, to the Administrator an amount equal to 25 percent of the amounts collected pursuant to fees and penalties assessed under paragraph (3) during the previous calendar year to award grants to States, Indian Tribes, municipalities, and electric utilities to support programs that lower residential electricity consumer energy costs, such as through energy use savings or direct rebates, to offset cost increases resulting from increased data center electricity consumption.

''(C) CLEAN FIRM GRANTS.—

''(i) IN GENERAL.—For fiscal year 2028 and each fiscal year thereafter, there are appropriated, out of any funds in the Treasury not otherwise appropriated, to the Administrator an amount equal to 70 percent of the amounts collected pursuant to fees and penalties assessed under paragraph (3) during the previous calendar year to award to eligible entities, as determined by the Administrator, grants, rebates, advanced market commitments, or low-interest loans, as determined appropriate by the Administrator, for the research, development, demonstration, and deployment of—

''(I) zero-carbon electricity generation assets that are capable of generating electricity throughout the year, with the exception of planned outages for maintenance, refueling, or retrofits, at capacity factors greater than 70 percent; or

''(II) long-duration energy storage assets that are capable of continuously discharging energy at their rated power output for at least 10 hours.

''(ii) APPLICATION.—An eligible entity seeking an award under clause (i) shall submit to the Administrator an application at such time, in such manner, and containing such information as the Administrator may require.

''(iii) CERTIFICATION AND CLAWBACK.—

''(I) CERTIFICATION.—An eligible entity that receives an award under clause (i) for the purpose of financing the construction or operation of an electricity generation asset or energy storage asset shall certify that any electric utility selling or contracted to sell electricity generated or stored by the asset shall—

''(aa) not later than 2 years after the date on which the eligible entity receives the award, allow the customers of the electric utility to voluntarily pay a higher rate for the purchase of electricity service that is sourced from zero-carbon electricity generation, including long-duration energy storage assets charged by zero-carbon electricity, in all hours of the year; and

''(bb) exclusively use the additional amounts collected pursuant to those higher rates to support the financing, development, or acquisition of—

''(AA) zero-carbon electricity generation assets that are capable of generating electricity throughout the year, with the exception of planned outages for maintenance, refueling, or retrofits, at capacity factors greater than 70 percent; or

''(BB) long-duration energy storage assets that are capable of continuously discharging energy at their rated power output for at least 10 hours.

''(II) CLAWBACK.—If the Administrator determines that a recipient of an award described in subclause (I) has violated the certification required under that subclause, the Administrator shall seek reimbursement of

the full amount of the award from the recipient.

''(d) APPLICABILITY TO LEASED FACILITIES.—For purposes of this section—

''(1) if a covered facility is leased to a tenant, the tenant shall be considered the owner of the facility; and

''(2) if a portion of a covered facility is leased to a tenant and the leased space also meets the requirements described in subsection (a)(1)—

''(A) the leased space shall be considered to be a separate covered facility from the rest of the larger facility; and

''(B) the tenant shall be considered the owner of the covered facility that comprises the leased space.''.

(b) SEVERABILITY.—If any provision of this section, an amendment made by this section, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this section and the amendments made by this section, and the application of the provision or amendment to any other person or circumstance, shall not be affected by the holding.

(c) EFFECTIVE DATE.—Notwithstanding section 19, this section and the amendments made by this section shall take effect on the date of enactment of this Act.

SA 2243. Mr. DURBIN submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

SEC. ___. TREATMENT OF PERMITTED PAYMENT STABLECOIN ISSUERS AS DEPOSITORY INSTITUTIONS.

A permitted payment stablecoin issuer shall be deemed to be an insured depository institution for the purpose of any requirement applicable to an insured depository institution to file a charter, submit suspicious activity reports, report large transactions under the Bank Secrecy Act, meet regulatory capital standards, and undergo audits.

SA 2244. Mr. DURBIN (for himself and Mr. WARNOCK) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

SEC. ___. FEDERAL CONSUMER FINANCIAL LAW SAVINGS CLAUSE.

No authority granted or conferred to a primary Federal payment stablecoin regulator or State payment stablecoin regulator under this Act, or pursuant to any rule or order issued thereunder, or pursuant to any other provision in this Act, shall be construed, either directly or in conjunction with any other provision of law, including the Consumer Financial Protection Act of 2010 (Public Law 110–203; 124 Stat. 1955) and the Electronic Fund Transfer Act (15 U.S.C. 1693 et. seq.), to limit or otherwise abridge the authority of the Director of the Consumer Financial Protection Bureau to enforce Federal consumer financial laws with respect to any person. For the avoidance of doubt, the Consumer Financial Protection Bureau has jurisdiction over permitted payment stablecoin issuers to enforce the consumer financial laws under the purview of the Consumer Financial Protection Bureau, and all enumerated consumer protection provisions under the Consumer Financial Protection

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

Act of 2010 (12 U.S.C. 5481 et seq.) are applicable to payment stablecoins.

**SA 2245.** Mr. DURBIN submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 4(a)(1)(B)(i), strike ''; and'' and insert a semicolon.

In section 4(a)(1)(B), add at the end the following:

''(iii) provide for fee limitations associated with purchasing or redeeming the payment stablecoins; and''.

**SA 2246.** Mr. DURBIN (for himself, Mr. BLUMENTHAL, Mr. REED, and Ms. WARREN) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

SEC. ___. CRYPTO ATM FRAUD PREVENTION.

(a) REGISTRATION WITH THE SECRETARY OF THE TREASURY.—Section 5330 of title 31, United States Code, is amended—

(1) in subsection (d)—

(A) in paragraph (1)(A), by inserting '', any person who owns, operates, or manages a virtual currency kiosk in the United States or its territories,'' after ''similar instruments''; and

(B) by adding at the end the following:

''(3) VIRTUAL CURRENCY; VIRTUAL CURRENCY ADDRESS; VIRTUAL CURRENCY KIOSK; VIRTUAL CURRENCY KIOSK OPERATOR.—The terms 'virtual currency', 'virtual currency address', 'virtual currency kiosk', and 'virtual currency kiosk operator' have the meanings given those terms, respectively, in section 5337.''; and

(2) by adding at the end the following:

''(f) REGISTRATION OF VIRTUAL CURRENCY KIOSK LOCATIONS.—

''(1) IN GENERAL.—Not later than 90 days after the effective date of this subsection, and not less than once every 90 days thereafter, the Secretary of the Treasury shall require virtual currency kiosk operators to submit an updated list containing the physical address of each virtual currency kiosk owned or operated by the virtual currency kiosk operator.

''(2) FORM AND MANNER OF REGISTRATION.—Each submission by a virtual currency kiosk operator pursuant to paragraph (1) shall include—

''(A) the legal name of the virtual currency kiosk operator;

''(B) any fictitious or trade name of the virtual currency kiosk operator;

''(C) the physical address of each virtual currency kiosk owned, operated, or managed by the virtual currency kiosk operator that is located in the United States or the territories of the United States;

''(D) the start date of operation of each virtual currency kiosk;

''(E) the end date of operation of each virtual currency kiosk, if applicable; and

''(F) each virtual currency address used by the virtual currency kiosk operator.

''(3) FALSE AND INCOMPLETE INFORMATION.—The filing of false or materially incomplete information in a submission required under paragraph (1) shall be deemed a failure to comply with the requirements of this subsection.''.

(b) PREVENTING FRAUDULENT TRANSACTIONS AT VIRTUAL CURRENCY KIOSKS.—

(1) IN GENERAL.—Subchapter II of Chapter 53 of Title 31, United States Code, is amended by adding at the end the following:

''§ 5337. Virtual currency kiosk fraud prevention

''(a) DEFINITIONS.—In this section:

''(1) BLOCKCHAIN ANALYTICS.—The term 'blockchain analytics' means the analysis of data from blockchains or public distributed ledgers, and associated transaction information, to provide risk-specific information about virtual currency transactions and virtual currency addresses.

''(2) CUSTOMER.—The term 'customer' means any person that purchases or sells virtual currency through a virtual currency kiosk.

''(3) EXISTING CUSTOMER.—The term 'existing customer' means a customer other than a new customer.

''(4) FINCEN.—The term 'FinCEN' means the Financial Crimes Enforcement Network of the Department of the Treasury.

''(5) NEW CUSTOMER.—The term 'new customer', with respect to a virtual currency kiosk operator, means a customer during the 14-day period beginning on the date of the first virtual currency kiosk transaction of the customer with the virtual currency kiosk operator.

''(6) TRANSACTION HASH.—The term 'transaction hash' means a unique identifier made up of a string of characters that act as a record of and provide proof that a transaction was verified and added to the blockchain.

''(7) VIRTUAL CURRENCY.—The term 'virtual currency' means any digital representation of value that is recorded on a cryptographically secured distributed ledger or any similar technology or another implementation, which was designed and built as part of a system to leverage or replace blockchain, distributed ledger technology, or their derivatives.

''(8) VIRTUAL CURRENCY ADDRESS.—The term 'virtual currency address' means an alphanumeric identifier associated with a virtual currency wallet identifying the location to which virtual currency purchased through a virtual currency kiosk can be sent or from which virtual currency sold through a virtual currency kiosk can be accessed.

''(9) VIRTUAL CURRENCY KIOSK.—The term 'virtual currency kiosk' means a stand-alone machine that is capable of accepting or dispensing legal tender in exchange for virtual currency.

''(10) VIRTUAL CURRENCY KIOSK OPERATOR.—The term 'virtual currency kiosk operator' means a person who owns, operates, or manages a virtual currency kiosk located in the United States or its territories.

''(11) VIRTUAL CURRENCY KIOSK TRANSACTION.—The term 'virtual currency kiosk transaction' means the purchase or sale of virtual currency via a virtual currency kiosk.

''(12) VIRTUAL CURRENCY WALLET.—The term 'virtual currency wallet' means a software application or other mechanism providing a means for holding, storing, and transferring virtual currency.

''(b) DISCLOSURES.—Before entering into a virtual currency transaction with a customer, a virtual currency kiosk operator shall disclose in a clear, conspicuous, and easily readable manner—

''(1) all relevant terms and conditions of the virtual currency kiosk transaction, including—

''(A) the amount of the virtual currency kiosk transaction;

''(B) the type and nature of the virtual currency kiosk transaction;

''(C) a warning that the virtual currency kiosk transaction is final, is not refundable, and may not be reversed; and

''(D) the type and amount of any fees or other expenses paid by the customer;

''(2) a warning relating to consumer fraud including—

''(A) a warning that consumer fraud often starts with contact from a stranger, and that the customer should never send money to someone they do not know;

''(B) a warning about the most common types of fraudulent schemes involving virtual currency kiosks, such as—

''(i) impersonation of a government official or a bank representative;

''(ii) threats of jail time or financial penalties;

''(iii) offers of a job or reward in exchange for payment, or offers of deals that seem too good to be true;

''(iv) claims of a frozen bank account or credit card; or

''(v) requests for donations to charity or disaster relief; and

''(C) a statement that the customer should contact the virtual currency kiosk operator's customer service helpline or State or local law enforcement if they suspect fraudulent activity.

''(c) ACKNOWLEDGMENT OF DISCLOSURES.—Each time a customer uses a virtual currency kiosk, the virtual currency kiosk operator shall ensure acknowledgment of all disclosures required under subsection (b) via confirmation of consent of the customer at the virtual currency kiosk.

''(d) RECEIPTS.—Upon completion of each virtual currency kiosk transaction, the virtual currency kiosk operator shall provide the customer with a receipt, which shall include the following information:

''(1) The name and contact information of the virtual currency kiosk operator, including a telephone number for a customer service helpline.

''(2) The name of the customer.

''(3) The type, value, date, and precise time of the virtual currency kiosk transaction, transaction hash, and each applicable virtual currency address.

''(4) The amount of the virtual currency kiosk transaction expressed in United States dollars.

''(5) All fees charged.

''(6) A statement that the customer may be entitled by law to a refund if the customer reports fraudulent activity in conjunction with the virtual currency kiosk transaction not later than 30 days after the date of the virtual currency kiosk transaction.

''(7) The refund policy of the virtual currency kiosk operator or a Uniform Resource Locator where the refund policy of the virtual currency kiosk operator can be found.

''(8) A statement that the customer should contact law enforcement if they suspect fraudulent activity, such as scams, including contact information for a relevant law enforcement or government agency.

''(9) Any additional information the virtual currency kiosk operator determines appropriate.

''(e) PHYSICAL RECEIPTS REQUIRED.—Not later than 1 year after the effective date of this section, each receipt required under subsection (d) shall be issued to the customer as a physical receipt at the virtual currency kiosk at the time of the virtual currency kiosk transaction, but such receipt may also be provided in additional forms or communications.

''(f) ANTI-FRAUD POLICY.—

''(1) IN GENERAL.—Each virtual currency kiosk operator shall take reasonable steps to detect and prevent fraud, including establishing and maintaining a written anti-fraud policy that includes—

''(A) the identification and assessment of fraud-related risk areas;

May 21, 2025      CONGRESSIONAL RECORD — SENATE      S3081

"(B) procedures and controls to protect against risks identified under subparagraph (A);

"(C) allocation of responsibility for monitoring the risks identified under subparagraph (A); and

"(D) procedures for the periodic evaluation and revision of the anti-fraud procedures, controls, and monitoring mechanisms under subparagraphs (B) and (C).

"(2) SUBMISSION OF ANTI-FRAUD POLICY TO FINCEN.—Each virtual currency kiosk operator shall submit to FinCEN the anti-fraud policy required under paragraph (1) not later than 90 days after the later of—

"(A) the effective date of this section; or

"(B) the date on which the virtual currency kiosk operator begins operating.

"(g) APPOINTMENT OF COMPLIANCE OFFICER.—Each virtual currency kiosk operator shall designate and employ a compliance officer who—

"(1) is qualified to coordinate and monitor compliance with this section and all other applicable Federal and State laws, rules, and regulations;

"(2) is employed full-time by the virtual currency kiosk operator;

"(3) is not the chief executive officer of the virtual currency kiosk operator; and

"(4) does not own or control more than 20 percent of any interest in the virtual currency kiosk operator.

"(h) USE OF BLOCKCHAIN ANALYTICS.—

"(1) IN GENERAL.—Each virtual currency kiosk operator shall use blockchain analytics to prevent sending virtual currency to a virtual currency wallet known to be affiliated with fraudulent activity at the time of a virtual currency kiosk transaction and to detect transaction patterns indicative of fraud or other illicit activities.

"(2) COMPLIANCE.—The Director of FinCEN may request evidence from any virtual currency kiosk operator to confirm compliance with this subsection.

"(i) VERBAL CONFIRMATION REQUIRED BEFORE NEW CUSTOMER TRANSACTIONS.—

"(1) IN GENERAL.—Before entering into a virtual currency kiosk transaction valued at $500 or more with a new customer, a virtual currency kiosk operator shall obtain verbal confirmation from the new customer that—

"(A) the new customer wishes to proceed with the virtual currency kiosk transaction;

"(B) the new customer understands the nature of the virtual currency kiosk transaction; and

"(C) the new customer is not being fraudulently induced to engage in the transaction.

"(2) REASONABLE EFFORT.—A virtual currency kiosk operator shall make a reasonable effort to determine whether the customer is being fraudulently induced to engage in the virtual currency kiosk transaction.

"(3) METHOD OF CONFIRMATION.—Each verbal confirmation required under paragraph (1) shall be given by way of a live telephone or video call to a person employed by, or on behalf of, the virtual currency kiosk operator.

"(j) REFUNDS.—

"(1) IN GENERAL.—

"(A) NEW CUSTOMERS.—Not later than 30 days after receiving an application under paragraph (2), a virtual currency kiosk operator shall issue a refund to a customer for the full amount of each virtual currency kiosk transaction, including the dollar value of virtual currency exchanged and all transaction fees, made during the period in which the customer was a new customer and for which the customer was fraudulently induced to engage in the virtual currency kiosk transaction.

"(B) EXISTING CUSTOMERS.—Not later than 30 days after receiving an application under paragraph (2), a virtual currency kiosk operator shall issue a refund to a customer for the full amount of all transaction fees associated with each virtual currency kiosk transaction made during the period in which the customer was an existing customer and for which the customer was fraudulently induced to engage in the virtual currency kiosk transaction.

"(2) APPLICATION.—A customer seeking a refund under paragraph (1) shall, not later than 30 days after the date of the virtual currency kiosk transaction, submit an application to the virtual currency kiosk operator that includes the following:

"(A) The name, address, and phone number of the customer.

"(B) The transaction hash of the virtual currency kiosk transaction or information sufficient to determine the type, value, date, and time of the virtual currency kiosk transaction.

"(C) A copy of a report to a State or local law enforcement or government agency, made not later than 30 days after the virtual currency kiosk transaction, that includes a sworn affidavit attesting that the customer was fraudulently induced to engage in the virtual currency kiosk transaction.

"(3) ENHANCED DAMAGES.—Any person who submits a refund to a customer in violation of paragraph (1) shall be liable to the customer for 3 times the amount of the refund owed under that paragraph or $10,000, whichever is greater. A penalty under this paragraph shall be in addition to any penalty under subsection (n).

"(k) TRANSACTION LIMITS WITH RESPECT TO NEW CUSTOMERS.—

"(1) IN A 24-HOUR PERIOD.—A virtual currency kiosk operator shall not accept more than $2,000, or the equivalent amount in virtual currency, from any new customer during any 24-hour period.

"(2) TOTAL.—A virtual currency kiosk operator shall not accept a total of more than $10,000, or the equivalent amount in virtual currency, from any new customer.

"(l) CUSTOMER SERVICE HELPLINE.—Each virtual currency kiosk operator shall provide live customer service during all hours that the virtual currency kiosk operator accepts virtual currency kiosk transactions, the phone number for which is regularly monitored and displayed in a clear, conspicuous, and easily readable manner upon each virtual currency kiosk.

"(m) COMMUNICATIONS WITH LAW ENFORCEMENT.—

"(1) IN GENERAL.—Each virtual currency kiosk operator shall provide a dedicated and frequently monitored phone number and email address for relevant law enforcement and government agencies to facilitate communication with the virtual currency kiosk operator in the event of reported or suspected fraudulent activity.

"(2) SUBMISSION.—Not later than 90 days after the effective date of this section, each virtual currency kiosk operator shall submit the phone number and email address described in paragraph (1) to FinCEN and all other relevant law enforcement and government agencies.

"(n) CIVIL PENALTIES.—

"(1) IN GENERAL.—Any person who fails to comply with any requirement of this section, or any regulation prescribed under this section, shall be liable to the United States for a civil monetary penalty of $10,000 for each such violation.

"(2) CONTINUING VIOLATION.—Each day that a violation described in paragraph (1) continues shall constitute a separate violation for purposes of such paragraph.

"(3) ASSESSMENTS.—Any penalty imposed under this section shall be assessed and collected by the Secretary of the Treasury as provided in section 5321 and any such assessment shall be subject to the provisions of that section.

"(o) RELATIONSHIP TO STATE LAWS.—The provisions of this section shall preempt any State law, rule, or regulation only to the extent that such State law, rule, or regulation conflicts with a provision of this section. Nothing in this section shall be construed to prohibit a State from enacting a law, rule, or regulation that provides greater protection to customers than the protection provided by the provisions of this section.".

(2) CLERICAL AMENDMENT.—The table of sections for chapter 53 of title 31, United States Code, is amended by inserting after the item relating to section 5336 the following:

"5337. Virtual currency kiosk fraud prevention.".

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect 90 days after the date of enactment of this Act.

SA 2247. Mr. LEE submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

SEC. ___. BANK SECRECY ACT REFORMS.

(a) RIGHT TO FINANCIAL PRIVACY ACT OF 1978.—The Right to Financial Privacy Act of 1978 (12 U.S.C. 3401 et seq.) is amended—

(1) by amending section 1102 (12 U.S.C. 3402) to read as follows:

"SEC. 1102. CONFIDENTIALITY OF RECORDS—GOVERNMENT AUTHORITIES.

"Except as provided by subsection (c) or (d) of section 1103 or section 1113, no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution unless the financial records are reasonably described and such financial records are disclosed in response to a search warrant which meets the requirements of section 1106.";

(2) by striking sections 1104 (12 U.S.C. 3404), 1105 (12 U.S.C. 3405), 1107 (12 U.S.C. 3407), and 1108 (12 U.S.C. 3408); and

(3) in section 1109(a) (12 U.S.C. 3409(a)), by striking "section 1104(c), 1105(2), 1106(c), 1107(2), 1108(4)," and inserting "section 1106(c)".

(b) TITLE 31.—Chapter 53 of title 31, United States Code, is amended—

(1) by amending section 5311 to read as follows:

"§ 5311. Declaration of purpose

"It is the purpose of this subchapter to require financial institutions to retain transaction records that include information identified with or identifiable as being derived from the financial records of particular customers.";

(2) in section 5312(a)—

(A) in paragraph (2), by repealing subparagraphs (O), (Q), (S), (T), (V), (Y), and (Z); and

(B) by amending paragraph (4) to read as follows:

"(4) 'nonfinancial trade or business' means any entity engaged in trade or business other than a financial institution.";

(3) by striking sections 5313, 5314, 5315, 5316, 5317, 5318A, 5324, 5326, 5331, 5332, and 5336;

(4) in section 5318—

(A) in subsection (a)—

(i) in the matter preceding paragraph (1), by striking "(except under section 5315 of this title and regulations prescribed under section 5315)";

(130 of 196), Page 130 of 196  Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 130 of 196
Case 4:25-cv-04966   Document 1-3   Filed 06/12/25   Page 67 of 82
S3082                    CONGRESSIONAL RECORD — SENATE                    May 21, 2025

(ii) by striking paragraph (2); and

(iii) by redesignating paragraphs (3) through (7) as paragraphs (2) through (6), respectively; and

(B) in subsection (k)—

(i) in paragraph (1)(C), by striking "has the same meaning as in section 5318A(e)(1)(B)" and inserting "means an account established to receive deposits from, make payments on behalf of a foreign financial institution, or handle other financial transactions related to such institution"; and

(ii) in paragraph (3)(A)(i)—

(I) in subclause (II), by adding "or" at the end;

(II) in subclause (III), by striking "; or" and inserting a period; and

(III) by striking subclause (IV);

(5) in section 5321—

(A) in subsection (a)—

(i) in paragraph (1), by striking "(except sections 5314, 5315, and 5336 of this title or a regulation prescribed under sections 5314, 5315, and 5336)";

(ii) by striking paragraphs (2), (3), (4), and (5);

(iii) in paragraph (6), by striking "(except section 5336)" each place that term appears;

(iv) in paragraph (7), by striking "or any special measures imposed under section 5318A"; and

(v) by redesignating paragraphs (6) and (7) as paragraphs (2) and (3), respectively;

(B) by striking subsection (c); and

(C) by redesignating subsections (d) through (g) as subsection (c) through (f), respectively;

(6) in section 5322—

(A) by striking "(except section 5315, 5324, or 5336 of this title or a regulation prescribed under section 5315, 5324, or 5336)" each place that term appears; and

(B) in subsection (d)—

(i) by striking ", or any special measures imposed under section 5318A,"; and

(ii) by striking "or section 5318A";

(7) in section 5325(a), in the matter preceding paragraph (1), by inserting after "$3,000" the following: "(as such amount is annually adjusted by the Secretary to reflect the percentage change in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the Department of Labor)";

(8) in section 5330(d)(1)—

(A) in subparagraph (A), by adding "and" at the end;

(B) by striking subparagraph (B); and

(C) by redesignating subparagraph (C) as subparagraph (B);

(9) in section 5335—

(A) by striking subsection (c); and

(B) by redesignating subsections (d) and (e) as subsections (c) and (d), respectively;

(10) by striking subchapter III; and

(11) in the table of contents for chapter 53, by striking the items relating to—

(A) sections 5313, 5314, 5315, 5316, 5317, 5318A, 5324, 5326, 5331, 5332, and 5336; and

(B) subchapter III.

SEC. ___. WARRANT REQUIREMENTS AND EXCEPTIONS.

The Right to Financial Privacy Act of 1978 (12 U.S.C. 3401 et seq.) is amended—

(1) in section 1108 (12 U.S.C. 3408)—

(A) by striking paragraph (2); and

(B) by redesignating paragraphs (3) and (4) as paragraphs (2) and (3), respectively; and

(2) in section 1113 (12 U.S.C. 3413)—

(A) by repealing subsections (a), (d), (e), (f), (g), (i), (l), (m), (n), (p), (q), and (r); and

(B) by adding at the end the following:

"(s) ACCESS OF RECORDS.—

"(1) IN GENERAL.—Notwithstanding any other provision of this title, the Federal Government may not access the financial records or information of an individual in a manner that is prohibited by the Fourth Amendment to the Constitution of the United States with respect to the records or information in question.

"(2) AID IN STATUTORY CONSTRUCTION.—It is the sense of Congress that, through the enactment of this title, Congress has established a statutory right that ensures that the expectation of privacy that the people of the United States have with respect to financial records is protected.".

SA 2248. Mr. TUBERVILLE submitted an amendment intended to be proposed to amendment SA 2228 proposed by Mr. THUNE (for Mr. RICKETTS (for himself and Ms. LUMMIS)) to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Add at the end the following:

(d) PROHIBITION ON FOREIGN ADVERSARY OWNERSHIP.—A foreign payment stablecoin issuer may not be owned, in whole or in part, by—

(1) the People's Republic of China, including the Hong Kong Special Administrative Region and the Macao Special Administrative Region;

(2) the Republic of Cuba;

(3) the Islamic Republic of Iran;

(4) the Democratic People's Republic of Korea;

(5) the Russian Federation; or

(6) the Bolivarian Republic of Venezuela under the regime of Nicolás Maduro Moros.

SA 2249. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 4(a)(10)(A)(i), strike "$50,000,000,000" and insert "$10,000,000,000".

SA 2250. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 4(a)(1), strike subparagraph (A) and insert the following:

(A) maintain reserves backing the issuer's payment stablecoins outstanding on an at least 1 to 1 basis, with reserves comprising—

(i) United States coins and currency (including Federal reserve notes);

(ii) funds held as insured demand deposits (or other deposits that may be withdrawn upon request at any time) at insured depository institutions or insured shares at insured depository institutions, subject to limitations established by the Corporation and the National Credit Union Administration, respectively, to address safety and soundness risks of such insured depository institutions; or

(iii) Treasury bills—

(I)(aa) with a remaining maturity of 93 days or less; or

(bb) issued with a maturity of 93 days or less; and

(II) with a weighted average maturity of not more than 30 days;

SA 2251. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the end the following:

SEC. ___. ACQUISITION AND DISPOSITION OF DIGITAL ASSETS.

(a) IN GENERAL.—No funds shall be used to acquire additional digital assets, other than in connection with criminal or civil asset forfeiture proceedings or in satisfaction of any civil money penalty imposed by any agency.

(b) DISPOSITION.—The Secretary of the Treasury and the Attorney General shall dispose of any digital assets in the Department of the Treasury Forfeiture Fund and the Department of Justice Assets Forfeiture Fund, respectively, in a reliable and predictable manner over time in order to—

(1) be returned to identifiable and verifiable victims of crime;

(2) be used for law enforcement operations;

(3) be equitably shared with State and local law enforcement partners; or

(4) for any other purpose described in section 9705 of title 31, United States Code, section 524(c) of title 28, United States Code, section 981 of title 18, United States Code, or section 511 of the Controlled Substances Act (21 U.S.C. 881).

(c) REPORTS.—The reports to Congress described in 9705 of title 31, United States Code, and section 524(c) of title 28, United States Code, shall include a report on the time horizons over which the Secretary and the Attorney General anticipate disposing of digital assets in the Funds.

SA 2252. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Add at the end the following:

SEC. ___. STANDARD OF REVIEW.

If this Act is silent or ambiguous as to the proper construction of a particular term or provision or set of terms or provisions, and a primary Federal payment stablecoin regulator has followed the applicable procedures in sections 551 through 559 of title 5, United States Code, has otherwise lawfully adjudicated a matter, or has followed the corresponding procedural provisions of this Act, as applicable, a reviewing court shall defer to the reasonable or permissible interpretation of that statute by an agency, regardless of the significance of the related agency action or a possible future agency action.

SA 2253. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Strike section 4(a)(10) and insert the following:

(10) AUDITING AND INTERNAL CONTROLS.—

(A) MANAGEMENT RESPONSIBILITY FOR FINANCIAL STATEMENTS AND INTERNAL CONTROLS.—Each payment stablecoin issuer shall prepare—

(i) annual financial statements in accordance with generally accepted accounting principles and such other disclosure requirements as the primary Federal payment stablecoin regulators and State payment stablecoin regulators may prescribe; and

(ii) a report signed by the chief executive officer and the chief accounting or financial officer of the institution which contains—

(I) a statement of the management's responsibilities for—

(aa) preparing financial statements;

(bb) establishing and maintaining an adequate internal control structure and procedures for financial reporting; and

(cc) complying with the laws and regulations relating to safety and soundness which

are designated by the primary Federal payment stablecoin regulators and State payment stablecoin regulators; and

(II) an assessment, as of the end of the institution's most recent fiscal year, of—

(aa) the effectiveness of such internal control structure and procedures; and

(bb) the institution's compliance with the laws and regulations relating to safety and soundness which are designated by the primary Federal payment stablecoin regulators and State payment stablecoin regulators.

(B) INTERNAL CONTROL EVALUATION AND REPORTING REQUIREMENTS FOR INDEPENDENT PUBLIC ACCOUNTANTS.—

(i) IN GENERAL.—With respect to any internal control report of any institution, the institution's independent public accountant shall attest to, and report separately on, the assertions of the institution's management contained in such report.

(ii) ATTESTATION REQUIREMENTS.—Any attestation pursuant to clause (i) shall be made in accordance with generally accepted standards for attestation engagements.

(C) ANNUAL INDEPENDENT AUDITS OF FINANCIAL STATEMENTS.—

(i) AUDITS REQUIRED.—The primary Federal payment stablecoin regulators and State payment stablecoin regulators shall prescribe regulations requiring that each payment stablecoin issuer shall have an annual independent audit made of the institution's financial statements by an independent public accountant in accordance with generally accepted auditing standards.

(ii) SCOPE OF AUDIT.—In connection with any audit under this subparagraph, the independent public accountant shall determine and report whether the financial statements of the issuer—

(I) are presented fairly in accordance with generally accepted accounting principles; and

(II) comply with such other disclosure requirements as the primary Federal payment stablecoin regulators and State payment stablecoin regulators may prescribe.

(D) FORM AND CONTENT OF REPORTS AND AUDITING STANDARD.—The scope of each report by an independent public accountant pursuant to this paragraph, and the procedures followed in preparing such report, shall meet or exceed the scope and procedures required by generally accepted auditing standards and other applicable standards recognized by the primary Federal payment stablecoin regulators and State payment stablecoin regulators.

SA **2254.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. SANCTIONS ENFORCEMENT.**

(a) EXTRATERRITORIAL JURISDICTION.—For purposes of any provision of law authorizing sanctions or sanctions enforcement actions, a payment stablecoin denominated in United States dollars, wherever located, shall be considered property subject to the jurisdiction of the United States.

(b) AUTHORITIES OVER DIGITAL ASSET PLATFORMS.—Section 203 of the International Emergency Economic Powers Act (50 U.S.C. 1702) is amended by adding at the end the following:

"(d) DIGITAL ASSET PLATFORMS.—

"(1) IN GENERAL.—For the purposes of this section, any digital asset platform, wherever located, shall be considered subject to the jurisdiction of the United States if the Secretary of the Treasury determines the plat-

form is engaged in the business of performing any of the functions of a digital asset platform in interstate commerce.

"(2) DEFINITION.—For purposes of paragraph (1), the term 'digital asset platform' means any person that the Secretary determines—

"(A) facilitates the exchange, purchase, sale, custody, transfer, issuance, or lending of digital assets (as defined in section 2 of the Guiding and Establishing National Innovation for U.S. Stablecoins Act);

"(B) makes available any service in connection with digital asset transactions; or

"(C) controls any person engaged in an activity described in subparagraph (A) or (B).".

SA **2255.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. USE OF SANCTIONS AUTHORITIES UNDER INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT WITH RESPECT TO BLOCKCHAIN-ENABLED SMART CONTRACTS.**

Section 203 of the International Emergency Economic Powers Act (50 U.S.C. 1702) is amended—

(1) in subsection (a), by adding at the end the following:

"(4) The President may exercise the authorities granted by this subsection with respect to blockchain-enabled smart contracts, or other similar technology, without regard to whether such contracts operate autonomously, can be modified, or are owned."; and

(2) by adding at the end the following:

"(d) In this section:

"(1) The term 'interest' includes any interest of any nature whatsoever, direct or indirect, present, future, or contingent, and legal, equitable, or beneficial, or otherwise, without regard to whether such interest is legally cognizable.

"(2) The terms 'person' and 'national' include—

"(A) any individual;

"(B) any entity, association, group, or other organization; and

"(C) any body of persons joined by common purpose or interest.

"(3) The term 'property' includes—

"(A) property of any nature whatsoever, real, personal, or mixed, tangible or intangible, even if such property is abandoned or ownerless;

"(B) services of any nature whatsoever; and

"(C) contracts of any nature whatsoever.".

SA **2256.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place in section 4(a), insert the following:

"(___) ADDITIONAL STANDARDS AUTHORIZED.—The primary Federal payment stablecoin regulators and State payment stablecoin regulators may establish additional prudential standards, including enhanced public disclosures, for payment stablecoin issuers that such regulators determine are appropriate, in their discretion.

SA **2257.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins,

and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. PROHIBITIONS OR CONDITIONS ON CERTAIN TRANSMITTALS OF FUNDS.**

Section 5318A of title 31, United States Code, is amended—

(1) in subsection (a)(2)(C), by striking "subsection (b)(5)" and inserting "paragraphs (5) and (6) of subsection (b)"; and

(2) in subsection (b)—

(A) in paragraph (5), by striking "for or on behalf of a foreign banking institution"; and

(B) by adding at the end the following:

"(6) PROHIBITIONS OR CONDITIONS ON CERTAIN TRANSMITTALS OF FUNDS.—If the Secretary finds a jurisdiction outside the United States, 1 or more financial institutions operating outside the United States, 1 or more types of accounts within, or involving, a jurisdiction outside the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside the United States to be of primary money laundering concern, the Secretary, in consultation with the Secretary of State, the Attorney General, and the Chairman of the Board of Governors of the Federal Reserve System, may prohibit, or impose conditions upon, certain transmittals of funds (to be determined by the Secretary) to or from any domestic financial institution or domestic financial agency if that transmittal of funds involves any such jurisdiction, institution, class of transaction, or type of account.".

SA **2258.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place in section 4(a)(8), insert the following:

(___) MANAGEMENT OFFICIALS.—

(i) IN GENERAL.—A management official of a permitted payment stablecoin issuer may not serve as a management official of any other permitted payment stablecoin issuer that is not an institution-affiliated party.

(ii) ENFORCEMENT.—In the enforcement of any violation of clause (i), the Attorney General shall have all of the functions and powers afforded the Attorney General under the Clayton Act (15 U.S.C. 12 et seq.) without respect to any jurisdictional limitations under that Act, including the power to bring an enforcement action in the same manner as if the violation of this subsection had been a violation of that Act. All of the functions and powers of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice are available to the Attorney General or to such Assistant Attorney General to investigate a possible violation of clause (i) in the same manner as if such possible violation was a possible violation of that Act.

SA **2259.** Mr. MURPHY submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. MEME ACT.**

(a) SHORT TITLE.—This section may be cited as the "Modern Emoluments and Malfeasance Enforcement Act" or the "MEME Act".

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

States Code, is amended by inserting after the item relating to section 220 the following:

"221. Prohibited financial transactions.".

---

**SA 2260.** Mr. SCHIFF submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place in section 4, insert the following:

(____) DISCLOSURE RELATING TO PAYMENT STABLECOINS.—Section 13104 of title 5, United States Code, is amended—

(1) in subsection (a)—

(A) in paragraph (5)—

(i) in subparagraph (B), by inserting "payment stablecoins (as defined in section 2 of the GENIUS ACT)," after "commodities futures,"; and

(ii) in the flush matter following subparagraph (B), by adding at the end the following: "Reporting is not required under subparagraph (B) of any exchange of payment stablecoins (as defined in section 2 of the GENIUS Act) for goods and services."; and

(B) by adding at the end the following:

"(9) PAYMENT STABLECOINS.—The identity and category of value of any payment stablecoin (as defined in section 2 of the GENIUS Act) that has a fair market value that exceeds $1,000 as of the close of the preceding calendar year held by the reporting individual during the preceding calendar year.";

(2) in subsection (b)(1)(B), by striking "(3) and (4)" and inserting "(3), (4), and (9)"; and

(3) in subsection (d)(1)—

(A) in the paragraph heading, by striking "(3), (4), (5), and (8)" and inserting "(3), (4), (5), (8), and (9)"; and

(B) in the matter preceding subparagraph (A), by striking "(3), (4), (5), and (8)" and inserting "(3), (4), (5), (8), and (9)".

---

**SA 2261.** Mr. SCHIFF submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place in section 4, insert the following:

(____) DISCLOSURE RELATING TO PAYMENT STABLECOINS.—Section 13104(a) of title 5, United States Code, is amended—

(1) in paragraph (3)—

(A) in the paragraph heading, by inserting "AND PAYMENT STABLECOINS" after "PROPERTY"; and

(B) in the first sentence, by inserting "or payment stablecoins (as defined in section 2 of the GENIUS Act)" after "any interest in property"; and

(2) in paragraph (5)—

(A) in subparagraph (B), by inserting "payment stablecoins (as defined in section 2 of the GENIUS ACT)," after "commodities futures,"; and

(B) in the flush matter following subparagraph (B), by adding at the end the following: "Reporting is not required under subparagraph (B) of any exchange of payment stablecoins (as defined in section 2 of the GENIUS Act) for goods and services.".

---

**SA 2262.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 6(b), strike "attempted" each place that term appears and insert "potential".

In section 6(b)(1)(A), strike "or has willfully recklessly violated" and insert ", has willfully or recklessly violated, or is about to willfully or recklessly violate".

In section 6(b)(2), in the matter preceding subparagraph (A), strike "attempting" and insert "about".

In section 6(b)(2), in the matter preceding subparagraph (A), strike "application or other request" and insert "application, notice, or other request by the permitted payment stablecoin issuer or institution-affiliated party or any written agreement entered into with the regulator".

---

**SA 2263.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 2(13), insert ", or agent for," after "controlling stockholder of".

In section 6(b)(3), in the matter preceding subparagraph (A), strike "all such permitted payment stablecoin issuers" and insert "all such permitted payment stablecoin issues, any insured depository institution, any savings association, any Farm Credit System institution chartered under, and subject to the provisions of, the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.), any appropriate Federal banking agency (as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the Federal Housing Finance Agency, any Federal Home Loan Bank, or the Bureau of Consumer Financial Protection".

In section 6(b)(3)(A), strike "; or" and insert a semicolon.

In section 6(b)(3)(B), strike the period and insert a semicolon.

In section 6(b)(3), add at the end the following:

(C) the institution-affiliated party has participated in any unsafe or unsound practice; or

(D) the institution-affiliated party has breached any fiduciary duty.

---

**SA 2264.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 4(f), in the subsection heading, strike "OR DIRECTORS" and insert "DIRECTORS, OR PRINCIPAL SHAREHOLDERS".

In section 4(f)(1)(A), strike "; or" and insert a semicolon.

In section 4(f)(1)(B), strike the period and insert "; or".

In section 4(f)(1), add at the end the following:

(C) a principal shareholder of a payment stablecoin issuer.

In section 4(f), add at the end the following:

(3) PRINCIPAL SHAREHOLDER.—For purposes of paragraph (1)(C), a person is a principal shareholder of a payment stablecoin issuer if that person controls more than 5 percent of a class of equity securities of a payment stablecoin issuer.

In section 5(c)(2), insert "any crime involving dishonesty or breach of trust or" after "convicted of".

---

**SA 2265.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins,

and for other purposes; which was ordered to lie on the table; as follows:

At the end of section 4(a), add the following:

(____) EXECUTIVE COMPENSATION STANDARDS.—Each primary Federal payment stablecoin regulator and State payment stablecoin regulator shall prescribe, with respect to each permitted payment stablecoin issuer within the jurisdiction of the regulator—

(A) standards prohibiting, as an unsafe and unsound practice, any employment contract, compensation or benefit agreement, fee arrangement, perquisite, stock option plan, post-employment benefit, or other compensatory arrangement that—

(i) would provide any executive officer, employee, director, or principal shareholder of the issuer with excessive compensation, fees, or benefits; or

(ii) could lead to material financial loss to the issuer;

(B) standards specifying when compensation, fees, or benefits described in subparagraph (A) are excessive, which shall require the regulator to determine whether the amounts are unreasonable or disproportionate to the services actually performed by the applicable individual, taking into consideration—

(i) the combined value of all cash and non-cash benefits provided to the individual;

(ii) the compensation history of the individual and other individuals with comparable expertise at the issuer;

(iii) the financial condition of the issuer;

(iv) comparable compensation practices at comparable issuers, which shall be based on such factors as asset size, geographic location, and the complexity of the asset portfolio;

(v) with respect to post-employment benefits, the projected total cost and benefit to the issuer;

(vi) any connection between the individual and any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with respect to the issuer; and

(vii) other factors that the regulator determines to be relevant; and

(C) such other standards relating to compensation, fees, and benefits as the regulator determines to be appropriate.

---

## NOTICE OF INTENT TO OBJECT TO PROCEEDING

I, Senator RICHARD J. DURBIN, intend to object to proceeding to the nomination of Jason Reding Quinones, of Florida, to be United States Attorney for the Southern District of Florida, dated May 21, 2025.

---

## AUTHORITY FOR COMMITTEES TO MEET

Mr. CASSIDY. Mr. President, I have 14 requests for committees to meet during today's session of the Senate. They have the approval of the Majority and Minority Leaders.

Pursuant to rule XXVI, paragraph 5(a), of the Standing Rules of the Senate, the following committees are authorized to meet during today's session of the Senate:

COMMITTEE ON AGRICULTURE, NUTRITION, AND FORESTRY

The Committee on Agriculture, Nutrition, and Forestry is authorized to meet during the session of the Senate

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

on Wednesday, May 21, 2025, at 10:30 a.m., to conduct a hearing on nominations.

COMMITTEE ON AGRICULTURE, NUTRITION, AND FORESTRY

The Committee on Agriculture, Nutrition, and Forestry is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, to conduct a business meeting.

COMMITTEE ON ARMED SERVICES

The Committee on Armed Services is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 9:30 a.m., to conduct a closed briefing.

COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

The Committee on Commerce, Science, and Transportation is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10 a.m., to conduct an executive session.

COMMITTEE ON ENERGY AND NATURAL RESOURCES

The Committee on Energy and Natural Resources is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 9:30 a.m., to conduct a business meeting.

COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

The Committee on Environment and Public Works is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10 a.m., to conduct a hearing.

COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS

The Committee on Health, Education, Labor, and Pensions is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10 a.m., to conduct a hearing.

COMMITTEE ON THE JUDICIARY

The Committee on the Judiciary is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10:15 a.m., to conduct a hearing on nominations.

COMMITTEE ON THE JUDICIARY

The Committee on the Judiciary is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 2:30 p.m., to conduct a hearing.

COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP

The Committee on Small Business and Entrepreneurship is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10 a.m., to conduct a hearing.

COMMITTEE ON VETERANS' AFFAIRS

The Committee on Veterans' Affairs is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 4 p.m., to conduct a hearing.

SELECT COMMITTEE ON INTELLIGENCE

The Select Committee on Intelligence is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 2:30 p.m., to conduct a closed briefing.

SUBCOMMITTEE ON CYBERSECURITY

The Subcommittee on Cybersecurity of the Committee on Armed Services is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 2:30 p.m., to receive testimony in open and closed sessions.

PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

The Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 2 p.m., to conduct a hearing.

_____

ORDERS FOR THURSDAY, MAY 22, 2025

Mr. THUNE. Mr. President, I ask unanimous consent that when the Senate completes its business today, it stand adjourned until 10 a.m. on Thursday, May 22; that following the prayer and pledge, the morning hour be deemed expired, the Journal of proceedings be approved to date, the time for the two leaders be reserved for their use later in the day, morning business be closed, and following leader remarks, the Senate resume consideration of H.J. Res. 88, the joint resolution be read a third time, and the Senate vote on passage of the joint resolution; finally, if passed, the motion to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

_____

ORDER FOR ADJOURNMENT

Mr. THUNE. Mr. President, if there is no further business to come before the Senate, I ask that it stand adjourned under the previous order, following the remarks of my colleagues.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from West Virginia.

_____

H.J. RES. 88

Mrs. CAPITO. Mr. President, as chairman of the Environment and Public Works Committee, I rise in support of my resolution to block the Biden EPA's rule approving California's Clean Air Act waiver for its Advanced Clean Cars II regulation.

I want to explain to my colleagues why they should join me in disapproving of this job-killing electric vehicle mandate and why the use of the Congressional Review Act is appropriate and correct in this instance.

First, I would like to offer a little bit of background about how we got here. Typically, the Clean Air Act stops State laws that regulate emissions for motor vehicles in favor of a national standard by the Environmental Protection Agency. This allows automakers to build the same vehicles for use by drivers all across the country.

Since 1966, the Clean Air Act has given California, and only California, the ability to seek a waiver of Federal mobile source emissions standards. Other States can choose to adopt California's standard or follow the Federal standard, but they cannot seek their own waiver.

Congress provided California this special ability because of its need to address unique locally high levels of pollution—like smog—in Los Angeles and in the San Joaquin Valley. But over the past two decades, California has used its waiver authority to push its extreme climate policies on the rest of the country, which was never the intent of the Clean Air Act's decision to grant the waiver. As EPA recognized in 2008, the rationale for California's ability to seek waivers does not extend to greenhouse gases, as these levels are not unique to California but are global in nature. But now, in addition to establishing an EV mandate, California is also seeking to use its waiver authority to eliminate diesel trucks. The Advanced Clean Trucks and Low $NO_X$ truck rules set unattainable standards that will harm our ability to ship goods across this country.

While my remarks today will focus on the resolution of disapproval that I have offered on the Advanced Clean Cars II EV mandate, I strongly support the resolutions that will follow that are offered by Senator FISCHER and Senator MULLIN to block these rules.

California's Advanced Clean Cars II program requires all—and I did say "all"—vehicles sold in that State, Washington, DC, and 11 other States that have adopted California's standard—all cars—to be zero-emissions vehicles by the year 2035; meaning, in one decade, these States, totaling 30 percent of the new car market, will have a full ban on the sale of gasoline-powered vehicles—and not just those but also on traditional hybrids as well.

The regulation begins in 2026—next year—by requiring affected States to sell 35 percent electric vehicles. These cars will hit showroom floors within the next few months. So to avoid the devastating impacts of these waivers, we need to act now.

These unattainable standards, backed by a fine of $26,000 per vehicle—I said $26,000 per vehicle—for noncompliance attempt to reshape auto manufacturing and take away consumer choice all across the country.

I want to be clear, I have no problem with electric vehicles. Consumers should be able to purchase the vehicle of their choice. But I do have a big problem with electric vehicle mandates that replace the will of the consumer and the will of the government.

Only 2.3 percent of new vehicle registrations in West Virginia last year were electric vehicles. Nationwide, EVs accounted for only 10.2 percent of new vehicle registrations. The plain truth is, electric vehicles are not popular. Even in New York, one of the States that has adopted the California standard, only 10.1 percent of 2024 new vehicle registrations were EVs. Perhaps that is why six New York House Democrats voted against this rule.

As States and manufacturers ramp up to meet this EV mandate, the impacts and costs will be massive. As the National Automobile Dealers Association wrote, the economic impact of California's regulation will affect all States. Soon, automakers will be forced to either sell more EVs or limit the number of gas cars for sale in the other affected States. Affordable new gas and hybrid vehicles, which cost between $30,000 and $40,000, are expected to be among the first vehicles that would be rationed out. This will leave consumers with far fewer choices and force everyone to pay more for new and used cars to reflect consumer demand and offset automaker losses.

To make matters worse, hundreds of thousands of jobs will be eliminated. The Specialty Equipment Market Association wrote that a ban on internal combustion engines "would represent over $100 billion annual economic impact to the U.S. economy and impact roughly 330,000 jobs."

And those job losses will not be confined to California, but they will be spread all across the Nation. Workers in auto manufacturing, oil and gas production, and the agriculture sectors across this country would lose jobs because of California's EV mandate.

And the elected officials who represent Michigan autoworkers, Nebraska corn farmers, or West Virginia gas workers had no say in California and EPA's decision to impose this mandate nationwide.

The responsibility of approving or disapproving California's waiver application rests solely with the EPA.

California applied to EPA for a waiver to implement ACC2 in May of 2023, and the Biden administration sat on that application until December of 2024. Well, there is no practical reason that the Biden EPA couldn't have acted on California's waiver in 2023 or even during the first 11 months of 2024, but we know why the previous administration decided to wait: President Biden and his team knew that electric vehicle mandates were unpopular with most American voters, especially swing State voters that would decide the Presidential and congressional elections. Mr. President, 2024 polling from WPA intelligence showed that 70 percent of likely voters opposed a ban on gas-powered cars, with only 18 percent in support.

Both the text of the Clean Air Act and public sentiment should have led the Biden EPA to reject California's application. Instead, the Biden administration approved California's waiver in December 2024, after Democrats lost the election.

EPA's approval was published in the Federal Register on January 6, 2025, the same day Congress certified President Trump's victory. The decision to limit consumer choice, increase car prices, and cost hundreds of thousands of jobs was made by California and approved by a Federal administration that had already been rejected by the American voters.

I strongly oppose these California EV mandates and strongly oppose a process that allows such a major national policy decision to be made against the will of the American people, without input from their Members of Congress.

In 1996, the Congressional Review Act was enacted through regular order to create an expedited process for Congress to consider resolutions that overturn rules finalized by Federal Agencies, like the Biden EPA's decision to approve California's EV mandate. The CRA's rationale—as explained by sponsors Don Nickles, Harry Reid, and Ted Stevens—was to allow Congress to efficiently stop rules it finds "too burdensome, excessive, inappropriate, or duplicative." Every one of these terms applies to the situation we find ourselves in today.

The CRA works by requiring Federal Agencies to submit their final rules to the Senate and to the House of Representatives. When a rule is submitted to Congress and published in the Federal Register, a 60-day period is opened for any Member to introduce a resolution of disapproval that, if passed by both Chambers and signed by the President, prevents the rule from taking effect. These resolutions, by law, are subject to limited debate, allowing them to be enacted by the Senate by a simple majority vote.

Senators can bring resolutions of disapproval to the Senate floor either by reporting them through committee or by submitting a petition that has been signed by at least 30 Senators. Either way, the process allows the Senators to vote on whether the rule should go into effect, providing a method for elected Representatives to have oversight over unelected bureaucracies.

I decided to use the CRA process and introduce this resolution against EPA's approval of the California electric vehicle mandate for two reasons.

First, enactment of the resolution would vacate EPA's rule approving of the California waiver, stopping the EV mandate and protecting consumers and workers across the country.

Second, because a vote here in the Senate and in the House would allow the elected representatives of Americans of all 50 States, not just California, to decide whether a nationally significant policy should be implemented.

As I discussed earlier, the Biden administration delayed its action on approving the California waiver for 18 months to get past the 2024 election. But that wasn't the end of the previous administration's effort to shield this unpopular EV mandate from the will of the people. The Biden EPA did not submit its approval of the California EV mandate for review under the CRA and claimed its action was not a rule. That was a clear effort to avoid accountability from Congress.

Fortunately, President Trump and EPA Administrator Lee Zeldin decided to give the American people a say by submitting the approved California

waiver to Congress as a rule. Under the CRA, that submission by the Trump EPA triggered my right as a Senator to introduce this resolution to block California's EV mandate. But that submission kicked off another effort by Democrats to stop the Senate from voting on this issue.

On March of this year, at the request of three Senate Democrats, the Government Accountability Office wrote an unprecedented letter stating its "observation" that the Biden EPA action approving California's EV waiver is not a rule subject to the CRA. Similar to the Biden administration's efforts, this GAO letter was obtained in an attempt to stop the Senate from exercising its authority provided by the CRA, keeping the California EV mandate in place without a vote in this Chamber.

Nothing in the Congressional Review Act, Senate rules, or Senate precedents gives unelected staff at the GAO the authority to prevent elected Senators from considering a resolution of disapproval against a rule. In fact, Comptroller General Gene Dodaro, who is head of the GAO, recently testified in a Senate hearing and said:

> Our decisions are not dispositive on the Congress—they're advisory.

But Democrats now want to give the GAO staff a veto over the Senate's use of the CRA to disapprove rules submitted by Federal Agencies.

The Senate has given GAO the authority in the CRA process in the past to protect the legislative branch's ability to conduct oversight over administrative rules.

My predecessor West Virginia Senator Jay Rockefeller was a leader in 2008 efforts to give GAO the ability to trigger the Congressional Review Act procedures for Agency actions not submitted to Congress as required by the statute.

The issue in 2008 was an action by the Centers for Medicare and Medicaid Services directing States on how they were to administer the Children's Health Insurance Program. CMS did not submit its action to Congress, calling it guidance rather than a rule. Senator Rockefeller asked GAO to determine that the CMS guidance was a rule. When GAO agreed with him, he introduced a resolution to block the rule—the first time such a resolution was introduced pursuant to a GAO decision rather than an Agency submission.

Ten years later, Congress passed and President Trump signed a resolution introduced by my colleague Senator MORAN from Kansas against guidance from the Consumer Financial Protection Bureau that was similarly not submitted. Senator Toomey went to GAO for a legal opinion that the CFPB guidance was a rule for the purposes of the CRA, and GAO determined that Congress could consider it as such.

I have personally gone to the GAO myself on several occasions when I believed that an Agency action not submitted to Congress under the CRA

(136 of 196), Page 136 of 196    Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 136 of 196
Case 4:25-cv-04966    Document 1-3    Filed 06/12/25    Page 73 of 82
S3088
CONGRESSIONAL RECORD — SENATE

should, in fact, be considered a rule, like I did in 2022, when GAO agreed with me that guidance from the Federal Highway Administration instructing State departments of transportation to prioritize bike and pedestrian projects over new highway capacity projects should be a rule. And I did so a year later, when GAO disagreed with my argument that a separate California waiver should have been submitted as a rule.

In all of these cases, Federal Agencies had not submitted their actions to Congress, but in this case, EPA did submit its rule approving the California EV mandate to Congress.

A GAO opinion has never been used to cut off the Senate's ability to consider a CRA resolution of disapproval when the Federal Agency actually submitted the rule to Congress. In fact, GAO has repeatedly recognized that its legal opinions are unnecessary when Agencies submit a rule to Congress.

In 2018, GAO wrote:

[The] Congressional Review Act gives agencies the primary responsibility for determining which agency actions meet the statute's definition of a rule.''

And:

Submission . . . to Congress pursuant to the Congressional Review Act obviates the need for a GAO opinion.''

Two years later, GAO concluded:

When an agency submits a document to our office under CRA, we consider that to be the agency's determination that the document is a rule under CRA. When a rule is submitted to Congress, Congress has an opportunity to review the rule and pass a joint resolution of disapproval to void the rule.

Protecting our legislative branch oversight is the basis upon which this Senate has involved GAO in the CRA process since 2008, but it does not follow that GAO should be able to halt congressional privileges when the executive branch does submit a rule. Once an Agency has submitted a rule to Congress, as EPA has done here, elected representatives should be able to decide whether to approve or disapprove of the rule. That is how the Congressional Review Act has functioned since its beginning in 1996.

I want to quickly talk about the filibuster and the Parliamentarian because this has been raised.

My Democrat colleagues argue that there will be ''profound institutional consequences'' by the Senate not allowing GAO a veto over the use of the CRA against Agency-submitted rules. I, on the other hand, disagree. Such a GAO veto has never existed before, and we must remember that the CRA is all about protecting the authority of elected representatives over unelected Agencies. Delegating to the unelected GAO staff the authority to determine if Members of Congress can use the CRA against Agency-submitted rules turns the statute completely on its head.

My Democrat colleagues say that our action today undermines the legislative filibuster, and that is simply not true. I support the legislative fili-

buster. I have supported the legislative filibuster as a Senator in the majority and as a Senator in the minority.

The Congressional Review Act, which was passed with the legislative filibuster in place, has stood since 1996, providing a narrow exception to the Senate's normal practice of extended debate. It applies only to allow for disapproval of Federal Agency rules and only during a prescribed time defined by the statute.

In deciding to retain the 30-year-old practice of allowing the use of CRA procedures against Agency-submitted rules, we are not expanding any authority to enact laws by a simple majority. We are not expanding the scope of the CRA itself but, rather, simply refusing to narrow the CRA by subjecting its use to GAO approval.

Like my colleagues in the Senate, I hold our Parliamentarians in very high regard. They perform and she performs a vital role in this institution, and her wise counsel is critical to making this Senate function.

I want to make two things crystal clear: The procedural action we have taken today is not about the filibuster and not about the Parliamentarian. Instead, the procedural issue before the Senate was simply whether GAO staff should be able to block resolutions of disapproval against Agency-submitted rules.

I have explained why my answer to that is no. I have spent significant time talking about the CRA itself and about procedure. I think that is important because I respect the Senate as an institution, and I care about how we do things.

We shouldn't lose sight of the substance of what we are doing today. We are deciding whether California, DC, and 11 other States can impose an electric vehicle mandate that will take away consumer choice, drive up prices, and eliminate jobs across the country.

West Virginians don't want California's climate policy. West Virginians don't want California's EV mandate. And I am confident that most Americans don't want these things either. That is why the House of Representatives passed this resolution of disapproval with a strong bipartisan vote that included every Republican and 35 Democrats, some from the State of California.

Today, despite the best efforts of the Biden administration and congressional Democrats to shield this EV mandate from the will of the American people, the Senate will have its say.

I urge my colleagues to vote tomorrow for the resolution of disapproval.

I yield the floor.

The PRESIDING OFFICER. The Senator from Rhode Island.

Mr. WHITEHOUSE. Mr. President, today, the Senate has done something unprecedented. Our actions and the ones that will follow from the procedural steps taken here today, over the next day or so, will change the Clean Air Act, will change the Congressional

Review Act, will change the rules of the Senate, and will do so by overruling the Parliamentarian and breaking the filibuster.

In effect, going nuclear. The Republicans can say what they like about this, but the fact of the matter is that the Parliamentarian ruled that the Congressional Review Act does not permit what we are doing.

And she did so on the basis of advice from the Government Accountability Office, which was given that role by the Senate, given that role in a bipartisan agreement years ago.

So we are de facto legislating here, amending the operation of the Clean Air Act to remove a statutory waiver for the State of California, amending the Congressional Review Act, so it is no longer the narrow provision only about rules with a short timeframe that the Senator from West Virginia described.

That may have been what the Congressional Review Act was like until today, but after today, none of that is true any longer because of this action.

It did not have to come to this. It did not have to come to this. There were many ways around the procedural shortcut of going nuclear, where a majority of the Senate shoves its view on the minority, without consideration, without cloture, without 60 votes, without negotiation, just rolling the minority in order to get what they want done. That ought to be a last recourse for a desperate majority, but instead it was the first recourse because this is the easy way to do what the fossil fuel industry wants.

Now, one way to do this would have been to go and amend the Clean Air Act and amend the Congressional Review Act through regular order, the way the laws were created, through bicameralism, with both Houses passing the bill and the President signing it. They have been amended over and over again. We know how to amend those laws. That is what we call in the Senate regular order. But regular order would have required compromise, would have required effort, would have required working with Democrats, and the fossil fuel industry didn't want to put up with any of that. They wanted the Republican Party to jam this through, and that is what happened.

So regular order—not interested, not going to do it. That was one way. The second way would have been to go to EPA and have them follow an administrative process, which they had already started in the first Trump administration, to review the three predicates for the waiver administratively.

Now, the problem is that would have taken a certain amount of administrative effort out of EPA, and it also would have required EPA to meet the basic standards for Agency action, that the Agency action be rationally based and not arbitrary and capricious.

If they made a decision that had no rational basis and was arbitrary and

CONGRESSIONAL RECORD — SENATE

capricious, then it could be challenged in court and knocked down. So rather than allow the Agency to go through that administrative process, subject to those very standard requirements of not being arbitrary and capricious and having a rational basis, they came here where it can be as arbitrary and capricious as you please, where it can have no rational basis as long as you have got the votes and are willing to roll the minority.

So that is the second avenue that Republicans could have followed here, that the fossil fuel industry could have followed here, but simply didn't want to.

The third avenue that they could have undertaken was to go talk to California. This is California's waiver. Last I heard, California had a Governor. Last I heard, the United States has a President. They could talk. They could invite the fossil fuel industry into the room. They could invite the auto industry into the room. They could invite environmental groups and health groups into the room.

They could say: Look, we want to have some consideration here. Let's negotiate. But they didn't want to do that because they had this quick and dirty, sneaky maneuver that they could pull off so they didn't have to negotiate, they didn't have to legislate, and they didn't have to use regulatory process. All those rules were available, and yet this was the shortcut that was chosen.

Now, we have repeatedly heard it said—in fact, it was recently said just now on the floor—that President Biden claimed that what was being done with the California waiver was not a rule, claimed that it was not a rule. Do you know why the Biden administration claimed it was not a rule? For the simple reason that it was not a rule.

It did not go through the APA rulemaking process, and it had a history. And I have got a summary of that history right here.

The EPA started granting waivers to California under this Clean Air Act process in 1968. The first waiver was granted on July 11, 1968. And this summary of the waivers that have either been granted or amended or modified over the years, 131 times. The score on whether the California clean air rule is treated by EPA as a waiver or a rule, it is 131 to 0.

It is nearly 50 years of constant practice undisputed. Under President Nixon, 15 times a Republican EPA granted the waivers. Under President Reagan, 33 times a Republican EPA granted the waivers. Under President George H. W. Bush, nine times a Republican EPA granted the waivers. Under George W. Bush, 15 times a Republican President granted the waivers. A waiver for half a century has never once been treated as a rule.

So it really ought to come as no surprise to anybody that the Biden administration did not treat it as a rule. The Reagan administration didn't treat it as a rule. Neither Bush administrations treated it as a rule. No Republican administration since the passage of the Clean Air Act has treated these California waivers as a rule. It just isn't so.

So it is pretty clear that with this history of waivers, there was a real problem. And that is why when EPA pretended for the first time that this was a rule, the Government Accountability Office, which didn't inject itself into this, which didn't butt in to try to interfere with us, which was tasked with giving advice on this by the Senate—we gave them this job, and now we are accusing them of butting in and interfering with our process? We gave them this job so they did it.

It has been said that what GAO did was unprecedented in making this decision that it is actually a waiver and not a rule. Yes, it is unprecedented. It is unprecedented in the same way that a referee blowing a whistle on an unprecedented foul is doing something unprecedented. But it is not the fault of the referee that their whistleblowing is unprecedented, it is the fault of the player committing the foul that has never been committed before, and the foul is to treat the waiver as a rule.

So it was easy for GAO to say: This ain't a rule. This is a waiver. It is not allowed under the Congressional Review Act. Not allowed. But the GAO is just advisory; they don't make any decisions for us.

The rules of the Senate are actually the Parliamentarian, and that is where the going nuclear happened because we went in with the California delegation staff and the EPW staff and the Republicans, and we argued in front of the Parliamentarian. GAO wasn't even in the room. We filed our pleadings. We made our arguments. The arguments went back and forth. The Parliamentarian asked questions.

At the end, there was a decision, and, in my view, it was a slam-dunk decision because the score going in was 131 to 0. Mr. President, 131 times these waivers have been granted. Never once was it even argued that they were a rule, let alone decided that they were a rule.

It was only when GAO and the Parliamentarian made the obvious decision that what the EPA did in this case was wrong that then the fossil fuel industry decided that Republicans had to go nuclear, and that is why we are where we are.

There is statutory text in the Clean Air Act that gives California its waiver. We had testimony from Administrator Reilly earlier today. He was the EPA Administrator at the time this happened. And he understands full well how valuable it was to have a second set of eyes on this process.

The California process is so popular that a dozen other States follow it, and it is in the law. The way we should work around here is if there is something in the law you don't like, you amend the law. You don't run it falsely through the Congressional Review Act,

treat it as a rule when it is not, override the Parliamentarian when she says it is not, and pretend you haven't broken the rules around here. We have broken the rules around here.

The other rule we broke was the Congressional Review Act itself, which says—I am reading from the text of the law:

In the Senate—

Which is where we are—

when a committee is discharged from further consideration of a joint resolution—

Which means it has come to the floor, it is out of the committee, which is procedurally where we are—

all points of order against the joint resolution are waived.

That is part of expediting the process; part of the deal with it being a very narrow process for only regulations and only in a short time window.

We just heard the person sitting in that chair before this Presiding Officer say that under the rule just created we are now going forward. We just created a new rule through this parliamentary process, and it is that rule that violates this law because now we have a point of order, even though the law says that all points of order are waived.

Why did we go through this? As has been said, the Congressional Review Act is kind of an odd thing. Usually, an Agency goes through a rulemaking process under the Administrative Procedures Act. And if they got it wrong, an aggrieved party can go to court and say that was a bad regulation; it was arbitrary and capricious; it is not a rational basis; you didn't follow the APA properly; your findings are demonstrably false; there isn't support for the rule; the way you have written it violates the actual law involved.

There are a whole array of challenges that you can make in court, but we wanted something more than that. We wanted to have a political intervention narrowed just to rules, just to that short time period window that the Congressional Review Act provides. That was the idea. And the two concerns were what we described in our argument to the Parliamentarian as oversubmission and undersubmission.

I will read from our presentation.

There are two ways in which the Executive branch could try to defeat congressional intent with respect to the scope of the Congressional Review Act. The first would pose an undersubmission problem. In this scenario, an Agency might purposely refrain from submitting an action to Congress, even when the withheld action meets the definition of a rule under the CRA.

Right? So there is a rule. It is actually amenable to Congressional Review Act under the CRA, but they don't submit. They just don't because they don't want to submit it to that process. They thought they could sneak around it would be the notion.

To protect against this type of abuse, it became congressional practice to ask the GAO for an opinion as to whether the withheld action is, nonetheless, a rule and to treat a

CONGRESSIONAL RECORD — SENATE *May 21, 2025*

positive GAO determination as a trigger for the CRA process.

So if an executive Agency tries to cheat on exposing itself to the CRA process by not submitting the rule, a Member of Congress can go to the GAO and say: Hey, what is up with this? Isn't this a rule?

And if GAO says it is a rule, then it is deemed submitted, and the CRA process begins. That solves the under submission process.

We continued in the argument: The second way an Agency could work to defeat Congressional intent in crafting the CRA would be this situation, the incident situation, where an Agency submits actions, which clearly do not meet the definition of a rule under the CRA. This would pose an over submission problem.

The three CRA submissions at stake here illustrate well the slippery slope that could ensue. Not only would treating them as rules override two GAO analyses and broaden the scope of CRA coverage in an unprecedented way, but the waivers are already in effect, and one was issued so long ago as to violate any reasonable reading of the time bounds in the CRA. To accept these three submissions as rules would be to reject the principle that the privileged procedure in the CRA should be closely examined and strictly limited.

Agencies could submit any final action, going back to the enactment of the CRA in 1996—including adjudications, leasing contracts, grant awards, and licensing decisions—and magically convert those actions into timely rules that could be disapproved under the CRA's privileged procedures. This would nullify the reasonable bounds that Congress itself set in the text of the CRA, in the statutory law.

Without strict limits—truly absent any meaningful limits—the statute would be fully weaponized, threatening to destabilize decades of Agency action and highjack the Senate floor for the foreseeable future, which is precisely the can of worms that the majority has just opened with this overruling of the Parliamentarian, this establishment of a new rule.

Now, the other problem with this is that it provides a way to evade court review. Court review is usually how you check the action of the executive branch when they are up to no good. But very often, they are doing perfectly reasonable things, but a special interest doesn't like it. So they have the right to go to court too.

But when they go to court, first of all, there is a record of the proceeding, and the court is bound to that record. Second of all, there is law involved. There is both the Administrative Procedure Act, and there is the substantive law that is the subject of the regulation. Then you have to deal with evidence. The court reviews evidence. Then there has to be a rational decision by the court. And the court is, what we know of, as a neutral and disinterested magistrate.

Those are pretty essential due process determinations. For the Congressional Review Act, none of that. The only thing is the politics and the votes. You have got the politics behind you, and you got the votes. Anything is fair game.

And that is the danger of what was done today. What we have just done is open up the Congressional Review Act from that little 6-month period—60-day period; I am sorry—all the way back to when the CRA was passed, 30 years. Licenses, leases, Executive actions that have had a decade or more of reliance could simply be brought forward, dumped into the Federal Register, sent over here as a submission, magically become a new rule because of this loophole we just built, and then the majority of the Senate, with a compliant House, can just shove it right out the door without following regular order, without ever going to court, without following bicameralism, and present with the constitutional requirements.

I will conclude with two things. First, please don't call this unprecedented when you are talking about GAO saying that this was not a rule. Please don't call it unprecedented when the Parliamentarian said: This was not a rule. This actually is illegal for you to do.

The only thing unprecedented about what GAO said and what the Parliamentarian said was the fact that this rule breaking by EPA, that is what was unprecedented.

Again, 131 waiver determinations over half a century always, always, always treated as waivers—always—a score of 131 to 0.

But the Trump administration, flacking for fossil fuel, decides that all of that is wrong, that this actually is a waiver, even though there was no APA rulemaking, even though none of the steps that lead to a regulation under the Congressional Review Act were undertaken. They just filed it in the Federal Register and sent it over as a submission.

You could do anything that way. File it in the Federal Register, send it over as a submission, and—boom—it is over here to be kicked around as a political football, without due process, without bicameralism, without regular order—none of it.

That is what was unprecedented. And the only reason that the GAO's decision was unprecedented was because nobody had the nerve or the foolishness to do something so stupid before. So they called them out for it for the first time because nobody had ever done such a thing before.

But because of the politics, that just got shoved through here. Because of the power of the fossil fuel industry, that just got shoved through here.

This is part of a campaign of the Trump administration to pretend that climate change isn't real, to ignore the immediate threats that are looming over us of climate change—looming over us—and to serve the interest of the fossil fuel industry.

You remember the President saying, "Give me a billion dollars, and I will give you everything you want," to the fossil fuel executives? Well, he didn't get the full billion dollars, but he got a lot of money. He got north of a 100 million, and now, sure enough, he has given them everything he wants.

And this is one of the payments—this breaking of the Senate rules, this overruling of the Parliamentarian, this going nuclear, this pretending that something that was never a rule, and is clearly not a rule by any reasonable reading of what APA rulemaking is, is suddenly now magically a rule. All of that is being done as just a political errand for the fossil fuel industry, and it is wrong.

I see that the two Senators from California are here. The hour is getting later and later. So I will not review at this moment my presentation earlier today, where I went through the multiple warnings of the systemic economic collapse that is coming at us, based on a fairly simple proposition, which is that climate risk is making weather and risk unpredictable. And when you can't predict weather risk, you can't predict the insurability of a piece of property. The original concern was about coastal risk—flooding, hurricanes, rainstorms, damage to coastal properties. Now wildfire is just as dangerous. And when you can't predict it, you can't insure it.

And we are right now, in the United States, in the middle of an insurance crisis. Go ask around Florida how property insurance is going. It is a full-blown meltdown.

And when you can't get insurance any longer, you can't get a mortgage on a property any longer. And when property doesn't carry a mortgage any longer, when you can't get a mortgage on that piece of real estate, then your buyer pool collapses. You are left with only cash buyers. And what happens then is that the property value crashes.

And that is the prediction: climate risk to insurance collapse, to mortgage unavailability, to property value crash, to economic collapse—recession. And it is coming from all over—all over. And we won't listen to those warnings whether they come from insurance CEOs, from Freddie Mac, from international banking safety reviews, from international economic magazines, from the chief risk officer of Goldman Sachs, from the head of the Bank of England. I mean, you can just go on and on. The warnings are piling, piling, piling up.

And as Ernest Hemingway said about going broke, "it happens gradually, and then all at once." And we are deep into "gradually" on this climate risk mess, and pretty soon we are going to get hit with "all at once."

And then all this foolishness done on this floor in the service of the fossil fuel industry, which has the world's biggest conflict of interest and a history of lying and of dark-money political influence, is going to look pretty damned bad.

I yield the floor.

The PRESIDING OFFICER. The senior Senator from California.

Mr. PADILLA. Mr. President, I, first of all, thank my colleague from the State of Rhode Island and echo his sentiment and his message that Senate Republicans have crossed the line this evening. They have chosen to overrule the Parliamentarian, thrown out some rules, rewritten some rules, established new precedents for how this body operates, despite claiming that that was something they were not going to do, despite the majority leader warning earlier this year that this would be akin to killing the filibuster.

But now we have seen it. It is on the record. They have overruled the Parliamentarian not just once but twice. And the Parliamentarian's determination as to whether or not the action taken this evening was in conformance with the rules that we have or not were buttressed by—again, as my colleague from Rhode Island has explained—the analysis and the findings of the GAO, which we charge with this input.

And so I want to take a moment to just read some excerpts from the GAO, as written to the Senate. And I will submit the entire letter for the RECORD, but the key excerpts are important to highlight.

From the GAO:

As background to these issues, we issued a legal decision concluding that a Clean Air Act preemption waiver was not a rule subject to CRA but was instead an adjudicatory order.

It couldn't be more clear than that.

Furthermore, we explained that even if the waiver were to satisfy the APA definition of a rule, it would be considered a rule of particular applicability and, therefore, would still not be subject to CRA's submission requirement because of CRA's exclusions.

Just two other elements that, again, I think are in need of being highlighted here because of the significance of the action taken this evening—quoting still from the letter:

EPA stated that the Notices of Decision were not rules under CRA, and, in the underlying decision documents for two of those notices, cited to our 2023 decision in support of that statement. However, EPA submitted them as rules to GAO and Congress without any explanation of this discrepancy.

Pretty clear.

And, finally, later in their letter:

The agency still did not address the statements in the notices regarding the inapplicability of the CRA, and, to date, EPA has not further responded to our letter.

GAO is charged with establishing this review and making a finding. They heard from the parties involved. They did not get responses from the EPA. Why? They must have something to hide. What are they afraid of? And the GAO shared their conclusions which informed the Parliamentarian in their determination: This was inconsistent with the rules.

Not only have Senate Republicans overruled the Parliamentarian this evening, they have also broken the Congressional Review Act, as has been respected for years, all to bypass the filibuster in order to undermine California's efforts to pursue cleaner air for our constituents. And while today the California waivers may be the target, we don't know what comes next.

In previous statements on this issue earlier today and in previous days, I have given examples of, now that the CRA has been applied in this fashion, there is a whole host of adjudicatory decisions by a wide variety of Agencies across the Federal Government that are now fair game.

But for now, let me continue to focus on the waivers in question that Republicans are seeking to overturn. See, I rise not only in opposition to this power play tonight, I rise in the interest of protecting the health of my constituents, the nearly 40 million Californians that I am honored to represent.

Because, colleagues, leaders in California didn't just wake up one day to find some special privileges to establish our own climate policy and impose it upon the rest of the country. And we certainly didn't cheat the system to jam States represented by Republicans in the Senate or in their Governors' mansions. No. California was explicitly granted waivers because of the unique air quality challenges that we face, different than anywhere else in the country.

California was granted these waivers because California, as a whole, and Los Angeles, in particular—the southern California area, the Los Angeles Basin—is uniquely situated to produce some of the most dangerous air pollution in the Nation. So it means that we had to work harder than other States and other regions to protect the health of our residents.

This is not some new liberal agenda. It actually goes back nearly a century with broad bipartisan support. Way back in the summer of 1943, Angelenos actually started to notice a brown haze descending upon the city. People's eyes and throats began to sting from this smoke, and they could no longer see more than a handful of blocks ahead of them, let alone the beautiful skyline or the views of the city around them.

It was actually in the middle of a World War when Americans feared that breakouts of chemical warfare were imminent and many started to wear gas masks as a result. While it didn't take long to learn that there was no chemical attack targeting Los Angeles, it would take researchers years to learn that the true source of the haze was different. Eventually, they learned it wasn't just factories that were pumping black smoke into the sky; it was in large part due to the cars that were being driven.

Now, unfortunately for us, Los Angeles does create the ideal conditions for smog to thrive. Southern California's sunshine along with a booming population of people reliant on car travel and all the exhaust that comes with it combines to make a photochemical reaction that we call smog. But in addition to that, given the beautiful mountains—and you all have seen the scenes—the mountains that surround the Los Angeles area act as a perfect sort of cradle to hold all those pollutants in, encasing the city in a thick haze of pollution.

For all the beauty of our city—most of you have visited, and you have certainly seen images on television and in the movies—generations of Angelenos know what it is like to feel engulfed by the smog around us.

As I began to share earlier today, that includes me. As many of you know by now, I grew up in the community of Pacoima in the San Fernando Valley, the northern part of the city of Los Angeles. And growing up in the 1970s and 1980s—40 years after the gas masks that I spoke about a minute ago—smog was still ever-present in our sky and part of our daily life.

I still remember what it was like being sent home early from school as a kid because the air was too unhealthy for us just to play on the playground—the stinging in our eyes, the tightness in your chest. Yes, when I was growing up, we were more often waking up to air quality forecasts of unhealthy or hazardous than clean. Imagine just the sheer simplicity of trying to take a deep breath, but not being able to because halfway through taking in a deep breath, your chest would tighten up. You literally choke because of the pollution in the air. While we have come a long way, for too many Californians today, that is still a reality. It doesn't have to be that way.

But that is why, decades ago, Congress recognized both California's unique air quality challenges but also its ingenuity, its creativity, the innovation that is in our DNA and granted California the special authority to do something about those unique air quality challenges.

Thanks to the Clean Air Act, which, again, was adopted in an overwhelming bipartisan basis over 50 years ago, California obtained the legal authority to set its own emissions standards because Congress wisely recognized back then that West Virginia and Wyoming are different than California; and their air quality is different; there are significantly fewer cars on the road in Salt Lake City than there are in Los Angeles; and because California was and still is seen as the innovation center of the United States.

So we earned the right to set California standards for California. We are not setting California standards for national standards. I am sure my colleagues in State government wish we had that kind of power and authority, but that is not the case. And it is certainly not California's agenda to impose our standards on States across the country. We are simply seeking to protect Californians.

And, quite frankly, if Members of this body representing the other 49 States in the Nation are worried about some Federal mandate taking effect

because of California's actions, then you should support California's right to set our own State standards. We know that the EPA and the Federal Government has not effectively done its part to rein in pollution.

So from a government standpoint, let me explain why I get so worked up on this. State and local jurisdictions in California have done all they can to push ambitious but implementable regulatory agendas in the country—some of the most ambitious in the country. But we are out of options when it comes to controlling the pollution sources that State and local governments are allowed to regulate.

What is left—the biggest nut to crack—are the mobile sources of pollution—the cars, the heavy-duty trucks, the locomotives, the ships, and the planes that are the key sources of the bad air quality in regions of California. These are industries that only the Federal Government can regulate.

So California has had no option, but we have embraced the challenge to innovate, to advance creative and indirect source rules or rules that, for example, require ships to plug in when docked in our ports to cut down on pollution.

That is why these waivers are so important. They let us get at these mobile sources of pollution that we need to clean up because unless or until the Federal Government gets more ambitious about setting national standards that meet the moment of this climate crisis, at least let California protect Californians.

I am realistic with the times that we are living in. Under this administration, I doubt we will get the assist from the Federal Government over the course of the next 3½ years.

I want to acknowledge that it was former President Ronald Reagan, when he was Governor of California, who first created the California Air Resources Board. And 3 years later, it was Republican President Nixon who signed amendments to the Clean Air Act into law, fulfilling a promise that he made at that year's State of the Union, that clean air should be the birthright of every American. What a far, far cry from Republican leadership then to the Republican agenda today.

But the bottom line is, colleagues, by supporting this measure, Republicans are simply making it harder for California to improve air quality in California.

As I did yesterday, I also just have to acknowledge what it means for families throughout the State. You see, as the parents of three growing boys—they are not little kids anymore; they are growing—through the course of their upbringing, we have been able to control certain things, like how we feed our kids. We go to the grocery store, and you are shopping for what you are going to prepare for dinner. You have readily accessible information—nutritional information—not just calorie information, protein information, but ingredients of what is in the product you are about to buy. There are certain things that we cannot control, like the ingredients in the air we breathe.

If you are fortunate enough to live in a part of the State of California, in the part of the country with a great air quality index, good for you. But for those who aren't as fortunate and with the assistance of the Union of Concerned Scientists, let me read off a couple of the ingredients that are in the air that we breathe—not just us, our children too.

Particulate matter, defined as follows:

One type of particulate matter is the soot seen in vehicle exhaust. Fine particles—less than one-tenth the diameter of a human hair—[it] pose[s] a serious threat to human health, as it can penetrate deep into the lungs. [Particulate matter] can be a primary pollutant or a secondary pollutant from hydrocarbons, nitrogen oxides, and sulfur dioxides. Diesel exhaust is major contributor to [particulate matter] pollution.

How is this for another ingredient; volatile organic compounds, known as VOCs, referred to as VOCs:

These pollutants react with nitrogen oxides in the presence of sunlight to form ground-level ozone, a main ingredient in smog.

Though beneficial in the upper atmosphere, at the ground level, this gas irritates the respiratory system, causing coughing, choking, and reduced lung capacity.

Now, I know I have felt those things as a kid. It is in the science.

VOCs emitted from cars, trucks and buses—which include the toxic air pollutants benzene, acetaldehyde, and butadiene—are linked to different types of cancer.

Just a couple more:

Nitrogen oxides.

Which we refer to as $NO_x$.

These pollutants form ground level ozone and particulate matter. . . . Also harmful as a primary pollutant, $NO_x$ can cause lung irritation and weaken the body's defenses against respiratory infections such as pneumonia and influenza.

I can go on and on—carbon monoxide, sulfur dioxide, greenhouse gases—but in the interest of time and given the late hour, let me say this: All of these ingredients are in the air that we breathe, as I just described, but as you heard me say earlier, it is not just our lungs that are at risk; these toxins can permeate into the bloodstream and spread to other parts of the body. That is what is at stake, again, not just for us but for our children.

But for all the dangers that I see around us, I also see opportunity. Thanks to the allowances afforded to California under the Clean Air Act, we have actually made tremendous progress.

As evidence of that, in 2015, USC—the University of Southern California—published a study that said that the reduction of air pollution was paying off; kids were breathing healthier.

Let me read just briefly from their findings, summarized in a National Geographic article from March of 2015 that said:

In the study published in the New England Journal of Medicine, researchers followed 2,000 kids from five southern California cities with some of the worst air, including Long Beach, Riverside, San Dimas, Upland, and Mira Loma. They focused on kids ages 11 to 15, whose lungs are growing the most.

While other studies have compared kids from polluted neighborhoods to those living with cleaner air, the USC team tracked children from the same communities over 20 years and correlated their findings with pollution data from local air monitors. That allowed them to more clearly weed out other potential factors.

Regardless of race, exposure to cigarette smoke, or factors like education and pets, kids tested between 2007 and 2011 had healthier lungs than kids the same ages tested between 1994 and 1998.

I will skip some of the additional scientific details and jump to more of the conclusions because during those decades differential in the study, "California officials set groundbreaking standards that phased out many inefficient car and truck engines and some of the dirtiest fuels for everything from jet skis and lawnmowers to school buses and heavy-duty trucks. Local smog-fighters in the Los Angeles basin forced cleanup of oil refineries, manufacturing plants, and consumer products such as paints and solvents. Other local and state programs offered incentives for replacing old trucks and buses."

The result: Some of the most problematic pollutants—smog-forming nitrogen dioxide and fine particles created by diesel-engine exhaust and other fossil fuels—declined in the worst neighborhoods by up to 50 percent in 20 years. Maritime pollution, particularly in neighborhoods near the massive ports of Los Angeles and Long Beach, also has dropped substantially.

As a side note, by the way, the two ports referenced in this, the ports of Long Beach and Los Angeles—sister ports in the San Pedro Sports Complex—account for 40 percent of our Nation's imports, those two ports alone. So you can imagine the intensity of the pollution in that specific region, let alone the air quality and health impacts for Californians.

So I go back to, if the Federal Government, through the EPA, isn't willing to step up to meet the challenge of air quality in California, let California take care of Californians. As these studies and reports lay out, California's leadership is working. Kids are breathing cleaner air.

But we still have a lot more work to do. We have a track record of successfully developing and implementing innovative tools to improve lives, but because of what is transpiring here now in the Senate, our progress is now at risk. It is important, it is urgent, it is significant because we still have so much more work to do.

California plans on continuing to exercise our legal authority under the Clean Air Act to protect kids, to set ambitious but achievable goals, to reduce pollution and, yes, Heaven forbid, set an example, set a model, set a path for other States to follow if they wish because no one is forcing California

CONGRESSIONAL RECORD — SENATE

standards on States that don't voluntarily choose to follow that simple path.

But what I see transpiring here with the overruling of the Parliamentarian and the overturning of these waivers as if they were rules is the Senators from other States, Republican Senators from other States, imposing their will on California. So much for States' rights, I guess.

And I hope you sleep well at night with the consequences of your decisions in the years ahead.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. GOVERNMENT
ACCOUNTABILITY OFFICE,
MARCH 6, 2025.

Congressional Requesters

Subject: Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act

This letter responds to your request for a legal decision as to whether the Environmental Protection Agency's (EPA) Clean Air Act preemption waivers and Notices of Decision that EPA submitted as rules to Congress and GAO in late February 2025 are rules subject to the Congressional Review Act (CRA). Our regular practice is to issue decisions on actions that agencies have not submitted to Congress as rules under CRA in order to further the purposes of CRA by protecting Congress's CRA review and oversight authorities. In this case, we are presented with a different situation because the actions were submitted as rules under the CRA, and it is not one in which we normally issue a legal decision. However, we do have prior caselaw that addressed the applicability of CRA to Clean Air Act preemption waivers, B–334309, Nov. 30, 2023, and EPA's recent submission is inconsistent with this caselaw. Therefore, we are providing you with our views and analysis of preemption waivers under the Clean Air Act that may be helpful as Congress considers how to treat these Notices of Decision and the application of CRA procedures.

As background to these issues, we issued a legal decision concluding that a Clean Air Act preemption waiver was not a rule subject to CRA but was instead an adjudicatory order. See B–334309, Nov. 30, 2023. Furthermore, we explained that even if the waiver were to satisfy the APA definition of a rule, it would be considered a rule of particular applicability and, therefore, would still not be subject to CRA's submission requirement because of CRA's exclusions. Id.

For the three Notices of Decision announcing the waivers at issue here, EPA stated that the Notices of Decision were not rules under CRA, and, in the underlying decision documents for two of those notices, cited to our 2023 decision in support of that statement. However, EPA submitted them as rules to GAO and Congress without any explanation of this discrepancy.

We reached out to EPA on February 20, 2025, for clarification on the submission of the Notices of Decision at issue here because the notices themselves stated that CRA did not apply. After receiving your request, we followed our regular procedure and sent a formal letter to EPA on February 25, 2025, seeking factual information and the agency's legal views on this matter. Although EPA resubmitted the Notices of Decision to GAO on February 27, 2025, with additional information in the corresponding CRA reports, the

agency still did not address the statements in the notices regarding the inapplicability of the CRA, and, to date, EPA has not further responded to our letter.

As explained more fully below, our view is that the analysis and conclusions in our 2023 Clean Air Act preemption waiver decision would also apply to the Notices of Decision recently submitted as rules to Congress by EPA.

BACKGROUND

Clean Air Act

The Clean Air Act generally preempts states from adopting or enforcing emission control standards for new motor vehicles or new motor vehicle engines. See 42 U.S.C. §7543(a); B–334309, Nov. 30, 2023. However, the Clean Air Act requires the EPA Administrator to grant a waiver of preemption for a state that adopted a standard prior to March 30, 1966, if the state determined its standard will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards. 42 U.S.C. §7543(b); B–334309, Nov. 30, 2023. Only California can qualify for preemption waivers under this section because it is the only state that adopted a standard prior to March 30, 1966. B–334309, Nov. 30, 2023.

The EPA Administrator must approve the waiver unless the Administrator makes any one of three findings set forth in the statute: (1) the determination of the state is arbitrary and capricious; (2) the state does not need state standards to meet compelling and extraordinary conditions; or (3) the state standards and accompanying enforcement procedures are not consistent with 42 U.S.C. §7521(a) (EPA standards for emissions from new motor vehicles or new motor vehicle engines). 42 U.S.C. §7543(b)(1)(A)–(C); B–334309, Nov. 30, 2023.

When the EPA Administrator receives a waiver request, they must provide notice of a public hearing and comment period. 42 U.S.C. §7543(b); B–334309, Nov. 30, 2023; EPA, Vehicle Emissions California Waivers and Authorizations, available at https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations (last visited Mar. 5, 2025) (California Waivers and Authorizations Website). The Administrator makes a decision on the waiver and publishes a notice of their decision and reasons in the Federal Register. B–334309, Nov. 30, 2023.

The Clean Air Act provides similar procedures for the EPA Administrator to authorize California to adopt and enforce emission control standards for certain nonroad engines or vehicles. 42 U.S.C. §7543(e)(2)(A). The Administrator must authorize California to adopt and enforce such standards if California determined that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards, unless the Administrator makes any one of three findings set forth in the statute: (1) California's determination is arbitrary and capricious; (2) California does not need its own standards to meet compelling and extraordinary conditions; or (3) the California standards and accompanying enforcement procedures are not consistent with 7543. Id. Like the waiver process under section 7543(b), the authorization process under section 7543(e)(2)(A) involves providing notice of a public hearing and comment period and publishing notice of the decision. See id.; California Waivers and Authorizations Website.

EPA Notices of Decision

At issue here are the following EPA Clean Air Act preemption waiver Notices of Decision:

*California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehi-*

*cle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle, Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision,* 88 Fed. Reg. 20688 (Apr. 6, 2023) (Advanced Clean Trucks Waiver Notice);

California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The "Omnibus" Low NO$_X$ Regulation; Waiver of Preemption; Notice of Decision, 90 Fed. Reg. 643 (Jan. 6, 2025) (Low NO$_X$ Waiver Notice); and

California State Motor Vehicle Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision, 90 Fed. Reg. 642 (Jan. 6, 2025) (Advanced Clean Cars II Waiver Notice).

In the Advanced Clean Trucks Waiver Notice, the EPA Administrator granted two separate requests for preemption waivers regarding four California regulations for heavy-duty on-road vehicles and engines. 88 Fed. Reg. at 20688. The Low NO$_X$ Waiver Notice announced the EPA Administrator's December 17, 2024, decision granting California a preemption waiver for regulations applicable to new 2024 and subsequent model year California on-road heavy-duty vehicles and engines and authorizing regulations regarding off-road diesel engines. 90 Fed. Reg. at 643–44. The Advanced Clean Cars II Waiver Notice announced the EPA Administrator's December 17, 2024, decision granting California a preemption waiver for regulations applicable to new 2026 and subsequent model year California on-road light- and medium-duty vehicles. 90 Fed. Reg. at 642.

Congressional Review Act (CRA)

CRA, enacted in 1996 to strengthen congressional oversight of agency rulemaking, requires federal agencies to submit a report on each new rule to both houses of Congress and the Comptroller General for review before the rule can take effect. 5 U.S.C. §801(a)(1)(A). The report must contain a copy of the rule, "a concise general statement relating to the rule," and the rule's proposed effective date. Id. CRA allows Congress to review and disapprove rules issued by federal agencies for a period of 60 days using special procedures. See 5 U.S.C. §802. If a resolution of disapproval is enacted, then the new rule has no force or effect. 5 U.S.C. §801(b)(1).

CRA adopts the definition of "rule" under the Administrative Procedure Act (APA), which states that a rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. §§551(4); 804(3). However, CRA excludes three categories of APA rules from coverage: (1) rules of particular applicability; (2) rules relating to agency management or personnel; and (3) rules of agency organization, procedure, or practice that do not substantially affect the rights or obligations of nonagency parties. 5 U.S.C. §804(3).

EPA did not submit CRA reports to Congress or GAO for any of the Notices of Decision when they were initially issued on April 6, 2023, and January 6, 2025, and each notice states that CRA does not apply because the relevant action is not a rule for purposes of the Act. Advanced Clean Trucks Waiver Notice, 88 Fed. Reg. at 20726; Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 645; Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 643. In addition, the underlying decision documents referenced in the Low NO$_X$ Waiver Notice and Advanced Clean Cars II Waiver Notice include similar statements about the inapplicability of CRA and cite our 2023 decision determining that a Clean Air Act preemption waiver notice of decision was not a rule

under CRA. See EPA, California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The ''Omnibus'' Low NO$_X$ Regulation; Waiver of Preemption; Decision Document (Dec. 17, 2024) (Low NO$_X$ Waiver Decision), at 95 & n.281; EPA, California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Decision Document (Dec. 17, 2024) (Advanced Clean Cars II Waiver Decision), at 189 & n.504 (both citing B–334309, Nov. 30, 2023).

EPA subsequently submitted a CRA report for the three Notices of Decision to Congress and GAO on February 19, 2025. The House of Representatives and GAO received the report on February 19, 2025, and the Senate received the report on February 20, 2025. EPA resubmitted the CRA report to GAO on February 27, 2025. The resubmitted report included additional information for each notice, including the date of the document, the nature of the action submitted, and proposed effective date. EPA did not explain in either submission why the agency was submitting the notices under CRA given its statement in each notice that CRA did not apply.

### DISCUSSION

*GAO's 2023 Decision on a Clean Air Act Preemption Waiver Notice of Decision*

In B–334309, we examined an EPA Notice of Decision titled California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision (Advanced Clean Car Program Waiver Notice). 87 Fed. Reg. 14332 (Mar. 14, 2022). This Notice of Decision rescinded EPA's 2019 withdrawal of a 2013 preemption waiver for California's greenhouse gas emissions standards and zero emission vehicle sale mandate, thereby reinstating the waiver. Id. at 14332; B–334309, Nov. 30, 2023.

We determined that the Advanced Clean Car Program Waiver Notice was not a rule under CRA because it did not meet the APA definition of a rule. We concluded that the notice was, instead, an ''order'' under APA. APA defines an order as ''the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing.'' 5 U.S.C. §551(6). APA further defines ''licensing'' to include an agency granting or revoking a license, and ''license'' to include an agency approval, statutory exemption, or other form of permission. 5 U.S.C. §551 (8), (9). An agency action that constitutes an order under APA is not a rule under the statute and, therefore, is not a rule under CRA. B–334309, Nov. 30, 2023 (citing B–334995, July 6, 2023; B–334400, Feb. 9, 2023; B–332233, Aug. 13, 2020 (rules and orders are ''mutually exclusive'')).

We explained that an adjudicatory order is a case-specific, individual determination of a particular set of facts that has immediate effect on the individual(s) involved. B–334309, Nov. 30, 2023 (citing *United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 245–46 (1973); *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017); *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994)). In contrast, a rule is a broad application of general principles that is prospective in nature. B–334309, Nov. 30, 2023 (citing *Florida East Coast Railway Co.*, 410 U.S. at 246; *Neustar*, 857 F.3d at 895; *Yesler Terrace Community Council*, 37 F.3d at 448).

We concluded that the Advanced Clean Car Program Waiver Notice met the APA definition of an order because the notice determined that California was not preempted from enforcing its Advanced Clean Car Program and therefore made a ''final disposition'' granting California a ''form of permission'' as described in the APA definition. B–334309, Nov. 30, 2023 (citing 5 U.S.C. §551 (6), (8), (9)). We noted that the notice was particular to California's Advanced Clean Car Program, involved consideration of particular facts, as opposed to general policy, and had immediate effect on California. *Id.*

We also concluded that even if the Advanced Clean Car Program Waiver Notice met the APA definition of a rule, it would still not be subject to CRA because of CRA's exclusion of rules of particular applicability. B–334309, Nov. 30, 2023. A rule of particular applicability is addressed to an identified entity and also addresses actions that entity may or may not take, taking into account facts and circumstances specific to that entity. B–334309, Nov. 30, 2023 (citing B–334995, July 6, 2023). We noted that the notice concerned a specific entity—California—and addressed a statutory waiver specific to California's Advanced Clean Car Program; therefore, the notice would be a rule of particular applicability. B–334309, Nov. 30, 2023.

*EPA's Recently Submitted Notices of Decision*

(1) Applicability of GAO's 2023 Decision

The analysis and conclusion in B–334309 that the Advanced Clean Car Program Waiver Notice was not a rule for purposes of CRA because it was an order under APA would apply to the three notices of decision at issue here. For example, all three notices of decision involve waivers granted to California under the same authority and process (42 U.S.C. §7543(b)) at issue in the Advanced Clean Car Program Waiver Notice. In each case, California requested preemption waivers from EPA with respect to specific California regulations, and EPA, after holding a public hearing, receiving comments, and considering information presented by California and opponents of the waivers, determined to grant the requested waivers. *See* Advanced Clean Trucks Waiver Notice, 88 Fed. Reg. at 20688?90; Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 643–45; Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 642–43.

The Low NO$_X$ Waiver Notice also involves an authorization under a separate authority (42 U.S.C. §7543(e)(2)(A)). As described above, the nature of the determination and process used is very similar to section 7543(b), and our analysis and conclusions in B–334309 would apply to this portion of the notice as well. *See* Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 644–45 (describing the relevant procedures and grouping the corresponding findings in sections 7543(b)(2) and 7543(e)(2)(A) together in summarizing the decision). Specifically, California requested EPA's authorization to adopt and enforce specific California regulations, and EPA, after holding a public hearing, receiving comments, and considering information presented by California and opponents of the authorization, determined to grant the requested authorization. *See* Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 643–45.

(2) Effect of Resolutions of Disapproval

If Congress were to treat the EPA Notices of Decisions as rules under CRA and subsequently enact resolutions of disapproval, there is a question as to the precise effect those resolutions would have. As described above, if a resolution of disapproval is enacted, then the rule has no force or effect. 5 U.S.C. §801(b)(1). However, two of the three Notices of Decision submitted by EPA to Congress, the Low NO$_X$ Waiver Notice and the Advanced Clean Cars II Waiver Notice, appear to merely notify the public of previously issued decision documents granting California the requested preemption waivers and, in the Low NO$_X$ Waiver Notice, the requested authorization for its regulations. See Low NO$_X$ Waiver Notice, 90 Fed. Reg. at 643–44 (stating that EPA ''is providing notice of its decision'' and referencing the Low NO$_X$ Waiver Decision); Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 642–43 (stating that EPA ''is providing notice of its decision'' and referencing the Advanced Clean Cars II Waiver Decision). EPA did not include the underlying decision documents in its submission to Congress and GAO. In contrast, the Advanced Clean Car Program Waiver Notice we examined in B–334309, appears to be the decision document. *See* 88 Fed. Reg. at 20688 (stating that EPA ''is granting . . . California['s] . . . requests for waivers''). Accordingly, if Congress were to enact resolutions disapproving the Low NO$_X$ Waiver Notice or the Advanced Clean Cars II Waiver Notice under CRA, it is unclear whether or how those resolutions would affect the underlying waivers and authorizations.

### CONCLUSION

In these circumstances, our view is that our prior analysis and conclusion in B–334309 that the Advanced Clean Car Program Waiver Notice was not a rule for purposes of CRA because it was an order under APA would apply to the three notices at issue here. We provide this information to assist Congress as it considers how to treat these Notices of Decision and the application of CRA procedures.

If you have any questions, please contact Shirley A. Jones, Managing Associate General Counsel, or Charlie McKiver, Assistant General Counsel for Appropriations Law.

Sincerely,

EDDA EMMANUELLI PEREZ,
*General Counsel.*

Congressional Requesters

HON. SHELDON WHITEHOUSE,
*Ranking Member, Committee on Environment and Public Works, U.S. Senate*

HON. ALEX PADILLA,
*U.S. Senate*

HON. ADAM B. SCHIFF,
*U.S. Senate*

Mr. PADILLA. I yield the floor.

The PRESIDING OFFICER. The Senator from California.

Mr. SCHIFF. Mr. President, my colleagues, it is getting very late. Indeed, most of our constituents are asleep. But across the U.S. Capitol tonight, the lights remain on.

Over in the House, they burn dimly on the House floor as Republicans try to jam through a ''big, ugly bill'' that would wreak havoc on our families, our communities, and our climate to pay for more tax cuts for wealthy people, that would cut Medicaid and block help for families that will go hungry so that billionaires like Elon Musk get another tax break they simply don't need.

But that is not what I am here to talk about this evening. I am here at this hour, or this morning, right here, right now, in the dead of night, Republicans in the Senate are hard at work on another objective, an unprecedented and previously unimaginable effort to abandon their own standards, their own precedent, their previous very public statements, the very rules of this body, to make our air less clean.

To do so is complicated. It requires a lot of parliamentary maneuvers. Why?

Because to make the air dirtier requires 60 votes, and they don't have 60 votes, or it requires Republicans to break their word, to eliminate the filibuster so they can do the bidding of those who would pollute our air.

Now, I don't blame my Republican colleagues for wanting to shroud what they have set out to do tonight in secrecy. I don't blame them for trying to hide it. It was just a few short weeks ago the Republican leader assured this body that he would never do any such thing, but that was then.

But hide or not, the blame will lay squarely on my Republican colleagues for the impact of what is done here tonight because tonight is a turning point, a moment in which the majority gave up yet another guardrail, where they chose to go nuclear, to violate the filibuster, to overturn the Parliamentarian in order to gratify the wishes of Big Oil over the need of our constituents for cleaner air.

The GOP wasn't always this way. Republican administrations didn't always demonstrate such hostility to the environment. At a different moment in our history, there was a very different kind of Republican Party.

So I would like to begin tonight by reading verbatim a message from President Ronald Reagan. The date was July 14, 1984. The then-President turned on a microphone in a studio here in Washington and took to the Nation's airwaves to deliver an address. This is part of what Ronald Reagan said:

My fellow Americans:

I'd like to talk to you today about our environment. But as I mentioned earlier this week, in doing so, I might be letting you in on a little secret—as a matter of fact, one of the best-kept secrets in Washington.

More than 15 years ago, the State of California decided that we needed to take action to combat the smog that was choking the beautiful cities of my home State. Out of that concern was born the first serious program to require manufacturers to build cleaner cars and help control air pollution. The auto industry had to build two kinds of cars—one that would be for sale in the other 49 States and one that would meet the stiff antipollution standards required in California.

We had other concerns in California, such as protecting our magnificent and unique coastline. And we took the lead in that area as well. It took the rest of the Nation a few years to catch on, but in 1970 the Congress followed California's lead and enacted the Clean Air Act. Other laws to protect and clean up the Nation's lakes and rivers were passed, and America got on with the job of protecting the environment.

Part of the secret I mentioned is that I happened to have been Governor of California back when much of this was being done. Now, obviously, neither the problems in California nor those nationally have been solved, but I'm proud of having been one of the first to recognize that States and the Federal Government have a duty to protect our natural resources from the damaging effects of pollution that can accompany industrial development.

Now, if you are just tuning in, this is a speech from Ronald Reagan.

The other part of the well-kept secret—

The former President had to say— has to do with the environmental record of our administration, which is one of achievement in parks, wilderness land, and wildlife refuges. According to studies by the Environmental Protection Agency, the quality of our air and water has continued to improve during our administration.

In many big cities, the number of days on which pollution alerts are declared has gone down. And if you live near a river, you may have noticed that the signs have been coming down that used to warn people not to fish or swim.

We came to Washington committed to respect the great bounty and beauty of God's creation. We believe very strongly—

Reagan said—

in the concept of stewardship, caring for the resources we have so they can be shared and used productively for generations to come. And we've put that philosophy to work, correcting deficiencies of past policies and advancing long-overdue initiatives.

Let me give you some facts that our critics never seem to remember. When we took office in 1980, we faced a dusty shelf of reports which pointed out our predecessors had been so busy spending money on new lands for parks that they seriously neglected basic upkeep of the magnificent parks we had. So, we temporarily put off acquiring new parkland and started a new billion-dollar, 5-year program to repair and modernize facilities at our national parks and wildlife refuges. If you've been to just about any national park lately, you've probably seen the results.

We've nearly finished repairing the damage from years of neglect, and I've asked the Congress for almost $160 million to resume buying lands to round out our national park and refuge systems. We also took the lead in developing a new approach to protecting some 700 miles of undeveloped coastal areas—the dunes, beaches, and barrier islands that are some of our most beautiful and productive natural resources.

Now—

Reagan said—

there are some who want you to believe that commitment to protecting the environment can be measured by comparing the budgets of EPA under the previous administration with those proposed and approved by the Congress under my administration. But they deliberately ignore that the major Federal environmental laws are designed to be carried out by the States in partnership with EPA.

By the time the clean air, clean water, and other big programs put in place in the early 1970's moved into their second decade, the States had largely taken over the job formerly performed by the Federal Government. With the successful delegation to the States, EPA, under the leadership of Bill Ruckelshaus, has been freed to move on to the challenges of the 1980's—such as cleaning up abandoned toxic waste dumps.

Under our administration, funding for the Superfund cleanup program will have increased from just over a hundred million dollars in 1981 to $620 million in 1985.

And by the way, under this "big, ugly bill," the cuts to Superfund cleanup will be enormous. It will move the country exactly the opposite direction that Ronald Reagan moved the country back in 1981.

By the end of this year—

Reagan said—

EPA expects to have undertaken more than 400 emergency actions to remove and contain public health hazards. And because we recognize that we need to do more cleanup work than the current law provides, I'm committed to seeking an extension of the Superfund program.

As I said, our progress on protecting the environment is one of the best-kept secrets in Washington. But it's not, by far, the only secret. And I'll have more on that in the months ahead.

Until next week, thanks for listening, and God bless you.

That was Ronald Reagan. The Republican Party wasn't always like it is today. There was a time when the environment and clean water and clean air were a priority of this party.

Now, this isn't the first time I have noted on the Senate floor that Ronald Reagan must be spinning in his grave. It is certainly true of our treatment of Ukraine and our giving in to the Kremlin. But that President, who was looked to as a portrait of the American conservative movement, watching as the party of Lincoln and Teddy Roosevelt and Reagan completes its transformation into the party of Donald J. Trump, it probably doesn't recognize what it sees.

What happened to "States' rights"? Because this attack on California's clean air policy is an attack on States' rights.

What happened to "freedom to innovate"? This will stifle innovation.

What happened to "family values"?

How is what we are doing here tonight in service of our kids and the air that they breathe?

Now, Ronald Reagan wasn't the only Republican President to believe in clean air and clean water. This is Richard Nixon giving an address January 22, 1970.

I now turn to a subject which, next to our desire for peace, may well become the major concern of the American people in the decade of the seventies.

In the next 10 years we shall increase our wealth by 50 percent. The profound question is: Does this mean we will be 50 percent richer in a real sense, 50 percent better off, 50 percent happier?

Or does it mean that in the year 1980 the President standing in this place will look back on a decade in which 70 percent of our people lived in metropolitan areas choked by traffic, suffocated by smog, poisoned by water, deafened by noise, and terrorized by crime?

These are not the great questions that concern world leaders at summit conferences. But people do not live at the summit. They live in the foothills of everyday experience, and it is time for all of us to concern ourselves with the way real people live in real life.

The great question of the seventies is, shall we surrender to our surroundings, or shall we make our peace with nature and begin to make reparations for the damage we have done to our air, to our land, and to our water?

If you are tuning in, these are the words of Richard Nixon.

Restoring nature to its natural State—

He said—

is a cause beyond party and beyond factions. It has become a common cause of all the people of this country. It is a cause of particular

(144 of 196), Page 144 of 196  Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 144 of 196
S3096   CONGRESSIONAL RECORD — SENATE   May 21, 2025
Case 4:25-cv-04966   Document 1-3   Filed 06/12/25   Page 81 of 82

concern to young Americans, because they more than we will reap the grim consequences of our failure to act on programs which are needed now if we are to prevent disaster later.

Clean air, clean water, open spaces—these should once again be the birthright of every American. If we act now—

Nixon said—

they can be.

We still think of air as free. But clean air is not free, and neither is clean water. The price tag on pollution control is high. Through our years of past carelessness we incurred a debt to nature, and now that debt is being called.

What more profound words for today than that?

Through our years of past carelessness we incurred a debt to nature, and now that debt is being called.

And that debt is called climate change. Those are my words, not Nixon's.

But Nixon went on to say:

The program I shall propose to Congress will be the most comprehensive and costly program in this field in America's history.

This was a Republican President.

It is not a program for just one year. A year's plan in this field is no plan at all. This is a time to look ahead not a year, but 5 years or 10 years—whatever time is required to do the job.

I shall propose to this Congress a $10 billion nationwide clean waters program to put modern municipal waste treatment plants in every place in America where they are needed to make our waters clean again, and do it now. We have the industrial capacity, if we begin now, to build them all within 5 years. This program will get them built within 5 years.

As our cities and suburbs relentlessly expand, those priceless open spaces needed for recreation areas accessible to their people are swallowed up—often forever. Unless we preserve these spaces while they are still available, we will have none to preserve.

Therefore—

Nixon said—

I shall propose new financing methods for purchasing open space and parklands now, before they are lost to us.

The automobile—

Nixon said—

is our worst polluter of the air. Adequate control requires further advances in engine design and fuel composition.

Little could he have imagined the electric vehicles of today. But he said:

We shall intensify our research, set increasingly strict standards—

This is Richard Nixon—

and strengthen enforcement procedures—and we shall do it now.

We can no longer afford to consider air and water common property, free to be abused by anyone without regard to the consequences. Instead, we should begin now to treat them as scarce resources, which we are no more free to contaminate than we are free to throw garbage into our neighbor's yard.

This requires comprehensive new regulations. It also requires that, to the extent possible, the price of goods should be made to include the costs of producing and disposing of them without damage to the environment.

Isn't this incredible? Richard Nixon, in the 1970s, talking about requiring that the price of goods should include

the cost of producing and disposing of them without damage to the environment.

He went on:

Now, I realize that the argument is often made that there is a fundamental contradiction between economic growth and the quality of life, so that to have one we must forsake the other.

The answer—

He said—

is not to abandon growth, but to redirect it. For example, we should turn toward ending congestion and eliminating smog with the same reservoir of inventive genius that created them in the first place.

Now, Richard Nixon—that was in January of 1970.

This was Richard Nixon in July of the same year, July of 1970, in a special message to the Congress:

To the Congress of the United States: As concern with the condition of our physical environment has intensified, it has become increasingly clear that we need to know more about the total environment—land, water and air. It also has become increasingly clear that only by reorganizing our Federal efforts can we develop that knowledge, and effectively ensure the protection, development and enhancement of the total environment itself.

The Government's environmentally related activities have grown up piecemeal over the years. The time has come to organize them rationally and systematically. As a major step in this direction, I am transmitting today two reorganization plans: one to establish an Environmental Protection Agency, and one to establish, within the Department of Commerce, a National Oceanic and Atmospheric Administration.

This was the work of a Republican President: the EPA and NOAA. And look what is happening to it today.

The Administrator of the EPA Lee Zeldin testified before our committee today. He is calling to cut the EPA in half—cut it by more than half, actually: by 55 percent. This creation of the Nixon administration, he believes more than half of it is a waste. This Agency devoted to what Reagan talked about, what Nixon talked about, devoted to clean air and clean water, is just a waste.

This was the CEO of Ford just a year ago:

If we cannot make money on EVs, we have competitors who have the largest market in the world, who already dominate globally, already setting up their supply chain around the world. If we don't make profitable EVs in the next five years, what is the future? We will just shrink into North America.

What about our competitiveness? Are we walking away from that too? Every step this body takes this week to undermine the growth of what could be America's next great manufacturing powerhouse will be felt not just by the big three but in communities all across America.

A recent study from Princeton University found that if Congress takes action to target these emissions regulations, as they are doing, and the EV tax credits that we passed in the last administration—can you guess the place that will be the most impacted? It will be the same States that sup-

ported Donald Trump in the last election. That is because the EV component plants that are being built for this burgeoning sector are happening in Texas and in Tennessee and in Missouri and in South Carolina. The battery factories are being launched in Indiana, Alabama, Georgia, Ohio, and Michigan.

Every signal we send to American industry and to the world that we are throwing in the towel to Chinese EV manufacturers will resonate far longer than I think this Senate realizes this week, and it will hit American families in the exact place it will hurt the most. It will hit them in the wallet. Cutting tax credits, shuttering American electric car manufacturers—these will make the modern commute, the future of family vacation, all that, more expensive as we become all that more reliant on fossil fuels to go anywhere.

It will also hurt the future earnings of our apprentices, our tradespeople, our engineers by killing in the cradle a sector of the American economy to the tune of thousands of good-paying jobs.

That is not to mention, even more significantly, making Americans spend far more on healthcare as they face more sick days and worse health conditions from dirtier air.

Now, I want to talk about that for a moment because I know there are many who take for granted our air, just as we take for granted that the sun will rise or set. While air that we breathe may feel like a given, we cannot lose sight of the fact, for 135 million people—more than 4 in every 10 Americans—they live in a community impacted by unhealthy levels of air pollution; and 24 million Americans—or 1 in every 14 adults—are living with asthma. That rate is even higher in children, with about 1 in every 12 kids living with asthma.

Now, consider for a second that elevated air pollution has been found by the University of Washington, Columbia, and the University of Buffalo to be equivalent on your lungs like a pack of cigarettes.

Why is smog like a pack of cigarettes? Because it has the same effects exactly on our health. Here is what the EPA says on this topic:

[C]onstant exposure to elevated particle pollution will contribute to reduced respiratory function, even in apparently healthy people.

Here is another quote:

Respiratory effects related to active exposure to fine particles include . . . reduction in pulmonary function, increased airway inflammation . . . and can be serious enough to result in emergency department visits and hospital admissions.

That is heart trouble, that is lung trouble, health effects so devastating you could land in the hospital just from constant exposure to smog—smog—something we will see a lot more of once again by repealing these Clean Air Act standards that California has set.

Now, I heard one of my colleagues earlier today say that California was

*May 21, 2025*                    CONGRESSIONAL RECORD — SENATE                    **S3097**

imposing its standards on everybody else. Now, that is just not the case. For decades now, California has had a right to set its own air quality standards. That right was given by statute.

But other States have chosen to follow California's lead. They weren't required to. They weren't forced to. They chose to. They chose for their constituents to have air as clean as what California was striving to achieve.

And, yes, a lot of States adopted those standards, and some of the other States might not like it. Maybe they are just fine with having dirtier air, and that is their judgment.

But to tell California we can't set our own air standard, to tell California that because other States are following our example, we should lose the opportunity to decide how clean or how dirty we want our own air to be; is that a road we really want to go down?

Now, I know because I have been in the majority before, and when you are in the majority, you feel like you will never be in the minority, but the tables will turn. Do my colleagues want a situation where the Democratic majority can look at rules we don't like in red States and say with a simple vote—majority vote—we are going to get rid of them? we don't like your rule on mifepristone? we don't like your license for natural gas? we don't like something your State likes, and therefore we are going to legislate by CRA? Because that is what is going to happen. You can overturn the Parliamentarian here. We can overturn the Par-

liamentarian there. I just don't think that is a road we want to go down.

I grew up in California. I have lived there since I was 11 years old. I saw the smog days, and I knew the haze that had come to define our cities and skies for a generation dating back to the first automobile boom of the post-war era. I remember all the smog alerts, days you were warned not to go outside.

It is no surprise that that smog at the time became synonymous with California. Even today, we see some of the most densely populated and at-risk areas in the Nation for air pollution are still in California.

The Los Angeles County area, including the San Fernando and San Gabriel Valleys; the Central Valley, including Bakersfield and Fresno; San Diego County; San Francisco Bay Area— these are all areas that see dense populations facing increasing health risks from smog, which is why California took such a step 60 years ago to become the first State to tackle air pollution caused by automobiles head-on, to take drastic generational action to clean up our air.

But the steps that my colleagues in the Republican Party are taking tonight aren't going to make America healthy again. They are going to make America hazy again. If we go down this road, the future is clear even if our skies won't be.

Americans will pay for this nuclear option with more of their paychecks on hospital bills. They will pay for it with

fewer jobs, less success in their communities, fewer years with their loved ones, more cancers, less time to enjoy the quality of life, and less quality of life.

That is not a future I want to see. I want to see a future envisioned, I think, as we heard by Democratic Presidents and Republicans Presidents alike, in which we invest in the technologies that can clean our air and clean our water, in which we get ahead of this tipping point on climate change, in which fire seasons go back to being a few months a year and not year-round, in which we are not constantly seeing our wildlife at risk, and in which we have to wonder what the future will look like for our kids and our grandkids.

It may seem like a small step tonight to get rid of the filibuster, to force California to abandon its standards for its own air, but this step down this road may be the first. It will not be the last. And I want better for my kids and grandkids, and I want better for everyone else's family as well.

I yield the floor.

─────◆─────

ADJOURNMENT UNTIL 10 A.M. TOMORROW

The PRESIDING OFFICER. Under the previous order, the Senate stands adjourned until 10 a.m., May 22, 2025.

Thereupon, the Senate, at 1:21 a.m., adjourned until Thursday, May 22, 2025, at 10 a.m.

# EXHIBIT D



# Congressional Record

## PROCEEDINGS AND DEBATES OF THE *119th* CONGRESS, FIRST SESSION

*Vol. 171*    WASHINGTON, THURSDAY, MAY 22, 2025    *No. 87*

# Senate

The Senate met at 10 a.m. and was called to order by the Honorable MARKWAYNE MULLIN, a Senator from the State of Oklahoma.

## PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Almighty God, source of enabling strength, sustain our Senators not only in the great moments but also in the repetitive and common tasks of life. Establish their work, strengthening them to honor You by serving others.

Lord, make them agents of healing and hope as they help people live blessed by greater justice and peace. Empower them to daily develop greater respect and submission to Your commands. Fill them with Your lifegiving spirit so that they will strive to permit justice to roll down like waters and righteousness like a mighty stream.

We pray in Your mighty Name. Amen.

## PLEDGE OF ALLEGIANCE

The Presiding Officer led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## APPOINTMENT OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication to the Senate from the President pro tempore (Mr. GRASSLEY).

The assistant bill clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
*Washington, DC, May 22, 2025.*
*To the Senate:*
Under the provisions of rule I, paragraph 3, of the Standing Rules of the Senate, I hereby appoint the Honorable MARKWAYNE MULLIN, a Senator from the State of Oklahoma, to perform the duties of the Chair.

CHUCK GRASSLEY,
*President pro tempore.*

Mr. MULLIN thereupon assumed the Chair as Acting President pro tempore.

## RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

## RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. The majority leader is recognized.

## CAPITAL JEWISH MUSEUM SHOOTING

Mr. THUNE. Mr. President, before I begin, I need to mention the shooting that occurred last night outside an event at the Capital Jewish Museum in Washington, DC, held by the American Jewish Committee. From everything we know so far, it is appallingly clear that event attendees were deliberately targeted. And two young Embassy employees—tragically, two employees on the verge of getting engaged and starting a life together—were murdered in the attack.

I am grateful that the suspect is already in custody and for the help the Capitol Police provided in responding to the attack, and I know that he will be swiftly prosecuted to the fullest extent of the law. But I suspect that is little comfort right now to the many whose sense of safety has been shattered and who are worried that they will be targeted simply because they are Jewish or Israeli.

My prayers today are with the families of the deceased, with event attendees, with the employees of the Israeli Embassy, and with all the members of the Jewish community suffering in the wake of this attack. And to the Israeli and Jewish communities here in Washington, DC, know that we stand with you.

## UKRAINE

Mr. THUNE. Mr. President, one other topic I want to mention before I get to the main subject today is the war in Ukraine.

For the last 4 months, President Trump has gone to extraordinary lengths to bring an end to the bloodshed in Ukraine, and we here in the Senate commend him for those efforts.

Now the ball is in Putin's court. It is time for him to come to the table in good faith and make a serious proposal for an immediate cease-fire that can lead to a just and lasting peace in Ukraine. I hope he realizes it is time to do so. If not, the Senate stands ready to act. Thanks to the dogged work of Senator GRAHAM, we have bipartisan legislation, cosponsored by 80 of my colleagues, to impose additional economic sanctions and tariffs on Russia. If Russia is not willing to engage in serious diplomacy, the Senate will work with the Trump administration to consider additional sanctions to force Putin to start negotiating.

## MEMORIAL DAY

Mr. THUNE. Mr. President, this month, I have had the privilege of welcoming two groups of South Dakota veterans to Washington during Honor Flight visits. I went simply to say hello and to thank these men and women for their service to our country. This is something I have done for many years, and it is always an occasion that inspires me and makes me grateful to be an American and an heir to what they fought for.

After one of these groups of veterans returned home to South Dakota, KELOLAND News reported on their

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

S3099

(148 of 196), Page 148 of 196 Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 148 of 196
Case 4:25-cv-04966 Document 1-4 Filed 06/12/25 Page 3 of 51
S3100 CONGRESSIONAL RECORD — SENATE May 22, 2025

visit, and a quote from one Vietnam veteran in that story struck me. He said:

I'm no hero. The heroes are the ones that didn't get to come back and have families, didn't get to become grandparents. They're the heroes.

Mr. President, this is a common sentiment among veterans. I know my dad, a World War II veteran, never talked much about himself; it was always about the men he served with, especially those who didn't come back. But no matter how many times I hear this, it always stops me in my tracks because it reminds me that we ask those who serve our country to be willing to sacrifice everything—their entire future and all that it could hold. And many, many Americans have given their lives to defend our security, liberty, and peace.

This Monday, on Memorial Day, we honor the men and women who sacrificed everything in service to our country. We remember their heroism and courage, and we take inspiration from their commitment to the ideals upon which our country is founded.

This year marks 80 years since the end of World War II. Millions of Americans served in the military during the war, and more than 400,000 Americans died. Among these were about 1,700 South Dakotans, men like CPT Arlo Olson of Toronto, SD, who was awarded the Congressional Medal of Honor for his bravery in advancing through Italy and who was killed there in 1943. He was 25 years old. Lieutenant Earl Ferguson, from Philip, who died when his B–24 bomber was shot down while targeting an oilfield in Romania. He was 26. And Private Glenn Dow, from Sioux Falls, who was killed on Omaha Beach on D-Day. Private Dow was 19.

These men gave their entire lives to defend our freedom and secure peace for us. They entrusted to us the future they would not see themselves, and they call on us to defend the peace they won.

In one of his Memorial Day proclamations, President Reagan wrote:

The defense of peace, like the defense of liberty, requires more than lip service. It requires vigilance, military strength, and the willingness to take risks and make sacrifices.

He continued:

The surest guarantor of both peace and liberty is our unflinching resolve to defend that which has been purchased for us by our fallen heroes.

On Memorial Day, we remember that our freedom has come at a cost, and we recognize that it is on us to live up to the ideals for which generations of Americans have been willing to give their lives.

These are American heroes, and we are a grateful nation.

I yield the floor.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The assistant bill clerk proceeded to call the roll.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

## RECOGNITION OF THE MINORITY LEADER

The ACTING PRESIDENT pro tempore. The Democratic leader is recognized.

## CAPITAL JEWISH MUSEUM SHOOTING

Mr. SCHUMER. Mr. President, last night, just a few blocks from here, at the Capital Jewish Museum, a scourge of anti-Semitism reared its ugly head yet again in America. The sickening, cold-blooded murder of two Jewish staffers of the Israeli Embassy seems to be another horrific incident of anti-Semitism, which we all know is much too rampant in our society.

Yaron Lischinsky, Sarah Milgrim—may their memories be a blessing.

Such a blatant and targeted act of anti-Semitism, right here in the Nation's Capital, should outrage everybody—a beautiful young couple about to be married just starting their lives, gunned down seemingly because they were Jewish.

Let this be a call to all of us: We must never allow the malicious poison of anti-Semitism to fester and flourish. While we still must learn more about this tragic incident, we do know that when anti-Semitism is rife in the air, all kinds of individuals cling to it and, sometimes, unfortunately, act on it.

This morning, I am praying for those who were killed in this senseless act of violence, all those affected, and their families.

## BUDGET RECONCILIATION

Mr. SCHUMER. Mr. President, now, on reconciliation, a few hours ago, while most Americans were fast asleep, House Republicans rammed through their so-called Big Beautiful Bill through the House of Representatives, in the dead of night, in the hopes that nobody would notice.

House Republicans took a bill that was already rotten to the core and made it even worse to appease the most radical factions of their party. It will bring deeper, harder, and even faster pain to the American people.

It seems the hard right over there wanted even quicker pain. It is truly jarring to watch House Republicans cheer and pat each other on the back while bond markets spiral and working families are left to worry about how they will make ends meet.

So this morning, let's take a look at a few ways this bill has gotten even worse as it has reached final passage. We will surely learn more in the coming days, but let me share a few

changes Republicans made that Americans deserve to hear.

First, this bill was already the largest cut in Medicaid in American history, but now these cuts have been rushed forward and will happen as soon as next year. Moving up the timeline now means that hospitals, particularly rural hospitals, have even less time to prepare and increases the chance that they will close and that hundreds in each county will lose their jobs.

Up to 14 million Americans are in danger of losing their health insurance. This bill will shut down rural hospitals, community health centers, urgent care clinics, and more. But while hospital beds are closing, Republicans are prioritizing a repeal on tanning bed taxes.

And, of course, at the last minute, the anti-choice radicals snuck in a new provision, penalizing enrollees in private plans on ACA exchanges covering reproductive care. Defunding Planned Parenthood wasn't enough. The radicals got their pitchforks and added a provision to effectively ban every insurance premium on every ACA exchange for covering abortion.

This is catastrophic and even increases the anti-choice provisions in the bill by a dramatic amount. It will mean that nearly one in seven Americans who has been insured through ACA since 2014 will be subject to this change.

And while our communities get sicker, our kids get hungry. Republicans weren't satisfied with simply making 4 million kids go hungry. They decided they needed to move up the timeline. Cuts to SNAP will take effect as soon as next year. That makes it even harder for food pantries to adapt—more chaos, more hunger, and more closures among our food pantries and kitchens that serve the hungry.

Widespread hunger is now on the fast track. Republicans seem to be saying that the average person who needs food gets only $5 a day. A dozen eggs cost more than $5 a day.

That is the price Republicans accept so they can cut taxes on the wealthy.

Republicans are stealing from hungry kids, stealing from low-income families to give trillions in tax giveaways to the wealthy.

This is not beautiful. It is ugly. It is revolting.

As the bill proceeds, perhaps the most dramatic change that occurred overnight is the surrender of America's clean energy future to China. Republicans are condemning Americans to higher energy costs and killing hundreds of thousands—even millions—of good-paying jobs.

Last night, the Republicans did something else too. They added a clean job kill switch. At the very last minute, Republicans added a provision that says any project that doesn't break ground within 60 days of this passage will lose the entire tax credit.

That is getting rid of the tax credit. No project can start in 60 days. That is

May 22, 2025     CONGRESSIONAL RECORD — SENATE     S3101

not how it works. They know that. They know that the clean energy tax credits are popular. They know that the clean energy tax credits will reduce costs for American families.

So instead of saying, "Kill it outright," they say, "You must start within 60 days." That is saying, "Kill it outright." Everyone knows that, and I saw that some of the hard-right people from the oil patch States were gloating—gloating—that clean energy is gone. It is one of the most devastating things added at the last minute in this bill, snuck in, in the dark of night.

We in the Senate—and I hope our Republican colleagues will join us in this—are going to fight this every step of the way. Much of the clean energy industry will be dead. As I said, hundreds of thousands, if not millions, of jobs will be lost, and China, 10 years from now, will be dictating what happens in our energy markets to our children.

To make matters even worse, of course, the bill also raises taxes on some projects that are underway. Donald Trump says he wants America to dominate energy, and then he does this—taxing energy projects, raising costs for families?

Nope. Donald Trump, what you are doing is absolutely stupid and counterproductive. You don't even know what you are doing. You just think: Oh, clean energy, let's just get rid of it. We will rely on oil, gas, and coal.

Well, there ain't enough oil, gas, and coal to fuel the world, and it is more expensive to do it, Donald Trump. What the heck are you doing?

This is an American energy kill switch. Solar jobs will vanish. Wind jobs will vanish. Manufacturing jobs will go to China, just the opposite of what the President says he wants. And people's electric bills will go up.

So America, when your electric bill starts going up, talk to Donald Trump, talk to the Republicans in the House, and please talk to the Republicans in the Senate and tell them not to move forward on this folly.

Republicans call their bill a tax break, but, in reality, it is a tax hike and a job killer, except for China, where it is a job creator. China wins; America loses.

In the coming days, Americans will take a look at the Republicans' Big Beautiful Bill and discover it gets uglier and uglier the closer they look.

The bill, hopefully, has a doomed future in the Senate. Senate Democrats will let hell freeze over and fight this in every way that we can.

Donald Trump told House Republicans that voting no on his bill will be the ultimate betrayal, but the real betrayal this morning was the Republicans voting yes—the betrayal of the American people—because there is nothing beautiful about the biggest cuts to Medicaid in American history, nothing beautiful about cutting SNAP benefits so children go hungry and can't learn or have productive lives,

nothing beautiful about cutting SNAP benefits by over $200 billion.

Senate Democrats will oppose this morally bankrupt bill with every fiber in our being—every fiber.

———

TRIBUTE TO RUTH CARNEGIE

Mr. SCHUMER. Mr. President, now on a more happy note, when Ruth Carnegie took a job with the Senate Doorkeepers 5 years ago, she quickly impressed everyone with her calm, competence, and her ability to handle chaos, which, of course, made perfect sense. She had spent the previous 3 years working for me.

Next week, after 3 years in "Schumerland," 12 years in the Senate, and 22 years on Capitol Hill, Ruth will move on to her next chapter. Now, it might surprise you that someone whose dream is to race down the autobahn found a home here in the Senate, an institution not known for its pace.

But, in truth, Ruth was built for both. When things moved fast, Ruth could keep up. When things slowed her down, Ruth could be steady. She is soft-spoken yet strong. She has a combination of humility, wisdom, and strength.

One of the things I admire most about Ruth is that she always lifts up everyone around her, being a mentor to many people who have and will go on to do great things.

Ruth, thank you, thank you, thank you. You have left an indelible mark on the Senate, and you have earned a very happy retirement.

I yield the floor.

———

CONCLUSION OF MORNING BUSINESS

The ACTING PRESIDENT pro tempore. Morning business is closed.

———

LEGISLATIVE SESSION

———

PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; ADVANCED CLEAN CARS II; WAIVER OF PREEMPTION; NOTICE OF DECISION"

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume H.J. Res. 88, which the clerk will report.

The senior assistant legislative clerk read as follows:

A joint resolution (H.J. Res. 88) providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision".

The ACTING PRESIDENT pro tempore. Under the previous order, the clerk will read the title of the joint resolution for the third time.

The joint resolution was ordered to a third reading and was read the third time.

VOTE ON H.J. RES. 88

The ACTING PRESIDENT pro tempore. The joint resolution having been read a third time, the question is, Shall the joint resolution pass?

Mr. CRAPO. Mr. President, I ask for the yeas and nays.

The ACTING PRESIDENT pro tempore. Is there a sufficient second?

There appears to be a sufficient second.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN), the Senator from North Carolina (Mr. BUDD), and the Senator from North Carolina (Mr. TILLIS).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) and the Senator from Oregon (Mr. MERKLEY) are necessarily absent.

The result was announced—yeas 51, nays 44, as follows:

[Rollcall Vote No. 277 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Slotkin |
| Curtis | Marshall | Sullivan |
| Daines | McConnell | Thune |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NAYS—44

| | | |
|---|---|---|
| Alsobrooks | Hickenlooper | Rosen |
| Baldwin | Hirono | Sanders |
| Bennet | Kaine | Schatz |
| Blumenthal | Kelly | Schiff |
| Blunt Rochester | Kim | Schumer |
| Booker | King | Shaheen |
| Cantwell | Klobuchar | Smith |
| Coons | Luján | Van Hollen |
| Cortez Masto | Markey | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |

NOT VOTING—5

| | | |
|---|---|---|
| Blackburn | Heinrich | Tillis |
| Budd | Merkley | |

The joint resolution (H.J. Res. 88) was passed.

The PRESIDING OFFICER (Mr. SHEEHY). The motion to reconsider is considered made and laid upon the table.

PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; HEAVY-DUTY VEHICLE AND ENGINE EMISSION WARRANTY AND MAINTENANCE PROVISIONS; ADVANCED CLEAN TRUCKS; ZERO EMISSION AIRPORT SHUTTLE; ZERO-EMISSION POWER TRAIN CERTIFICATION; WAIVER OF PREEMPTION; NOTICE OF DECISION"—Motion to Proceed

The PRESIDING OFFICER. The majority leader.

Mr. THUNE. Mr. President, I understand the Senate received H.J. Res. 87 from the House.

The PRESIDING OFFICER. The Senator is correct.

Mr. THUNE. I move to proceed to H.J. Res. 87.

The PRESIDING OFFICER. The clerk will report the motion.

The assistant bill clerk read as follows:

Motion to proceed to H.J. Res. 87, a joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision".

VOTE ON MOTION

Mr. THUNE. I ask for the yeas and nays.

The PRESIDING OFFICER. The question is on agreeing to the motion. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 278 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Curtis | Justice |
| Barrasso | Daines | Kennedy |
| Boozman | Ernst | Lankford |
| Britt | Fischer | Lee |
| Capito | Graham | Lummis |
| Cassidy | Grassley | Marshall |
| Collins | Hagerty | McConnell |
| Cornyn | Hawley | McCormick |
| Cotton | Hoeven | Moody |
| Cramer | Husted | Moran |
| Crapo | Hyde-Smith | Moreno |
| Cruz | Johnson | Mullin |
| Murkowski | Schmitt | Thune |
| Paul | Scott (FL) | Tillis |
| Ricketts | Scott (SC) | Tuberville |
| Risch | Sheehy | Wicker |
| Rounds | Sullivan | Young |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was agreed to.

---

PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; HEAVY-DUTY VEHICLE AND ENGINE EMISSION WARRANTY AND MAINTENANCE PROVISIONS; ADVANCED CLEAN TRUCKS; ZERO EMISSION AIRPORT SHUTTLE; ZERO-EMISSION POWER TRAIN CERTIFICATION; WAIVER OF PREEMPTION; NOTICE OF DECISION"

The PRESIDING OFFICER. The clerk will report the joint resolution by title.

The legislative clerk read as follows:

A joint resolution (H.J. Res. 87) providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision".

The PRESIDING OFFICER. Under the provisions of 5 U.S.C. 802, there will now be 10 hours of debate equally divided.

The Senator from Nebraska.

H.J. RES. 87

Mrs. FISCHER. Mr. President, today, the U.S. Senate will vote on my resolution to overturn the EPA's waiver for California's Advanced Clean Trucks.

First of all, I would like to thank my friend and colleague Chairman CAPITO for her strong leadership and work on this very important issue. This heavy-handed regulation imposes unrealistic emissions requirements for heavy-duty trucks and heavy-duty diesel engines. This government mandate handed down to vehicle manufacturers demands that they sell zero-emission trucks at an increased rate from 2024 to 2035. We aren't under any illusions as to what this means. We know that the goal is to effectively end the sale of internal combustion engines.

Now, I am not here today to disparage electric vehicles, and I am certainly not here to discourage the manufacturing and the purchasing of EVs either. What I am concerned about is the Federal Government dictating which cars and which trucks are acceptable and which are not. If Americans want to drive an electric or a hybrid car, that is fine. However, the government—the government—should not pick winners and losers in the vehicle marketplace. I believe in the power of America's free markets, and I believe we should allow the markets to determine the viability of clean trucks.

Here is the truth: This California waiver and subsequent regulation is simply not based in reality, and it will have real-world consequences on us. By requiring truckers to meet California's standards, even while working outside of the State, operator costs increase, fleet upgrades would be impacted, and interstate commerce would be disrupted. And American consumers would bear the brunt of increased costs. Hard-working families are already dealing with the high cost of everyday goods and services, and they cannot afford this regulation.

Let me be clear. This action is necessary to stop one State from dictating emission policies for the entire country. Prior to this waiver being granted, California's own Air Resources Board readily admitted this action would extend beyond its own State borders, and several States have already followed suit.

I would also like to address the eligibility of Congress disapproving rules. A few weeks ago, I questioned the Government Accountability Office Comptroller during an Appropriations subcommittee hearing. The Comptroller explicitly stated that GAO's role is just an advisory one and that it is up to us—it is up to Congress—to determine what constitutes a rule. Again, let me be clear. We are reclaiming our congressional authority under the Congressional Review Act.

I will be proud for this body to vote on and pass my resolution, which is a commonsense step to keep government overreach at bay, protect consumers, and support America's free markets. With the passage of the House version of this resolution and with the passage of the Senate's version today, it will head to the President's desk to be signed into law.

I yield the floor.

The PRESIDING OFFICER. The Senator from Wyoming.

CAPITAL JEWISH MUSEUM SHOOTING

Ms. LUMMIS. Mr. President, before I talk about digital assets, I want to take a moment to remember Sarah Lynn Milgrim and Yaron Lischinsky, who were tragically, senselessly murdered last night at the Capital Jewish Museum.

(151 of 196), Page 151 of 196    Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 151 of 196
Case 4:25-cv-04966    Document 1-4    Filed 06/12/25    Page 6 of 51

May 22, 2025                    CONGRESSIONAL RECORD — SENATE                                        S3103

May their memory be a blessing for their families, their friends, their community, and their faith.

Let me be very clear. Anti-Semitism and this kind of hate-fueled violence have no place in our country, no place in the world.

I encourage you all to join me in keeping these families in your prayers in the coming weeks. I am proud to stand in support of Israel during this time.

GENIUS ACT

Mr. President, now I will switch to the GENIUS Act.

The GENIUS Act is a watershed moment in how we approach digital finance while also preserving the institutions that have served our Nation for decades.

Digital assets are the future, and it is our responsibility to ensure the United States continues to lead the way. The uncomfortable reality is that our payment system is outdated. Many of our financial rails date back to the 1970s and 1980s, before the internet transformed how we live and work.

When a small business owner in Cheyenne uses a traditional payment system to send a payment to a supplier overseas, they face delays up to 10 days and 2 to 5 percent transaction fees. This isn't just inconvenient; it is a competitive disadvantage to American businesses.

But digital assets change all that. Stablecoins can complete these same transactions in seconds, at a fraction of the cost, 365 days out of the year. The GENIUS Act not only revolutionizes the way we do business but preserves critical financial institutions, and they need this opportunity.

For more than 150 years, our country has maintained both State-chartered and national banks. There are about 5,000 banks; 4,000 of them are chartered at the State level and only 1,000 at the Federal level. This system has been the engine for American economic growth, providing businesses of all sizes with diverse financial services tailored to local needs.

In Wyoming, we have seen firsthand how State-chartered banks serve the specific needs of ranchers, energy producers, and Main Street that might otherwise have been overlooked by larger institutions. We have also seen how the dual banking system permits States, as laboratories of democracy, to thoughtfully integrate new products and services into our banking system.

Wyoming and other States were the first to provide legal clarity for digital assets and show, in great detail, how they can thoughtfully be integrated into our payments and contracts. The GENIUS Act thoughtfully preserves the dual banking system by creating clear pathways for stablecoin issuance under both State and Federal oversight. The legislation also protects and builds upon Wyoming's regulatory framework for digital assets that both protects consumers and promotes responsible innovation.

This legislation, the GENIUS Act, is thoughtful, and it is a balanced approach America needs to maintain and grow our influence in financial advancement, and history will remember how we capitalize on or squander this moment.

American leadership in digital finance is a privilege. Let's ensure it stays in America and not Europe, not Singapore, not China. Let's lead in this innovation, this technology, this advantage to individuals and small communities. We need American values and American leadership to ensure prosperity in the next generation.

Let's get the GENIUS Act passed and secure America's financial future.

I yield the floor.

The PRESIDING OFFICER (Mr. HAGERTY). The Senator from Utah.

UNANIMOUS CONSENT REQUESTS

Mr. LEE. Mr. President, last year this body, the United States Senate, passed 41 bills from the Energy and Natural Resources Committee. And 25 of those bills have been reintroduced. They all have bipartisan support. They all have been vetted in committee. They all are ready to move.

Today, I am asking that we pass four of them at the same time as a modest step forward for the kind of open, Member-driven process for which the Senate was built and has long existed.

The first, from Senator KING of Maine, would expand access to the Katahdin Woods and Waters National Monument—something that passed this body unanimously last year.

The second, from Senator CORNYN of Texas, would adjust the boundaries of Big Bend National Park—again, a commonsense proposal with bipartisan support.

The third, from Senator GILLIBRAND of New York, would establish a national historic park at Fort Ontario—the site of the only Holocaust refugee shelter in American history.

And fourth, from Senator LANKFORD of Oklahoma, would designate the Historic Greenwood District, also known as Black Wall Street, as a national monument.

The Greenwood District in Tulsa was once a thriving community of Black-owned businesses, professionals, and families until the Tulsa Race Massacre of 1921 tragically burned it to the ground.

Hundreds were killed, and thousands were left homeless. Designating this site as a national monument is long overdue. And this month, May 31—in fact, just a few days from now—marks the anniversary of that tragic, tragic massacre.

With that, Mr. President, I ask unanimous consent that the Committee on Natural Resources be discharged and the Senate proceed to the immediate consideration of the following bills en bloc: S. 282, the Katahdin Woods and Waters National Monument access from Senator KING; S. 1051, the Historic Greenwood District—Black Wall Street—National Monument from Senator LANKFORD; S. 432, Fort Ontario Holocaust Refugee Shelter National Historic Park Establishment Act from Senator GILLIBRAND; and S. 1112, the Big Bend National Park Boundary Adjustment Act from Senator CORNYN; further, that the bills be considered read a third time and passed and that the motions to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Is there an objection?

The Senator from Oregon.

Mr. WYDEN. Mr. President, reserving the right to object.

I would say to my colleague, I very much wish that I was not in this position. This morning, I was—like Chairman LEE, I was chairman of the committee, and I know this is a challenging process to put these measures together.

Chairman LEE and I have worked very closely for years on these issues and a host of others, and I look forward to having plenty of opportunities in the future to continue our good work.

So the reason I am here is I requested that two additional, strongly bipartisan measures that already cleared the Chamber last Congress and had no objections be individually included in the request.

One of those bills was S. 356, the Secure Rural Schools Reauthorization Act of 2025, that for years I have championed with my friend and colleague from Idaho Senator CRAPO.

Across the West, this legislation has had bipartisan support because it would reauthorize a crucial lifeline—particularly for schools and law enforcement and roads throughout the West.

I was in Grant County recently, a small community in eastern Oregon, and they are basically hanging by a thread if they don't get the Secure Rural Schools money restored. That is why I am here on the floor today.

I am clear that I want us to work together and to get this done as expeditiously as possible. I am committed, as I have been over the years, working with Chairman LEE to advance these bipartisan proposals swiftly.

I deeply regret being out here and having to express my concerns today and to object, and I just hope we can be back on this floor very, very quickly to pass this good package of bills and make sure the Secure Rural Schools legislation is included.

Therefore, I object.

The PRESIDING OFFICER. The objection is heard.

The Senator from Utah.

Mr. LEE. Mr. President, I appreciate the kind words from my friend and colleague the distinguished Senator from Oregon.

I know my time is short, but I need to respond to a couple of points. First, the bills to which my Democratic colleagues are referring have been cleared. They have been cleared through what is known as our hotline, cleared for passage on the Republican side—not one objection from one Republican.

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

It is the Democrats that are holding it up here. We are not the ones.

Secondly, I want to make very clear: This is a very unfortunate occurrence in the Senate. It is a bad habit that we have gotten into, and it is a habit that we must break.

The habit involves raising an objection. One of the things you did not hear from my friend and colleague from Oregon is a single objection, not on the merits, not on any legitimate procedural ground to any of the bills that I just mentioned—not a single one. No, these bills are drawing an objection today, not allowed to pass the Senate today—even though they passed in the past unanimously, and they don't have any substantive objection.

They are objecting to these not because they are unpopular but because they are popular. When they are popular, when the need for them is due and undisputed, when there is no legitimate argument against them, when the House delegation, the local population, the Senate delegation is all supportive of them, they use them and take them as hostages.

And they use them so that the way these things can happen is they will cuddle together a whole bunch of bills, and these bills all accomplish similar things. They have a lot of commonalities. They do similar things. They enjoy similar amounts of support. They have passed in the past. The local communities overwhelmingly support them. It makes sense to offer these up together. We opt to do them individually as often as we can.

But what they want to do is what has been done in the past, is you cuddle together a whole bunch of bills—sometimes a dozen or more, maybe dozens of them—and then time the introduction of that package to a moment just before a major holiday or long-scheduled recess, they bring them forward, and they say: Take them or leave them.

You must take all of them or have none of them. And what that does to public land States like mine, where 67 percent of the land is owned by the U.S. Government or beholden to everything, is it puts us in an impossible decision.

Usually, these deals are put together by two or three people in secret, and they bring it forward at the last possible minute when there is no time for debate, no time for amendments, no time to say, OK, this one doesn't belong, the others are fine.

Take it or leave it. It is extortion. We have got to end that process. There is not one legitimate reason why we shouldn't pass any one of these four bills. Let's get it done today. I find it tragic that this drew an objection.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. WYDEN. Just to briefly respond because we are hearing about hostages and extortion and all this kind of thing. I just want my colleague to know because he and I have worked together for years and years and we have

never had a difference of opinion that was based on somebody trying to take hostages and these kinds of things.

This is about something that is really, in my communities, a question of whether they are going to make it in terms of keeping the schools open. There are no objections to what Senator CRAPO and I have been doing here.

Let me repeat that: No objections.

And throughout the West and in the Federal Government, like in my colleague's State, the Federal Government owns much of our land. People are waiting to see if we will work together and fix this.

I want to tell my colleague, I am happy to join him in 20 minutes if we have worked this out, and we will be done, and if my colleague says we will go home and say we got something else done that was constructive.

So I want to renew my point: This is not about politics. It is bipartisan. There are no objections. I stand willing, with my staff, to join the LEE staff right now. We can work together over the next few minutes. We have a unanimous consent request, and we are done. I yield the floor.

The PRESIDING OFFICER. The Senator from Utah.

Mr. LEE. Mr. President, I have got colleagues ready to speak, and I just need 10 seconds here.

I respect and appreciate my friend and colleague from Oregon. It is not to him, personally, about taking bills hostage. But this is a process that has happened in the past over and over and over again. This is how it is playing out.

As to these bills, I reiterate there is not one Republican Senator objecting to them. Bring them forward. Let's pass them now. If there are problems, I don't know what they are, why they would arise. They are on the Democrat side, not ours.

But that is not our problem. It shouldn't be an impediment for Senator CORNYN's bill or Senator LANKFORD's bill or Senator GILLIBRAND's bill or Senator KING's bill that the Democrats can't get their act together, that, for some reason, they are not willing to support that legislation. This is unfortunate. We have got to fix it.

The PRESIDING OFFICER. The Senator from Texas.

Mr. CORNYN. Mr. President, I want to start by thanking my friend from Utah Senator LEE, the chairman of the committee of jurisdiction for hosting this unanimous consent request today to highlight the importance of many pieces of legislation but including the Big Bend National Park Boundary Adjustment Act.

It is no secret that Texas is home to a lot of wide-open spaces, beautiful terrain, and vibrant wildlife. And Big Bend is a national treasure.

This legislation expands and preserves the park's heritage, natural resources, and jaw-dropping scenery while safeguarding private property

rights. It authorizes the National Park Service to acquire approximately 6,100 additional acres adjacent to Terlingua Creek along the western boundary of the park.

And it clarifies that the Park Service may only acquire land through donation or exchange, not through eminent domain.

I am disappointed that our colleagues across the aisle have objected to this. This legislation is critical to Texans and all Americans being able to enjoy our big, beautiful national parks, including Big Bend.

And I thank my colleague from Utah for making the unanimous consent request, but I am disappointed that even on something as much as a no-brainer as something like this, our Democratic colleagues can't resist making partisan objections.

The PRESIDING OFFICER. The Senator from Oklahoma.

CAPITAL JEWISH MUSEUM SHOOTING

Mr. LANKFORD. Mr. President, I want to make a comment on the lands bill, my frustration of where things have gone today on things.

I do want to just pause for a moment and recognize that two staff members of the Israeli Embassy were murdered last night here in Washington, DC, simply because they were Jewish.

The murderer literally hovered outside of the Jewish museum here in Washington, DC, waiting for someone to walk out to murder—just a random person, apparently just to be able to kill a Jew. And then later screamed at the front door "Free Palestine."

This is anti-Semitism at its worst, and I want my Jewish friends to be able to know we are praying for you; we are speaking out on your behalf today; and we have not forgotten. And this kind of hatred and anti-Semitism cannot continue in America.

HISTORIC GREENWOOD DISTRICT–BLACK WALL STREET NATIONAL MONUMENT ESTABLISHMENT ACT

Mr. President, today, I am also disappointed. There is a bill that is a very simple bill that literally every single Republican has released and said: We want to be able to move this.

This is recognition of a national monument for the Historic Greenwood District in North Tulsa. In 1921, on May 31, overnight to June 1, there was the worst race massacre in American history. It is a stain on our American history, but it is also a moment to be able to look back to and learn from.

Over 100 years ago, this race massacre, when it occurred, was pushed under the rug and was told for generations to forget about it. We are pulling that thread and saying: There is some benefit to not losing track of that moment.

This particular bill is a designation as a national monument for that Historic Greenwood District. Now, it is written very carefully and in very close cooperation to make sure there is no eminent domain for the Federal Government; there is no Federal takeover;

*May 22, 2025*     CONGRESSIONAL RECORD — SENATE     **S3105**

private property rights are all protected. But it puts a recognition in this area that it is a Federal designation, just a recognition, no property is taken over, but to say: We as a nation remember.

It is important to the people of North Tulsa because the families and communities and the businesses in North Tulsa are literally turning tragedy into triumph. They are looking back on that time and saying that is what happened on that day, but don't look at just that day, look at who we are; look at who we have been; look at who we are now and where we are going.

This is an important piece that literally every single Republican cleared. No struggle with this bill at all. And then my Democrat colleagues came today, of all weeks and this day, to be able to say they were going to block it.

So my challenge is to my Democratic colleagues, I don't know what the fight and struggle is on this, and I don't know why this is difficult to be able to do. We should all have agreement on this. So whatever struggle is happening among their conference, I would encourage them to be able to work it out so we can pass this because in the past, in this body, this has been a unanimous issue. This should not be controversial to say: We, as a nation, recognize what happened on that day, and we honor the people of North Tulsa for what they are working to still create there in the Greenwood District.

So my encouragement is, let's work out our differences today on this. Let's get this passed and get this done.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oklahoma.

Mr. LANKFORD. Mr. President, I know of no further debate on the pending item.

The PRESIDING OFFICER. Is there further debate?

Hearing none, the clerk will read the title of the joint resolution for the third time.

The joint resolution was ordered to a third reading and was read the third time.

VOTE ON H.J. RES. 87

The PRESIDING OFFICER. The joint resolution having been read the third time, the question is, Shall the joint resolution pass?

Mr. SCHUMER. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from Maryland (Ms.

ALSOBROOKS) and the Senator from New Mexico (Mr. HEINRICH) are necessarily absent.

The result was announced—yeas 51, nays 45, as follows:

[Rollcall Vote No. 279 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NAYS—45

| | | |
|---|---|---|
| Baldwin | Hirono | Rosen |
| Bennet | Kaine | Sanders |
| Blumenthal | Kelly | Schatz |
| Blunt Rochester | Kim | Schiff |
| Booker | King | Schumer |
| Cantwell | Klobuchar | Shaheen |
| Coons | Luján | Slotkin |
| Cortez Masto | Markey | Smith |
| Duckworth | Merkley | Van Hollen |
| Durbin | Murphy | Warner |
| Fetterman | Murray | Warnock |
| Gallego | Ossoff | Warren |
| Gillibrand | Padilla | Welch |
| Hassan | Peters | Whitehouse |
| Hickenlooper | Reed | Wyden |

NOT VOTING—4

| | | |
|---|---|---|
| Alsobrooks | Budd | Heinrich |
| Blackburn | | |

The joint resolution (H.J. Res. 87) was passed.

The PRESIDING OFFICER. Under the previous order, the motion to reconsider is considered made and laid upon the table.

━━━━━━

PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE AND NONROAD ENGINE POLLUTION CONTROL STANDARDS; THE 'OMNIBUS' LOW $NO_X$ REGULATION; WAIVER OF PREEMPTION; NOTICE OF DECISION"—Motion to Proceed

The PRESIDING OFFICER. The Senator from Utah.

Mr. CURTIS. I understand the Senate received H.J. Res. 89 from the House.

The PRESIDING OFFICER. The Senator is correct.

Mr. CURTIS. I move to proceed to H.J. Res. 89.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

Motion to proceed to H.J. Res. 89, a joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine and Nonroad Engine Pollution Control

Standards; The 'Omnibus' Low $NO_X$ Regulation; Waiver of Preemption; Notice of Decision".

VOTE ON MOTION

Mr. CURTIS. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN), the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 280 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was agreed to.

━━━━━━

PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE AND NONROAD ENGINE POLLUTION CONTROL STANDARDS; THE 'OMNIBUS' LOW $NO_X$ REGULATION; WAIVER OF PREEMPTION; NOTICE OF DECISION"

The PRESIDING OFFICER. The clerk will report the joint resolution by title.

The assistant bill clerk read as follows:

A joint resolution (H.J. Res. 89) providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The 'Omnibus' Low $NO_X$ Regulation; Waiver of Preemption; Notice of Decision".

The PRESIDING OFFICER. The Senator from California.

CALIFORNIA CLEAN AIR ACT AUTHORITIES

Mr. PADILLA. Mr. President, I know we are working our way through a series of votes. Many people are at lunch or wrapping up lunch. We have a little bit of business still ahead of us, but I want to take a minute just to remind this body what has transpired here over the last 24 hours: evidence again, actions again standing up that Donald Trump and Republicans in Congress are stopping at nothing to attack California for the audacity of working to protect the health of Californians and for having the audacity to lead the clean energy economy.

But as I have said repeatedly over the last couple of days, it is not just what Donald Trump's EPA and Senate Republicans are doing that is problematic; it is how they made this possible—by fundamentally changing how the Senate operates through rules changes last night.

Now, it was not a magic trick. Before dinner yesterday, these bills to gut California's Clean Air Act authority were recognized as regular bills, subject to the filibuster rule requiring 60 votes to move forward, open to full debate and amendments, but somehow, after dinnertime yesterday, once Senate Republicans were done with overruling the Parliamentarian, these bills were now not subject to the filibuster.

For the record and for the public's recognition, this is the first time in Senate history that the majority has used a nuclear option to take joint resolutions that were subject to the filibuster one minute and eliminate the filibuster for them the next. You may hear them try to deny it, but it is all on the record.

So let me recap. The Senate Parliamentarian, through the Chair, confirmed that all points of order are waived during a Congressional Review Act resolution. That is in the law. But the majority voted to ignore that provision of the law and raise one anyway.

Then the Senate Parliamentarian, through the Chair, confirmed that these resolutions do not qualify—repeat, do not qualify—for expedited consideration, but the majority voted to override the Parliamentarian again and plow ahead anyway.

But no one should be fooled. What happened on the floor, as witnessed by the public, was nothing short of a power play that fundamentally changed how the Senate works.

Why? What was the driving impetus here? Was it President Trump? Is it the fossil fuel industry and what they want? Or did you happen to just think changing these rules and the way the Senate operates was simply a good idea? I would love to hear you make that case. But I know that one of the results of last night's actions and today's votes is that Californians will be forced to breathe dirtier air than they should have to.

California is being targeted for its leadership—it is that blatant; it is that obvious—because, yes, for over half a century, we have been the innovators and trailblazers in the fight against pollution.

A little bit of a history refresher here. Back in 1966, California established the first tailpipe emission standard for passenger vehicles in the Nation, responding to California's unique air quality needs with policy based on science and data. A year later, California established the California Air Resources Board to more comprehensively address the severe air pollution and its consequences.

Then, some of you may remember a catastrophic oilspill off the coast of Santa Barbara. Californians rose up and demanded stronger environmental protections, and this became the birth of the modern-day environmental movement and eventually the first Earth Day in 1970, which has grown in its recognition and celebration.

That same year, Congress passed the Clean Air Act on an overwhelming bipartisan basis. That original Clean Air Act authorized the waiver provision that allows California to set our own separate and more ambitious vehicle emissions standards.

Fast-forward to the year 2006, when California passed the Global Warming Solutions Act, stating the bold goal of reducing emissions to 1990 levels by the year 2020. It was the first in the world set of goals to establish both the regulatory and market programs to achieve real-world reductions in the greenhouse gas emissions that were causing climate change.

I remember it vividly because that same year, I ran for State senate because I wanted to be part of crafting policies to actually achieve those goals and implementing those policies and programs. I went on to serve for 6 years as chair of the California State Senate Committee on Energy, Utilities and Communications.

Since then, California has continued to lead the Nation with increasingly ambitious goals for cutting emissions.

It is a remarkable history when you stop and think about it and especially when you recognize that it hasn't just been Democrats that have been driving this.

As President, former California Senator Richard Nixon signed into law landmark legislation, including the National Environmental Policy Act, the Clean Air Act of 1970, the Endangered Species Act, and the creation of the EPA.

Yes, folks watching at home, Republicans did that.

As Governor, Ronald Reagan established the California Air Resources Board, committing California to a comprehensive, statewide approach to aggressively address air pollution in California.

A Republican did that.

It was Republican Governor Pete Wilson who established the California EPA.

A Republican did that.

It was Republican Governor Arnold Schwarzenegger who signed the 2006 Global Warming Solutions Act into law.

A Republican did that.

As a result of bipartisan efforts, in 2025, California achieved a diverse portfolio of clean energy resources—think not just conceptual but actually operational solar energy, wind energy, geothermal energy—all while fostering the fourth largest economy in the world. And we have a plan to decarbonize nearly every sector of our economy, from transportation to electricity, to manufacturing, to agriculture, construction, and buildings.

It is that long-term vision that has diversified our energy sources so that after seasons of extreme weather, we can still take advantage—more importantly, take advantage—of hydropower opportunity after rainstorms or reap the benefits of expanded wind and solar energy because we have grown our battery storage, technology, performance, and capabilities and capacity.

Now, here is where the rubber meets the road, colleagues. Most of you were not here last night in the wee hours of the morning when I explained that California, at the State and local level, has already done almost all they can to push the most ambitious regulatory agenda in the country to reduce emissions. They have done what they can from what is within their jurisdiction. We are investing in R&D into cleaner locomotives. We are investing in port electrification. We are making breakthroughs in hydrogen marine technologies like the first hydrogen fuel cell ferry in the United States.

But despite all this innovation, despite all this investment, we are still shy in too many regions of attaining Federal clean air standards. Why? That is a logical question. If California is doing so much, why?

Well, California has done everything it can, but the Federal Government has not. We need the Federal Government to do its part.

Unless or until we have a Federal Government that says we need more ambitious goals and standards for the Nation, then California needs and deserves the ability to lead for itself, to protect Californians. That is why these waivers have been so important, because absent the Federal Government doing its part—and I am not holding my breath for the next 3½ years waiting for the Trump EPA to do so—California needs the Federal waivers to get the job done.

CONGRESSIONAL RECORD — SENATE

But I know that even after all this progress, the detractors will fall back on the same tired playbook of excuses. We know that the big oil industry sees California's clean cars and clean truck sales as existential threats. California has made tremendous advancements not just in technology but in markets, but that is why the fossil fuel industry has launched an all-out assault on California's rules.

I will give you just one example. If you happened to be reading the Wall Street Journal this past January, you might have picked up the paper to find an op-ed with the headline ''Biden's EPA Tries to Put One Over With EV Mandate.'' That kind of sounds a little ominous, but if you read who the authors were—the authors went on to complain about how slow and laborious the process is for the EPA to revoke a California waiver administratively. They literally tripped themselves up searching for every possible way to weaponize the Congressional Review Act to take down California's waivers.

Now, who were those authors? The authors were partners at the law firm of Boyden Gray, who represent oil and gas clients and who were in court actively trying to repeal California's waivers. So it makes a whole lot of sense when you realize that they wanted to publish this op-ed by January 8, just 12 days before January 20, when Donald Trump was sworn into his second term.

It is certainly no surprise that a month later, the EPA attempted to submit waivers as rules for congressional review, claiming that the Biden EPA had withheld them. Now, that is a little rich, to accuse the Biden administration of withholding EPA waivers when the first Trump administration did the exact same thing, and so did every other EPA before it, both Republican and Democratic, in its entire 50-plus-year history of the California waiver provision.

In fact, when Donald Trump's EPA did what the Boyden Gray lawyers told them to—submitting these waivers as rules to Congress—they actually still included language admitting that these were waivers and not rules. And when they were called on it, when it was pointed out, they had to go through the motions, do backups, and resubmit the waivers to Congress—ridiculous, blatant.

Now, regardless of how ludicrous this effort has been, we continue to hear all kinds of misinformation from detractors about why California's ambitious goals just won't work. I have a series of them, but I will just focus on the main talking point that I have heard from my Republican colleagues and from industry: that California is somehow coercing other States into adopting California's standards; or to let California do this is the equivalent of setting a national standard; or that these emissions standards become de facto national ones.

That is ridiculous. We have made it clear: Let California take care of Californians. If California had the power, the authority to set those national standards, trust me, we would be doing this and a lot more. But we don't.

But I think the good work that California has done that has benefitted Californians—both our health and our economy, along with our environment—has inspired more than a dozen other States to follow California's lead voluntarily. Nobody is forcing other States—blue States or red States—to follow California's lead, but these other States see the benefits of what California is doing, and they choose to do so to protect their residents and to protect their environment.

Lastly, let me just conclude by stating something that has conveniently been stifled in this whole debate—limited debate—and conversation. So who benefits from all of this? It is not unleashing job creation and innovation in States—the other 49 States—but California. It is holding our Nation back in terms of improving air quality and our transition to a clean energy economy.

The winner here is actually China because, like it or not, the clean energy boom globally is happening. We have a big say in who leads it and who benefits from it.

Is it the United States? Not by the leadership and the policies I have seen of this administration in the near future. It can be California, but it seems like you are more interested in taking our tools away. And so now we risk China jumping ahead, both economically and technologically, in this space.

So I will remind you, folks, despite—not despite but because of California's leaning in on addressing the emissions, pollution, and climate challenges, California has become the fourth largest economy in the world.

We have proven that is what is good for clean air and is good for business and the economy. And that is something that you all ought to replicate and scale up, not fear and stifle. We have to be able to do both—protect our planet, strengthen our economy.

California has shown us the way. We can have reliable cars. Our kids can breathe clean air. We can invest in our economy and in our future.

California has been proud to fill the role of national leader in this space. We will continue to try to do anything and everything we can to do so, both for our interests and for the Nation's, but what has happened in the last 24 hours makes the job that much harder.

I yield the floor.

The PRESIDING OFFICER (Ms. LUMMIS). The Senator from California.

Mr. SCHIFF. Madam President, Members, welcome to the roaring twenties, not the ones you may have read about in F. SCOTT FITZGERALD novels, not the ones with jazz and liberation and industrial boom. I mean these roaring twenties—the ones where instead of flappers, you get fossil fuel and dirty air; where instead of innova-tion, you get obstruction, tariffs, isolationism, blinding nostalgia for a world that no longer exists. Instead of leaders who want to tackle the climate crisis head-on, you get votes to tear down the tools that we need to fight it.

The reason I stand here today and was here last night until 1:30, 2 in the morning is that Senate Republicans have pushed through resolutions to revoke California's authority to set its own vehicle emissions standards, to set its own rules about what kind of air we breathe in California.

This is an authority that my State has had by statute for more than 50 years. We have had the right to deal with our unique problems of congestion, our topography, our smog. We have had the right to demand of ourselves cleaner air, for ourselves and for our children.

That is under attack right now, and not just California's ability to set its standards to protect its people, but because other States have also followed California's lead. This will affect the quality of air all around the country.

And that is the gravamen of the problem for my colleagues in the GOP. And that is that it is not just California. It is the fact that so many other States have followed our lead. So many other States have decided they would rather have fewer cancers than more cars with combustion engines.

That was their choice. That was their right. They weren't coerced into joining California. They made the decision about what was best for their constituents, and it is not for us in this body to arrogate to ourselves, to decide we know better for Californians or we know better for people in other States than what their own leaders have decided about the quality of their air.

This is a direct attack not only on my State but on our ability to innovate, to lead, and, indeed, to breathe clean air. This is bad policy—clearly, certainly yes—but it is also a dangerous abuse of the process in this House that will lead to other harmful consequences.

To get this done, to repeal California's statutory waiver to set its own air pollution rules, Republican leadership has decided to blow a procedural hole in the filibuster. And let's call it what it is: This is a dangerous new kind of nuclear option that dispenses with the filibuster. But they would have us believe: only here, only when it is necessary to cater to the oil industry. It is the oil exception to the filibuster rule.

Now, the nuclear option has been used over nominees in the past. And there has been debate about doing away with the filibuster entirely. But, today, what we are talking about is only carving out the oil industry from the filibuster—so not carving out protection for voting rights; not carving out protection for reproductive freedom; not carving out fundamental rights for the American people, for which there would be a strong case to

(156 of 196), Page 156 of 196 Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 156 of 196
Case 4:25-cv-04966 Document 1-4 Filed 06/12/25 Page 11 of 51
S3108 CONGRESSIONAL RECORD — SENATE May 22, 2025

have a carve-out from the filibuster. But no, today, we are talking about an oil-industry-only carve-out. And they are using it to overturn some of the most successful clean air policies in American history.

Since the 1960s, California has had the obligation and the ability and the authority to lead, and they have used it. We have used it to reduce pollution, to increase fuel efficiency, and to drive innovation across the country. And much of the country has California to thank for the development of electric vehicles, for the improvement in fuel efficiency standards, because as we have led, others have followed and industry has adapted.

Despite the naysayers and those always saying it is too hard, it can't be done, America got cleaner cars thanks to California, and consumers got more choices thanks to California. Now, some in this Chamber want to go back in time, not because the policy failed but because it succeeded.

Imagine if, just after Henry Ford unveiled the Model T, Congress passed a resolution demanding we double down on bigger, stronger horses, because that is what this is—a deliberate attempt to deny the future because it threatens the status of Big Oil.

The President says that he is for energy independence. That is their mantra: Make America energy independent. But that is not what they are doing. They are killing clean energy all over the country.

You know what just came out of the House in the dead of night, last night, in their reconciliation bill—their "Big Ugly Bill?" A provision to essentially kill every clean energy project in the country that is not almost all finished. If it isn't going to be operational in a very short period of time, they want to pull the plug.

Now, why would they do that? Why would they do that when, in fact, most of those projects are in red States, not blue ones, not States like California but States like Indiana and Kentucky.

Why would they do that? Because the obligation here is not to their State or constituency. The obligation here is to the oil industry. They would sacrifice the jobs and the clean energy industry all over the country. To their own constituents, they would put those people out of work. And why? Because of fealty to the oil industry.

This is not about energy independence. It is about oil dependence.

Today, we are in a full transition to a clean transportation future—or we could be—and Senate Republicans are trying to bring back the smog. They are trying to make America smoggy again.

We are seeing the climate crisis, and they are trying to cut the brake lines on progress. We are literally standing at the gates of the future—a future that we will lead or China will lead, a renewable energy future—and some would rather turn it all around and ride off in a horse and buggy, because

that is what this vote means. That is what these votes mean—not just being stuck in a past technology beholden to an old way of doing things, but also stuck in a dirtier and more toxic world.

Millions will be stuck breathing in hazardous emissions unnecessarily.

What is the pay-for here? What is the pay-for for this gift to the oil industry? Cancer—cancer is the pay-for. We will pay for this repeal of clean air rules with cancer—maybe your cancer, maybe your father's cancer, maybe your sister's cancer, maybe your child's cancer.

That will be the pay-for because this is about power, and it is about profit, and it is about punishing States that dare to lead. It is about undermining the Senate's own rules to score a short-term win that will do long-term damage but will placate the oil industry, because once you start twisting the CRA into a weapon to attack anything you don't like—rules, waivers, facts—you don't just hurt California; you hurt the country, because don't think for a second it ends here.

If this gambit works, it will not be the last time this tactic is used. Today, we blow a hole in the filibuster for the oil industry. Tomorrow, we blow another hole in the filibuster for what other polluting industry? Or, more broadly, should we expect this majority to use it to strip away protections for workers or privacy rights or reproductive freedom?

This is the real fight here, not just over emissions or waivers or vehicles, but whether we are a nation led by and empowered to shape the future or held hostage by the past.

The roaring twenties were a time of reckless optimism. The stock markets soared, inequality deepened, and political leaders told Americans not to worry, everything was under control—until it wasn't, because the same decade that gave us jazz and swing also gave us the Smoot-Hawley Tariff Act, a disastrous attempt to protect American industry by walling off our economy to the rest of the world.

It sparked global retaliation. It strangled trade. It helped turn a market crash into a full-blown depression.

What are we seeing now? New tariffs, retaliation threats, political attacks on States that lead, and now an attempt to tear down environmental progress and green innovation just as the global economy is demanding more of it—much more of it.

The roaring twenties gave us invention, yes, but also an illusion, a false belief that we could grow forever without rules and without consequences.

We are in danger of making the same mistake again. We should be building the EV infrastructure for the future, not dismantling climate progress. We should be investing in clean energy, not clinging to combustion engines. We should be protecting the rules of this Chamber, not torching them when they become inconvenient to the oil industry.

The gutting of these norms doesn't end in prosperity; the sacrifice of clean air doesn't end in making us healthy again. It ends in cancer; it ends in an enfeebled economy; it ends in a country going backward and shrinking in on itself. It ends in crisis. Let's not go there.

I yield the floor.

The PRESIDING OFFICER. The Senator from Florida.

RECOGNIZING THE SIGNIFICANCE OF JEWISH AMERICAN HERITAGE MONTH AND CALLING ON ELECTED OFFICIALS AND CIVIL SOCIETY LEADERS TO COUNTER ANTISEMITISM

Mr. SCOTT of Florida. Madam President, I stand today to condemn the anti-Semitic and hate-fueled murders of Yaron Lischinsky and Sarah Milgrim that occurred last night at the hands of a Hamas sympathizer. This was a sickening, violent, and anti-Semitic attack in our Nation's Capital.

These two young professionals were targeted and murdered because they represented Israel and the Jewish people, with their murderer chanting "Free Palestine" after killing them in cold blood.

These were innocents, out for a night together at the Capital Jewish Museum here in DC, just like members of our own staff do each and every week. This anti-Semitism and hate for Israel and the Jewish people is disgusting, unacceptable, and must be condemned on every level. It is despicable, and it is dangerous.

We have seen a rise in anti-Semitism and anti-Israel hate since the October 7, 2023 attacks. We have seen Hamas sympathizers take over college campuses and instill fear in Jewish students. We have seen violent protests on our streets and now in our Nation's Capital. Jewish Americans are afraid to walk outside or live their daily lives. For nearly 600 days now, Israel has defended itself against Iran-backed Hamas terrorists who want to destroy Israel and destroy the Jewish people.

These terrorists murder babies and women in cold blood, take and murder innocent people, and brag about their acts with no remorse. They took innocent people, including Americans, hostage and tortured them. They still hold the bodies of American hostages to deprive their families of closure.

Israel is the United States' greatest democratic ally in the Middle East. We cannot abandon our ally. Thankfully, we have a President who is an ally of Israel and who is working to fight anti-Semitism in the United States.

President Trump is pushing back on colleges and universities that allow hateful anti-Semitic actions on campus that threaten the safety of Jewish students. He has appointed the most pro-Israel Cabinet ever assembled. And he is committed to defending Israel, combating terrorism, and protecting Jewish Americans.

May 22, 2025 | CONGRESSIONAL RECORD — SENATE | S3109

Today, I rise to condemn last night's heinous and anti-Semitic attack on these innocent people. I condemn this hateful rhetoric against Israel and against the Jewish people who deserve the right to live freely and without fear in the United States and around the world.

The United States must always stand with Israel and the Jewish people, and today we join together to remember the innocent lives taken in an act of hate and pay tribute to their lives and the contributions of the Jewish people to our Nation.

Madam President, the fight against anti-Semitism is a bipartisan one. I am grateful for my colleague Jackie Rosen for working with me to draft a resolution that draws attention to anti-Semitism in America and declaring May, Jewish American Heritage Month.

I yield to my colleague from Nevada Senator ROSEN.

The PRESIDING OFFICER. The Senator from Nevada.

Ms. ROSEN. Madam President, I want to begin by thanking my colleague from Florida for his bipartisanship and his partnership, including to pass this bipartisan resolution to recognize Jewish American Heritage Month by unanimous consent.

I also want to take a moment to speak about the horrific murders that took place last night. Like so many other Jews in America and around the world, I woke up this morning heartbroken by the news of yet another unspeakable act of anti-Semitic violence that occurred late last night, this time—this time—in our Nation's Capital, less than 1 mile from where I am standing this very moment. This shooting occurred outside of the Capital Jewish Museum, where the American Jewish Committee was holding a large event. And the shooter went there specifically to target and kill Jews and people whom he perceived to be Jewish.

This is anti-Semitism—plain and simple. There is no justification in the world for carrying out or condoning this violent and vile hate crime. It is pure anti-Semitic violence.

My heart is shattered for the two Israeli Embassy workers who were killed, Yaron and Sarah—taken from us far, far too soon. Both were committed to public service, social action, peace, the betterment of the world. They were a young couple in love.

I have read reports that Yaron was planning to propose to Sarah next week in Israel.

They were cruelly taken from us far too soon at the beginning of their lives. May their memory be a blessing, and may their killer be brought to swift justice.

It is a tragedy that these innocent lives were cut short by hate, and it continues to be a tragedy that these incidents continue to occur in the United States and all over the world.

Over the last few years alone, we have seen anti-Semitic hate and extremist violence. It has done nothing but increase across this country. All over America, Jewish people, we have been threatened, beaten, verbally accosted. We have been killed just because of our faith, just because of whom they are—because of whom we are.

We have seen horrendous anti-Semitic incidents and attacks on Jewish communities, at schools and on college campuses, at Jewish-owned places of business, and on synagogues and places of worship.

And incidents of anti-Semitism in the United States and globally have risen dramatically since Hamas's brutal terrorist attack on October 7. All of it—all of it—is wrong and has no place in our country, no place in our society, no place in the world.

Those who commit these egregious acts, they want to send a message. They want to terrorize Jews. They want to scare Jews. They want to intimidate us. And it is vital that we all stand up together and send a clear and forceful message, and the message is this: We will not be afraid.

We will not be afraid.

We cannot be silent. There is desperate need to confront dangerous and growing anti-Semitism in our country and around the world to show that bigoted efforts to intimidate us will not work. We cannot be afraid. We cannot be silent.

That is why I am here on the Senate floor today. By passing this resolution and recognizing Jewish American Heritage Month, we are not just celebrating the numerous accomplishments and contributions that Jews have made to our country, we are sending the message back, a message that Jewish people have a place in America; that this is our home as well; that our lives, that they have value and they have meaning, just like anyone else; and that our country stands with it.

So I thank my colleagues on both sides of the aisle for allowing this resolution to pass, and I want to thank Senator SCOTT of Florida for his partnership in the effort to counter anti-Semitism and hate everywhere.

So, Madam President, I ask unanimous consent that the Senate proceed to the consideration of S. Res. 246 submitted earlier today.

The PRESIDING OFFICER. The clerk will report the resolution by title.

The legislative clerk read as follows:

A resolution (S. Res. 246) recognizing the significance of Jewish American Heritage Month and calling on elected officials and civil society leaders to counter anti-semitism.

There being no objection, the Senate proceeded to consider the resolution.

Ms. ROSEN. I ask unanimous consent that the resolution be agreed to, the preamble be agreed to, and that the motions to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolution (S. Res. 246) was agreed to.

The preamble was agreed to.

(The resolution, with its preamble, is printed in today's RECORD under "Submitted Resolutions.")

Ms. ROSEN. Thank you, Madam President. Again, thank you to all my colleagues for passing this important resolution unanimously today.

---

PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE AND NONROAD ENGINE POLLUTION CONTROL STANDARDS; THE 'OMNIBUS' LOW NO$_X$ REGULATION; WAIVER OF PREEMPTION; NOTICE OF DECISION"

The PRESIDING OFFICER. The Senator from Mississippi.

Mr. WICKER. I know of no further business and suggest we proceed to the vote.

The PRESIDING OFFICER. Is there further debate on the joint resolution? If not, the clerk will read the title for the third time.

The joint resolution was ordered to a third reading and was read the third time.

VOTE ON H.J. RES. 89

The PRESIDING OFFICER. The joint resolution having been read the third time, the question is, Shall the joint resolution pass?

Ms. BALDWIN. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN), the Senator from Alabama (Mrs. BRITT), the Senator from North Carolina (Mr. BUDD), and the Senator from Kansas (Mr. MORAN).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 49, nays 46, as follows:

[Rollcall Vote No. 281 Leg.]

YEAS—49

| | | |
|---|---|---|
| Banks | Daines | Kennedy |
| Barrasso | Ernst | Lankford |
| Boozman | Fischer | Lee |
| Capito | Graham | Lummis |
| Cassidy | Grassley | Marshall |
| Collins | Hagerty | McConnell |
| Cornyn | Hawley | McCormick |
| Cotton | Hoeven | Moody |
| Cramer | Husted | Moreno |
| Crapo | Hyde-Smith | Mullin |
| Cruz | Johnson | Murkowski |
| Curtis | Justice | Paul |

(158 of 196), Page 158 of 196 Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 158 of 196
Case 4:25-cv-04966 Document 1-4 Filed 06/12/25 Page 13 of 51

S3110     CONGRESSIONAL RECORD — SENATE     *May 22, 2025*

| | | |
|---|---|---|
| Ricketts | Scott (SC) | Tuberville |
| Risch | Sheehy | Wicker |
| Rounds | Sullivan | Young |
| Schmitt | Thune | |
| Scott (FL) | Tillis | |

### NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Lujan | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

### NOT VOTING—5

| | | |
|---|---|---|
| Blackburn | Budd | Moran |
| Britt | Heinrich | |

The joint resolution (H.J. Res. 89) was passed.

(Mr. HUSTED assumed the Chair.)

The PRESIDING OFFICER (Mr. MORENO). The majority leader.

---

## EXECUTIVE SESSION

___

### EXECUTIVE CALENDAR

Mr. THUNE. Mr. President, I move to proceed to executive session to consider Calendar No. 73.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Michael Duffey, of Virginia, to be Under Secretary of Defense for Acquisition and Sustainment.

CLOTURE MOTION

Mr. THUNE. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 73, Michael Duffey, of Virginia, to be Under Secretary of Defense for Acquisition and Sustainment.

John Thune, Pete Ricketts, John Barrasso, Tim Sheehy, Bernie Moreno, Steve Daines, Eric Schmitt, Roger Marshall, Tommy Tuberville, John Hoeven, Marsha Blackburn, Bill Cassidy, John R. Curtis, Jim Justice, Thom Tillis, Katie Boyd Britt, Markwayne Mullin.

---

## LEGISLATIVE SESSION

Mr. THUNE. Mr. President, I move to proceed to legislative session.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

---

## EXECUTIVE SESSION

___

### EXECUTIVE CALENDAR

Mr. THUNE. Mr. President, I move to proceed to executive session to consider Calendar No. 103.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Allison Hooker, of Georgia, to be an Under Secretary of State (Political Affairs).

CLOTURE MOTION

Mr. THUNE. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 103, Allison Hooker, of Georgia, to be an Under Secretary of State (Political Affairs).

John Thune, Markwayne Mullin, John Barrasso, Katie Boyd Britt, Jim Banks, Cindy Hyde-Smith, Mike Rounds, Joni Ernst, Pete Ricketts, John Boozman, David McCormick, Bernie Moreno, James E. Risch, Bill Cassidy, John R. Curtis, Kevin Cramer.

---

## LEGISLATIVE SESSION

Mr. THUNE. Mr. President, I move to proceed to legislative session.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

---

## EXECUTIVE SESSION

___

### EXECUTIVE CALENDAR

Mr. THUNE. Mr. President, I move to proceed to executive session to consider Calendar No. 109.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Dale Marks, of Florida, to be an Assistant Secretary of Defense.

CLOTURE MOTION

Mr. THUNE. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 109, Dale Marks, of Florida, to be an Assistant Secretary of Defense.

John Thune, Markwayne Mullin, John Barrasso, Katie Boyd Britt, Jim Banks, Cindy Hyde-Smith, Mike Rounds, Joni Ernst, Pete Ricketts, John Boozman, David McCormick, Bernie Moreno, Rick Scott of Florida, James E. Risch, Bill Cassidy, John R. Curtis, Kevin Cramer.

---

## LEGISLATIVE SESSION

Mr. THUNE. Mr. President, I move to proceed to legislative session.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

---

## EXECUTIVE SESSION

___

### EXECUTIVE CALENDAR

Mr. THUNE. Mr. President, I move to proceed to executive session to consider Calendar No. 97.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Jared Isaacman, of Pennsylvania, to be Administrator of the National Aeronautics and Space Administration.

CLOTURE MOTION

Mr. THUNE. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 97, Jared Isaacman, of Pennsylvania, to be Administrator of the National Aeronautics and Space Administration.

John Thune, Dan Sullivan, John Barrasso, Mike Rounds, Todd Young, Cynthia M. Lummis, Tom Cotton, James Lankford, Bernie Moreno, John R. Curtis, Ted Budd, Mike Crapo, Katie Boyd Britt, Jim Banks, Markwayne Mullin, Jon A. Husted, Steve Daines.

---

## LEGISLATIVE SESSION

___

### MORNING BUSINESS

Mr. THUNE. Mr. President, I ask unanimous consent that the Senate resume legislative session and be in a period of morning business, with Senators permitted to speak therein for up to 10 minutes each.

The PRESIDING OFFICER. Without objection, it is so ordered.

May 22, 2025      CONGRESSIONAL RECORD — SENATE      **S3111**

## TRIBUTE TO ORVILLE VON EHWEGEN

Mr. GRASSLEY. Mr. President, this month brims with milestones for students across America.

In Iowa, more than 34,000 students are among the class of 2025. I congratulate our graduates and encourage you to keep working hard. The sky is the limit. You get to define your future because you live in the land of the free.

That is because we have extraordinary patriots who have answered the call to serve and defend our cherished freedoms. One of these extraordinary patriots is a member of the class of 2025. His name is Orville Von Ehwegen.

Orville's journey to East Sac County High School's commencement ceremony this past weekend took an unusual detour and extended timeline. He missed out on the pomp and circumstance as a teenager because he answered history's call to serve. You see, Orville is 107 years old. He was born in 1917 and dropped out of school at age 14 to help on the family farm during the Great Depression.

Later, he enlisted in the U.S. Army and fought in the South Pacific during World War II. When he returned, he opened an appliance store and was a successful small business owner alongside his wife.

On Sunday, this remarkable World War II veteran received an honorary diploma from East Sac County High School, 93 years after his last day as a student. Orville's inspiring life story is an example of sacrifice and service, which his fellow graduates can emulate.

I congratulate Orville and thank you for your service. I would be honored to have you share your story as part of my annual Veterans History Project so that future generations don't ever take freedom and liberty for granted and understand what it takes to preserve them.

Orville's advice to the class of 2025 is a lesson for us all: Be kind and work hard.

## VOTE EXPLANATION

Mr. GALLEGO. Mr. President, on May 14, 2025, I was unfortunately unable to cast my vote on rollcall vote No. 256, the confirmation of Eric M. Ueland to be Deputy Director for Management at the Office of Management and Budget. If I had been present, I would have voted nay.

## TRIBUTE TO TINA CAPPETTA

Mr. VAN HOLLEN. Mr. President, I rise today to pay tribute to a tremendous public servant Tina Cappetta, superintendent of the Chesapeake and Ohio Canal National Historical Park. Ms. Cappetta has served our National Park Service for over 35 years. She has dedicated herself to preserving our Nation's natural beauty and history at parks around the country for generations of families to enjoy.

In 2020, Ms. Cappetta returned as superintendent of the Chesapeake and Ohio Canal National Historical Park, where she served earlier in her career as the chief of resources management. During her tenure as superintendent, she has overseen the celebration of the park's 50th anniversary, managed the relocation of the Park's headquarters to Williamsport, MD, and renewed the Great Falls Canal Boat Program. Her thoughtful stewardship of one of our Nation's most cherished historical and recreational resources has inspired scores of visitors from around the world.

Ms. Cappetta's work to preserve the C&O Canal's history and breathtaking scenery is truly remarkable. The park is home to the largest collection of 19th-century canal features and buildings and is one of the most biologically diverse natural areas in our national park system. It provides recreational and educational activities in rural and urban settings, spanning from Washington, DC, to Cumberland, MD. Ms. Cappetta's tireless commitment to the park has touched countless lives, from visitors experiencing the canal for the first time, to locals enjoying a weekend bike trip or walk on the towpath.

I commend Ms. Cappetta for her extraordinary devotion to our National Park Service here in Maryland and around the country. Her legacy is one of leadership and unwavering dedication to the preservation of one of our region's gems and one of our Nation's most historically significant landscapes. I ask my colleagues to join me in thanking her and wishing her a well-earned, enjoyable, and fulfilling retirement.

## ADDITIONAL STATEMENTS

## RECOGNIZING BENTONVILLE STUDENTS' STEM COMPETITION PERFORMANCE

● Mr. BOOZMAN. Mr. President, I rise today to recognize three exceptional students from Bentonville West High School: Ronak Pai, LalitAditya Kameshwaran, and Veera Sai Joshik Unnam for winning the Samsung Solve for Tomorrow national competition.

The students, identifying a lack of affordable, nonintensive oral cancer screenings across the Natural State, dedicated their time and efforts to crafting a solution. Inspired by the direct experiences of their close family, friends, and loved ones who struggled to receive oral health care in both Arkansas and around the world, the trio conducted research and met with local dentists, as well as health providers, computer scientists, and cancer experts in hopes of making a difference.

They quickly discovered that oral cancer is one of the deadliest forms of cancer, as it can be difficult to diagnose and treat. That led them to compile thousands of images of mouth cancers and subsequently train an artificial intelligence model to develop an application that can detect and classify stages of oral cancer.

In February, their Oral Care app secured a statewide win, delivering a $12,000 technology prize package that included new computers for their school community, as well as the opportunity to showcase their work and compete on the national stage.

Ronak, LalitAditya, and Veera presented Oral Care to a panel of judges in Washington, DC, in April and earned the Community Choice Award against nine other teams.

As national winners, the students secured another prize package of $100,000 for Bentonville West, including more technology and classroom resources.

I am proud to celebrate these three exceptional students whose efforts have benefited their communities and have the potential to better the lives of people around the world. It is exciting to see young Arkansans recognized on the national stage. Ronak, LalitAditya, and Veera have showed not only their unique entrepreneurial and technological skills but a desire to create a brighter, healthier future.●

## REMEMBERING OFFICER MICHAEL T. HORAN

● Mr. BUDD. Mr. President, I rise today to honor the life of Greensboro Police Officer Michael T. Horan.

Officer Horan served our Nation in uniform for 18 years as an Active Reservist in the U.S. Coast Guard and joined the Greensboro Police Department in 2017, where he served on the department's violent crime reduction team, crimes against persons unit, patrol districts two and four, special events team, and as a rapid deployment and active shooter instructor. Officer Horan was known by his colleagues for always being willing to mentor the younger officers in his department and, oftentimes, took the rookies under his wing.

For Officer Horan, the call of duty had no boundaries, and in 2019, he received a lifesaving award for rescuing a father and son from rip currents while on vacation with his family in Emerald Isle, NC.

On Monday morning, December 23, 2024—just 2 days before Christmas—the Greensboro Police Department received a report about a suspect with a handgun inside a grocery store on Lawndale Drive. Like he always did, Officer Horan responded to the call. When he arrived on the scene, he encountered the suspect who, without warning, pulled out his weapon and took Officer Horan's life in an instant.

This year, on January 9, members of Officer Horan's family, as well as many members of the public, gathered inside Greensboro's Westover Church to say their final goodbyes. The service concluded with a 21-gun salute to memorialize Officer Horan's last watch.

(160 of 196), Page 160 of 196 Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 160 of 196
Case 4:25-cv-04966    Document 1-4    Filed 06/12/25    Page 15 of 51
S3112                    CONGRESSIONAL RECORD—SENATE                    May 22, 2025

Michael was devoted to his family and his community. Throughout his career, he was always committed to public safety. He will forever be remembered as a leader who put his city's most vulnerable first, and may his commitment to selfless service be an example to us all.

Now, I ask that you join me in a moment of silence to honor the memory of Greensboro Police Officer Michael T. Horan.●

---

### REMEMBERING KAREN ALEXANDER

● Mr. BUDD. Mr. President, I rise today to memorialize a servant leader of the great State of North Carolina. Mayor Karen Alexander of Salisbury went to her heavenly home far too soon on Sunday, December 29, 2024, at the age of 73 years young. Her colleagues and I will remember her as a loving, caring, and kind leader, always putting the needs of her city and the people she served above herself. She lived her life by the teachings of the Apostle Paul to Timothy: "And a servant of the Lord must not quarrel but be gentle to all, able to teach, patient, in humility correcting those who are in opposition, if God perhaps will grant them repentance, so that they may know the truth," 2 Timothy 2:24–25.

As an architect by trade, she founded her firm in 1989, where she led numerous renovation and design projects across the city. She was first elected to the city council in 2013. Not long after, she began serving as the mayor of Salisbury from 2015 to 2017 and later returned to the office in 2019. And she served as the president and board member of the North Carolina League of Municipalities.

Her initiatives as mayor brought new life to Salisbury's historic downtown area, improved public safety, and made life better for the city's residents. Throughout her career in public service, she was known for building consensus with class and grace.

Her relationships with her colleagues are described as being genuinely invested in the success of others. Her loving family will remember her as nurturing and supportive. As her daughter-in-law, Christy Mason Almazan, shared, "Karen had a way of making you feel like the very center of her attention. Her love was immense, and her presence was radiant."

The motto for the State of North Carolina is "Esse Quam Videri," Latin for "to be rather than to seem." I believe that Mayor Karen Alexander of Salisbury truly lived up to that standard and set the bar even higher.

Now, I ask that you join me in a moment of silence to honor the memory of Mayor Karen Alexander, a great North Carolinian who dedicated her life to public service.●

---

### RECOGNIZING THE ROWAN COUNTY CHAMBER OF COMMERCE

● Mr. BUDD. Mr. President, on March 19, 1925, the Rowan County Chamber of Commerce held its first annual meeting. For 100 years, the chamber has played a vital role in the growth and development of Rowan County, serving over 800 members and representing 60,000 employees.

Rowan County has a strong history of entrepreneurship and innovation, serving as the birthplace of some of North Carolina's most iconic businesses. In 1917, during a nationwide sugar shortage, the popular cherry soda Cheerwine was first crafted here. By the 1920s, it has become a favorite soft drink across the region, cementing its place as a symbol of Southern culture for over a century now. Likewise, in 1957, a modest local grocery store called Food Town opened its doors in Rowan County. Just a few decades later, it rebranded as Food Lion, and now is a household name with over 1,100 stores across 10 States, serving millions of families across the Southeast.

Since its founding, the Rowan Chamber has been a driving force behind the county's economic growth and business success. As a hub for collaboration, the chamber brings together businesses and community leaders, harnessing their collective expertise to tackle local challenges and advance economic development throughout the region.

From the beginning, the Rowan Chamber has been at the forefront of prioritizing community development. In their first annual report, in 1925, the chamber celebrated its efforts that brought Catawba College to Salisbury, promoted a new creamery for farmers to produce dairy products, and advocated for better roads. In more recent accomplishments, the chamber has been at the forefront of business advocacy, workforce and leadership development, and funding for transportation and education. The Rowan Chamber has also successfully advocated for infrastructure projects that have led to increased economic development across the county. The Yadkin River Bridge Project, I–85 four-lane expansion, the Old Beatty Ford Road exit, the Rowan County Airport expansion, and the development of the Paul E. Fisher Gateway Building are just some of the accomplishments that have been made possible by the chamber's concentrated efforts.

As a small business owner, myself, and a member of the Senate Commerce and Small Business Committees, I appreciate the efforts of President Elaine Spalding, the board of directors, and everyone at the Rowan Chamber of Commerce for their work to support business leaders and keep North Carolina an attractive place to live and work.●

---

### RECOGNIZING AMAZING GLAZE

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Amazing Glaze during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Amazing Glaze opened in 2017 when Dean and Katie Giesbrecht purchased Double Shot Donuts from Bob and Heather Ross. The Rosses initially aimed to start a local coffee shop featuring a small bakery with pastries and donuts. In hopes of replicating a family donut recipe, the Rosses underwent 2 weeks of trial and error to create the well-known potato donut, using mashed potatoes in the dough.

Since the owners of Double Shot never planned to run a donut shop, they approached Dean and Katie to see if they were interested in purchasing the business. Dean, who had always wanted to own a business, and his wife Katie jumped at the opportunity. Together, the Giesbrechts learned everything they could about making donuts and running the shop.

After renaming the company to Amazing Glaze, Dean and Katie continued to serve the beloved potato donuts—growing the treat's popularity to new heights. In just 2 years, Dean and Katie partnered with Idaho State University in Pocatello to open an Amazing Glaze kiosk in the Student Union Building on campus. The kiosk has been a great success, inspiring the couple to open a third Amazing Glaze location in Idaho Falls in 2024. The pair hopes to launch more locations and expand the business to the Treasure Valley in the years to come.

Congratulations to Dean and Katie Giesbrecht and all of the employees at Amazing Glaze for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

---

### RECOGNIZING BLUETICK COFFEE

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage

(161 of 196), Page 161 of 196   Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 161 of 196
Case 4:25-cv-04966   Document 1-4   Filed 06/12/25   Page 16 of 51

May 22, 2025                    CONGRESSIONAL RECORD — SENATE                    S3113

Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Bluetick Coffee during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Bluetick Coffee started in 2021 after Julie Kinskie and her family moved to Idaho County. As a new member of the community and coffee lover, Julie decided to open a coffee stand to meet her neighbors and embrace her new home. What started as a small coffee stand has grown to four locations in Riggins, Grangeville, New Meadows, and Kamiah, with plans to open a fifth stand soon.

Community comes first at Bluetick Coffee. Everything is locally sourced—with homemade baked goods from her friend Denise Vandyk and beef sticks from a nearby farm Cross O Meats. Julie also offers discounts to support local law enforcement, first aid professionals, and teachers.

Congratulations to Julie and all of the employees at Bluetick Coffee for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

RECOGNIZING BOND & BEVEL

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Bond & Bevel during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Bond & Bevel was born in the garage of Heath and Krista Albers in March of 2020. Heath had been looking for a good quality leather bag for years but could never justify the expense. When the world shut down in 2020, he had the time to learn how to make the bag of his dreams. He bought a full-grain leather cowhide and leathercraft tools and got to work.

As Heath fell in love with crafting leather goods, word got out of his new endeavor. Friends began to send him orders for a variety of leather products, and soon, what started as a hobby became a business. Krista created a website and social media pages to support Heath's growing popularity and established an online store.

In 2022, the Albers opened Bond & Bevel's brick-and-mortar store in Caldwell. Since then, Bond & Bevel has quickly become an integral part of the community. Now serving craft coffee, the store is a popular spot for Bible studies, work meetings, and monthly worship nights with local churches.

Congratulations to the Albers and all of the employees at Bond & Bevel for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

RECOGNIZING CLOVERLEAF CREAMERY

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small business owners and establishments that make our State special. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Cloverleaf Creamery during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Founded by Bill and Donna Stoltzfus, Cloverleaf Creamery has served Idahoans high-quality grass-fed dairy products for 18 years. Born and raised on his family's dairy farm in Pennsylvania, Bill has a lifelong love of the dairy industry. When Bill and his wife Donna saw demand for local, grass-fed dairy products in Buhl, they purchased Smith's Dairy in 2007 with the intent to sell their products directly to the consumer. Both their son and son-in-law, who also share ownership of Cloverleaf Creamery, helped to grow the business and purchased a 160-acre farm to grow feed for the dairy cows. Eric Stoltzfus is the plant manager of the creamery, while son-in-law Eric Butterworth is the manager of the farming operation.

Growing up on the family farm, Bill developed strong beliefs in the importance of responsibility, hard work, and the humane treatment of animals. Today, Bill runs Cloverleaf with the same high-quality standards—small herd numbers, grazing cattle on grass as the primary feed source, and managing the farm with careful attention to detail and respect for the animals. This level of care has proven successful, as Cloverleaf is now a staple across the Magic Valley and the Gem State.

The creamery continues to grow, gaining attention from local companies that have started selling Cloverleaf products in their stores. Today, you can find Cloverleaf's ice cream, yogurt, and cream in Boise, Sun Valley, Twin Falls, and in Swensen's Market in Paul. In 2021, Bill's daughter and son-in-law Olivia and Eric Butterworth opened Cloverleaf Farm Market in Twin Falls. The market carries Cloverleaf products along with other items from small, local farms and businesses.

Congratulations to Bill and Donna Stoltzfus, Eric Stoltzfus, Olivia and Eric Butterworth, and all of the employees at Cloverleaf Creamery for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

RECOGNIZING HAWKTECH ARMS, INC.

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor HawkTech Arms during Support Local Gems as one of Idaho's Small Business of the Month for June 2025.

Founded in 1999 by Dan and Jami Hawkins, HawkTech Arms has become a mainstay for firearms enthusiasts and competitive shooters across the Pacific Northwest. What began as a way to generate hobby income to support a passion for shooting, HawkTech Arms has become an integral part of the firearms community in Idaho and beyond. With a special focus on encouraging the shooting sports community, HawkTech Arms sponsors local and regional matches in a variety of shooting disciplines. The business has also been recognized for its support of junior shooting programs designed to promote education and competitive shooting among youth.

As Idaho's leading suppressor dealer, HawkTech Arms is uniquely equipped to handle high-volume NFA sales and, as such, offers the largest selection for local shooters and collectors alike. HawkTech Arms is well known for providing top-quality products in the firearms industry, coupled with exceptional service to an ever-growing customer base. The business also holds a strong commitment to the military and law enforcement communities. Recognized as one of the highest volume law enforcement dealers in the Northwest region through GLOCK's

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

Blue Label Dealer Program, HawkTech Arms is dedicated to providing firearms and addressing the needs of first responders.

Finally, it is worth noting that the staff and owners of HawkTech Arms are active volunteers in the Treasure Valley community. Mr. Hawkins has served on the board of directors for a local shooting range for the better part of 20 years, and many employees have taken leadership roles in a variety of local initiatives.

Congratulations to the Hawkins family and all the employees at HawkTech Arms on their selection as the Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

### RECOGNIZING REDMAN & COMPANY INSURANCE

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Redman & Company Insurance during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Redman & Company Insurance was founded in 1992 by Eric and Sue Redman with the goal of providing the best possible care to the people of Rathdrum. In 2005, their son Jordan and his wife Amy joined the family business. After growing the Redman & Company Insurance for 20 years, Eric and Sue sold the agency to Jordan, Amy, and Josh and Nicole Tebbee.

The agency quickly became an industry and community leader, with Jordan serving as a board member for region I of the Independent Insurance Agents & Brokers of Idaho and earning the 2018 Young Agent of the Year Award. In 2019, Redman & Company split into two agencies, Redman's and Tebbee's; and Redman & Company Insurance moved to Coeur d'Alene.

Today, Redman & Company Insurance is deeply involved in the north Idaho community. From supporting various organizations, including Ronald McDonald House, Second Harvest, and Tunnel to Towers, to their partnership with the State of Idaho to provide time off for new foster parents, Redman & Company Insurance makes giving back to their community a top priority.

Congratulations to Jordan, Amy, and all of the employees at Redman & Company Insurance for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

### RECOGNIZING THOR'S CHOCOLATE

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Thor's Chocolate during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Thor's Chocolate opened its doors to the Idaho Falls community in 2023, but their story began well before then. Christian Becker, founder of Thor's Chocolate, was raised in Germany and surrounded by world-famous, rich, and flavorful chocolates. After moving to Idaho in 1992, Christian noticed the Gem State was missing the high-quality chocolate he grew up enjoying.

Christian had always dreamed of going into the chocolate business and crafting his own European-style chocolate in Idaho. In 2020, with support from his wife Brittney, Christian bought his first cocoa bean roaster and melanger and began making his dream a reality. Following years of testing and crafting, Christian created a chocolate that could rival the feasts of Valhalla.

In 2023, Christian and Brittney launched Thor's Chocolate in Idaho Falls. Their chocolate has quickly become a staple in the community. Not only does Thor's Chocolate provide residents with irresistible sweets, but they partner with local charities, like the People in Need Coalition, to give back to the eastern Idaho region.

Congratulations to Christian and Brittney Becker and all of the employees at Thor's Chocolate for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

### RECOGNIZING 300 YEARS OF THE REFORMED CHURCH IN THE UNITED STATES

● Mr. ROUNDS. Mr. President, on June 12, 2025, we recognize the celebration of the tricentennial anniversary of the Reformed Church in the United States, RCUS, at the Mount Rushmore National Memorial in South Dakota.

The mission of the German Reformed Church in America, now known as the Reformed Church in the United States, officially began in the United States in 1725 when Rev. John Phillip Boehm formally organized a dozen congregations in Pennsylvania.

Throughout its history, the Reformed Church in the United States has had countless courageous members stand up for the American values of life and liberty. German Reformed immigrant John Peter Zenger was responsible for the first ruling of an American jury against a royal governor. Captain Peter Humrickhouse of the Church's Germantown congregation crossed the Delaware with General George Washington and was selected by General Washington to deliver a wagon train of powder to Yorktown. Baron von Steuben served in the Continental Army and trained troops at Valley Forge. Multiple German Reformed pastors volunteered as chaplains in the Continental Army.

As a testament to the Reformed Church's service to the United States of America, upon his inauguration as President, General George Washington published a letter to the pastors and elders of the German Reformed Church in America commending their loyalty to the cause of liberty.

It is fitting that the Reformed Church in the United States celebrate its tricentennial anniversary at the Mount Rushmore National Memorial, among the great faces of our Presidents, as a testament to the role RCUS played in preserving our Nation's legacy and ideals. It is nonetheless appropriate that the celebration be held in South Dakota, as the State did significant work in advancing the Reformed Church in the United States through the Eureka Classis.

Three hundred years after its founding, the Reformed Church in the United States shares the gospel of Jesus Christ and ministers to people both at home in the United States and across the world.

The tricentennial anniversary of the Reformed Church in the United States is an incredible time to commemorate the invaluable ways the church has shaped the intellectual and spiritual life of American communities.●

### MESSAGES FROM THE PRESIDENT

Messages from the President of the United States were communicated to the Senate by Mr. Hanley, one of the secretaries.

### EXECUTIVE MESSAGES REFERRED

As in executive session the PRESIDING OFFICER laid before the Senate messages from the President of the United States submitting sundry nominations which were referred to the appropriate committees.

(163 of 196), Page 163 of 196   Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 163 of 196
Case 4:25-cv-04966   Document 1-4   Filed 06/12/25   Page 18 of 51

May 22, 2025                  CONGRESSIONAL RECORD — SENATE                          S3115

(The messages received today are printed at the end of the Senate proceedings.)

## MESSAGE FROM THE HOUSE

At 12:49 p.m., a message from the House of Representatives, delivered by Mrs. Alli, one of its reading clerks, announced that the House has passed the following joint resolution, without amendment:

S.J. Res. 31. Joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "Review of Final Rule Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act".

The message also announced that the House has passed the following bills, in which it requests the concurrence of the Senate:

H.R. 1701. An act to require the Secretary of Defense and the Secretary of State to monitor efforts by the People's Republic of China to build or buy strategic foreign ports, and for other purposes.

H.R. 1969. An act to amend and reauthorize the Staff Sergeant Parker Gordon Fox Suicide Prevention Grant Program of the Department of Veterans Affairs.

The message further announced that the House has agreed to the following resolution:

H. Res. 435. Resolution relative to the death of the Honorable Gerald E. Connolly, a Representative from the Commonwealth of Virginia.

The message also announced that pursuant to 20 U.S.C. 4412, and the order of the House of January 3, 2025, the Speaker appoints the following Members on the part of the House of Representatives to the Board of Trustees of the Institute of American Indian and Alaska Native Culture and Arts Development: Mr. Cole of Oklahoma and Ms. Leger Fernandez of New Mexico.

The message further announced that pursuant to 20 U.S.C. 4303, and the order of the House of January 3, 2025, the Speaker appoints the following Members on the part of the House of Representatives to the Board of Trustees of Gallaudet University: Mr. Owens of Utah and Ms. McCollum of Minnesota.

## MEASURES REFERRED

The following bills were read the first and the second times by unanimous consent, and referred as indicated:

H.R. 1701. An act to require the Secretary of Defense and the Secretary of State to monitor efforts by the People's Republic of China to build or buy strategic foreign ports, and for other purposes; to the Committee on Foreign Relations.

H.R. 1969. An act to amend and reauthorize the Staff Sergeant Parker Gordon Fox Suicide Prevention Grant Program of the Department of Veterans Affairs; to the Committee on Veterans' Affairs.

## EXECUTIVE REPORTS OF COMMITTEES

The following executive reports of nominations were submitted:

By Mr. CASSIDY for the Committee on Health, Education, Labor, and Pensions.

*Kirsten Baesler, of North Dakota, to be Assistant Secretary for Elementary and Secondary Education, Department of Education.

*Nicholas Kent, of Virginia, to be Under Secretary of Education.

*Henry Mack III, of Florida, to be an Assistant Secretary of Labor.

*Kevin O'Farrell, of Florida, to be Assistant Secretary for Career, Technical, and Adult Education, Department of Education.

*Wayne Palmer, of Virginia, to be Assistant Secretary of Labor for Mine Safety and Health.

*Julie Hocker, of Virginia, to be an Assistant Secretary of Labor.

*Marco Rajkovich, Jr., of Virginia, to be a Member of the Federal Mine Safety and Health Review Commission for a term of six years expiring August 30, 2030.

By Mr. GRASSLEY for the Committee on the Judiciary.

Terrance Cole, of Virginia, to be Administrator of Drug Enforcement.

Gadyaces Serralta, of Florida, to be Director of the United States Marshals Service.

*Nomination was reported with recommendation that it be confirmed subject to the nominee's commitment to respond to requests to appear and testify before any duly constituted committee of the Senate.

(Nominations without an asterisk were reported with the recommendation that they be confirmed.)

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second times by unanimous consent, and referred as indicated:

By Mr. BLUMENTHAL (for himself and Mr. TILLIS):

S. 1855. A bill to amend title XIX of the Social Security Act to establish State plan requirements for determining residency and coverage for military families, and for other purposes; to the Committee on Finance.

By Mr. BLUMENTHAL:

S. 1856. A bill to amend the Internal Revenue Code of 1986 to exclude military bonuses from gross income; to the Committee on Finance.

By Mr. BLUMENTHAL:

S. 1857. A bill to amend title 14, United States Code, to require the retention of certain enlisted members of the Coast Guard who have completed 18 or more, but less than 20, years of service, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. DAINES:

S. 1858. A bill to require that national cemeteries be open to visitors on legal public holidays; to the Committee on Veterans' Affairs.

By Mr. BLUMENTHAL:

S. 1859. A bill to amend title 10, United States Code, to make certain members of the Ready Reserve who served on active duty after September 11, 2001, eligible for early retirement; to the Committee on Armed Services.

By Mr. LEE (for himself and Mr. CURTIS):

S. 1860. A bill to direct the Secretary of Agriculture to convey to Brian Head Town, Utah, certain National Forest System land; to the Committee on Energy and Natural Resources.

By Mr. BLUMENTHAL:

S. 1861. A bill to amend title 10, United States Code, to allow members of the Selected Reserve and National Guard holding employment within the Federal Government the choice between military and civilian healthcare plans, and for other puposes; to the Committee on Armed Services.

By Mr. BARRASSO (for himself and Mr. HEINRICH):

S. 1862. A bill to amend title XI of the Social Security Act to expand and clarify the exclusion for orphan drugs under the Drug Price Negotiation Program; to the Committee on Finance.

By Mr. BLUMENTHAL:

S. 1863. A bill to amend section 455(m) of the Higher Education Act of 1965 to modify the eligibility requirements of the public service loan forgiveness program for certain members of the Armed Forces, the National Guard, and the commissioned corps of the National Oceanic and Atmospheric Administration, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. SCOTT of Florida:

S. 1864. A bill to amend the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 to modify the provision relating to public reporting of Chinese military companies, and for other purposes; to the Committee on Armed Services.

By Mr. PAUL (for himself, Mr. RICKETTS, Mr. CRAMER, and Mr. BUDD):

S. 1865. A bill to amend the Internal Revenue Code of 1986 to repeal the excise tax on indoor tanning services; to the Committee on Finance.

By Ms. BALDWIN (for herself, Ms. COLLINS, Ms. CORTEZ MASTO, and Ms. KLOBUCHAR):

S. 1866. A bill to amend the Public Health Service Act to reauthorize and improve the National Breast and Cervical Cancer Early Detection Program for fiscal years 2026 through 2030, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. WHITEHOUSE (for himself and Mr. GRAHAM):

S. 1867. A bill to provide for phase-out of de minimis treatment under the Tariff Act of 1930, and for other purposes; to the Committee on Finance.

By Mr. CRAMER (for himself and Mr. SHEEHY):

S. 1868. A bill to amend title 38, United States Code, to expand access by veterans to critical access hospitals and affiliated clinics under the Veterans Community Care Program, and for other purposes; to the Committee on Veterans' Affairs.

By Mr. CRUZ:

S. 1869. A bill to require the Secretary of Defense to carry out an operational experimentation program to evaluate the military utility of optionally piloted vehicle rotary-wing aircraft, and for other purposes; to the Committee on Armed Services.

By Mr. SCHIFF (for himself and Mr. PADILLA):

S. 1870. A bill to adjust the boundary of the Santa Monica Mountains National Recreation Area to include the Rim of the Valley Corridor, and for other purposes; to the Committee on Energy and Natural Resources.

By Ms. CORTEZ MASTO (for herself and Mr. CASSIDY):

S. 1871. A bill to require the Secretary of Homeland Security to develop a plan to identify, integrate, and deploy new, innovative, disruptive, or other emerging or advanced

technologies that are safe and secure to enhance U.S. Customs and Border Protection's capabilities to meet its mission needs along international borders and at ports of entry; to the Committee on Homeland Security and Governmental Affairs.

By Ms. ERNST (for herself and Ms. BLUNT ROCHESTER):

S. 1872. A bill to direct the Secretary of Commerce to conduct a study on the feasibility of manufacturing in the United States products for critical infrastructure sectors, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. BOOKER (for himself, Mr. SCHUMER, Mr. SCHIFF, Mr. PADILLA, and Mr. WYDEN):

S. 1873. A bill to amend title 28, United States Code, to transfer the United States Marshals Service to the judicial branch, and for other purposes; to the Committee on the Judiciary.

By Mr. MERKLEY (for himself, Ms. COLLINS, Ms. BALDWIN, Mrs. BLACKBURN, Mr. BLUMENTHAL, Mr. COONS, Mrs. GILLIBRAND, Mr. KELLY, Mr. SCHIFF, and Ms. MURKOWSKI):

S. 1874. A bill to amend the Public Health Service Act to reauthorize certain nursing workforce development programs, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. PETERS (for himself and Mr. LANKFORD):

S. 1875. A bill to establish an interagency committee to harmonize regulatory regimes in the United States relating to cybersecurity, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. TILLIS (for himself and Mr. BUDD):

S. 1876. A bill to authorize the Secretary of Agriculture to relocate a memorial honoring the 9 Air Force crew members who lost their lives in an airplane crash in the Cherokee and Nantahala National Forests during a training mission on August 31, 1982; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. TILLIS (for himself, Mr. HICKENLOOPER, Mrs. SHAHEEN, Mr. ROUNDS, Mr. PETERS, Mr. BUDD, and Mrs. BRITT):

S. 1877. A bill to direct the Securities and Exchange Commission to promulgate rules with respect to the electronic delivery of certain required disclosures, and for other purposes; to the Committee on Banking, Housing, and Urban Affairs.

By Mrs. FISCHER (for herself and Ms. SMITH):

S. 1878. A bill to establish an interactive online dashboard to improve public access to information about grant funding related to mental health and substance use disorder programs; to the Committee on Health, Education, Labor, and Pensions.

By Mr. OSSOFF (for himself, Mr. KELLY, Ms. BALDWIN, Ms. DUCKWORTH, Mr. SCHATZ, Mrs. SHAHEEN, Mr. WARNOCK, Mr. BENNET, and Mrs. GILLIBRAND):

S. 1879. A bill to amend chapter 131 of title 5, United States Code, to require Members of Congress and their spouses and dependent children to place certain assets into blind trusts, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Ms. SMITH (for herself, Mr. ROUNDS, Mr. BOOKER, Mr. DAINES, Mr. SHEEHY, Mr. HICKENLOOPER, Ms. KLOBUCHAR, Mrs. HYDE-SMITH, Mr. GALLEGO, Ms. LUMMIS, Ms. BLUNT ROCHESTER, and Mr. CRAPO):

S. 1880. A bill to amend the Community Development Banking and Financial Institutions Act of 1994 to reauthorize and improve the community development financial institutions bond guarantee program, and for other purposes; to the Committee on Banking, Housing, and Urban Affairs.

By Mr. MARKEY (for himself, Mr. SCHUMER, Mr. SANDERS, Mr. LUJÁN, Ms. WARREN, Mr. WYDEN, Mr. VAN HOLLEN, Mr. PADILLA, Mr. BLUMENTHAL, Ms. BALDWIN, and Mr. SCHIFF):

S. 1881. A bill to amend the Occupational Safety and Health Act of 1970 to expand coverage under such Act to public employees; to the Committee on Health, Education, Labor, and Pensions.

By Mrs. HYDE-SMITH (for herself, Mr. LANKFORD, Mr. GRASSLEY, and Mr. CORNYN):

S. 1882. A bill to expand and promote research and data collection on reproductive health conditions, to provide training opportunities for medical professionals to learn how to diagnose and treat reproductive health conditions, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. COONS (for himself and Mr. McCORMICK):

S. 1883. A bill to require the executive branch to develop a whole-of-government strategy to disrupt growing cooperation among the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, and the Democratic People's Republic of Korea, which are the foremost adversaries of the United States, and mitigate the risks posed to the United States; to the Committee on Foreign Relations.

By Mr. CORNYN (for himself, Mr. BLUMENTHAL, Mr. TILLIS, Mr. BOOKER, Mrs. BLACKBURN, Mr. FETTERMAN, Mr. SCHMITT, and Mrs. BRITT):

S. 1884. A bill to clarify the Holocaust Expropriated Art Recovery Act of 2016, to appropriately limit the application of defenses based on the passage of time and other nonmerits defenses to claims under that Act; to the Committee on the Judiciary.

By Mrs. BRITT (for herself and Mr. FETTERMAN):

S. 1885. A bill to require the Federal Trade Commission, with the concurrence of the Secretary of Health and Human Services acting through the Surgeon General, to implement a mental health warning label on covered platforms, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. BANKS:

S. 1886. A bill to amend the Trade Act of 1974 to authorize the United States Trade Representative to impose remedial measures with respect to certain entities that evade or may attempt to evade duties imposed with respect to nonmarket economy countries, and for other purposes; to the Committee on Finance.

By Mr. WYDEN (for himself, Ms. CANTWELL, Mr. MERKLEY, Mr. BLUMENTHAL, Ms. BALDWIN, Mr. VAN HOLLEN, Mr. WELCH, Ms. WARREN, Mr. BOOKER, Mr. SCHATZ, Mr. BENNET, Mr. MARKEY, and Mr. WHITEHOUSE):

S. 1887. A bill to amend the Help America Vote Act of 2002 to allow all eligible voters to vote by mail in Federal elections, to amend the National Voter Registration Act of 1993 to streamline the procedures under which individuals may apply to register to vote in such elections through State motor vehicle authorities, to permit automatic voter registration through such authorities for eligible citizens of the United States who do not complete voter registration applications, and for other purposes; to the Committee on Rules and Administration.

By Mr. GRAHAM (for himself, Mr. COONS, and Mr. BOOZMAN):

S. 1888. A bill to establish the United States Foundation for International Food Security to leverage private sector investments in order to improve and scale economically viable agricultural production, build food systems to mitigate food shock, reduce malnutrition, and drive economic growth, and for other purposes; to the Committee on Foreign Relations.

By Mr. SCOTT of South Carolina (for himself, Ms. HASSAN, Mr. HAGERTY, Ms. ROSEN, and Mr. WHITEHOUSE):

S. 1889. A bill to repeal the sunset provision of the Iran Sanctions Act of 1996; to the Committee on Banking, Housing, and Urban Affairs.

By Mr. CORNYN (for himself and Mr. WELCH):

S. 1890. A bill to establish a grant program for certain State and local forensic activities, and for other purposes; to the Committee on the Judiciary.

By Mr. COTTON:

S. 1891. A bill to amend the Internal Revenue Code of 1986 to establish the generic drugs and biosimilars production credit, and for other purposes; to the Committee on Finance.

By Ms. MURKOWSKI (for herself, Mr. DURBIN, Mr. TUBERVILLE, Mrs. MURRAY, Mr. MORAN, and Mrs. SHAHEEN):

S. 1892. A bill to clarify that amounts from declinations should be deposited in the Crime Victims Fund and to temporarily provide additional deposits into the Crime Victims Fund; to the Committee on the Judiciary.

By Mr. VAN HOLLEN (for himself and Ms. ALSOBROOKS):

S. 1893. A bill to award posthumously a Congressional Gold Medal to Henrietta Lacks, in recognition of her immortal cells which have made invaluable contributions to global health, scientific research, our quality of life, and patients' rights; to the Committee on Banking, Housing, and Urban Affairs.

By Ms. LUMMIS (for herself and Mr. CRAMER):

S. 1894. A bill to amend MAP–21 to modify provisions relating to a categorical exclusion for projects of limited Federal assistance, and for other purposes; to the Committee on Environment and Public Works.

By Mr. YOUNG (for himself, Mrs. SHAHEEN, and Mr. CRAMER):

S. 1895. A bill to establish the Mental Health Excellence in Schools Program to increase the recruitment and retention of school-based mental health service providers, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. CORNYN (for himself and Mr. COONS):

S. 1896. A bill to modify the provision of law on expedited review of export licenses for exports of advanced technologies to Australia, the United Kingdom, and Canada; to the Committee on Foreign Relations.

By Mrs. SHAHEEN (for herself and Mrs. BLACKBURN):

S. 1897. A bill to amend the Omnibus Crime Control and Safe Streets Act of 1968 to establish the Adverse Childhood Experiences Response Team grant program, and for other purposes; to the Committee on the Judiciary.

By Mr. HICKENLOOPER (for himself, Ms. CANTWELL, Mr. WICKER, and Ms. LUMMIS):

S. 1898. A bill to establish a demonstration program for the active remediation of orbital debris and to require the development of uniform orbital debris standard practices in order to support a safe and sustainable orbital environment, and for other purposes; to the Committee on Commerce, Science, and Transportation.

(165 of 196), Page 165 of 196  Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 165 of 196
Case 4:25-cv-04966  Document 1-4  Filed 06/12/25  Page 20 of 51

May 22, 2025 CONGRESSIONAL RECORD — SENATE S3117

By Mr. WARNER:

S. 1899. A bill to require Federal contractors to implement a vulnerability disclosure policy consistent with NIST guidelines, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. McCORMICK (for himself, Mr. ROSEN, Mr. SULLIVAN, and Ms. SLOTKIN):

S. 1900. A bill to require the Secretary of the Treasury to pursue more equitable treatment of Taiwan at the international financial institutions, and for other purposes; to the Committee on Foreign Relations.

By Mr. CRUZ (for himself, Mr. CORNYN, Mr. WICKER, and Mr. SCOTT of South Carolina):

S. 1901. A bill to address the effect of litigation on applications to export liquefied natural gas, and for other purposes; to the Committee on Environment and Public Works.

By Mr. RISCH (for himself and Mr. HICKENLOOPER):

S. 1902. A bill to require the Secretary of Energy to establish an energy threat analysis program, and for other purposes; to the Committee on Energy and Natural Resources.

By Mr. REED (for himself, Mr. HEINRICH, and Mr. MARKEY):

S. 1903. A bill to prohibit changes to Medicare and Medicaid in reconciliation; to the Committee on the Budget.

By Mr. REED:

S. 1904. A bill to amend the Animal Health Protection Act to require certain certifications from persons provided indemnification or compensation by the Secretary of Agriculture for poultry flocks affected by the highly pathogenic avian influenza, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. LUJÁN:

S. 1905. A bill to amend the Food and Nutrition Act of 2008 to increase the Federal cost share for supplemental nutrition assistance program administration to improve staffing and retention, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. MARSHALL (for himself, Ms. BALDWIN, Mr. MORAN, Mr. BENNET, Mr. GRASSLEY, Mr. KING, and Ms. KLOBUCHAR):

S. 1906. A bill to amend the Federal Food, Drug, and Cosmetic Act with respect to the regulation of zootechnical animal food substances; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. MARSHALL (for himself and Mr. PADILLA):

S. 1907. A bill to amend the Federal Insecticide, Fungicide, and Rodenticide Act to provide for a consistent definition for plant biostimulants; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. LANKFORD (for himself and Mr. KELLY):

S. 1908. A bill to require the Under Secretary of Defense for Intelligence and Security to complete a threat assessment regarding unmanned aircraft systems at or near the international borders of the United States, and for other purposes; to the Committee on Armed Services.

By Mrs. SHAHEEN (for herself and Mr. WICKER):

S. 1909. A bill to encourage increased trade and investment between the United States and the countries in the Western Balkans, and for other purposes; to the Committee on Foreign Relations.

By Mr. BOOKER (for himself, Ms. HIRONO, Mr. PADILLA, Mr. MARKEY, Mr. MERKLEY, Mr. BLUMENTHAL, and Ms. WARREN):

S. 1910. A bill to provide for the overall health and well-being of young people, including the promotion and attainment of lifelong sexual health and healthy relationships, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. RICKETTS:

S. 1911. A bill to amend the Congressional Budget and Impoundment Control Act of 1974 to codify the Panel of Health Advisors within the Congressional Budget Office, and for other purposes; to the Committee on the Budget.

By Mr. DAINES (for himself, Ms. LUMMIS, and Mr. GRASSLEY):

S. 1912. A bill to amend title 38, United States Code, to expand access to the Veterans Community Care Program of the Department of Veterans Affairs to include certain veterans seeking mental health or substance-use services, and for other purposes; to the Committee on Veterans' Affairs.

By Mr. MARKEY (for himself, Ms. WARREN, and Mr. SANDERS):

S. 1913. A bill to amend the Revised Statutes to remove the defense of qualified immunity in the case of any action under section 1979, and for other purposes; to the Committee on the Judiciary.

By Ms. WARREN (for herself, Mr. BLUMENTHAL, Ms. HIRONO, Mr. MARKEY, Mr. MERKLEY, and Mr. SANDERS):

S. 1914. A bill to require Federal law enforcement and prison officials to obtain or provide immediate medical attention to individuals in custody who display medical distress; to the Committee on the Judiciary .

By Ms. WARREN (for herself, Mr. MERKLEY, Ms. SMITH, Mr. PADILLA, Mr. SANDERS, Mr. SCHIFF, Mr. BLUMENTHAL, and Mr. WYDEN):

S. 1915. A bill to rescind each Medal of Honor awarded for acts at Wounded Knee Creek on December 29, 1890, and for other purposes; to the Committee on Armed Services.

By Mr. CORNYN (for himself, Ms. KLOBUCHAR, and Mr. GRASSLEY):

S. 1916. A bill to amend title 11, United States Code, to account for the protection of genetic information in bankruptcy; to the Committee on the Judiciary.

By Mr. HICKENLOOPER (for himself and Mr. MARSHALL):

S. 1917. A bill to amend the Small Business Investment Act of 1958 to exclude from the limit on leverage certain amounts invested in smaller enterprises located in rural or low-income areas and small businesses in critical technology areas, and for other purposes; to the Committee on Small Business and Entrepreneurship.

By Mr. BOOZMAN (for himself and Mr. LUJÁN):

S. 1918. A bill to amend the Internal Revenue Code of 1986 to allow a refundable tax credit against income tax for the purchase of qualified access technology for the blind; to the Committee on Finance.

By Mrs. HYDE-SMITH (for herself, Mrs. BRITT, Mr. MARSHALL, and Mr. BOOZMAN):

S. 1919. A bill to amend the Internal Revenue Code of 1986 to establish a domestic cotton consumption credit; to the Committee on Finance.

By Mr. TILLIS (for himself, Ms. HASSAN, Mr. SULLIVAN, and Ms. CORTEZ MASTO):

S. 1920. A bill to amend title XIX of the Social Security Act to develop national quality standards for continuous skilled nursing services provided through Medicaid, and for other purposes; to the Committee on Finance.

By Ms. BLUNT ROCHESTER (for herself and Mr. ROUNDS):

S. 1921. A bill to amend title 38, United States Code, to modify the administration of housing loans of the Department of Veterans Affairs to prevent or resolve default under such loans, and for other purposes; to the Committee on Veterans' Affairs.

SUBMISSION OF CONCURRENT AND SENATE RESOLUTIONS

The following concurrent resolutions and Senate resolutions were read, and referred (or acted upon), as indicated:

By Ms. ROSEN (for herself, Mr. SCOTT of Florida, Mr. WARNOCK, Mr. LANKFORD, Mr. HICKENLOOPER, Mr. RISCH, Mr. FETTERMAN, Mr. GRAHAM, Mrs. GILLIBRAND, Mr. PAUL, Ms. DUCKWORTH, Mr. CASSIDY, Mr. KAINE, Mr. CRAPO, Mr. WYDEN, Mr. CRAMER, Mr. SCHUMER, Mr. GRASSLEY, Mr. KELLY, Mr. MORENO, Ms. BALDWIN, Mrs. MOODY, Mrs. MURRAY, Mrs. CAPITO, Mr. HAGERTY, Mr. HAWLEY, Mrs. BRITT, and Mrs. SHAHEEN):

S. Res. 246. A resolution recognizing the significance of Jewish American Heritage Month and calling on elected officials and civil society leaders to counter antisemitism; considered and agreed to.

By Ms. HIRONO (for herself and Mr. BARRASSO):

S. Res. 247. A resolution designating May 2025 as "National Wildfire Preparedness Month"; to the Committee on the Judiciary.

By Mr. MERKLEY (for himself and Mr. BLUMENTHAL):

S. Res. 248. A resolution expressing the need for the Federal Government to establish a national biodiversity strategy for protecting biodiversity for current and future generations; to the Committee on Environment and Public Works.

By Mr. LUJÁN (for himself and Mr. DAINES):

S. Res. 249. A resolution expressing support for the designation of May 2025 as "Mental Health Awareness Month"; to the Committee on Health, Education, Labor, and Pensions.

By Mr. GRASSLEY (for himself, Mr. LUJÁN, Mr. RISCH, Mr. CRAPO, Ms. HASSAN, Mr. BARRASSO, Mr. WARNER, Mr. PADILLA, Mr. KAINE, Mr. CORNYN, Mrs. CAPITO, Mrs. HYDE-SMITH, Mr. MULLIN, Mr. HUSTED, Mrs. BRITT, Mr. WYDEN, Mr. YOUNG, and Ms. KLOBUCHAR):

S. Res. 250. A resolution recognizing National Foster Care Month as an opportunity to raise awareness about the challenges of children in the foster care system, and encouraging Congress to implement policies to improve the lives of children in the foster care system; considered and agreed to.

By Mr. HUSTED (for himself and Mr. FETTERMAN):

S. Res. 251. A resolution supporting the designation of May 4 through May 10, 2025, as "Children's Mental Health Awareness Week"; considered and agreed to.

By Mr. SCOTT of Florida (for himself, Mr. KELLY, Mr. JUSTICE, Mr. WARNOCK, Ms. WARREN, Mr. McCORMICK, Mrs. GILLIBRAND, Ms. COLLINS, Mr. TUBERVILLE, Mrs. MOODY, Mr. HUSTED, and Mr. KIM):

S. Res. 252. A resolution designating May 2025 as "Older Americans Month" ; considered and agreed to.

By Mr. SCHMITT (for himself, Mr. DURBIN, Ms. COLLINS, Mr. KAINE, Mr. LUJÁN, Mr. RISCH, Mr. PADILLA, Mr. RICKETTS, Mr. ROUNDS, Mr. SULLIVAN, Mr. WELCH, Ms. CORTEZ MASTO, Mr. HOEVEN, and Mr. PAUL):

S. Res. 253. A resolution congratulating His Holiness Pope Leo XIV on his election to the papacy; considered and agreed to.

**S3118** CONGRESSIONAL RECORD — SENATE *May 22, 2025*

By Mr. CASSIDY (for himself and Mr. WARNOCK):

S. Res. 254. A resolution designating June 12, 2025, as "National Seersucker Day", designating every Thursday after National Seersucker Day through the last Thursday in August 2025 as "Seersucker Thursday", and designating June 2025 as "Seersucker Appreciation Month"; considered and agreed to.

By Mr. HAWLEY (for himself, Mr. SCHMITT, Mr. THUNE, Mr. SCHUMER, Ms. ALSOBROOKS, Ms. BALDWIN, Mr. BANKS, Mr. BARRASSO, Mr. BENNET, Mrs. BLACKBURN, Mr. BLUMENTHAL, Ms. BLUNT ROCHESTER, Mr. BOOKER, Mr. BOOZMAN, Mrs. BRITT, Mr. BUDD, Ms. CANTWELL, Mrs. CAPITO, Mr. CASSIDY, Ms. COLLINS, Mr. COONS, Mr. CORNYN, Ms. CORTEZ MASTO, Mr. COTTON, Mr. CRAMER, Mr. CRAPO, Mr. CRUZ, Mr. CURTIS, Mr. DAINES, Ms. DUCKWORTH, Mr. DURBIN, Ms. ERNST, Mr. FETTERMAN, Mrs. FISCHER, Mr. GALLEGO, Mrs. GILLIBRAND, Mr. GRAHAM, Mr. GRASSLEY, Mr. HAGERTY, Ms. HASSAN, Mr. HEINRICH, Mr. HICKENLOOPER, Ms. HIRONO, Mr. HOEVEN, Mr. HUSTED, Mrs. HYDE-SMITH, Mr. JOHNSON, Mr. JUSTICE, Mr. KAINE, Mr. KELLY, Mr. KENNEDY, Mr. KIM, Mr. KING, Ms. KLOBUCHAR, Mr. LANKFORD, Mr. LEE, Mr. LUJÁN, Ms. LUMMIS, Mr. MARKEY, Mr. MARSHALL, Mr. MCCONNELL, Mr. MCCORMICK, Mr. MERKLEY, Mrs. MOODY, Mr. MORAN, Mr. MORENO, Mr. MULLIN, Ms. MURKOWSKI, Mr. MURPHY, Mrs. MURRAY, Mr. OSSOFF, Mr. PADILLA, Mr. PAUL, Mr. PETERS, Mr. REED, Mr. RICKETTS, Mr. RISCH, Ms. ROSEN, Mr. ROUNDS, Mr. SANDERS, Mr. SCHATZ, Mr. SCHIFF, Mr. SCOTT of Florida, Mr. SCOTT of South Carolina, Mrs. SHAHEEN, Mr. SHEEHY, Ms. SLOTKIN, Ms. SMITH, Mr. SULLIVAN, Mr. TILLIS, Mr. TUBERVILLE, Mr. VAN HOLLEN, Mr. WARNER, Mr. WARNOCK, Ms. WARREN, Mr. WELCH, Mr. WHITEHOUSE, Mr. WICKER, Mr. WYDEN, and Mr. YOUNG):

S. Res. 255. A resolution honoring the life, achievements, and legacy of former United States Senator Christopher "Kit" Bond of Missouri; considered and agreed to.

By Mr. LUJÁN:

S. Res. 256. A resolution designating May 2025 as "American Stroke Month" ; to the Committee on the Judiciary.

By Mr. SCHIFF (for himself and Mr. DURBIN):

S. Res. 257. A resolution expressing the sense of the Senate concerning the arrest and continued detention of Ekrem Imamoglu and urging the Government of Turkiye to uphold democratic values; to the Committee on Foreign Relations.

## ADDITIONAL COSPONSORS

### S. 199

At the request of Mr. CRAPO, the name of the Senator from Connecticut (Mr. BLUMENTHAL) was added as a cosponsor of S. 199, a bill to amend the Internal Revenue Code of 1986 to provide special rules for the taxation of certain residents of Taiwan with income from sources within the United States.

### S. 201

At the request of Mr. KELLY, the name of the Senator from Virginia (Mr. WARNER) was added as a cosponsor of S. 201, a bill to provide for a study by the National Academies of Sciences, Engineering, and Medicine on the preva-

lence and mortality of cancer among individuals who served as active duty aircrew in the Armed Forces, and for other purposes.

### S. 427

At the request of Mr. ROUNDS, the name of the Senator from Nebraska (Mr. RICKETTS) was added as a cosponsor of S. 427, a bill to require the Federal financial institutions regulatory agencies to take risk profiles and business models of institutions into account when taking regulatory actions, and for other purposes.

### S. 554

At the request of Mr. SULLIVAN, the name of the Senator from New Jersey (Mr. BOOKER) was added as a cosponsor of S. 554, a bill to enhance bilateral defense cooperation between the United States and Israel, and for other purposes.

### S. 557

At the request of Mr. KENNEDY, the name of the Senator from Idaho (Mr. CRAPO) was added as a cosponsor of S. 557, a bill to repeal the small business loan data collection requirements under the Equal Credit Opportunity Act.

### S. 897

At the request of Mr. VAN HOLLEN, the name of the Senator from California (Mr. SCHIFF) was added as a cosponsor of S. 897, a bill to prohibit the sale and distribution of expanded polystyrene food service ware, expanded polystyrene loose fill, and expanded polystyrene coolers, and for other purposes.

### S. 911

At the request of Mr. MCCONNELL, the name of the Senator from Nebraska (Mrs. FISCHER) was added as a cosponsor of S. 911, a bill to amend the Omnibus Crime Control and Safe Streets Act of 1968 to include certain retired law enforcement officers in the public safety officers' death benefits program.

### S. 996

At the request of Mr. MULLIN, the name of the Senator from South Carolina (Mr. SCOTT) was added as a cosponsor of S. 996, a bill to amend the Clean Air Act to prevent the elimination of the sale of motor vehicles with internal combustion engines, and for other purposes.

### S. 1144

At the request of Mr. THUNE, the name of the Senator from Minnesota (Ms. KLOBUCHAR) was added as a cosponsor of S. 1144, a bill to amend the Internal Revenue Code of 1986 to treat certain amounts paid for physical activity, fitness, and exercise as amounts paid for medical care.

### S. 1241

At the request of Mr. GRAHAM, the name of the Senator from South Dakota (Mr. ROUNDS) was added as a cosponsor of S. 1241, a bill to impose sanctions and other measures with respect to the Russian Federation if the Government of the Russian Federation refuses to negotiate a peace agreement

with Ukraine, violates any such agreement, or initiates another military invasion of Ukraine, and for other purposes.

### S. 1330

At the request of Mr. BLUMENTHAL, the names of the Senator from Arizona (Mr. KELLY) and the Senator from Delaware (Mr. COONS) were added as sponsors of S. 1330, a bill to advance research to achieve medical breakthroughs in brain tumor treatment and improve awareness and adequacy of specialized cancer and brain tumor care.

### S. 1515

At the request of Mr. YOUNG, the names of the Senator from Pennsylvania (Mr. MCCORMICK) and the Senator from Virginia (Mr. KAINE) were added as cosponsors of S. 1515, a bill to amend the Internal Revenue Code of 1986 to reform the low-income housing credit, and for other purposes.

### S. 1593

At the request of Mr. MARKEY, the name of the Senator from Maryland (Mr. VAN HOLLEN) was added as a cosponsor of S. 1593, a bill to exempt small business concerns from duties imposed pursuant to the national emergency declared on April 2, 2025, by the President.

### S. 1643

At the request of Ms. CORTEZ MASTO, the name of the Senator from Tennessee (Mrs. BLACKBURN) was added as a cosponsor of S. 1643, a bill to amend title XVIII of the Social Security Act to protect patient access to ground ambulance services under the Medicare program.

### S. 1668

At the request of Mr. MERKLEY, the name of the Senator from Michigan (Mr. PETERS) was added as a cosponsor of S. 1668, a bill to amend chapter 131 of title 5, United States Code, to prohibit the President, Vice President, Members of Congress, and individuals appointed to Senate-confirmed positions from issuing, sponsoring, or endorsing certain financial instruments, and for other purposes.

### S. 1741

At the request of Mr. SCHUMER, the names of the Senator from Maryland (Mr. VAN HOLLEN), the Senator from New Jersey (Mr. KIM) and the Senator from Connecticut (Mr. BLUMENTHAL) were added as cosponsors of S. 1741, a bill to ensure transparency with respect to the impact of certain tariffs on the prices of goods, and for other purposes.

### S. 1744

At the request of Mr. RICKETTS, the name of the Senator from Colorado (Mr. BENNET) was added as a cosponsor of S. 1744, a bill to amend the Arms Export Control Act to include Taiwan among the list of recipient countries with respect to which shorter certification and reporting periods apply and to expedite licensing for allies transferring military equipment to Taiwan, and for other purposes.

S. 1751

At the request of Mr. CORNYN, the name of the Senator from Alabama (Mrs. BRITT) was added as a cosponsor of S. 1751, a bill to require the Secretary of Agriculture to establish a New World screwworm fly rearing facility, and for other purposes.

S. 1779

At the request of Ms. ERNST, the name of the Senator from Missouri (Mr. SCHMITT) was added as a cosponsor of S. 1779, a bill to amend the Clean Air Act to prohibit State standards relating to the control of emissions from existing locomotives and engines used in locomotives, and for other purposes.

S. 1810

At the request of Mr. CRUZ, the name of the Senator from Texas (Mr. CORNYN) was added as a cosponsor of S. 1810, a bill to amend the Internal Revenue Code of 1986 to allow a credit against tax for charitable donations to nonprofit organizations providing education scholarships to qualified elementary and secondary students.

S. 1821

At the request of Mr. TILLIS, the name of the Senator from Ohio (Mr. HUSTED) was added as a cosponsor of S. 1821, a bill to amend the Internal Revenue Code of 1986 to establish a tax on income from litigation which is received by third-party entities that provided financing for such litigation.

S. 1823

At the request of Mr. MULLIN, the name of the Senator from Texas (Mr. CORNYN) was added as a cosponsor of S. 1823, a bill to authorize livestock producers and their employees to take black vultures to prevent death, injury, or destruction to livestock, and for other purposes.

S. 1827

At the request of Mrs. MOODY, the names of the Senator from Utah (Mr. LEE) and the Senator from Missouri (Mr. HAWLEY) were added as cosponsors of S. 1827, a bill to authorize the expedited removal of aliens who are criminal gang members, members of foreign terrorist organizations, or have been convicted of certain specified crimes.

S. RES. 212

At the request of Mr. GRAHAM, the names of the Senator from Mississippi (Mrs. HYDE-SMITH) and the Senator from Arkansas (Mr. BOOZMAN) were added as cosponsors of S. Res. 212, a resolution affirming the acceptable outcome of any nuclear deal between the United States and the Islamic Republic of Iran, and for other purposes.

S. RES. 240

At the request of Ms. HIRONO, the name of the Senator from Oregon (Mr. MERKLEY) was added as a cosponsor of S. Res. 240, a resolution affirming that diversity, equity, inclusion, and accessibility are fundamental values of the United States and emphasizing the ongoing need to address discrimination and inequality in the workplace, pre-K through 12th grade and higher education systems, government programs, the military, and our society.

AMENDMENT NO. 2246

At the request of Mr. DURBIN, the names of the Senator from Hawaii (Ms. HIRONO) and the Senator from Rhode Island (Mr. WHITEHOUSE) were added as cosponsors of amendment No. 2246 intended to be proposed to S. 1582, a bill to provide for the regulation of payment stablecoins, and for other purposes.

─────────────

STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. BARRASSO (for himself and Mr. HEINRICH):

S. 1862. A bill to amend title XI of the Social Security Act to expand and clarify the exclusion for orphan drugs under the Drug Price Negotiation Program; to the Committee on Finance.

Mr. BARRASSO. Mr. President, I ask unanimous consent that the text of the bill be printed in the RECORD.

There being no objection, the text of the bill was ordered to be printed in the RECORD, as follows:

S. 1862

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the "Optimizing Research Progress Hope And New Cures Act" or the "ORPHAN Cures Act".

SEC. 2. EXPANDING AND CLARIFYING THE EXCLUSION FOR ORPHAN DRUGS UNDER THE DRUG PRICE NEGOTIATION PROGRAM.

Section 1192(e) of the Social Security Act (42 U.S.C. 1320f–1(e)) is amended—

(1) in paragraph (1), by adding at the end the following new subparagraph:

"(C) TREATMENT OF FORMER ORPHAN DRUGS.—In calculating the amount of time that has elapsed with respect to the approval of a drug or licensure of a biological product under subparagraph (A)(ii) and subparagraph (B)(ii), respectively, the Secretary shall not take into account any period during which such drug or product was a drug described in paragraph (3)(A)."; and

(2) in paragraph (3)(A)—

(A) by striking "only one rare disease or condition" and inserting "one or more rare diseases or conditions"; and

(B) by striking "such disease or condition" and inserting "one or more rare diseases or conditions (as such term is defined in section 526(a)(2) of the Federal Food, Drug, and Cosmetic Act)".

─────────────

By Mr. REED (for himself, Mr. HEINRICH and Mr. MARKEY):

S. 1903. A bill to prohibit changes to Medicare and Medicaid in reconciliation; to the Committee on the Budget.

Mr. REED. Mr. President, critical programs for Americans from all walks of life are under threat right now: Medicare and Medicaid. The Trump administration and my colleagues on the other side of the aisle are working to pass partisan legislation that would make massive cuts to Medicaid. Indeed, the House of Representatives passed their bill last night, voting for the largest cut ever to healthcare for working-class Americans by a single vote. That is why I am introducing the Protect Medicare and Medicaid Act of 2025 with my colleagues Senators HEINRICH and MARKEY.

Under the budget reconciliation process, Republicans can ram through massive cuts to Medicaid or Medicare by a simple majority in the U.S. Senate. It shouldn't be possible to use this fast-track process to strip away the healthcare coverage of millions of Americans. Regrettably, that is what Donald Trump and congressional Republicans are doing.

Senators who served before me had the wisdom to say that this process is too partisan to touch a program like Social Security, which serves as a lifeline for retirees and has worked to reduce poverty among the elderly, and therefore exempted Social Security from the budget reconciliation process.

The bill I am introducing today is very simple. It would exempt Medicare and Medicaid from budget reconciliation, alongside Social Security. These programs are too important to fall victim to partisan attacks. Medicare and Medicaid combined provide health insurance to well over 100 million Americans, providing nursing home care to seniors and those with disabilities, health insurance for children and pregnant women, and countless others. Without these programs, millions of Americans would lose insurance, go bankrupt, or both. One party should not be able to unilaterally dismantle these programs. This bill would prevent that from happening. I hope my colleagues will join me in supporting this effort to protect the healthcare coverage of tens of millions of our fellow Americans.

─────────────

By Mr. REED:

S. 1904. A bill to amend the Animal Health Protection Act to require certain certifications from persons provided indemnification or compensation by the Secretary of Agriculture for poultry flocks affected by the highly pathogenic avian influenza, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

Mr. REED. Mr. President, today I am introducing the Ending Taxpayer Support for Big Egg Producers Act. This legislation would help ensure that Federal funding intended to fight the avian flu outbreak is used responsibly to eradicate the disease and lower the cost of eggs, and does not go to large or highly profitable companies.

I have expressed concerns to both Democratic and Republican administrations that major egg producers may be taking advantage of the avian flu outbreak to engage in price gouging. The five largest U.S. egg producers control roughly half of the country's egg market, limiting choices for American consumers. I am glad that the Department of Justice has opened a probe into this potential anticompetitive behavior.

The fact is, egg prices remain high as companies continue to reel in profits.

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

One company, Cal-Maine Foods, recently announced in an SEC filing that it is spending up to $500 million to buy back shares for the benefit of the founder's family. Cal-Maine also recently reported quarterly profits of $509 million, more than three times what it made in the same period a year ago.

Despite its tremendous profits, last year Cal Maine received $44 million in USDA indemnity payments to compensate for bird deaths due to the avian flu outbreak. It should be uncontroversial that a company that has earmarked hundreds of millions of dollars of cash on-hand and expected earnings for stock buybacks also has the resources to bear losses and implement biosecurity measures without taxpayer assistance.

There are also some very large private companies that have benefited from government assistance under this program. While these companies do not have access to liquidity from the public markets, their size and national scale provide them with greater access to funding from banks and other lenders on terms that are more favorable than those available to smaller private companies that operate regionally or locally. Further, any company that is private-equity backed surely has similar access to funding through the sponsor of the investment fund that owns the company.

This legislation would ensure that taxpayer funds to support egg producers will be made available to publicly traded or private equity-backed companies only if they will not pay dividends or buy back stock. To receive taxpayer assistance, these companies also must certify that they cannot access alternative sources of financing. There are strong penalties, including criminal liability, for falsifying these certifications.

As egg prices remain high, and the Trump administration limits Federal resources at the Department of Agriculture, we must ensure that these limited resources are used effectively to combat the avian flu and help producers who need it most, rather than highly profitable companies.

I urge my colleagues to join me in supporting this commonsense legislation.

─────

SUBMITTED RESOLUTIONS

─────

SENATE RESOLUTION 246—RECOGNIZING THE SIGNIFICANCE OF JEWISH AMERICAN HERITAGE MONTH AND CALLING ON ELECTED OFFICIALS AND CIVIL SOCIETY LEADERS TO COUNTER ANTISEMITISM

Ms. ROSEN (for herself, Mr. SCOTT of Florida, Mr. WARNOCK, Mr. LANKFORD, Mr. HICKENLOOPER, Mr. RISCH, Mr. FETTERMAN, Mr. GRAHAM, Mrs. GILLIBRAND, Mr. PAUL, Ms. DUCKWORTH, Mr. CASSIDY, Mr. KAINE, Mr. CRAPO, Mr.

WYDEN, Mr. CRAMER, Mr. SCHUMER, Mr. GRASSLEY, Mr. KELLY, Mr. MORENO, Ms. BALDWIN, Mrs. MOODY, Mrs. MURRAY, Mrs. CAPITO, Mr. HAGERTY, Mr. HAWLEY, Mrs. BRITT, and Mrs. SHAHEEN) submitted the following resolution; which was considered and agreed to:

S. RES. 246

Whereas "Jewish American Heritage Month" has its origins in 1980, when Congress enacted the Joint Resolution entitled "Joint Resolution to authorize and request the President to issue a proclamation designating April 21 through April 28, 1980, as 'Jewish Heritage Week'", approved April 24, 1980 (Public Law 96–237; 94 Stat. 338);

Whereas, on April 24, 1980, President Jimmy Carter issued the proclamation for "Jewish Heritage Week", and in that proclamation, President Carter spoke about the bountiful contributions made by the Jewish people to the culture and history of the United States;

Whereas Congress has played a central role in recognizing "Jewish American Heritage Month" since the Senate and House of Representatives passed resolutions in 2005 and 2006, respectively, urging the President to proclaim the national observation of a month recognizing the Jewish-American community;

Whereas, since 2006, Presidents Bush, Obama, Trump, and Biden have all issued proclamations for "Jewish American Heritage Month", which celebrates Jewish Americans and encourages all people of the United States to learn more about Jewish heritage and the contributions of Jewish people throughout the history of the United States;

Whereas the people of the United States celebrate the rich history of Jewish people in the United States and the more than 350-year history of Jewish contributions to society in the American Colonies and United States;

Whereas the United States has long served as a haven for Jewish people escaping oppression in search of liberty, justice, and tolerance;

Whereas the Jewish-American community dates back to 1654, when a group of 23 Jewish people, fleeing persecution at the hands of the Portuguese Inquisition, fled Brazil and found refuge in what is now New York City;

Whereas Jewish Americans have established deep roots in communities across the United States and served their neighbors and the United States as loyal and patriotic citizens, always grateful for the safe harbor that the United States has provided for them;

Whereas the Jewish-American community has grown to over 6,000,000 people, representing approximately 2 percent of the population of the United States in 2024;

Whereas Jewish Americans have served in government and the military, won Nobel prizes, led universities and corporations, advanced medicine and philanthropy, created and performed in enduring works of performing and visual art, written great novels, become emblems of justice as members of the Supreme Court, and so much more;

Whereas, since Hamas' deadly attack on Israel on October 7, 2023, antisemitism in the United States has reached record highs with incidents targeting Jews and those who are perceived as Jewish;

Whereas, according to the American Jewish Committee, 77 percent of American Jews say they feel less safe as a Jewish person in the United States because of the October 7, 2023, Hamas terrorist attacks;

Whereas, according to the American Jewish Committee, almost 70 percent of Jewish adults report experiencing antisemitism online, including on social media;

Whereas, according to Hillel International, 83 percent of Jewish college students have experienced or witnessed some form of antisemitism since the October 7, 2023, Hamas terrorist attacks;

Whereas, in 2024, the Anti-Defamation League recorded 9,354 antisemitic incidents in the United States, which equals an average of 25 incidents per day and represents a 344 percent increase in antisemitic incidents over the previous 5 years and an increase of nearly 900 percent over the previous decade;

Whereas the Federal Bureau of Investigation has aggregated 2023 hate crime data showing the highest number of single-bias anti-Jewish hate crime incidents ever recorded;

Whereas one of the most effective ways to combat antisemitism and hate is through increasing education and awareness about the contributions Jewish Americans have made to the United States through the arts, entertainment, science and technology, the military, the government, business, culinary traditions, and other fields; and

Whereas, as the strength of a society can be measured by how that society protects its minority populations and celebrates their contributions, it is altogether fitting for the United States to once again mark the month of May as "Jewish American Heritage Month": Now, therefore, be it

*Resolved,* That the Senate—

(1) recognizes the significance of Jewish American Heritage Month as a time to celebrate the contributions of Jewish Americans to the society and culture of the United States;

(2) calls on elected officials, faith leaders, and civil society leaders to condemn and counter all acts of antisemitism;

(3) calls on elected officials and State and local leaders to educate the public on the contributions of the Jewish-American community and uplift Jewish stories and voices; and

(4) takes all possible steps to ensure the safety, security, and dignity of American Jews in all aspects of their lives, including at the workplace, college and university campuses, synagogues, and home.

─────

SENATE RESOLUTION 247—DESIGNATING MAY 2025 AS "NATIONAL WILDFIRE PREPAREDNESS MONTH"

Ms. HIRONO (for herself and Mr. BARRASSO) submitted the following resolution; which was referred to the Committee on the Judiciary:

S. RES. 247

Whereas wildfires across the contiguous United States, Alaska, Hawaii, and the United States territories have increased in scale, complexity, and severity, fire seasons have lengthened in many parts of the United States to encompass the entire year, and wildfire has become a threat in regions of the United States that have little or no history of wildfire;

Whereas, in the United States from 2015 to 2024, an average of 62,435 wildfires burned, consuming on average a total of 7,553,704 acres, which is 705,612 acres above the previous 10-year average;

Whereas, in the United States from January 1 to May 2, 2025, 22,759 wildfires burned 988,319 acres, which is above both the 10-year average occurrence of 15,639 wildfires and the average 10-year burned area of 951,468 acres;

Whereas, from May 2025 to August 2025, over 60 percent of States in the United States are predicted to be at risk for significant wildfire events, and over 50 percent of

States are expected to face above-normal risks for significant wildfire damage;

Whereas nearly 85 percent of wildland fires in the United States are caused by humans;

Whereas Federal wildfire suppression efforts cost over $2,500,000,000 per year, and the total cost of wildfire damage across the United States is estimated to be tens to hundreds of billions of dollars per year;

Whereas significant investments in proactive planning, mitigation, and risk reduction are necessary for the United States to counteract increasingly severe wildfire risk, damage, and loss;

Whereas firefighters on the front lines and are at an increased risk of developing cancer and respiratory diseases because they are exposed to smoke and hazardous chemicals in the line of duty;

Whereas the effects of long-term exposure to wildfire smoke will harm more people, as particulate pollution triggers asthma attacks, heart attacks, and strokes, and can kill;

Whereas preventative measures exist to help individuals and communities increase their fire resilience through—

(1) reducing the risk of home ignition by using fire-resistant construction materials and maintaining yard vegetation;

(2) community planning that reduces home wildfire exposure and increases access for firefighters;

(3) evacuation planning and assistance for people and their animals;

(4) vegetation and forest management; and

(5) limited use of combustibles during high heat or drier seasons, including fireworks, exhaust, and open flames; and

Whereas a nationally designated Wildfire Preparedness Month—

(1) increases awareness of the threat of wildfires and knowledge of lifesaving and fire mitigation practices; and

(2) promotes educational initiatives, encourages community programming, and increases overall knowledge and preparedness: Now, therefore, be it

*Resolved,* That the Senate—

(1) designates the month of May 2025 as "National Wildfire Preparedness Month";

(2) encourages increased awareness of, and preparedness for, the threat of wildfires and subsequent suppression efforts at the Federal, State, local, and Tribal levels of government, including Alaska Native and Native Hawaiian communities, and by nongovernmental organizations and communities; and

(3) supports resources and educational initiatives that communicate how communities at risk of exposure to wildfire hazards can take preventative measures, including, home hardening, land management practices that reduce or remove highly flammable grasses and shrubs, instituting or enhancing early warning systems, reducing unplanned human ignitions, reducing adverse health impacts from smoke and fire exposure, and safely and efficiently evacuating people and their animals.

---

SENATE RESOLUTION 248—EXPRESSING THE NEED FOR THE FEDERAL GOVERNMENT TO ESTABLISH A NATIONAL BIODIVERSITY STRATEGY FOR PROTECTING BIODIVERSITY FOR CURRENT AND FUTURE GENERATIONS

Mr. MERKLEY (for himself and Mr. BLUMENTHAL) submitted the following resolution; which was referred to the Committee on Environment and Public Works:

S. RES. 248

Whereas the planet is facing an unprecedented biodiversity crisis, largely driven by human activity;

Whereas recent scientific studies have confirmed that human-driven activities are significantly damaging the ecosystems of the planet by—

(1) altering 75 percent of the area of terrestrial environments and 66 percent of marine environments;

(2) directly exploiting wildlife and plant species;

(3) accelerating climate change, directly harming nature and exacerbating other threats;

(4) polluting air, land, and water; and

(5) introducing invasive species;

Whereas recent scientific studies have shown that human-driven threats have harmed biodiversity by—

(1) threatening approximately 1,000,000 species with imminent or near extinction, including—

(A) more than 40 percent of amphibians;

(B) 33 percent of corals, sharks, shark relatives, and marine mammals;

(C) more than 60 percent of cycads and more than 30 percent of conifer trees; and

(D) approximately 10 percent of the more than 5,000,000 insect species on the planet; and

(2) causing population sizes of wild species to decline by—

(A) an average of 68 percent for species of mammals, birds, fish, amphibians, and reptiles;

(B) approximately 3,000,000,000 birds in North America since 1970;

(C) approximately 50 percent for species of live corals; and

(D) an average of more than 20 percent overall;

Whereas human activity is accelerating the decline of important economic and cultural services, including—

(1) land productivity, with a reduction in the productivity of approximately ¼ of the land surface;

(2) land and freshwater resources, with more than ⅓ of the land surface and 75 percent of freshwater resources devoted to crop or livestock production;

(3) global crops, with approximately $500,000,000,000 of global crops at risk due to pollinator loss;

(4) marine fisheries, with ⅓ of marine fisheries overfished, 60 percent fished at capacity, and only 7 percent fished below capacity; and

(5) environmental health, with 25 percent of greenhouse gas emissions caused by land clearing, crops, and fertilization;

Whereas the decline of biodiversity disproportionately impacts indigenous and other communities that rely on nature for essential services, including Native Americans and Alaska Natives, who offer unique perspectives and traditional ecological knowledge critical to preserving biodiversity;

Whereas the decline of biodiversity and ecosystem services observed worldwide is occurring in the United States;

Whereas the United States possesses an abundance and great diversity of species of fish, wildlife, and plants that are of significant value to the United States for intrinsic, aesthetic, ecological, educational, cultural, recreational, economic, and scientific reasons;

Whereas the decline of biodiversity presents a direct threat to the security, health, and well-being of the people of the United States by causing economic harm through the loss of valuable ecosystem services, including zoonotic disease buffering, pollination, water filtration, soil replenishment, the provision of game species, medicinal products, and recreational opportunities;

Whereas communities of color, low-income communities, Tribal communities, and other populations that have been systematically and deliberately targeted for environmentally degrading activities and excluded from conservation efforts face disproportionate impacts from biodiversity loss;

Whereas Federal agencies are tasked with protecting and conserving biodiversity in the United States and worldwide through a variety of legal and policy channels;

Whereas there is no coordinating policy to maximize the effectiveness of the conservation efforts of the Federal Government and collaboration by the Federal Government with States, local governments, Indian Tribes, private landowners, and other nongovernmental stakeholders;

Whereas the United States should play a leading role on the international stage in addressing the biodiversity crisis, yet the United States—

(1) is not a party to—

(A) the Convention on Biological Diversity, done at Rio de Janeiro June 5, 1992;

(B) the Convention on the Conservation of Migratory Species of Wild Animals (commonly known as "the Convention on Migratory Species"), done at Bonn November 6, 1979; or

(C) other relevant international agreements;

(2) does not issue a periodic national biodiversity outlook, contrary to most other countries; and

(3) does not have a national biodiversity strategy as part of the Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Services; and

Whereas scientific research highlights essential pathways forward, including—

(1) establishing the effective conservation, restoration, and durable protection of not less than 30 percent of an ecologically representative area of the lands, freshwater, and oceans in the United States and in the world by 2030 by working collaboratively with governments, land owners, fishers, indigenous peoples, communities, and others;

(2) restoring or rewilding species and degraded habitats, and ensuring integrity and connectivity of protected areas;

(3) retaining and protecting highly intact ecosystems;

(4) reducing pesticide use to levels not higher than necessary for ecologically sustainable and safe food production; and

(5) addressing the threats posed by invasive species: Now, therefore, be it

*Resolved,* That it is the sense of the Senate that—

(1) it is in the national interest for the Federal Government to establish a national biodiversity strategy—

(A) to ensure the conservation and restoration of the biodiversity of the United States;

(B) to secure and restore the ecosystem services provided by nature for current and future generations;

(C) to deliver on the United Nations Sustainable Development Goals;

(D) to set ambitious, yet necessary, goals for protecting biodiversity in the coming decades;

(E) to promote social equity and justice in the conservation of the biodiversity of the United States;

(F) to coordinate the actions of Federal agencies to advance the conservation of biodiversity;

(G) to promote collaboration among Federal, State, and Tribal governments, nongovernmental stakeholders, civil society, and international parties to advance conservation;

(170 of 196), Page 170 of 196   Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 170 of 196
Case 4:25-cv-04966   Document 1-4   Filed 06/12/25   Page 25 of 51
S3122                         CONGRESSIONAL RECORD — SENATE                         May 22, 2025

(H) to honor the Federal trust obligations to Indian Tribes and Native Americans; and

(I) to provide global leadership in addressing the biodiversity crisis; and

(2) the national biodiversity strategy described in paragraph (1) should include direction on—

(A) achieving the national goal of conserving not less than 30 percent of the land and waters of the United States to protect biodiversity and address climate change by 2030 (referred to in this resolution as "30x30"), supporting international efforts to achieve the same goal on a global scale, and setting other goals necessary to reduce the threats to biodiversity as indicated by the best available scientific information;

(B) taking action to protect threatened, endangered, and at-risk species from further imperilment or extinction;

(C) climate adaptation and mitigation strategies for biodiversity conservation, including—

(i) leading international agreements to combat climate change, including the decision of the 21st Conference of Parties of the United Nations Framework Convention on Climate Change adopted in Paris December 12, 2015 (commonly known as the "Paris Agreement");

(ii) establishing climate refugia and climate corridors for conservation of species affected by climate change; and

(iii) the rapid build-out of renewable energy;

(D) reviewing existing laws, plans, programs, and strategies that are relevant to addressing threats to biodiversity to assess how the laws, plans, programs, and strategies can contribute to the objectives of this resolution and, as necessary, recommending new laws, plans, programs, and strategies;

(E) ensuring integration of biodiversity protection across the activities of the Federal Government, including foreign policy and foreign assistance;

(F) advancing conservation in collaboration with State and Tribal governments and on private lands through incentives, funding, technical support, and partnerships;

(G) incorporating indigenous knowledge and practices to support conservation and biodiversity, safeguarding the rights and needs of indigenous peoples, and ensuring fulfillment of the Federal trust obligations that apply to government decisionmaking that impacts the interests of Native Americans;

(H) ensuring equitable access to nature, inclusive decisionmaking on biodiversity protection, and just allocations of resources to achieve the goals of this resolution, including with respect to systematically and deliberately targeted populations such as communities of color, low-income communities, and Native American communities;

(I) establishing regular monitoring and reporting on the status of biodiversity in the United States and globally, including a quadrennial assessment reported to Congress and the people of the United States;

(J) prioritizing programs to identify knowledge gaps and accelerate research and development of new conservation solutions across sectors;

(K) assessing and integrating the role of the United States in international biodiversity, ecosystem services, and nature conservation in—

(i) national security and foreign policy strategies, including in international development policies, planning and finance, diplomatic dialogues, and trade agreements; and

(ii) advancing global adoption of and progress toward 30x30; and

(L) funding existing conservation programs, developing new funding sources, and reducing subsidies that harm biodiversity in amounts commensurate with the scale of the harm to biodiversity.

───────────

SENATE RESOLUTION 249—EXPRESSING SUPPORT FOR THE DESIGNATION OF MAY 2025 AS "MENTAL HEALTH AWARENESS MONTH"

Mr. LUJÁN (for himself and Mr. DAINES) submitted the following resolution; which was referred to the Committee on Health, Education, Labor, and Pensions:

S. RES. 249

Whereas millions of people in the United States face mental health challenges and have unmet mental health needs;

Whereas, according to the Centers for Disease Control and Prevention, mental health disorders are chronic conditions, and, without proper diagnosis and treatment, children can face problems at home and in school, which can interfere with the future development of those children;

Whereas more resources should be dedicated in schools to the prevention, early detection, and treatment of mental health disorders in children;

Whereas childhood depression is more likely to persist into adulthood if it is left untreated;

Whereas it is important that the United States provides the necessary funding and resources to reach children and youth early on in life;

Whereas the COVID-19 pandemic accelerated the use of digital technologies, such as social media;

Whereas there has been a great concern about the impact of social media on the mental health of children and youth;

Whereas social media exposes children to bullying, depression, anxiety, and self-harm;

Whereas there is a strong need to further understand and deter any negative impact of social media on children and youth;

Whereas suicide is a significant public health issue that can have an enduring impact on individuals and their communities;

Whereas additional resources should be dedicated to the prevention of suicide in the United States;

Whereas veterans are more likely to experience mental health challenges than civilians;

Whereas it is important that the United States provides additional funding and resources to support veterans with mental health needs; and

Whereas it would be appropriate to observe May 2025 as "Mental Health Awareness Month": Now, therefore, be it

*Resolved,* That the Senate—

(1) supports the designation of May 2025 as "Mental Health Awareness Month" to remove the stigma associated with mental illness and place emphasis on scientific findings regarding mental health recovery;

(2) declares mental health a national priority;

(3) supports increasing access to mental health services;

(4) recognizes that mental well-being is equally as important as physical well-being for the citizens, communities, schools, businesses, and economy of the United States;

(5) applauds the coalescing of national, State, local, medical, and faith-based organizations in—

(A) working to promote public awareness of mental health; and

(B) providing critical information and support to individuals and families affected by mental illness; and

(6) encourages all individuals to draw on "Mental Health Awareness Month" as an opportunity to promote mental well-being and awareness, ensure access to appropriate coverage and services, and support overall quality of life for those living with mental illness.

───────────

SENATE RESOLUTION 250—RECOGNIZING NATIONAL FOSTER CARE MONTH AS AN OPPORTUNITY TO RAISE AWARENESS ABOUT THE CHALLENGES OF CHILDREN IN THE FOSTER CARE SYSTEM, AND ENCOURAGING CONGRESS TO IMPLEMENT POLICIES TO IMPROVE THE LIVES OF CHILDREN IN THE FOSTER CARE SYSTEM

Mr. GRASSLEY (for himself, Mr. LUJÁN, Mr. RISCH, Mr. CRAPO, Ms. HASSAN, Mr. BARRASSO, Mr. WARNER, Mr. PADILLA, Mr. KAINE, Mr. CORNYN, Mrs. CAPITO, Mrs. HYDE-SMITH, Mr. MULLIN, Mr. HUSTED, Mrs. BRITT, Mr. WYDEN, Mr. YOUNG, and Ms. KLOBUCHAR) submitted the following resolution; which was considered and agreed to:

S. RES. 250

Whereas National Foster Care Month was established more than 30 years ago—

(1) to bring foster care issues to the forefront;

(2) to highlight the importance of permanency for every child; and

(3) to recognize the essential role that foster parents, social workers, and advocates have in the lives of children in foster care throughout the United States;

Whereas all children deserve a safe, loving, and permanent home;

Whereas the primary goal of the foster care system is to ensure the safety and well-being of children while working to provide a safe, loving, and permanent home for each child;

Whereas there are approximately 368,530 children living in foster care in the United States;

Whereas there were approximately 186,602 youths that entered the foster care system in 2022 in the United States, while more than 108,877 youths were awaiting adoption at the end of 2022;

Whereas approximately 61,585 children entered foster care in 2022 due to parental drug abuse;

Whereas children of color are more likely to stay in the foster care system for longer periods of time and are less likely to be reunited with their biological families;

Whereas foster parents are the front-line caregivers for children who cannot safely remain with their biological parents, and foster parents provide physical care, emotional support, and education advocacy, and are the largest single source of families providing permanent homes for children leaving foster care to adoption;

Whereas children in foster care who are placed with relatives, compared to children placed with non-relatives—

(1) have more stability, including fewer changes in placements;

(2) have more positive perceptions of their placements;

(3) are more likely to be placed with their siblings; and

(4) demonstrate fewer behavioral problems;

Whereas some relative caregivers receive less financial assistance and support services than do foster caregivers;

Whereas an increased emphasis on prevention and reunification services is necessary

(171 of 196), Page 171 of 196 Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 171 of 196
Case 4:25-cv-04966  Document 1-4  Filed 06/12/25  Page 26 of 51

May 22, 2025                    CONGRESSIONAL RECORD — SENATE                              S3123

to reduce the number of children that enter or re-enter the foster care system;

Whereas approximately 18,538 youths aged out of foster care in 2022 without a legal permanent connection to an adult or family;

Whereas youth who age out of foster care lack the security or support of a biological or adoptive family and frequently struggle to secure affordable housing, obtain health insurance, pursue higher education, and acquire adequate employment;

Whereas foster care is intended to be a temporary placement, but children remain in the foster care system for an average of 22.6 months;

Whereas approximately one-third of children in foster care experience more than 2 placements while in care, which often leads to disruption of routines and the need to change schools and move away from siblings, extended families, and familiar surroundings;

Whereas youth in foster care are much more likely to face educational instability, with a study showing that 75 percent of foster youth experienced an unscheduled school change during a school year, compared to less than 40 percent of youth not in foster care;

Whereas children entering foster care often confront the widespread misperception that children in foster care are disruptive, unruly, and dangerous, even though placement in foster care is based on the actions of a parent or guardian, not the child;

Whereas 30 percent of children in foster care are taking not less than 1 anti-psychotic medication, and 34 percent of those children are not receiving adequate treatment planning or medication monitoring;

Whereas, due to heavy caseloads and limited resources, the average annual turnover rate is between 20 percent and 40 percent for child welfare workers;

Whereas States, localities, and communities should be encouraged to invest resources in preventative and reunification services and post-permanency programs to ensure that more children and older youth in foster care are provided with safe, loving, and permanent placements;

Whereas, in 2018, Congress passed the Family First Prevention Services Act (Public Law 115–123; 132 Stat. 232), which provided new investments in prevention and family reunification services to help more families stay together and ensure more children are in safe, loving, and permanent homes;

Whereas Federal legislation during the past 4 decades, including the Adoption Assistance and Child Welfare Act of 1980 (Public Law 96–272; 94 Stat. 500), the Adoption and Safe Families Act of 1997 (Public Law 105–89; 111 Stat. 2115), the Fostering Connections to Success and Increasing Adoptions Act of 2008 (Public Law 110–351; 122 Stat. 3949), the Child and Family Services Improvement and Innovation Act (Public Law 112–34; 125 Stat. 369), the Preventing Sex Trafficking and Strengthening Families Act (Public Law 113–183; 128 Stat. 1919), and the Supporting America's Children and Families Act (Public Law 118–258; 138 Stat. 2947) provided new investments and services to improve the outcomes of children in the foster care system;

Whereas May 2025 is an appropriate month to designate as "National Foster Care Month" to provide an opportunity to acknowledge the child welfare workforce, foster parents, the advocacy community, and mentors for their dedication, accomplishments, and the positive impact they have on the lives of children; and

Whereas much remains to be done to ensure that all children have a safe, loving, nurturing, and permanent family, regardless of age or special needs: Now, therefore, be it

*Resolved,* That the Senate—

(1) supports the designation of May 2025 as "National Foster Care Month";

(2) recognizes National Foster Care Month as an opportunity to raise awareness about the challenges that children face in the foster care system;

(3) encourages Congress to implement policies to improve the lives of children in the foster care system;

(4) acknowledges the unique needs of children in the foster care system;

(5) recognizes foster youth throughout the United States for their ongoing tenacity, courage, and resilience while facing life challenges;

(6) acknowledges the exceptional alumni of the foster care system who serve as advocates and role models for youth who remain in care;

(7) honors the commitment and dedication of the individuals who work tirelessly to provide assistance and services to children in the foster care system;

(8) supports the designation of May 31, 2025, as "National Foster Parent Appreciation Day";

(9) recognizes National Foster Parent Appreciation Day as an opportunity to recognize the efforts of foster parents to provide safe and loving care for children in need and to raise awareness about the increasing need for foster parents to serve in their communities; and

(10) reaffirms the need to continue working to improve the outcomes of all children in the foster care system through initiatives designed to—

(A) support vulnerable families;

(B) prevent families from entering the foster care system and reunite families in cases where reunification is in the best interest of the child;

(C) promote adoption in cases where reunification is not in the best interests of the child;

(D) adequately serve those children brought into the foster care system; and

(E) facilitate the successful transition into adulthood for youth that "age out" of the foster care system.

---

## SENATE RESOLUTION 251—SUPPORTING THE DESIGNATION OF MAY 4 THROUGH MAY 10, 2025, AS "CHILDREN'S MENTAL HEALTH AWARENESS WEEK"

Mr. HUSTED (for himself and Mr. FETTERMAN) submitted the following resolution; which was considered and agreed to:

S. RES. 251

Whereas millions of youth in the United States struggle with mental health challenges, many of which suffer undiagnosed and untreated;

Whereas adults who struggle with mental health often show symptoms in their youth that go unaddressed and can continue later in life;

Whereas childhood and adolescence can be challenging times in life, leaving our youth especially vulnerable to anxiety, depression, bullying, and self-harm;

Whereas stigma surrounding mental health often prevents youth from seeking the help and support they need, which can exacerbate the effects of mental health conditions;

Whereas, according to the Centers for Disease Control and Prevention, mental health conditions are chronic conditions, and untreated mental health conditions can harm the development and well-being of children, impacting their academic, social, and home environments;

Whereas youth suicide continues to be a significant public health crisis, affecting families, individuals, and communities, and there is a need for extensive suicide awareness and prevention programs; and

Whereas May 4 through May 10, 2025, is an opportunity to strengthen public awareness of youth mental health conditions and advocate for meaningful action to improve mental health care for children in the United States: Now, therefore, be it

*Resolved,* That the Senate—

(1) supports the designation of May 4 through May 10, 2025, as "Children's Mental Health Awareness Week" to raise awareness of the mental health conditions facing our children and the importance of early detection, treatment, intervention, and prevention strategies;

(2) recognizes the relationship between children's mental health and plenty of outdoor recreation, a healthy diet, regular socialization with peers, and adequate sleep;

(3) urges youth mental health be categorized as a national priority and calls for the continued promotion of mental health in schools and communities;

(4) applauds the collaboration of local, State, and Federal organizations in promoting awareness of youth mental health and providing support for those in need;

(5) advocates for individuals, families, and communities to participate in activities during "Children's Mental Health Awareness Week" to promote mental health initiatives, reduce stigma, and facilitate access to essential services and resources; and

(6) reaffirms the importance of mental health as a necessary aspect of overall well-being and urges continued efforts to facilitate access to mental health care for the children of the United States.

---

## SENATE RESOLUTION 252—DESIGNATING MAY 2025 AS "OLDER AMERICANS MONTH"

Mr. SCOTT of Florida (for himself, Mr. KELLY, Mr. JUSTICE, Mr. WARNOCK, Ms. WARREN, Mr. MCCORMICK, Mrs. GILLIBRAND, Ms. COLLINS, Mr. TUBERVILLE, Mrs. MOODY, Mr. HUSTED, and Mr. KIM) submitted the following resolution; which was considered and agreed to:

S. RES. 252

Whereas President John F. Kennedy first designated May as "Senior Citizens Month" in 1963;

Whereas, in 1963, only approximately 17,778,000 individuals living in the United States were 65 years of age or older, approximately ⅓ of those individuals lived in poverty, and few programs existed to meet the needs of older individuals in the United States;

Whereas, in 2023, there were more than 59,248,361 individuals who were 65 years of age or older living in the United States and those individuals accounted for 17.7 percent of the total population of the United States;

Whereas approximately 11,216 individuals in the United States turn 65 years of age each day;

Whereas, in 2023, more than 8,402,856 veterans of the Armed Forces were 65 years of age or older;

Whereas older individuals in the United States rely on Federal programs, such as programs under the Social Security Act (42 U.S.C. 301 et seq.), including the Medicare program under title XVIII of that Act (42 U.S.C. 1395 et seq.) and the Medicaid program under title XIX of that Act (42 U.S.C. 1396 et seq.), for financial security and high-quality affordable health care;

Whereas the Older Americans Act of 1965 (42 U.S.C. 3001 et seq.) provides—

(1) supportive services to help older individuals in the United States maintain maximum independence in the homes and communities of those individuals; and

(2) funding for programs that promote social connection and improve the health and well-being of older individuals, including nutrition services, transportation, and care management, which assist more than 10,000,000 older individuals in the United States each year;

Whereas, as local aging network leaders, Area Agencies on Aging are critical partners in the healthy aging continuum;

Whereas, in 2023, an estimated 6,774,000 individuals in the United States who were 65 years of age or older continued to work as full-time, year-round employees;

Whereas older individuals in the United States play an important role in society by continuing to contribute their experience, knowledge, wisdom, and accomplishments;

Whereas older individuals in the United States play vital roles in their communities and remain involved in volunteer work, the arts, cultural activities, and activities relating to mentorship and civic engagement;

Whereas more than 143,000 older individuals serve as AmeriCorps Seniors volunteers in the Foster Grandparent Program, Senior Companion Program, and the Retired and Senior Volunteer Program, helping communities by mentoring and tutoring children, providing independent living support and companionship to other older adults, addressing food insecurity, and more; and

Whereas a society that recognizes the success of older individuals and continues to enhance the access of older individuals to quality and affordable health care will—

(1) encourage the ongoing participation and heightened independence of older individuals; and

(2) ensure the continued safety and well-being of older individuals: Now, therefore, be it

Resolved, That the Senate—

(1) designates May 2025 as "Older Americans Month"; and

(2) encourages the people of the United States to provide opportunities for older individuals to continue to flourish by—

(A) emphasizing the importance and leadership of older individuals through public recognition of the ongoing achievements of older individuals;

(B) presenting opportunities for older individuals to share their wisdom, experience, and skills with younger generations; and

(C) recognizing older individuals as valuable assets in strengthening communities across the United States.

SENATE RESOLUTION 253—CONGRATULATING HIS HOLINESS POPE LEO XIV ON HIS ELECTION TO THE PAPACY

Mr. SCHMITT (for himself, Mr. DURBIN, Ms. COLLINS, Mr. KAINE, Mr. LUJÁN, Mr. RISCH, Mr. PADILLA, Mr. RICKETTS, Mr. ROUNDS, Mr. SULLIVAN, Mr. WELCH, Ms. CORTEZ MASTO, Mr. HOEVEN, and Mr. PAUL) submitted the following resolution; which was considered and agreed to:

S. RES. 253

Whereas the Senate recognizes the historic and spiritual significance of the election of His Holiness Pope Leo XIV as the Bishop of Rome and leader of the worldwide Catholic Church;

Whereas the Senate recognizes the historic and spiritual significance of the first Pope from the United States ever elected to the papacy;

Whereas the Pope serves as a global symbol of peace, compassion, humility, and the pursuit of justice; and

Whereas the election of the new Pope marks a moment of profound importance for over 1,000,000,000 Catholics worldwide, including millions in the United States, and for people of all faiths who are inspired by his message and ministry: Now, therefore, be it

Resolved, That the Senate—

(1) acknowledges the commitment of His Holiness Pope Leo XIV to promoting human dignity, defending the poor and marginalized, advancing interfaith dialogue, and fostering reconciliation and peace throughout the world;

(2) expresses the hope that the strong relationship between the United States and The Holy See will continue to deepen, reflecting shared values of human rights, religious freedom, and global cooperation;

(3) recognizes the significance of the Catholic Church in promoting justice, humanitarian assistance, and moral leadership in the world; and

(4) extends its best wishes for a successful and inspiring pontificate.

SENATE RESOLUTION 254—DESIGNATING JUNE 12, 2025, AS "NATIONAL SEERSUCKER DAY", DESIGNATING EVERY THURSDAY AFTER NATIONAL SEERSUCKER DAY THROUGH THE LAST THURSDAY IN AUGUST 2025 AS "SEERSUCKER THURSDAY", AND DESIGNATING JUNE 2025 AS "SEERSUCKER APPRECIATION MONTH"

Mr. CASSIDY (for himself and Mr. WARNOCK) submitted the following resolution; which was considered and agreed to:

S. RES. 254

Whereas seersucker was introduced to the United States in the South in the middle of the 19th century;

Whereas seersucker suits were popularized in the United States in the early 1900s by New Orleans businessman Joseph Haspel at his Broad Street facility in New Orleans, Louisiana;

Whereas, as a lightweight, hard-wearing fabric, seersucker is mostly worn and enjoyed by the people of the United States during hot summer months;

Whereas former Senator Trent Lott of Mississippi brought Seersucker Thursday to Congress in 1996, and after the day went unobserved in 2012 and 2013, then-Representative Bill Cassidy, with the help of the late Senator Dianne Feinstein, revived the tradition in 2014;

Whereas the Senate will remember the historic service of the late Senator Dianne Feinstein, who shall forever remain a part of this tradition, which Senator Raphael Warnock will continue in her stead;

Whereas the name "seersucker" originates from the Persian phrase "shir-o-shakar", meaning "milk and sugar", alluding to the alternating textures of the fabric;

Whereas the seersucker textile is made of cotton, linen, or silk (or combinations thereof), woven on a loom with threads at different tensions, creating alternating stripes of smooth and puckered textures that do not lay flat on one's skin, which is what makes the fabric so breathable;

Whereas cotton is an important crop that producers in the United States, including 3,500 family farms in Georgia, strive to cultivate in the highest quality; and

Whereas one of the alternating stripes in seersucker is frequently in a color, typically blue, but sometimes gray, green, tan, red, pink, or another color, which, in combination with the white stripes, creates the iconic pattern so well known today: Now, therefore, be it

Resolved, That the Senate—

(1) designates June 12, 2025, as "National Seersucker Day";

(2) designates every Thursday after National Seersucker Day through the last Thursday in August 2025 as "Seersucker Thursday";

(3) designates June 2025 as "Seersucker Appreciation Month";

(4) recognizes the contributions of the hard-working people of the United States through the wearing of seersucker, the unique warm weather clothing known as the working person's uniform;

(5) encourages Senators to support the objective of National Seersucker Day and Seersucker Thursday;

(6) encourages local governments in the United States to build partnerships with local organizations and other members of the clothing industries and enthusiasts to promote the wearing of seersucker; and

(7) invites the people of the United States to don their warm weather finest on National Seersucker Day and every Seersucker Thursday.

SENATE RESOLUTION 255—HONORING THE LIFE, ACHIEVEMENTS, AND LEGACY OF FORMER UNITED STATES SENATOR CHRISTOPHER "KIT" BOND OF MISSOURI

Mr. HAWLEY (for himself, Mr. SCHMITT, Mr. THUNE, Mr. SCHUMER, Ms. ALSOBROOKS, Ms. BALDWIN, Mr. BANKS, Mr. BARRASSO, Mr. BENNET, Mrs. BLACKBURN, Mr. BLUMENTHAL, Ms. BLUNT ROCHESTER, Mr. BOOKER, Mr. BOOZMAN, Mrs. BRITT, Mr. BUDD, Ms. CANTWELL, Mrs. CAPITO, Mr. CASSIDY, Ms. COLLINS, Mr. COONS, Mr. CORNYN, Ms. CORTEZ MASTO, Mr. COTTON, Mr. CRAMER, Mr. CRAPO, Mr. CRUZ, Mr. CURTIS, Mr. DAINES, Ms. DUCKWORTH, Mr. DURBIN, Ms. ERNST, Mr. FETTERMAN, Mrs. FISCHER, Mr. GALLEGO, Mrs. GILLIBRAND, Mr. GRAHAM, Mr. GRASSLEY, Mr. HAGERTY, Ms. HASSAN, Mr. HEINRICH, Mr. HICKENLOOPER, Ms. HIRONO, Mr. HOEVEN, Mr. HUSTED, Mrs. HYDE-SMITH, Mr. JOHNSON, Mr. JUSTICE, Mr. KAINE, Mr. KELLY, Mr. KENNEDY, Mr. KIM, Mr. KING, Ms. KLOBUCHAR, Mr. LANKFORD, Mr. LEE, Mr. LUJÁN, Ms. LUMMIS, Mr. MARKEY, Mr. MARSHALL, Mr. MCCONNELL, Mr. MCCORMICK, Mr. MERKLEY, Mrs. MOODY, Mr. MORAN, Mr. MORENO, Mr. MULLIN, Ms. MURKOWSKI, Mr. MURPHY, Mrs. MURRAY, Mr. OSSOFF, Mr. PADILLA, Mr. PAUL, Mr. PETERS, Mr. REED, Mr. RICKETTS, Mr. RISCH, Ms. ROSEN, Mr. ROUNDS, Mr. SANDERS, Mr. SCHATZ, Mr. SCHIFF, Mr. SCOTT of Florida, Mr. SCOTT of South Carolina, Mrs. SHAHEEN, Mr. SHEEHY, Ms. SLOTKIN, Ms. SMITH, Mr. SULLIVAN, Mr. TILLIS, Mr. TUBERVILLE, Mr. VAN HOLLEN, Mr. WARNER, Mr. WARNOCK, Ms. WARREN, Mr. WELCH, Mr. WHITEHOUSE, Mr. WICKER, Mr. WYDEN, and Mr. YOUNG) submitted the following resolution; which was considered and agreed to:

(173 of 196), Page 173 of 196   Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 173 of 196
Case 4.25-cv-04966   Document 1-4   Filed 06/12/25   Page 28 of 51

*May 22, 2025*                     CONGRESSIONAL RECORD — SENATE                                    S3125

## S. RES. 255

Whereas Christopher Samuel "Kit" Bond, born to Arthur and Elizabeth Bond on March 6, 1939, in St. Louis, Missouri;

Whereas Kit Bond, a sixth-generation Missourian, grew up and lived in Mexico, Missouri, where he devoted his life to public service with integrity, energy, and an unshakable commitment to the people of Missouri and the United States;

Whereas Kit Bond served as Missouri's State Auditor from 1971 to 1973;

Whereas Kit Bond served as the 47th and 49th Governor of Missouri, serving from 1973 to 1977 and again from 1981 to 1985, during which time he was the youngest governor in the State's history when first elected;

Whereas Kit Bond served four terms in the United States Senate from 1987 to 2011, representing the people of Missouri with distinction, advancing conservative values, championing infrastructure, advocating for Missouri farmers, strengthening national defense, and working to secure America's leadership;

Whereas, during his time in the Senate, Kit Bond worked with Missouri developers to expand the availability of housing throughout the State and played a key role in growing the Parents as Teachers program statewide;

Whereas, during his time in the Senate, Kit Bond was a strong supporter of literacy programs and efforts to make high-quality care more accessible for women and children;

Whereas Kit Bond was a dedicated public servant for more than 40 years;

Whereas Kit Bond passed away on May 13, 2025, leaving behind a legacy of service, integrity, and love for Missouri and the Nation; and

Whereas Kit Bond is survived by his wife, Linda, his son, Sam, and two grandchildren: Now, therefore, be it

*Resolved,* That the Senate—

(1) has heard with profound sorrow and deep regret the announcement of the death of Christopher "Kit" Bond, former member of the Senate;

(2) directs the Secretary of the Senate to communicate this resolution to the House of Representatives and transmit an enrolled copy of this resolution to the family of Christopher "Kit" Bond; and

(3) stands adjourned, as a further mark of respect to the memory of the late Christopher "Kit" Bond, when the Senate adjourns today.

---

## SENATE RESOLUTION 256—DESIGNATING MAY 2025 AS "AMERICAN STROKE MONTH"

Mr. LUJÁN submitted the following resolution; which was referred to the Committee on the Judiciary:

### S. RES. 256

Whereas quick identification and treatment for stroke results in a higher chance of survival and reduces recovery time for individuals experiencing a stroke;

Whereas treatment depends on the type of stroke someone is having, which must be diagnosed by a health care professional;

Whereas, when dealing with a time-sensitive medical emergency like a stroke, the right care, at the right time, at the right facility, is of the utmost importance;

Whereas a system of care allows for scientifically proven measures to be applied to every patient, every time;

Whereas, every 40 seconds, someone in the United States has a stroke;

Whereas stroke is a leading cause of serious long-term disability and the fifth-leading cause of death in the United States, causing more than 160,000 deaths each year;

Whereas nearly ½ of adults in the United States have high blood pressure, which is a leading cause and controllable risk factor for stroke;

Whereas the "F.A.S.T." warning signs and symptoms of stroke include face drooping, arm weakness, speech difficulty, and time to call 911;

Whereas, during American Stroke Month in May, and year-round, the "Together to End Stroke" initiative of the American Stroke Association strives to teach people everywhere that stroke is largely preventable, treatable, and beatable; and

Whereas more research and education is needed to help prevent and treat stroke: Now, therefore, be it

*Resolved,* That the Senate—

(1) designates May 2025 as "American Stroke Month";

(2) recognizes and reaffirms the commitment of the Federal Government and people of the United States to fighting stroke—

(A) by promoting awareness about the causes, risks, and prevention of stroke;

(B) by supporting research on stroke; and

(C) by improving access to affordable, quality care to reduce long-term disability and mortality;

(3) commends the efforts of States, territories, and possessions of the United States, localities, nonprofit organizations, businesses and other entities, and the people of the United States who support American Stroke Month; and

(4) encourages all individuals in the United States to familiarize themselves with the risk factors associated with stroke, recognize the warning signs and symptoms, and on first sign of a stroke, dial 911 immediately in order to begin to reduce the devastating effects of stroke on the population of the United States.

---

## SENATE RESOLUTION 257—EXPRESSING THE SENSE OF THE SENATE CONCERNING THE ARREST AND CONTINUED DETENTION OF EKREM İMAMOĞLU AND URGING THE GOVERNMENT OF TÜRKIYE TO UPHOLD DEMOCRATIC VALUES

Mr. SCHIFF (for himself and Mr. DURBIN) submitted the following resolution; which was referred to the Committee on Foreign Relations:

### S. RES. 257

Whereas the Republic of Türkiye is a member of the North Atlantic Treaty Organization, an important ally of the United States, and, for many years, had been on a path to join the European Union, a process that involved important democratic and other reforms;

Whereas Ekrem İmamoğlu was elected as Mayor of Istanbul, Türkiye, in 2019, and was reelected in 2024;

Whereas Mr. İmamoğlu was widely seen as a likely opposition party candidate to compete in the 2028 Türkiye presidential election;

Whereas, on March 19, 2025, Turkish police detained Mr. İmamoğlu along with more than 100 other politicians, journalists, and businessmen;

Whereas, on March 23, 2025, Ekrem İmamoğlu was formally arrested and charged with corruption and terrorism charges, including establishing and managing a criminal organization, taking bribes, extortion, and aiding the Kurdistan Workers' Party (PKK), and was subsequently charged with threatening Istanbul Chief Prosecutor Akin Gürlek;

Whereas the Government of Türkiye has not provided any credible evidence to the public to support the charges against Mr. İmamoğlu;

Whereas widespread protests opposing the arrest and detention of Mr. İmamoğlu have erupted throughout Türkiye, constituting the largest anti-government protests in Türkiye since the Gezi Park protests in 2013;

Whereas numerous human rights and pro-democracy organizations and political figures in Türkiye have condemned the charges against Mr. İmamoğlu as baseless and politically motivated;

Whereas, on March 23, 2025, the Republican People's Party, the main opposition party in Türkiye, formally nominated Ekrem İmamoğlu as the party's candidate for president after receiving nearly 15,000,000 votes in the primary election;

Whereas, on April 11, 2025, Ekrem İmamoğlu appeared in court in Istanbul and denied all charges brought against him;

Whereas the Government of Türkiye, under the presidency of Recep Tayyip Erdoğan, has engaged in actions that undermine democracy and the rule of law, as evidenced in the Department of State's 2023 Country Reports on Human Rights Practices, which states the Government of Türkiye—

(1) "restricted equal competition and placed restrictions on the fundamental freedoms of peaceful assembly and expression"; and

(2) "restricted the activities of opposition political parties, leaders, and officials, including through police detention";

Whereas the leadership of the Government of Türkiye has been subject to numerous allegations of corruption since 2013;

Whereas May 19, 2025, marks 2 months since Ekrem İmamoğlu was arbitrarily detained in government custody;

Whereas on March 19, 2025, European Commission President Ursula von der Leyen called the arrest of Mayor İmamoğlu "deeply concerning" and stated, "Türkiye must uphold the democratic values, especially the rights of elected officials";

Whereas on March 26, 2025, Elizabeth Throssell, a spokesperson for the United Nations Office of the High Commissioner on Human Rights, referencing the March 19, 2025 arrests of protesters by the Turkish police, that all those detained "for the legitimate exercise of their rights must be released immediately and unconditionally" and that those facing charges "should be treated with dignity" and "their rights to due process and a fair trial, including access to a lawyer of their own choice, must be fully ensured";

Whereas on April 9, 2025, the Parliamentary Assembly of the Council of Europe called on the Government of Türkiye "to release immediately Ekrem İmamoğlu"; and

Whereas on May 8, 2025, Turkish authorities blocked the social media account of Mayor İmamoğlu, preventing him from communicating with his supporters: Now, therefore, be it

*Resolved,* That the Senate—

(1) calls on President Erdoğan and law enforcement authorities in Türkiye to present any credible evidence against Ekrem İmamoğlu or immediately release him from detention;

(2) urges the Government of Türkiye to uphold democratic values, including free and fair elections; and

(3) urges the Secretary of State to issue forceful and timely statements and to engage diplomatically with the Government of Türkiye over anti-democratic behavior.

## AMENDMENTS SUBMITTED AND PROPOSED

SA 2266. Mr. PAUL submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table.

SA 2267. Mr. PAUL submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2268. Ms. SLOTKIN (for herself and Ms. LUMMIS) submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2269. Mr. CORNYN (for himself, Ms. CORTEZ MASTO, and Mr. SULLIVAN) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2270. Mr. MERKLEY (for himself, Mr. SCHUMER, Ms. WARREN, Mr. PETERS, Mr. REED, Mr. MURPHY, and Mr. BENNET) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2271. Mr. MERKLEY (for himself and Mr. BENNET) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2272. Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2273. Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2274. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2275. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2276. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2277. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

## TEXT OF AMENDMENTS

**SA 2266.** Mr. PAUL submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. AUDIT REFORM AND TRANSPARENCY FOR THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM.**

(a) IN GENERAL.—Notwithstanding section 714 of title 31, United States Code, or any other provision of law, the Comptroller General of the United States shall complete an audit of the Board of Governors of the Federal Reserve System and the Federal reserve banks under subsection (b) of that section not later than 12 months after the date of enactment of this Act.

(b) REPORT.—

(1) IN GENERAL.—Not later than 90 days after the date on which the audit required pursuant to subsection (a) is completed, the Comptroller General of the United States—

(A) shall submit to Congress a report on the audit; and

(B) shall make the report described in subparagraph (A) available to the Speaker of the House, the majority and minority leaders of the House of Representatives, the majority and minority leaders of the Senate, the Chair and Ranking Member of the committee and each subcommittee of jurisdiction in the House of Representatives and the Senate, and any other Member of Congress who requests the report.

(2) CONTENTS.—The report required under paragraph (1) shall include a detailed description of the findings and conclusion of the Comptroller General of the United States with respect to the audit that is the subject of the report, together with such recommendations for legislative or administrative action as the Comptroller General of the United States may determine to be appropriate.

(c) REPEAL OF CERTAIN LIMITATIONS.—Subsection (b) of section 714 of title 31, United States Code, is amended by striking the second sentence.

(d) TECHNICAL AND CONFORMING AMENDMENTS.—

(1) IN GENERAL.—Section 714 of title 31, United States Code, is amended—

(A) in subsection (d)(3), by striking "or (f)" each place the term appears;

(B) in subsection (e), by striking "the third undesignated paragraph of section 13" and inserting "section 13(3)"; and

(C) by striking subsection (f).

(2) FEDERAL RESERVE ACT.—Subsection (s) (relating to "Federal Reserve Transparency and Release of Information") of section 11 of the Federal Reserve Act (12 U.S.C. 248) is amended—

(A) in paragraph (4)(A), by striking "has the same meaning as in section 714(f)(1)(A) of title 31, United States Code" and inserting "means a program or facility, including any special purpose vehicle or other entity established by or on behalf of the Board of Governors of the Federal Reserve System or a Federal reserve bank, authorized by the Board of Governors under section 13(3), that is not subject to audit under section 714(e) of title 31, United States Code";

(B) in paragraph (6), by striking "or in section 714(f)(3)(C) of title 31, United States Code, the information described in paragraph (1) and information concerning the transactions described in section 714(f) of such title," and inserting "the information described in paragraph (1)"; and

(C) in paragraph (7), by striking "and section 13(3)(C), section 714(f)(3)(C) of title 31, United States Code, and" and inserting ", section 13(3)(C), and".

**SA 2267.** Mr. PAUL submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Beginning on page 8, strike line 3 and all that follows through page 12, line 24, and insert the following:

(12) ELIGIBILITY.—Nothing in this Act shall

**SA 2268.** Ms. SLOTKIN (for herself and Ms. LUMMIS) submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

On page 98, between lines 16 and 17, insert the following:

(4) MITIGATION OF CERTAIN RISKS.—A State payment stablecoin regulator or appropriate Federal banking agency may, by rule or order, limit, condition, or prohibit the application of paragraph (2), in whole or in part, where necessary to mitigate systemic risk, protect depositors and consumers, address liquidity or operational risks, or preserve the safety and soundness of insured depository institutions. In prescribing any such rule or order, the regulators shall tailor requirements based on the nature of the custodial arrangement, the type and risk profile of the permitted payment stablecoin issuer, the size and complexity of the insured depository institution, and the scope of commingled activity.

**SA 2269.** Mr. CORNYN (for himself, Ms. CORTEZ MASTO, and Mr. SULLIVAN) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the end, add the following:

**TITLE II—FOREIGN INVESTMENT GUARDRAILS TO HELP THWART CHINA ACT OF 2025**

**SEC. 201. SHORT TITLE.**

This title may be cited as the "Foreign Investment Guardrails to Help Thwart China Act of 2025" or "FIGHT China Act of 2025".

**SEC. 202. SECRETARY DEFINED.**

Except as otherwise provided, in this title, the term "Secretary" means the Secretary of the Treasury.

**SEC. 203. SEVERABILITY.**

If any provision of this title, or the application thereof, is held invalid, the validity of the remainder of this title and the application of such provision to other persons and circumstances shall not be affected thereby.

**SEC. 204. AUTHORIZATION OF APPROPRIATIONS.**

(a) IN GENERAL.—There is authorized to be appropriated $150,000,000 to the Department of the Treasury, out of which amounts may be transferred to the Department of Commerce to jointly conduct outreach to industry and persons affected by this title, for each of the first two fiscal years beginning on or after the date of the enactment of this Act, to carry out this title.

(b) HIRING AUTHORITY.—

(1) BY THE PRESIDENT.—The President may appoint, without regard to the provisions of sections 3309 through 3318 of title 5, United States Code, not more than 15 individuals directly to positions in the competitive service (as defined in section 2102 of that title) to carry out this title.

(2) BY AGENCIES.—The Secretary and the Secretary of Commerce may appoint, without regard to the provisions of sections 3309 through 3318 of title 5, United States Code, individuals directly to positions in the competitive service (as defined in section 2102 of that title) of the Department of the Treasury and the Department of Commerce, respectively, to carry out this title.

**SEC. 205. TERMINATION.**

This title shall cease to have any force or effect on the date on which the Secretary of Commerce revises section 791.4 of title 15, Code of Federal Regulations, to remove the People's Republic of China from the list of foreign adversaries contained in such section.

### Subtitle A—Imposition of Sanctions

**SEC. 211. IMPOSITION OF SANCTIONS.**

(a) IN GENERAL.—The President may impose the sanctions described in subsection (b) with respect to any foreign person determined by the Secretary, in consultation with the Secretary of State, to be a covered foreign person.

(b) SANCTIONS DESCRIBED.—The President may exercise all of the powers granted to the

President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to the extent necessary to block and prohibit all transactions in property and interests in property of a covered foreign person that is determined to be a covered foreign person pursuant to subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(c) PENALTIES.—The penalties provided for in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) shall apply to any person who violates, attempts to violate, conspires to violate, or causes a violation of any prohibition of this section, or an order or regulation prescribed under this section, to the same extent that such penalties apply to a person that commits an unlawful act described in section 206(a) of such Act (50 U.S.C. 1705(a)).

(d) EXCEPTION FOR INTELLIGENCE AND LAW ENFORCEMENT ACTIVITIES.—Sanctions under this section shall not apply with respect to any activity subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.) or any authorized intelligence activities of the United States.

(e) EXCEPTION FOR UNITED STATES GOVERNMENT ACTIVITIES.—Nothing in this section shall prohibit transactions for the conduct of the official business of the Federal Government by employees, grantees, or contractors thereof.

(f) REPORT TO CONGRESS.—Not later than 365 days after the date of the enactment of this Act, and annually thereafter for 7 years, the Secretary shall submit to the appropriate congressional committees a report that—

(1) states whether each foreign person on the Non-SDN Chinese Military-Industrial Complex Companies List is a covered foreign person; and

(2) shall be submitted in unclassified form, but may include a classified annex.

(g) CONSIDERATION OF CERTAIN INFORMATION IN IMPOSING SANCTIONS.—In determining whether a foreign person is a covered foreign person, the President—

(1) may consider credible information obtained by other countries, nongovernmental organizations, or the appropriate congressional committees that relates to the foreign person; and

(2) may consider any other information that the Secretary deems relevant.

(h) ADMINISTRATIVE PROVISIONS.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) to carry out this section.

(i) DELEGATION.—The President shall delegate the authorities granted by this section to the Secretary.

**SEC. 212. DEFINITIONS.**

In this title:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Financial Services and the Committee on Foreign Affairs of the House of Representatives; and

(B) the Committee on Banking, Housing, and Urban Affairs and the Committee on Foreign Relations of the Senate.

(2) COUNTRY OF CONCERN.—The term "country of concern"—

(A) means the People's Republic of China; and

(B) includes the Hong Kong Special Administrative Region and the Macau Special Administrative Region.

(3) COVERED FOREIGN PERSON.—The term "covered foreign person" means a foreign person—

(A)(i) that is incorporated in, has a principal place of business in, or is organized under the laws of a country of concern;

(ii) the equity securities of which are primarily traded in the ordinary course of business on one or more exchanges in a country of concern;

(iii) that is a member of the Central Committee of the Chinese Communist Party;

(iv) that is the state or the government of a country of concern, as well as any political subdivision, agency, or instrumentality thereof;

(v) that is subject to the direction or control of any entity described in clause (i), (ii), (iii), or (iv); or

(vi) that is owned in the aggregate, directly or indirectly, 50 percent or more by an entity or a group of entities described in clause (i), (ii), (iii), or (iv); and

(B) that knowingly engaged in significant operations in the defense and related materiel sector or the surveillance technology sector of the economy of a country of concern.

(4) FOREIGN PERSON.—The term "foreign person" means a person, country, state, or government (and any political subdivision, agency, or instrumentality thereof) that is not a United States person.

(5) NON-SDN CHINESE MILITARY-INDUSTRIAL COMPLEX COMPANIES LIST.—The term "Non-SDN Chinese Military-Industrial Complex Companies List" means the list maintained by the Office of Foreign Assets Control of the Department of the Treasury under Executive Order 13959, as amended by Executive Order 14032 (50 U.S.C. 1701 note; relating to addressing the threat from securities investments that finance certain companies of the People's Republic of China), or any successor order.

(6) UNITED STATES PERSON.—The term "United States person" means—

(A) any United States citizen or an alien lawfully admitted for permanent residence to the United States;

(B) an entity organized under the laws of the United States or of any jurisdiction within the United States (including any foreign branch of such an entity); or

(C) any person in the United States.

## Subtitle B—Prohibition and Notification on Investments Relating to Covered National Security Transactions

**SEC. 221. PROHIBITION AND NOTIFICATION ON INVESTMENTS RELATING TO COVERED NATIONAL SECURITY TRANSACTIONS.**

The Defense Production Act of 1950 (50 U.S.C. 4501 et seq.) is amended by adding at the end the following:

## "TITLE VIII—PROHIBITION AND NOTIFICATION ON INVESTMENTS RELATING TO COVERED NATIONAL SECURITY TRANSACTIONS

**"SEC. 801. PROHIBITION ON INVESTMENTS.**

"(a) IN GENERAL.—The Secretary may prohibit, in accordance with regulations issued under subsection (e), a United States person from knowingly engaging in a covered national security transaction in a prohibited technology.

"(b) EVASION.—Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in subsection (a) is prohibited.

"(c) WAIVER.—Subject to subsection (d), the Secretary is authorized to exempt from the prohibition set forth in subsection (a) any activity determined by the President, in consultation with the Secretary, the Secretary of Commerce and, as appropriate, the heads of other relevant Federal departments and agencies, to be in the national interest of the United States.

"(d) CONGRESSIONAL NOTIFICATION.—The Secretary shall—

"(1) notify the appropriate congressional committees not later than 5 business days after issuing a waiver under subsection (c); and

"(2) include in such notification an identification of the national interest justifying the use of the waiver.

"(e) REGULATIONS.—

"(1) IN GENERAL.—The Secretary, in consultation with the Secretary of Commerce and, as appropriate, the heads of other relevant Federal departments and agencies, may issue regulations to carry out this section in accordance with subchapter II of chapter 5 and chapter 7 of title 5, United States Code (commonly known as 'Administrative Procedure Act').

"(2) NON-BINDING FEEDBACK.—

"(A) IN GENERAL.—The regulations issued under paragraph (1) shall include a process under which a person can request non-binding feedback on a confidential basis as to whether a transaction would constitute a covered national security transaction in a prohibited technology.

"(B) AUTHORITY TO LIMIT FRIVOLOUS FEEDBACK REQUESTS.—In establishing the process required by subparagraph (A), the Secretary may prescribe limitations on requests for feedback identified as frivolous for purposes of this subsection.

"(3) NOTICE AND OPPORTUNITY TO CURE.—

"(A) IN GENERAL.—The regulations issued under paragraph (1) shall account for whether a United States person has self-identified a violation of the prohibition set forth in subsection (a) in determining the legal consequences of that violation.

"(B) SELF-DISCLOSURE LETTERS.—The regulations issued under paragraph (1) shall dictate the form and content of a letter of self-disclosure, which shall include relevant facts about the violation, why the United States person believes its activity to have violated the prohibition set forth in subsection (a), and a proposal for mitigation of the harm of such action.

"(4) PUBLIC NOTICE AND COMMENT.—The regulations issued under paragraph (1) shall be subject to public notice and comment.

"(5) LOW-BURDEN REGULATIONS.—In issuing regulations under paragraph (1), the Secretary shall balance the priority of protecting the national security interest of the United States while, to the extent practicable—

"(A) minimizing the cost and complexity of compliance for affected parties, including the duplication of reporting requirements under current regulations;

"(B) adopting the least burdensome alternative that achieves regulatory objectives; and

"(C) prioritizing transparency and stakeholder involvement in the process of issuing the rules.

"(6) PENALTIES.—

"(A) IN GENERAL.—The regulations issued under paragraph (1) shall provide for the imposition of civil penalties described in subparagraph (B) for violations of the prohibition set forth in subsection (a).

"(B) PENALTIES DESCRIBED.—

"(i) UNLAWFUL ACTS.—It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, notification requirement, or prohibition issued under this section.

"(ii) CIVIL PENALTY.—The Secretary may impose a civil penalty on any person who commits an unlawful act described in clause

(176 of 196), Page 176 of 196 Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 176 of 196
Case 4:25-cv-04966 Document 1-4 Filed 06/12/25 Page 31 of 51

S3128     CONGRESSIONAL RECORD — SENATE     *May 22, 2025*

(i) in an amount not to exceed the greater of—

''(I) $250,000; or

''(II) an amount that is twice the amount of the transaction that is the basis of the violation with respect to which the penalty is imposed.

''(iii) DIVESTMENT.—The Secretary may compel the divestment of a covered national security transaction in a prohibited technology determined to be in violation of this title.

''(iv) RELIEF.—The President may direct the Attorney General of the United States to seek appropriate relief, including divestment relief, in the district courts of the United States, in order to implement and enforce this title.

''(7) BURDEN OF PROOF.—In accordance with section 556(d) of title 5, United States Code, in an enforcement action for a violation of the prohibition set forth in subsection (a), the burden of proof shall be upon the Secretary.

''**SEC. 802. NOTIFICATION ON INVESTMENTS.**

''(a) MANDATORY NOTIFICATION.—Not later than 450 days after the date of the enactment of this title, the Secretary shall issue regulations prescribed in accordance with subsection (b), to require a United States person that engages in a covered national security transaction in a prohibited technology (unless the Secretary has exercised the authority provided by section 801(a) to prohibit knowingly engaging in such covered national security transaction) or a notifiable technology to submit to the Secretary a written notification of the transaction not later than 30 days after the completion date of the transaction.

''(b) REGULATIONS.—

''(1) IN GENERAL.—Not later than 450 days after the date of the enactment of this title, the Secretary, in consultation with the Secretary of Commerce and, as appropriate, the heads of other relevant Federal departments and agencies, shall issue regulations to carry out this section in accordance with subchapter II of chapter 5 and chapter 7 of title 5, United States Code (commonly known as 'Administrative Procedure Act').

''(2) PUBLIC NOTICE AND COMMENT.—The regulations issued under paragraph (1) shall be subject to public notice and comment.

''(3) LOW-BURDEN REGULATIONS.—In issuing regulations under paragraph (1), the Secretary shall balance the priority of protecting the national security interest of the United States while, to the extent practicable—

''(A) minimizing the cost and complexity of compliance for affected parties, including the duplication of reporting requirements under current regulation;

''(B) adopting the least burdensome alternative that achieves regulatory objectives; and

''(C) prioritizing transparency and stakeholder involvement in the process of issuing the rules.

''(4) PENALTIES.—

''(A) IN GENERAL.—The regulations issued under paragraph (1) shall provide for the imposition of civil penalties described in subparagraph (B) for violations of the notification requirement set forth in subsection (a).

''(B) PENALTIES DESCRIBED.—

''(i) UNLAWFUL ACTS.—It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, notification requirement, or prohibition issued under this section.

''(ii) CIVIL PENALTY.—A civil penalty may be imposed on any person who commits an unlawful act described in clause (i) in an amount not to exceed the greater of—

''(I) $250,000; or

''(II) an amount that is twice the amount of the transaction that is the basis of the violation with respect to which the penalty is imposed.

''(5) BURDEN OF PROOF.—In accordance with section 556(d) of title 5, United States Code, in an enforcement action for a violation of the prohibition set forth in subsection (a), the burden of proof shall be upon the Secretary.

''(6) COMPLETENESS OF NOTIFICATION.—

''(A) IN GENERAL.—The Secretary shall, upon receipt of a notification under subsection (a), and in consultation with the Secretary of Commerce, promptly inspect the notification for completeness.

''(B) INCOMPLETE NOTIFICATIONS.—If a notification submitted under subsection (a) is incomplete, the Secretary shall promptly inform the United States person that submits the notification that the notification is not complete and provide an explanation of relevant material respects in which the notification is not complete.

''(7) IDENTIFICATION OF NON-NOTIFIED ACTIVITY.—The Secretary, in coordination with the Secretary of Commerce, shall establish a process to identify covered national security transactions in a prohibited technology or a notifiable technology for which—

''(A) a notification is not submitted to the Secretary under subsection (a); and

''(B) information is reasonably available.

''(c) CONFIDENTIALITY OF INFORMATION.—

''(1) IN GENERAL.—Except as provided in paragraph (2), any information or documentary material filed with the Secretary pursuant to this section shall be exempt from disclosure under section 552(b)(3) of title 5, United States Code, and no such information or documentary material may be made public by any government agency or Member of Congress.

''(2) EXCEPTIONS.—The exemption from disclosure provided by paragraph (1) shall not prevent the disclosure of the following:

''(A) Information relevant to any administrative or judicial action or proceeding.

''(B) Information provided to Congress or any of the appropriate congressional committees.

''(C) Information important to the national security analysis or actions of the Secretary to any domestic governmental entity, or to any foreign governmental entity of an ally or partner of the United States, under the direction and authorization of the Secretary, only to the extent necessary for national security purposes, and subject to appropriate confidentiality and classification requirements.

''(D) Information that the parties have consented to be disclosed to third parties.

''(E) Information where the disclosure of such information is determined by the Secretary to be in the national security interest.

''(d) INAPPLICABILITY.—If the Secretary prohibits a covered national security transaction in a prohibited technology under section 801, the requirements of this section shall not apply with respect to the covered national security transaction.

''**SEC. 803. REPORT.**

''(a) IN GENERAL.—Not later than one year after the date on which the regulations issued under section 801(e) take effect, and not less frequently than annually thereafter for 7 years, the Secretary, in consultation with the Secretary of Commerce, shall submit to the appropriate congressional committees a report that—

''(1) lists all enforcement actions taken subject to the regulations during the year preceding submission of the report, which includes, with respect to each such action, a description of—

''(A) the prohibited technology or notifiable technology;

''(B) the covered national security transaction; and

''(C) the covered foreign person;

''(2) provides an assessment of whether Congress should amend the definition of the term 'prohibited technology' by—

''(A) identifying additional technologies, not currently listed as a prohibited technology, that the Secretary, in consultation with the Secretary of Commerce and, as applicable, the Secretary of Defense, the Secretary of State, the Secretary of Energy, the Director of National Intelligence, and the heads of any other relevant Federal agencies, determines may pose an acute threat to the national security of the United States if developed or acquired by a country of concern;

''(B) explaining why each technology identified in subparagraph (A) may pose an acute threat to the national security of the United States if developed or acquired by a country of concern; and

''(C) recommending the repeal of technologies from the category of prohibited technology to the extent that the technologies no longer pose an acute threat to the national security of the United States if developed or acquired by a country of concern;

''(3) lists all notifications submitted under section 802 during the year preceding submission of the report and includes, with respect to each such notification—

''(A) basic information on each party to the covered national security transaction with respect to which the notification was submitted; and

''(B) the nature of the covered national security transaction that was the subject to the notification, including the elements of the covered national security transaction that necessitated a notification;

''(4) includes a summary of those notifications, disaggregated by prohibited technology, notifiable technology, by covered national security transaction, and by country of concern;

''(5) provides additional context and information regarding trends in the prohibited technology, notifiable technology, the types of covered national security transaction, and the countries involved in those notifications; and

''(6) assesses the overall impact of those notifications, including recommendations for—

''(A) expanding existing Federal programs to support the production or supply of prohibited technologies or notifiable technologies in the United States, including the potential of existing authorities to address any related national security concerns;

''(B) investments needed to enhance prohibited technologies or notifiable technologies and reduce dependence on countries of concern regarding those technologies; and

''(C) the continuation, expansion, or modification of the implementation and administration of this title, including recommendations with respect to whether the definition of the term 'country of concern' under section 807(2) should be amended to add or remove countries.

''(b) CONSIDERATION OF CERTAIN INFORMATION.—In preparing the report pursuant to subsection (a), the Secretary—

''(1) shall consider information provided jointly by the chairperson and ranking member of any of the appropriate congressional committees;

''(2) may consider credible information obtained by other countries and nongovernmental organizations that monitor the military, surveillance, intelligence, or technology capabilities of a country of concern; and

(177 of 196), Page 177 of 196   Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 177 of 196
Case 4:25-cv-04966   Document 1-4   Filed 06/12/25   Page 32 of 51

May 22, 2025            CONGRESSIONAL RECORD — SENATE                    S3129

"(3) may consider any other information that the Secretary deems relevant.

"(c) FORM OF REPORT.—Each report required by this section shall be submitted in unclassified form, but may include a classified annex.

"(d) TESTIMONY REQUIRED.—Not later than one year after the date of the enactment of this title, and annually thereafter for five years, the Secretary and the Secretary of Commerce shall each provide to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives testimony with respect to the national security threats relating to investments by United States persons in countries of concern and broader international capital flows.

"(e) REQUESTS BY APPROPRIATE CONGRESSIONAL COMMITTEES.—

"(1) IN GENERAL.—After receiving a request that meets the requirements of paragraph (2) with respect to whether a technology should be included in the amendments as described in subsection (a)(2), the Secretary shall, in preparing the report pursuant to subsection (a)—

"(A) determine if that technology may pose an acute threat to the national security of the United States if developed or acquired by a country of concern; and

"(B) include in the report pursuant to subsection (a) an explanation with respect to that determination that includes—

"(i) a statement of whether or not the technology, as determined by the Secretary, may pose an acute threat to the national security of the United States if developed or acquired by a country of concern; and

"(ii) if the Secretary determines that—

"(I) the technology may pose an acute threat to the national security of the United States if developed or acquired by a country of concern, an explanation for such determination and a recommendation whether that technology should be named a prohibited technology or a notifiable technology; and

"(II) the technology would not pose an acute threat to the national security of the United States if developed or acquired by a country of concern, an explanation for such determination.

"(2) REQUIREMENTS.—A request under paragraph (1) with respect to whether a technology may pose an acute threat to the national security of the United States if developed or acquired by a country of concern shall be submitted to the Secretary in writing jointly by the chairperson and ranking member of one or more of the appropriate congressional committees.

"SEC. 804. MULTILATERAL ENGAGEMENT AND COORDINATION.

"(a) AUTHORITIES.—The Secretary, in coordination with the Secretary of State, the Secretary of Commerce, and the heads of other relevant Federal agencies, should—

"(1) conduct bilateral and multilateral engagement with the governments of countries that are allies and partners of the United States to promote and increase coordination of protocols and procedures to facilitate the effective implementation of and appropriate compliance with the prohibitions pursuant to this title;

"(2) upon adoption of protocols and procedures described in paragraph (1), work with those governments to establish mechanisms for sharing information, including trends, with respect to such activities; and

"(3) work with and encourage the governments of countries that are allies and partners of the United States to develop similar mechanisms of their own, for the exclusive purpose of preventing the development or acquisition of prohibited technologies by a country of concern.

"(b) STRATEGY FOR MULTILATERAL ENGAGEMENT AND COORDINATION.—Not later than 180 days after the date of the enactment of this title, the Secretary, in consultation with the Secretary of State, the Secretary of Commerce, and the heads of other relevant Federal agencies, should—

"(1) develop a strategy to work with the governments of countries that are allies and partners of the United States to develop mechanisms that are comparable to the prohibitions pursuant to this title, for the exclusive purpose of preventing the development and acquisition of prohibited technologies by a country of concern; and

"(2) assess opportunities to provide technical assistance to those countries with respect to the development of those mechanisms.

"(c) REPORT.—Not later than one year after the date of the enactment of this title, and annually thereafter for four years, the Secretary shall submit to the appropriate congressional committees a report that includes—

"(1) a discussion of any strategy developed pursuant to subsection (b)(1), including key tools and objectives for the development of comparable mechanisms by the governments of allies and partners of the United States;

"(2) a list of partner and allied countries to target for cooperation in developing their own prohibitions;

"(3) the status of the strategy's implementation and outcomes; and

"(4) a description of impediments to the establishment of comparable mechanisms by governments of allies and partners of the United States.

"(d) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term 'appropriate congressional committees' means—

"(1) the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate; and

"(2) the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives.

"SEC. 805. PUBLIC DATABASE OF COVERED FOREIGN PERSONS.

"(a) IN GENERAL.—The Secretary, in consultation with the Secretary of Commerce, may establish a publicly accessible, non-exhaustive database that identifies covered foreign persons in a prohibited technology pursuant to this title.

"(b) CONFIDENTIALITY OF EVIDENCE.—The Secretary shall establish a mechanism for the public, including Congress, stakeholders, investors, and nongovernmental organizations, to submit evidence on a confidential basis regarding whether a foreign person is a covered foreign person in a prohibited technology and should be included in the database described in subsection (a), if any.

"(c) EXEMPTION FROM DISCLOSURE.—

"(1) IN GENERAL.—Except as provided in paragraph (2), any information or documentary material filed with the Secretary pursuant to this section shall be exempt from disclosure under section 552(b)(3) of title 5, United States Code, and no such information or documentary material may be made public (other than the identity of a covered foreign person in accordance with subsection (b)).

"(2) EXCEPTIONS.—Paragraph (1) shall not prohibit the disclosure of the following:

"(A) Information relevant to any administrative or judicial action or proceeding.

"(B) Information to Congress or any duly authorized committee or subcommittee of Congress.

"(C) Information important to the national security analysis or actions of the Secretary to any domestic governmental entity, or to any foreign governmental entity of a United States ally or partner, under the exclusive direction and authorization of the Secretary, only to the extent necessary for national security purposes, and subject to appropriate confidentiality and classification requirements.

"(D) Information that the parties have consented to be disclosed to third parties.

"(d) RULE OF CONSTRUCTION.—The database described in subsection (a), if any, shall not be considered to be an exhaustive or comprehensive list of covered foreign persons for the purposes of this title.

"SEC. 806. RULE OF CONSTRUCTION.

"Nothing in this title may be construed to negate the authority of the President under any authority, process, regulation, investigation, enforcement measure, or review provided by or established under any other provision of Federal law, or any other authority of the President or the Congress under the Constitution of the United States.

"SEC. 807. DEFINITIONS.

"In this title:

"(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—Except as provided by section 804(d), the term 'appropriate congressional committees' means—

"(A) the Committee on Financial Services, the Committee on Foreign Affairs, the Committee on Energy and Commerce, and the Committee on Appropriations of the House of Representatives; and

"(B) the Committee on Banking, Housing, and Urban Affairs and the Committee on Appropriations of the Senate.

"(2) COUNTRY OF CONCERN.—The term 'country of concern'—

"(A) means the People's Republic of China; and

"(B) includes the Hong Kong Special Administrative Region and the Macau Special Administrative Region.

"(3) COVERED FOREIGN PERSON.—Subject to regulations prescribed in accordance with this title, the term 'covered foreign person' means a foreign person that—

"(A) is incorporated in, has a principal place of business in, or is organized under the laws of a country of concern;

"(B) is a member of the Central Committee of the Chinese Communist Party;

"(C) is subject to the direction or control of a country of concern, an entity described in subparagraph (A) or (B), or the state or the government of a country of concern (including any political subdivision, agency, or instrumentality thereof); or

"(D) is owned in the aggregate, directly or indirectly, 50 percent or more by a country of concern, an entity described in subparagraph (A) or (B), or the state or the government of a country of concern (including any political subdivision, agency, or instrumentality thereof).

"(4) COVERED NATIONAL SECURITY TRANSACTION.—

"(A) IN GENERAL.—Subject to such regulations as may be issued in accordance with this title, the term 'covered national security transaction' means any activity engaged in by a United States person that involves—

"(i) the acquisition of an equity interest or contingent equity interest in a covered foreign person;

"(ii) the provision of a loan or similar debt financing arrangement to a covered foreign person, where such debt financing—

"(I) is convertible to an equity interest; or

"(II) affords or will afford the United States person the right to make management decisions with respect to or on behalf of a covered foreign person or the right to appoint members of the board of directors (or equivalent) of the covered foreign person;

"(iii) the entrance by such United States person into a joint venture with a covered foreign person;

"(iv) the conversion of a contingent equity interest (or interest equivalent to a contingent equity interest) or conversion of debt to an equity interest in a covered foreign person;

"(v) the acquisition, leasing, or other development of operations, land, property, or other assets in a country of concern that will result in, or that the United States person intends to result in—

"(I) the establishment of a covered foreign person; or

"(II) the engagement of a person of a country of concern in a prohibited technology where it was not previously engaged in such prohibited technology;

"(vi) knowingly directing transactions by foreign persons that the United States person has knowledge at the time of the transaction would constitute an activity described in clause (i), (ii), (iii), (iv), or (v), if engaged in by a United States person; or

"(vii) the acquisition of a limited partner or equivalent interest in a venture capital fund, private equity fund, fund of funds, or other pooled investment fund that the United States person has knowledge at the time of the acquisition, intends to engage in an activity described in clause (i), (ii), (iii), (iv), (v), or (vi).

"(B) EXCEPTIONS.—Subject to notice and comment requirements prescribed in consultation with Congress and in accordance with this title, the term 'covered national security transaction' does not include—

"(i) any transaction the value of which the Secretary determines is de minimis;

"(ii) any category of transactions that the Secretary determines is in the national interest of the United States;

"(iii) an investment—

"(I) in a security (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a))) that is traded on an exchange or the over-the-counter market in any jurisdiction;

"(II) in a security issued by an investment company (as defined in section 3 of the Investment Company Act of 1940 (15 U.S.C. 80a–3)) that is registered with the Securities and Exchange Commission;

"(III) made as a limited partner or equivalent in a venture capital fund, private equity fund, fund of funds, or other pooled investment fund (other than as described in subclause (II)) where—

"(aa) the limited partner or equivalent's committed capital is not more than $2,000,000, aggregated across any investment and co-investment vehicles of the fund; or

"(bb) the limited partner or equivalent has secured a binding contractual assurance that its capital in the fund will not be used to engage in a transaction that would be a covered national security transaction if engaged in by a United States person; or

"(IV) in a derivative of a security described under subclause (I), (II), or (III);

"(iv) any ancillary transaction undertaken by a financial institution (as defined in section 5312 of title 31, United States Code);

"(v) the acquisition by a United States person of the equity or other interest owned or held by a covered foreign person in an entity or assets located outside of a country of concern in which the United States person is acquiring the totality of the interest in the entity held by the covered foreign person;

"(vi) an intracompany transfer of funds, as defined in regulations prescribed in accordance with this title, from a United States parent company to a subsidiary located in a country of concern or a transaction that, but for this clause, would be a covered national security transaction between a United States person and its controlled foreign person that supports operations that are not covered national security transactions or

that maintains covered national security transactions that the controlled foreign person was engaged in prior to January 2, 2025;

"(vii) a transaction secondary to a covered national security transaction, including—

"(I) contractual arrangements or the procurement of material inputs for any covered national security transaction (such as raw materials);

"(II) bank lending;

"(III) the processing, clearing, or sending of payments by a bank;

"(IV) underwriting services;

"(V) debt rating services;

"(VI) prime brokerage;

"(VII) global custody;

"(VIII) equity research or analysis; or

"(IX) other similar services;

"(viii) any ordinary or administrative business transaction as may be defined in such regulations; or

"(ix) any transaction completed before the date of the enactment of this title.

"(C) ANCILLARY TRANSACTION DEFINED.—In this paragraph, the term 'ancillary transaction' means—

"(i) the processing, settling, clearing, or sending of payments and cash transactions;

"(ii) underwriting services;

"(iii) credit rating services; and

"(iv) other services ordinarily incident to and part of the provision of financial services, such as opening deposit accounts, direct custody services, foreign exchange services, remittances services, and safe deposit services.

"(5) FOREIGN PERSON.—The term 'foreign person' means a person that is not a United States person.

"(6) NOTIFIABLE TECHNOLOGY.—

"(A) IN GENERAL.—The term 'notifiable technology' means a technology with respect to which a covered foreign person—

"(i) designs any advanced integrated circuit that is not covered under paragraph (8)(A)(iii);

"(ii) fabricates any integrated circuit that is not covered under paragraph (8)(A)(iv);

"(iii) packages any integrated circuit that is not covered under paragraph (8)(A)(v); or

"(iv) develops any artificial intelligence system that is not covered under clause (vii), (viii), (ix), or (xvi) of paragraph (8)(A), and that is—

"(I) designed to be used for—

"(aa) any military end use (such as for weapons targeting, target identification, combat simulation, military vehicle or weapons control, military decision-making, weapons design (including chemical, biological, radiological, or nuclear weapons), or combat system logistics and maintenance); or

"(bb) any government intelligence or mass-surveillance end use (such as through incorporation of features such as mining text, audio, or video, image recognition, location tracking, or surreptitious listening devices);

"(II) intended by the covered foreign person or joint venture to be used for—

"(aa) cybersecurity applications;

"(bb) digital forensics tools;

"(cc) penetration testing tools; or

"(dd) control of robotic systems; or

"(III) trained using a quantity of computing power greater than $10^{23}$ computational operations (such as integer or floating-point operations).

"(B) UPDATES.—The Secretary, in consultation with Congress, may prescribe regulations in accordance with this title to refine the technical parameters of technologies described in subparagraph (A) as reasonably needed for national security purposes or to add or remove categories to or from the list in subparagraph (A).

"(7) PARTY.—The term 'party', with respect to a covered national security transaction, has the meaning given that term in regulations prescribed in accordance with this title.

"(8) PROHIBITED TECHNOLOGY.—

"(A) IN GENERAL.—The term 'prohibited technology' means a technology with respect to which a covered foreign person—

"(i) develops or produces any design automation software for the design of integrated circuits or advanced packaging;

"(ii) develops or produces any—

"(I) electronic design automation software for the design of integrated circuits or advanced packaging;

"(II) front-end semiconductor fabrication equipment designed for the volume fabrication of integrated circuits, including equipment used in the production stages from a blank wafer or substrate to a completed wafer or substrate; or

"(III) equipment for performing volume advanced packaging;

"(iii) designs any integrated circuit designs that meet or exceed the specifications set in Export Control Classification Number (ECCN) 3A090 in Supplement No. 1 to the Export Administration Regulations, or integrated circuits designed for operation at or below 4.5 Kelvin;

"(iv) fabricates integrated circuits that are—

"(I) logic integrated circuits using a nonplanar transistor architecture or with a technology node of 16/14 nanometers or less, including fully depleted silicon-on-insulator (FDSOI) integrated circuits;

"(II) NOT–AND (NAND) memory integrated circuits with 128 layers or more;

"(III) dynamic random-access memory (DRAM) integrated circuits using a technology node of 18 nanometer half-pitch or less;

"(IV) integrated circuits manufactured from a gallium-based compound semiconductor;

"(V) integrated circuits using graphene transistors or carbon nanotubes; or

"(VI) integrated circuits designed for operation at or below 4.5 Kelvin;

"(v) packages any integrated circuit using advanced packaging techniques;

"(vi) develops, designs, or produces any commodity, material, software, or technology designed exclusively for use in or with extreme ultraviolet lithography fabrication equipment;

"(vii) develops, designs, or produces any artificial intelligence models trained with at least $10^{25}$ floating point operations;

"(viii) develops, designs, or produces any artificial intelligence models that rely upon or utilize advanced integrated circuits that meet or exceed the specifications set in Export Control Classification Number (ECCN) 3A090 in Supplement No. 1 to the Export Administration Regulations;

"(ix) develops, designs, or produces any artificial intelligence models designed for use by the Government of the People's Republic of China, its special administrative regions, or its agencies and instrumentalities;

"(x) develops a quantum computer or produces any critical components required to produce a quantum computer such as a dilution refrigerator or two-stage pulse tube cryocooler;

"(xi) develops or produces any quantum sensing platform designed for, or which the relevant covered foreign person intends to be used for, any military, government intelligence, or mass-surveillance end use;

"(xii) develops or produces quantum networks or quantum communication systems designed for or intended to be used for—

"(I) networking to scale up the capabilities of quantum computers, such as for the purposes of breaking or compromising encryption;

"(II) secure communications, such as quantum key distribution; or

"(III) any other application that has any military, government intelligence, or mass-surveillance end use;

"(xiii) develops, designs, or produces materials, components, avionics, flight control, propulsion, Global Positioning System (GPS), data relay, and target detection systems designed for use in hypersonic systems or capable of sustainable operations above 1,000 degrees Celsius;

"(xiv) develops, installs, sells, or produces any supercomputer enabled by advanced integrated circuits that can provide theoretical compute capacity of 100 or more double-precision (64-bit) petaflops or 200 or more single-precision (32-bit) petaflops of processing power within a 41,600 cubic foot or smaller envelope;

"(xv) develops, designs, or produces any other technologies in the advanced semiconductors and microelectronics sector, the artificial intelligence sector, the high-performance computing and supercomputing sector, the hypersonic missiles sector, or the quantum information science and technology sector that are—

"(I) defense articles or defense services included on the United States Munitions List set forth in the International Traffic in Arms Regulations under subchapter M of chapter I of title 22, Code of Federal Regulations;

"(II) specially designed and prepared nuclear equipment, parts or components, materials, software, or technologies covered by part 810 of title 10, Code of Federal Regulations (relating to assistance to foreign atomic energy activities);

"(III) nuclear facilities, equipment, or materials covered by part 110 of title 10, Code of Federal Regulations (relating to export and import of nuclear equipment and material); or

"(IV) emerging or foundational technologies controlled pursuant to section 1758 of the Export Control Reform Act of 2018 (50 U.S.C. 4817); or

"(xvi) develops any artificial intelligence system that is designed to be exclusively used for, or which the relevant covered foreign person intends to be used for, any—

"(I) military end use (such as for weapons targeting, target identification, combat simulation, military vehicle or weapon control, military decision-making, weapons design (including chemical, biological, radiological, or nuclear weapons), or combat system logistics and maintenance); or

"(II) government intelligence or mass-surveillance end (such as through incorporation of features such as mining text, audio, or video, image recognition, location tracking, or surreptitious listening devices).

"(B) UPDATES.—The Secretary, in consultation with Congress, may prescribe regulations in accordance with this title to make updates to the technical parameters of technologies described in subparagraph (A) as reasonably needed for national security purposes.

"(9) SECRETARY.—Except as otherwise provided, the term 'Secretary' means the Secretary of the Treasury.

"(10) UNITED STATES PERSON.—The term 'United States person' means—

"(A) any United States citizen or an alien lawfully admitted for permanent residence to the United States;

"(B) an entity organized under the laws of the United States or of any jurisdiction within the United States (including any foreign branch of such an entity); or

"(C) any person in the United States.".

## Subtitle C—Securities and Related Matters

### SEC. 231. REQUIREMENTS RELATING TO THE NON-SDN CHINESE MILITARY-INDUSTRIAL COMPLEX COMPANIES LIST.

(a) REPORT.—

(1) IN GENERAL.—Not later than 365 days after the date of the enactment of this Act, and biennially thereafter for 6 years, the Secretary shall submit to the appropriate congressional committees a report that states whether any of the following foreign persons qualifies for inclusion on the Non-SDN Chinese Military-Industrial Complex Companies List:

(A) Any PRC person listed on the Military End-User List (Supplement No. 7 to part 744 of the Export Administration Regulations).

(B) Any PRC person listed pursuant to section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (10 U.S.C. 113 note).

(C) Any PRC person listed on the Department of Commerce's Entity List (Supplement No. 4 to part 744 of the Export Administration Regulations).

(2) PROCESS REQUIRED.—To prepare the reports under paragraph (1), the President shall establish a process under which the Federal agencies responsible for administering the lists described in subparagraphs (A), (B), and (C) of paragraph (1) shall share with each other all relevant information that led to the identification of the entities described in such lists.

(3) RISK-BASED PRIORITIZATION FRAMEWORK.—In making the initial determinations under paragraph (1), the Secretary may establish a risk-based prioritization framework factoring in prioritization of entity review submitted to the Secretary by the Federal agencies administering the lists described in subparagraphs (A), (B), and (C) of paragraph (1).

(4) ANNUAL REPORTS TO THE APPROPRIATE CONGRESSIONAL COMMITTEES.—The report under paragraph (1) may summarize findings concerning entities previously reviewed pursuant to this section and do not necessitate additional review by the Secretary.

(5) MATTERS TO BE INCLUDED.—The Secretary shall include in the report required by paragraph (1) an overview of the criteria required for listing on Non-SDN Chinese Military-Industrial Complex Companies List. The heads of the Federal agencies administering the lists described in subparagraphs (A), (B), and (C) of paragraph (1) shall provide an overview of the criteria for entity identification or listing on each respective list.

(b) REQUIREMENT FOR DIVESTMENT.—

(1) IN GENERAL.—The President shall promulgate rules that prohibit a United States person from knowingly holding securities of entities on the Non-SDN Chinese Military-Industrial Complex Companies List, after the date that is 365 days after the date of the enactment of this Act.

(2) AUTHORIZATION.—The prohibitions on investment imposed under paragraph (1) shall not apply to a transaction in a security that is entered into on or before the date that is 365 days after the date of the enactment of this Act by a United States person, if such transaction is entered into solely to divest of the security.

(c) WAIVER.—

(1) IN GENERAL.—The President may establish a process under which the requirements of subsection (b) shall not apply if the President determines to do so is necessary to protect the national security or foreign policy objectives of the United States.

(2) CASE-BY-CASE REQUIREMENT.—Determinations under paragraph (1) shall be issued on a case-by-case basis for each entity on the Non-SDN Chinese Military-Industrial Complex Companies List.

(3) NOTICE AND BRIEFING.—The President shall notify the appropriate congressional committees in writing in advance of issuing a determination under paragraph (1) and shall provide a substantive briefing on the determination to the appropriate congressional committees within 30 days of issuing a determination.

(d) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Financial Services and the Committee on Foreign Affairs of the House of Representatives; and

(B) the Committee on Banking, Housing, and Urban Affairs of the Senate.

(2) COUNTRY OF CONCERN.—The term "country of concern"—

(A) means the People's Republic of China; and

(B) includes the Hong Kong Special Administrative Region and the Macau Special Administrative Region.

(3) NON-SDN CHINESE MILITARY-INDUSTRIAL COMPLEX COMPANIES LIST.—The term "Non-SDN Chinese Military-Industrial Complex Companies List" means the list maintained by the Office of Foreign Assets Control of the Department of the Treasury under Executive Order 13959, as amended by Executive Order 14032 (50 U.S.C. 1701 note; relating to addressing the threat from securities investments that finance certain companies of the People's Republic of China), and any successor order.

(4) PRC PERSON.—The term "PRC person" means a foreign person that—

(A) is incorporated in a principal place of business in, or is organized under the laws of, a country of concern;

(B) is a member of the Central Committee of the Chinese Communist Party;

(C) is the state or the government of a country of concern, as well as any political subdivision, agency, or instrumentality thereof; or

(D) is owned in the aggregate, directly or indirectly, 50 percent or more by an entity or a group of entities described in subparagraph (A), (B), or (C).

---

**SA 2270.** Mr. MERKLEY (for himself, Mr. SCHUMER, Ms. WARREN, Mr. PETERS, Mr. REED, Mr. MURPHY, and Mr. BENNET) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Strike section 4(i) and insert the following:

(i) RULES OF CONSTRUCTION.—Nothing in this Act shall be construed as expanding the authority of the Board with respect to the services the Board can make directly available to the public.

(j) PREVENTING PAYMENT STABLECOIN CORRUPTION.—

(1) DEFINITIONS.—In this subsection—

(A) the term "covered individual" means—

(i) the President;

(ii) the Vice President;

(iii) a Member of Congress;

(iv) an individual appointed to a Senate-confirmed position; or

(v) a special Government employee (as defined in section 202 of title 18, United States Code) associated with the Executive Office of the President;

(B) the term "directly" means by virtue of the ownership or beneficial interest of a covered individual, or the spouse or child of a covered individual, in a payment stablecoin issuer;

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

(C) the term ''indirectly'' means by virtue of the financial interest of a covered individual, or the spouse or child of a covered individual, in a business entity, partnership interest, company, investment fund, trust, or other third party in which the covered individual, or the spouse or child of a covered individual, has an ownership or beneficial interest;

(D) the term ''Member of Congress'' has the meaning given that term in section 13101 of title 5, United States Code; and

(E) the term ''promote'' includes the use of the name and likeness of a covered individual in any marketing materials, including in the title of the payment stablecoin.

(2) PROHIBITION.—It shall be unlawful for any covered individual, or any spouse or child of any covered individual, to directly or indirectly own, control, promote in exchange for anything of value, or affiliate with any payment stablecoin issuer or any entity that provides custodial or safekeeping services for payment stablecoins.

(3) TRANSITION.—Any individual in violation of paragraph (2) on the date of enactment of this Act shall, not later than 90 days after the date of enactment of this Act, come into compliance with the prohibition under that paragraph.

(4) ENFORCEMENT.—

(A) IN GENERAL.—Beginning on the date that is 90 days after the date of enactment of this Act, a violation of paragraph (2) shall be punishable by not more than 5 years in prison and fines of not more than 3 times the monetary value of any earnings related to the violation.

(B) NOT AN OFFICIAL ACT.—A violation of paragraph (2) shall not be deemed an official act if committed by any covered individual who is in office at the time of the violation.

(C) STATUTE OF LIMITATIONS.—No person shall be prosecuted, tried, or punished for any offense under this subsection unless the indictment for such offense is found, or the information for such offense is instituted, not later than 15 years after the date on which the offense was committed.

(k) FINANCIAL DISCLOSURE REPORTS.—Section 13104(b) of title 5, United States Code, is amended—

(1) by redesignating paragraph (2) as paragraph (3); and

(2) by inserting after paragraph (1) the following:

''(2) DISCLOSURE RELATING TO PAYMENT STABLECOIN INVOLVEMENT.—

''(A) DEFINITIONS.—In this paragraph:

''(i) DIRECTLY.—The term 'directly' means by virtue of the ownership or beneficial interest of a reporting individual, or the spouse or child of a reporting individual, in a payment stablecoin issuer.

''(ii) INDIRECTLY.—The term 'indirectly' means by virtue of the financial interest of a reporting individual, or the spouse or child of a reporting individual, in a business entity, partnership interest, company, investment fund, trust, or other third party in which the reporting individual, or the spouse or child of a reporting individual, has an ownership or beneficial interest.

''(iii) PAYMENT STABLECOIN.—The term 'payment stablecoin' has the meaning given the term in section 2 of the GENIUS Act.

''(iv) PROMOTE.—The term 'promote' includes the use of the name and likeness of a reporting individual in any marketing materials, including in the title of the payment stablecoin.

''(B) REQUIREMENT.—Each report filed pursuant to subsections (b) and (c) of section 13103 shall include a statement of whether the reporting individual, or the spouse or child of the reporting individual, as of the filing date, directly or indirectly owns, controls, promotes in exchange for anything of value, or affiliates with any payment stablecoin issuer or any entity that provides custodial or safekeeping services for payment stablecoins.''.

SA 2271. Mr. MERKLEY (for himself and Mr. BENNET) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Strike section 4(i) and insert the following:

(i) RULES OF CONSTRUCTION.—Nothing in this Act shall be construed as expanding the authority of the Board with respect to the services the Board can make directly available to the public.

(j) PREVENTING CRYPTOCURRENCY CORRUPTION.—

(1) DEFINITIONS.—In this subsection—

(A) the term ''covered cryptocurrency'' means any cryptocurrency, meme coin, token, non-fungible token, payment stablecoin, or other digital asset that is sold for remuneration;

(B) the term ''covered individual'' means—

(i) the President;

(ii) the Vice President;

(iii) a Member of Congress;

(iv) an individual appointed to a Senate-confirmed position; or

(v) a special Government employee (as defined in section 202 of title 18, United States Code) associated with the Executive Office of the President;

(C) the term ''directly'' means by virtue of the ownership or beneficial interest of a covered individual, or the spouse or child of a covered individual, in an issuer of a covered cryptocurrency;

(D) the term ''indirectly'' means by virtue of the financial interest of a covered individual, or the spouse or child of a covered individual, in a business entity, partnership interest, company, investment fund, trust, or other third party in which the covered individual, or the spouse or child of a covered individual, has an ownership or beneficial interest;

(E) the term ''Member of Congress'' has the meaning given that term in section 13101 of title 5, United States Code; and

(F) the term ''promote'' includes the use of the name and likeness of a covered individual in any marketing materials, including in the title of the covered cryptocurrency.

(2) PROHIBITION.—It shall be unlawful for any covered individual, or any spouse or child of any covered individual, to directly or indirectly own, control, promote in exchange for anything of value, or affiliate with any issuer of a covered cryptocurrency or any entity that provides custodial or safekeeping services for covered cryptocurrencies.

(3) TRANSITION.—Any individual in violation of paragraph (2) on the date of enactment of this Act shall, not later than 90 days after the date of enactment of this Act, come into compliance with the prohibition under that paragraph.

(4) ENFORCEMENT.—

(A) IN GENERAL.—Beginning on the date that is 90 days after the date of enactment of this Act, a violation of paragraph (2) shall be punishable by not more than 5 years in prison and fines of not more than 3 times the monetary value of any earnings related to the violation.

(B) NOT AN OFFICIAL ACT.—A violation of paragraph (2) shall not be deemed an official act if committed by any covered individual who is in office at the time of the violation.

(C) STATUTE OF LIMITATIONS.—No person shall be prosecuted, tried, or punished for any offense under this subsection unless the indictment for such offense is found, or the information for such offense is instituted, not later than 15 years after the date on which the offense was committed.

(k) FINANCIAL DISCLOSURE REPORTS.—Section 13104(b) of title 5, United States Code, is amended—

(1) by redesignating paragraph (2) as paragraph (3); and

(2) by inserting after paragraph (1) the following:

''(2) DISCLOSURE RELATING TO COVERED CRYPTOCURRENCY INVOLVEMENT.—

''(A) DEFINITIONS.—In this paragraph:

''(i) COVERED CRYPTOCURRENCY.—The term 'covered cryptocurrency' means any cryptocurrency, meme coin, token, non-fungible token, payment stablecoin, or other digital asset that is sold for remuneration.

''(ii) DIRECTLY.—The term 'directly' means by virtue of the ownership or beneficial interest of a reporting individual, or the spouse or child of a reporting individual, in a covered cryptocurrency issuer.

''(iii) INDIRECTLY.—The term 'indirectly' means by virtue of the financial interest of a reporting individual, or the spouse or child of a reporting individual, in a business entity, partnership interest, company, investment fund, trust, or other third party in which the reporting individual, or the spouse or child of a reporting individual, has an ownership or beneficial interest.

''(iv) PAYMENT STABLECOIN.—The term 'payment stablecoin' has the meaning given the term in section 2 of the GENIUS Act.

''(v) PROMOTE.—The term 'promote' includes the use of the name and likeness of a reporting individual in any marketing materials, including in the title of the covered cryptocurrency.

''(B) REQUIREMENT.—Each report filed pursuant to subsections (b) and (c) of section 13103 shall include a statement of whether the reporting individual, or the spouse or child of the reporting individual, as of the filing date, directly or indirectly owns, controls, promotes in exchange for anything of value, or affiliates with any covered cryptocurrency issuer or any entity that provides custodial or safekeeping services for covered cryptocurrencies.''.

SA 2272. Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

SEC. ___. PROHIBITIONS ON THE ISSUE OF CENTRAL BANK DIGITAL CURRENCY.

(a) PROHIBITION ON FEDERAL RESERVE BANKS RELATING TO CERTAIN PRODUCTS OR SERVICES FOR INDIVIDUALS AND PROHIBITION ON DIRECTLY ISSUING A CENTRAL BANK DIGITAL CURRENCY.—Section 16 of the Federal Reserve Act (12 U.S.C. 411 et seq.) is amended by adding at the end the following:

''A Federal reserve bank may not—

''(1) offer products or services directly to an individual;

''(2) maintain an account on behalf of an individual; or

''(3) issue a central bank digital currency, as defined in section 10(11)(D), or any digital asset that is substantially similar under any other name or label.''.

(b) PROHIBITION ON FEDERAL RESERVE BANKS INDIRECTLY ISSUING A CENTRAL BANK DIGITAL CURRENCY.—Section 16 of the Federal Reserve Act (12 U.S.C. 411 et seq.), as amended by section 2, is further amended by adding at the end the following:

''A Federal reserve bank may not offer a central bank digital currency, as defined in

(181 of 196), Page 181 of 196  Case: 25-106, 09/08/2025, DktEntry: 44.2, Page 181 of 196
Case 4:25-cv-04966   Document 1-4   Filed 06/12/25   Page 36 of 51

May 22, 2025                     CONGRESSIONAL RECORD — SENATE                                    S3133

section 10(11)(D), or any digital asset that is substantially similar under any other name or label, indirectly to an individual through a financial institution or other intermediary.''.

''(c) PROHIBITION WITH RESPECT TO CENTRAL BANK DIGITAL CURRENCY.—Section 10 of the Federal Reserve Act (12 U.S.C. 241 et seq.) is amended by inserting before paragraph (12) the following:

''(11) PROHIBITION WITH RESPECT TO CENTRAL BANK DIGITAL CURRENCY.—

''(A) IN GENERAL.—The Board of Governors of the Federal Reserve System may not test, study, develop, create, or implement a central bank digital currency, or any digital asset that is substantially similar under any other name or label.

''(B) MONETARY POLICY.—The Board of Governors of the Federal Reserve System and the Federal Open Market Committee may not use a central bank digital currency to implement monetary policy, or any digital asset that is substantially similar under any other name or label.

''(C) EXCEPTION.—Subparagraph (A) and the eighteenth and nineteenth undesignated paragraphs of section 16 may not be construed to prohibit any dollar-denominated currency that is open, permissionless, and private, and fully preserves the privacy protections of United States coins and physical currency.

''(D) CENTRAL BANK DIGITAL CURRENCY DEFINED.—In this paragraph, the term 'central bank digital currency' means a form of digital money or monetary value that is—

''(i) denominated in the national unit of account;

''(ii) a direct liability of the Federal Reserve System; and

''(iii) widely available to the general public.''.

(d) SENSE OF CONGRESS.—It is the sense of Congress that the Board of Governors of the Federal Reserve does not have the authority to issue a central bank digital currency, or any digital asset that is substantially similar under any other name or label, and will not have such authority unless Congress grants such authority pursuant to section 8 of article I of the Constitution of the United States.

———

SA 2273. Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

SEC. ___. PROHIBITION ON RESTRICTING TRANSACTIONS USING SELF-CUSTODIAL SOFTWARE INTERFACES.

(a) DEFINITION.—In this section, the term "covered official" means—

(1) an appropriate Federal banking agency;

(2) the Board;

(3) the Comptroller;

(4) the Corporation; or

(5) a primary Federal payment stablecoin regulator.

(b) PROHIBITION.—No covered official may prohibit, restrict, or otherwise impair the ability of a person to conduct a transaction that—

(1) is for that person's own and otherwise lawful purposes; and

(2) uses self-custodial software interfaces.

———

SA 2274. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes;

which was ordered to lie on the table; as follows:

At the end of section 3(c)(2), add the following:

(C) LIMITATIONS.—With respect to a limited safe harbor provided under this paragraph—

(i) the safe harbor shall expire not later than 180 days after the date on which the Secretary of the Treasury provides the safe harbor; and

(ii) after the expiration of the safe harbor under clause (i), the Secretary of the Treasury may not renew, extend, or re-provide the safe harbor.

———

SA 2275. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 3(b)(2), strike "digital asset service provider" and insert "person".

———

SA 2276. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 18(c)(2), strike subparagraph (B) and insert the following:

(B) be subject to the jurisdiction of the United States with respect to the enforcement of this Act and any other applicable laws of the United States relating to anti-money laundering, countering the financing of terrorism, economic sanctions, financial fraud, and related financial crimes, including laws administered by the Department of the Treasury, the Office of Foreign Assets Control, the Financial Crimes Enforcement Network, and the Department of Justice.

———

SA 2277. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 3(f), insert "or (b)" after "subsection (a)" each place it appears.

◆

AUTHORITY FOR COMMITTEES TO MEET

Mr. LANKFORD. Mr. President, I have three requests for committees to meet during today's session of the Senate. They have the approval of the Majority and Minority Leaders.

Pursuant to Rule XXVI, paragraph 5(a), of the Standing Rules of the Senate, the following committees are authorized to meet during today's session of the Senate:

COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

The Committee on Banking, Housing, and Urban Affairs is authorized to meet during the session of the Senate on Thursday, May 22, 2025, at 10 a.m., to conduct a hearing.

COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS

The Committee on Health, Education, Labor, and Pensions is author-

ized to meet during the session of the Senate on Thursday, May 22, 2025, at 11:45 a.m., to consider nominations.

COMMITTEE ON THE JUDICIARY

The Committee on the Judiciary is authorized to meet during the session of the Senate on Thursday, May 22, 2025, at 10:15 a.m., to conduct an executive business meeting.

The PRESIDING OFFICER. The Senator from Rhode Island.

———

CONGRESSIONAL REVIEW ACT

Mr. WHITEHOUSE. Mr. President, the series of votes that we have concluded in the last 24 hours, with the last vote that just concluded, brings to its completion a sad and a sordid moment in the history of the Senate. I want to just wrap up to leave a record of what took place.

Before we got into this parliamentary rigmarole, there were two things that were pretty clear: one, a Congressional Review Act, a statute in American law, that allows Congress to override a very narrow set of Executive actions for a very narrow time period. The narrow set of Executive actions is EPA rulemakings. And the timeframe is set by the Congressional Review Act, but it is, at most, months. That is the law, or was the law until our procedural shenanigans intervened, and it had been the law for quite a long time. The Congressional Review Act goes back 30 years. So there was a long, long, long tradition of obeying this law.

It is not hard to figure out what a rule is because rulemakings have a very distinct procedural set of steps that they go through, and the Congressional Review Act was carefully crafted to deal just with those rules, including a provision that if the executive branch tried to hide a rule by not submitting it, that our Government Accountability Office was authorized to blow a whistle and say: No, that is actually a rule, in which case, it would have to come over here for a review under the Congressional Review Act.

So the question of what a rule was has long been considered during the course of the Congressional Review Act and over those 30 years, and it has always, always, always been a rule.

Before the Congressional Review Act came along—in fact, 20 years earlier—the Clean Air Act was passed by Congress. The Clean Air Act was a healthy respect for federalism and the role of sovereign States, and the role of California—what is now the fourth biggest economy on the planet—allowed California a waiver in order to be able to make its own clean air auto emissions rules.

So beginning with the passage of the Clean Air Act, California took advantage of this, and these waivers were filed with the EPA and processed by the EPA. Sometimes, they created the waiver. Sometimes, they amended a waiver. Sometimes, they renewed a waiver. Sometimes, they modified a waiver.

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

The first action was taken on July 11, 1968, by the EPA—so 50-plus years ago. The most recent one, until our current procedural rigmarole, was December 17, 2024—a week before Christmas, last year. Between July 11 of 1968 and December 17 of 2024, California's clean air standard was reviewed under this waiver process 131 times—and every single time, it was determined to be a waiver and not a rule. It was never—across that half century-plus—ever treated as a rule. It clearly was a waiver. It is described as a waiver in the statute. That is actually the law.

So that is where we stood: California had a legal right to run its own clean air program for 50 years, EPA was obliged to treat it as a waiver, and the Congressional Review Act did not apply because the Congressional Review Act only applied to rules, and this was not one.

The problem was that the fossil fuel industry, more or less, runs this place right now, and it wants to sell more gasoline. So California's Clean Air rules to make cars either be more efficient and get more miles per gallon or become hybrid and be able to run back and forth between gas and electric or be fully electric interfered with the impulse of Big Oil to sell more gasoline and, of course, do more pollution.

What was Big Oil to do in that circumstance? Well, there were a couple of things that they could have done. They could have, for instance, negotiated with California. Indeed, they could have asked the President to negotiate with California and, perhaps, with States like Rhode Island that joined the California Clean Air standard so we would be in the room and have more voices heard too. There could have been a robust, healthy, political, and democratic negotiation. But, no, Big Oil chose not to do that because it knew it had a fast lane through this body.

They had another alternative, which is to amend the Clean Air Act or the Congressional Review Act to solve this problem. You could amend the Clean Air Act to call the waiver a rule or make it proceed by rule, or you could amend the Congressional Review Act so that it wasn't limited to rules anymore but a waiver could fit in. You could do either one of those things by what my Republican colleagues usually like to cheer about, which is regular order—the regular order of the Senate, the regular order of Congress.

Of course, the problem for Big Oil in that was that they would have to get the law passed in the House, and they would have to get the law passed in the Senate. And in the Senate, that was subjected to having to negotiate with the Democrats in order to get past cloture and get 60 votes and then get the bill signed by the President. That is the proper way to proceed when you want to amend a law. But Big Oil didn't care to do that because it knew it had a fast lane through this body.

The third way they could have done this, which was actually commenced in

the first Trump administration, was to have the EPA undertake an administrative review of the three key predicates that have to be checked off in order to grant the waiver to California and proceed under ordinary administrative Agency process; indeed, one that had already been commenced in the previous administration. They could easily have done that. But, of course, whatever Big Oil convinced Big Oil's representatives at EPA—LEE ZELDIN—to do would have then had to survive scrutiny in court because you can't do administrative procedures in this country if there is no rational basis for the decision at the end of the day. You can't do administrative decisions in this country if they are—to use the magic words of administrative law—"arbitrary and capricious." So they chose not to follow the administrative process either because they knew they had a fast lane through this body.

Unfortunately, the fast lane that Big Oil knew it had through this body ran right over the Parliamentarian because the Parliamentarian is obliged to police what is appropriate under the Congressional Review Act. She is our referee here over whether we are doing things legally and by the rules or not. And she determined—which, in my view, was an extremely easy determination based on 131 to 0 in previous waivers, never in 30 years under the Congressional Review Act something that wasn't a rule and the statutory waiver for 50 years for California in the Clean Air Act—hard to do much of a stronger case than that. So we got a decision, a proper decision, from the Parliamentarian saying, no, the special expedited procedures of the Congressional Review Act don't work in the Senate because it would be illegal because this is not a rule; this is a waiver. And it, obviously, was not a rule. It, obviously, was a waiver. So she wasn't wrong.

But the Parliamentarian is vulnerable to the political power of this body. This body can overrule the Parliamentarian. The majority can do it with a simple 51 votes.

Imagine a football game in which one team has more players than the other. One team commits a foul. The ref blows a whistle on the foul that the majority team committed, and the majority team gets—by vote—to overrule the referee.

That is a crummy way to go about doing business in an orderly, deliberative body like the U.S. Senate, and that is why it happens so rarely. Overruling the Parliamentarian on a matter is considered going nuclear—going nuclear—and this is the first time in the history of the Senate in which the majority has gone nuclear, overruling the Parliamentarian on a matter affecting legislation—both the Congressional Review Act and the Clean Air Act.

So the complex procedural rigmarole you saw last night and today was all

designed to do a parliamentary end run around the Parliamentarian, overruling the determination that this was not a rule, changing the Congressional Review Act and the Clean Air Act, but without the proper procedures under the Constitution that we are obliged to follow when we are passing or amending laws.

There is a particular other problem here, which is that if they had gone the negotiation route with California, all of us who like clean air and want strong vehicle emissions regulations would have had a voice. Something would have had to have been agreed to. There would have had to have been some compromise. But Big Oil didn't want that because they knew what they had here in the Senate: a fast lane to whatever they want, whenever they wanted.

They could have gone through the court process, but the court process is bounded by laws, by fair procedures, by the opportunity for affected parties to be heard, and by the standards of having a rational basis and not being arbitrary and capricious. In this forum, the majority can have no rational basis and be 100 percent arbitrary and capricious and ram its view through. So the court thing wasn't quite as appealing because what has happened here would, by any standard, have had no rational basis and been arbitrary and capricious.

They could have gone the legislative route and passed the bill properly—amended the bill properly and used the constitutional procedures—but again, we would have had a voice in that.

So this ram job was the solution. Rolling over and overriding the Parliamentarian was the method, and serving the fossil fuel interests behind the Republican Party was the goal. But the outcome is going to be bad outside the Chamber, and it is going to be bad inside the Chamber. Outside the Chamber, the bad outcome is going to be a lot dirtier air; a far worse competitive position for our auto industry against China, which is already running ahead of us in the future technology of electric vehicles; and worse health outcomes, particularly in busy areas where there is lots of traffic—not to mention having the majority of the country's economy overruled by a minority of the country's economy, where the majority of the country's economy chose cleaner air.

So those are all the bad things that happened outside this body, and, as Senator SCHIFF said earlier, that will be measured in things like cancer diagnoses. This gets personal pretty quickly when it is clean air and health matters.

Inside the body, we have just opened an entirely new avenue for mischief. It could be mischief by any 30 of us. Frankly, it could be mischief by a minority of the majority who want to drive something through that most of the majority don't want. They can do it now using the Congressional Review

May 22, 2025                              CONGRESSIONAL RECORD — SENATE                                          S3135

Act, which requires 30 signatures to get in. You can go back to any Executive action taken since the passage of the Congressional Review Act, and you can drop that into the Federal Register and submit it here and say it is a rule. Even if you are lying, even if it is not a rule, we have just opened the gate so that every Executive action ever taken can now be considered a rule, whether it is or not, for purposes of the Congressional Review Act. And a powerful special interest that controls a powerful party can ram whatever it wants through this body without constitutional procedure, without judicial safeguards, and without compromise.

So they broke wide open the window of what can be brought through the Congressional Review Act in time. It used to be just a matter of usually just a couple of months—depends on the change in elections—60 days or thereabouts. Now, 30 years of stuff is available to be dropped into the hopper in this process and shoved through this body.

The other is that it is not rules anymore; it is anything. So we have gone from a very narrow, carefully guardrailed provision to provide a short-term opportunity for Congress to overrule an offending regulation immediately after that regulation is passed to a wide-open sewer for political influence and interference into any Executive decision ever rendered that can be pulled out of the past, dropped into the Federal Register, submitted over here under the pretense that it was a rule, and with 30 votes and a majority behind it, off you go to the races.

So this is a bad, bad day for the Senate. It signals a willingness of this majority, after so much talk about defending the filibuster—oh, defending the filibuster. When we were in the majority, you never heard them stop talking about how important the filibuster was, but now that they are in the majority, it is only a little over 100 days—and this started some time ago. They immediately started the plot to bring this chore for the fossil fuel funders through the Senate floor and break the filibuster in order to accomplish their goal.

So give me a break.

I yield the floor. I see my friend Senator CASSIDY from Louisiana waiting to speak.

The PRESIDING OFFICER. The Senator from Louisiana.

RISK RATING 2.0

Mr. CASSIDY. Mr. President, I know you have a family legacy in Florida. You will appreciate that along the gulf coast and certainly in Louisiana, people in Louisiana are preparing for hurricanes.

I just had a meeting with the Calcasieu Parish Police Jury, and they sent me some photos of some Lake Charles homes. I am saying this in the context of a discussion about flood insurance and what has happened that just seems irrational.

To reduce their risk of flooding and therefore their monthly flood insurance premiums, people have paid to elevate their homes. It makes sense. If you get floodwaters, it works. And it costs anywhere from $25,000 to $40,000. If your foundation needs repair, there is another $25,000 on top of that. If you have to fully replace your foundation, that can be another $100,000. But if it lowers your flood insurance premiums, it can be a worthwhile investment. You lift your homes, and you may not flood.

Here is this home, a similar home. You can see, whereas the neighbors are flooding in this one, an elevation like this prevents a flood, in this picture. That home is not flooding. Their insurance premium should go down.

But after spending tens of thousands of dollars to mitigate one's risk of flooding, they are still seeing high insurance premiums. They are getting the worst of both worlds. They had to pay to elevate their home, successfully preventing flooding; despite that, they are having to pay much higher insurance premiums.

Let's put up the chart of prices. Two properties. This is before they elevated their home, after they elevated their home. At first, it worked. They go from $12,000 a year to $758, from $4,500 to $751. This is an investment which would lower the cost of flood insurance, saving the National Flood Insurance Program money; therefore, it is worthwhile to raise your home.

Now, however, under a new system called Risk Rating 2.0, it doesn't matter. Here, they pay tens of thousands of dollars to elevate their home, and under this new system, their premium is back up to $9,800 or to $7,300—in this case, higher than it was before they elevated their home. The percentage increase is about 1,200 percent. The percentage increase here is almost 900 percent. It does not make sense.

By the way, why would you pay to elevate your home if you get the double whammy of paying to elevate and then your premiums, in some cases, are higher than when they started?

These are just two examples of people who did everything right, did what they were supposed to—they are not going to flood—and yet, after Risk Rating 2.0, this is what happened. I don't know if people still say "ripped off," but they feel ripped off. They feel as if they did what was right and they have been punished and penalized because the premiums almost or in some cases more than doubled relative to what happens.

Now, these are nice homes, but they are not castles. These are middle-income families. The neighbor is driving a pickup truck. It looks a little bit—the Presiding Officer is a car dealer. That doesn't look like it is a 2025. It is a good truck. It is a good family. These are not wealthy families. They are good, middle-income families, spending tens of thousands of dollars to elevate their home, and, yet, still, their premium continues to rise.

So with Risk Rating 2.0 driving up costs for lower and middle-income families, about a fifth of those enrolled in the National Flood Insurance Program will be forced to drop their coverage over the next 10 years, OK? You raise premiums, and you raise them to a degree that 20 percent of the people—typically the lowest risk—drop their coverage. Then the Flood Insurance Program has to spread its risk over a smaller base, which means it elevates the premiums even more, and so those who need it least are the next 20 percent to drop off. This initiates what is called an actuarial death spiral.

Risk Rating 2.0 is like termites eating away at the foundation of a house, and if we do nothing, the home is going to collapse.

I introduced legislation in February to give low- and middle-income households enrolled in the National Flood Insurance Program a 33-percent reduction in their premium in the form of a refundable tax credit that would go straight to their premium payment at the time it is due.

Hurricane season won't wait on those who need flood insurance. Americans in my State and across the country need relief now. If we really want to put Americans first, we can start by making the National Flood Insurance Program affordable now and keeping it affordable 10 to 15 years from now. It is a pocketbook issue, but when you flood, like folks in Louisiana and other States have, it becomes a personal issue.

Since the start of 2025, at least 21 Americans across 8 States have died as a result of flooding and storms hitting their communities. Millions have been left without power or evacuated from their homes. And when you hear "flood insurance"—hey, I don't live in a coastal State. I don't live in Florida or Louisiana. Why does it bother me? My home will not get destroyed.

I wish that were true. This isn't a one-State problem; it is a one-nation problem. All 50 States have National Flood Insurance Program policyholders. The darker the color, the more likely the flooding. Missouri is in a dark color. New York State—minimal coastline—is in a dark color. Pennsylvania is in a dark color.

This is called river ring flooding, where you have a river and it comes down like this, and people building in the valley get flooded because the river overflows its banks, and it fills up that V-shaped valley. So that is why you would see flooding.

And so that is why you see flooding here in the darker—not as dark, but still dark.

You have the Dakotas also having problems with flooding. So it is a 50-State problem. And in these States, there are many who don't have flood insurance, and the time will come when they wish that they did.

The National Flood Insurance Program can provide certainty for individuals and for their families. Maybe you

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

won't see flooding as extreme as losing a home. I sure hope you don't. But I am not just talking about the worst case scenario.

Let's imagine going back to this picture. The family didn't get their home completely flooded. The family got 4 inches of water in their living room. Their carpets are destroyed. If their floor is anything but concrete, it is destroyed. If you have furniture in there that is cloth, it is destroyed. If you get mold, then you are going to have to rip out the sheetrock and replace wherever you had sheetrock. Two to 3 inches destroys the carpet. In fact, the most expensive 3 inches in a flood are the first 3 inches. And that is what makes flooding so difficult for a middle-income family to recover from.

And for many, the National Flood Insurance Program is the only option they have. Now, by the way, the program designed to help them is failing them, and when millions of Americans are being impacted, Washington should act.

Let me be clear: the National Flood Insurance Program is a Federal program, meaning that Congress and the President can change and improve it. We just need to have the will.

So I urge my colleagues to join me in working with the Trump administration to end Risk Rating 2.0.

In 2019, my office worked with the Trump administration to successfully delay Risk Rating 2.0 because of the lack of transparency as to how FEMA was calculating the rates. President Trump understood then and now understands that Americans are tired of being ripped off.

When rivers swell, when coastlines have rising water, Americans should not have to fear the cost of rebuilding without affordable insurance. So let's make the National Flood Insurance Program affordable, accountable, and sustainable.

Severe weather is relentless. We must be too.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant bill clerk proceeded to call the roll.

Ms. BLUNT ROCHESTER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Delaware.

---

## MEDICAID

Ms. BLUNT ROCHESTER. Mr. President, according to Secretary Kennedy, the Trump administration is committed to building the most compassionate Department of Health and Human Services in the history of the United States.

So I went to the dictionary and looked up the term "compassionate." It means: "a sympathetic consciousness of others' distress, together with a desire to alleviate it."

Yet when the proposed Republican budget would make historic billion-dollar cuts to the programs real Americans rely on. Instead of alleviating distress, this "Big Bad Bill" would actually exacerbate it.

And late, late last night, House Republicans added even more distress to their Medicaid cuts, changes that would cut care and prevent access to care for millions of Americans; changes that would cut funding that ensures safe, healthy births for newborns; changes that will endanger our parents and grandparents who live in nursing homes.

So I rise today and seek true compassion from my colleagues and ask in the words of the famous song: "Where is the love?"

I rise today because I have been getting call after call, email after email, meeting with person after person, all worried sick about cuts to Medicaid. And I want to share some of their stories today. I want my colleagues to hear their names and understand the trade-offs they are making to support tax cuts for the wealthy, while failing to shrink the national debt.

Again, I am going to say that again: while failing to shrink the national debt.

Here are their stories.

Emmanual lives in Sussex County. When I met with him recently, he told me that if we pull the thread of Medicaid, his whole life would unravel. Emmanual calls himself a CP warrior, and he doesn't let cerebral palsy or his wheelchair stop him.

For Emmanual, Medicaid is more than prescriptions and doctors' appointments. It is about freedom and independence. Participating in Medicaid allowed him to get and keep a job. Access to Medicaid is how he went from being homeless to being employed, housed, and financially secure. It is what enables his wife to be his primary caretaker, while also allowing them to live together as husband and wife.

He struggles to plan for his future and that of his family because his life depends on decisions that we make here in this body.

Joy. Joy lives in Wilmington with her 34-year-old son, who she says is severely autistic. He received amazing services from the Delaware Autism Program when he was in school and now attends their day program at Point of Hope. And you guessed it; Point of Hope is funded through Medicaid.

Joy is literally terrified of what could happen if these cuts close that program. She doesn't know where her son will end up if they lose the support that Medicaid provides and she can no longer take care of him.

And Nancy. Nancy lives in Dover with her 19-year-old son Christopher, who was born prematurely. Christopher coded in the NICU and suffered a brain injury. As a result, he is on a Medicaid waiver since he was 8 months old.

For the last 19 years, Nancy has advocated for her family, as well as countless Delawareans. She built her life around caring for Christopher in their home versus an expensive long-term care facility.

Medicaid covers the medical equipment Nancy rents to keep Christopher alive. Medicaid covers the skilled medical professionals that help Nancy care for her son and give her respite. Nancy told me that Christopher's life depends on this budget.

In her words, this debate about funding cuts feels like the rug is being pulled from under her.

Emmanual, Joy, Nancy, and Christopher—these are just a few of the stories that I have been told since our Republican colleagues started their crusade against care. These are real people with real needs that Medicaid fills—real people whom we shine the light on and not ignore.

And I want my colleagues to hear their names. I want them to remember the names of the people in their own States who are imploring us to stand up and protect their access to care: the Emmanuals, the Joys, Nancys, the Christophers.

So whether you are a person of faith or just somebody who cares about your neighbor, now is the time to move from the Golden Rule of treating others as you would like to be treated to the "Platinum Rule"—to treat others the way they want to be treated, with real compassion, and to start with protecting Medicaid.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oregon.

---

## CONGRESSIONAL REVIEW ACT

Mr. MERKLEY. Mr. President, colleagues, using the Congressional Review Act to overturn waivers puts polluters in charge of government policy.

In 1970, Congress passed the Clean Air Act. The law explicitly states that individual States like California can enact stricter emission standards to protect the environment if they receive from the Environmental Protection Agency a waiver. And States like Oregon can adopt those standards if they so choose.

Since then, California has applied for, well, about 100 waivers. They have made vehicle emissions 99 percent cleaner than they were in 1970.

I remember going down to Southern California in the early eighties and seeing how incredibly polluted the air was near L.A., and I thought, How can anyone live here?

It hurt your eyes; it hurt your lungs. People don't have that impression today, despite the amount of vehicle miles going way up, because of the incredible efforts California made to clean up their air from auto emissions.

You know, in the last 50 years, California has never had a waiver revoked. That tells me they put together very competent proposals and that the Nation supported their effort to clean up their air.

CONGRESSIONAL RECORD — SENATE

But something different is happening right now. Senate Republicans are using the Congressional Review Act in ways that Congress never intended. Of course, the Congressional Review Act says if a rule is implemented and you are within 60 legislative days, it can be brought to the floor and it can be overturned by the House and the Senate and that if it is vetoed, well, then the House and Senate can overturn the veto, if they have enough votes—but all about rules; no mention of waivers.

Both the Government Accountability Office and the Senate Parliamentarian said the Congressional Review Act cannot be used to overturn waivers because, quite simply, they are not rules.

You know, here is the thing, words have meanings, and you can only trust the law if those words are honored. And to magically say a waiver is a rule is a real travesty of lawmaking, but that is where we are at now.

So what is this really all about—this Republican decision to invent new meanings to existing words when every bit of common sense and every bit of legal knowledge knows that that is a lie. Why did my colleagues engage in this massive deception? It is an end-run around the policymaking process.

They could have easily said: We want to expand the Congressional Review Act to cover waivers. And then you simply craft a bill. Republicans being in charge of the Senate and the House, they bring it to the floor; we debate it; it either passes or it doesn't pass.

It has the advantage of going through committee and being considered and having people weigh in on whether it is a good idea or not. But to simply reinvent and pretend, if you will, that the color black is the color white or an orange is an apple—because everyone understands a waiver is not a rule.

So it is unfortunate that the colleagues in charge of the legislative process have so corrupted it yesterday and today, not even trying to actually enact the law to accomplish what they want but instead saying: Let's use an expedited process that doesn't go through committee, where there is very limited debate, where there are no amendments allowed, in order to do a favor for a powerful special interest.

What does that tell us about government in the United States? My colleagues are choosing to be the agents for the powerful by inventing new meanings to words that don't exist, meanings that are not supported by the Parliamentarian; they are not supported by the Government Accountability Office, GAO, because they are so dedicated to pulling the strings of government on behalf of the fossil fuel industry. That is corruption plain and simple, on full display before the American public. That is what has happened.

Think about what this means for the future of this Nation. You can't count on a waiver staying in place so how do you make decisions based on getting that waiver?

Well, you get a license from the government. But the license, maybe that looks a lot like a rule. It is an act of government. It is a decision. How is that different from a waiver? You can't count on that license not being taken away by this body.

What about a grant? A grant is a government decision. Kind of like a waiver, except it has money coming in. So now a grant can be brought here to the floor and wiped out.

What about a permit? A permit is very close to being a waiver, saying: Hey, you can undertake this process. We are giving you permission. Well, that is what a waiver does. It says: Yes, you can undertake that process.

So now no one has a foundation for pursuing projects because they know that if the majority wants to play favors for a powerful special interest, they can wipe you out with no foundation of law.

That is what happened here, and that is a travesty. It is a travesty that none of my colleagues, I would hope—if they reflected on it outside the pressure of having their arms twisted—would engage in.

And I know they would be highly critical if the parties were reversed.

In addition, once that waiver is struck down, it is suggested under the rules of the CRA that a similar waiver might not be able to be granted in the future.

So now you have two laws in conflict with each other. One law says you can grant the waiver, and the other law says if something was struck down through the CRA, nothing similar can be done.

How are we to resolve this? My colleagues have no answer. They have taken us down a path where words have no meaning and where sheer power by one of the richest enterprises in America—the fossil fuel industry—is all that matters. They are the puppet masters of my Republican colleagues. They have pulled the strings, and now we are in deep trouble to have an honest foundation for legislative action.

This one waiver was something that the fossil fuel industry really hated because when cars became more efficient, they used less oil, and therefore the oil companies made less money. When these waivers were enacted, people were incentivized to buy cars that didn't even have gasoline, and the oil companies were like: Oh, my goodness, we are not going to make as much money. Help us. Help us, dear Republicans. Help us out here. Invent something. Change the meaning of some words. Find some way to go past the normal legislative process to somehow deliver what we want.

And my colleagues obliged.

The damage is done. It is going to be extremely difficult to fix it. It has eviscerated half a century of California's clean air protections.

It was the wrong thing to do to blow up the good work of a State seeking to solve its air pollution problem. It was

absolutely the wrong thing to do to blow up the integrity of this body by deciding that a waiver is a rule and undermining the ability of any group to act with confidence based on decisions made by the Government of the United States because whether you have a waiver or you have a permit or you have a license, now you don't know whether some powerful interest is going to have this body rip it away from you.

Let's work together to reestablish integrity in this Chamber, integrity in our legislative process that was so badly damaged yesterday and last night.

The PRESIDING OFFICER (Mr. HUSTED). The Senator from Oklahoma.

_____

## HISTORIC GREENWOOD DISTRICT-BLACK WALL STREET NATIONAL MONUMENT ESTABLISHMENT ACT

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Committee on Energy and Natural Resources be discharged from further consideration of S. 1051 and the Senate proceed to its immediate consideration.

The PRESIDING OFFICER. The clerk will report the bill by title.

The assistant bill clerk read as follows:

A bill (S. 1051) to establish the Historic Greenwood District-Black Wall Street National Monument in the State of Oklahoma, and for other purposes.

There being no objection, the committee was discharged, and the Senate proceeded to consider the bill, which had been reported by the Committee on Energy and Natural Resources.

Mr. LANKFORD. I ask unanimous consent that the bill be considered read a third time and passed and the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The bill (S. 1051) was ordered to be engrossed for a third reading, was read the third time, and passed as follows:

S. 1051

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

**SECTION 1. SHORT TITLE.**

This Act may be cited as the ''Historic Greenwood District—Black Wall Street National Monument Establishment Act''.

**SEC. 2. DEFINITIONS.**

In this Act:

(1) COMMISSION.—The term ''Commission'' means the Historic Greenwood District—Black Wall Street National Monument Advisory Commission established by section 5(a).

(2) MAP.—The term ''Map'' means the map entitled ''Greenwood Historic District—Black Wall Street National Monument, Proposed Boundary'', numbered 196/188,275, and dated August 2024.

(3) NATIONAL MONUMENT.—The term ''National Monument'' means the Historic Greenwood District—Black Wall Street National Monument established by section 3(a).

(4) SECRETARY.—The term ''Secretary'' means the Secretary of the Interior.

## SEC. 3. ESTABLISHMENT OF HISTORIC GREENWOOD DISTRICT—BLACK WALL STREET NATIONAL MONUMENT.

(a) ESTABLISHMENT.—

(1) IN GENERAL.—Subject to paragraph (2), there is established the Historic Greenwood District—Black Wall Street National Monument in the State of Oklahoma as a unit of the National Park System to preserve, protect, and interpret for the benefit of present and future generations resources associated with the Historic Greenwood District, Black Wall Street, and the Tulsa Race Massacre of 1921 and the role of each in the history of the State of Oklahoma and the United States.

(2) CONDITIONS OF ESTABLISHMENT.—

(A) DETERMINATION BY THE SECRETARY.—The National Monument shall be established on the date the Secretary determines that a sufficient quantity of land or interests in land has been acquired to constitute a manageable park unit.

(B) NOTICE.—Not later than 30 days after the date on which the Secretary makes a determination under subparagraph (A), the Secretary shall publish in the Federal Register notice of the establishment of the National Monument.

(b) BOUNDARY.—The boundary of the National Monument shall be as generally depicted on the Map.

(c) MAP.—The Map shall be on file and available for public inspection in the appropriate offices of the National Park Service.

(d) ACQUISITION AUTHORITY.—The Secretary may acquire any land or interest in land located within the boundary of the National Monument by—

(1) donation;

(2) purchase from a willing seller with donated or appropriated funds; or

(3) exchange.

(e) AGREEMENTS.—

(1) IN GENERAL.—The Secretary may enter into cooperative agreements, as appropriate, with public or private entities to provide and facilitate, within or outside the boundary of the National Monument, interpretive and educational services, administrative support, and technical assistance relating to the National Monument.

(2) MARKING AND INTERPRETATION OF SIGNIFICANT HISTORIC OR CULTURAL RESOURCES.—The Secretary may enter into agreements to mark or interpret significant historic or cultural resources or locations on land within the boundary of the National Monument.

(f) PRIVATE PROPERTY.—Nothing in this Act affects the rights of an owner of private property within or adjacent to the National Monument.

## SEC. 4. ADMINISTRATION.

(a) ADMINISTRATION BY SECRETARY.—The Secretary shall administer the National Monument in accordance with—

(1) this Act; and

(2) the laws generally applicable to units of the National Park System.

(b) MANAGEMENT PLAN.—

(1) IN GENERAL.—Not later than 3 years after the date on which funds are first made available to carry out this Act, the Secretary shall prepare a management plan for the National Monument in accordance with section 100502 of title 54, United States Code.

(2) CONSULTATION.—The Secretary shall consult with the Commission on the preparation of the management plan under paragraph (1).

## SEC. 5. ESTABLISHMENT OF HISTORIC GREENWOOD DISTRICT—BLACK WALL STREET NATIONAL MONUMENT ADVISORY COMMISSION.

(a) ESTABLISHMENT.—There is established an advisory commission, to be known as the "Historic Greenwood District—Black Wall Street National Monument Advisory Commission".

(b) DUTY.—The Commission shall advise the Secretary on matters relating to the development and management of the National Monument, including the construction of visitor service facilities and infrastructure.

(c) MEMBERSHIP.—

(1) COMPOSITION.—The Commission shall be composed of 11 members, to be appointed by the Secretary, of whom—

(A) 7 members shall be descendants of individuals who lived or worked in the Greenwood District of Tulsa in 1921, to be appointed after consideration of recommendations from interested organizations or individuals;

(B) 3 members shall have experience in the field of historic preservation or the purposes for which the National Monument was established; and

(C) 1 member shall be appointed after consideration of recommendations submitted by the Mayor of Tulsa.

(2) TERMS.—A member of the Commission shall be appointed for a term of 5 years.

(3) VACANCIES.—Any vacancy on the Commission shall be filled in the same manner in which the original appointment was made.

(4) SUCCESSORS.—Notwithstanding the expiration of a 5-year term of a member of the Commission, a member of the Commission may continue to serve on the Commission until the date on which—

(A) the member is reappointed by the Secretary; or

(B) a successor is appointed by the Secretary.

(d) CHAIR; BYLAWS.—The Commission shall—

(1) have a Chair, who shall be elected by the members of the Commission; and

(2) adopt such bylaws as the Commission considers necessary to carry out the functions of the Commission under this Act.

(e) MEETINGS.—The Commission shall meet at the call of—

(1) the Chair; or

(2) a majority of the members of the Commission.

(f) QUORUM.—A majority of the members of the Commission shall constitute a quorum.

(g) COMPENSATION.—

(1) IN GENERAL.—Members of the Commission shall serve without compensation.

(2) TRAVEL EXPENSES.—Members of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for an employee of an agency under subchapter I of chapter 57 of title 5, United States Code, while away from the home or regular place of business of the member in the performance of the duties of the Commission.

(h) FACA NONAPPLICABILITY.—Section 1013(b) of title 5, United States Code, shall not apply to the Commission.

(i) TERMINATION.—The Commission shall terminate 10 years after the date on which the National Monument is established.

## NATIONWIDE INJUNCTIONS

Mr. LANKFORD. Mr. President, I rise today to talk about two separate issues that seem to be confusing in our current climate at this point.

The first of those is something called nationwide injunctions. Now, for folks that don't track this issue of nationwide injunctions, they have no idea what this means. I would tell you it is a fairly recent thing.

We have three branches of government. Any civics student in middle school knows that. We have the legislative branch, we have the executive branch, and we have the judicial branch. All three have unique roles. The legislative branch that we are in right now—we write the law. The executive branch executes the law. The judicial branch interprets the law.

Now, we know there is a difference between the House and the Senate. The Senate has a responsibility and the House has a responsibility, and they are different, but they are both in the legislative branch.

The judicial branch also has different pieces as well, just like the legislative branch. There is the Supreme Court. We know that. It is right across the street. There are nine Justices that sit there, and they are the final decision makers on what the law says. But there are also daughter courts. There are circuit courts below the Supreme Court, and below the Supreme Court, there are district courts. District courts are scattered all over the country, and those individual, small district courts that are scattered all around the country—those individual courts make a decision on the person that is in front of them.

Now, again, this is fairly simple civics. When you have a Federal case in front of you, you go to the district court, and you file, and you get time in front of a judge. It may take time to be able to get there, but they make a decision on what is in front of them. That is what district courts do. They don't make decisions on something that is in a different State. The fine judges that are in Oklahoma make decisions about the case that is in front of them in Oklahoma. They don't decide a case in Indiana because they are not in Indiana and it is not a case filed in front of them; it is only the case filed in front of them in Oklahoma.

Now, if there is a dispute about that, it can be appealed, and it goes up to a circuit court, and it takes in a region. If there is a dispute even there, they take it on to the Supreme Court.

It is pretty simple—until the last several decades. You see, prior to 1960, there was no such thing as a nationwide injunction. No one even considered that. But we started seeing this beginning point where a district judge in a court in a single State would hear a case and say: This is so big, I am not going to let this go to the circuit court or to the Supreme Court. In my lower—in fact, lowest—court in the Federal structure, I am going to decide for the entire country, not just the person in front of me.

There were just a few that happened at that time, and the Supreme Court kind of looked away because they seemed like big cases. But then it started to rise.

During the George W. Bush administration, there were six nationwide injunctions that were done in these local district courts. Under President Obama, there were 12 nationwide injunctions that were issued. Then under President Trump, the first term, there were 64 nationwide injunctions.

More and more individual district courts decided: I have an opinion, and I am not going to decide about the case in front of me; I am going to decide about the entire country.

Under President Biden, there were 14 nationwide injunctions that happened. In fact, President Biden's Solicitor General—the one who actually argues to the Supreme Court—warned that nationwide injunctions halt legal government actions and policies.

See, this is not a Republican-Democrat thing; this is a constitutional thing. This is the U.S. Constitutional structure to say: What is the role of lower courts? What is the role of a circuit court? What is the role of the Supreme Court?

We as people in our Nation honor the constitutional construct. For me, it is exceptionally important that the courts are blind to these issues and that they take action on the case in front of them and not a case that is not in front of them.

Senator GRASSLEY has introduced a bill to rein in the use of nationwide injunctions. His legislation is called the Judicial Relief Clarification Act. It makes it very simple. It is an important piece of legislation to decide how we are going to handle cases like this. It is very simple: Courts decide the cases in front of them. That had been the practice up until the early 1960s. We need to get it to be back to that practice again.

It is not a Republican issue and not a Democrat issue. It is a constitutional issue.

Nationwide injunctions are a backdoor way for judges to actually write legislation and to bring the decision of the executive branch to a halt.

The executive branch does have checks and balances, as does the legislative branch, as does the judicial branch. Those checks and balances are clear. If the executive branch does something inconsistent with the Constitution, it goes to our Federal courts and quickly works its way up through the district court, circuit court, to the Supreme Court. The Supreme Court is the one who checks the executive branch, not each district court around the country. It is the Supreme Court. We need to be able get back to that process in the days ahead. That needs to be done.

So I am looking forward to seeing Senator GRASSLEY's legislation actually move.

CONGRESSIONAL REVIEW ACT

Mr. LANKFORD. Mr. President, a second issue. This body for the last week has had a conversation about CRAs, and most Americans would just flip the dial and go "I don't even know what that is."

Well, a Congressional Review Act is a CRA. It has actually only existed in the last several decades as Congress found a reason to do oversight of the executive branch, especially when the

executive branch writes what is called a midnight regulation. Now, that doesn't mean they wrote it at midnight; that means they wrote it and put it in place at the very end of a Presidency.

A Congressional Review Act says that if there is a piece of regulation that is put in place, a rule that is done by an Agency and it is put in place—especially when there is a change in Congress and the White House—that the next Congress and the next White House can look at it and say: Yeah, that is out of bounds. That is too big. That needs to be stopped.

It was actually first used under President Bill Clinton. He put in what is called an ergonomics rule that literally changed the rules for every keyboard on every desk in America that would be produced. It was a giant rule they did at the very end. The next Congress came in and said: That would cost hundreds of millions of dollars. By the way, why should we in the Federal Government care what everyone's desk is like? Let people choose on that.

That simple statement, that simple first time that it was actually used, started a process now of saying: If an administration at the last minute puts in a rule that Congress then comes in and says "You overreached your bounds," we can check it.

Now, how do you determine whether it is a rule or not? What is a rule? What is not a rule? Because a lot of times, Agencies put out guidance or they put out orders. They put out all kinds of things. The Congressional Review Act is very specific. It says that you can only take action on this when it is actually a rule.

Well, there are two different ways that is determined, actually. One is, how much is it going to cost the entire economy? If it is over $100 million that it is going to cost the economy, it is a rule. It is going to have a massive effect across the entire economy.

The second way is pretty straightforward. The Government Accountability Office—you will hear it often referred to as GAO—in 2018, they came out and wrote their legal decision and said: It can even be a big thing that costs $100 million across the government. I am going to quote GAO in this, in their decision that the CRA—the Congressional Review Act—gives Agencies the primary responsibility for determining which Agency actions meet the CRA's definition of "rule." In other words, Agencies get the first option to say: Is this a rule or is this not a rule? If an Agency says it is a rule, it is a rule. That is what GAO said.

They came back a couple years later and rewrote an updated document. GAO came out again and said in their legal opinion: When an Agency submits a document to our office—that is, GAO—under the CRA, we consider that to be the Agency's determination that the document is a rule under the Congressional Review Act.

Now, again, everyone is glazing over on this because it just seems like

legalese. Why are we even talking about this? Well, because it has been in the news this week because something unique happened.

In 2022, the State of California put in a request to the Biden administration and said: We want to do a rule that is different in our State for electric vehicles than the rest of the country.

Now, you may say: Well, they can't do that.

Well, actually, interestingly enough, California can. California is the only State in America—because they had environmental rules even before the Clean Air Act was done. So California got a waiver, basically, to say: If your rules are at least as strong as the Clean Air Act, you can have your own rules, but you have to ask permission.

So that is part of law that was originally written on the Clean Air Act.

So California approached the Biden administration in 2022 and said: We would like to have an even stronger rule on emissions and on vehicles. We want to have a rule that says that by 2026, 35 percent of all vehicles have to be zero emission—that is, electric vehicles—by 2026.

Now, they asked for this in 2022. So they said: Within 4 years, we want 35 percent of all the vehicles sold in California to be zero emission, and by 2035, we want 100 percent of all vehicles to be electric vehicles, to be zero-emission vehicles.

Now, they asked for that in 2022, as I mentioned before. The Biden administration took a look at it, and in 2023, the Biden administration sat down with the GAO, the Government Accountability Office, and they started working on the text for this. The specific question was: How can we make sure that this is not a rule; that this is an order? And for months, they worked to be able to shape the language to be able to make sure it was an order, not a rule. And then the Biden administration sat on it and did nothing with it. In the meantime, 11 other States said: If California does that for electric vehicles, we are going to do that as well.

Here is the other thing about the law I didn't mention. The way the Clean Air Act gave permission to California to be able to do their own rules, the Clean Air Act is also written to say: If other States want to adopt the California rule because it is at least as strong as the national, other States could do it. So in the next few months, from 2022 and 2023, 11 other States adopt this rule. Suddenly, this is not a single-State issue; this is a national issue. In fact, it would now affect 40 percent of all the vehicles sold in America. This just shifted. This is not about one State anymore. This is almost half the vehicles sold in America now are going to have a new set of rules.

The Biden administration sat on that request. They didn't move on it. They have gotten their opinion worked out with GAO in 2023, but they didn't move on it, quite frankly, because the American people hate mandates. We don't

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

like them at all. We like choice. We like to make our own decisions. I would dare say, everybody in this room uses a different kind of ink pen because we all like our choices and options. We drive different cars. We wear different colors of ties and different shoes because we like our options.

The Biden administration knew most American people would hate this rule because it suddenly created a nationwide mandate for what kind of car you could buy, and it had to be electric. So they sat on it.

After the election was over, in late December of 2024 and into January of 2025, the Biden administration dropped their order and gave California permission now to be able to do zero-emission vehicles by 2026. Next year, 35 percent of vehicles that have to be sold across 12 different States were going to have to be zero emissions, which would dramatically change car sales in America.

They did it after the election. That is the very definition of a midnight regulation. That is the very definition of a rule. It meets both criteria. It is well over $100 million of impact onto our Nation, and it affects multiple States.

So when the Trump administration came into office, the Environmental Protection Agency immediately reupped this, and they laid it down and said: That is definitely a rule. That is a rule. The Agency declared it. Now, it definitely has both definitions: The Agency declared it is a rule, and it is over $100 million of impact.

But then a letter went to GAO. Remember I said in 2023, they had worked with the Biden administration? Someone in this body wrote a letter to GAO and said: That thing you worked out with the Biden administration, do you still have that in the file? And GAO sent a letter back and said: We declared this, in 2023, just an order because it only affected one State, just California.

Here is the problem. GAO, as I mentioned in the beginning, in their very own legal opinion, said: If an Agency says it is a rule, it is a rule. And GAO doesn't even get involved. Literally, GAO broke its own legal opinion to now declare it is an order.

Why would they do that? Well, they would do that to prevent this Congress from speaking to that rule. It would no longer be under the Congressional Review Act.

I told you this was technical. But this was a fascinating little plot that went from 2022 all the way to the present to try to figure out how to get an electric vehicle mandate in America without ever having a vote in Congress. It was slick. It was well-shaped—except it was dependent on one thing: GAO breaking its own legal opinion.

I happened to call the leadership of GAO just last week and said: As far as you know, has GAO ever—ever—declared something not a rule when the Agency said it was a rule? And after a moment of silence, he responded: As far as I know, GAO has always deferred to the Agencies, until now.

They literally broke their own policy. They literally violated their own legal counsel. So now, we are in a quandary. GAO has broken their own legal counsel. We have an issue that will have well over $100 million of effect onto the country. It is now a near nationwide mandate on electric vehicle sales across the country without ever having a vote in Congress.

And our Democratic colleague says you can't change it because we worked a way to be able to fix it so you couldn't. That is not true. This body worked extensively with the Parliamentarian's office. This body worked extensively across the aisle to be able to have conversation, talking with members of the Democratic caucus to say: Do you really want to have, in your State, a mandate sitting there?

We don't.

Not only that, what will this do to our economy across the country? This was not about challenging the essence of the Senate; this was not about breaking the filibuster rule; this was not about going nuclear. This is about confronting an entity that broke its own rules intentionally to prevent this body from acting. This was a decision made to say: Get an Agency to impose on America a mandate that Congress never spoke to—never.

Where does Congress get to speak to this?

I would say to you as a Member of the U.S. Senate, the U.S. Congress is the lawmaking body for the country. The U.S. Constitution begins with "All legislative power shall reside in a Congress," not an Agency that wants to have electric vehicle mandates for every American. That is not how it works.

So we worked to make sure that we were clarifying one simple thing—in the Congressional Review Act, in this time as it has been every time it has been done and for every time in the future, this one simple question: When an Agency says it is a rule, is it a rule? It has been every other time until this time.

We clarified that one question. It didn't change the dates of the Congressional Review Act. It didn't change the process. It answered one question that, apparently, was in dispute that was never in dispute before but now appeared to be in dispute: When an Agency says it is a rule, is it a rule?

And we clarified what it has always been. The answer is, yes, it is a rule. And then we acted on that.

This body said, no, we will not have a nationwide mandate for electric vehicles across the country.

By the way, I don't have any opposition to electric vehicles. If somebody wants to buy an electric vehicle, they should be able to buy them. I think a lot of them look like great vehicles. Buy if you choose to.

But we are Americans. This body should not mandate that everyone has to be able to buy one. This body should make the path that if people choose to buy one, they can. That is setting the rules of the road saying: Here is the definition of a safe vehicle. Pick any one of those safe vehicles you want to be able to have.

We just set the rules of the road and then get out of the way and let people decide which vehicle they want to drive on that road. That is what has happened this week.

I understand there has been a lot of bluster and trying to redefine what actually occurred. But what has occurred this week is choice for the American people and clarification of what has always been: When an Agency says it is a rule, it is a rule—just like it was last year, just like it is now, just like it will be next year.

It is technical but important because the American people want to follow the U.S. Constitution and know that all legislative powers resides with this body, not in some other building somewhere down the street.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oklahoma.

HISTORIC GREENWOOD DISTRICT—
BLACK WALL STREET NATIONAL
MONUMENT ESTABLISHMENT
ACT

Mr. LANKFORD. Mr. President, I wanted to thank the Presiding Officer and several folks because we passed by unanimous consent today a national monuments piece for the Greenwood District in Oklahoma.

On May 31 of 1921, the largest race massacre in American history occurred in my great State of Oklahoma. It was in North Tulsa. That community was burned to the ground and destroyed in a race massacre. It is a scar on our Nation's history and on my State's history, but it is an area that we remember for a reason because we know how far we have come.

The community in North Tulsa and Greenwood—they are turning tragedy into triumph. They are starting new businesses. It is a beautiful area, and it continues to be able to grow and advance, but it still bears the scars of over 100 years ago of the incredible fire and massacre that happened there.

What we did today with unanimous consent didn't change the property rights of any person in Tulsa or in Oklahoma. It didn't add eminent domain. It didn't change codes. It didn't give the Federal Government control of any square inch of my great State. It just gave a designation—a monument designation—to that area. It is very similar to some other places in that it is just a designation so that we will always remember as a nation that something significant happened here.

And it is not just about what happened on that day, May 31, into June 1 of 1921. It is what it was like before, when it was Black Wall Street, a thriving community. It was like what it was like afterward, when people stayed and rebuilt a community. It is like what it

is now. It is people with great pride who continue to be able to thrive in that community and still call it Black Wall Street based on the entrepreneurship that is there.

So I appreciate my colleagues who have been involved in this—Chairman MIKE LEE and Ranking Member MARTIN HEINRICH—for their leadership in allowing this to be able to move today, and to ANGUS KING and CORY BOOKER, who has been my partner in this now for years, to be able to move this particular designation.

I just want to tell the Presiding Officer that I appreciate all of the work of this body in what has actually occurred here and for allowing this to move, because it may not be significant to a lot of people in the country, but it is to us in Oklahoma; it is to the good folks in Greenwood. And it is not a bad thing for us to remember, during this time period, how far we have come and the work that is still yet to come.

### APPOINTMENTS

The PRESIDING OFFICER. The Chair, on behalf of the President of the Senate, pursuant to Public Law 106–286, appoints the following Members to serve on the Congressional-Executive Commission on the People's Republic of China: the Honorable JEFF MERKLEY of Oregon, the Honorable TAMMY DUCKWORTH of Illinois, the Honorable ANDY KIM of New Jersey, the Honorable LISA BLUNT ROCHESTER of Delaware.

The Chair announces, on behalf of the Majority Leader, pursuant to Public Law 70–770, the appointment of the following individual to the Migratory Bird Conservation Commission: the Honorable JOHN BOOZMAN of Arkansas.

### EXECUTIVE SESSION

### EXECUTIVE CALENDAR

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Senate proceed to executive session to consider the following nominations en bloc: all nominations on the Secretary's desk in the Air Force, Army, Coast Guard, Marine Corps, Navy, and Space Force, with the exception of PN89, Matthew Ryan, of the Army; that the nominations be confirmed en bloc; that the motions to reconsider be considered made and laid upon the table with no intervening action or debate; that no further motions be in order to any of the nominations; that the President be immediately notified of the Senate's action; and that the Senate then resume legislative session.

The PRESIDING OFFICER. Without objection, it is so ordered.

The nominations considered and confirmed are as follows:

NOMINATIONS PLACED ON THE SECRETARY'S DESK

AIR FORCE

PN116 AIR FORCE nominations (133) beginning JOSEPH L. ABRAMS, and ending JO-

SEPH M. YABES, JR., which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN117 AIR FORCE nominations (23) beginning MARGARET E. ABBOTT, and ending RACHAEL L. VOIGT, which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN132-1 AIR FORCE nominations (209) beginning AMARA B. ADAMS, and ending ROBERT D. YOUNG, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

ARMY

PN121 ARMY nominations (3) beginning MATTHEW D. BRANDT, and ending DEJENE G. KASSAYE, which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN122 ARMY nomination of Missy L. McNeill, which was received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN134 ARMY nominations (932) beginning DOMANIQUE M. ABNER, and ending 00003259357, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

PN135 ARMY nominations (425) beginning EDWIN A. ABRAZADO, and ending 0003102153, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

PN136 ARMY nominations (466) beginning JESSICA S. ABBOTT, and ending 0003390902, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

PN137 ARMY nominations (29) beginning ROSS O. ANDERSON, and ending 0002422513, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

COAST GUARD

*PN127-1 COAST GUARD nominations (262) beginning JOSHUA S. ALLEMAN, and ending MATTHEW G. ZAVALIJ, which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

*PN128 COAST GUARD nominations (2) beginning JASON B. VEARA, and ending TARA E. LARKIN, which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

MARINE CORPS

PN50 MARINE CORPS nominations (2) beginning NATHAN C. HESS, and ending CHRISTOPHER S. LAMBERT, which nominations were received by the Senate and appeared in the Congressional Record of March 14, 2025.

PN151 MARINE CORPS nomination of Edward R. Rogers, II, which was received by the Senate and appeared in the Congressional Record of May 12, 2025.

NAVY

PN123 NAVY nomination of Wendell C. Eldridge, which was received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN124 NAVY nomination of Eric M. Beall, which was received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN125 NAVY nomination of Alexandra K. Holland, which was received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN152 NAVY nominations (4) beginning ISABEL M. BERNAL, and ending JOHN J. W. YUN, which nominations were received by the Senate and appeared in the Congressional Record of May 12, 2025.

SPACE FORCE

PN126 SPACE FORCE nomination of Zachary R. Eagle, which was received by the

Senate and appeared in the Congressional Record of April 28, 2025.

### LEGISLATIVE SESSION

The PRESIDING OFFICER. The Senate will resume legislative session.

### JOINT REFERRAL

Mr. LANKFORD. Mr. President, I ask unanimous consent that, as if in executive session, the nomination of Jeremiah Workman, of Ohio, to be Assistant Secretary of Labor for Veterans' Employment and Training, received in the Senate on May 6, 2025, be jointly referred to the Committee on Health, Education, Labor, and Pensions and the Committee on Veterans' Affairs.

The PRESIDING OFFICER. Without objection, it is so ordered.

### RESOLUTIONS SUBMITTED TODAY

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Senate now proceed to the en bloc consideration of the following resolutions, which are at the desk: S. Res. 250, S. Res. 251, S. Res. 252, S. Res. 253, and S. Res. 254.

There being no objection, the Senate proceeded to consider the resolutions en bloc.

Mr. LANKFORD. I ask unanimous consent that the resolutions be agreed to, the preambles agreed to, and the motions to reconsider be considered made and laid upon the table, all en bloc.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolutions were agreed to.

The preambles were agreed to.

(The resolutions, with their preambles, are printed in today's RECORD under "Submitted Resolutions.")

### HONORING THE LIFE, ACHIEVEMENTS, AND LEGACY OF FORMER UNITED STATES SENATOR CHRISTOPHER "KIT" BOND OF MISSOURI

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Senate proceed to the consideration of S. Res. 255, which is at the desk.

The PRESIDING OFFICER. The clerk will report the resolution.

The assistant bill clerk read as follows:

A resolution (S. Res. 255) honoring the life, achievements, and legacy of former United States Senator Christopher "Kit" Bond of Missouri.

There being no objection, the Senate proceeded to consider the resolution.

Mr. LANKFORD. I ask unanimous consent that the resolution be agreed to, that the preamble be agreed to, and that the motions to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

The resolution (S. Res. 255) was agreed to.

The preamble was agreed to.

(The resolution, with its preamble, is printed in today's RECORD under "Submitted Resolutions.")

---

RECOGNIZING THE SIGNIFICANCE OF ASIAN AMERICAN, NATIVE HAWAIIAN, AND PACIFIC ISLANDER HERITAGE MONTH AS AN IMPORTANT TIME TO CELEBRATE THE SIGNIFICANT CONTRIBUTIONS OF ASIAN AMERICANS, NATIVE HAWAIIANS, AND PACIFIC ISLANDERS TO THE HISTORY OF THE UNITED STATES

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Committee on the Judiciary be discharged from further consideration and the Senate now proceed to S. Res. 214.

The PRESIDING OFFICER. The clerk will report the resolution.

The assistant bill clerk read as follows:

A resolution (S. Res. 214) recognizing the significance of Asian American, Native Hawaiian, and Pacific Islander Heritage Month as an important time to celebrate the significant contributions of Asian Americans, Native Hawaiians, and Pacific Islanders to the history of the United States.

There being no objection, the committee was discharged, and the Senate proceeded to consider the resolution.

Mr. LANKFORD. I ask unanimous consent that the resolution be agreed to, that the preamble be agreed to, and the motions to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolution (S. Res. 214) was agreed to.

The preamble was agreed to.

(The resolution, with its preamble, is printed in the RECORD of May 8, 2025, under "Submitted Resolutions.")

---

ORDERS FOR FRIDAY, MAY 23, 2025, THROUGH MONDAY, JUNE 2, 2025

Mr. LANKFORD. Mr. President, I ask unanimous consent that when the Senate completes its business today, it adjourn to then convene for pro forma sessions only, with no business being conducted, on the following dates and times: Friday, May 23 at 10 a.m.; Tuesday, May 27 at 1:15 p.m.; Friday, May 30 at 7 a.m.; further, that when the Senate adjourns on Friday, May 30, it stand adjourned until 3 p.m. on Monday, June 2; that following the prayer and pledge, the morning hour be deemed expired, the Journal of proceedings be approved to date, the time for the two leaders be reserved for their use later in the day, and that the Senate be in a period of morning business with Senators permitted to speak therein for up to 10 minutes each; finally, notwithstanding rule XXII, the cloture motions filed on May 22 ripen at 5:30 p.m.

The PRESIDING OFFICER. Without objection, it is so ordered.

ADJOURNMENT UNTIL MAY 23, 2025, AT 10 A.M.

Mr. LANKFORD. Mr. President, if there is no further business to come before the Senate, I ask that it stand adjourned under the provisions of S. Res. 255.

There being no objection, under the previous order and pursuant to S. Res. 255, as a further mark of respect for the late Christopher "Kit" Bond, the former Senator from the State of Missouri, the Senate, at 4:42 p.m., adjourned until Friday, May 23, 2025, at 10 a.m.

---

NOMINATIONS

Executive nominations received by the Senate:

IN THE AIR FORCE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

JEFFREY A. SMITH

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

JOSHUA S. STINSON

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be lieutenant colonel*

CYRUS A. PERRY

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

BENJAMIN R. WASHBURN

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

RAYMOND E. KERR

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

MATTHEW T. OLSON

THE FOLLOWING NAMED AIR NATIONAL GUARD OF THE UNITED STATES OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTIONS 12203 AND 12212:

*To be colonel*

LEMUEL J. RIOS

THE FOLLOWING NAMED AIR NATIONAL GUARD OF THE UNITED STATES OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTIONS 12203 AND 12212:

*To be colonel*

JESSE C. ALLEN
BRYAN R. AMARA
WILLIAM S. ANDERSON II
ERIC D. ARCARA
CHRISTINA M. BALOCKI
BRANDON P. BAUGHMAN
ERIKA A. BOENISCH
MICHEAL E. BOLES
BRETT D. BOLLINGER
JOSEPH L. BOUSQUET
DOUGLAS C. BOWERS
CHRISTOPHER M. BOYD
AARON T. BOYER
JAISON T. BROWN
JERAMY S. BROWNING
ROBERT P. BUZZELL
MATTHEW V. CAIN
RAOUL P. CALIMLIM
JOHN L. CHAPMAN
CODY W. CLARK
JEFFREY M. CRETZ
CHRISTOPHER M. DANIELS
JORDAN A. DARNAUER
JEREMY D. DEROXAS
RICHARD D. DIXON
JEREMY R. DOOREN
THOMAS R. DORSETT
DENNIS M. DUKE
JENNIFER R. DURBIN
MATTHEW M. ERPENBACH

TOBBY R. EVANS
KENNETH F. FECHTER
SCOTT A. FEDAK
KELLY A. FORREST
DANIEL E. FROST
JAMES T. GARVEY
JAMISON M. GILKERSON
WILLIAM M. GOURLAY
MICHAEL S. GRAHAM
JAMES J. GROSS
BRIAN R. HANRAHAN
ANNE K. HANSEN
KENNETH S. HARTMAN
JEANIE L. HELMS
PETER L. HICKMAN II
ERIK L. HOWG
RUSSELL A. ISEMINGER
BRIAN A. JACKSON
SHAHZAD K. JAHROMI
ELZADIA P. KAINA
JAMES A. KEPKA
JEREMY K. KETTER
CRAIG KINKADE
JASON D. KOLACIA
KEVIN A. KRAUSS
JUSTIN C. KROWICKI
GARY A. LEADSTROM
RACHEL L. LEIMBACH
JESSICA A. LEWIS
MARGIE J. LIPPERT
JOHN W. LOVE
AMBER L. MACRAE
NATHAN D. MASUNAGA
CHRISTOPHER J. MAYOR
KENNETH J. MCCORMICK
ANTHONY C. MEYERS
JOHN A. MIMS
STEVEN MONTALVO
TONJA M. MOON
ANTHONY R. MORFITT
JOHN W. MOYER
JOHN P. MURTHA
RICHARD A. NEELY
LEE H. NIETZEL
TIMOTHY J. NOVAK
MICHAEL F. ODONNELL
JON PERLSTEIN
SEAN S. PETERSON
JESSICA D. PISANO
ANDREW D. POWELL
MICHAEL K. PUGH
LEE G. RINELLA
RONA P. RITCHIE
ANTONIO D. RODRIGUEZ
BRANDON A. ROTH
RYAN W. SATTERTHWAITE
DOMINICK A. SICILIANO
BRENDAN N. SIMISON
PATRICK E. SLAVIN
SCOTT A. SMIT
ELIM M. SNIADY
CHRISTOPHER S. SOLBERG
RANDY ST JEAN
SHANA M. STROH
JOHN D. THOMPSON
ROBERT P. TONEY
PATRICK A. TRITZ
DIEGO M. URIBE
JAMES A. VENDETTI
JOSEPH R. WINTER
JOSEPH P. WITT
BRIDGET S. ZORN

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

CLAYTON J. AUNE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be major*

GARRETT M. WELLS

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be major*

BRANDON G. WAGONER

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be major*

GARRETT C. GUTHRIE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be lieutenant colonel*

VANESSA J. MOFFETT

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

RAMON MORADO

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be lieutenant colonel*

JOHN H. DIAZ

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT
TO THE GRADE INDICATED IN THE RESERVE OF THE AIR
FORCE UNDER TITLE 10, U.S.C., SECTION 12203:

### To be colonel

BRENNAN P. MCDONALD

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT
TO THE GRADE INDICATED IN THE RESERVE OF THE AIR
FORCE UNDER TITLE 10, U.S.C., SECTION 12203:

### To be colonel

TYLER B. SMITH

### IN THE ARMY

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT
AS A PERMANENT PROFESSOR AT THE UNITED STATES
MILITARY ACADEMY IN THE GRADE INDICATED UNDER
TITLE 10, U.S.C., SECTIONS 7433(B) AND 7436(A):

### To be colonel

MARGARET A. NOWICKI

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES ARMY
UNDER TITLE 10, U.S.C., SECTION 624:

### To be colonel

ARTHUR G. BRONG

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES ARMY
DENTAL CORPS UNDER TITLE 10, U.S.C. , SECTIONS 624
AND 7064:

### To be lieutenant colonel

SPENCER R. ATKINSON
BRITTANY E. BARTENSTEIN
ANGELICA BEDOYA ASTRAUSKAS
GARY M. BLYLEVEN
JESSICA L. BONDYCAREY
RAQUEL C. BRENTSON
REBECCA H. BRIM
KAISHA T. CALVIN
YUSHENG CHEN
DEBRA L. CHURCH
NICOLE A. COLLINS
FRANK A. DELATOUR
JOSHUA D. GONZALEZ
JOHN C. HASTINGS
ANDREW C. JENZER
JOSHUA D. JONES
ANDREW J. KLISH
NATHAN E. KOSIBA
KIRSTIN M. LOW
JEFFREY M. MARRS
TAE Y. MOON
JENNY J. OH
NATHAN S. PERSELL
NICHOLAS G. RUANA
JAE W. SHIN
MARTIN J. SMALLIDGE
THOMAS M. WELNAK
ANNA YOO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES ARMY
MEDICAL CORPS UNDER TITLE 10, U.S.C., SECTIONS 624
AND 7064:

### To be lieutenant colonel

JOSEPH R. ADAMS
BRETT S. AMBROSON
MARC K. AMING
ROBERT J. ATCHISON
DRISCOLL H. AUGUSTINE
EVAN M. BAINES
LORAINE BARAKI
MORGAN R. BARRON
JULIE A. BAUNCHALK
CHRISTOPHER M. BELYEA
SARA E. BIBBENS
MATTHEW R. BLATTNER
KATHERINE A. BOHRINGER
KATHLEEN M. BOYER
JOSEPH D. BOZZAY
TOMMY A. BROWN II
WESLEY L. BRUNDRIDGE
RICHARD M. BUCK
ROBERT T. BUCKLEY
ANTHONY T. CANCIO
MIGUEL J. CANO
WILLIAM R. CARLTON, JR.
HANNAH C. CHEN
SIEN CHEN
JIN H. CHO
JAMES P. CHOHONIS
KELLY E. CHOHONIS
EDWIN Y. CHOI
ZACHARIAH Q. CLARK
BENJAMIN A. COOK
CHRISTOPHER J. CORKINS
BRIAN M. CORLISS
AMANDA C. COUSINS
CHRISTOPHER J. CRELLIN
HOLLY B. CRELLIN
MICHAEL J. DECKSON
ALEXANDER A. DEW
LAITH R. DINKHA
KATELYN A. DOLEZAL
MERCEDES Y. DRISCOLL
CHRISTOPHER R. DUNBAR
MICHAEL J. ELSENBECK, JR.
DIMAS C. ESPINOLA
THORAN G. FARNSWORTH
SEAN E. FINDLAY
RAYMOND D. FISHER

CHRISTOPHER T. FLINTON
SHELLEY A. FLORES
NATHAN A. FRANKLIN
MEAGAN R. FREEMAN
SAMUEL V. GALIMA
TIMOTHY R. GALL
PHILIP H. GOERING
CHRISTOPHER M. GRACE
ANDREW E. GRAFF
JAMES I. GRAGG
MATTHEW D. GRANT
CARY T. GRAYSON III
PATRICK D. GRIMM
ALLY HA
ALAN J. HANS
MATHEW D. HARRELL
BRANDON F. HARRIS
DANIEL M. HEILMANN
GREGORY T. HORN
DAVID R. HOURANI
ALEXANDER P. HOUSER
ANDREW J. HOWARD
WILLIAM T. JAEGLE
ASHLEY R. JONES
ZACHARY C. JUNGA
BRYAN J. KANTNER
AMIR KARIMIAN
THOMAS M. KELLEY
JOSEPH A. KELLY
ELAINE S. KEUNG
ALYSON M. KIL
KARL J. KMIECIK
ADAM W. KOWALSKI
JOHN P. KUCKELMAN
SABRINA E. KUNCIW
ALEXANDER E. LANIGAN
BRIAN H. LEE
MITCHELL A. LEGG
ROBERT D. LEIMBACH
LEON S. LI
CORY G. MADIGAN
MEGAN B. MAHOWALD
JEREMY J. MANDIA
JOSEPH A. MANSFIELD
ANDY J. MARTINEZMORALES
CHINYERE A. MBAGWU
JOHN F. MCCAULEY IV
EDWARD R. MCCLELLAN
ISAAC E. MCCOOL
STERLING S. MCKISSACK
CLAY M. MERRITT
RAYMOND M. MEYER
CHRISTOPHER F. MIDDLEMAN
CHARLES A. MILLER
SUMIT MITTAL
JUSTIN G. MYGATT
MATTHEW A. NESTANDER
AMANDA P. NOPAKUN
ROBERT D. NORMAN
DREW W. NUTE
JOSHUA J. OLIVER
SARAH M. ORDWAY
JACOB H. PALUBICKI
EDWARD J. PARK
ELIZABETH M. PERKINS
CYNTHIA PHILIP
CODY J. PHILLIPS
ELYSE F. PIERRE
ALFRED J. PISANO
CHANDRA PUNCH
LAUREN K. RECKLEY
CREVAN O. REID
DUSTIN R. ROBERIE
CAROLYN A. ROBINSON
MARINA J. RODRIGUEZ
TYLER S. ROGERS
DANIEL J. ROUBIK
TIMOTHY G. RUSSELL
STEPHEN J. SAVIOLI
JOHN P. SCHACHT
WILLIAM C. SCHAFFENBURG
ANN SCHILLING
JOHN Q. SCHISLER
TONI M. SCHISLER
STEPHANIE J. SEXTON
ANGELA K. SHADDEAU
ROWAN R. SHELDON
JAMES M. SILCOX
SARAH M. SMILOW
CAITLIN S. STEELE
FEHLIN STONE
JUSTINE K. STREMICK
JONATHAN I. STUART
PETER P. STUDEBAKER
NICHOLAS M. STUDER
AZFAR B. SYED
PAUL A. TATE
DERRICK J. THIEL
MATTHEW W. THOMPSON
TEODORA J. THOMPSON
DEWEY J. THOMS
RICHARD J. UPTON
PATRICK F. WALKER
MERRITT E. WARE
STEVEN L. WARNER
SHARON N. WEEKSGROH
JENNIFER M. WELLINGTON
TARA R. WHITE
SEAN L. WILKES
PAUL R. WISTERMAYER
CLAIRE P. WITMER
YUSHUANG XIE
YUCHING YEH
STEPHEN M. YOUNG
LIANG ZHOU

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES ARMY

DENTAL CORPS UNDER TITLE 10, U.S.C. , SECTIONS 624
AND 7064:

### To be colonel

MICHAEL M. ARMSTRONG
ANDREW M. BAKER
CHRISTOPHER K. CHANG
DAVID A. DANTES
YONG S. KIM
KWAME O. KWATENG
KHAI Q. LE
DONG S. LEE
JUSTIN P. LEWIS
SERGIO MUNOZ
DEMARCIO L. REED
RUSSELL K. SEARLE
ERIC J. SETTER
MARY S. STUART
SHANI O. THOMPSON BURKES
NAM T. VO
DOUGLAS N. WATERMAN
GARRETT G. WOOD

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES ARMY
MEDICAL CORPS UNDER TITLE 10, U.S.C., SECTIONS 624
AND 7064:

### To be colonel

JASON B. ALISANGCO
DAVID M. ANDERSON
KELLY G. ANDERSON
MICHAEL D. APRIL
PETER S. ARMANAS
DARRELL F. BARKER
KELLY E. BEKKEN
ADRIANE E. BELL
MARK A. BLACK
JOEL R. BROCKMEYER
KRISTEN P. BUNCH
KRISTINA G. BURGERS
JASON M. CAGE
BARRETT M. CAMPBELL
MARIDELLE M. CHARIT
GRIGORY CHARNY
BRIAN M. COHEE
SUSAN M. COLLA
JAMES A. COX
RAJESH K. DANIELS
CASEY A. DANIELSEN
MIA D. DEBARROS
ERIK A. DEDEKAM
KATHERINE L. DENGLER
GRANT H. EVANS
BRANDON I. GARDNER
RONALD P. GOODLETT
LOUIS K. HAASE
SONYA M. HEIDT
AICHA M. HULL
KEITH L. JACKSON
DANIEL G. KANG
DAVID KASSOP
MONIKA A. KRZYZEK
CHRISTIAN A. LABRA
JAMES C. LEAGUE-PASCUAL
JOSEPH S. LEE
MYRO A. LU
JASON A. MACDONNELL
MATTHEW E. MILLER
MICHAEL D. NICKERSON
MELODY R. NOLAN
ARTHUR C. OKWESILI
RYAN T. OLESZEWSKI
MICHAEL I. ORESTES
NICHOLAS M. ORR
PATRICK D. OWSIAK
JEANNE C. PATZKOWSKI
MICHAEL S. PATZKOWSKI
ERIKA PETRIK
JILLIAN F. PHELPS
BRUCE D. PIER
JUSTIN D. PILGRIM
JASON S. RADOWSKY
JULIE A. RIZZO
ERIK Q. ROEDEL
LUIS O. ROHENA
REBECCA M. SEIFRIED
JERRY P. SEILER
OMAR SHAMI
WILLIAM J. SHERMAN
EMILY H. SHIN
TERRY SHIN
EMILY A. SIMMONS
TYSON J. SJULIN
RACHEL M. SULLIVAN
JONATHAN P. SWISHER
EVAN T. TRIVETTE
ROBERT J. WALTER
MATTHEW A. WESTHOFF
AARON B. WICKLEY
ALICIA M. WILLIAMS
SHAPRINA R. WILLIAMS
AHMAD H. YASSIN
CHONG K. YI
0002961750
0002875100

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE RESERVE OF THE
ARMY UNDER TITLE 10, U.S.C., SECTION 12203:

### To be colonel

KYLE L. AKERS
JOHN B. ALLEN III
LUIS M. ALVAREZ
ROSS D. AMICO
JON M. ANDERSON

**S3144**

CONGRESSIONAL RECORD — SENATE

*May 22, 2025*

DAVID C. ANDREWS
ASHKAN ANGHA
KENNETH V. ANTHONY
CHRISTOPHER S. APPLEGATE
JEFFREY W. ARLEQUE
STEPHEN C. ARNETT
ADAM R. ASHWORTH
SAMUEL W. BAKER
SETH A. BARUN
JAMES W. BASS
JOSHUA F. BEHSUDI
ROBERT R. BELL II
MICHAEL J. BENDICH III
RAYMOND A. BENISEK II
BRANDON J. BENNETT
MATTHEW T. BESMER
JAMES A. BLOCKER
ROBERT L. BOHL
CHRISTOPHER B. BOWERS
BRAD D. BRADFORD
DANIEL M. BRADY
MATTHEW D. BRADY
MARCO D. BRETTMANN
PERVIS L. BROWN
DARIN G. BUSSABARGER
JUSTIN L. BUTCHER
NICHOLAS I. CALENICOFF
TRISHA A. CAMPBELL
JARID A. CATRENICH
JASON L. CELLETTI
STEPHEN O. CHAN
DAVID S. CHANG
HARRY P. CHANG
DANIEL M. CHICOLA
DANIEL L. CHISM
THOMAS R. CLARK
ANITA Y. CLEVELAND
ORLANDO A. COBOS
BENJAMIN C. COOK
SHANON W. COTTA
JESUS J. CRUZ
JAMES R. DAVIS
JOSEPH M. DAVISON
TIMOTHY D. DEAN
MONICA M. DELACRUZ
JACK H. DENTON
TREVOR A. DEVALL
JASON D. DIAZ
NATHANIEL E. DIBLING
NATHAN D. DICKS
BRIAN D. DIMOND
JUSTIN C. DOUGLAS
JAMES N. DOWNEY
BRIAN T. DUDLEY
BRIAN A. DUKES
TERRY D. DURHAM
THOMAS L. EDWARDS
JAMES J. ELLIOTT
JASON R. EVANS
JOSHUA T. EVILSIZOR
COLIN F. FALKENSTEIN
DANIEL L. FALL
ROBERT N. FELICIO
JOHN D. FIEREK
DAMIEN K. FISHER
MICHAEL J. FORD
LEN A. FORTENBERRY
SARAH R. FRATER
MAX W. FURMAN, JR.
CLAUDIO GARCIA-CASTRO
DAVID J. GARNER
TODD N. GEORGE
RICHARD C. GHINELLI
ALLEN E. GLEATON, JR.
CURTIS A. GOLLER III
MARK D. GOODWIN
JENNIFER M. GREEN
AARON L. GRIMM
PETER O. GUSTAFSON
JAYSON R. HACKETT
KYLE J. HALSETH
CHRISTOPHER D. HANNA
DEREK W. HART
EARNEST G. HEARN
JONATHAN P. HEARN
PATRICK D. HEFFERNAN
DANIEL S. HENDERSHOT
JASON P. HENDERSON
EVAN D. HESSEL
ALLAN T. HETTEEN
JAMES P. HICKS II
JOHN M. HOBOT
JAMES R. HOLDEN
JASON D. HOLMES
ERIC M. HOLTZAPFFLE
JOHN T. HUBBARD
JUSTIN H. HUNTER
BRIAN G. IAROSSI
SAFIYA L. INGRAM
MARLIN J. JENKINS
PHILIP K. JERGENSON
DAVID L. JOHANSSON
BRADY B. JOHNSON
MARK D. JUNTUNEN
CHRISTOPHER L. JURNEY
LAURA L. KEENAN
CHRISTOPHER P. KEENE
MARK H. KELLIHER
MATHEW D. KILGORE
CHIN U. KIM
JAMES P. KING
NATHANIEL S. KING
JASON M. KLEINSCHMIT
JUSTIN K. KRAMER
MARK I. LAMPTON
DAVID M. LAUGHLIN
AARON P. LEFTON

RYAN A. LEONARD
CAMALA A. LEPAK
ALAN W. LESTER
JASON B. LEWIS
AARON D. LOCKHART
BARBARA J. LOWE
FLORANTE P. MANALOTO
THOMAS W. MANERA, JR.
JEFFREY M. MANN
JACKIE M. MANTON
JOSEPH D. MARTINKIS
PETER J. MCCANN
TREVIS A. MCCULLOUGH
ROBERT L. MCELHANEY
ARTHUR L. MCLAURIN, JR.
JESSICA J. MCPHERSON
THOMAS S. MEARES
JOSEPH P. MENDEL
RENE A. MENDOZA
MATTHEW D. MERCADO
JERAMY A. MILES
DANIEL M. MILLAR, JR.
TODD R. MILLER
MICHAEL L. MINARD
NATHAN J. MOORE
CLIFF A. MORALES
DANIEL J. MORRISON
CHARLTON J. MOSLEY
DANIEL M. MURPHY
SETH D. NELSON
PETER S. NEWMAN
THOMAS R. NYFAVER
KYLE W. OBRECHT
DEMETRIUS D. PARROTT
ALICIA M. PARTIN
KENNETH D. PAUL
BRUCE J. PAULEY
LELAND G. PEARSON
IAN H. PIENIK
BRANDON T. PITCHER
ERNEST F. POLK III
BENJAMIN W. POSIL
CHARLES B. PRIEST
FRANK G. QUERNS III
ERIC L. QUINN
BRYAN P. REED
ROBERT W. REED
RODNEY C. RHODES
NOLAN O. RINEHART
JEFFREY T. RITTER
BRADLEY E. ROACH
SAMUEL J. ROBERTS
EDWIN M. RODRIGUEZ
MARCOS R. ROGERS
ZACHARY R. ROLF
JOSHUA M. ROMANO
KEVIN A. ROMINE
RICHARD P. ROWLAND
ROBERT C. SANDS
MICHAEL B. SHARP
ISAAC S. SHIELDS
STEFAN A. SHIRLEY
VINCENT SIRACUSA, JR.
GREGORY W. SMITH
JAMES W. SMITH
JEREMY K. SMITH
BRETT G. SNYDER
JEROMY R. SPELLINGS
GABRIEL D. SPICER
DONALD F. STADOLNIK, JR.
HARRY A. STAFFORD IV
GEORGE J. STALTER
BEVAN C. STANSBURY
SAMUEL B. STRAIN III
RALPH W. SULLENBERGER, JR.
GRANT T. SWINGER
PATRICK J. SZYVETITZ
JEREMIAH J. SZYNSKIE
CHRISTINA L. TAYLOR
CHAD E. THOMSON
JASON L. THOMSON
LUCAS K. THORNE
DAVID A. THORNELOE
ADAM J. TIFFEN
CHADD M. TILLMAN
ERIC J. TOLSKA
BENJAMIN T. TOOLEY
OSCAR TORRES
JOSHUA A. URBAN
MARK A. VANVELDHUIZEN
DUC M. VO
LEW R. WEBER
JONATHAN R. WILKES
CHRISTOPHER D. WINNEK
JESSE N. WRIGHT
MATTHEW S. YORK
ADAM H. YOUNG
BRIAN E. ZDUNOWSKI

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE RESERVE OF THE ARMY UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

ANGELA J. ALLEN
ERIC M. ANDERSON
PAUL D. BARNETT
MATTHEW R. BERNOSKI
CHRISTIAN E. BONNER II
JOSHUA C. BOONE
DAVID L. BREWER
MATTHEW B. BROWN
SONYA L. CARTER
KURT C. CHARTIER
ROBERT O. COOKE
STEPHEN M. COWNE, JR.
BRADLEY D. DENISAR

CHARLES J. DUFFEE
THOMAS C. DUNAWAY
SARAH E. FRATICELLI
JANE A. GUMATAOTAO
QIANA HARDER
DAVIS N. HO
JAMES A. HOLLEY, JR.
JEREMIAH C. HOOD
TAYLOR JONES
JASON R. KIM
MEESHACK R. LEE
CHRISTOPHER C. LEWIS
JOHN H. LI
BRIAN M. MANDOCK
CARMONA C. MARCH
CHRISTIAN MARTINEZ
AUDREY D. MATTHEWS
CHAD V. MAYNARD
BRIAN J. MORRIS
FREDERICK A. MOSS
BRONWYN B. ODHNER
DAVID W. POWELL
JOSE H. RIVERA
LACEY R. ROCHA
MATTHEW D. ROUSSEAU
CHARLES J. SCHECK
GREGORY L. SMITH
DUANE E. SYNOGROUND, JR.
CHRISTOPHER H. TISON
MATTHEW P. VERETT
TYLER J. WATERHOUSE
KARL S. WHATLEY
COREY F. WILLIE
MATTHEW W. YARBROUGH
SHUN Y. YU

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE RESERVE OF THE ARMY UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

CARLOS J. ACOSTA RIVERA
JOSHUA B. ADAMES
THOMAS L. ADAMS III
YOLANDA M. AHMAD
ALEXANDER R. ALABIAD
DANIEL R. ALBAUGH
SYED M. ALI
MONETTE D. AMAYA
PATRICK J. ANDERSON
STEPHEN M. ANEST
THOMAS S. BAILEY
BRETT L. BARTELL
KERRY D. BATES
ROBERT L. BEAT
PETER BERMUDEZ
LEE W. BERRY
JAMES M. BISHOP
ASHLEY L. BLESSUM
PHILIP J. BOLDT
LUCAS J. BREWER
DANTE O. BROWN
KRISTEN G. BROWN
STEPHANIE M. BUCK
JORDAN L. BURFIELD
ANTHONY P. CARRIERE
SCOTT M. CARRINGTON
DANIELLE I. CASEY
ELISABETH J. CASTILLO
HIRAM A. CENTENOJUSTINIANO
COLLEEN C. CHIANESE
KEITH J. CHRUSTOWSKI
JOSHUA R. CLARK
SHANE B. CLARKE
MARIA E. CLAUS
KEITH A. CLAUSON
MICHAEL J. COCHENOUR
BRANDON B. COLE
JON R. COPE
MICHAEL P. CRAM
JAMES A. CROWELL
BRAD M. DAVIES
CHAD A. DAVIS
RAYMOND N. DEVOE
MATTHEW R. DICK
HUNG M. DIEP
CHARLES F. DOTTER
WILLIAM S. DOUGLASS
LETICIA L. DREILING
KARA E. DUBINSKY
BARON J. DULANEY
SCOTT M. EBERLE
DAVID L. EVANS
TIMOTHY C. FARRAR
ERICH W. FEIGE
SARAH M. FERNANDEZ
BEATRIZ A. FLOREZ
BENJAMIN L. FLOSI
LOUIS FOUST III
JONATHAN L. FREEMAN
PATRICK D. FRESHWATER
SARAH C. GAGE
PAMELA N. GILBERT
TERRELL T. GIVENS
DANIEL A. GOMEZ
RICHARD J. GOMEZ
LEWIS J. GRAY
STEVEN J. GRIFFIN
ROBERT J. GUAGLIARDI
LUIS A. GURRI
SAMUEL T. GUY
MATTHEW T. HAGERMAN
MATTHEW J. HALKO
GEORGINA HAMMOND
PAUL S. HAN
ANTONIO J. HARDY
SARA M. HARE

JOSEPH N. HARRIS
NICOLE M. HATCH
KNUD A. HERMANSEN
DEMERE K. HESS
AARON L. HOFFMAN
ROBERT M. HOGUE, JR.
LAUREN D. HOLLEY
SUNG S. HONG
LANCE R. HUBLICK
BILLY J. HYATT
JENNY IGLESIAS
MATTHEW O. ISNER
THOMAS G. IVANCO
JOHN H. JACKSON
LISA A. JASTER
BENJAMIN M. JENSEN
JEREMY M. JOHNSON
JEFFREY M. JONES
JEFFREY S. JONES
MATTHEW P. JOYCE
NATALIE A. JUHLIN
JACOB R. KARN
KEVIN A. KAUFMAN
KHARA J. KEEGAN
CHEYENNE D. KIEL
ANDREW R. KIMES
JASON R. KROPTAVICH
PHILLIP LEAHY
CHRISTOPHER K. LEE
JASON E. LESSER
JOSHUA A. LEWIS
JEFFREY Z. LI
MICHAEL A. LIPSNER
LUKE A. LISELL
BRIAN E. LOVE
WILLIAM V. LOWRY
CHARLES V. LUCAS
KATE J. MACALLISTER
CHRISTOPHER E. MACKIN
RENE A. MAHOMED
STEPHANIE M. MANN
JEREMIAH P. MANNING
MICHAEL T. MARRA
NORMA L. MARTINEZ
THEODORE C. MATAXIS
WILLIE G. MCCALLISTER
CHARLES R. MCGRUE
THOMAS M. MCINNIS
RYAN L. MENDENHALL
DANIEL R. MENENDEZ
SHAWN M. MEREDITH
MICHAEL A. MICHELL
NOEL MILIAN
SAMUEL A. MILLER
ARMER MITCHELL III
JEREMY S. MITCHELL
DIANE N. MONCRIEF
NATHAN F. MOORE
JOHNNY T. MORSE
ROBERT A. MUSTAFA
MARK E. MYERS
CHRISTOPHER E. NEELEY
BRUCE A. NEIGHBOR
ADAM C. NICKELSON
PATTON C. NIX
MICHAEL E. NOCKUNAS
KRISTY L. NORQUIST
BILAL M. OMARJEE
DUSTAN G. OWENS
JENNIFER S. PAMPUCHBORDEN
EVELYN R. PARKS
DAVID B. PAROBY
DIANA J. PARZIK
JARED D. PATTON
DEVIN R. PENALUNA
WOODROW D. PENGELLY
VICTOR M. PEREZ
MARTIN C. PETERS
JEFFREY R. PETTY
WILLIE O. PORTER, JR.
IRA PRAY
ANDREW K. PREWITT
SHAWN W. PRINKEY
ADAM D. PROCTOR
JOSEPH A. PROCTOR
GEORGEO X. PULIKKATHARA
ROMEO X. PULIKKATHARA
CHRISTOPHER M. PULLIAM
ANDREW J. RADANO
DAVID M. RADERSTORF II
MICHAEL R. REDINGTON
DAVID A. RICHARDS
JOHN C. RICHIE
EDWARD J. RIFFLE
JASON S. RITTER
JOSE M. RIVERA
ANDREW M. ROMER
ADAM C. ROSENBAUM
ROY A. ROSS
JEREMI D. RUBY
CHRISTOPHER M. RUFF
SCOTT M. RYMAN
JAMES P. SAKAI
JESUS SALAZAR
MOLLY J. SCHAEFER
MICHAEL J. SCHILLING
MICHAEL N. SCOTT
NATHAN D. SCOTT
PAUL A. SEGRO
JAMES P. SERVI
CHRISTOPHER R. SILBAUGH
MATTHEW D. SILVERMAN
BLAZEJ SLEZAK
BRADLEY D. SMITH
PHILLIP J. SMITH
DAVID C. SOUTTER
JARED R. SPERLI

SAMANTHA W. STANFORD
CHRISTOPHER J. STEIGHNER
CHRIS M. STONE
KEVIN P. STURM
DAVID M. STYS
ADAM M. SYMANSKI
MATTHEW J. TAVARES
CHARLES A. TAYLOR
GARRETT S. THOMPSON
DARRELL R. TRAN
STEVEN H. TRAWEEK
JEFFREY P. TRINIDAD
DOMINIC S. TRIPPODO
JOANN M. TROWBRIDGE
CHRISTOPHER P. TUNG
MATTHEW L. VANDERZANDEN
WILFREDO VELEZRODRIGUEZ
SHANNON M. VIRGADAMO
LOAN L. VO
MICHELLE WALDEN
WESLEY F. WELDON
JOEL R. WELTER
DAVID M. WHITT
WILLIAM H. WIGHTMAN
SHANECA K. WILLIAMS
MATTHEW L. WOOD
JACANNA F. WYATT
ZACHARY ZMAYEFSKI
JAY A. ZWIRBLIS

### IN THE NAVY

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

DAVID C. SANDOMIR

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

ALLEN H. GRIMES

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JONATHAN D. PADGETT

THE FOLLOWING NAMED OFFICER FOR TEMPORARY APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 605:

*To be captain*

JONATHAN D. PADGETT

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

RICKY R. ROWE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

DANIEL P. BRADLEY
STEVEN L. CABALLERO
ROBERT E. DANIELSON
SETH DINOLA
ERIN L. ELLIOTT
PATRICK A. GRIFFIN
JARED E. HENDERSON
CHRISTOPHER B. HOGAN
JASON D. HOWELL
BOBBY H. HSU
ERNEST K. JESSOP
KEVIN M. KAHL
KRIS KIER
RICHARD C. LINNELL
FRANK F. MEGNA
JAMES C. MUSE
CHAD S. RORSTROM
NICHOLAS W. RYAN
RICHARD W. SEALY
CHARLES E. SHAMONSKY
BENJAMIN V. SIMON
NATHANIEL B. VANDEVENTER
CHAD J. VANKEULEN
KASIMIR M. WNUK

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT AS A SENIOR MILITARY ACQUISITION ADVISOR IN THE GRADE INDICATED UNDER TITLE 10, U.S.C., SECTION 1725(A).

*To be captain*

DANIEL P. MALATESTA

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

MARTHA C. ADAMS
TIMOTHY S. AJA
NATHAN D. ATKINSON
CHRISTOPHER T. BECK
ROBERT C. BLACKWOOD
DANIEL B. BOZUNG
ANDREW M. BROWN
ZACHARY D. BUTALA

JAMES R. CATHRO
JEFFREY K. CUMMINGS
TIMOTHY A. CUSHANICK
JAMES W. DUVALL
MATTHEW T. EDWARDS
RUSS T. ELKIN
TYSON L. FIELDS
NATALIE R. FRANTZ
TODD J. FRUEHAUF
CAMERON L. FULRATH
SCOTT R. GOLICH
DAVID K. HAGLUND
JUSTIN M. HANE
RICHARD A. HARVEY
MICHAEL A. HEAPHY, JR.
JOSEPH A. HEYNE
ZACHARY R. HOLLCRAFT
ADAM K. HRUBY
STEVEN R. HYMAN
MASON A. JEFFERSON
SANDRA L. KIRKWOOD
JOSHUA J. LARSON
PETER A. LINSKY
DAVID A. LIVERMORE
DAVID W. LUNDY
BRENDAN L. MAGUIRE
WILLIAM G. MANGAN
KIMBERLY R. MARTINEZ
BRYAN R. MCCARTHY
MICHAEL D. MONTELLANO
DOUGLAS R. NELSON
MITCHELL A. NEWTON
DAVID W. OLDHAM
DAVID P. PASCOE
CHRISTINA L. PETERSON
ANDREW M. PETTIT
CHARLES F. PLUNGIS III
MATTHEW C. PRESTON
SEAN E. PURDY
PETER G. RATZ
EVAN D. REESE
BRIAN J. ROBINSON
MICHAEL A. ROGERS
CHRISTOPHER C. RONNANDER
NICHOLAS A. RUEDA
THOMAS SANECKI
MICHAEL J. SAUNDERS
JOHN R. SCOTT
PETER SCOTT
CHRISTOPHER B. SHETTER
SARAH E. L. SPARKS
SAMUEL M. SPLETZER
RYAN E. SROGI
ERIC D. STEIDLE
MARK A. SWARTZ
MICHAEL W. SWEENEY
CHRISTOPHER A. VICTOR
JOSEPH M. VOLANSKY, JR.
BENJAMIN M. WALBORN

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

JOHN K. HOPE III

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

MICHAEL W. COULTER
DAVID C. DANIEL
STUART M. GOLD
DANIEL R. GREEN
REO HATFIELD
JEFFREY R. KIRKPATRICK
DAVID KLETT
JONATHAN J. LYNN
RONALD J. MATTHEWS
SHANE J. MEISNER
ARTHUR G. MOSLEY
CORNELIUS C. MURRAY
MONTY A. VIKDAL

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

ROBERT J. CHAVEZ
VALIS K. HOUSTON
DEAN T. MOON

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

DANIEL S. AVONDOGLIO
ROBERT F. MARNELL

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

SANTIAGO M. CARRIZOSA

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

ALLISON M. ASHBARRIOLA
BARTHOLOMEW W. CONNOLLY
PATRICK L. OBRIEN

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

JOSEPH E. BENTON III
DANIEL P. BERGIN
STEPHEN L. CASAPULLA
WILLIAM P. DELAO
LEE C. DORTZBACH
JAMES R. DOUGHTY
WILLIAM J. FEASTER
JOHN J. FRENCH III
GUY E. HOWERTON III
MICHAEL J. MESSENGER
SCOTT W. PHILLIPS
RONALD C. RILEY
THOMAS M. RYAN
CHRISTOPHER B. SPRINGER
LUKE G. WISNIEWSKI

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

LEON W. MOORE
NATHAN C. POTTER
SEAN M. SPICER
TODD M. SPITLER

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

CHRISTOPHER A. BAXTER

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

CALVIN MARTIN
MIKO K. WADE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

BRIAN J. ABBOTT
ZACHARY A. KENNAN
ERIC P. NARDO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

WADE A. BERZETT
KEVIN W. COCHRAN
EMMANUEL C. SAYOC
DEREK A. SCHIERLMANN
WAYNE W. STEPHENS
REGIS C. WORLEY, JR.

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

SCOTT P. BENNIE
AMBER B. BRANDT
ANDREW M. MENOCAL
CHRISTOPHER M. SCHMID

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JESSE BANDLE
STEPHANIE M. BEDZIS
JONATHAN H. BERGER
CATHERINE M. BERJOHN
MATTHEW S. BIDLACK
RICHARD J. BOWER
ORLANDO G. CABRERA
ROBERT C. CALL
RACHEL E. CARTER
ANNA Y. CHOE
JAMES C. CLIFFORD
CANDIDA A. COORE
ADRIAN M. CUELLAR
BRIDGET K. CUNNINGHAM
MOHENISH K. DAUGHTRY
CHRISTOPHER M. DAVIS
DANIEL P. DECECCHIS
KATHLEEN M. DONAHUE
SEAN M. DRISCOLL
ELIZABETH A. DUBIL
JAMES I. DUPREE
STEPHANIE L. ELENBAUM
AIDITH FLORESCARRERA
DANIEL A. FOSTER
PHILIP A. GAUDREAU III
RYAN J. GNANDT
JAMES L. HEGARTY
CHRISTOPHER D. HELMAN
PATRICK M. HENDERSON
GEORGE A. JAKUBEK
REBECCA L. JOHNSON
LEVI K. KITCHEN
DAVID J. KLIMASKI
KARL A. KUERSTEINER
DANIELLE M. LAGOSKI
LAURA M. LAUER
JESSICA J. LEE

LOUIS R. LEWANDOWSKI
JONATHAN T. LIEBIG
BRYCE D. LOKEY
DEBRA M. LOWRY
MATTHEW L. LUTYNSKI
KATHARINE I. MANGAN
JANELLE M. MARRA
JOHN C. MATTINGLY
ANDREW J. MCDERMOTT
JONATHAN D. MCDIVITT
PETER E. MCINTYRE
JOSELYN C. MERCADOABADIE
DANIELLE C. MONTEIL
JEFFREY L. MOORE, JR.
KENNETH E. NEEDHAM
NICHOLAS T. NELSON
TARA A. OCONNELL
JEREMY K. RAMSEY
RYAN D. RESTREPO
CRYSTAL A. RUSSELL
OMAR SAEED
ELLE M. SCHOLLNBERGER
VIKAS SRIVASTAVA
RAJ C. SINGARAJU
CHRISTOPHER S. SMITH
DUSTIN K. SMITH
TRACIE C. SNIDER
NICHOLAS N. SWEET
SCOTT A. TRASK
ROBYN M. TREADWELL
OBINNA N. UGOCHUKWU
ROBERT B. WALTON
ALLISON B. WEISBROD
REBECCA R. WELCH
CHRISTOPHER R. WORLEY
KATHERINE A. WRENNMARESH
JAY A. YELON
COLIN R. YOUNG
JOSEPH E. ZEMAN, JR.
JAMES L. ZIMMERMAN

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

WILLIAM P. BOGGESS
ANGEL J. CALVO
AMANDA A. FIX
DANIEL J. FUHRMANN
THOMAS D. GRUBBS
NICHOLAS J. HAMLIN
DREW B. HAYARD
MARIA D. JULIAMONTANEZ
ALLEN D. RASMUSSEN
CLAYTON T. RAU
MICHAEL A. SMITH
ERIC D. VILLARREAL
RACHEL L. WERNER

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JAMES P. ADWELL
JOHNFRITZ E. ANTOINE
MATTHEW N. ENGLISH
ASHLEE C. ESPIRITU
JOSEPH M. FROMKNECHT
THERON HAMILTON
LINDA D. HAVENS
JASON M. JONES
SANDEEP KUMAR
KIMBERLY L. LITTEL
JESSE D. LOCKE
ANN M. MACDONALD
RUDY D. MEDINA
DARIO P. MORGAN
OLUSEGUN A. OLABODE
EUGENE D. OSBORN
MICHAEL D. OWEN
SETH A. REINI
NICHOLAS C. SCHAAL
JONATHAN G. SHEA
MARK P. SIMONS
JONE L. TILLMAN
JENNIFER C. WALLINGER
TIMOTHY T. WELSH

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

DENIZ M. BAYKAN
JOHN R. GOODIN
JOSEPH T. GRIFFO
DAVID H. LEE
MARK A. LINDSEY
PETER R. OSTROM
JESSICA L. PYLE
KATHERINE E. SHOVLIN
GARRETT S. SNOW
ALLISON E. WARD
LENA E. WHITEHEAD
KATHERINE D. WORSTELL

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ERIC K. CONRAD
JULIO A. PETERSON
STEPHANIE A. RIVERA
COREY J. SYLVE
KATHERINE VESTER

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ANTHONY B. FRIES
MICHELLE V. HIGINGBOTHAM
DENNIS D. SMITH, JR.

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

MICHAEL R. FASANO
JERIAHMI L. L. TINSLEY

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

EMILY J. BINGHAM
WILLIAM M. CORLEY
DANIELLE L. GARFIELD
RICHARD J. MORRISSEY
SARAH C. M. PETTIT
ALICIA M. SALERNO
NICOLE A. SERRANO
THOMAS H. WRIGHT

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JEREMIAH P. ANDERSON
JERMAINE A. BAILEY
JOHN R. CRUMPACKER
JASON W. DOWNS
RICHARD L. DULDULAO
WILLIAM A. GIBSON
RAYMOND J. KILWAY II
SUNNY G. LAU
NICHOLAS A. MANZINI
MICHAEL P. MCCORMICK
ADAM J. MILLS
THOMAS B. PILKERTON
MICHAEL A. SAMMATARO
JUSTIN K. STEPANCHICK
CHRISTOPHER A. TILLEY
GILBERTO P. VIERA III
JAMES W. WALDREP
JOHNATHAN C. WALKER
JEFFREY K. WHITE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

BRIEN J. CROTEAU
KATHLEEN B. GILES
ISAAC R. STUTTS
LI SUNG
BRENT F. WEST

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

IAN P. ADAMS
TRAVIS S. AMERINE
ROBERT W. ANDERSON IV
GIEORAG M. ANDREWS
KEVIN C. ANTONUCCI
AARON S. ARKY
KATHLEEN R. BALL
JOHN G. BARRY
CHAD D. BARTKUS
DAVID R. BEAM
CLAYTON C. BEAS
KEVIN A. BEATLEY
MATTHEW A. BECKER
JOHN A. BENDA
DANIEL J. BERRY
MASON W. BERRY
RICHARD BETANCOURT
JESSICA F. BETZ
TIMOTHY W. BIERBACH
ZACHARY A. BITTNER
CHRISTOPHER H. BLAND
PHILLIP E. BOICE
TODD C. BOWERS
MATTHEW D. BOYCE
DOUGLAS A. BRAYTON
WALTER R. BRINKLEY, JR.
MATTHEW P. BROUILLARD
AMANDA G. BROWNING
VALERIE K. BROZNAK
ADAM L. BRYAN
GRANT T. BRYAN
JOSEPH BUBULKA
GABRIEL D. BURGI
KYLE F. CALTON
RENE R. CANO, JR.
BENJAMIN R. CANTU
WILLIAM J. CARROLL
MATTHEW E. CHANG
NATHANIEL J. CHASE
MICHAEL R. CHESNUT
SCOTT F. CHIROWIN
CLINTON J. CHRISTOFK
RONNIE P. CITUK
CHRISTOPHER W. CLEVENGER
JASON E. COATES
ADAM COHEN

MATTHEW D. COLLINSWORTH
RANDY S. CONANT
JASON A. CONLEY
ERIN N. CONNOR
ANDREW S. COUNTISS
KELLY N. CRAFT
CALEB T. CRAMER
COLLIER C. CROUCH
ANDREW C. CROUSE
JEREMIAH M. DALEY
MATTHEW J. DATTOLI
CHRISTOPHER M. DESCOVICH
DUSTIN W. DETRICK
THOMAS E. DIGAN, JR.
EMIL D. DINNOCENZO
THOMAS T. DIXON
MATTHEW S. DOMINICK
JAMES J. DONCHEZ
SEAN R. DOUGHERTY
RYAN R. DOWNING
LUCAS R. EDWARDS
DONALD W. EMERSON
RONALD C. FAIRBANKS
BILLIE J. FARRELL
MICHAEL R. FELBER
RANDALL L. FIELDS, JR.
LEE R. FIKE
PETER C. FLYNN
MARSHALL H. FOARD
WARREN H. FOGLER
ALEXANDER J. FRANZ
MICHAEL L. FRISBY II
THOMAS D. FUTCH
BRYAN M. GALLANT
JEREMY D. GARCIA
ROWDY A. GARCIA
JASON M. GARFIELD
KENT A. GEBICKE
JOHN M. GLEASON
DEREK M. GOEBEL
JOSHUA P. GOODIN
NICHOLAS M. GREEN
JUSTIN R. GROVER
GREGORY A. GRUBBS
ERIK H. GUSTAFSON
DOUGLASS G. HAGENBUCH
STEVEN A. HALLE
JOSEPH S. HAMILTON
BRANDON C. HARDIN
JUSTIN H. HARDY
KEVIN M. HARRINGTON
KARL HASSENFRATZ
CHRISTOPHER S. HATHAWAY
CONOR L. HEELY
KYLE R. HICKMAN
JAMES M. HIGGINS, JR.
JUSTIN J. HOFF
JASON E. HOLBROOK
JOHN E. HOLTHAUS
JAMES D. HOSTETLER
JOHN J. HOY
MICHAEL J. HUBER
ISAIABENETTE E. INFANTE
ROBERT B. INMAN
BRIAN M. IRISH
JAMES J. IRRGANG, JR.
MATTHEW J. IWANCZUK
ALLEN W. JACOB
CARL D. JAPPERT
BRETT J. JASIONOWSKI
KEITH A. JOHNSON
LAUREN M. JOHNSON
JOSEPH T. KARAFFA
ROBERT E. KELLER
LUKE E. KELVINGTON
JAMES H. KEPPER IV
SAMEER KHANNA
LEANDRA N. KISSINGER
REED A. KITCHEN
RYAN J. KLAMPER
ERIC J. KNEPPER
DUSTIN T. KRAEMER
DOMINIC J. KRAMER
ANDREW L. LAIDLER
KYLE P. LAMBERT
STEPHEN V. LAMOURE
ANDREW A. LAMSON
CLIFTON G. LENNON
RANDALL J. LESLIE
SCOTT D. LIPPINCOTT
YILEI LIU
CARNE M. LIVINGSTON
ALFRED W. LONG, JR.
ROBERT A. LOW
RALPH P. LUFKIN
KATIE J. LUNSER
KERRY M. MAJOR
LUDWIG MANN III
JORDAN A. MAYO
KEVIN K. MCCLELLAN
JOHN P. MCCRAY
KYLE S. MCVAY
WILLIAM T. MIANTE
ADAM S. MILLER
MICHAEL J. MILLER
SAMUEL C. MILLS
DAXTON H. MOORE
JAMES J. MOORE
MICHELLE D. MORGAN
BRIAN M. MOWRY
GWENDOLYN H. MURPHY
BRAD W. MUSKOPF
JUSTIN M. NEFF
JONATHAN P. NELSON
JUSTIN A. NIXON
DAVID R. OWENS
KENNETH C. PACKARD

GARRETT T. PANKOW
JOSHUA D. PETERS
CAROLYN K. PETERSON
RYAN D. PIERCE
NICHOLAS R. PINKSTON
ANDREW W. PITTMAN
ANTHONY M. PIUNNO III
JOSEPH P. PRESTON
JOHN E. PRITCHETT
NICHOLAS R. QUIHUIS
JEFFREY W. RANSOM
RICHARD S. RAY
JOSEPH F. REARDON
ETHAN A. REBER
JAMES M. REEVES
JUSTIN D. REEVES
JOHN L. REID
ERIK S. REYNOLDS
BRIAN M. RHOADES
MICHAEL P. RILEY
NICHOLAS A. ROA
TAD J. ROBBINS
JEFFREY R. ROBERTS, JR.
THOMAS M. ROBERTS
CHRISTOPHER W. ROSE
BRIAN A. ROSS
THADDEUS RUSINEK
SETH D. SAALFELD
BLADE A. SCHALLENBERGER
ZACHARY F. SCHERTZ
DAVID M. SCHERR
JOSEPH R. SCHIPPERT
JONATHAN P. SCOBO
VANCE D. SCOTT
ADAM A. SHAPIRO
MATTHEW S. SHAW
JOHNATHAN E. SHEATER
ANTONIA K. SHEY
NATHANIEL R. SHUCK
MICHAEL J. SIEDSMA
RICHARD W. SKINNELL
RICHARD D. SLYE
JAMES L. SMITH
JOHANNES SMITH
JUSTIN B. SMITH
JOSEPH P. SNELGROVE
PABINA SOMNHOT
DIRK C. SONNENBERG
JOSHUA C. STARR
JAMES A. STEELE
ADAM M. STEIN
STEVEN L. STEINMETZ
EMILY C. STELLPFLUG
WILLIAM C. STEWART
MARK P. STINES
JEFFREY C. STORER
NICHOLAS J. SYLVESTER
DALE T. TELLA
DAVID R. TERRY
KRISTOFER A. TESTER
ANDREW M. THOM
JARED B. THOMAS
JOSHUA H. TILEY
NEIL J. TOOHEY, JR.
DALE E. TOURTELOTTE
TODD M. TRAGO
ARTURO TREJO
MICHAEL Q. TREMEL
BRIAN TRUONG
TERRY L. TURNER II
GREGORY M. VALDEZ
JAMIE E. VANDYKE
CHRISTOPHER W. VANLOENEN
JOSLYN M. VENEY
FRANK P. VERDUCCI III
DAVID J. VITOLLO
SHAWN M. VRABEL
CHAD C. WALKER
DESMOND K. WALKER
ADAM P. WALTERS
ROBERT W. WARD
GEORGE B. WATKINS
JAMES N. WATTS
SCOTT E. WELLES
ELIOT A. WESTON
VES W. WHITTEMORE
STEPHEN V. WILLIAMS
MATTHEW W. WOLF
DAVID J. WRISLEY
KARI E. YAKUBISIN
CRISTOBAL YERA
CHRISTOPHER P. YOST
TIMOTHY C. YUHAS
KENNETH W. ZILKA
GEORGE S. ZINTAK

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES NAVY
UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JAMES G. ANGERMAN
JAMES J. AUGER
THOMAS J. DILL
EDWARD A. FOSSON
DENNIS LA
ROBERT W. LEFTWICH
MICHAEL J. MCMANUS
WILLIAM E. MOILES
RACHAEL M. MUSSER
ROBERT L. OLSON
STEVEN H. PARKS
FEDERICO PEREZROMERO
JEREMY R. POTTS
TYLER R. SCHARAR
RILEY W. SMITH
ROBERT M. SYRE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES NAVY
UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

AARON E. KLEINMAN
KYU C. LEE
PHILIP N. PARK
JEFFREY J. ROSS
DAVID S. SCHLEUSENER
STEVEN E. STOUGARD

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES NAVY
UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

LAMONT A. BROWN
CHRISTOPHER S. BURT
CURTISS BUTLER
MICHAEL J. COLLINS
JOSEPH M. COZART
MATTHEW E. DUNCAN
ANDRE L. FIELDS
MELISSA S. FLYNN
MELISSA A. GONZALES
MARK A. GUNTER
ADAM L. HAMILTON
JOSHUA R. HARDING
MICHAEL C. HOCKETT, JR.
MICHAEL D. LABBE
RAYMOND J. LANCLOS III
QUENTIN E. LEASE
JAMES R. MARSH
SCOTT M. MCCARTHY
MATTHEW L. MILLER
ARTHUR C. NELSONWILLIAMS
JACOB M. PRENTISS
MATTHEW B. REED
JAN D. SCHOTMAN
FREDERICK M. STAINES
RYAN R. STICKEL
BRENT L. SUMMERS

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES NAVY
UNDER TITLE 10, U.S.C., SECTION 624:

COLLEEN L. ABUZEID
SHEILA I. ALMENDRASFLAHERTY
ERICA L. ARNOLD
MARTIN L. BOESE
GABRIELLE A. CRANE
RONALD G. DEWEES
LORELIE D. FLINN
SARAH E. GENTRY
ANGELA M. JORDAN
KATHERINE M. KIDDE
JACQUELINE LOPEZ
SCOTT M. MACDONALD
THOMAS O. MATELLA, JR.
REGINALD MIDDLEBROOKS
JEFFREY A. MILES
SUSAN L. MOLINA
RACHEL E. NEWNAM
PETER I. NYILAS
JESSICA M. ORZECHOWSKI
HARLEY R. RAGLE III
APRIL L. REAVES
GINA D. ROMANO
TERI R. RYALS
AMANDA E. SCHAFFELD
JULIE M. SLAUGH
BETTINA A. SOLWAZI
CATHERINE C. SOTERAS
HANNAH C. STARNES
SARAH J. T. TALLENT
AMY B. TOMAINO
TONY TORRES
CHRISTOPHER R. WEISS
ELIZABETH M. ZULOAGA

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT
IN THE GRADE INDICATED IN THE NAVY RESERVE
UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

JUSTIN J. DEGRADO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES NAVY
UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

NAIMI AMIRAL
RICHARD J. COLLOT
DUSTIN D. DINOLA
STEPHANIE C. LASTINGER
CHESTER LEE III
KIMBERLY T. MANUEL
DANIEL M. MARZLUFF
JONATHAN I. NORRIS
SAINATH P. PANJETI
DANIEL C. ROLNICK
TONJA W. ROSS
CHRISTOPHER L. WALLACE
MICHAEL A. WHITE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE UNITED STATES NAVY
UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ARLO K. ABRAHAMSON
TIMOTHY A. HAWKINS
RICHLYN C. IVEY

CONGRESSIONAL RECORD — SENATE *May 22, 2025*

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JAMES C. BAILEY
CHARLES L. FISHER, JR.
GAVIN D. GUIDRY
DANIEL J. HUTTON
JAMES M. LANDRY
ALEJANDRO PALOMINO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

DANIEL J. BELLINGHAUSEN
BARRY F. CARMODY, JR.
AMY M. GABRIEL
TRAVIS J. HARTMAN
BRYANNA H. HERRING
DEVIN M. HOLMES
JACOB E. KING
MICHAEL C. MABREY
TRAVIS J. REAM
JAMIE H. ROGERS
RICHARD M. ULLOA
JASON C. VINING
JAMES F. WRIGHTSON, JR.
ERIC ZILBERMAN

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

MICHAEL J. BONACORSA
LAJUANA BUHMANN
ANDREW C. DAVIS
DANIEL R. FLEMMING
WILLIAM B. FOX
WILLIAM L. GRENOBLE V
DANIEL A. HOLLENDONER
FRANK C. KOVACS
ANDREW T. MICHALOWICZ
CHRISTOPHER M. MICHALSKI
MATTHEW D. MYERS
AMANDA R. RICHARDS
JEFFREY M. ROARK
JUSTIN L. SCARBROUGH
JUSTIN M. SPRAGUE
KHALIA S. WARNERBUTLER
JACOB E. WILSON

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

CHRISTIAN G. ACORD
JOHN R. BELCHER
SEAN S. BROWN
JEFFREY T. COVINGTON
KEVIN D. CUMMINGS
JEREMY J. HULS
CAMERON J. MACKLEY
EHAB MAKHLOUF
CRAIG T. MCLEMORE
NICHOLAS A. MIDZAK
ROBERT R. PINCKNEY, JR.
CHRISTOPHER J. WASEK

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

AARON N. AARON
ANDREW R. BELDING
KENNETH W. BROOKS
JOSEPH E. CANTU, JR.
ELIAS J. GEORGE
COLLEEN P. HANDBURY
JOSEPH J. KRUPPA
MICHAEL N. PERKINS II

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

KRISTINE N. BENCH
DOMINIC F. DIMAGGIO
MARK A. HEBERT
JAMES A. SCIANNA
CHRISTOPHER K. TUGGLE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

KURT E. DAVIS
ERVIN L. HENLEY
JASON A. RINTO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ANDREW J. ADAMS
PETER B. MANZOLI

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JAIME I. ROMAN

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

MATTHEW L. SEVIER

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ASHLEY S. M. MCABEE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JEREMY D. BARTOWITZ

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

BRENNA L. SCHNARS

THE FOLLOWING NAMED OFFICER FOR TEMPORARY APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 605:

*To be captain*

STEVEN A. HALLE

IN THE SPACE FORCE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES SPACE FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be lieutenant colonel*

KRISTEN M. BARRA

IN THE COAST GUARD

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT IN THE UNITED STATES COAST GUARD TO THE GRADE INDICATED UNDER TITLE 14, U.S.C., SECTION 2130(A):

*To be captain*

JOHN C. ADAMS
JAMES E. FOTHERGILL
ALAN K. ROSENBERG
JUDSON B. WHEELER

## CONFIRMATIONS

Executive nominations confirmed by the Senate May 22, 2025:

### IN THE AIR FORCE

AIR FORCE NOMINATIONS BEGINNING WITH JOSEPH L. ABRAMS AND ENDING WITH JOSEPH M. YABES, JR., WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.

AIR FORCE NOMINATIONS BEGINNING WITH MARGARET E. ABBOTT AND ENDING WITH RACHAEL L. VOIGT, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.

AIR FORCE NOMINATIONS BEGINNING WITH AMARA B. ADAMS AND ENDING WITH ROBERT D. YOUNG, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

### IN THE ARMY

ARMY NOMINATIONS BEGINNING WITH MATTHEW D. BRANDT AND ENDING WITH DEJENE G. KASSAYE, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.

ARMY NOMINATION OF MISSY L. MCNEILL, TO BE MAJOR.

ARMY NOMINATIONS BEGINNING WITH DOMANIQUE M. ABNER AND ENDING WITH 0000259937, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

ARMY NOMINATIONS BEGINNING WITH EDWIN A. ABRAZADO AND ENDING WITH 0003102153, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

ARMY NOMINATIONS BEGINNING WITH JESSICA S. ABBOTT AND ENDING WITH 0003390902, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

ARMY NOMINATIONS BEGINNING WITH ROSS O. ANDERSON AND ENDING WITH 0002422513, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

### IN THE MARINE CORPS

MARINE CORPS NOMINATIONS BEGINNING WITH NATHAN C. HESS AND ENDING WITH CHRISTOPHER S. LAMBERT, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON MARCH 14, 2025.

MARINE CORPS NOMINATION OF EDWARD R. ROGERS II, TO BE LIEUTENANT COLONEL.

### IN THE NAVY

NAVY NOMINATION OF WENDELL C. ELDRIDGE, TO BE LIEUTENANT COMMANDER.

NAVY NOMINATION OF ERIC M. BEALL, TO BE COMMANDER.

NAVY NOMINATION OF ALEXANDRA K. HOLLAND, TO BE LIEUTENANT COMMANDER .

NAVY NOMINATIONS BEGINNING WITH ISABEL M. BERNAL AND ENDING WITH JOHN J. W. YUN, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON MAY 12, 2025.

### IN THE SPACE FORCE

SPACE FORCE NOMINATION OF ZACHARY R. EAGLE, TO BE LIEUTENANT COLONEL.

### IN THE COAST GUARD

COAST GUARD NOMINATIONS BEGINNING WITH JOSHUA S. ALLEMAN AND ENDING WITH MATTHEW G. ZAVALIJ, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.

COAST GUARD NOMINATIONS BEGINNING WITH JASON B. VEARA AND ENDING WITH TARA E. LARKIN, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.